Richard G. Himelrick, #004738
J. James Christian, #023614
**Tiffany & Bosco, P.A.**
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

Attorneys for Plaintiffs Facciola and Reznik

Andrew S. Friedman, #005425
**Bonnett, Fairbourn, Friedman
  & Balint, P.C.**
2901 N. Central Avenue
Suite 1000
Phoenix, AZ  85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com

Attorneys for Plaintiffs Hagel and Baker

# United States District Court

## District of Arizona

| | |
|---|---|
| ROBERT FACCIOLA; THE ROBERT MAURICE FACCIOLA TRUST DATED DECEMBER 2, 1994; HONEYLOU C. REZNIK; THE MORRIS REZNIK AND HONEYLOU C. REZNIK TRUST; JEWEL BOX LOAN COMPANY, INC.; JEWEL BOX, INC.; H-M INVESTMENTS, LLC; FRED C. HAGEL AND JACQUELINE M. HAGEL REVOCABLE LIVING TRUST DATED MARCH 15, 1995; JUDITH A. BAKER; individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>  vs.<br><br>GREENBERG TRAURIG, LLP, a New York limited liability partnership; QUARLES & BRADY, LLP, a Wisconsin limited liability partnership; CBIZ, INC., a Delaware corporation; CBIZ MHM, LLC, a Delaware limited liability company; MAYER HOFFMAN MCCANN, P.C., | No.<br><br>**Complaint**<br><br><br>**Jury Trial Demanded** |

a Missouri professional corporation; MICHAEL
M. DENNING and DONNA J. DENNING,
husband and wife; TODD S. BROWN and
CYNTHIA D. BROWN, husband and wife;
CHRISTOPHER J. OLSON and RACHEL L.
SCHWARTZ-OLSON, husband and wife;
JEFFREY A. NEWMAN and KATHLEEN N.
NEWMAN, husband and wife; TOM HIRSCH
(AKA TOMAS N. HIRSCH) and DIANE ROSE
HIRSCH, husband and wife; HOWARD EVAN
WALDER and BERTA FRIEDMAN WALDER
(AKA BUNNY WALDER), husband and wife;
HARISH PANNALAL SHAH and MADHAVI H.
SHAH, husband and wife;

Defendants.

## Table of Contents

I.      Introduction ........................................................................................................ 1

II.     Jurisdiction and Parties .................................................................................... 8

        A.      Jurisdiction ........................................................................................... 8

        B.      Venue ..................................................................................................... 8

        C.      Plaintiffs ............................................................................................... 9

        D.      Defendants ........................................................................................... 10

                1.      The Lawyer Defendants ...................................................... 10

                2.      The Auditor Defendants ...................................................... 10

                3.      Senior Management Defendants ........................................ 10

III.    The Plaintiff Classes ....................................................................................... 12

IV.     Factual Allegations ......................................................................................... 14

        A.      The Scheme ......................................................................................... 14

                1.      In September 2005, Mortgages Ltd. and Radical Bunny began
                        to joint venture as a common enterprise ........................... 14

2.   Mortgages Ltd. and Radical Bunny operated a Ponzi scheme through a series of integrated securities offerings .......................... 18

3.   The ML-RB Joint Venture issued a continuous stream of false and misleading securities offerings ................................................ 21

   a.   Mortgages Ltd.'s offering documents ................................. 21

   b.   Radical Bunny's offering documents .................................. 24

4.   Mortgages Ltd. and Radical Bunny failed to disclose that their operations and existence were dependent on illegally issued securities ................................................................. 27

5.   Mortgages Ltd. and Radical Bunny misrepresented the secured status of the Radical Bunny indebtedness ........................ 28

6.   Mortgages Ltd. and Radical Bunny continued to mislead investors as Mortgages Ltd. slid into ever deepening insolvency ............................................................................... 30

7.   In mid-2007, Mortgages Ltd.'s lack of liquidity forced it to halt new loan originations ................................................ 33

8.   In 2008, the Ponzi scheme collapsed ........................................ 35

9.   Regulatory investigation followed the collapse ........................... 36

B.   The Lawyer Defendants played an integral role in facilitating the fraudulent scheme ...................................................................... 38

   1.   "Attorneys must inform a client in a clear and direct manner when its conduct violates the law.  If the client continues the objectionable activity, the lawyer must withdraw 'if the representation will result in violation of the rules of professional conduct or other law.'" ............................................... 38

   2.   The Lawyer Defendants recognized and discussed Radical Bunny's past and ongoing securities violations ............................. 39

      a.   By December 2006, Greenberg concluded that Radical Bunny was violating the securities laws:  *"Your picture is going to be on the front page of the Arizona Republic."* ......................................................................... 40

      b.   Quarles also concluded that Radical Bunny was violating the securities laws ................................................. 43

      c.   Greenberg and Quarles continued representing Mortgages Ltd. and Radical Bunny even as the securities violations continued:  *"They put people in jail for this."* .......................................................................... 45

3.    The Lawyer Defendants violated their professional duty to disclose the ongoing securities violations and withdraw from further representation ...................................................................49

4.    "An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, . . ." ..............................................................................53

5.    The Lawyer Defendants instead induced, assisted, and participated in the fraudulent scheme and unlawful securities sales ...............................................................................................54

    a.    Greenberg's role in the fraudulent scheme and illegal securities sales ..............................................................57

        1.    Preparation of false and misleading offering documents failing to disclose ongoing securities violations ...................................................................57

        2.    Preparation of false and misleading offering documents failing to disclose Mortgage Ltd.'s deepening insolvency .................................................61

        3.    Greenberg helped Mortgages Ltd. cover-up the Company's fraud by creating a new product ............64

        4.    Greenberg helped Mortgages Ltd. cover-up the Company's fraud by advising it that disclosure on the Company's inability to meet loan commitments was not needed ..................................65

        5.    Greenberg helped Mortgages Ltd. terminate an insider who attempted to blow the whistle on the Company's fraud .............................................66

    b.    Quarles' role in the fraudulent scheme and illegal securities sales ..............................................................70

        1.    Quarles participated in the ongoing unlawful securities sales.........................................................73

        2.    Quarles also substantially assisted in Radical Bunny's attempts to rectify without disclosure the misrepresentations that investors were purchasing secured investment .................................78

        3.    Quarles withdraws after Coles' death ......................81

C.    Mayer Hoffman & McCann's Role.........................................................83

1.      Mayer Hoffman's audits were essential to Mortgages Ltd.'s
        ability to raise money from investors ............................................... 83

2.      Mayer Hoffman knew that Mortgages Ltd.'s CFO lacked the
        skills to prepare GAAP-compliant financial statements ................. 93

3.      Mortgages Ltd.'s financial statements should have been
        consolidated to include the limited-liability companies that
        Mortgages Ltd. managed ..................................................................... 94

4.      Because the financial statements were not properly
        consolidated, they misrepresented Mortgages Ltd.'s financial
        condition ................................................................................................. 95

5.      The disclosures regarding notes payable to Radical Bunny
        were materially incomplete and misleading ..................................... 96

6.      The financial statements required going-concern disclosures
        that were not made ................................................................................ 99

7.      The financial statements were materially incomplete and
        misleading regarding the Company's valuation practices and
        writedowns ........................................................................................... 102

D.      CBIZ's Role ........................................................................................ 106

E.      Tender .................................................................................................. 109

V.      Legal Claims ................................................................................................. 110

Count One (Primary Statutory Liability Under A.R.S. § 44-2003(A)) ............... 110

Count Two (Statutory Control Liability Under A.R.S. § 44-1999(B)) ............... 111

Count Three (Aiding and Abetting Statutory Securities Fraud) ......................... 113

Count Four (Aiding and Abetting Breach of Fiduciary Duties) ......................... 114

Count Five (Negligent Misrepresentation and Nondisclosure) .......................... 115

Count Six (Primary Statutory Liability Under A.R.S. § 44-3241) ..................... 118

Count Seven (Aiding and Abetting Violations of A.R.S. § 44-3241) ................. 119

Count Eight (Common-Law Secondary Liability of CBIZ Defendants) ............ 120

Demand for Relief ...................................................................................................... 120

Expert Testimony ....................................................................................................... 120

Demand for Jury Trial ................................................................................................ 121

# I.     Introduction

> *Where were these professionals . . . when these clearly improper transactions were being consummated?*
>
> *Why didn't any of them speak up or disassociate themselves from the transactions?*
>
> *Where . . . were the outside accountants and attorneys when these transactions were effectuated?*
>
> *What is difficult to understand is . . . why at least one professional would not have blown the whistle to stop the overreaching that took place in this case.*
>
> *Lincoln Savings and Loan Ass'n v. Wall*, 743 F. Supp. 901, 920 (D.D.C. 1990).

1.     This case presents a familiar saga.  A company, Mortgages Ltd., was once successful.  Its business was real-estate loans, conservatively made.  But over time, the Company's young CEO, Scott Coles, became increasingly extravagant.  There were not enough homes, luxuries, and deals to satisfy him.  Ten of millions of dollars were needed to support his lifestyle and the philanthropic image he craved.

2.     Coles abandoned the conservative underwriting practices that had served the Company well.  He did so in an effort to score ever bigger, ever riskier deals with greater profits.

3.     Coles surrounded himself with a seasoned management team, experienced lawyers, and auditors from national firms.  These managers and professionals, the Defendants in this lawsuit, saw the financial excesses that were occurring but did nothing to stop them.  Instead, they cooperated with Coles to help him raise hundreds of millions of dollars from investors.

4.     As the Company moved through 2005, its financial condition deteriorated.  It was capitalized almost entirely by debt.  Its working capital disappeared.  It had almost no equity and was leveraged to the point that debt exceeded assets by 248 to 1.  Any competent auditor reviewing the assets (nearly all real estate) that the Company held with

borrowed money would have realized that the Company was in financial trouble.

5.     By late 2005, the Company was insolvent and on the path to bankruptcy.  It was able to survive only by continuing to borrow from its investors.  New money from these investors was essential for operating expenses and to cover interest due old investors.

6.     This class action seeks recovery on behalf of these investors—more than 2,000 investors who collectively lost over $900 million when Mortgages Ltd. and its co-venturer, Radical Bunny, LLC, collapsed under the mountain of debt they created.  *See* Exhibit A (summarizing cash flow from investors).

7.     Before its collapse, Mortgages Ltd., with loan capital from Radical Bunny, operated as an Arizona-based mortgage broker that originated, sold, and serviced loans to real-estate developers.

8.     By early 2005, if not before, the Company had adopted the originate-and-sell business model used by most subprime lenders.  Under this model, the Company originated developer loans and then sold most of them to investors.  For its efforts, the Company booked income from various fees including loan origination, servicing, and processing fees.  Through the sales, the Company passed the risk of loan defaults, poor underwriting decisions, and declines in real-estate value to investors.

9.     The Company's deteriorating financial condition in late 2005 drove Coles to adopt a Ponzi approach in which an ever-expanding base of investor money was borrowed to cover operating expenses, investor interest, investor redemptions, and Coles' lifestyle.  By this time, late 2005, Coles did not have the resources to independently raise the money he needed.  For help he turned to his friend and accountant, Tom Hirsch.  Hirsch controlled a base of 900 or so investors whose money he could use to fund a revolving line of credit to supplement new money that Coles was obtaining from his own investors.

10.     Between them, Coles and Hirsch formed a business alliance to enrich themselves and perpetuate Mortgages Ltd.'s operations.  Together they raised hundreds of millions of dollars from investors.  But Coles and Hirsch (as well as the auditors and attorneys who prepared the offering documents and audited financial statements needed to raise the money) did not tell the investors that Mortgages Ltd. was insolvent.  They did not tell investors that the Company was financially underwater, able to pay interest, meet redemptions, and cover expenses only by selling new securities to its own investors and borrowing nearly $200 million more through Hirsch's company (Radical Bunny), which was illegally operating as an unlicensed securities dealer for Mortgages Ltd.

11.     No investor had any idea that Mortgages Ltd. and Radical Bunny were operating a Ponzi scheme.  But because Mortgages Ltd. never made principal payments on its Radical Bunny loans, that is exactly what resulted.  Radical Bunny had to continually raise new money to meet redemption requests from old investors.  Radical Bunny raised the redemption money and more without disclosing that the money from new investors funded redemptions by old Radical Bunny investors.  Worse yet, Radical Bunny and its managers—including Hirsch and "Bunny" Walder— uniformly misled their investors by falsely assuring them that their investments were secured by Mortgages Ltd.'s assets.  Or, as Mortgages Ltd.'s auditors misdescribed it in the Company's financial statements, that Radical Bunny's loans were "collateralized by the assets of the Company."  In truth, there was no security or collateral:  the loans were utterly unsecured.

12.     The Ponzi scheme was needed because Mortgages Ltd. was insolvent.  As the burden of paying interest to its own investors and Radical Bunny increased, senior management began to concentrate Mortgages Ltd.'s portfolio in fewer and fewer high-risk loans.  In late 2006, and the first quarter of 2007, Mortgages Ltd. made five mammoth loan commitments that collectively exceeded $600 million.  Soon afterwards,

60% of the money managed in the Company's mortgage pools was concentrated in just four of these loans.

13.     By May 2007, the burden of funding these and other loan commitments surpassed the Company's fundraising efforts.  New money from Radical Bunny and the Company's own investors was not enough to sustain the Company's business.

14.     By mid-2007, the Company's core business—loan originations—had ceased all together.  The liquidity needed for new loans did not exist.  But even with its legitimate business at an end, the Company, in league with Radical Bunny, continued raising money from new and existing investors under false pretenses—without disclosing Mortgages Ltd.'s insolvency or Radical Bunny's misrepresentations about the collateral for the 900 Hirsch investors' loan participations.

15.     By June 2008, when the Company was forced into bankruptcy, loans from Radical Bunny totaled $197 million and the unpaid principal due Mortgages Ltd.'s own investors totaled another $700 million.  *See* Exhibit A.

16.     Mortgages Ltd. and Radical Bunny could not have perpetrated and concealed a fraud so massive without the complicity of lawyers and accountants.  These professionals provided a facade of legitimacy to the scheme.  As the scheme unfolded, Mortgages Ltd. was represented by Greenberg Traurig, a national law firm with offices in Phoenix.  Radical Bunny was represented by Quarles & Brady, another national law firm with offices in Phoenix.  And Mortgages Ltd.'s financial statements were audited by Mayer, Hoffman & McCann, P.C., a national accounting firm controlled by CBIZ, Inc., a publicly traded professional-services firm.  These professionals actively assisted and ultimately participated in the scheme that Mortgages Ltd. and Radical Bunny co-ventured.

17.     Shortly after it was retained in April 2006, the Greenberg firm began preparing private-offering memorandums (POMs) for its new client.  Robert Kant, a

1    Greenberg Traurig partner, drafted these POMs.  During the next two years, Kant

2    prepared 11 POMs for Mortgages Ltd.   None of the POMs disclosed that Mortgages Ltd.

3    was insolvent.  None of them disclosed that the Company's existence depended on capital

4    raised by Radical Bunny.  Nor did the POMs disclose that Radical Bunny was selling

5    unregistered securities in violation of Arizona and federal securities laws.  Nor did the

6    POMs reveal that Radical Bunny was falsely representing to its investors that Radical

7    Bunny's loans were secured when, in fact, they were not.  Quite the contrary; the POMs

8    included audited financial statements that falsely represented that Radical Bunny's loans

9    were "collateralized by the assets of the Company."

10          18.     From at least December 2006, Kant was fully aware that Mortgages Ltd.

11   was being funded with proceeds collected from Radical Bunny's illegal securities sales.

12   The illegality of this fundraising was so apparent to Kant that he told Coles and Hirsch

13   (during a meeting with lawyers from the Quarles & Brady firm) that "people go to jail"

14   for such misconduct.  By May 2007, Kant knew (and had discussed with attorneys from

15   Quarles & Brady) that Radical Bunny was falsely representing to investors that its loans

16   to Mortgages Ltd. were secured.  Even so, Kant chose not to disclose these facts in the

17   POMs.

18          19.     Kant's concerns about the illegal securities sales were so great that he

19   admonished the Radical Bunny managers in late 2006 to obtain securities counsel, so that

20   their pictures would not wind up "on the front page of the Arizona Republic."  Radical

21   Bunny then hired Quarles & Brady in early 2007.

22          20.     The Quarles attorneys also quickly concluded that Radical Bunny was

23   violating both Arizona and federal securities laws and that it was falsely representing to

24   investors that its loans to Mortgages Ltd. were secured.  The Quarles partner in charge of

25   securities compliance issues even questioned in a file note whether Mortgages Ltd.'s

26   relationship with Radical Bunny had "a Ponzi scheme feel" to it.  He recognized from the

1   outset (March 2007) that this was a "serious concern."

2        21.    In early May 2007, Quarles told Radical Bunny's managers that Radical

3   Bunny's fundraising activities violated the securities laws and that Radical Bunny was

4   illegally operating as an unregistered securities dealer.   The Quarles lawyers later would

5   claim in SEC testimony that they told Radical Bunny's managers that they had to stop

6   selling the securities and that they needed to contact the SEC and the Arizona securities

7   regulators to admit that they had violated the securities laws.   One of the Quarles partners

8   suggested telling the regulators that the securities violations happened because the

9   managers were "dumb."   He offered to refer Hirsch and his partners to a criminal lawyer.

10        22.    In response, Hirsch told the Quarles lawyers that he did not want to talk to

11   the regulators.  He did not want to disclose Radical Bunny's past securities violations.

12   "[W]e don't want to deal with the past," Hirsch told the Quarles lawyers.  "[W]hat's past

13   is done," he said.  We just "want to be compliant going forward."

14        23.    The Quarles law firm, like the Greenberg law firm, turned a blind eye to

15   Radical Bunny's refusal to disclose its past securities violations to new investors.  Indeed,

16   two of the senior Quarles lawyers (Robert Moya and Robert Bornhoft) attended the

17   meeting in which Kant acknowledged that "people go to jail" for the sort of illegal

18   conduct that was being perpetrated by Radical Bunny.  Even though both law firms knew

19   that Radical Bunny was continuing to sell unregistered securities in violation of criminal

20   laws (and that Mortgages Ltd. and Radical Bunny were both continuing to sell securities

21   through deceptive offering documents), the lawyers did not disassociate themselves from

22   the illegal activities.  Instead, the lawyers continued to actively assist the two companies

23   by preparing legal documents and providing advice that facilitated new securities sales

24   that were just as illegal as those that had occurred previously.

25        24.    Mayer Hoffman, the outside auditor for Mortgages Ltd., also actively

26   assisted and participated in the scheme.  Mayer Hoffman issued three clean audits during

1    the period from 2005 through 2007, when Radical Bunny loaned $197 million to

2    Mortgages Ltd.  The 2006 and 2007 audit reports, as well as a restated 2005 audit,

3    included financial statements that falsely represented that Radical Bunny's notes were

4    collateralized by Mortgages Ltd.'s assets—a misrepresentation that helped persuade

5    Radical Bunny's managers to continue raising loan money for Mortgages Ltd.  Moreover,

6    contrary to Generally Accepted Accounting Principles (GAAP), the financial statements

7    did not disclose the contingent liability that existed because of the potential criminal,

8    regulatory, and civil litigation associated with this misrepresentation.  Instead, the audit

9    reports for all three years—2005, 2006, and 2007—falsely stated that the financial

10   statements were presented in conformity with GAAP in all material respects.

11          25.    Worse yet, none of the audit reports for 2005, 2006, or 2007 included a

12   going-concern qualification or disclosure.  Even the 2007 audit report, which was issued

13   after Mortgages Ltd.'s loan-origination business had long ended, failed to include a

14   going-concern disclosure.  And that report was issued despite information from

15   Mortgages Ltd.'s CFO, Defendant Olson, explaining that—

16          •      The Company's core business had ended.

17          •      Because of liquidity issues, the Company had ended its profit-
                   sharing plan and had ceased honoring investor-redemption requests.
18
19          •      The Company was experiencing delays in meeting its loan
                   commitments, which exceeded $130 million for 2008.

20          26.    Three months after the 2007 audit was released, Mortgages Ltd. was forced

21   into bankruptcy by two of the developers to whom large construction loans had been

22   made.  Radical Bunny's bankruptcy followed later that year.  By the time Mortgages Ltd.

23   filed bankruptcy, it owed nearly $1 billion, most of which was debt to investors like

24   Plaintiffs and members of the classes on whose behalf this action is brought.

25          27.    Mortgages Ltd.'s financial collapse prompted regulatory investigations of

26   both the Company and Radical Bunny.  The investigations were headed by the Arizona

Department of Financial Institutions, the Securities and Exchange Commission, and the Arizona Corporation Commission's Securities Division.  In 2009, formal findings by the Arizona Department of Financial Institutions exposed Mayer Hoffman's audit failures. In that same year, Radical Bunny and Mortgages Ltd.'s securities violations were revealed in enforcement actions filed by the SEC and Arizona's Securities Division.

28.     The enforcement actions were based upon a joint investigation in which hundreds of thousands of documents were reviewed and sworn testimony from more than 30 witnesses was taken.

29.     This year (2010), the Arizona Corporation Commission concluded that Radical Bunny "violated A.R.S. § 44-1991 by (a) employing a device, scheme, or artifice to defraud, (b) making untrue statements or misleading omissions of material facts, or (c) engaging in transactions, practices, or courses of business that operate or would operate as a fraud or deceit."

30.     Earlier in the year (January 2010), the SEC issued findings that documented federal securities-fraud violations under Rule 10b-5 by Radical Bunny, Mortgages Ltd., and the subsidiary through which Mortgages Ltd. sold its securities.

## II.     Jurisdiction and Parties

### A.     Jurisdiction

31.     The Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the action is a class action filed under Rule 23 of the Federal Rules of Civil Procedure in which (a) the matter in controversy in the aggregate exceeds the sum or value of $5,000,000, exclusive of interest and costs, (b) at least one Plaintiff or member of the class and at least one Defendant are citizens of different States, and (c) the number of members of the proposed class is in excess of 100.

### B.     Venue

32.     Venue in this Court is proper under 28 U.S.C. § 1391(a).

C.      **Plaintiffs**

33.      Plaintiff Robert Facciola is a single man who is a resident, domiciliary, and citizen of California.  Attached as Exhibit B is a schedule showing investments in Mortgage Ltd.'s securities related to Mr. Facciola.  These investments were made through The Robert Facciola IRA #3333 and The Robert Maurice Facciola Trust dated December 2, 1994.  Mr. Facciola is the trustee of this trust.  Collectively, these Plaintiffs are referred to as "Facciola."

34.      Plaintiff Honeylou C. Reznik is a resident, domiciliary, and citizen of Arizona.  Her husband recently passed away.  Attached as Exhibit C is a schedule showing investments made in Mortgages Ltd.'s securities related to Mrs. Reznik.  These investments were made through the Honeylou Reznik IRA, The Morris Reznik and Honeylou C. Reznik Trust, Jewel Box Loan Company, Inc., Jewel Box, Inc., and H-M Investments, LLC.  Mrs. Reznik is the trustee of The Morris Reznik and Honeylou C. Reznik Trust; the President of Jewel Box Loan Company, Inc. and Jewel Box, Inc.; and the manager of H-M Investments, LLC.  Collectively, these Plaintiffs are referred to as "Reznik."

35.      Fred C. Hagel is a resident, domiciliary, and citizen of Montana and is a trustee of The Fred C. Hagel and Jacqueline M. Hagel Revocable Living Trust dated March 15, 1995 ("the Hagel Family Trust"), an Arizona revocable trust.  Attached as Exhibit D is a schedule showing the Hagel Family Trust's investments in Mortgages Ltd.'s securities made through Radical Bunny.  Collectively, these Plaintiffs are referred to as "Hagel."

36.      Plaintiff Judith A. Baker is a resident, domiciliary, and citizen of Arizona.  Attached as Exhibit E is a schedule showing the investments in Mortgages Ltd.'s securities made through Radical Bunny related to Mrs. Baker; these investments were made by Judy Baker, directly and through her IRA accounts.  This Plaintiff is referred to

1   as "Baker."

2   **D.   Defendants**

3   **1.   The Lawyer Defendants.**

4   37.   Defendant Greenberg Traurig, LLP is a New York limited liability

5   partnership, with members domiciled in numerous states other than Arizona, that does

6   business in Arizona.

7   38.   Defendant Quarles & Brady, LLP is a Wisconsin limited liability

8   partnership, with members domiciled in numerous states other than Arizona, that does

9   business in Arizona.

10   **2.   The Auditor Defendants.**

11   39.   Defendant CBIZ, Inc. is a Delaware corporation, with its principal place of

12   business in Ohio, that does business in Arizona.

13   40.   Defendant CBIZ MHM, LLC (formerly named CBIZ Accounting, Tax &

14   Advisory Services, LLC) is a Delaware limited liability company, with members

15   domiciled in numerous states other than Arizona, that does business in Arizona.

16   41.   Defendant Mayer Hoffman McCann, P.C. is a Missouri professional

17   corporation, with its principal place of business in Ohio, that does business in Arizona.

18   **3.   Senior Management Defendants.**

19   42.   Defendant Michael M. Denning and Donna J. Denning are husband and

20   wife who are domiciled and reside in Maricopa County, Arizona.  The conduct described

21   in this Complaint was undertaken by Mr. Denning on behalf of his marital community

22   comprised of him and his wife, Donna J. Denning.  Mr. Denning was president of

23   Mortgages Ltd. from early 2006 to January 2008.  Before that he was the president of

24   Mortgages Ltd. Securities, LLC, a subsidiary through which Mortgages Ltd. brokered its

25   products.

26   43.   Defendant Todd S. Brown and Cynthia D. Brown are husband and wife

who are domiciled and reside in Maricopa County, Arizona.  The conduct described in this Complaint was undertaken by Mr. Brown on behalf of his marital community comprised of him and his wife, Cynthia D. Brown.  Mr. Brown was an officer of Mortgages Ltd. from November 2006 until January 2008.  He held the position of Senior Vice President of Operations.

44.     Defendant Christopher J. Olson and Rachel L. Schwartz-Olson are husband and wife who are domiciled and reside in Maricopa County, Arizona.  The conduct described in this complaint was undertaken by Mr. Olson on behalf of his marital community comprised of him and his wife, Rachel L. Schwartz-Olson.  Mr. Olson was intermittently the CFO and Vice President of Mortgages Ltd. from late 2000 until the Company's bankruptcy.  He was also the CFO of Mortgages Ltd. Securities, LLC from about June 2003 to June 2008.

45.     Defendant Jeffrey A. Newman and Kathleen N. Newman are husband and wife who are domiciled and reside in Maricopa County, Arizona.  The conduct described in this complaint was undertaken by Mr. Newman on behalf of his marital community comprised of him and his wife, Kathleen N. Newman.  Newman was the President of Mortgages Ltd. Securities, LLC and a Vice President of Mortgages Ltd. from December 2006 through June 2007.  Robert Kant, a Greenberg attorney solicited Newman to join Mortgages Ltd.  During December 2006, Kant and Newman began discussing Mortgages Ltd.'s dependence on Radical Bunny and Radical Bunny's failure to comply with the securities laws.

46.     Defendant Tom Hirsch (aka Tomas N. Hirsch) and Diane Rose Hirsch are husband and wife who are domiciled and reside in Maricopa County, Arizona.  The conduct described in this complaint was undertaken by Mr. Hirsch on behalf of his marital community comprised of him and his wife, Diane Rose Hirsch.  Mr. Hirsch was a managing member of Radical Bunny, who has been licensed as a CPA since 1979.

1   Hirsch and his accounting firm prepared tax returns for Mortgages Ltd. including the

2   returns for 2004, 2005, and 2006 (the last return before Scott Coles' death).  Hirsch

3   served as trustee of various trusts affiliated with Scott Coles including the SML

4   Revocable Trust.  From 2005 through June 2008, Hirsch received, reviewed, and relied

5   upon as an agent of Radical Bunny investors, audited and unaudited financial statements

6   of Mortgages Ltd.

7        47.    Defendant Berta Friedman Walder (aka Bunny Walder) and Howard Evan

8   Walder are husband and wife who are domiciled and reside in Maricopa County,

9   Arizona.  The conduct described in this complaint was undertaken by Mr. and Mrs.

10  Walder on behalf of their marital community.  Mr. and Mrs. Walder were managing

11  members of Radical Bunny.  From September 2005 onward, the Walders, attended

12  weekly meetings held by Mortgages Ltd.'s management.  Since at least late 2005, Mr.

13  and Mrs. Walder received, reviewed, and relied upon as an agent of Radical Bunny

14  investors, audited and unaudited financial statements of Mortgages Ltd.

15       48.    Defendant Harish P. Shah and Madhavi H. Shah are husband and wife who

16  reside in Maricopa County.  The conduct described in this complaint was undertaken by

17  Mr. Shah on behalf of his marital community comprised of him and his wife, Madhavi H.

18  Shah.  Shah was a managing member of Radical Bunny, who has been licensed as a

19  certified public accountant since 1976.  From 2007 onward, Shah, the Walders, or both,

20  attended weekly staff meetings at Mortgages Ltd.  Since at least late 2005, Shah received,

21  reviewed, and relied upon as an agent of Radical Bunny investors, audited and unaudited

22  financial statements of Mortgages Ltd.

23  **III.    The Plaintiff Classes**

24       49.    Plaintiffs bring this action on behalf of the following investor classes

25  (sometimes referred to as the "Classes" or the "Class"):

26

- Plaintiffs Facciola and Reznik sue on behalf of all persons who purchased or held investments issued by Mortgages Ltd. (or the limited-liability companies it managed) during the period from September 1, 2005 through June 3, 2008.

- Plaintiffs Hagel and Baker sue on behalf of all persons who purchased or held investments issued by Radical Bunny, LLC during the period from September 1, 2005 through June 3, 2008.

50. Excluded from the Classes are: the Defendants and Scott Coles; members of the individual Defendants' and Coles' families; the estate of Scott Coles; any entity in which the Defendants or Scott Coles have a controlling interest or which is a parent, subsidiary or affiliate of or is or was controlled by Mortgages Ltd. or Radical Bunny, LLC; and the officers, directors, managers, employees, affiliates, agents, legal representatives, heirs, predecessors, successors, and assigns of any of the Defendants or Scott Coles.

51. The members of the Classes are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties, Class members, and the Court.

52. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect only individual members of the Classes include:

- Whether the Defendants breached fiduciary duties owed to members of the Classes or aided and abetted breaches of fiduciary duties;

- Whether the Defendants violated the Arizona Securities Act or are liable as controlling persons under the Arizona Securities Act;

- Whether Defendants participated in, induced, made or aided and abetted securities sales in connection with which material facts were omitted, misrepresented, or both;

- Whether Defendants negligently supplied false or misleading information to members of the Classes;

- Whether Defendants violated the Arizona Investment Management Act or aided and abetted violations of the Act; and

- Whether members of the Classes are entitled to recover damages and the amount of damages that members of the Classes are entitled to recover.

53.    Plaintiffs' claims are typical of those of the other members of the Classes. Plaintiffs will adequately protect the interests of the Class members.  Plaintiffs have retained separate counsel for the two Classes.  Plaintiffs' counsel are experienced in class-action securities litigation.  Plaintiffs have no interests that conflict with those of the members of the Classes.

54.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IV.    Factual Allegations

### A.    The Scheme

#### 1.    In September 2005, Mortgages Ltd. and Radical Bunny began to joint venture as a common enterprise.

55.    Mortgages Ltd. was formed in 1964 by Charles J. Coles.  As a licensed mortgage broker, it operated as a private-mortgage lender in Arizona.  Scott M. Coles (Coles), who was the son of Charles Coles, became CEO and Chairman of Mortgages Ltd. in 1997 and held those positions until his death on June 2, 2008.  Mortgages Ltd.'s sole shareholder was a trust formed by Coles.

56.     For many years the Company's business consisted of originating, selling, and servicing real-estate loans.  But by 2005, Coles had focused the Company's core business almost exclusively in making expensive (high-interest) bridge loans to real-estate developers in need of capital to start their projects.  As explained below, Mortgages Ltd. spiraled deeper and deeper into insolvency during 2005, 2006, 2007, and 2008.  The Company collapsed in bankruptcy in June 2008.

57.     Mortgages Ltd. secured the developer loans primarily with Arizona real estate, including multifamily residential projects, office buildings, and mixed-used projects.[1]

58.     The Company raised the money to fund the developer loans from private investors, selling them fractional interests called pass-throughs in the secured promissory notes signed by the developers.

59.     Hirsch, the Walders, and Shah formed Radical Bunny in 1999.  Hirsch and his team used Radical Bunny and a related company named Horizon Partners to assemble investors in various projects, including acquiring pass-through interests in the developer loans offered by Mortgages Ltd.  While operating as Horizon Partners, Hirsch's team received a fee of only 1/4 to 1/2% for their efforts.

60.     In late 2005, however, Coles proposed a new relationship under which Radical Bunny ceased direct investing in Mortgages Ltd.'s pass-through investments. Instead, Coles and Hirsch agreed to a joint venture under which Radical Bunny raised funds to loan exclusively to Mortgages Ltd. at high-interest rates.  Although neither Radical Bunny nor any of its managers was registered as a dealer or salesperson, Hirsch and Coles agreed that Hirsch and his team would keep for themselves two percentage points of the 13% paid on the principal amount of funds raised by Radical Bunny for Mortgages Ltd.

61.     The new loan program was financially advantageous to both Coles and Hirsch.  Coles wanted the new program because it eased Mortgages Ltd.'s growing liquidity problems by providing the Company with an unsecured credit line.[2]  Hirsch liked the program because Coles agreed to pay a fixed interest rate of 11% or more,

---

[1] As of June 23, 2008, the Company had outstanding loans of approximately $894 million in approximately 66 real-estate projects.

[2] As explained to the SEC by Mayer Hoffman's audit partner, the Radical Bunny note program was "almost like a revolving line of credit."

-15-

making the investment appealing to investors, while at least quadrupling Hirsch and his partners' fees from 1/2% or less to two percentage points (15.4% of the interest paid). Hirsch and his partners saw the new loan program as a way to greatly increase their personal profits.  Because the 2% was paid on all outstanding principal, Hirsch and his partners had an undisclosed financial incentive to allow Coles to roll the notes at maturity.  In this way, the principal on which the 2% was paid was continually expanding.

62.     Although the notes from Mortgages Ltd. to Radical Bunny contained maturity dates, Coles and Hirsch secretly agreed that the notes would be rolled into new notes at maturity, so that Mortgages Ltd. need never make a principal payment to Radical Bunny.

63.     Radical Bunny made the first loan of $6,010,000 to Mortgages Ltd. in September 2005. With the onset of the new program, existing investors in Radical Bunny and Horizon were either cashed out or rolled into the new direct-loan program.

64.     By the end of 2005, over a period of only a few months, Radical Bunny had raised and lent to Mortgages Ltd. $38.8 million.  The 2% interest spread on this money was kept as a fee that was divided among Hirsch, the Walders, and Shah.

65.     From at least the fourth quarter of 2005 until June 2008, Coles and Hirsch operated Mortgages Ltd. and Radical Bunny as a common enterprise and joint venture, under which Radical Bunny generated the funds that allowed Mortgages Ltd. to operate. Through the common enterprise, the two companies acted as agents of one another and shared profits made possible by the money that was raised.  For its part, Mortgages Ltd. used the borrowed money to capitalize its mortgage business.  In turn, Radical Bunny operated as an unregistered, captive dealer for Mortgages Ltd.  As a securities dealer, Radical Bunny profited on the money raised by retaining two percentage points (i.e., 2/13th) of the total interest paid by Mortgages Ltd. to Radical Bunny's investors.

1    Additional profits were received through redemption fees that Radical Bunny charged its

2    investors.

3    66.    As part of the common enterprise, Coles, on behalf of Mortgages Ltd.,

4    authorized Radical Bunny to market the loan program as participations in mortgage-

5    backed loans originated by Mortgages Ltd.  Hirsch and Coles agreed to this even though

6    the notes that Mortgages Ltd. issued to Radical Bunny did not create any direct investor

7    rights in Mortgages Ltd.'s loan participations.

8    67.    Mortgages Ltd. and Radical Bunny were united in their common enterprise

9    and joint venture.  The business terms to which the two companies agreed were atypical

10   terms that would not be accepted in a normal commercial transaction.  *See infra* ¶ 352

11   (describing atypical terms).  But abnormal terms were needed to satisfy the financial

12   needs of both Coles and Hirsch.  Coles, for example, needed an open-ended, unsecured

13   credit line.  Hirsch, in turn, wanted a stream of large loans so he had new product (new

14   loans) to sell to his 900 Radical Bunny family members and to expand the principal base

15   on which he and his partners shared 2% each month.  Mortgages Ltd. and Radical Bunny

16   shared common profits from their joint venture and each of them retained the right to

17   control the common enterprise's affairs relating to their respective roles in the joint

18   venture.

19   68.    In furtherance of the common enterprise and joint venture, Radical Bunny

20   was invited to attend and did attend numerous Mortgages Ltd. management meetings.

21   Radical Bunny's managers were also given Mortgages Ltd.'s internal management

22   reports on outstanding loans, loan commitments, and similar information.  Mortgages

23   Ltd. also shared with Radical Bunny its detailed, internal financial statements, as well as

24   its audited financial statements prepared by Mayer Hoffman.  Radical Bunny was even

25   given access to Mortgages Ltd.'s CFO for any financial information it required.

26   69.    With Mortgages Ltd.'s knowledge, and the consent of Mayer Hoffman,

-17-

1   Hirsch and the other Radical Bunny managers used the Mayer Hoffman audits in

2   recommending investments in Mortgages Ltd. to Radical Bunny's investors.  The 2006

3   and 2007 audited financials, as well as the restated 2005 financials, falsely represented

4   that the Radical Bunny notes were collateralized by the assets of Mortgages Ltd.

5       70.    As another part of the common enterprise and joint venture, Hirsch (and his

6   accounting firm with Shah) provided tax advice and prepared the tax returns for

7   Mortgages Ltd., Radical Bunny, and the limited-liability companies through which

8   Mortgages Ltd. raised investor money.  As still another part of the common enterprise

9   and joint venture, Coles and Hirsch cemented their alliance by having Hirsch serve (or

10  continue to serve) as the trustee of the trust that was Mortgages Ltd.'s sole shareholder.

11      71.    Also in furtherance of the common enterprise and joint venture, Radical

12  Bunny and Mortgages Ltd. agreed that Radical Bunny could obtain securities advice from

13  Mortgages Ltd.'s own legal counsel at the Greenberg law firm.  This advice included

14  having Greenberg prepare drafts of a private-offering memorandum for Radical Bunny's

15  use in selling Mortgages Ltd.'s loan participations.

16      72.    The common enterprise and joint venture formed and operated by

17  Mortgages Ltd. and Radical Bunny is referred to throughout the remainder of this

18  Complaint as the "ML-RB Joint Venture."

19          **2.    Mortgages Ltd. and Radical Bunny operated a Ponzi scheme
                    through a series of integrated securities offerings.**

20

21      73.    From September 2005 through June 2008, Radical Bunny and Mortgages

22  Ltd. jointly sponsored a series of integrated securities offerings in which both companies

23  sold securities packaged or originated by Mortgages Ltd. to support Mortgages Ltd.'s

24  business.  The securities sold during this two-and-a-half-year period were part of a joint

25  plan of financing that provided the capital and cash flow that enabled Mortgages Ltd. to

26  stay in business.  Each company was dependent on the other throughout this period, and

each company acted in furtherance of the purpose and goals of the ML-RB Joint Venture.

74.    Without Radical Bunny's loans, the façade of solvency that Mortgages Ltd. presented to the public would have collapsed.  Similarly, Radical Bunny's business depended upon its association with Mortgages Ltd. and the false representation to Radical Bunny investors that their investments were secured by Mortgages Ltd.'s assets.  Just as Mortgages Ltd. did in soliciting its own investors, Hirsch's team marketed investments with Radical Bunny by touting the line that Mortgages Ltd. had never missed a principal payment.  Because Radical Bunny received millions of dollars in redemption requests each year, it needed continual borrowings by Mortgages Ltd. (and the façade that Mortgages Ltd. was financially healthy) so it had marketable loans to sell to new investors.  In short, the ML-RB Joint Venture operated through a Ponzi platform in which loans from new Radical Bunny investors supported both companies.

75.    Mortgages Ltd. securitized and sold its developer loans to investors through two captive brokerage firms.  One firm, named Mortgages Ltd. Securities, LLC ("ML Securities") was a registered broker-dealer that Mortgages Ltd. had formed in response to an investigation by the Arizona Securities Division.  The second firm was Radical Bunny, which operated as an illegal, unlicensed shadow dealer for Mortgages Ltd.'s products and investment-banking needs.

76.    The two firms (Radical Bunny and ML Securities) directed referrals to one another.  Radical Bunny offered its investors the opportunity to invest directly with Mortgages Ltd.  Some investors held investments in both Mortgages Ltd. and Radical Bunny.

77.    The core securities that Mortgages Ltd. sold were the same for all investors: participation interests in the secured notes given by its developer clients.  According to the Company's offering materials, the interest rates paid on its participation interests ranged from about 9% to 10.5% per annum.  Interest was to be paid by Mortgages Ltd. to

the ML Securities investors on a periodic, usually monthly, basis.  For marketing

purposes, Mortgages Ltd. packaged the note participations in different programs.  But all

of the Company's securities shared the same essential characteristics.  And more

importantly, all of the offering documents used by Mortgages Ltd. contained the same

misleading statements and omissions of adverse facts and risks that would have been

critically important to existing and prospective investors.

78.     ML Securities sold the Mortgages Ltd. securities to investors using offering

documents that, starting in May 2006, were prepared by Greenberg Traurig.

79.     Radical Bunny meanwhile sold Mortgages Ltd. securities to prospective

investors using an offering document called a "Direction to Purchase."  Hirsch, the

Walders, and Shah made investor presentations touting Coles, Mortgages Ltd., and the

opportunity to invest in Mortgages Ltd.'s loan participations.  The Directions to Purchase

misrepresented the investments as loan participations collateralized by beneficial interests

in deeds of trust.  The interest rate promised on the investments varied according to the

maturity date, but was typically 11%.  Interest was paid to Radical Bunny by Mortgages

Ltd. on at least a monthly basis.

80.     According to Hirsch, Mortgages Ltd. investments sold through Radical

Bunny offered multiple advantages:  a higher interest rate (11%), shorter loan maturity,

and more collateral.  If an investor wished to redeem his or her principal before the

maturity date, Radical Bunny retroactively deducted a 2% redemption fee from the stated

interest rate.

81.     Radical Bunny investors were not told that the maturity dates were illusory.

They were not told that Radical Bunny had agreed with Mortgages Ltd. that the notes

would always be rolled into new notes to create what was in substance an unsecured,

revolving credit line.

82.     Nor were Radical Bunny investors told that, beginning in about January or

1   February 2006, the notes were revised to allow Mortgages Ltd. to make payments by the

2   assignment of deeds of trust, rather than in cash.  The deeds of trust to be assigned were

3   left entirely to Mortgages Ltd.'s discretion—another undisclosed fact.

4          83.    Through the foregoing integrated securities offerings during the Class

5   period, Mortgages Ltd. and Radical Bunny together raised over $900 million from more

6   than 2,000 investors nationwide.

7          **3.**    **The ML-RB Joint Venture issued a continuous stream of false
    and misleading securities offerings.**

8

9          84.    Mortgages Ltd. and Radical Bunny issued securities to the Class members

10   during the Class Period through a stream of false and misleading offering documents.

11          **a.**    **Mortgages Ltd.'s offering documents.**

12          85.    Before investing, Mortgages Ltd. investors were given a private-offering

13   memorandum (POM) and subscription agreement.  Beginning with a May 15, 2006

14   POM, Greenberg prepared a series of 11 different POMs for use in soliciting investors.

15          86.    Through the POMs, Mortgages Ltd. engaged in a fraudulent course of

16   business.  The POMs were all materially false and misleading because they

17   misrepresented or failed to disclose the following material facts, among others:

18            •    By September 2005, Mortgages Ltd.'s ability to continue its business
    operations depended on a continuous stream of funds from Radical
19                Bunny raised through securities sales that violated Arizona and
    federal securities laws.
20

21            •    Because of the integrated offerings sold under the ML-RB Joint
    Venture, neither a Regulation D registration exemption nor any other
    securities registration exemption existed under Arizona or federal
22                law.

23            •    Because Mortgages Ltd. and its management had illegally sold
    securities without a registration exemption, millions of dollars in
24                ever-increasing contingent liabilities existed regarding potential
    investor lawsuits, proceedings by securities regulators, and state and
25                federal criminal authorities.

26

- Unless both Mortgages Ltd. and Radical Bunny ceased violating the securities laws, the securities attorneys at Greenberg and Quarles who represented Mortgages Ltd. and Radical Bunny were ethically required to withdraw and report the ongoing securities violations to the securities regulators able to prevent further violations.

- Mortgages Ltd. and its unregistered dealer, Radical Bunny, were operating through a Ponzi platform by which Mortgages Ltd.'s operating capital and its debt service to Radical Bunny, and Radical Bunny's ability to honor redemption requests, were funded or paid in material part with proceeds collected from new Radical Bunny and Mortgages Ltd. investors.

- Mortgages Ltd. was insolvent by fiscal year end 2005.

- Mortgages Ltd. was so undercapitalized and laden with debt that it was forced to end its core business—new loan originations—in the summer of 2007.

- Radical Bunny was violating Arizona and federal securities laws by selling investments for Mortgages Ltd. without registering as a securities dealer.

- Hirsch, Shah, and the Walders were violating Arizona and federal securities laws by selling investments for Mortgages Ltd. without registering as securities salespersons.

- Contrary to the representations of collateralization in Mortgages Ltd.'s audited financial statements, the notes Mortgages Ltd. issued to Radical Bunny were unsecured.

- The maturity dates in Mortgages Ltd.'s notes to Radical Bunny were illusory because the notes were automatically rewritten on or before the maturity date.

- Mortgages Ltd. had no obligation to repay in cash the principal under its notes to Radical Bunny.

- Mortgages Ltd. had the right to repay money borrowed from Radical Bunny by assigning deeds of trust.

- Mortgages Ltd. did not have enough loan participations (or deeds of trust) to pay its debt to Radical Bunny. For example, at December 31, 2006, notes payable to Radical Bunny exceeded Mortgages Ltd.'s mortgage investments by about $49 million.

- If Mortgages Ltd.'s insolvency and Radical Bunny's securities violations had been disclosed, the Company's Arizona mortgage-banker license would have been subject to investigation and revocation.

- If Mortgages Ltd.'s insolvency and Radical Bunny's securities violations had been disclosed, the securities license of ML Securities would have been in jeopardy and subject to revocation.

- In May 2007, Radical Bunny's attorney at Quarles & Brady (Hoffmann) told Hirsch and the other Radical Bunny managers (the Walders and Shah) that they needed criminal counsel to advise them on their securities violations.

- In August 2007, Mortgages Ltd.'s attorney at Greenberg Traurig (Kant) told Hirsch that he could go to jail for the securities violations that he had committed.

- By at least December 2007, Mortgages Ltd. was unable to honor its loan commitments.

- By December 2007, Mortgages Ltd.'s insolvency prevented it from honoring investor requests for redemption.

- If booked at fair value, Mortgages Ltd.'s real-estate assets would have required millions of dollars in writedowns.

- Mortgages Ltd. systematically avoided disclosing defaults by its borrowers by rewriting the loans to extend their maturity and other terms.

- Mortgages Ltd. was progressively concentrating its loan exposure and increasing the risks to investors by issuing fewer and fewer loans in larger amounts.  This loan concentration included tens of millions of dollars in loans that had been re-written to avoid declaring a default.

- Mortgages Ltd. had never made a principal payment on the money it borrowed from Radical Bunny investors.

- Mortgages Ltd. and Greenberg had suppressed or attempted to suppress efforts by Robert Furst to disclose the nondisclosures and fiduciary misconduct listed in paragraph 233.

87.     Rather than disclose these adverse facts, the POMs that the Greenberg firm prepared contained only a generalized description of Mortgages Ltd.'s loan-origination business and the risks associated with it.  The POMs were crafted to provide general rather than fact-specific risk disclosures.  In fact, the Greenberg-prepared risk disclosures were so generic and standardized that the language was nearly identical throughout the entire period between May 15, 2006 and February 2008 (involving 11 POMs).  Even

when Mortgages Ltd.'s business materially changed—as it did when the Company's loan concentrations, loan rewrites, deterioration in underwriting standards, and insolvency expanded—Greenberg never amended or updated the POMs to disclose the adverse facts and risks associated with the changes.

88.    As illustrated by the examples in paragraph 206, the very use of generalized risk disclosures operated as a fraudulent practice or course of business on investors by burying or obscuring known risks.

89.    Denning, Brown, Newman, and Olson read the POMs, checked them for accuracy, and assisted Kant in the POMs' preparation.  Olson was also the member of senior management primarily responsible for preparing the financial statements that were included in the POMs.  As explained below in Part IV(C), the financial statements misrepresented their conformity to GAAP and contained numerous misrepresentations.

### b.    Radical Bunny's offering documents.

90.    The investments that the Radical Bunny Class purchased were deceptively marketed by Hirsch, Shah, and the Walders as interests in a form of mortgage-backed loan.  But unlike a true mortgage-backed loan, there was no mortgage or deed of trust that backed the notes Mortgages Ltd. issued to Radical Bunny.  Radical Bunny's supposedly secured loan interests were sold under Directions to Purchase signed by the investor and a managing member of Radical Bunny.  The Directions to Purchase ("RB Offering Documents") authorized a managing member, as the purchaser's agent, to acquire an interest in a specific Mortgages Ltd. loan that had been funded by Radical Bunny.  The RB Offering Documents also set forth the amount that the investor invested, the investor's percentage interest in the loan, the net interest rate to be paid to the investor (typically 11%), the loan maturity date, the interest due dates, and the representation that the investment was secured by deeds of trust held by Mortgages Ltd.

91.    The RB Offering Documents operated as a fraudulent course of business on

investors and were materially false and misleading because they misrepresented or failed to disclose the following material facts, among others:

- Radical Bunny was violating the registration and antifraud provisions of the Arizona and federal securities laws by selling unregistered securities without full disclosure.

- Radical Bunny was illegally acting as an unlicensed securities dealer in violation of the Arizona and federal securities laws.

- Radical Bunny's managers (Hirsch, Shah, and the Walders) were illegally acting as unlicensed securities salespersons.

- Radical Bunny misrepresented that the "investment[s] were collateralized by the beneficial interest under various deeds of trust held by Mortgages Ltd." when, in fact, the underlying loans from Radical Bunny to Mortgages Ltd. were unsecured.

- Radical Bunny failed to disclose that 15.4% of the interest payments made by Mortgages Ltd. to Radical Bunny would be retained by Radical Bunny as a management fee.

- The undisclosed 15.4% created a financial incentive for Radical Bunny's managers (Hirsch, the Walders, and Shah) to extend the interest payments and increase the principal balance on the Radical Bunny notes—an additional conflict of interest, in and of itself, which was not disclosed to the Radical Bunny investors.

- Mortgages Ltd. was not required to pay the principal amount due under the underlying notes at maturity and it had neither the intention nor the ability to do so.

- Millions of dollars that Radical Bunny collected from investors were not used to acquire new loans but were instead used to fund redemptions by existing investors.

- Mortgages Ltd.'s ability to repay the loans was in jeopardy because Mortgages Ltd. was insolvent.

- Mortgages Ltd. had no obligation to repay in cash the principal under its notes to Radical Bunny.

- Mortgages Ltd. had the right to repay money borrowed from Radical Bunny by assigning deeds of trust.

- Mortgages Ltd. did not have enough loan participations or deeds of trust to pay its debt to Radical Bunny. For example, at December 31, 2006, notes payable to Radical Bunny exceeded Mortgages Ltd.'s mortgage investments by about $49 million.

- Any deeds of trust that were assigned as payment could be selected by Mortgages Ltd. in its discretion.

- If Mortgages Ltd.'s insolvency and Radical Bunny's securities violations had been disclosed, Mortgages Ltd.'s Arizona mortgage-banker license would have been subject to investigation and revocation.

- If Mortgages Ltd.'s insolvency and Radical Bunny's securities violations had been disclosed, the securities license of ML Securities would have been in jeopardy and subject to revocation.

- In May 2007, Radical Bunny's attorney at Quarles (Hoffmann) told Hirsch and the other Radical Bunny managers (the Walders and Shah) that they needed criminal counsel to advise them on their securities violations.

- In August 2007, Mortgages Ltd.'s attorney at Greenberg (Kant) told Hirsch that he could go to jail for the securities violations that he had committed.

- By the summer of 2007, Mortgages Ltd. was unable to continue its core business of making new loans.

- By at least December 2007, Mortgages Ltd. was unable to honor its loan commitments.

- By December 2007, Mortgages Ltd.'s insolvency prevented it from honoring investor requests for redemption.

- If booked at fair value, Mortgages Ltd.'s real-estate assets would have required millions of dollars in writedowns.

- Mortgages Ltd. systematically avoided disclosing defaults by its borrowers by rewriting the loans to extend their maturity and other terms.

- Mortgages Ltd. was progressively concentrating its loan exposure and increasing the risks to investors by issuing fewer and fewer loans in larger amounts.  This loan concentration included tens of millions of dollars in loans that had been re-written to avoid declaring a default.

- Mortgages Ltd. had never made a principal payment on the money it borrowed from Radical Bunny investors.

- Mortgages Ltd. and Greenberg had suppressed or attempted to suppress efforts by Robert Furst to disclose the nondisclosures and fiduciary misconduct listed in paragraph 233.

**4.      Mortgages Ltd. and Radical Bunny failed to disclose that their operations and existence were dependent on illegally issued securities.**

92.      Radical Bunny did not register its investment securities under the Arizona or federal securities laws.  Nor did Radical Bunny qualify for a registration exemption under Arizona or federal law.  Radical Bunny's conduct in selling unregistered securities throughout the Class period violated the Arizona and federal securities laws.

93.      In addition, although Radical Bunny was acting as a dealer for the securities issued by Mortgages Ltd., neither Radical Bunny nor its managers registered as dealers or salespersons under the Arizona or federal securities laws.  Radical Bunny's activities in selling securities for itself and on behalf of Mortgages Ltd. without registering itself as a securities dealer (or its managers as salespersons) constituted additional violations of the Arizona and federal securities laws.

94.      Radical Bunny's systematic, ongoing, and continuous violations of the Arizona and federal securities laws created undisclosed risks and contingent liabilities for both Radical Bunny and Mortgages Ltd.  All of the investment proceeds raised by Radical Bunny and funneled to Mortgages Ltd. were tainted by these unlawful securities sales.  As a consequence, Radical Bunny and Mortgages Ltd. faced the risk that (a) their operations would be shut down by regulatory or criminal authorities or private litigation and (b) they would be required to pay restitution to investors, plus interest.  Indeed, because the securities violations were ongoing and the clients (Radical Bunny and Mortgages Ltd.) were unwilling to stop the fraud that was occurring, the attorneys at Greenberg and Quarles were professionally required to disclose their clients' illegal conduct to the securities regulators.  *See* Ariz. Ethical Rules 1.2(d) & cmt. 11, 1.6(c)-(d), 1.16(a)(1), and 4.1(b).

95.      Senior management of Mortgages Ltd. (including Coles, Denning, and Olson) and Radical Bunny (including Hirsch, the Walders, and Shah) knew about these

1    illegal activities and the attendant risks and liabilities because, among other things, they

2    were expressly and forcefully told by senior attorneys at Greenberg and Quarles that

3    Radical Bunny's fundraising conduct and activities violated Arizona and federal

4    securities laws.

5         96.    Despite senior management's participation in preparing the offering

6    documents, none of the Mortgages Ltd. POMs or RB Offering Documents disclosed that

7    Radical Bunny was violating the Arizona and federal securities laws by selling

8    unregistered securities and by selling investments for Mortgages Ltd. without registering

9    as a securities dealer.

10        97.    Charles McLane, the Mayer Hoffman audit partner for the 2006 and 2007

11   audits, acknowledged the materiality of this undisclosed information.  He explained, quite

12   accurately, that if Radical Bunny was operating illegally, it threatened Mortgages Ltd.'s

13   ability to continue in business:

14           [T]hey [Mortgages Ltd.] were getting a lot of money from Radical
             Bunny.  Their representation to us was they were going to continue
15           to do that.  If Radical Bunny was doing something illegal obviously
             that funding might not be available in the future.
16
             .   .   .
17
             I mean it speaks to the ongoing viability of the company if they were
18           dependent upon that funding and it might go away, that could be a
             problem.  (pp. 118-19)
19

20       **5.     Mortgages Ltd. and Radical Bunny misrepresented the secured
                  status of the Radical Bunny indebtedness.**
21

22        98.    The RB Offering Documents represented to Plaintiffs Hagel, Baker, and

23   other investors that, "Your investment is collateralized by the beneficial interest under

24   various deeds of trust held by Mortgages Ltd."  Hirsch also uniformly told Radical Bunny

25   investors at the biannual meetings that their investment was secured by all of Mortgages

26   Ltd.'s assets.  Substantially the same representation was made in the financial statements

1    for which Mayer Hoffman issued unqualified audit reports.  In addition, Coles, on behalf

2    of Mortgages Ltd. made the representation that all Mortgages Ltd. assets were security

3    for the loans in one or more invalid UCC forms given to Hirsch.  These representations

4    were material to the Radical Bunny investors because the false assurance of security

5    caused them to believe that they were protected from defaults by the borrower.  Yet in

6    reality,

7    - The Radical Bunny investors received no fractional interest in any of
     the deeds of trust held by Mortgages Ltd.

8

9    - The indebtedness from Mortgages Ltd. to Radical Bunny was not
     secured by deeds of trust encumbering the underlying collateral.

10   - The debt was not secured by the assets of Mortgages Ltd.

11   - A valid security agreement and UCC-1 was never properly filed or
     prepared.

12

13       99.    Audited financial statements of Mortgages Ltd. were provided to

14   Mortgages Ltd. investors (and their financial advisors) through Mortgages Ltd.'s POMs.

15   The same audited financial statements were provided to Radical Bunny managers, who

16   acted as the Radical Bunny investors' agent under the RB Offering Documents.  The

17   financial statements, as audited by Mayer Hoffman, described the notes payable to

18   Radical Bunny as being "collateralized by the assets of the Company."  This

19   representation in the financial statements was false.  Neither the financial statements nor

20   the Mortgages Ltd. POMs or RB Offering Documents disclosed to the Mortgages Ltd. or

21   Radical Bunny investors that this representation was false or that misrepresentations had

22   been made to the Radical Bunny investors concerning the secured status of their

23   investments.

24       100.    As explained below, senior management at Mortgages Ltd. (including

25   Coles, Denning, Newman, and Brown) and Radical Bunny (including Hirsch, the

26   Walders, and Shah) knew that the representations concerning the secured status of the

1    Radical Bunny investments were false as a result of many communications with the

2    attorneys at Greenberg and Quarles.  Even so, throughout the Class period, Hirsch, the

3    Walders, and Shah continued to falsely represent to existing and prospective Radical

4    Bunny investors that their interests were secured by Mortgages Ltd. assets collateralizing

5    the loans issued by Mortgages Ltd.  And the RB Offering Documents continued to falsely

6    represent that the investments were collateralized by the beneficial interest under deeds of

7    trust held by Mortgages Ltd.  Likewise, the Mortgages Ltd. financial statements and the

8    Mortgages Ltd. POMs continued to conceal the known risks and contingent liabilities

9    associated with the misrepresentations to the Radical Bunny investors.  Mortgages Ltd.

10   and Radical Bunny's senior management, despite assisting in the preparation of the

11   offering documents used by their respective companies, took no steps to make accurate

12   disclosures in the POMs or RB Offering Documents.

13               **6.      Mortgages Ltd. and Radical Bunny continued to mislead
                           investors as Mortgages Ltd. slid into ever deepening insolvency.**
14

15          101.    As explained below in Part IV(C), Mortgages Ltd. was insolvent by late

16   2005 and continued to be insolvent until its bankruptcy in mid-2008.

17          102.    By the end of 2006, Mortgages Ltd.'s cash needs had forced it to borrow

18   $128.8 million from Radical Bunny.  This resulted in annual interest expense of $16.7

19   million.

20          103.    Despite its ever-deepening insolvency, Mortgages Ltd. continued to portray

21   itself to investors as a financially healthy, well-diversified, and liquid company.  For

22   example, in its newsletter to investors for Winter 2006, Mortgages Ltd. said:

23               Mortgages Ltd. continues to underwrite the finest real estate projects
                 in Arizona.  Our borrowers are always bankable in order to provide
24               security for our loans.  Liquidity, diversification and double digit
                 returns in conjunction with no fees is our benchmark commitment to
25               our investors.

26

104.    Nothing could be further from the truth.  As its debt to Radical Bunny expanded, Mortgages Ltd. originated significantly larger, but fewer and riskier loans. Many of these loans contained delayed-funding ("delay-flex") terms that obligated Mortgages Ltd. to fund substantial portions of the loan in stages rather than funding the entire amount upfront.

105.    The largest of the loans consisted of a bundle of mega-loans summarized as follows:

### Table 1 — Summary of Mega Loans

| Borrower | Origination Date[3] | Amount of Loan |
|---|---|---|
| Grace Entities (Vento) | June 2006 and August 2006 | $181 million |
| Central Phoenix Partners (Chateau on Central) | March 2007 | $47 million |
| Tempe Land Co. (Centerpoint) | March 2007 | $150 million |
| University & Ash, LLC (Mosaic) | June 2007 | $130 million |
| Rightpath Ltd. Development Co. | April 2007 | $121 million |
| | | **Total:   $629 million** |

106.    Tens of millions of dollars in this mega-loan concentration involved loan rewrites.  For example, the Central Phoenix Partners was a rewrite that included a $28.5 million loan made to bail part of the project out of a foreclosure initiated by an earlier lender.  In addition, by year end 2007, all of these loans were impaired.[4]  For example, by the end of 2007 the Grace (Vento) loans were impaired by $60 million.  *See infra* ¶ 375. In the following month, January 2008, Greenberg prepared a notice of default for the Company to send to the Grace-Vento borrowers.

107.    Mortgages Ltd.'s management (i.e., Denning, Brown, Newman, and Olson)

---

[3] All loans listed originated as smaller loans of less than $10 million.  Table 1's origination date is the date when the smaller initial loans were refinanced or rewritten into the larger construction loans.

[4] An *impaired loan* has a carrying value greater than its fair value.

recognized the threat to the Company posed by funding a concentration of mega-loans with deferred funding commitments.  They recognized that the mega-loans stifled the ability to make new loans to other developers.  For example, Denning issued a President's Update memo on May 14, 2007, in which he wrote under the heading Loan Origination:  "The current delay-flex [loan commitment] schedule has exhausted our ability to fund new loans until payoffs occur."  The following week Denning issued a second President's Update stating in bold letters that "**cash will be extremely tight** for the next two months."  As it was, the needed payoffs never occurred and a liquidity crisis developed.

108.    In May 2007, Defendant Newman gave notice of his resignation.  He could not accept the direction that Mortgages Ltd. was taking.  As Denning explained it in a May 2007 memo to Coles, "He [Newman] feels that the direction the Company has taken with its loans creates more risk in the portfolio than he is willing to represent to investors."  No one in management, including Defendants Denning, Brown, Newman, or Olson, took any steps to update Mortgages Ltd.'s POMs to disclose this heightened risk.

109.    Denning, Brown, and Newman were also concerned about the risks posed by Mortgages Ltd.'s reliance on funds raised through Radical Bunny.  These three Defendants knew (and discussed with Greenberg attorney Robert Kant) that Radical Bunny was conducting unregistered securities offerings to obtain funds for Mortgages Ltd.  They knew that Radical Bunny's securities sales were ongoing and had led to $128.8 million in loans to Mortgages Ltd. by the end of 2006, with millions more being raised monthly.  These Defendants all knew that the Radical Bunny funds were tainted by Radical Bunny's securities registration and disclosure violations.  They also knew that Radical Bunny was operating as an unregistered securities dealer.

110.    In an effort to patch the registration problem, Denning, Brown, and Newman took steps in December 2006 to have Hirsch obtain a securities license through

ML Securities.  But neither Hirsch nor any of the other Radical Bunny managers ever

obtained a securities license.

### 7.   In mid-2007, Mortgages Ltd.'s lack of liquidity forced it to halt new loan originations.

111.   Mortgages Ltd.'s core business was loan originations, i.e., making loans to

Arizona real-estate developers and then selling the loans to investors.  Funding the new

loans required liquidity.  But with ever-increasing liabilities and no revenue other than

dwindling loan payoffs and money from investors in the ongoing Ponzi scheme, a

liquidity crisis developed.  The expense of paying interest on over $700 million owed to

its own investors plus more than $150 million owed to Radical Bunny investors was

unsustainable.  The debt burden left no funds for new loans.  At best, Mortgages Ltd.

could only cover its debt service, and it could do that only by borrowing more money

from other investors.   Thus, new loan originations—the Company's core business—

ended in the summer of 2007.  Denning addressed the problem in a President's Update

Memo for the week of July 30, 2007.  In the memo, he told Coles, "The lack of cash to

fund new loans and therefore generate revenue is my biggest concern."

112.   Thus, by summer 2007, Mortgages Ltd. had stopped writing new loans, its

revenue from outstanding loans was shrinking, and the new and rollover investment

proceeds it was collecting from investors was being used to satisfy payroll, general and

administrative expenses, and interest payments to existing investors, including Radical

Bunny.

113.   Rather than tell the truth about its insolvency, the Company continued to

use its audited financial statements and newsletters to falsely portray itself as a successful

.   .   .

.   .   .

1    and financially healthy company.  In a letter dated August 7, 2007 to its investors,

2    including the Radical Bunny investors, Scott Coles falsely wrote:

3               . . . I have been asked by numerous people what this all [the sub-
             prime mortgage crisis] means to Mortgages Ltd.  The answer is
4            opportunity.  As conventional financing sources tighten up, more
             good lending opportunities present themselves to us. . . .  Our
5            underwriting standards and long history provide a measure of
             predictability of the performance of our borrowers.  We have not
6            seen and do not expect an increase in defaulted loans.  2007 appears
             to be another record year and our investor portfolio has hit an all
7            time high of over $880 million.

8        114.    The letter was all fiction.  In reality,

9        •    Mortgages Ltd. was no longer writing new loans;

10       •    It was experiencing a growing number of defaults and non-
             performing loans (which it was concealing by rewriting and
11           extending the loan terms);

12       •    It had ceased normal business operations; and

13       •    Its underwriting standards, both at the time of the letter and in the
             past, did not meet standard industry practices and created atypical
14           risks (*see infra* ¶¶ 365-69) (describing deficiencies in Mortgages
             Ltd.'s underwriting).

15

16       115.    Around October 2007 or soon after, Mortgages Ltd. was confronted with an

17   increase in non-performing loans (including the Grace-Vento loans) that it tried to

18   conceal and paper over with more loan workouts.  In most instances, the Company agreed

19   to loan rewrites that extended the time to repay principal, with interest payments due in

20   the interim.  In this way, it maintained the illusion that the loans were current.

21       116.    Nevertheless, on November 2, 2007, Coles authored another investor letter,

22   yet again falsely assuring investors that all was well:

23           Our investors have NEVER lost any of their principal, and in
             uncertain markets that possibility should be everyone's primary
24           concern. . . .  Mortgages Ltd. is a private lender.  Private money
             lending is not non-conforming or "hard money" lending, and it
25           certainly is not sub-prime lending.  Our borrowers are bankable and
             their projects represent the best collateral available when the loans
26           were made. . . .  My father, Charles J. Cole, founded our company on
             one simple premise:  integrity.  Integrity is reflected in all that we do

-34-

and how we do it.  Living this passion is the cornerstone of Mortgages Ltd.

117.    On December 18, 2007, Nechelle Wimmer, a Mortgages Ltd. officer, sent Denning an e-mail listing millions of dollars in construction loans on seven projects that were due for funding that week.  In response, Denning circulated an e-mail to Wimmer and others stating, "There will be no further fundings of any sort until either Scott or I authorize them."  At about the same time (December 2007), Denning decided to resign.

118.    By the end of 2007, the notes payable to Radical Bunny had increased to $172.6 million.  Annual interest expense on this debt alone was $22.4 million and growing.

119.    Conditions only worsened in 2008.  The Company had upcoming loan commitments to developers for the year of $131 million.  But as of January 2008, it had no funds for any of its loan obligations.  Thus, on January 4, 2008, Ms. Wimmer sent Coles an e-mail listing four construction loans on which the developers were "in urgent need of funding."  Coles responded, "We do not have the funds at present."

120.    In the following weeks things turned even more hopeless.  The only significant source of funds to meet the loan commitments was loan payoffs from outstanding loans.  By February 2008, the Company had hoped for some $70 million in loan payoffs, but only $1-2 million in payoffs occurred.

121.    The lack of liquidity was so great that in January 2008, Coles instructed Olson to call Radical Bunny "once a day" to see if Radical Bunny had raised any more money that could be borrowed.  If money was available, a messenger was sent to pick up the check.  Olson e-mailed reports to Coles on how much new money Radical Bunny had raised (or whether there was no money).

**8.      In 2008, the Ponzi scheme collapsed.**

122.    Mortgages Ltd.'s only meaningful cash flow in 2008 was money from new

1    investors.  During 2008, the Company raised over $70 million in new money from

2    Mortgage Ltd. investors and another $24.6 million in new money from Radical Bunny

3    investors.  The Company was no longer originating new loans.  The mega-loans on which

4    it had bet its existence were defaulting; developer loan payments had all but stopped; and

5    the real estate securing the loans was worth far less than the outstanding loan balances.

6        123.   As the ML-RB Joint Venture collapsed and the Ponzi scheme ground to a

7    halt, Coles took his life on June 2, 2008.  In the turmoil that followed, Mortgages Ltd.

8    was forced into bankruptcy in June 2008 and Radical Bunny followed suit in October

9    2008.

10        124.   As of July 18, 2008, Mortgages Ltd. owed approximately 900 Radical

11   Bunny investors $197,232,758.  This sum represents the aggregate principal balance of

12   the 99 loans made by Radical Bunny from September 2005 through June 2008.

13              **9.     Regulatory investigation followed the collapse.**

14        125.   With the collapse of the ML-RB Joint Venture, regulatory investigations

15   began.  Investigations were initiated by the Securities and Exchange Commission, the

16   Securities Division of the Arizona Corporation Commission, and the Arizona Department

17   of Financial Institutions.

18        126.   After a joint investigation with the SEC involving over 30 sworn witness

19   statements and production of hundreds of thousands of documents, the Arizona

20   Corporation Commission issued findings in a cease and desist order against Radical

21   Bunny on April 28, 2010, which is incorporated by reference.  The findings conclude that

22   Radical Bunny engaged in multiple violations of Arizona's securities laws:

23            Respondent [Radical Bunny] violated A.R.S. § 44-1991 by (a)
             employing a device, scheme, or artifice to defraud, (b) making
24            untrue statements or misleading omissions of material facts, or (c)
             engaging in transactions, practices, or courses of business that
25            operate or would operate as a fraud or deceit.  The conduct of
             Respondent includes, but is not limited to, the following:
26

a.      From at least December 2006, Respondent represented to offerees and Participants that the Participants were investing "in MLtd notes and deeds of trust" when, in fact, the Participants were investing in Respondent;

b.      From at least December 2005, Respondent represented to offerees and Participants that the RB-MLtd Loans were evidenced by "secured" promissory notes and/or collateralized by [all of] the assets of MLtd and the personal guaranty of Coles when, in fact, the security interest was never properly perfected;

c.      From at least December 2005, Respondent failed to inform offerees and Participants that the nature and/or value of Coles' personal assets were never ascertained;

d.      From at least December 2005, Respondent failed to advise offerees and Participants that promissory notes evidencing the RB-MLtd Loans did not contain any language that limited the use of the RB-MLtd Loan proceeds to funding of MLtd Loans; and

e.      From at least the last quarter of 2006, Respondent failed to advise offerees and Participants that it had been told by its attorneys that it had or were engaged in unregistered securities offerings in violation of the Securities Act.

127.    Similarly, on January 19, 2010, the SEC revoked the registration of ML Securities and published its findings regarding the relationship between Radical Bunny and Mortgages Ltd.[5]  The SEC found that Mortgages Ltd.'s investors had no way of knowing, and were misled by, Radical Bunny's critical role in providing capital to Mortgages Ltd.:

24.     From September 2005 to June 2008, MLtd. borrowed $197 million from Radical Bunny.  Radical Bunny raised the money that it loaned to MLtd. from hundreds of investors to whom it issued promissory notes.  By early 2007, notes held by Radical Bunny were maturing and MLtd. was obligated to pay them a much higher rate of return in exchange for Radical Bunny's continued capital infusions. As MLtd. faced decreased payoffs of loans, Radical Bunny became increasingly important as a source of capital to MLtd.

---

[5] The January 19, 2010 findings (Securities Exchange Act Release No. 61377) are incorporated in full by reference.

25.     Investors had no way of knowing of Radical Bunny's critical role in providing capital to MLtd.  These funds enabled MLtd. to continue its lending operations, which ultimately impacted MLtd.'s ability to pay investors' principal.

26.     In January 2007, MLtd. and Radical Bunny met and discussed a number of issues concerning their relationship.  Among the concerns raised at that meeting, which Coles attended, were the following:  (1) whether MLtd. had accepted money that Radical Bunny had raised pursuant to an unregistered offering of securities; (2) whether some of the monies that MLtd. accepted from Radical Bunny came from unaccredited investors; and (3) whether Radical Bunny had failed to provide its investors with offering documents making the appropriate disclosures and audited financial statements.

27.     Radical Bunny's offering was never registered; and MLtd. never ceased accepting the monies that Radical Bunny continued to raise through its unregistered offering.  Neither MLtd. nor MLS ever disclosed to investors that Radical Bunny had failed and continued to fail to comply with the securities registration provisions, or that MLtd. had relied and continued to rely on Radical Bunny's unregistered offering proceeds to fund virtually all of its business activity.  Indeed, MLtd. accepted about $120 million from Radical Bunny after the compliance issues first surfaced.

128.   As a result of these omissions and other material nondisclosures regarding Mortgages Ltd.'s financial condition, the SEC found that ML Securities had willfully violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

**B.      The Lawyer Defendants played an integral role in facilitating the fraudulent scheme.**

**1.      "Attorneys must inform a client in a clear and direct manner when its conduct violates the law."[6]**

**"If the client continues the objectionable activity, the lawyer must withdraw 'if the representation will result in violation of the rules of professional conduct or other law.'"[7]**

129.   The Lawyer Defendants at Greenberg and Quarles (a) were knowing participants in the ongoing illegal sales of securities by Mortgages Ltd. and Radical Bunny, (b) played a substantial role in inducing the illegal sales, and (c) lent substantial

---

[6] *In re Am. Cont'l Corp./Lincoln Sav. and Loan Secur. Litig.*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992).

[7] *Id*. (quoting ER 1.16).

1    assistance to an ongoing scheme to defraud.

2        130.   The highly experienced senior lawyers at Greenberg and Quarles were fully

3    aware that the ML-RB Joint Venture was funded by capital raised through a continuous

4    and ongoing pattern of illegal securities sales by Radical Bunny that violated Arizona and

5    federal securities laws—violations that the lawyers candidly acknowledged would land

6    "people in jail" if the illegal activities did not stop.  But the illegal securities sales did not

7    stop.  Instead, with the knowledge and active assistance of Greenberg and Quarles, the

8    co-ventured securities violations continued unabated for more than a year and a half.

9    During that time, the ML-RB Joint Venture raised more than hundreds of millions of

10   dollars in new money on top of rollovers from pre-September 2005 investments by

11   unsuspecting investor Class members.  None of these Class members knew about the

12   securities violations that tainted Radical Bunny's loans because, as the SEC found (*see*

13   *supra* ¶ 127), "[i]nvestors had no way of knowing of Radical Bunny's critical role in

14   providing capital to [Mortgages Ltd.]" or that Radical Bunny's "funds enabled

15   [Mortgages Ltd.] to continue its lending operations, which ultimately impacted

16   [Mortgages Ltd.'s] ability to pay investors' capital."

17            **2.    The Lawyer Defendants recognized and discussed Radical
                     Bunny's past and ongoing securities violations.**
18

19       131.   Greenberg began representing Mortgages Ltd. in April, 2006.  Robert Kant

20   was the senior Greenberg shareholder responsible for overall representation of Mortgages

21   Ltd. including corporate issues and securities compliance.  Greenberg assigned other

22   lawyers to provide legal and business advice to Mortgages Ltd., including John Lomax,

23   Karl Freeburg, John Clemency, and Jeffrey Verbin.

24       132.   Kant was initially retained specifically to review Mortgages Ltd.'s existing

25   and prospective POMs for compliance with the Arizona and federal securities laws,

26   including all applicable disclosure requirements.  Greenberg's engagement quickly

1   expanded to include representing Mortgages Ltd. in corporate, securities, employment,

2   banking, real estate, and litigation matters.  Through this work, Greenberg became

3   familiar with every aspect of Mortgages Ltd.'s operations: its assets, debts, practices

4   regarding defaulted developer loans, and relationship with Radical Bunny.

        **a.**     **By December 2006, Greenberg concluded that Radical**
5                       **Bunny was violating the securities laws:*"Your picture is***
6                       ***going to be on the front page of the Arizona Republic."***

7       133.   Soon after his retention in April 2006, Kant became familiar with the

8   intertwined relationship between Mortgages Ltd. and Radical Bunny.  By at least the

9   fourth quarter of 2006, Kant knew from discussions with Defendants Denning, Brown,

10  and Newman that Mortgages Ltd. was heavily dependent upon Radical Bunny as a source

11  of funds, having already borrowed over $128 million from Radical Bunny.

12      134.   In December 2006, Kant discussed Mortgages Ltd.'s dependence on

13  Radical Bunny's fundraising with Denning, Brown, and Newman, all of whom, including

14  Kant, recognized that Mortgages Ltd. was capitalized with money raised through Radical

15  Bunny.

16      135.   Kant knew that Radical Bunny obtained its money by selling participation

17  interests in the loans that Radical Bunny made to Mortgages Ltd.  He knew that Radical

18  Bunny was obtaining money from its investors without using formal offering documents

19  containing the disclosures required by the Arizona and federal securities laws.  He knew

20  that Radical Bunny did not use a private-offering memorandum or similar disclosure

21  document.  He knew that Radical Bunny had not taken steps to limit its investors to

22  accredited investors and, as a result, the securities being sold by Radical Bunny were not

23  exempt from registration.  Kant also knew that Mortgages Ltd. was using Radical Bunny

24  as an unlicensed dealer to sell interests in the notes that Mortgages Ltd. issued to Radical

25  Bunny.  Kant realized that the use of Radical Bunny as an unlicensed securities dealer

26  constituted an independent violation of the Arizona and federal securities laws.  Kant

1  knew these things because he discussed them in December 2006 with senior management

2  of Mortgages Ltd. and Radical Bunny, including Denning, Brown, Newman, and Hirsch.

3      136.   Kant also knew from his familiarity with Mortgages Ltd.'s POMs (and the

4  financial statements included in the POMs) that no disclosure had been made to the

5  Mortgages Ltd. investors of any risk or contingent liability arising from the ongoing

6  Radical Bunny funding.  Thus, Kant knew that because Radical Bunny was

7  systematically violating the Arizona and federal securities laws, Mortgages Ltd. was

8  likewise violating the securities laws by failing to disclose its contingent liability

9  stemming from its receipt of monies raised in violation of those laws.

10      137.   To address this unlawful conduct, Kant arranged a meeting in December

11  2006 with management representatives from both Mortgages Ltd. and Radical Bunny.

12  Attending were Kant and Coles, Defendants Hirsch, Shah, and the Walders on behalf of

13  Radical Bunny, and Defendants Denning, Newman, and Brown on behalf of Mortgages

14  Ltd.  During the meeting, Kant voiced his concerns about the lack of Radical Bunny

15  securities compliance.  He told Hirsch, in the presence of the other meeting participants,

16  that the manner in which Radical Bunny was raising investor money was "not valid;" that

17  it was "wrong;" and that it "violated the law."

18      138.   In sworn testimony before the SEC, Kant testified that it was "crystal clear"

19  to him that the "offerings being done by Radical Bunny violated numerous provisions of

20  federal and state securities laws and I was very concerned about it because my client was

21  doing business with them."  To drive his point home, Kant told Hirsch (in December

22  2006) that "some day [Hirsch's] picture was going to be on the front page of the Arizona

23  Republic and I [Kant] didn't want to see Scott Coles' picture next to him [Hirsch]."

24      139.   As a result of these discussions, Newman, Brown, and Denning began

25  brainstorming ways to remedy Radical Bunny's past and continuing securities violations

26  without disrupting Mortgages Ltd.'s source of funds.  Newman took the lead in outlining

1   the issues.  In early 2007, these three defendants approved a memo that listed under

2   Option A:

3       1.    Bring Radical Bunny into compliance with securities regulations

4       2.    Adopt, prepare and distribute appropriate investors disclosures

5           a.    Collateral base - disclosure must state that collateral includes
                assets of Mtg Ltd such as REO, DOT, P+ and receivable from

6                   SMC

7           b.    Engage attorney to prepare the disclosure document, review
                with Kant

8

9       3.    Investors who choose not to move forward (or are non-accredited)
        will be liquidated as their loans mature

10       4.    Continue to raise money

11       140.    The memo was given to Hirsch and the other Radical Bunny managers.

12       141.    Shortly before the memo was finished, Kant gave Hirsch the names of three

13   securities attorneys that he could contact to address Radical Bunny's noncompliance with

14   the securities laws.  One of the attorneys was a senior securities attorney at Quarles &

15   Brady named Robert Moya.  Brown too recommended that Hirsch contact Moya, who

16   Brown knew.

17       142.    Shortly after the meeting in which Kant told Hirsch that Radical Bunny was

18   engaged in securities violations, Denning, on December 28, 2006, directed his staff to

19   prepare a form known as a U-4 to list Hirsch under the license with ML Securities.

20   Denning also arranged for the study materials for a securities license to be sent to Hirsch.

21   Denning made these preparations for Hirsch to obtain a securities license as a result of his

22   knowledge, through Kant, that Radical Bunny had been illegally selling Mortgages Ltd.

23   loan participations as an unlicensed securities dealer in violation of Arizona and federal

24   law.

25       143.    Even though Denning had caused the Company to hire Kant to ensure that

26   its POMs made full disclosure, Denning took no steps to amend or update the POMs to

1   disclose Radical Bunny's securities violations.

2          **b.      Quarles also concluded that Radical Bunny was violating**
             **the securities laws.**

3

4          144.    In January 2007, Kant telephoned Moya to make sure Moya would take

5   Hirsch's anticipated call.

6          145.    On about January 25, 2007, Hirsch called Moya and described Radical

7   Bunny's fundraising from investors.  Hirsch told Moya that Radical Bunny had 700

8   investors (some unaccredited) who had invested $139 million and that $4-5 million in

9   new money was being raised each month.

10         146.    Moya realized immediately that Radical Bunny's business raised serious

11  securities-compliance issues.  Moya prepared an e-mail to his Quarles partner Chris

12  Hoffmann in which Moya explained that Radical Bunny was concerned with securities

13  regulations and acknowledged, "I can see why."  Moya asked Hoffmann if he could help;

14  Hoffmann said he would.

15         147.    On January 31, 2007, Hoffmann spoke with Hirsch, Shah, and the Walders.

16  Hoffmann learned that Radical Bunny had raised about $140 million without an offering

17  memorandum, or registration as a securities dealer, and that the money had been loaned

18  to Mortgages Ltd.  Hoffmann also learned that Radical Bunny was raising $4 to $5

19  million per month in new investor money.  Hoffmann then scheduled a February 2007

20  meeting with Hirsch and the Radical Bunny team.

21         148.    Before the meeting, Hoffmann sent Radical Bunny a letter asking for copies

22  of the company's investor records and selling documents.  In response to Hoffmann's

23  request, Radical Bunny provided copies of the loan documents it used with its investors

24  as well as lists of the amounts loaned to Mortgages Ltd. and the repayments that had been

25  made.  Included in the documents that Hoffmann received was the Newman memo with

26  the Option A proposal quoted in paragraph 139 above.

149.    Hoffmann then met with Hirsch and the other members of Radical Bunny's management (the Walders and Shah) on February 12, 2007.  Afterwards, Radical Bunny formally retained Quarles for advice in addressing the securities violations earlier identified by Kant.  Moya was the Quarles partner in charge of the Radical Bunny account.  Hoffmann assumed responsibility along with Moya to provide legal advice on securities compliance.  Robert Bornhoft, another Quarles partner, took responsibility to provide advice on loan-security matters.

150.    Moya and Hoffmann were, like Kant, each experienced attorneys. Hoffmann had practiced over 25 years.  Moya had practiced over 35 years.  From previous work on securities issues, they knew that Radical Bunny's past securities violations created contingent liabilities adversely affecting both Mortgages Ltd. and Radical Bunny.  They knew that these past and ongoing securities violations were material facts that had to be disclosed to both Radical Bunny and Mortgages Ltd. investors.  They knew, recklessly ignored, or should have known that FASB 5[8] required that Mortgages Ltd.'s financial statements disclose the contingent liability arising from Mortgages Ltd.'s securities violations.  *See infra* ¶¶ 186-87.

151.    Quarles billing records confirm that Hoffmann and Quarles attorney Gary Shullaw thoroughly researched Radical Bunny's securities exposure throughout February, March, and April 2007.

152.    On May 2, 2007, Hoffmann, Moya, and Bornhoft jointly spoke with Hirsch, the Walders, and Shah.  Hoffmann confirmed to his clients that Radical Bunny's raising of what was then in excess of $140 million had been done in violation of the securities laws.  Hoffmann also told them that Radical Bunny was illegally operating as an unregistered dealer for Mortgages Ltd.'s securities.

---

[8] FASB Accounting Standards Codifications Subtopic 450-20, Contingencies—Loss Contingencies (codifying Statement of Financial Accounting Standards No. 5).

-44-

153.    Hoffmann has told the SEC that during the May 2 telephone conference he also told Hirsch, the Walders, and Shah that they needed to stop selling the securities, disclose their securities violations to the SEC and Arizona Securities Division, and comply with the securities-registration statutes before any new sales occurred.  Hirsch (as well as the Walders and Shah) have told the SEC that Hoffmann said no such thing.  But there is no dispute that Hoffmann did not memorialize his purported advice in any client writing, let alone a formal letter confirming his purported advice that Radical Bunny stop selling and disclose past violations involving at least $140 million to securities regulators.

154.    In any event, whether he was advised or not to do so, Hirsch told Hoffmann that he had no intention of disclosing Radical Bunny's past securities violations. According to Hoffmann, Hirsch said that he only wanted to address securities compliance on a going forward basis.  "[W]e don't want to deal with the past," Hirsch told Hoffmann.  "[W]hat's past is done," he said.

155.    Afterwards, Quarles acquiesced in Hirsch's position.  Nothing was done to disclose or address Radical Bunny's past securities violations.  Quarles was willing to turn a blind eye to Radical Bunny's past registration and disclosure violations (and to Mortgages Ltd.'s complicity in the violations).  On the "going forward basis" that Hirsch wanted, Moya, Hoffmann, Shullaw and Bornhoft continued to represent Radical Bunny on its securities and loan-security matters.

156.    Under Greenberg and Quarles' watch, both Mortgages Ltd. and Radical Bunny continued raising money throughout 2007 and 2008 from investors without disclosure of the acknowledged securities violations.

c.    **Greenberg and Quarles continued representing Mortgages Ltd. and Radical Bunny even as the securities violations continued: *"They put people in jail for this."***

157.    On May 3, 2007, Hoffmann, Moya, and Bornhoft discussed Radical Bunny's securities violations with Kant.  By this time, Moya and Hoffmann had, like

1   Kant, concluded that Radical Bunny's securities violations exposed Radical Bunny

2   management to significant civil and criminal liability.  At this point, the notes payable

3   from Mortgages Ltd. to Radical Bunny had increased to over $150 million.

4       158.   As described below, Greenberg and Quarles knew throughout 2007 that the

5   ML-RB Joint Venture was continuing its illegal sales of securities in violation of Arizona

6   and federal securities laws.

7       159.   During spring of 2007, Denning became increasingly worried that the

8   Radical Bunny joint venture was out of control.  He and Kant exchanged e-mails and

9   discussed this repeatedly.  Kant sometimes captioned his e-mails "*Out-of-Control*

10  *Bunny*."

11      160.   In August 2007, Denning prepared a President's Update memo for Coles in

12  which Denning warned that, "Radical Bunny contract must be rationalized."  He noted

13  that a meeting of Mortgages Ltd. and Radical Bunny representatives had been scheduled

14  for the following Monday, August 13, 2007, to discuss the situation.

15      161.   The meeting took place as scheduled.  On August 13, 2007, Kant, Moya,

16  Shullaw, and Bornhoft attended what Moya called an all-hands meeting.  Also present

17  were Coles, Hirsch, Denning, Brown, the Walders, and Shah.  Before the August 13

18  meeting, Kant had decided to again make a point of Radical Bunny's continuing

19  securities violations.  To "make my [Kant's] point in front of his [Hirsch's] lawyer," Kant

20  told Hirsch: "They put people in jail for this" or "someday you're going to jail for this if

21  you don't stop."  According to Kant's sworn SEC testimony, he didn't "know how any

22  experienced securities lawyer could disagree with" his (Kant's) conclusion that Radical

23  Bunny's securities violations exposed Hirsch to going to jail.  After the meeting, Moya

24  thanked Kant for making the point.

25      162.   During the meeting, the Lawyer Defendants went through the numbers,

26  including in particular the fact that Radical Bunny's loans to Mortgages Ltd. had by then

-46-

increased to about $160 million, but that Mortgages Ltd. only had about $100 million in loan participations available to secure the $160 million indebtedness.  Kant, Moya, Bornhoft, Denning, and Hirsch then discussed a new plan under which Radical Bunny's notes would be converted to LLC interests of the type sold through Mortgages Ltd.'s pool offerings.

163.    Kant later acknowledged in his SEC testimony that he knew—when he was meeting with Moya and the other Quarles lawyers—that Radical Bunny was continuing to raise money from investors that was loaned to Mortgages Ltd.  Moya and the other Quarles lawyers also knew that Radical Bunny was still raising tainted funds because they had the offering materials Radical Bunny was currently using.  They also knew the amount of money being raised because they were told that Radical Bunny's loans to Mortgages Ltd. had by August 13 increased to about $160 million from $140 million.  The loans were about $140 million in late January 2007, when Moya and Hoffmann first spoke with Hirsch.  Despite this knowledge that new loans were continuing to be made, neither Greenberg nor Quarles withdrew as counsel for Mortgages Ltd. or Radical Bunny.  Nor did any of the lawyers attending the August 13 meeting insist that Mortgages Ltd. stop accepting criminally tainted funds from Radical Bunny.  Nor did any of them insist that the investor offering documents disclose that the funds loaned by Radical Bunny to Mortgages Ltd. were raised through illegal securities sales.

164.    Instead, during the August 13 meeting and on August 15, 2007, Kant and Moya discussed preparing a private-offering memorandum for use by Radical Bunny to raise still more funds for Mortgages Ltd.  Kant explained that he would prepare the POM for a fee of $20,000, but that Quarles must be listed in the POM as counsel for the issuer.  Kant and Moya agreed that Radical Bunny would pay Greenberg the $20,000.

165.    Although he was a securities attorney, Moya privately acknowledged that he had not kept current on the requirements for a securities-compliant POM.

1   Accordingly, Moya was glad to let Kant take the lead in preparing Radical Bunny's

2   POM.

3   166.   Kant later told the SEC that he was frustrated with the Quarles attorneys

4   because Radical Bunny was "out there violating the damn law," but rather than get

5   Radical Bunny in compliance, Quarles was acting as "if Radical Bunny were Citibank."

6   Kant explained that it was because of this frustration that he obtained permission from

7   Denning to prepare the POM for Radical Bunny, thereby advancing the ML-RB Joint

8   Venture.  Moya or Bornhoft meanwhile obtained Hirsch's approval to pay the $20,000.

9   167.   During September 2007, Kant prepared the draft of a private-offering

10   memorandum for Radical Bunny.  On September 20, 2007, Kant e-mailed the draft POM

11   to Coles, Denning, and Brown.  Denning in turn e-mailed it to Moya with a copy to Kant.

12   168.   Kant intended the POM to be a first draft that Quarles could revise.  But

13   Kant received nothing back from Quarles.

14   169.   When Kant did not receive a new draft from Quarles, he decided to meet

15   with Hirsch and others directly to get the input he needed to finish the POM or to at least

16   generate a second draft that was acceptable to Hirsch and his partners.  Quarles gave Kant

17   permission to work directly with Hirsch.

18   170.   On October 25, 2007, Kant met with Hirsch, Coles, Denning, and Brown.

19   During the meeting, he received Hirsch's comments on the earlier POM, which he used

20   to prepare a second draft.  The next day, October 26, 2007, Kant sent the revised private-

21   offering memorandum to Denning, Brown, and Coles.  On the following Monday,

22   October 29, 2007, Brown sent the new draft to Radical Bunny.

23   171.   Hirsch asked Bornhoft and Moya to review the new draft.  Bornhoft asked

24   Moya, the Quarles securities attorney, if he could do it.  Moya agreed but waited another

25   month to read the revised POM.  Finally, on December 1, 2007, he read it, and e-mailed

26   Bornhoft that "the book [private-offering memorandum] was quite good.  Clearly, Kant's

-48-

1   team has spent a lot of time honing the language in related offering memos."

2   172.   Neither Quarles nor Greenberg ever completed a private-offering

3   memorandum for Radical Bunny.  Nor was an alternative plan to legalize Radical

4   Bunny's securities adopted.  In June 2007, Coles had suggested that Radical Bunny

5   become a "real estate investment advisor" to secure an exemption from the securities

6   laws, but Quarles concluded that would not help.  Similarly, in November 2007, Quarles

7   considered but rejected Hirsch's idea that Radical Bunny could exempt itself from

8   securities regulation by transitioning its investment sales program into a program

9   governed by the Arizona Department of Insurance.

10   173.   Accordingly, Radical Bunny simply continued raising money without

11   registering and without a private-offering exemption until Coles' death in June 2008.  As

12   a result, while Kant and Moya discussed, negotiated, and circulated draft private-offering

13   memorandums, none of the accredited and unaccredited investors from whom Radical

14   Bunny raised money were warned about Radical Bunny's past or ongoing securities

15   violations.  Likewise, until Coles' death, Mortgages Ltd. continued accepting tainted

16   loans from Radical Bunny and raising money from the Company's own unwitting

17   investors.

18       **3.**    **The Lawyer Defendants violated their professional duty to disclose the ongoing securities violations and withdraw from further representation.**

19

20

21   174.   Greenberg and Quarles knew that Radical Bunny was continuing to sell

22   tens of millions of dollars of unregistered securities in violation of the securities laws

23   throughout 2007 and until Scott Coles died in 2008.  They knew this at the very same

24   time they were telling their clients that these activities were illegal.  Meanwhile, Radical

25   Bunny in 2008 advanced another $24.6 million in new loans to Mortgages Ltd. that was

26   funded with money solicited in violation of Arizona and federal securities laws.  By that

time, Mortgages Ltd. was so insolvent that Olson was calling Radical Bunny daily to see what could be borrowed.

175.    Greenberg and Quarles also knew that Mortgages Ltd. was continuing to raise capital from its own investors.  By August 2007, Moya and Bornhoft had received one of the Greenberg-prepared POMs that Mortgages Ltd. was using for its securities sales.  They could see from reading it that it did not disclose anything about Radical Bunny's securities violations.

176.    Beginning in late 2007, Kant prepared four new private-offering memorandums for Mortgages Ltd. (two in November 2007, one in January 2008, and one in February 2008).  Each of the POMs was for a new securities offering by Mortgages Ltd.  None of these offering documents disclosed Radical Bunny's history of unremedied securities violations or its ongoing illegal sales.

177.    Moya, Bornhoft, and other Quarles lawyers likewise knew that Radical Bunny was continuing to raise capital for the ML-RB Joint Venture through its ongoing illegal securities sales, despite Hoffmann's assertion in early May 2007 that such sales were unlawful.

178.    Moreover, despite their mutual awareness of Radical Bunny's securities violations, the two law firms (Greenberg and Quarles), after May 3, 2007, drafted and circulated documents (besides the Radical Bunny POM) that provided for more loan by Radical Bunny to Mortgages Ltd.

179.    On May 10, 2007, Bornhoft sent a security agreement to Kant acknowledging that Mortgages Ltd.'s indebtedness to Radical Bunny had increased by another $12 million (from $140 million to $152 million) during the short time that Quarles had been retained.  Bornhoft's draft security agreement showed that he knew that the Radical Bunny fundraising that Hoffmann had said was illegal was continuing.  The agreement recited that "the Secured Party [Radical Bunny] has made and continues to

make loans to the Debtor [Mortgages Ltd.], with each loan evidenced by a promissory note . . . ."  Bornhoft copied Hoffmann, Shullaw, and Moya on the e-mail transmitting the securities agreement.  Neither Hoffmann, Shullaw, nor Moya objected to the provision for continuing loans.

180.    Quarles billing records show that Hoffmann and Shullaw in May 2007 worked with Radical Bunny on a "securities plan," a "draft of letter for current investors," "disclosure documents," and a "process sheet to be given to investors." On May 23, 2007, Quarles sent Radical Bunny a packet of materials "to be used for new investors along with a flow chart of the process for your use."

181.    In early June 2007, Quarles explored Radical Bunny's "options for . . . selling securities," and Hoffmann held a telephone conference with Hirsch and the Walders on June 12 to discuss "securities issues." The telephone conference of June 12 is memorialized by typewritten notes prepared by Berta Walder.  The notes reflect that Mortgages Ltd. wanted Radical Bunny "to mimic the rules and regulations" of a securities firm to deal with the unlawful securities sales before dealing with the lack of collateral for the Mortgage Ltd. notes given to Radical Bunny.  Radical Bunny, on the other hand, wanted to deal with the lack of collateral first.  In the meantime, Quarles sent Radical Bunny documents to provide "some degree of protection" for the Radical Bunny investors.  Afterwards, Hoffmann and Shullaw continued to prepare disclosure documents for new investors.

182.    In June 2007 Bornhoft sent Kant another draft security agreement that provided for Radical Bunny to continue making new loans to Mortgages Ltd.  Once again, Bornhoft copied Hoffmann and Shullaw and received no objection to the provision for continuing loans.

183.    On June 26, 2007, Bornhoft reviewed a draft disclosure statement for new Radical Bunny investors, which did not disclose either the past securities violations or the

1   lack of collateral.

2       184.   On July 24, 2007, Moya, Bornhoft, and Shullaw met at Radical Bunny's

3   office.  On July 26, 2007, Shullaw reviewed "new materials being used by Radical

4   Bunny," and on July 31, 2007, he discussed with Hoffmann the status of review of

5   Radical Bunny's "new offering documents."  On August 1, 2007, Shullaw forwarded to

6   Hoffmann the "materials currently being used" along with a "summary of securities

7   issues."

8       185.   Radical Bunny's ongoing illegal securities sales were thus the primary

9   subject at the August 13 meeting during which Kant told Hirsch, in the presence of Moya

10   and Bornhoft, that "they put people in jail for this."  During this same meeting, Kant,

11   Moya, Bornhoft, Denning, and Hirsch discussed the idea of Radical Bunny's notes being

12   converted to LLC interests of the type sold through Mortgages Ltd.'s pool offerings.  The

13   lawyers went through the numbers including the fact that Radical Bunny's loans to

14   Mortgages Ltd. had increased to about $160 million but that Mortgages Ltd. could make

15   available only about $100 million in loan participations as security for the $160 million

16   indebtedness.

17       186.   Because Kant had cited FASB 5[9] in letters that he had written, he was

18   unquestionably well-aware of its requirement for financial-statement disclosure of

19   contingent liabilities from possible litigation like that associated with Radical Bunny's

20   securities violations.  Kant knew that FASB 5 required Mortgages Ltd. to disclose its

21   contingent liability regarding receipt of loans funded with money raised in violation of

22   the securities laws.  Yet Kant continued to draft private-offering memorandums

23   incorporating financial statements without such disclosures.

24

25   _____

26      [9] FASB Accounting Standards Codifications Subtopic 450-20, Contingencies—
Loss Contingencies (codifying Statement of Financial Accounting Standards No. 5).

1

2

**4.      "An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, . . ."[10]**

3       187.   Kant, Moya, and Bornhoft all knew or should have known that under the

4   standards of the legal profession, "[A] lawyer has an obligation not knowingly to

5   participate in any violation by the client of the securities laws."  ABA Statement of

6   Policy on Lawyer Responses to Auditor Requests for Information.  Kant, Moya, and

7   Bornhoft also knew or should have known that a "lawyer may also be required . . . to

8   resign his engagement if his advice concerning disclosure is disregarded by the client."

9   *Id.*  The attorneys knew or should have been familiar with these standards because an

10  understanding of FASB 5 and the ABA Statement of Policy is needed to respond to

11  auditor requests for information concerning possible litigation claims.  Kant, for example,

12  had cited FASB 5 and the ABA Statement of Policy in letters to Mayer Hoffman.

13      188.   Similarly, Kant, Moya, Hoffmann, and Bornhoft knew that Arizona's

14  professional standards for attorneys impose an affirmative duty to disclose material facts

15  when disclosure is needed to avoid assisting fraud.  *See* Ariz. Ethical Rules 1.2(d) & cmt.

16  11, 1.16(a)(1), and 4.1(b).

17      189.   Radical Bunny's securities violations (and the contingent liabilities

18  associated with them) were material facts that Kant and Hoffmann (with Moya's

19  participation) had advised Hirsch, the Walders, and Shah created potential criminal, civil,

20  and regulatory liability.  Nevertheless, the ML-RB Joint Venture continued operating

21  Radical Bunny as an unregistered securities dealer and continued loaning illegally

22  obtained funds to Mortgages Ltd. in violation of state and federal securities laws.

23  _____

24      [10] *In re Am. Cont'l Corp./Lincoln Sav. and Loan Secur. Litig.*, 794 F. Supp. 1424,

25  1452 (D. Ariz. 1992) (In its entirety the quoted sentence reads: "An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that

26  the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue.").

190.    In these circumstances, Quarles was professionally obligated to terminate its representation to avoid covering-up and assisting the ongoing (and past) fraud perpetrated by Radical Bunny and the ML-RB Joint Venture.  *See* Az. Ethical Rules 1.2(d) & cmt. 11, 1.6(c)-(d), 4.1(b), 1.16(a)(1), and 1.13.  Instead, Quarles violated these ethical and professional standards by continuing to represent a client that the firm knew was engaged in ongoing securities registration and antifraud violations.

191.    Likewise, the same standards required Greenberg to terminate its representation to avoid assisting the ongoing fraud perpetrated by Radical Bunny and the ML-RB Joint Venture.  Instead, Greenberg violated these ethical and professional standards by continuing to represent a client that the firm knew was engaged in ongoing securities violations by selling securities through private-offering memorandums that did not disclose that Mortgages Ltd. was capitalized with proceeds from Radical Bunny's illegal securities sales.

192.    In sum, despite knowledge that unlawful conduct was occurring, the Lawyer Defendants did not cease representing Mortgages Ltd., Radical Bunny, or the ML-RB Joint Venture.  To the contrary, as shown below, they induced, participated in, and aided and abetted the securities fraud.

**5.      The Lawyer Defendants instead induced, assisted, and participated in the fraudulent scheme and unlawful securities sales.**

193.    The Lawyer Defendants knew that Radical Bunny was continuing to fund loans to Mortgages Ltd.  They knew that the money used to fund those loans was raised by misrepresenting the security for the investments made by Radical Bunny's investors.  They knew that the money was solicited from Radical Bunny's investors in violation of state and federal securities registration and disclosure laws.  They knew that this conduct created criminal, regulatory, and civil-liability risks.  But despite knowledge of all these facts, the Lawyer Defendants assisted Mortgages Ltd., Radical Bunny, and the ongoing

1   ML-RB Joint Venture.

2          194.   As previously described, Greenberg continued to prepare POMs for

3   Mortgages Ltd. that contained statements that Greenberg knew were materially

4   misleading and that were written with generalized risk disclosures that obscured or buried

5   known facts and risks that should have been concretely disclosed.  Throughout 2007 and

6   2008, Greenberg helped Mortgages Ltd. continue to raise capital through Radical

7   Bunny's illegal securities sales and facilitated Radical Bunny's continuing securities

8   violations.  Through the incomplete and misleading POMs, Greenberg assisted

9   Mortgages Ltd. in papering over and concealing mounting loan defaults.  *See* ¶¶ 86-87

10  and 204-07.  Greenberg also actively helped Mortgages Ltd. cover up the Company and

11  Greenberg's own wrongdoing.  *See* ¶¶ 218-46.  And in 2008, Greenberg structured and

12  helped create a new fraudulent product (the VTL Fund) issued by Mortgages Ltd. to raise

13  additional capital from unsuspecting investors.  *See infra* ¶¶ 218-23.

14         195.   Through its actions, Greenberg (a) was a knowing participant in the

15  fraudulent scheme perpetrated by the ML-RB Joint Venture, (b) induced, substantially

16  assisted, and participated in the illegal securities sales in violation of Arizona and federal

17  law, and (c) helped Mortgages Ltd. continue the illegal securities sales needed to

18  perpetrate Mortgages Ltd.'s existence and to cover up Greenberg's own professional

19  misconduct and participation in Mortgages Ltd. and Radical Bunny's securities

20  violations.

21         196.   Quarles, for its part, also lent substantial assistance to Radical Bunny and

22  the ML-RB Joint Venture.  Quarles knew that Radical Bunny was continuing to raise

23  capital for Mortgages Ltd. through ongoing securities sales that constituted civil and

24  criminal violations of the Arizona and federal securities laws.  Rather than withdraw from

25  representing Radical Bunny, as it was required to do, Quarles continued to assist

26  Mortgages Ltd., Radical Bunny, and the ML-RB Joint Venture's illegal activities by,

- Preparing documents for Radical Bunny to use in soliciting new investors.

- Preparing loan documents to facilitate Radical Bunny's relationship with Mortgages Ltd.

- Failing to insist that Radical Bunny inform existing investors of its prior and ongoing securities registration and antifraud violations.

- Failing to insist that Radical Bunny inform investors that its prior representations that their investments were secured were false.

- Allowing Radical Bunny to use Quarles & Brady's name and reputation in connection with offering documents to be used to solicit new investors and in connection with Radical Bunny's investor communications and meetings.

- Helping to arrange for Radical Bunny to pay Greenberg's fees in drafting a POM for Radical Bunny's use under the ML-RB Joint Venture.

- Agreeing to allow Radical Bunny's mangers to meet and work directly with Greenberg to negotiate deal points for the ongoing ML-RB Joint Venture.

- Reviewing and evaluating for Radical Bunny the loan documents that Mortgages Ltd. proposed for use in the ongoing ML-RB Joint Venture.

- Evaluating various ways to create a registration exemption for Radical Bunny in the midst of past and ongoing registration violations.

197.   Through its actions, Quarles knowingly (a) induced, (b) participated in, and (c) substantially assisted in violation of professional standards, the fraudulent scheme and unlawful securities sales perpetrated by the ML-RB Joint Venture.  Through its willingness to continue representing Radical Bunny despite Radical Bunny's illegal activities, Quarles enabled Radical Bunny to continue raising the illegal money that Mortgages Ltd. was dependent on to continue its own investor fundraising.  If the flow of loans from Radical Bunny to Mortgages Ltd. had ended, Mortgages Ltd. would not have been able to survive.  *See supra* ¶ 97 (quoting testimony from Mortgages Ltd.'s auditor).

### a.    Greenberg's role in the fraudulent scheme and illegal securities sales.

#### 1.    Preparation of false and misleading offering documents failing to disclose ongoing securities violations.

198.    Throughout the Class period, Kant prepared a stream of POMs that were deliberately written to obscure or bury known risks and adverse facts and that contained false or misleading statements and failed to disclose material facts necessary for the statements to be not misleading.  *See* ¶¶ 86-87, 200, and 204-09.  During the time that Greenberg served as counsel for Mortgages Ltd., Kant drafted no less than 11 different POMs for the following offerings:

### Table 2 — POMs Prepared by Greenberg Traurig

| Date | Issuer | Funds Raised |
|---|---|---|
| May 15, 2006 | Mortgage Opportunity Fund MP11, LLC (formerly known as MP120030, LLC) | $67,346,352 |
| June 30, 2006 | Mortgages Ltd. Opportunity Fund MP12, LLC | $17,014,510 |
| June 30, 2006 | Mortgages Ltd. Opportunity Fund MP13, LLC | $3,745,869 |
| June 30, 2006 | Mortgages Ltd. Opportunity Fund MP14, LLC | $11,866,757 |
| July 10, 2006 | Mortgages Ltd. | Estimated at $229 million |
| March 30, 2007 | Mortgages Ltd. Opportunity Fund MP15, LLC | $147,320,540 |
| April 12, 2007 | MP122030, LLC (also known as MP11) | Unknown |
| November 1, 2007 | Mortgages Ltd. Opportunity Fund MP16, LLC | $6,879,277 |
| November 2, 2007 | Mortgages Ltd. Opportunity Fund MP17, LLC | $64,999,905 |
| January 28, 2008 | Value-to-Loan Opportunity Fund 1, LLC | $7,701,631 |
| February 11, 2008 | Mortgages Ltd. | Estimated at $9 million |

199.   According to an internal memo authored by Denning, Greenberg Traurig was initially engaged "to review our Private Offering Memoranda (POMs) resulting in complete revision of MP11 which . . . corrects several hundred internal mistakes and inconsistencies.  This lays the foundation for going forward with MP12."  But far from correcting mistakes, all of the new POMs prepared by Greenberg partner Kant, beginning with MP11, were materially false and misleading.  *See, e.g.,* ¶¶ 86-87, 200, and 204-09 (listing material omissions and misleading representations in the POMs).

200.   The first POM that Kant prepared for Mortgages Ltd. amended an August 1, 2005 private-offering memorandum for MP122030, LLC, which was later renamed MP11.  The August 2005 private-offering memorandum, which was prepared by a law firm that preceded Greenberg, included in its risk factors a disclosure that registration violations in connection with sales of Mortgages Ltd. loan participations to earlier investors could result in rescission claims that—

- Might affect Mortgages Ltd.'s financial condition; and

- Might affect Mortgages Ltd.'s performance as the manager of the LLC.

Kant took even this very generalized disclosure out of the amended POM and kept it out of the ten POMs that he prepared afterwards.  His decision to eliminate this disclosure about liability from past securities violations foreshadowed his later decision to leave undisclosed the Radical Bunny securities violations for which he castigated Hirsch.

201.   New money raised under the May 15, 2006 private-offering memorandum and a replacement private-offering memorandum dated April 12, 2007 totaled $88.6 million.

202.   During the period from March 2007 through February 11, 2008, Kant prepared six new POMs for Mortgages Ltd.   Each POM was for a new securities offering.  None of the POMs made any disclosure about Radical Bunny's history of

unremedied securities violations.  In fact, during the entire time (December 2006 to June 2008) that Kant knew that Mortgages Ltd. was co-venturing with Radical Bunny and receiving tainted funds—criminal conduct for which Kant said "they put people in jail"— Kant was authoring POMs from which he scrubbed or omitted all risk disclosures relating to past securities compliance.  Indeed, the disclosure language never materially changed in any of Kant's POMs.

203.   During 2007, after Kant had concluded that Radical Bunny was violating the securities laws, Mortgages Ltd. raised an additional $127,319,356 million from its investors.  And yet another $70 million was raised in 2008.  All of this was solicited under POMs that Kant prepared without disclosing Radical Bunny's securities violations.

204.   The POMs that Greenberg prepared contain only a generalized description of Mortgages Ltd.'s loan-origination business.  Because of the generality, it was impossible for an investor to understand such matters as,

- the tens of millions of dollars in interest expense needed to sustain Mortgages Ltd.'s operations;

- the hundreds of millions of dollars in loans that were rewritten or sold to avoid showing borrower defaults;

- the progressive concentration of loans in fewer and fewer loans of larger amounts;

- the fears expressed by members of Mortgages Ltd.'s senior management including Denning, Brown, Newman, and Olson about these loan-concentrations and the delayed-funding obligations that they created;

- the debt burden that forced Mortgages Ltd. to end new loan originations in the summer of 2007;

- the Ponzi circle of money from new investors to old investors through which Radical Bunny provided the loans that capitalized Mortgages Ltd.; and

- the use of new investor money to pay interest to old investors and cover redemption requests.

205.   The POMs were honed, to use Moya's word, by Kant's team to provide general rather than fact-specific risk disclosures.  In fact, the risk disclosures were standardized to the point that the risk-disclosure language in the 11 POMs prepared by Greenberg between May 15, 2006 and February 2008 is nearly identical.

206.   Even when Mortgages Ltd.'s business materially changed, the POMs were never amended or updated to disclose adverse facts and risks associated with the changes. For example, the POMs make the following "Risk Factor" disclosures, yet fail to disclose the noted facts—

- *Represented risk*:

    "The Company [Mortgages Ltd.] will be subject to the risks of leverage to the extent it incurs debt."

    *Undisclosed facts*:

    Mortgages Ltd. had borrowed tens of millions of dollars through Radical Bunny on which it was incapable of repaying the principal.  The loans totaled $38.8 million as of December 31, 2005; $128.8 million as of December 31, 2006; and $172.6 million as of December 31, 2007.  Mortgages Ltd. never made a principal payment on the more than 90 loans obtained from Radical Bunny.  All 90 loans were funded with money raised by Radical Bunny through securities registration and disclosure (antifraud) violations.

- *Represented risk*:

    "The profitability of the Company depends on its acquiring interests in favorable Loans [and] [t]here will be a concentration of Loans among Borrowers."

    *Undisclosed facts*:

    By the summer of 2007, Mortgages Ltd.'s financial condition had deteriorated to the point that it was unable to continue its core business of making loans to developers.  The collapse of new loans coincided with Coles' decision to make loan commitments on five mega-loans exceeding $600 million.  Mortgages Ltd. lacked the funds to meet these loan commitments and began defaulting before the end of the year.

- *Represented risk*:

     "Loans are subject to the risk of default, in which
     event the Company would have the added
     responsibility of foreclosing and protecting the loans."

     *Undisclosed facts*:

     By January 2008, developers to whom Mortgages Ltd.
     had made loans had defaulted on more than $100
     million in outstanding loans.[11]  To avoid declaring
     defaults, Mortgages Ltd. systematically rewrote loans
     when borrowers were unable to obtain takeout
     financing or were otherwise financially troubled.

Rather than being informative, abstract risk descriptions like those just quoted were incomplete statements that operated as a fraudulent course of business through which Greenberg and its client misled investors about the Company's financial health.

**2.      Preparation of false and misleading offering documents failing to disclose Mortgages Ltd.'s deepening insolvency.**

207.    Mortgages Ltd.'s financial condition deteriorated drastically throughout 2007 and 2008.

208.    As more and more of its loans became non-performing, Mortgages Ltd. began to routinely rewrite or extend the loans to avoid disclosing borrower defaults. These practices accelerated sharply during 2007.  By February 2008, 28 of the 70 loans in the Mortgages Ltd. portfolio, representing $340 million of the $900 million of outstanding loan balances, were rewrites or loan extensions.

209.    Despite these accelerating loan rewrites, which required Mortgages Ltd. to raise additional tainted funds from Radical Bunny, the POMs prepared by Kant and the Senior Management Defendants failed to include disclosures about the increase in rewrites.  Nor did the POMs disclose the degraded underwriting standards that Mortgages

---

[11] Because of Mortgages Ltd.'s delayed-funding procedures, the loans had not been fully funded.

1   Ltd. was systematically using to create the rewritten loans needed to mask what would

2   otherwise be defaults on impaired loans.

3   210.   The risks created by the loan rewrites, extensions, and degraded

4   underwriting were exacerbated by the funding obligations incurred in connection with the

5   mega-loans issued by Mortgages Ltd.  Coles, Denning, Brown, and Newman knew that

6   Mortgages Ltd. lacked the capital to satisfy its funding obligations on these loans.  They

7   also knew that an increasing number of investor redemption requests was exasperating

8   the Company's lack of liquidity.  Coles, Denning, Brown, and Newman also knew that

9   Mortgages Ltd.'s inability to meet its funding obligations created substantial risks that the

10   mega-loans would default and that Mortgages Ltd. would face liability for breaching its

11   funding obligations.  Yet despite Coles, Denning, Bornhoft and Newman's review and

12   assistance in checking and preparing the POMs, none of the POMs described these

13   known risks in a manner calculated to allow an investor to understand how the risks

14   affected the Company's existing financial condition.

15   211.   During the period from March 2007 through November 2, 2007, Kant

16   prepared four new POMs for Mortgages Ltd. (MP 15, MP11, MP 16 and MP 17).  *See*

17   ¶ 198.  Each of these POMs was for a new securities offering by Mortgages Ltd.  None of

18   these POMs contain adequate disclosures concerning: (1) the risks associated with the re-

19   written and extended loans; (2) the risks associated with the increasing concentration of

20   mega-loans; or (3) the risks associated with Mortgages Ltd.'s inability to fund loan

21   commitments.  Moreover, the POMs prepared by Kant for the two new issuances in

22   November 2007 (MP 16 and MP 17) failed to disclose that Mortgages Ltd. has ceased its

23   core business operations and no longer had the financial capacity to make new loans.

24   212.   Soon after loan originations stopped, the Company was unable to meet

25   investor-redemption requests that had historically been honored.  Kant was aware of the

26   change in Mortgages Ltd.'s redemption practices and advised Coles that he could invoke

1    language in the governing documents that gave him discretion to reject redemption

2    requests.

3         213.   Mortgages Ltd.'s inability to honor redemption requests coincided with

4    defaults by borrowers on millions of dollars in maturing loans.  By at least mid-January

5    2008, Greenberg knew that the borrowers on over $100 million in development loans that

6    Mortgages Ltd. had funded had defaulted.  Greenberg knew this because attorneys in its

7    real-estate and bankruptcy departments (Karl Freeburg, Julie Rystad, and John

8    Clemency) prepared default notices for Mortgages Ltd. to send to the borrowers who had

9    given notice that they would not pay upcoming payments.

10        214.   One borrower for which Greenberg prepared a default notice was known as

11   the Grace Capital or Vento Group.  The default letter that Greenberg prepared noticed a

12   default on loans with an outstanding principal balance of over $100 million.  At the time

13   of default, the Grace (Vento) loans were impaired by about $60 million.  *See infra* ¶ 375.

14   No disclosure of the impairment was made in the Company's POM or its audited 2007

15   financial statements.

16        215.   Another borrower for which Greenberg prepared a $37 million default

17   notice in January 2008 was Central Phoenix Partners, LLC, a developer whose property

18   had been in foreclosure in early 2007.  At the time of default notice, the loan was

19   impaired by about $6.6 million (*see infra* ¶ 375), but no disclosure of the impairment or

20   earlier foreclosure was made in the Company's POMs or its audited 2007 financial

21   statements.

22        216.   Mortgages Ltd.'s inability to honor redemption requests, also overlapped

23   with (a) Coles' instructions to Defendant Olson to call Radical Bunny once a day to see if

24   it had new money to loan and (b) Mortgages Ltd.'s inability to pay Greenberg's own bills

25   as they became due.

26        217.   In the midst of this financial turmoil, Kant prepared POMs for two new

2008 offerings.  These new POMs, like the earlier POMs prepared by Kant, failed to disclose:

- The risks associated with the re-written and extended loans;

- The risks associated with the increasing concentration of mega-loans;

- The risks associated with Mortgages Ltd.'s inability to fund loan commitments;

- That Mortgages Ltd. had ceased its core business operations and no longer had the financial capacity to make new loans; or

- The growing defaults on the loans held by Mortgages Ltd.

### 3.   Greenberg helped Mortgages Ltd. cover-up the Company's fraud by creating a new product.

218.   One offering involved a new product that Kant helped structure.  The new product was known as the Value-to-Loan Opportunity Fund (VTL Fund).  It was marketed under a POM dated January 28, 2008 that Kant prepared.

219.   The VTL Fund was a direct result of Mortgages Ltd.'s insolvency, i.e., its inability to pay its interest obligations and other debts as they become due.  Kant and Mortgages Ltd. created the Fund at the same time Olson was making daily calls to Radical Bunny to see if it had new money to loan.  Kant formed the Fund in violation of voting requirements in operating agreements under which Mortgages Ltd. was managing existing LLCs.

220.   The VTL Fund was formed to borrow more money (on top of the $131 million already owed Radical Bunny investors)[12] that could be loaned by the VTL Fund to the LLCs (MP Funds) listed in Exhibit A.  In addition to the non-disclosures described in earlier paragraphs, the  VTL Fund offering documents did not disclose that millions of dollars to be raised under the VTL offering were earmarked to fund impound accounts

---

[12] At December 31, 2007, Mortgages Ltd. owed Radical Bunny $131 million.

1    through which interest to existing Mortgages Ltd. investors would be paid.

2        221.    Through the creation of the VTL Fund, Kant helped mask the Company's

3    insolvency by raising new money that had nothing to do with loan originations.

4        222.    Through the VTL Fund, Mortgages Ltd. raised over $7 million.  More than

5    55% of the money was used to fund impound accounts for interest owed by developers

6    who had previously borrowed money from Mortgages Ltd.  Nearly all of these developer

7    loans were troubled loans that had been rewritten during a period of falling real-estate

8    prices.  Mortgages Ltd. used money in the impound accounts to pay interest on money

9    owed to earlier Mortgages Ltd. investors.  In short, the VTL Fund was largely created to

10   raise money from new investors to pay old investors.

11       223.    Kant was aware of Mortgages Ltd.'s inability to pay its debts as they came

12   due (see, e.g., ¶¶ 213-15, 227, and 233-35) and of its dependence on Radical Bunny's

13   tainted funds (see, e.g., ¶¶ 202-03, 226-27, and 233-35).  By preparing the documents

14   needed to create and sell the VTL Fund, Kant and Greenberg knowingly participated in

15   Mortgages Ltd.'s ongoing fraud and helped the Company cover-up its fraud.

16                    **4.    Greenberg helped Mortgages Ltd. cover-up the**
                              **Company's fraud by advising it that disclosure on**
17                            **the Company's inability to meet loan commitments**
                              **was not needed.**
18

19       224.    As the Company's financial crisis worsened in 2008, Mortgages Ltd.

20   employees began to abandon the sinking ship.

21       225.    Newman, who Kant had recruited for the Company, resigned in mid-2007.

22       226.    From late 2006 through 2007, Denning and Brown had participated in the

23   meetings, telephone conversations, and written communications regarding Radical

24   Bunny's securities violations.  Both men knew that Mortgages Ltd.'s ability to operate

25   depended on illegal money for which that they heard Kant say people go to jail. By

26   December 2008, Denning and Brown were fearful to the point that they had decided to

-65-

1   resign.  Kant was aware of their resignations and had discussed their concerns about

2   Radical Bunny with them.

3       227.   On January 15, 2008, Coles and Nechelle Wimmer, a Mortgages Ltd.

4   officer, met with Kant to discuss Mortgages Ltd.'s funding obligations under its loan

5   commitments.  During this meeting, Coles asked Kant if they were required to disclose to

6   Mortgages Ltd.'s investors that the Company was having difficulty meeting its funding

7   obligations.  Kant said "no."

8           **5.     Greenberg helped Mortgages Ltd. terminate an**
            **insider who attempted to blow the whistle on the**
9           **Company's fraud.**

10      228.   Robert Furst was a broker who worked for Mortgages Ltd.'s captive

11  securities broker, ML Securities.  Furst was also licensed as an attorney.

12      229.   Through his work, Furst learned about defaults by Mortgages Ltd. on loans

13  to its borrowers.  He was also aware that Mortgages Ltd. was borrowing money from

14  Radical Bunny.  He had heard about the securities violations through which Radical

15  Bunny was raising its money.

16      230.   In December 2007, Furst raised concerns with his supervisor about

17  Mortgages Ltd.'s defaults on obligations to its investors and borrowers.  In March 2008,

18  Furst raised additional concerns about Mortgages Ltd.'s business practices with Coles

19  and others.

20      231.   That same month, Mortgages Ltd. contacted Greenberg about Furst's

21  concerns.  Kant and a Greenberg employment partner named John Lomax evaluated the

22  issues and advised Mortgages Ltd. on how to respond.

23      232.   At Lomax's direction, Greenberg advised Mortgages Ltd. to inform Furst

24  that he should not be making baseless allegations.  Greenberg also approved a decision to

25  suspend Furst with pay.  The suspension was implemented on March 31, 2008.

26      233.   The next day, April 1, 2008, Furst sent an e-mail to Mortgages Ltd. that

was forwarded to Lomax at Greenberg the same day.  In his e-mail, Furst responded to a request from Mortgages Ltd. for a list of his allegations.  In response, Furst's April 1 e-mail listed 14 investor or disclosure issues that needed to be addressed, namely:

> 1. Revolving opportunity program investors who are victims of a default by Mortgages Ltd.
>
> 2. Capital opportunity program investors who are victims of a default by Mortgages Ltd.
>
> 3. Mortgages Ltd./Radical Bunny securities issues
>
> 4. Mortgage pool investors disclosure issues
>
> 5. Value-to-loan fund disclosure issues
>
> 6. Investors who did not grant discretion to Mortgages Ltd.
>
> 7. Investors who wanted to receive their 2007 reinvested interest but did not receive it
>
> 8. Mortgages Ltd. 401(k) plan participant issues
>
> 9. Broker dealers and registered investment advisors disclosure issues
>
> 10. Solvency issues of Mortgages Ltd.
>
> 11. Loan summary sheets and related disclosure issues
>
> 12. Borrowers who are victims of a default by Mortgages Ltd.
>
> 13. Loan workouts questioned by investors
>
> 14. Discrimination in treatment among investors by Mortgages Ltd.

234. On April 8, 2008, Furst and his attorney met with Kant and Lomax to discuss the issues Furst listed.  The meeting was unproductive.

235. Rather than address Furst's concerns—which Kant knew from his own work were legitimate—Kant and Lomax mapped a plan for Mortgages Ltd. to fire Furst.  Furst was fired on April 25, 2008.

236. On April 28, 2008, a securities attorney from Snell & Wilmer representing Furst sent Lomax a letter.  In the letter, the Snell & Wilmer partner explained that Furst

had been fired in retaliation for his decision to disclose Mortgages Ltd.'s securities

violations.  One of the disclosure violations that was listed was Mortgages Ltd.'s

"potential complicity in the securities offerings to Radical Bunny's investors."

237.   The letter from the Snell & Wilmer partner concluded:  "Although your

client seemed to have no interest in hearing (let alone resolving) these issues and others

which Mr. Furst either brought, or attempted to bring, to Mr. Cole's attention, they will

undoubtedly be of interest to the Arizona Securities Division and other regulators."

238.   In a regulatory filing made to explain why Furst was fired, ML Securities

gave the following reason:  "[w]e learned that he may not be well suited to continue

working for us.  For example, it appears he may have misrepresented his credentials."

Greenberg, with Kant's approval, drafted this language.

239.   Kant knew that Furst's concerns were legitimate.  For example, Furst was

concerned about Radical Bunny's securities violations.  Kant had himself expressed

concern about these same violations since at least December 2006—15 months before

Furst raised the issue.  Kant had gone so far as to say that Hirsch could go to jail for

Radical Bunny's securities violations and that both Hirsch and Coles could end up on the

front page of the Arizona Republic.  Likewise, Kant knew that Furst's concerns about

loan defaults and Mortgages Ltd.'s solvency were legitimate issues.  He knew that

Greenberg attorneys were assisting Mortgages Ltd. on workout issues and had noticed

defaults on over $100 million in loans due from developers.  And he knew that by

November 2007, or earlier, that Mortgages Ltd. had stopped paying Greenberg's fees.  In

December 2007, he sent a series of e-mails to Denning and Brown pressing for payment.

In January 2008, he negotiated a workout on the fees under which Mortgages Ltd. agreed

to pay $50,000 a month on past due balances.

240.   In this regard, Plaintiffs have examined the Company's 2008 records

regarding deposits of money from Radical Bunny and payments to Greenberg.  Those

1   records show that during 2008, Greenberg accepted over $268,000 in fees paid by checks

2   issued within one day of money borrowed from Radical Bunny being deposited.

3   Throughout this period, Defendant Olson was making daily calls to Radical Bunny to see

4   if money could be borrowed.  In addition to the 2008 fees made possible by Radical

5   Bunny's loans, Kant agreed to accept $20,000 in tainted money from Radical Bunny in

6   return for preparing Radical Bunny's private-offering memorandum.

7       241.   Although Furst's 14-point e-mail raised material disclosure issues, Kant

8   took no action to amend or supplement the POMs that he had prepared to disclose

9   Mortgages Ltd.'s inability to pay its debts as they became due or the tainted Radical

10  Bunny funds on which Mortgages Ltd.'s survival depended.

11      242.   Despite his knowledge of the ongoing fraud, Kant until the end continued

12  to devise ways to extend the deception.  On May 29, 2008, just days before Coles' death,

13  Kant sent Coles a message encouraging him to continue what Kant knew was a

14  fraudulent enterprise:

15          Scott, I had a meeting with my team . . . .  We have a plan,
            which I want to discuss with you.  I did want you to know
16          that everyone at the meeting had nothing but great things to
            say about you, including how smart you are and how hard
17          you are working to protect your investors.  We do not always
            see that in situations like this.  Let's chat.
18

19      243.   In May 2008, when Kant sent this note, he had assembled a team of

20  Greenberg attorneys to handle regulatory inquiries about Mortgages Ltd. and Radical

21  Bunny's activities that were anticipated or underway by the Financial Industry

22  Regulatory Authority, the Securities and Exchange Commission, the Arizona Securities

23  Division, and the Arizona Department of Financial Institutions.

24      244.   During these regulatory inquiries, Kant and Greenberg insisted that

25  Mortgages Ltd. was blameless.

26      245.   In June 2008, when Mortgages Ltd. was forced into involuntarily

1   bankruptcy, Greenberg attempted to control public disclosures by filing a petition for a

2   voluntary bankruptcy reorganization.

3       246.   Even after creditors filed bankruptcy objections explaining that Greenberg

4   was really defending its own conduct, Greenberg persisted in trying to control the

5   bankruptcy in a series of heated bankruptcy hearings.  Eventually, pressure from creditors

6   forced Greenberg to resign.

7           **b.    Quarles' role in the fraudulent scheme and illegal securities
                   sales.**

8

9       247.   As alleged above, Moya, Hoffmann, and Bornhoft quickly realized that

10  Radical Bunny was selling securities in violation of Arizona and federal securities laws.

11  Hoffmann also suspected that the co-venture between Mortgages Ltd. and Radical Bunny

12  was a Ponzi scheme.

13      248.   After his first conversation with Hirsch on January 25, 2007, Moya wrote

14  an e-mail to his partner Hoffmann, in which Moya explained that Radical Bunny was

15  concerned with securities-compliance issues and stated, "I can see why."

16      249.   Reviewing Radical Bunny's files, Hoffmann saw loan lists showing that

17  Mortgages Ltd. had never repaid any of the principal that was borrowed.  For example,

18  Radical Bunny provided Quarles with a March 1, 2007 loan list showing that $144.5

19  million had been borrowed as of that date, but none of the principal had been repaid.

20  Hoffmann knew from his discussions with Hirsch that the loans that led to this $144.5

21  million had begun in 2005.

22      250.   As an experienced, 25-year securities lawyer, Hoffmann was familiar with

23  Ponzi schemes.  Because of the continuing rollover of money without any payment of

24  principal, Hoffmann questioned whether Mortgages Ltd. was operating a Ponzi scheme

25  fueled by funding from Radical Bunny's securities sales.  On March 22, 2007, he made a

26  file note asking, "[A] Ponzi scheme feel?"  When asked by the SEC to explain this

1    reference to a Ponzi scheme, Hoffmann acknowledged that it was a serious concern:

2            Q.      But something prompted you to raise that
         question.  I'm trying to find out what that was.

3            A.      Well, we were talking among ourselves and
4        raising issues, and so the -- if you see a few lines earlier, do
         we ever -- oh, how do our investors reinvest, and do they ever
5        send money back to us, meaning does Mortgages Limited
         ever send money back to us?  So I'm raising these questions.
6        Therefore, if they never send money back to us other than
         interest, does that have a Ponzi scheme feel to it.

7            Q.      A serious concern?

8            A.      Yes.

9

10   Despite the admitted seriousness of the issue (and with willful blindness to the existence

11   of the scheme), Hoffmann and the other Quarles attorneys continued representing Radical

12   Bunny in its loans to Mortgages Ltd. until after Coles died.  The result was some $200

13   million in preventable losses by both Mortgages Ltd. and Radical Bunny investors.

14          251.    In short order, Quarles concluded that the Radical Bunny sales of loan

15   participation interests to investors, many of whom were unaccredited, involved securities

16   registration and disclosure violations.  In a conversation with Kant on May 3, 2007,

17   Hoffmann, Moya, and Bornhoft discussed these securities violations and the need to

18   remedy them.  This was no surprise to Kant.  As Kant later told the SEC, he didn't see

19   how an experienced securities attorney could reach any other conclusion.

20          252.    Quarles also quickly realized that, contrary to what Radical Bunny had

21   been telling its investors, its notes from Mortgages Ltd. were *not* secured.  Mortgages

22   Ltd. had never signed a security agreement in favor of Radical Bunny.  Nor did the

23   promissory notes evidencing the loans refer to any collateral that secured repayment.

24   Rather than reveal the false representation of security to investors, Quarles tried to

25   address the problem without disclosure.  Thus, in April 2007, Quarles attorney Bornhoft

26   prepared a Term Sheet outlining a loan program in which Radical Bunny's loans would

                                          -71-

1    become secured as represented to its investors.

2        253.    Moya and Bornhoft were previously sued by a non-client (David Kremser)

3    for allegedly failing to properly perfect a security interest.  In that case, the Arizona Court

4    of Appeals held that Quarles had a duty to properly perfect the security interest even

5    though the plaintiff was not a client of the firm.[13]  Because of the Kremser litigation,

6    Moya and Bornhoft were especially sensitive to the materiality of the failure to perfect

7    the security interest represented to Radical Bunny's investors.

8        254.    As alleged above (¶ 153), on May 2, 2007, Hoffmann purportedly told

9    Hirsch and the other Radical Bunny managers that they had to stop selling securities,

10   disclose their securities violations to the SEC and Arizona Securities Division, and

11   comply with the securities-registration statutes before any new sales occurred.

12       255.    Hirsch told the Quarles lawyers that Radical Bunny would not agree to

13   admit and disclose the past securities violations.  *See supra* ¶¶ 22, 154-55.  Hoffmann

14   later testified to the SEC that he and the other Quarles lawyers assumed that Radical

15   Bunny would at least stop the illegal securities sales, thereby acknowledging that it would

16   be improper for Quarles to continue representing Radical Bunny with knowledge that its

17   client was continuing to sell investments in violation of the Arizona and federal securities

18   laws.  But as alleged above (¶¶ 23, 155-85) and further explained below, that is exactly

19   what Quarles proceeded to do.

20       256.    Quarles attorneys Hoffmann, Moya, and Bornhoft knew that Radical Bunny

21   was continuing to sell securities in violation of the securities laws.  *See supra* ¶¶ 155-85.

22   But rather than withdraw from further representation, they participated in, induced, and

23   substantially assisted Radical Bunny (and, in turn, the ML-RB Joint Venture) in

24   perpetrating the illegal loan program through which Class members were defrauded.

25   _____

26       [13] *See Kremser v. Quarles & Brady, L.L.P.*, 201 Ariz. 413, 36 P.3d 761 (App.
     2002).

1   **1.   Quarles participated in the ongoing unlawful**
2   **securities sales.**

3   257.   In May of 2007, with full knowledge of Radical Bunny's unlawful

4   securities sales, Quarles began working with Greenberg (Kant) to prepare a Radical

5   Bunny private-offering memorandum to replace the materially incomplete and

6   misleading Directions to Purchase that Quarles knew Radical Bunny had been using.

7   258.   Quarles attorneys Hoffmann and Shullaw began planning a private-offering

8   memorandum to be used in continuing sales to Radical Bunny investors.  Shullaw

9   notified Radical Bunny on May 8, 2007 that he had "begun work on a participation

10   agreement to be used in lieu of your direction to purchase."  Pending completion of the

11   new participation agreement, however, Radical Bunny needed advice on what risk

12   disclosures should be made to its new investors.

13   259.   In mid-May 2007, Quarles drafted and sent to Hirsch interim risk-

14   disclosure language and other documents that could be used with new investors.  Shullaw

15   sent some of those documents to Radical Bunny on May 23, 2007, together with a

16   "process summary to be used for *new* investors."  (Emphasis added).  Quarles thus knew

17   that Radical Bunny was continuing sales to new investors.  Radical Bunny revised its

18   investor forms to incorporate the risk-disclosure language that Quarles drafted.

19   260.   But the language Quarles drafted for new sales was itself misleading.  The

20   new risk disclosures falsely represented that the investments being sold by Radical Bunny

21   were secured with a lien on the assets of Mortgages Ltd.  Quarles knew that no such

22   security existed and that Mortgages Ltd. had balked at providing collateral to secure its

23   growing debt to Radical Bunny.  The Quarles' risk-disclosure language also failed to

24   reveal that Radical Bunny's prior sales violated the securities laws (even though

25   Hoffmann supposedly had told Hirsch that Radical Bunny needed to make this corrective

26   disclosure to existing investors).  Nor did the Quarles documents disclose the risks and

1   contingent liabilities associated with the illegal securities sales.

2   261.   After being told by Quarles, in early May 2007, that Radical Bunny was

3   violating the securities laws, Hirsch, the Walders, and Shah sought advice from Quarles

4   attorneys (including Hoffmann and Bornhoft) on the annual investor meeting scheduled

5   for later that month at the Orange Tree Resort.  Hirsch explained that all Radical Bunny

6   investors would be invited.  He explained to the Quarles attorneys that multiple

7   presentations would be made over a three-day period so that all investors would have a

8   chance to attend.

9   262.   Hirsch told the Quarles attorneys that the purpose of the meeting was to

10  update investors on Radical Bunny's status. Quarles advised Hirsch and his partners how

11  to conduct the meeting.  Quarles recommended controlling the persons who attended the

12  May 2007 investor meeting by having Radical Bunny require admittance tickets.  The

13  Quarles attorneys also discussed with Hirsch what would be said to the investors.  In

14  these discussions, Quarles agreed that Hirsch could tell the investors that Radical Bunny

15  was being represented by Quarles on securities issues and that a new investment program,

16  prepared and approved by Quarles, would be forthcoming.

17  263.   Hoffmann, Moya, and Bornhoft knew that Hirsch would make no

18  disclosure at the May meeting of Radical Bunny's past securities violations including the

19  misrepresentation that Radical Bunny's loans were secured by all of Mortgages Ltd.'s

20  assets.  The Quarles attorneys knew this because Hirsch had already told Hoffmann,

21  Moya, and Bornhoft on May 2, 2007 that he was not willing to admit to securities

22  violations.

23  264.   Quarles also knew that Hirsch and Radical Bunny intended to continue

24  selling new investments and that, because investors who attended the annual meeting had

25  historically reinvested with Radical Bunny, the meeting participants would inevitably be

26  purchasing or reinvesting in Radical Bunny securities.

265.    From June through December 2007, Moya, Shullaw, and Bornhoft, and to some extent Hoffmann, worked with Kant in preparing loan documents and continuing work on a private-offering memorandum.  On July 26, 2007, Quarles attorney Shullaw reviewed "new materials being used by Radical Bunny," and on July 31, 2007, he discussed with Hoffmann the status of the review of Radical Bunny's "new offering documents."  On August 1, 2007 Shullaw forwarded to Hoffmann the "materials currently being used" along with a "summary of securities issues."

266.    As explained above (see ¶¶ 161-64), a meeting was held on August 13, 2007.  At that meeting, Kant told Hirsch, in the presence of Moya and Bornhoft, that Hirsch could go to jail for Radical Bunny's securities violations.  During the meeting, Kant, Moya, Bornhoft, Denning, and Hirsch then discussed a new plan under which Radical Bunny's notes would be converted to LLC interests and sold under a POM of the type used for the limited-liability companies that Mortgages Ltd. managed.

267.    When Moya failed to prepare the contemplated Radical Bunny private-offering memorandum, Kant stepped forward to personally prepare the POM at a charge of $20,000.  Moya gave Kant permission to work directly with Hirsch in preparing the POM.  Moya knew that Kant intended to list Quarles as counsel for Radical Bunny in the POM, noting that Kant wanted Quarles "on the book," as Moya called the POM.  Moya agreed that Quarles' name could be used in the POM.  Quarles was later listed as counsel in the draft POMs for Radical Bunny that were circulated among Greenberg, Quarles, and senior management for Mortgages Ltd. and Radical Bunny.

268.    As explained above (¶¶ 167-71), Kant prepared drafts of a Radical Bunny POM in September and October 2007 that were circulated to Denning and Brown and from them to Moya and Bornhoft.  A third draft was prepared in early November 2007.  All of these drafts listed Quarles & Brady as counsel.

269.    When Quarles received the draft private-offering memorandum from Kant,

1   Bornhoft asked Moya to review it over the following week.  In an e-mail to Moya on

2   November 28, 2007, Bornhoft noted that Radical Bunny preferred the draft to be

3   reviewed by Moya rather than Hoffmann (who had told Hirsch to stop the illegal

4   securities sales).  Bornhoft acknowledged that "[y]ou and I are clearly the 'Chosen Ones'

5   for this client at this point in time."  Bornhoft and Moya were, in fact, chosen by Radical

6   Bunny because they were willing to assist Radical Bunny in its ongoing illegal securities

7   sales.

8        270.   In response to Bornhoft's e-mail, Moya agreed to review the draft POM

9   even though he was "not current with respect to POM's."  Moya also suggested that they

10   turn to Kant to review securities-compliance issues associated with the draft private-

11   offering memorandum even though "that won't get Q&B [Quarles] off the hook if

12   something falls between the cracks."

13        271.   Moya reviewed Kant's draft of the private-offering memorandum and

14   concluded that it was "quite good."  *See supra* ¶ 171.  Moya particularly liked the risk

15   factors disclosed in the draft POM, noting that they "were enough to scare off anyone"

16   and "[t]hat is a good thing because I think many of the items constitute real risks."  But

17   the draft POM and risk factors that satisfied Moya disclosed the risks stemming from

18   neither Radical Bunny's past nor ongoing securities registration, licensing, and disclosure

19   (antifraud) violations.  In that regard, the POM was no better than the inadequate

20   disclosures Quarles had already given Radical Bunny for use in the interim.

21        272.   At the November 2007 meeting of Radical Bunny investors, Hirsch once

22   again reassured the investors that Quarles' work on the private-offering memorandum

23   was continuing.  But while assuring investors that Quarles was looking out for their

24   interests, Hirsch failed once again to tell them about Radical Bunny's securities

25   violations or that their investments were not secured by Mortgages Ltd.'s assets, as they

26   had been led to believe.

273.   As alleged above, Quarles advised Radical Bunny on an alternative strategy to continue sales to non-accredited investors.  For example, in November 2007 Radical Bunny asked Quarles to explore the possibility of selling investments styled as fixed annuities through an insurance affiliate.  According to notes prepared by Robert Bornhoft, Radical Bunny wanted to find a "safe haven for non-accrediteds" but "would still use [the investment] funds to invest in Mtgs. Ltd. products."  The Quarles attorney recognized that the proposed new strategy would raise "securities issues" and questioned "could this be viewed as attempt to circumvent securities law?"

274.   In December 2007, Bornhoft learned that Hirsch wanted the option to continue funding Mortgages Ltd. under the same approach used in the past.  Bornhoft therefore suggested to Hirsch that he open direct negotiations with Mortgages Ltd. on deal points that were acceptable to Radical Bunny.  After that, the lawyers at Greenberg (Kant) and Quarles (Moya and Bornhoft) made no further efforts to address Radical Bunny's past or ongoing securities violations.

275.   With Quarles' consent, Radical Bunny again told its investors at the May 2008 meetings that Quarles' work on the private-offering memorandum was continuing.

276.   Thus, throughout 2007 and the first half of 2008, Quarles continued to assist Radical Bunny in its illegal sales of securities by working on a private-offering memorandum, by preparing interim disclosure documents, by assisting Hirsch in connection with the investor meetings, by advising Radical Bunny on alternative investment structures, and by lending Quarles' name to Radical Bunny's sales efforts. *See also supra* ¶ 196 (describing Quarles' assistance).  By doing so, Quarles not only provided substantial assistance and a façade of legitimacy to the ongoing fraudulent scheme, it also substantially induced and participated in the illegal securities sales.

**2.**   **Quarles also substantially assisted Radical Bunny's attempts to rectify without disclosure the misrepresentations that investors were purchasing secured investments.**

277.   Quarles also substantially assisted Radical Bunny's efforts to cure without disclosure the lack of any enforceable security interest in Mortgage, Ltd.'s assets.  As alleged above, Radical Bunny had represented to all of its investors (in the RB Offering Documents, at investor meetings, and in written communications) that their investments were secured or collateralized by interests in deeds of trust or by the assets of Mortgages Ltd.

278.   Shortly after Quarles was retained, Bornhoft concluded that, contrary to those investor representations, the notes from Mortgages Ltd. to Radical Bunny were unsecured.  The notes were not secured by an enforceable security interest in the assets of Mortgages Ltd. or anything else.

279.   In April 2007, Bornhoft prepared a Term Sheet that outlined a loan program in which Radical Bunny's loans would become secured as represented to its investors.

280.   Bornhoft e-mailed the Term Sheet to Kant on April 25, 2007.  Attorneys Hoffmann and Moya were both copied on the e-mail.  Kant ignored Bornhoft's Term Sheet.  He insisted that Quarles address Radical Bunny's securities violations before time was spent documenting the loan relationship or security between Radical Bunny and Mortgages Ltd.

281.   Frustrated with the lack of movement on loan security, and knowing that Radical Bunny was continuing to misrepresent that the investors' interests were secured, Bornhoft proposed replacing the Term Sheet with a basic security agreement and UCC-1 statement.  Bornhoft sent these to Kant by e-mail on May 10, 2007.  Bornhoft's e-mail states:  "Presently, the documentation to create and/or perfect the necessary liens and

securities interests *is either non-existent or defective in numerous respects*."  (Emphasis added).  Bornhoft proposed the blanket security agreement as "an interim approach to dealing with the issue."  Bornhoft emphasized that the documentation needed to be "put in place <u>immediately</u>" and that Radical Bunny had "been absolutely clear with me that this is the arrangement your client agreed to."  (Emphasis in original).

282.    Denning reacted emphatically and negatively to Bornhoft's proposed security agreement.  Denning learned about Bornhoft's proposal when Kant sent him an e-mail forwarding the security agreement with the note that "[y]ou will not like this."  Denning replied that there was "[n]ot a snowball's chance in you know where" that Mortgages Ltd. would grant the security interest belatedly sought by Radical Bunny.  Denning knew that Mortgages Ltd.'s insolvency and lack of liquidity prevented it from paying Radical Bunny's notes if they were called.  He and Kant agreed that they would not create a situation where Radical Bunny could call the notes at maturity and use a security agreement to foreclose on Mortgages Ltd.'s assets.

283.    During the ensuing months, Bornhoft continued to assist Radical Bunny in its efforts to find some retroactive way to secure the notes payable from Mortgages Ltd. to Radical Bunny.  Bornhoft sent e-mails to Kant.  When these were ignored, Bornhoft wrote a letter to Kant dated June 15, 2007.  The letter complained that Radical Bunny "is becoming increasingly concerned by the lack of cooperation by your client in providing meaningful collateral security for the loans from our client to your client that are currently outstanding."  Bornhoft concluded the letter saying that, if Mortgages Ltd. did not sign the security agreement that Bornhoft had prepared or provide specific comments, Radical Bunny would "have no choice but to conclude that your client is unwilling to fulfill its obligations with respect to the outstanding loans, and our client will proceed accordingly."  After reading this, Kant e-mailed Denning that, "These people are getting annoying."

284.   Bornhoft and Radical Bunny had every reason to be concerned.  As Bornhoft knew,

- Radical Bunny had falsely represented to its investors that the Mortgages Ltd. notes were secured;

- Hirsch had told Quarles that he would not admit to securities violations; and

- Radical Bunny was continuing to sell securities to investors under the false pretense that the investments were secured.

285.   In August 2007, the issue came to a head when Kant sent Moya and Bornhoft the draft Radical Bunny POM that he had agreed to prepare for $20,000.  The organizational structure described in the POM did not provide for a security agreement that would collateralize Radical Bunny's outstanding notes from Mortgages Ltd.  Once again, Hirsch and Bornhoft insisted that a perfected security agreement be provided. Kant and Denning were equally adamant that Mortgages Ltd. would not sign a security agreement.

286.   Finally, on September 8, 2007, Kant bluntly notified Moya in a terse e-mail that "ML will not put up additional collateral."[14]  Kant also told Moya that Mortgages Ltd. was not even obligated to pay its notes when they matured.  Instead, the notes gave Mortgages Ltd. discretion to pay maturing notes by assigning deeds of trust.  In Kant's words, "ML does not even have to pay in cash and your client will still be operating in a questionable manner."

287.   Moya was surprised to learn that Mortgages Ltd. was not obligated to pay in cash.  He asked Kant to tell him "why ML believes it is entitled to pay in kind instead of cash." Of course, as alleged above, Mortgages Ltd. was entitled to do just that under the terms of its notes to Radical Bunny (which apparently Moya had not even bothered to read).  This was another material fact that Kant (and now Moya) knew had not been

---

[14] Kant was overstating things because no collateral of any kind existed.

1    disclosed to Radical Bunny's investors.

2        288.   When Moya read the terms of the notes, he admitted that "I now agree with

3    Kant." Moya also realized that Radical Bunny's failure to disclose this information to its

4    investors was yet another material non-disclosure. Moya concluded that Mortgages

5    Ltd.'s option to assign deeds of trust rather than paying off its notes did not "jive with

6    what the client may have told existing investors with respect to their investments. I

7    suspect no one thought they were buying into a note that could be paid off in kind."

8        289.   Thus, not only had Quarles assisted Radical Bunny in continuing its illegal

9    securities sales for many months under the false representation that the Mortgages Ltd.

10   notes were secured; it had also recklessly disregarded that Radical Bunny's investors

11   were being misled into believing they had the right to repayment at maturity that did

12   exist.

13       290.   Bornhoft's response was to try to wash his hands of the matter by telling

14   Hirsch to negotiate with Mortgages Ltd. directly. Meanwhile, Radical Bunny continued,

15       •    Selling unregistered securities in violation of the securities laws;

16       •    Falsely representing to investors that their investments were secured;

17       •    Falsely representing that Mortgages Ltd. had an obligation to pay the
18            notes in cash; and

19       •    Funding investor redemptions with money from new investors.

20       291.   During the eight months in 2007 that Bornhoft allowed to pass without

21   curing the misrepresentation that collateral existed, Radical Bunny raised more than

22   $22.9 million from new sales based on the false and misleading offering documents. The

23   money from these new sales, as both Quarles and Greenberg knew, was loaned to

24   Mortgages Ltd.

25               **3.    Quarles withdraws after Coles' death.**

26       292.   Coles died on June 2, 2008. The very next day, Bornhoft spoke with Hirsch

1    by telephone.  Hirsch told Bornhoft that he expected a "run on the bank" as investors

2    sought to redeem and that the Radical Bunny loans to Mortgages Ltd. now totaled almost

3    $200 million.

4        293.    On June 6, Bornhoft discussed the matter with another partner at Quarles,

5    who "review[ed] the file of investor materials from Radical Bunny" and who drafted and

6    circulated a "potential investor script."

7        294.    On June 9, 2008, Quarles attorneys Bornhoft and Hoffmann spoke with

8    Hirsch, Shah, and the Walders.  During this call, Hoffmann and Hirsch both

9    acknowledged that Radical Bunny had continued to sell securities on behalf of Mortgages

10   Ltd. since the time Quarles began representing Radical Bunny more than a year earlier.

11       295.    The next day, on June 10, 2008, Bornhoft sent a letter to Radical Bunny

12   terminating Quarles' representation.  Bornhoft observed that in the wake of Mortgages

13   Ltd.'s impending financial collapse Radical Bunny would be unable to make payments

14   due to its investors.  As a result, Bornhoft concluded that Radical Bunny would inevitably

15   be sued by investors over the securities-law violations, non-disclosures, and licensing

16   violations that Quarles itself had known about, participated in, and assisted for more than

17   a year:

18                We are writing to confirm that our representation of your company
                 has ended. . . .  [I]t is almost certain that Mortgages Ltd. will not be
19               able to pay its note obligations to Radical Bunny in accordance with
                 their terms moving forward and this will prevent Radical Bunny
20               from being able to service its own accounts.  The inevitable claims
                 which will follow will address the previous advice Quarles & Brady
21               provided to Radical Bunny.  This advice expressly dealt with
                 procedures necessary to comply with securities laws going forward,
22               correcting information and documentation previously provided to
                 Radical Bunny's customers, addressing its collateral position and
23               addressing various licensing issues and banking regulations.

24       296.    Quarles' after-the-fact decision to discontinue representation of Radical

25   Bunny came far too late for the investor Class members who had continued to invest

26   funds and hold their Radical Bunny investments while Quarles actively assisted Radical

1   Bunny, knowingly participated in the ongoing fraudulent scheme, and helped induce

2   illegal securities sales over the prior 13 months.

3       297.   Ironically, one of the after-the-fact justifications offered by Quarles for its

4   disassociation with Radical Bunny was the possibility that the firm represented some of

5   the 900 Radical Bunny investors and therefore might have a conflict of interest.  Quarles

6   apparently did not bother to investigate these potential conflicts while it was accepting

7   fees and building a relationship with Radical Bunny.

8       **C.    Mayer Hoffman & McCann's Role**

9           **1.    Mayer Hoffman's audits were essential to Mortgages Ltd.'s
                     ability to raise money from investors.**

10

11      298.   For nearly a decade (beginning in 1998-99), Mayer Hoffman served as

12  Mortgages Ltd.'s outside auditor.

13      299.   Because of its long history with Mortgages Ltd., Mayer Hoffman was

14  intimately familiar with the Company's business model, its employees, its products, and

15  its exposure to real estate and mortgage-backed assets.

16      300.   Mayer Hoffman's work included auditing Mortgages Ltd.'s financial

17  statements for fiscal years ending in 2005, 2006, and 2007.

18      301.   Mayer Hoffman knew its audit reports would be used and relied upon by

19  prospective and existing investors (or their financial advisors) to evaluate the purchase

20  and holding of Mortgages Ltd.'s securities.  Thus, Mayer Hoffman acknowledged in risk-

21  assessment documents produced for the SEC that Mortgages Ltd.'s audited "financial

22  statements are used to secure additional funding and to provide evidence of financial

23  stability to investors interested in purchasing mortgage backed securities."  Mayer

24  Hoffman also noted in these documents that (a) investors were Mortgages Ltd.'s primary

25  source of financing and (b) the investments included "short term loans from Radical

26  Bunny, LLC and sales of participation (mortgage backed securities to investor pools)."

302.    For fiscal years 2005, 2006, and 2007, Mayer Hoffman provided clean audit reports, which represented that—

- Mayer Hoffman had conducted its audits in accordance with Generally Accepted Auditing Standards (GAAS); and

- Mortgages Ltd.'s financial statements fairly presented, in all material respects, its financial position for fiscal years 2005, 2006, and 2007, in conformity with General Accepted Accounting Procedures (GAAP).

303.    These clean audit reports were essential to Mortgages Ltd.'s ability to continue raising money through its debt-offerings to Plaintiffs and other investors in the proposed Classes.

304.    In conducting its audits, Mayer Hoffman had unique access to the underlying information used to prepare Mortgages Ltd.'s financial statements. This information was not available to the public. Mayer Hoffman knew that a central purpose of its audits was to have the firm act as a reputational intermediary who would use its unique access to inside information to provide independent assurances of financial stability to Mortgages Ltd.'s investors.

305.    Mayer Hoffman, CBIZ, Inc., and CBIZ MHM, LLC jointly promoted themselves as one of the foremost accounting and professional-service firms in the nation, with special experience in real estate. One of CBIZ's websites touts its Valuation Group's expertise in all types of real-estate valuations. In turn, Mayer Hoffman's website promotes its attest services with statements like the following: "Mayer Hoffman McCann, P.C.'s expertise may be supplemented with resources available through our close association with CBIZ, Inc., . . . a national multidisciplinary services company [that] is one of the nation's largest providers of professional business services."

306.    Mayer Hoffman was well aware of the particular audit risks[15] at Mortgages

---

[15] *Audit risk* is the risk that the auditor will not detect that the financial statements are materially misstated. Auditors successfully reduce audit risk by designing and

-84-

1   Ltd. that were associated with the Company's real-estate-related assets.  During its field

2   work and planning for the 2005, 2006, and 2007 audits, Mayer Hoffman reviewed

3   Mortgages Ltd.'s internal controls, paying specific attention to real-estate asset

4   valuations, which Mayer Hoffman recognized involved especially sensitive valuation

5   estimates.  In fact, in connection with the 2007 audit, the senior on the Mayer Hoffman

6   auditor team sent an e-mail to Defendant Olson explaining that "the name of the game

7   this year is impairment and collateral testing."

8       307.   Mayer Hoffman recognized or should have recognized the risk of

9   nonpayment (especially of high-interest bridge loans like those in which Mortgages Ltd.

10   specialized) as well as the risk of a downturn in the economy and the dangers of an

11   overconcentrated investment in a small pool of large loans.

12       308.   Mayer Hoffman also recognized or should have recognized the audit risk

13   created by Mortgages Ltd.'s exposure to even a minor downturn in Arizona's commercial

14   real-estate market.

15       309.   Prudent mortgage lending requires reserves that reflect losses inherent in a

16   loan portfolio, but higher reserves mean lower net income and a decrease in total assets.

17   A basic principle of financial accounting standards requires recording real-estate assets at

18   fair value and recording loan impairments.  As explained below (¶¶ 369-75), Mortgages

19   Ltd. overvalued its real-estate assets and failed to properly record loan impairments or

20   reserves.

21       310.   Audits are designed to obtain an opinion on whether a company's financial

22   statements fairly present, in all material respects, the financial position of the company in

23   conformity with GAAP.  To accomplish this, audits must be conducted in accordance

24   with GAAS, which are codified in Statements of Auditing Standards (SAS) that are

25   referred to with an AU number.

26

performing proper audit procedures.  AU 312.12.

311.   As acknowledged in Mayer Hoffman's audit opinions, and as set forth in AU 110.02, the firm had the affirmative duty under GAAS to plan and perform its audits to obtain reasonable assurance that the Company's financial statements were free of material misstatement, whether caused by error or fraud.

312.   To obtain this reasonable assurance, the independent auditor has to perform the procedures called for by GAAS.  Then, after performing these procedures, the auditor must decide if anything came to the auditor's attention that would lead the auditor to believe that the financial statements are not fairly presented in accordance with GAAP. AU 150.02 (Standards of Fieldwork).  Thus, the audit process *requires professional skepticism* to properly test management's representations.  In this way, the auditor has a reasonable basis on which to form an opinion regarding the financial statements. AU 333.02.  The audit opinion is valuable precisely because the auditor is supposedly conducting an *independent* and *skeptical* examination of the information provided by management.

313.   Under GAAS, the auditor must consider both audit risk (see *supra* note 15) and materiality in (a) planning the audit and designing audit procedures, and (b) in evaluating the results of the audit in relation to the financial statements as a whole. AU 312.11.  The auditor must plan the audit to obtain reasonable assurance of detecting material misstatements that the auditor believes could be large enough, individually or in the aggregate, to be quantitatively material to the financial statements.  AU 312.18.

314.   Mayer Hoffman failed to adhere to these basic accounting principles.  As a result, its audit reports misrepresented to investors the true financial condition of Mortgages Ltd. and misrepresented that Mayer Hoffman had conducted its audits in compliance with GAAS.

315.   In performing its audit work for Mortgages Ltd., Mayer Hoffman agreed and had a duty to perform its work in conformity with GAAS.  GAAS establishes ten

Professional Standards of Care:

**General Standards**

1.     The audit must be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.     In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditors.

3.     Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

**Standards of Field Work**

4.     The work is to be adequately planned and assistants, if any, are to be properly supervised.

5.     A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

6.     Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

**Standards of Reporting**

7.     The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

8.     The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

9.     Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10.     The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefor should be stated.  In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

316.     From its annual audit work, Mayer Hoffman knew or negligently disregarded—

•     The true financial condition and exposure of Mortgages Ltd.,

- • The value of Mortgages Ltd.'s real-estate assets; and

- • Mortgages Ltd.'s deteriorating financial condition,

which contradicted the unqualified audit reports on Mortgages Ltd.'s financial statements.

317. During its audit work, Mayer Hoffman identified material weaknesses in Mortgages Ltd.'s internal-control structure. These weaknesses are discussed below and were identified in internal-control reports issued by Mayer Hoffman to Mortgages Ltd.'s board of directors in connection with the 2006 and 2007 audits. Despite these material weaknesses, Mayer Hoffman issued clean, unqualified audits for Mortgages Ltd.'s financial statements.

318. Mayer Hoffman violated GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report.

319. Mayer Hoffman also violated GAAS Reporting Standard No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP. Mayer Hoffman's audit opinion falsely represented that Mortgages Ltd.'s financial statements complied with GAAP. For example, Mayer Hoffman negligently,

- • Concluded that GAAP (i.e., FIN 46)[16] allowed Mortgages Ltd. to present its financial statements without consolidating the limited-liability companies through which Mortgages Ltd. raised money.

- • Certified Mortgages Ltd.'s financial statements as GAAP compliant even though, contrary to FAS 57,[17] Radical Bunny was not identified as a related party and all material transactions between Radical Bunny and Mortgages Ltd. were not disclosed.

---

[16] FASB Accounting Standards Codification Subtopic 810-10-15, Consolidation-Entities (Codifying FASB Interpretation No. 46).

[17] FASB Accounting Standards Codifications Subtopic 850-10, Related Party Disclosures (codifying Statement of Financial Accounting Standards No. 57).

- • Represented that Mortgages Ltd.'s financial statements were GAAP compliant even though Mortgages Ltd. did not report its real-estate assets at fair value as required by FAS 157[18] and failed to disclose the fair-value methods used in valuation as required by FAS 107.[19]

320.    These misstatements in Mortgages Ltd.'s financial statements were material and misrepresented Mortgages Ltd.'s compliance with GAAP.  In making these misstatements, Mayer Hoffman breached its professional responsibilities and acted in violation of GAAS in its audits of the 2005, 2006, and 2007 financial statements of Mortgages Ltd.  The GAAS violations are described more particularly in the following paragraphs.

321.    Mayer Hoffman violated GAAS Field Standard No. 1, and the standards set forth in AU sections 311, 314, 318, and others, by failing to adequately plan its audit and properly supervise the work of assistants to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

322.    Mayer Hoffman violated AU section 316, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism.  Section 316 begins with the statement that:  "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."  AU  316.01.  Numerous audit red flags and risk factors existed that should have alerted Mayer

.    .    .

.    .    .

---

[18] FASB Accounting Standards Codifications Subtopic 820-10, Fair Value Measurements and Disclosures (codifying Statement of Financial Accounting Standards No. 157).

[19] FASB Accounting Standards Codifications Subtopic 820-10-50, Fair Value Measurements and Disclosures (codifying Statement of Financial Accounting Standards No. 107).

Hoffman to the potential for misstatements.  These red flags and risk factors include the

material weaknesses identified in Mayer Hoffman's internal-control reports.  They also

include:

- The resignation of three members of senior management (Defendants Denning, Brown, and Newman) during the months leading up to the 2007 audit report.

- The atypical lending terms between Mortgages Ltd. and its largest investor-lender, i.e., Radical Bunny.  *See infra* ¶ 352.

- Adverse key financial ratios.  *See infra* ¶¶ 357-60 & n. 34.

- The Company's increasing dependence on cash flow from Mortgages Ltd. and Radical Bunny investors.  *See* Table 3 in the following paragraph, depicting the rise in borrowing from Radical Bunny and Mortgages Ltd. investors.

- Working capital deficiencies.

- The cessation of loan originations in 2007.  During the 2007 audit, Defendant Olson told the Mayer Hoffman auditors that loan originations had ceased.

- Efforts by Mortgages Ltd. in 2007 to expand its financing by having outside broker-dealers and investment advisors sell the Company's securities.

- Increased loan extensions and default workouts that increased the time required for loan repayment.

- Termination of Mortgages Ltd.'s profit-sharing plan.  According to Defendant Olson's SEC testimony, the Mayer Hoffman auditors knew, during the 2007 audit, that the profit-sharing plan had been terminated.

- A weakening economy that signaled greater mortgage impairments and reductions in asset carrying values.

- By the end of 2007, Mortgages Ltd. did not have the cash flow to meet redemption requests that had historically been honored.  According to Defendant Olson's SEC testimony, the Mayer Hoffman auditors were aware of this.

323.   In his SEC testimony, Charles McLane, the engagement partner for the

2006 and 2007 audits, acknowledged that information indicating that any of the following

had occurred would be an important fact for an auditor to consider:

- • That Mortgages Ltd. had stopped making new loans.

- • That Mortgages Ltd. had ended its employee profit-sharing payments.

- • That Mortgages Ltd. had stopped honoring investor redemption requests.

According to Defendant Olson, Mayer Hoffman was aware, during the 2007 audit, of each of these adverse facts.

324.   The graph in Table 3 describes the increase in investor borrowing during the Class period, i.e., from September 2005 through June 2008.  As shown by the graph, debt due Radical Bunny increased from $14.8 million at October 31, 2005 to approximately $197 million at June 30, 2008.  Debt due Mortgages Ltd. investors increased from about $498 million at October 31, 2005 to approximately $733 million at June 30, 2008.

**Table 3 — Increase in Debt Due Investors**



325.    Because of this increase in debt, Mortgages Ltd.'s interest expense quadrupled, increasing from $13 million at October 31, 2005 to $60 million at December 31, 2007.  As a percentage of revenue, interest expense during the same period increased from 32% of total revenue to 57% of total revenue.[20]

326.    Despite the red flags described in the three preceding paragraphs, Mayer Hoffman failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence.  AU section 316.27, which discusses the need to exercise professional skepticism in response to the risk of material misstatement, requires:  (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions, and (b) increased recognition of the need to corroborate management explanations or representations concerning material matters.  As AU section 316.52 states, "[t]he nature of audit procedures may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information.  For example, more evidential matter may be needed from independent sources outside the entity."  In this regard, Mayer Hoffman failed to (a) obtain adequate confirmations or otherwise communicate directly with Mortgages Ltd.'s borrowers and the Company's primary lender (i.e., Radical Bunny) and (b) fully understand the relationship between Radical Bunny and Mortgages Ltd., despite knowledge of risk factors and audit red flags that required auditor follow up.

327.    In summary, and as more fully explained below, by giving unqualified audit opinions for the Mortgages Ltd.'s financial statements for fiscal years 2005, 2006, and 2007, Mayer Hoffman represented that its audits of Mortgages Ltd.'s books and records were done in accordance with GAAP and GAAS.  They were not.  Thus, Mayer Hoffman's audit reports were materially misleading and falsely reported Mortgages

---

[20] These calculations assume that the financial statements were properly consolidated as required by FIN 46.

1  Ltd.'s financial condition to the Company's investors.

2          **2.      Mayer Hoffman knew that Mortgages Ltd.'s CFO lacked the**
           **skills to prepare GAAP-compliant financial statements.**
3

4  328.   Defendant Olson was Mayer Hoffman's primary management contact in

5  connection with the 2005, 2006, and 2007 audits.

6  329.   Olson lacked the skills to competently prepare the financial statements that

7  were the basis for Mayer Hoffman's audits.

8  330.   Mayer Hoffman was aware of Olson's shortcomings.  Olson's lack of

9  familiarity with GAAP and audit standards was explained in a March 2007 memo

10  prepared after Mayer Hoffman's 2006 audit.  Mayer Hoffman wrote:

11          • "The initial draft of the consolidated financial statements provided
            by management [Olson] did not include all required disclosures
12          under GAAP.  In addition, certain transactions were not properly
            classified or presented in the consolidated financials."
13
            • "Company personnel [Olson and his assistants] do not have the
14          appropriate tools, such as, disclosure checklists, AICPA accounting
            and audit guides and other authoritative literature necessary to
15          prepare the Company's annual consolidated financial statements
            including related footnote disclosures in accordance with GAAP."
16
            • "It is strongly recommended that those individuals [Olson and his
17          assistants] responsible for the maintenance of the Company's
            accounting records seek out opportunities to enhance their
18          understanding of generally accepted accounting principles (GAAP)."

19  331.   As a result of the quoted findings, Mayer Hoffman knew that Olson's lack

20  of understanding regarding GAAP and audit requirements was a material weakness in the

21  reliability of Mortgages Ltd.'s accounting system.

22  332.   Under AU section 318, this material weakness required higher scrutiny and

23  more skepticism in auditing the financial statements that Olson prepared.

24  333.   Deficiencies in Olson's work required a restatement of the audited 2005

25  financials.  These deficiencies also required Mayer Hoffman to actively assist Olson in

26  preparing the 2006 financial statements that Mayer Hoffman audited.  In other words, for

1  the 2006 audit, Mayer Hoffman was actively involved in both preparing and auditing

2  what were supposed to be management's financials.

3          **3.      Mortgages Ltd.'s financial statements should have been
                      consolidated to include the limited-liability companies that
4                     Mortgages Ltd. managed.**

5          334.    Mortgages Ltd. securitized its loan participations and sold the participation

6  interests through limited-liability companies (LLCs).  Mortgages Ltd. was the manager of

7  these limited-liability companies.

8          335.    Investors in these LLCs were passive investors who depended upon

9  Mortgages Ltd. for the managerial experience and know-how to manage the LLCs.

10         336.    Investors did not have the experience, desire, or know-how to manage a

11 complex company like Mortgages Ltd.

12         337.    Under the operating agreements that governed the LLCs, Mortgages Ltd.

13 retained exclusive discretion over all aspects of the loans in which the LLCs invested.

14 Thus, Mortgages Ltd. had exclusive authority on matters such as loan quality, loan terms,

15 loan rewrites, loan modifications, and decisions on declaring defaults.  Investors in the

16 LLCs had no right to participate in these decisions or to remove Mortgages Ltd. because

17 of disagreements about its business judgment in making management decisions.

18         338.    Under the operating agreements, Mortgages Ltd. could be removed only for

19 willful misconduct or fraud.[21]  A supermajority vote (75%) was required for removal.

20 Investor-members were given no right to remove Mortgages Ltd. because of

21 disagreements about nonfraudulent managerial decisions.

22         339.    Through FIN 46,[22] GAAP requires consolidation when equity holders like

23

24         [21] Removal for "willful misconduct or fraud" became the standard in June 2006
25 when Greenberg revised the POM and operating agreement for the MP 12 offering.
   Before that, the Mortgages Ltd. could be removed only for a "materially negligent act or
26 omission to act."
           [22] Cited *supra* note 16.

1   Mortgages Ltd.'s investors lack the ability through voting or similar rights to "make

2   decisions about an entity's activities that have a significant effect on the success of the

3   entity."

4        340.   Because of the exclusive managerial control and discretion that Mortgages

5   Ltd. possessed, Mortgages Ltd.'s investors had no control over the business decisions that

6   determined the success of the limited-liability companies.  Thus, FIN 46 required that the

7   2005, 2006, and 2007 financial statements be presented as consolidated statements that

8   included the limited-liability companies.

9        341.   Because of the terms of the operating agreements and the POMs, no

10  reasonable auditor could have concluded that the investors in the limited-liability

11  companies had the ability to control Mortgages Ltd.

12       342.   Even so, Mayer Hoffman negligently represented to investors in its 2005,

13  2006, and 2007 audit reports that Mortgages Ltd.'s financial statements complied with

14  GAAP despite the fact that, contrary to FIN 46, the Mortgages Ltd.'s financial statements

15  did not consolidate the limited-liability companies.

16                    **4.    Because the financial statements were not properly consolidated,
                            they misrepresented Mortgages Ltd.'s financial condition.**
17

18       343.   By failing to consolidate the limited-liability companies, the financial

19  statements and Mayer Hoffman's audit reports misrepresented Mortgages Ltd.'s debt,

20  leverage of assets and equity, interest expense, and lack of liquidity.  For example, when

21  consolidated, Mortgages Ltd.'s October 31, 2005 balance sheets show a debt-to-equity

22  ratio of 248x rather than the 10.7x ratio shown on an unconsolidated basis.[23]

23       344.   The adverse 2005 debt-to-equity ratio was part of an abrupt reversal of

24  Mortgages Ltd.'s financial condition that began in 2005.  The Company's spiral into

25  ────────────────

26  [23] Debt-to-equity is defined as total debt divided by total equity.  A debt-to-equity
    ratio of 248x means that there is $24,800 of debt to third parties on the books of
    Mortgages Ltd. for every $100 of equity belonging to the owners.

negative equity and increasing debt levels was masked by the decision not to consolidate the LLCs is shown by the following table:[24]

### Table 4 — Debt and Equity Balances by Year



345.   As red-flagged by these ratios, and as explained in Part IV(C)(6) below, if the LLCs had been included as consolidated entities, Mortgages Ltd. would have been insolvent—a fact that a reasonable auditor would have disclosed.

**5.      The disclosures regarding notes payable to Radical Bunny were materially incomplete and misleading.**

346.   Although Mortgages Ltd. borrowed $14,820,000 from Radical Bunny in the last two months of the 2005 fiscal year, the Company's audited 2005 financial statements

---

[24] Numbers in the table are after consolidation.

1    do not include any disclosure regarding Mortgages Ltd.'s indebtedness to Radical Bunny.

2         347.   The first disclosure regarding Radical Bunny appears in footnote 9 of the

3    2006 and restated 2005 financials.  Without mentioning Radical Bunny by name, footnote

4    9 provides the following description of the notes payable to Radical Bunny:

| "**Notes payable consist of:** | December 31, 2006 | October 31, 2006 | October 31, 2005 |
|---|---|---|---|
| Notes payable to an investor, collateralized by the assets of the Company, payable in monthly installments of interest only at a rate of 13% annually, maturing in various months in 2007.  Notes payable as of October 31, 2006 and 2005 had terms of 12 months or less. | $128,839,758 | $99,008,500 | $14,820,000 |

.    .    .

The notes payable amounts above can be repaid through the assignment of participation interests in mortgages investments."

347.

348.   Footnote 11 of the 2007 audited financial statements contains a similar

description of Mortgages Ltd.'s notes payable to Radical Bunny.  It reads:

> The Company has $172,609,758 of outstanding notes payable
> with one lender as of December 31, 2007, of which
> $127,215,351 represents notes entered into during 2006 that
> were renewed in 2007 and $45,394,407 represents new notes
> issued in 2007.  The notes are collateralized by the assets of
> the Company, payable in monthly installments of interest
> only at 13% and maturing at various times during 2008.  The
> monthly interest installments approximated $1,870,000 per
> month during the year ended December 31, 2007.  The lender
> allows for repayment to be made through the assignment of
> participation interests in mortgage investments held for
> investment and sale.

349.   Under GAAP (FAS 57),[25] Radical Bunny and Mortgages Ltd. were related parties.  In that regard, Radical Bunny acted as an unregistered, captive-securities dealer, which sold Mortgages Ltd. loan participations to investors.  *See supra* ¶¶ 75-76 and 142. Because of the financial ties between the two companies, Mortgages Ltd. was able to significantly influence Radical Bunny's management and Radical Bunny's operating and investment policies.

350.   Contrary to FAS 57, the related-party disclosures in the footnotes to Mortgages Ltd.'s 2005, 2006, and 2007 financial statements did not identify Radical Bunny as a related party and did make the disclosures required by FAS 57.

351.   Because of the related party relationship, AU section 334 required that the transactions between Mortgages Ltd. and Radical Bunny be given greater auditor scrutiny.  Similarly, FAS 57 required detailed related-party disclosures.

352.   From examining Mortgages Ltd.'s notes to Radical Bunny and the payment history under them, Mayer Hoffman knew or should have known that the notes contained atypical terms that would not be accepted in an arms-length commercial transaction. Examples of the atypical terms include the following:

- Notes from Mortgages Ltd. to Radical Bunny were never paid at maturity.  The notes were always rolled into new notes with new maturities.

- Mortgages Ltd. was not required to repay the notes in cash.  Instead, it could pay the notes by assigning loan participations.

- The notes were written to allow payment in loan participations even though Mortgages Ltd.'s financial statements showed that it did not have enough mortgage investments to pay Radical Bunny's notes if they were called.

- Mortgages Ltd. was given complete discretion to decide what loan participations were assigned.

- The notes paid an above-market, 13% rate of return.

---

[25] Cited *supra* note 17.

353.   Contrary to FAS 57, the representations in the footnotes quoted above were incomplete and misleading in the following ways:

- The notes were not collateralized by Mortgages Ltd. assets.

- By their terms, the notes did not provide for security.

- A security agreement between Radical Bunny and Mortgages Ltd. did not exist.

- A security interest in Mortgages Ltd.'s assets had not been perfected.

- Mortgages Ltd. did not hold enough mortgage investment interests to pay the Radical Bunny notes by assignments.  At December 31, 2006, Mortgages Ltd.'s indebtedness to Radical Bunny exceeded the mortgage investments that Mortgages Ltd. owned by $49.2 million.  At December 31, 2007, Mortgages Ltd.'s indebtedness to Radical Bunny exceeded the mortgage investments that Mortgages Ltd. owned by $20.1 million.

### 6.   The financial statements required going-concern disclosures that were not made.

354.   AU section 341 (i.e., SAS 59)[26] requires an auditor to evaluate whether there is a substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time.  Conditions such as working-capital deficiencies, negative cash flows, and adverse financial ratios coupled with other indications of financial difficulties must be considered in the aggregate to decide if an opinion or disclosure on the entity's ability to continue as a going concern is needed.

355.   By the fourth quarter of 2005, Mortgages Ltd. was cash-flow insolvent.[27] The Company at this point was dependent on loans funded by illegal money that Radical Bunny was raising through violations of Arizona and federal securities laws.  To cover its operating expenses, Mortgages Ltd. borrowed $38.9 million from Radical Bunny in the final four months of 2005.

---

[26] Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 59 (Am. Inst. of Certified Pub. Accountants 1988).

[27] *Cash-flow insolvent* means that a company is unable to generate enough cash flow from its own operations to support its daily expense of doing business.

356.    By 2006, Mortgages Ltd. was balance-sheet insolvent.[28]  With consolidation, Mortgages Ltd. would have shown a negative net worth in 2006 and 2007, as follows:

## Table 5 — Negative Net Worth By Year

| Date | Net Worth |
|------|-----------|
| October 31, 2006 | (2,480,888) |
| December 31, 2006 | (3,673,014) |
| December 31, 2007 | (9,435,653) |

357.    Similarly, with consolidation, the October 31, 2005 audited balance sheet shows negative working capital with a current ratio of 0.99x.[29]  After consolidation, the 2005 debt-to-asset ratio[30] increases from 0.87x to 0.96x and the debt-to-equity ratio[31] increases from 10.7x to 248x.  On the income side, income coverage for 2005 decreased from 7.9x to 1.6x,[32] and interest expense rose from 6% to 32% of total revenue.[33]  Other adverse financial ratios that the auditors should have considered in a going-concern

---

[28] *Balance-sheet insolvent* means a company has negative equity.  Stated another way, liabilities exceed assets so that the company's balance sheet has no positive value.

[29] The *current ratio* is defined as current assets divided by current liabilities.  A current ratio below 1.0 means there is negative working capital with current liabilities exceeding current assets.  In other words, there are not enough liquid assets available to cover the payment of all current expenses due.

[30] The *debt-to-asset ratio* is defined as total debt divided by total assets.  A debt-to-asset ratio at or above 1.0 means that all assets of the company are debt financed.  Equity financing is non-existent and the company has zero positive value.

[31] *See supra* note 23 for definition.

[32] *Income coverage* is defined as net income before interest expense divided by interest expense.  As income coverage approaches 1.0, the company has less ability to pay off interest expense each year.  Income coverage below 1.0 signifies the company does not have enough income to pay interest expense.

[33] *Interest Expense Percent* is defined as interest expense divided by total revenue.  As the percentage increases, more revenue is required to cover interest expense and cannot be used for other operations of the company.

analysis are listed and defined in the footnote.[34]  These adverse financial ratios required a going-concern qualification or disclosure.  But no such qualification or disclosure was made in the original or restated 2005 audit reports that Mayer Hoffman knew would be used by investors and their financial advisors to evaluate Mortgages Ltd.'s financial condition.

358.   For 2005, the asset-to-equity ratio after consolidation was 260x, an extremely leveraged position.  For every $100 of assets on the books of Mortgages Ltd., only 39 cents was due to earnings.  In other words, 99.6% of every dollar of assets on the Company's books was owned by third parties or was the result of borrowings.

359.   Comparatively, Lehman Brothers, a highly leveraged company that filed the largest bankruptcy in U.S. history in September 2008, had asset-to-equity ratios in the months preceding its bankruptcy of 16.1x at 4Q07, 15.4x at 1Q08, and 12.0x at 2Q08.  Lehman's excessive leverage was a major factor in its bankruptcy.  Yet Lehman's leverage ratios were a fraction of Mortgages Ltd.'s leverage.

360.   The volume of Mortgages Ltd.'s debt as a percentage of its assets, and the associated interest expense are shown in Table 6.  As depicted by the graph in Table 6, by 2005 Mortgages Ltd. had leveraged itself to the point that its debt essentially equaled or

---

[34] Other adverse ratios that Mayer Hoffman disregarded or should have considered as red flags that indicated insolvency are the capitalization ratio, debt-service ratio, and cash ratio.

The *capitalization ratio* is the Company's total debt divided by the sum of total debt and total equity.  After consolidation, the capitalization of Mortgages Ltd. grew from 91.4% financed by debt to 99.6% financed by debt.  In other words, the Company was capitalized in all material respects by borrowed money.

The *debt-service ratio* of total debt divided by net income shows the number of years of current earnings that are needed to retire outstanding debt.  In 2005, the debt-service ratio jumped from 6 years of earnings to pay off debt to over 33 years.

The *cash ratio* of cash divided by current liabilities measures the liquidity of a company and the ability of available cash to meet the needs of current obligations coming due.  After consolidating the October 31, 2005 financials, the cash ratio of 0.03 means that current cash levels only cover 3% of current liabilities.  Or in dollar terms, there was only enough cash to pay $3 for every $100 of current liabilities outstanding.

exceeded the Company's assets.

**Table 6 — Debt Ratios and Interest Expense by Year**



361.   As described above in paragraphs 355-57, Mortgages Ltd. was balance-sheet insolvent in 2006 and 2007, and its financial conditions in 2005 raised substantial doubt about its ability to operate without a continuing pipeline of mounting debt from new investors.  Yet contrary to AU section 341, Mayer Hoffman issued unqualified audit reports for 2005, 2006, and 2007.

362.   These reports, which contained neither a going-concern qualification, nor any disclosure regarding the issue, (a) rendered untrue Mayer Hoffman's representation that it had audited Mortgages Ltd. in accordance with GAAS, and (b) misled investors and their financial advisors about the Company's financial stability.

### 7.   The financial statements were materially incomplete and misleading regarding the Company's valuation practices and writedowns.

363.   Mayer Hoffman knew that Mortgages Ltd.'s business was real-estate driven

1   and that management's estimates of the real estate and mortgage investments that it

2   owned were particularly sensitive.  This was so because of the significance of these

3   estimates to the financial statements and possible changes in value caused by the real-

4   estate market.

5          364.   Mayer Hoffman realized and noted in March 2006 and March 2007

6   memorandums to Mortgages Ltd.'s directors that disclosures regarding the Company's

7   mortgage investments were among the "most sensitive estimates" in the Company's

8   financial statements.

9          365.   Loan files and records made available to Mayer Hoffman during its audits

10  showed that Mortgages Ltd. did not follow normal mortgage-industry practices in the

11  Company's loan-underwriting decisions.  For example,

12         •      The files showing loan-approval decisions contain only a brief
                  description of the project, the borrower, and the collateral taken on
13                the loan.

14         •      The files contain little repayment analysis of the borrowers or
                  guarantors.
15

16         •      No financial spreads of borrower or guarantor tax returns or
                  financial statements were performed.

17         •      Personal financial statements on guarantors were obtained, but the
                  assets reported were not verified by file documentation.  Thus, cash
18                and liquidity shown on borrowers' asset schedules was not verified
                  with bank statements or deposit information.
19

20         •      Many personal financial statements indicated future values that were
                  supported by the real-estate project's estimated completion value
                  rather than the property's value at of the date of the financial
21                statement.

22         •      Independent appraisals were not typically required.

23         366.   In addition to knowledge of these risk-heightening underwriting practices,

24  Mayer Hoffman's communications with Mortgages Ltd.'s directors show that it knew

25  that rather than follow reliable industry practices in valuing its real-estate assets,

26  Mortgages Ltd. had "no policies and procedures in place that provide for regular reviews

1   by management of the potential impairment of real estate" assets held by the Company.

2   The same documents also show Mayer Hoffman knew that unlike most well-managed

3   companies, Mortgages Ltd. did not have any procedure for annual or other periodic

4   reviews through appraisers, analysis of recent sales of comparable properties, or other

5   valuation techniques that are common practice in the real-estate industry.  Mayer

6   Hoffman's March 28, 2008 memorandum to Mortgages Ltd.'s board of directors shows

7   that it knew and identified this as a material weakness in Mortgages Ltd.'s internal-

8   accounting system and the reliability of its financial statements.  The same material

9   weakness existed when the earlier 2005 and 2006 audits occurred.

10          367.   Mayer Hoffman also knew that the Company in large part based its

11   valuations (and its decision not to record loss reserves for impaired real-estate assets) on

12   historical collections.  That is, the Company claimed its historical performance in

13   recapturing principal lent to borrowers on behalf of investors demonstrated that a loss

14   reserve for impairment was unneeded.

15          368.   Mayer Hoffman knew that extrapolating real-estate values from loan

16   collections was not a recognized valuation methodology.  It noted in its March 28, 2007

17   internal-controls memorandum that it had not subjected the Company's position to

18   auditing procedures.  Even so, Mayer Hoffman knew from its familiarity with Mortgages

19   Ltd.'s loan files that the Company carelessly evaluated the creditworthiness of its

20   borrowers and guarantors and did follow industry standards in making its loan-

21   underwriting decisions.  *See supra* ¶ 365.  Mayer Hoffman also knew or should have

22   known from its impairment and collateral testing that Mortgages Ltd. systematically

23   rewrote loans to extend their maturity rather than declare a default.  Mayer Hoffman also

24   knew or negligently ignored that by 2007, the entire country was experiencing a steep

25   decline in real-estate prices.

26          369.   As a result of the facts just described, the real-estate values for loans

underwritten by Mortgages Ltd. were impaired and the value of real-estate assets reported on Mortgages Ltd.'s balance sheet was overstated.  Specifically, Plaintiffs are informed and believe that by December 31, 2007—

- At least 31 individual loan balances exceeded the fair market value of the collateral that secured the loans.

- Collectively, these loans exceeded the market value of the collateral for the loan balances by approximately $193 million.

- Of this $193 million, Mortgages Ltd.'s share of the impaired value was $42.5 million as of May 31, 2008.  The remaining $150.5 million was the share securing investor loans.

370.   The information that forms the basis for Plaintiffs' belief is contained in (a) regulatory findings made by the Arizona Department of Financial Institutions (AzDFI) in connection with the revocation of Mortgages Ltd.'s mortgage license and (b) the Examiner's Report on which the findings were based.

371.   The AzDFI examined Mortgages Ltd.'s May 31, 2008 balance sheet and spent five weeks assessing the quality and value of Mortgages Ltd.'s real-estate portfolio. AzDFI found multiple GAAP violations and concluded that Mortgages Ltd.'s balance-sheet entry for mortgage investments was stated at cost, which exceeded fair-market value by $42.5 million.

372.   If the mortgages held for investments had been stated at fair-market value, Mortgages Ltd. would have shown a negative net equity rather than the positive $9.8 million shown on the May 31, 2008 balance sheet.  That is, $42.5 million minus $9.8 million equals <$32.7 million>.

373.   The overvaluation of mortgage investments on Mortgages Ltd. May 31, 2008 balance sheet and that on the December 31, 2007 balance sheet that Mayer Hoffman audited are not materially different as to the insolvency (negative-equity) analysis

conducted by the AzDFI.[35]  Mortgage investments on the December 31, 2007 and May 31, 2008 balance sheets are respectively $304 million and $285 million.  And the equity reported on the balance sheets was respectively $8.2 million (12/31/07) and $9.8 million (5/31/07).  Mortgages Ltd. did not originate any new loans in 2008.  It stopped originating new loans in 2007.  All of the 31 loans that AzDFI determined were impaired were outstanding at December 31, 2007.

374.    Although the value of these 31 loans was impaired as of December 31, 2007, Mortgages Ltd.'s audited 2007 financial statements did not include a writedown or loss reserve to cover the impaired value.  Despite this and in violation of GAAP (FAS 107 & 157),[36] Mayer Hoffman issued a clean audit report for 2007 that misrepresented the fair value of Mortgages Ltd.'s real-estate assets and misled investors and their financial advisors.

375.    All five of the mega loans in Table 1 (¶ 105) were listed as impaired.  For example, loans to the Grace Entities (Vento) were impaired by $60 million.  Loans to Central Phoenix Partners were impaired by $6.6 million.  And loans to the University and Ash borrowers were impaired by $24 million.

**D.    CBIZ's Role**

376.    As a public company, CBIZ, Inc. cannot provide audit and other attest services.

377.    Rather than give up the profits from attest work, CBIZ and its subsidiary, CBIZ MHM, LLC (collectively "CBIZ") joint venture with Mayer Hoffman, a nonpublic company controlled by CBIZ.  As a result of the joint venture, CBIZ is able to provide its clients with attest as well as other professional services (e.g., tax solutions, business consulting, and employee services).

---

[35] The accounts on the two balance sheets are not materially different.
[36] Cited *supra* notes 18-19.

378.   Although nominally separate to satisfy professional standards required for auditor independence, CBIZ and Mayer Hoffman operate as one business under which CBIZ and Mayer Hoffman jointly market themselves as the country's eight largest accounting and professional-services firm.

379.   As a component of their relationship, CBIZ and Mayer Hoffman are parties to an Administrative Services Agreement under which revenues are divided and expenses allocated.  The two companies also maintain a joint-referral relationship designed to mutually benefit both CBIZ and the CPAs who work through Mayer Hoffman by increasing the size of both parties' client base.

380.   The joint venture provides the CBIZ employees who work as auditors with (a) the capital and resources of a national firm, (b) access to national training programs, and (c) the reputational stature of working in a national professional-services firm.  CBIZ in turn is able to use the Mayer Hoffman name to provide (and profit from) an attestation business unit.  Under the terms of the joint venture, CBIZ receives nearly all of the profits from the attest work as well as cross-work from attest clients who use CBIZ's services in other areas such as tax work, financial-advisory services (e.g., valuations), and employee services (e.g., benefits, retirements, and recruiting).

381.   CBIZ controls the prices charged for the venture's attest services.  It also controls all material costs incurred in delivering the attest services.

382.   The CPAs who perform audits under the Mayer Hoffman name are employees and agents of CBIZ who, as more fully explained below, are entirely dependent on CBIZ for their compensation, staff, and continued employment.

383.   CBIZ's control of Mayer Hoffman is illustrated by the fact that for the two years spanning August 1, 2006 to July 31, 2008, Mayer Hoffman retained as profits only $62,000 on each $1 million of revenue that its attest services produced.  The remaining profits flowed to CBIZ, which received 85% of Mayer Hoffman's gross revenue and

1    required Mayer Hoffman to use nearly all of the remaining 15% to cover operating

2    expenses that supported the attest revenue that flowed to CBIZ.  Thus, CBIZ required

3    Mayer Hoffman to pay the following expenses from Mayer Hoffman's 15% of the attest

4    revenue:  expenses for continuing CPA education, professional-liability insurance, and

5    professional licensing fees.  In short, Mayer Hoffman was and is a financially controlled

6    company that CBIZ uses to channel to itself the profits from audit and other attest work

7    that CBIZ is otherwise prohibited from receiving.  Nearly all of the little revenue that

8    Mayer Hoffman has is revenue that it is contractually required to spend for expenses that

9    support the profits from attest work that flow to CBIZ.

10        384.    CBIZ makes the decision on what CPAs are available to staff Mayer

11   Hoffman's audits and has the right to hire, fire, and relocate the CPAs.  CBIZ also

12   controls the billing rates for all audit and other attest services.

13        385.    For the 2005, 2006, and 2007 Mortgages Ltd. audits, all of the CPAs doing

14   the attest work were CBIZ employees.  These CPAs' salaries, raises, bonuses, and other

15   employment benefits are and were controlled by CBIZ.  Similarly, the staff, office space,

16   and nearly all other support resources needed for the 2005-07 audit work were provided

17   and controlled by CBIZ.

18        386.    Although the CPAs who perform audit work are also designated as Mayer

19   Hoffman employees, they receive no salaries, bonuses, retirement benefits, dividends, or

20   other financial remuneration from Mayer Hoffman.  Nor do they receive a W-2 from

21   Mayer Hoffman.  Instead, the only W-2s and the only compensation that they receive

22   comes from CBIZ.  The CBIZ employees became Mayer Hoffman employees only by

23   virtue of entering into a Mayer-Hoffman stockholder agreement that CBIZ requires.

24        387.    These stockholder agreements benefit CBIZ by including noncompetition,

25   nonsolicitation, and nondisclosure provisions that CBIZ has the contractual right to

26   enforce by suing for both injunctive relief and damages.

388.    All money for services from attest clients is banked by CBIZ, which bills and collects money that is owed by the attest clients.  Thus, bills for Mayer Hoffman's work on Mortgages Ltd. audits were invoiced to Mortgages Ltd. by the Phoenix office of CBIZ MHM, LLC.  The invoices instructed Mortgages Ltd. to make payment to a CBIZ MHM office in Los Angeles.

389.    The CBIZ and Mayer Hoffman personnel in Phoenix and other offices share the same space with the same entrance and a common receptionist.  In Phoenix, the same managing partner, Joel Kramer, oversees the CBIZ practice and the Mayer Hoffman practice.  The audit partners for the 2005, 2006, and 2007 audits reported to Mr. Kramer, who does not himself maintain an audit practice.

390.    All employees use CBIZ business cards including the CPAs providing attest functions (they do not use Mayer Hoffman business cards).

391.    Because of the control that CBIZ has, it was required to establish a reasonable system of supervision designed to ensure competent audits by the employees it controls.  Rather than fulfill this supervisory responsibility, CBIZ improperly and in violation of the protective purposes of Arizona's securities laws purports to (a) treat its CPA-employees as independent contractors when they perform audits and (b) disclaim responsibility for the attest services for which they are paid by CBIZ.

**E.      Tender**

392.    Individually and on behalf of the proposed Classes, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).  In return, Plaintiffs demand rescission with interest and attorney fees as provided in A.R.S. § 44-2001(A).

1  **V.**     **Legal Claims**

2                                           **Count One**

3                      **(Primary Statutory Liability Under A.R.S. § 44-2003(A))**

4       393.    Plaintiffs incorporate the preceding allegations.

5       394.    The investments sold by Mortgages Ltd. and Radical Bunny under the ML-

6  RB Joint Venture were securities under Arizona and federal law.

7       395.    Through the ML-RB Joint Venture, Mortgages Ltd. and Radical Bunny

8  jointly engaged in the unlawful integrated sale of securities to Plaintiffs and other Class

9  members in violation of A.R.S. §§ 44-1991(A)(1) and (3).

10      396.    Through the ML-RB Joint Venture, Mortgages Ltd. and Radical Bunny

11 jointly made misleading representations and omissions in connection with the integrated

12 sale of securities in violation of A.R.S. § 44-1991(A)(2).  *See, e.g., supra* ¶¶ 86-87, 91,

13 200, 204-09, 353, 362, and 374.

14      397.    Defendant Greenberg violated A.R.S. § 44-1991(A)(1), (2), and (3) and

15 participated in or induced the unlawful integrated securities sales to Plaintiffs Facciola,

16 Reznik, Hagel, Baker, and other members of the proposed Classes, within the meaning of

17 A.R.S.§ 44-2003(A).

18      398.    Defendant Quarles violated A.R.S. § 44-1991(A)(1), (2), and (3) and

19 participated in or induced the unlawful integrated securities sales to Plaintiffs Facciola,

20 Reznik, Hagel, Baker, and other members of the proposed Classes, within the meaning of

21 A.R.S.§ 44-2003(A).

22      399.    Defendant Mayer Hoffman violated A.R.S. § 44-1991(A)(2) and (3) and

23 participated in or induced the unlawful integrated securities sales to Plaintiffs Facciola,

24 Reznik, Hagel, Baker, and other members of the proposed Classes, within the meaning of

25 A.R.S.§ 44-2003(A).

26      400.    Defendants Denning, Brown, Newman, and Olson violated A.R.S. § 44-

1991(A)(1), (2), and (3) and participated in or induced the unlawful integrated securities sales to Plaintiffs Facciola, Reznik, Hagel, Baker, and other members of the proposed Classes, within the meaning of A.R.S.§ 44-2003(A).

401.    Defendants Hirsch, the Walders, and Shah violated A.R.S. § 44-1991(A)(1), (2), and (3) and participated in or induced the unlawful integrated securities sales to Plaintiffs Facciola, Reznik, Hagel, Baker, and other members of the proposed Classes, within the meaning of A.R.S. § 44-2003(A).

402.    Defendants Greenberg, Quarles, Mayer Hoffman, Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah are, under A.R.S. § 44-2003(A), jointly and severally liable to the same extent as Mortgages Ltd. and Radical Bunny for the unlawful sales and violations of A.R.S. § 44-1991(A).  Except for their bankruptcy, Mortgages Ltd. and Radical Bunny would also be jointly and severally liable under section 44-2003(A).

403.    Under A.R.S. § 44-2001(A), Defendants Greenberg, Quarles, Mayer Hoffman, Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah are liable for rescission (as to violations of 44-1991(A)(1) and (3)) or damages (as to violations of 44-1991(A)(2)) plus costs, attorney fees, and pre and post-judgment interest.

**Count Two**

**(Statutory Control Liability Under A.R.S. § 44-1999(B))**

404.    Plaintiffs incorporate the preceding allegations.

405.    Through the ML-RB Joint Venture, Mortgages Ltd. violated A.R.S. § 44-1991(A).  Except for its bankruptcy, Mortgages Ltd. would be held liable under § 44-2003(A) for its unlawful sales and violations of section 44-1991(A).

406.    Individually and as a group, Defendants Denning, Brown, Newman, and Olson controlled Mortgages Ltd. within the meaning of A.R.S. § 44-1999(B) when Mortgages Ltd.'s violations of § 44-1991(A) occurred.  As statutory controlling persons

of Mortgages Ltd., Defendants Denning, Brown, Newman, and Olson are jointly and severally liable under A.R.S. § 44-1999(B) for Mortgages Ltd.'s unlawful sales and violations of section 44-1991(A).

407.   Through the ML-RB Joint Venture, Radical Bunny violated A.R.S. § 44-1991(A).  Except for its bankruptcy, Radical Bunny would be held liable under 44-2003(A) for its unlawful sales and violations of § 44-1991(A).

408.   Individually and as a group, Defendants Hirsch, the Walders, and Shah controlled Radical Bunny within the meaning of A.R.S. § 44-1999(B) when Radical Bunny's violations of § 44-1991(A) occurred.  As statutory controlling persons of Radical Bunny, Hirsch, the Walders, and Shah are jointly and severally liable under A.R.S. § 44-1999(B) for Radical Bunny's unlawful sales and violations of 44-1991(A).

409.   As a group, Defendants Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah controlled the ML-RB Joint Venture within the meaning of A.R.S. § 44-1999(B) when the Joint Venture's violations of § 44-1991(A) occurred.[37]  As statutory controlling persons of the Joint Venture, Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah are jointly and severally liable under A.R.S. § 44-1999(B) for the Joint Venture's unlawful sales and violations of section 44-1991(A).

410.   As alleged in Count One, Mayer Hoffman committed violations of A.R.S. § 44-1991(A) for which it is primarily liable under A.R.S. § 44-2003(A).

411.   Individually or in combination, CBIZ, Inc. and CBIZ MHM, LLC controlled Mayer Hoffman within the meaning of A.R.S. § 44-1999(B) when Mayer Hoffman's violations of § 44-1991(A) occurred.  As statutory controlling persons under A.R.S. § 44-1999(B), CBIZ, Inc. and CBIZ MHM, LLC are jointly and severally liable for Mayer Hoffman's violations of 44-1991(A).

---

[37] Except for the bankruptcies of Mortgages Ltd. and Radical Bunny, the Joint Venture would be held liability for its unlawful sales and violations of A.R.S. § 44-1991(A).

412.    Accordingly, under this Count, Defendants Greenberg, Quarles, Mayer Hoffman, CBIZ, Inc., CBIZ MHM, LLC, Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah are liable as statutory control persons for rescission (as to violations of 44-1991(A)(1) and (3)) or damages (as to violations of 44-1991(A)(2)) plus costs, attorney fees, and pre and post-judgment interest.

**Count Three**

**(Aiding and Abetting Statutory Securities Fraud)**

413.    Plaintiffs incorporate the preceding allegations.

414.    Through the ML-RB Joint Venture, Mortgages Ltd. and Radical Bunny committed violations of A.R.S. § 44-1991(A) in the integrated sale of securities to Plaintiffs and the Classes.  Except for their bankruptcies, Mortgages Ltd. and Radical Bunny would be liable under § 44-2003(A) for their unlawful sales and violations of § 44-1991(A).

415.    Defendants Greenberg and Quarles knowingly and substantially assisted the securities law violations by Mortgages Ltd., Radical Bunny, and the ML-RB Joint Venture despite knowing (or willfully disregarding), among other things, that

- Radical Bunny was violating the registration and disclosure provisions of Arizona and federal securities law.

- Those violations were not being disclosed to Mortgages Ltd. and Radical Bunny investors like Plaintiffs and the proposed Classes.

- Radical Bunny and Mortgages Ltd. were perpetrating a Ponzi scheme.

416.    Defendants Denning, Brown, Newman, and Olson knowingly and substantially assisted the securities law violations by Mortgage Ltd., Radical Bunny, and the ML-RB Joint Venture despite knowing (or willfully disregarding), among other things, that

- Radical Bunny was violating the registration and disclosure provisions of Arizona and federal securities law.

- Those violations were not being disclosed to Mortgages Ltd. and Radical Bunny investors like Plaintiffs and the proposed Classes.

- Radical Bunny and Mortgages Ltd. were perpetrating a Ponzi scheme.

417.   Defendants Hirsch, the Walders, and Shah knowingly and substantially assisted the securities law violations by Mortgage Ltd., Radical Bunny, and the ML-RB Joint Venture despite knowing (or willfully disregarding), among other things, that

- Radical Bunny was violating the registration and disclosure provisions of Arizona and federal securities law.

- Those violations were not being disclosed to Mortgages Ltd. and Radical Bunny investors like Plaintiffs and the proposed Classes.

- Radical Bunny and Mortgages Ltd. were perpetrating a Ponzi scheme.

418.   Accordingly, under this Count, Defendants Greenberg, Quarles, Mayer Hoffman, Denning, Brown, Newman, Olson, Hirsch, the Walders, and Shah are liable for rescission (as to violations of 44-1991(A)(1) and (3)) or damages (as to violations of 44-1991(A)(2)) plus costs, attorney fees, and pre and post-judgment interest.

**Count Four**

**(Aiding and Abetting Breach of Fiduciary Duties)**

419.   Plaintiffs incorporate the preceding allegations.

420.   Under the POMs prepared by Greenberg, Mortgages Ltd. was a manager or agent with fiduciary discretion to act acting on behalf of its investors.  The Company's investors were dependent on Mortgages Ltd. for the managerial skill needed to run the Company.

421.   Similarly, Radical Bunny was an agent or manager acting on behalf of its investors, whom Hirsch and his partners called the Radical Bunny family.  Mortgages Ltd. was Radical Bunny's co-venturer and agent in connection with these offerings.

422.    As managers or agents of the ML-RB Joint Venture, Mortgages Ltd. and Radical Bunny owed Plaintiffs and other investors in the proposed Classes fiduciary duties of full disclosure, loyalty, good faith, and fairness.

423.    Individually and as joint venturers, Mortgages Ltd. and Radical Bunny breached their fiduciary duties of disclosure, loyalty, good faith, and fairness by conducting a Ponzi scheme and failing to disclose to Class members, among other things, the materially adverse facts described in paragraphs 86-87, 91, 200, 204-09, 353, 362, and 374 and the deceptive and unfair acts and course of business described in Part IV(A).

424.    Defendants Denning, Brown, Newman, Olson, Hirsch, the Walders, Shah, Greenberg, and Quarles each knowingly aided and abetted and participated in the fiduciary breaches by Mortgages Ltd., Radical Bunny, and the ML-RB Joint Venture.

425.    Plaintiffs and the proposed Classes were damaged (and were induced to buy or retain their securities) by Defendants' aiding and abetting and participation in the fiduciary nondisclosure and other misconduct described in this Count.

426.    In addition to compensatory damages, Plaintiffs are entitled to punitive damages.

### Count Five

### (Negligent Misrepresentation and Nondisclosure)

427.    Plaintiffs incorporate the preceding allegations.

428.    Defendant Greenberg negligently gathered, compiled, and communicated information in the POMs through which Mortgages Ltd.'s unlawfully sold securities to Plaintiffs and members of the proposed Class of Mortgages Ltd. investors.  *See, e.g., supra* ¶¶ 86-87, 91, 200, 204-09, 353, 362, and 374.

429.    Defendant Quarles negligently gathered, compiled, and authorized the distribution of information used in the investor meetings and materials through which Radical Bunny unlawfully offered, sold, or described securities to Plaintiffs and members

1    of the proposed Class of Radical Bunny investors.  *See, e.g., supra* ¶¶ 150, 153-55, 161-

2    66, 172-73, 180-85, 196, 250-52, 258-65, 271-72, 275-76, 284, and 287-89.

3         430.    Defendant Mayer Hoffman negligently gathered, compiled, and

4    communicated information in its audit reports for 2005, 2006, and 2007 through which

5    Mortgages Ltd., Radical Bunny, and the ML-RB Joint Venture engaged in the unlawful

6    integrated sale of securities to Plaintiffs and members of both proposed Classes.  In

7    connection with its audits, Mayer Hoffman negligently misrepresented Mortgages Ltd.'s

8    financial condition and negligently represented that the financial statements were audited

9    in accordance with GAAS and were presented in conformity with GAAP.  This was done

10   even though Mayer Hoffman had full knowledge that these reports would be submitted to

11   and relied upon by existing and prospective Mortgages Ltd. and Radical Bunny investors

12   as well as the financial advisors and agents of the investors.

13        431.    Other negligent misrepresentations in Mayer Hoffman's 2005, 2006, and

14   2007 audit reports include falsely representing that,

15   •    Mortgages Ltd.'s financial statements complied with GAAP even
          though, contrary to FIN 46, Mortgages Ltd.'s financial statements
16        were presented without consolidating the limited-liability companies
          through which Mortgages Ltd. raised money.

17
18   •    Mortgages Ltd.'s financial statements complied with GAAP even
          though, contrary to FAS 57,[38] Radical Bunny was not identified as a
          related party and all material transactions between Radical Bunny
19        and Mortgages Ltd. were not disclosed.

20   •    Mortgages Ltd.'s financial statements complied with GAAP even
          though Mortgages Ltd. (a) did not report its real-estate assets at fair
21        value as required by FAS 157[39] and (b) had failed to disclose the
          fair-value methods used in valuation as required by FAS 107.[40]
22

23        [38] FASB Accounting Standards Codifications Subtopic 850-10, Related Party
     Disclosures (codifying Statement of Financial Accounting Standards No. 57).
24        [39] FASB Accounting Standards Codifications Subtopic 820-10, Fair Value
     Measurements and Disclosures (codifying Statement of Financial Accounting Standards
25   No. 157).
          [40] FASB Accounting Standards Codifications Subtopic 820-10-50, Fair Value
26

432.   In addition, Mayer Hoffman negligently:

- Misrepresented Mortgages Ltd.'s debt, leverage of assets and equity, interest expense, and lack of liquidity (*see supra* ¶¶ 343-45 and 356-58).

- Issued its audit reports with neither a going-concern qualification, nor any disclosure regarding the issue, which (a) rendered untrue Mayer Hoffman's representation that it had audited Mortgages Ltd. in accordance with GAAS, and (b) misled investors and their financial advisors about the Company's financial stability.

- Failed to disclose, in violation of GAAP (FAS 107 & 157), that 31 of the Company's loans were impaired as of December 31, 2007 (*see supra* ¶¶ 369-75).

- Represented that Mortgages Ltd.'s audited 2007 financial statements were presented in conformity with GAAP even though the financial statements did not include a writedown or loss reserve to cover the impaired value as required by FAS 107 & 157.

433.   The Defendants named in this Count, in the course of their business, profession, or employment, thus supplied false information for the guidance of the named Plaintiffs and other members of the proposed Classes in their business transactions relating to the purchase and retention of Mortgages Ltd.'s securities.  These Defendants are therefore subject to liability for pecuniary loss caused to Plaintiffs and the Classes by their justifiable reliance upon the information, because these Defendants failed to exercise reasonable care or competence in gathering or communicating that information.

434.   Defendants' negligence damaged Plaintiffs and the Classes and caused their losses.

435.   If Mortgages Ltd.'s true financial condition had been disclosed in the POMs, RB Offering Documents, and the audited 2005, 2006, and 2007 financial statements, the securities sold by Mortgages Ltd. and Radical Bunny would have been unsalable and worthless.

---

Measurements and Disclosures (codifying Statement of Financial Accounting Standards No. 107).

**Count Six**

**(Primary Statutory Liability Under A.R.S. § 44-3241)**

436.    Plaintiffs incorporate the preceding allegations.

437.    This Count arises under section 44-3241(A)-(B) of the Arizona Investment Management Act (AzIMA).

438.    The transactions in which Plaintiffs and members of the proposed Classes purchased and held their investments involved the provision of investment advisory services within the scope of the AzIMA.  As to the Class of Mortgages Ltd. investors, these investment advisory services were provided by salespersons who worked as managing directors through ML Securities.  As to the Class of Radical Bunny investors, these investment advisory services were provided by Radical Bunny, an unlicensed securities dealer, and its management, i.e., Defendants Hirsch, the Walders, and Shah, who operated as unlicensed securities salespersons.

439.    Mortgages Ltd. and Radical Bunny individually and jointly engaged in the unlawful provision of investment advisory services to Plaintiffs and other Class members in violation of A.R.S. §§ 44-3241(A)(1), (2), and (4).

440.    The AzIMA extends liability not only to persons who violate section 44-3241(A) while providing investment-advisory services, but also to any person who, directly or indirectly, commits an act prohibited by section 44-3241 in connection with a transaction involving investment-advisory services.  Accordingly, a defendant need not be an investment adviser to violate section 44-3241.

441.    Defendants Greenberg, Quarles, and Mayer Hoffman committed acts prohibited by A.R.S. §§ 44-3241(A)(1), (2), or (4) in connection with transactions involving investment-advisory services, namely:

- Through the POMs that it prepared, Greenberg provided incomplete and misleading information that was used in connection with the investment advisory services that ML Securities (and its managing directors) provided to Mortgages Ltd. investors.

- • Through the disclosure materials that it prepared, Quarles provided incomplete and misleading information that was used in connection with the investment advisory services that Radical Bunny (and its managers) provided to Radical Bunny investors.

- • Through the audit reports on Mortgages Ltd.'s financial statements for 2005, 2006, and 2007 that it prepared, Mayer Hoffman provided misleading information regarding the financial condition of Mortgages Ltd. that was used in connection with the investment advisory services that ML Securities and Radical Bunny provided to Plaintiffs and the proposed Classes.

442. The statutory violations of the AzIMA described in this Count damaged Plaintiffs and other members of the proposed Classes by causing them to purchase or hold their securities.

443. Plaintiffs are entitled to damages as provided in A.R.S. § 44-3241(B).

**Count Seven**

**(Aiding and Abetting Violations of A.R.S. § 44-3241)**

444. Plaintiffs incorporate the preceding allegations.

445. Defendants Greenberg and Quarles knowingly aided, abetted, and substantially assisted the ML-RB Joint Venture, Radical Bunny, and Mortgages Ltd. in the following ways (and other ways described above):

- • Through the POMs that it prepared, Greenberg provided incomplete and misleading information that was used in connection with the investment advisory services that ML Securities (and its managing directors) provided to Mortgages Ltd. investors.

- • Through the disclosure materials that it prepared, Quarles provided incomplete and misleading information that was used in connection with the investment advisory services that Radical Bunny (and its managers) provided to Radical Bunny investors.

- • Through the audit reports on Mortgages Ltd.'s financial statements for 2005, 2006, and 2007 that it prepared, Mayer Hoffman provided misleading information regarding the financial condition of Mortgages Ltd. that was used in connection with the investment advisory services that ML Securities and Radical Bunny provided to Plaintiffs and the proposed Classes.

446.    The statutory violations of the AzIMA described in this Count damaged Plaintiffs and other members of the proposed Classes by causing them to purchase or hold their securities.

447.    Plaintiffs are entitled to damages as provided in A.R.S. § 44-3241(B).

### Count Eight

### (Common-Law Secondary Liability of CBIZ Defendants)

448.    CBIZ, Inc., CBIZ MHM, LLC, and Mayer Hoffman were joint venturers in connection with the preparation and issuance of the audit reports for Mortgages Ltd.'s 2005, 2006, and 2007 financial statements.

449.    As members of a joint venture, CBIZ, Inc., CBIZ MHM, LLC, and Mayer Hoffman are jointly and severally liable for the damages caused by the acts and misconduct of one another that are alleged under Counts One, Five, and Six.

### Demand for Relief

Therefore, Plaintiffs demand judgment against Defendants jointly and severally as follows:

> A.    Rescissionary or compensatory damages according to proof;
>
> B.    Punitive damages in a just amount;
>
> C.    Costs and attorneys' fees;
>
> D.    Pre- and post-judgment interest; and
>
> E.    Any other relief needed to provide Plaintiffs and other Class members with a complete remedy.

### Expert Testimony

Plaintiffs certify under A.R.S. § 12-2602 that expert testimony is required to prove the negligence allegations against Mayer, Hoffman & McCann, P.C.  Except as stated, expert testimony is not needed under A.R.S. § 12-2602.

1

**Demand for Jury Trial**

2

Plaintiffs demand a trial by jury on all issues.

3

4

Dated:  May 11, 2010.

5

6

**Tiffany & Bosco, P.A.**

7

By: _____*s/ Richard G. Himelrick*_____

Richard G. Himelrick, #004738

8

J. James Christian, #023614

Third Floor Camelback Esplanade II

9

2525 East Camelback Road

Phoenix, Arizona 85016-4237

10

Attorneys for Plaintiffs Facciola and Reznik

11

**Bonnett, Fairbourn, Friedman**

12

**& Balint, P.C.**

13

By: _____*s/ Andrew S. Friedman (with permission)*_

14

Andrew S. Friedman, #005425

2901 N. Central Avenue

15

Suite 1000

Phoenix, Arizona 85012

16

Attorneys for Plaintiffs Hagel and Baker

17

#15283-1  431054.doc

18

19

20

21

22

23

24

25

26