EXHIBIT A

Robert E. Gooding, Jr. (*admitted pro hac vice*)
Scott B. Garner (*admitted pro hac vice*)
Isabelle Carrillo Smith (*admitted pro hac vice*)
goodingr@howrey.com
garners@howrey.com
smithi@howrey.com
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

Francis J. Burke, Jr. (SBN 010570)
Michella A. Kras (SBN 022324)
fburke@steptoe.com
mkras@steptoe.com
STEPTOE & JOHNSON LLP
Collier Center
201 East Washington Street
16th Floor
Phoenix, AZ 85004
Telephone: (602) 257-5200
Facsimile: (602) 257-5299

Attorneys for Defendant QUARLES & BRADY LLP

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT FACCIOLA, *et al.* | Case No. 2:10-cv-01025-NVW |
| Plaintiffs, | **DEFENDANT QUARLES & BRADY LLP'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| vs. | |
| GREENBERG TRAURIG, LLP, *et al.* | **[Oral Argument Requested]** |
| Defendants. | |

DM_US:23360007_19

1    Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendant Quarles &

2    Brady LLP moves to dismiss the Complaint for failure to state a claim and failure to plead with

3    particularity.  This Motion is supported by the attached memorandum of points and authorities

4    and the attached Exhibits A through C.

5         Respectfully submitted this 18th day of August, 2010.

6

7                                        /s/ Francis J. Burke, Jr.
                                         Francis J. Burke Jr.
8                                        Michella A. Kras
                                         STEPTOE & JOHNSON LLP
9
                                         Robert E. Gooding, Jr.
10                                       Scott B. Garner
                                         Isabelle Carrillo Smith
11                                       HOWREY LLP

12                                       Attorneys for Defendant
                                         QUARLES & BRADY LLP
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Robert E. Gooding, Jr. (*admitted pro hac vice*)
   Scott B. Garner (*admitted pro hac vice*)
2  Isabelle Carrillo Smith (*admitted pro hac vice*)
   goodingr@howrey.com
3  garners@howrey.com
   smithi@howrey.com
4  HOWREY LLP
   4 Park Plaza, Suite 1700
5  Irvine, CA  92614
   Telephone:  (949) 721-6900
6  Facsimile:  (949) 721-6910

7  Francis J. Burke, Jr. (SBN 010570)
   Michella A. Kras (SBN 022324)
8  fburke@steptoe.com
   mkras@steptoe.com
9  STEPTOE & JOHNSON LLP
   Collier Center
10 201 East Washington Street
   16th Floor
11 Phoenix, AZ  85004
   Telephone:  (602) 257-5200
12 Facsimile:  (602) 257-5299

13 Attorneys for Defendant QUARLES & BRADY LLP

14

15                    UNITED STATES DISTRICT COURT

16                         DISTRICT OF ARIZONA

17

18 ROBERT FACCIOLA, *et al*,              ) Case No. 2:10-cv-01025-NVW
                                          )
19            Plaintiffs,                  ) **DEFENDANT QUARLES & BRADY**
                                          ) **LLP'S MEMORANDUM OF POINTS**
20      vs.                                ) **AND AUTHORITIES IN SUPPORT OF**
                                          ) **MOTION TO DISMISS COMPLAINT**
21 GREENBERG TRAURIG, LLP, *et al*.        )
                                          )
22            Defendants.                  )
   ───────────────────────────────────────)

23

24

25

26

27

28

DM_US:23360007_19

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 1

II.  FACTUAL BACKGROUND ............................................................................ 2

    A.   Quarles Began Representing RB in 2007. ........................................... 2

    B.   Quarles Told RB To Stop Selling Securities. ..................................... 4

    C.   Quarles Began Drafting Disclosure Documents For Use In a Future Compliant Securities Offering. ........................................... 5

    D.   The Draft RB Private Offering Memorandum Never Was Finalized or Provided to Investors. ....................................................... 6

    E.   Quarles Spent Months Fruitlessly Trying To Structure a Perfected Security Interest in ML Assets. .......................................... 6

    F.   Quarles Formally Terminated Its Representation of RB in June 2008. ............................................................................................ 7

    G.   Bankruptcy and Regulatory Investigation. ......................................... 7

III. ARGUMENT ................................................................................................... 8

    A.   Plaintiffs Fail To Meet the Pleading Requirements of *Twombly* and *Iqbal*. .................................................................................. 8

    B.   Plaintiffs Fail To State a Claim That Quarles Is Primarily Liable for Violation of the Arizona Securities Laws Because They Do Not Allege That Quarles Made, Participated in or Induced the Unlawful Sale of Securities. ............................................................................................. 9

        1.   Plaintiffs Fail To Plead That Quarles "Made" or "Induced" Illegal Sales or Purchases. ................................ 9

        2.   Plaintiffs Fail To Plead Sufficient Facts To Show That Quarles "Participated in" the Sale of Securities to Plaintiffs. ................................................. 10

        3.   Plaintiffs Fail To State with Particularity Facts Giving Rise to a Strong Inference of Scienter. ............... 16

    C.   Plaintiffs Fail To State a Claim That Quarles Is Primarily Liable Under the Investment Management Act ......................................... 17

    D.   Plaintiffs Fail To State a Claim for Aiding and Abetting .......................... 18

        1.   Aiding and Abetting Securities Fraud No Longer Should Be Recognized in Arizona. ................................. 18

**TABLE OF CONTENTS (Cont'd.)**

Page(s)

2.    Plaintiffs Have Not Sufficiently Pled That Quarles Aided and Abetted RB's or ML's Securities Fraud. ....................... 19

    a.    Plaintiffs Do Not Plead Facts Showing That Quarles Had Actual Knowledge RB Was Continuing To Sell Securities................................................ 20

    b.    Plaintiffs' Allegations Against Quarles Do Not Rise to the Level of "Substantial Assistance" Required under Arizona Law. ........................... 21

3.    Plaintiffs Fail To State a Claim for Aiding and Abetting Breach of Fiduciary Duty or Violation of the Investment Management Act. .................................................... 22

E.    Plaintiffs Fail To State a Claim for Negligent Misrepresentation and Nondisclosure. ....................................................... 23

F.    Plaintiffs Fail to Allege Control Person Liability. .................................... 24

IV.    CONCLUSION ................................................................................................ 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## <u>CASES</u>

4

*Ashcroft v. Iqbal*,
5
    129 S. Ct. 1937 (2009) ................................................................................8

6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 547 (2007) ...................................................................................8
7

8

*Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994) .......................................................................5

9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
10
    511 U.S. 164 (1994) .................................................................................19

11

*Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*,
12
    206 Ariz. 399 (2003) ................................................................................25

13

*Galbraith v. County of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002)....................................................................5
14

15

*Glenbrook Capital Ltd. P'ship v. Kuo*,
    No. C07-02377 MJJ, 2008 U.S. Dist. LEXIS 80888
16
    (N.D. Cal. Apr. 3, 2008)............................................................................5

17

*Grand v. Nacchio*,
    No. CV-09-0317-PR, 2010 Ariz. LEXIS 35
18
    (D. Ariz. Aug. 5, 2010) ...............................................................8, 11, 19, 20

19

*Grubaugh v. DeCosta*,
20
    291 Ariz. Adv. Rep. 11 (Ariz. Ct. App. Mar. 16, 1999) .................................19

21

*In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*,
22
    794 F. Supp. 1424 (D. Ariz. 1992).........................................................15, 22

23

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999).....................................................................17

24

25

26

27

28

1

**TABLE OF AUTHORITIES (Cont'd.)**

2

Page(s)

3

*In re Stac Elecs. Sec. Litig.*,

4
    89 F.3d 1399 (9th Cir. 1996) ............................................................................. 5

5

*Merrick Bank Corp. v. Savvis, Inc.*,
    No. CIV 09-1088-PHX-CKJ, 2010 U.S. Dist. LEXIS 6421

6
    (D. Ariz. Jan. 8, 2010) .................................................................................... 24

7

*Merrill Lynch Bank USA v. Wolf*,
    No. CV09-734-PHX-JAT, 2010 U.S. Dist. LEXIS 34854

8
    (D. Ariz. Apr. 8, 2010) .................................................................................... 24

9

*Sprewell v. Golden State Warriors*,

10
    266 F.3d 979 (9th Cir. 2001) ............................................................................. 8

11

*Standard Chartered PLC v. PriceWaterhouse*,

12
    190 Ariz. 6 (Ct. App. 1996) ............................................................. 10, 11, 24

13

*State v. Superior Court (Davis)*,

14
    123 Ariz. 324 (1979) ....................................................................................... 19

15

*Stern v. Charles Schwab & Co.*,
    No. CV-09-1229-PHX-DGC, 2009 U.S. Dist. LEXIS 96697

16
    (D. Ariz. Oct. 16, 2009) .............................................................................. 20, 22

17

*Stern v. Charles Schwab & Co.*,
    No. CV-09-1229-PHX-DGC, 2010 U.S. Dist. LEXIS 38395

18
    (D. Ariz. Mar. 24, 2010) ......................................................................... 20, 21, 23

19

*Sweeney v. Darricarrere*,

20
    No. 2:09-cv-00266 JWS, 2009 U.S. Dist. LEXIS 61720 (D. Ariz.

21
    July 14, 2009) ............................................................................................. 9, 24

22

*Wells Fargo  Bank v. Ariz. Laborers*,

23
    201 Ariz. 474 (Ariz. 2002) ........................................................................ 20, 22

24

*Wojtunik v. Kealy*,
    394 F. Supp. 2d 1149 (D. Ariz. 2005) ............................................................ 9, 17

25

*Wojtunik v. Kealy*,

26
    No. CV-03-2161-PHX-PGR, 2006 U.S. Dist LEXIS 73448

27
    (D. Ariz. Sept. 30, 2006) ................................................................................. 25

28

1

**TABLE OF AUTHORITIES (Cont'd.)**

2

**Page(s)**

3

**FEDERAL STATUTES**

4

15 U.S.C. § 78u-4(b)(1) & (b)(2) ...............................................................17

5

Fed. R. Civ. P. 9(b)................................................................................9, 17, 24

6

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 8

7

**ARIZONA STATUTES**

8

A.R.S. § 2082(A) & (B) .................................................................................17

9

A.R.S. § 44-1991 ..................................................................................9, 10, 17, 23

10

A.R.S. § 44-1999(B).......................................................................................25

11

A.R.S. § 44-2001(A) ........................................................................................9

12

A.R.S. § 44-2003(A) ...............................................................................passim

13

A.R.S. § 44-2082(A) & (B).............................................................................17

14

A.R.S. § 44-3241 .............................................................................................18

15

Rules of Prof. Conduct, ER 1.16(a) ........................................................15, 16

16

Rules of Prof. Conduct, ER 1.2 ...............................................................15, 16

17

Rules of Prof. Conduct, ER 1.6(c) & (d)........................................................16

18

Rules of Prof. Conduct, ER 4.1 ......................................................................16

19

**OTHER AUTHORITIES**

20

RESTATEMENT (SECOND) OF TORTS § 552(2) (1977) .......................................24

21

22

23

24

25

26

27

28

1   **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

2          Plaintiffs have filed this action on behalf of purported classes of Radical Bunny and

3   Mortgages Ltd. investors ("Plaintiffs"), alleging that various legal and accounting professionals

4   participated in and substantially assisted Radical Bunny ("RB") and Mortgages Ltd. ("ML") in

5   committing securities fraud through a so-called Ponzi scheme.

6          Plaintiffs' Complaint alleges seven counts against Quarles & Brady LLP ("Quarles") for

7   primary and secondary liability under the Arizona securities laws and related claims.  The crux

8   of each of these claims is that Quarles, allegedly knowing that RB had been selling and

9   continued to sell unregistered securities to investors in violation of the securities laws,

10  participated in and assisted RB with its illegal sales rather than withdrawing from the

11  representation and disclosing RB's misconduct to investors and regulators.

12         Despite its length, the Complaint fails to include specific factual allegations to support

13  Plaintiffs' theory that Quarles "participated in" or "substantially assisted" the illegal conduct –

14  elements that, as recently confirmed by the Arizona Supreme Court, are required under

15  Arizona law.  Indeed, Plaintiffs have failed to allege any facts showing that Quarles was acting

16  in anything other than its professional capacity as RB's attorneys.

17         The facts alleged in the Complaint make clear that RB's *modus operandi* was well

18  established long before Quarles' retention in 2007, and that the vast bulk of investor funds had

19  been raised prior to that time.  Plaintiffs themselves allege that by the time RB retained

20  Quarles, RB already had raised $140 million for ML from 700 investors, that ML already was

21  insolvent, and that ML and RB already were engaged in a "Ponzi scheme approach."

22         Far from pleading that Quarles somehow participated in the illegal sale of securities,

23  Plaintiffs actually allege facts indicating just the opposite – that Quarles was retained to

24  examine already existing conduct and affirmatively advised its client that it was violating the

25  securities laws, that it should stop selling securities, and that it should disclose its prior

26  misconduct to investors and regulators.  These facts show Quarles tried to ***prevent*** continuing

27  sales of securities, not participate in, induce, or assist in them.

28

-1-

The omission of allegations and facts suggesting Quarles' assistance or substantial participation is fatal to each of Plaintiffs' claims.  Plaintiffs do not (and cannot) allege that any Quarles attorney ever met or spoke with any RB or ML investors, provided an RB or ML investor with documents, drafted an offering document that was given to an investor or potential investor, or made any representation to any RB or ML investor.  Nor have they alleged that any ML or RB investors actually relied on any statements made by or attributed to Quarles in making their investments.

Thus, Plaintiffs are left with their allegation that Quarles "turned a blind eye" by not blowing the whistle or withdrawing from representing RB.  But those allegations are unavailing because they, too, fail to establish that Quarles actually participated or assisted in the alleged fraud.  Arizona law is clear: a lawyer cannot be deemed to have participated in a client's fraud merely by continuing to render professional services.  Quarles' failure to withdraw or blow the whistle on RB cannot serve as a proxy for actual assistance or participation.  On the contrary, Arizona's ethical rules confirm that Quarles had no obligation to disclose its client's confidences or to withdraw from its representation for the same reason it is not liable under the securities laws: Quarles did not participate in RB's alleged fraud.

## II.    FACTUAL BACKGROUND[1]

### A.    Quarles Began Representing RB in 2007.

Quarles is a national law firm with offices throughout the country.  Compl. ¶ 38.  In January 2007, Robert Moya, a partner in Quarles' Phoenix office, received a call from Greenberg Traurig ("Greenberg") partner Robert Kant referring Moya a potential client, Radical Bunny LLC.  *Id*. ¶ 144.  RB was a limited liability partnership formed in 1999 by its four managers – Tom Hirsch, Berta Walder, Howard Walder, and Harish Shaw ("RB principals") – to raise funds from private investors to loan to a large and long-standing licensed mortgage-broker, Mortgages Ltd.  *Id.* ¶ 59.  ML originated, sold, and serviced high-interest,

---

[1] Solely for purposes of this Motion, Quarles assumes the truth of all well-pleaded factual allegations in the Complaint.

1   secured real estate loans for developers in Arizona by raising money from private investors.

2   *Id.* ¶¶ 55-58.  When Moya received the call from Kant in January 2007, he spoke initially with

3   Hirsch, who described how RB raised funds from investors.  *Id.* ¶ 145.

4           By the time Moya was called in early 2007, ***RB already had raised $140 million for***

5   ***ML from 700 investors***.  *Id.* ¶¶ 145, 147.  Moreover, as alleged by Plaintiffs, ***since at least***

6   ***2005***, ML "was insolvent and on the path to bankruptcy," and ML's and RB's entire operation

7   had become a Ponzi scheme.  *Id.* ¶¶ 5, 9.  Starting in 2005, when it began focusing on "making

8   expensive (high interest) bridge loans to real estate developers" (*Id.* ¶ 56), ML became

9   dependent on RB and RB's investors to bring ML additional liquidity in the form of private

10  loans so that ML could continue to meet its interest payment obligations to previous investors.

11  *Id.* ¶ 61.  RB's loans supplemented the money ML was bringing in from its own investors.  *Id.*

12  ¶ 9.

13          In late 2006, however, ML was becoming increasingly concerned that RB was raising

14  large amounts of money for ML through unregistered securities offerings.  *Id.* ¶ 109.  During a

15  meeting in December 2006 with RB – prior to Quarles' retention – Kant told RB that "the

16  manner in which [it] was raising investor money was 'not valid;' that it was 'wrong;' and that

17  it 'violated the law.'"  *Id.* ¶ 137.   In an effort to get RB to address its securities compliance

18  issues, Kant referred RB to Quarles.  *Id.* ¶ 141.

19          RB retained Quarles on February 12, 2007.  *Id.* ¶ 149.  Based on RB's need for

20  securities compliance advice, Moya asked Quarles securities partner Christian Hoffmann to

21  work with RB.  *Id.* ¶ 146.  After several meetings with RB, Hoffmann identified two key issues

22  that Quarles needed to address:  (1) whether RB was selling unregistered securities and, if so,

23  whether there was an applicable exemption under state and federal securities law; and

24  (2) whether the loans that RB was representing to investors as secured by ML assets in fact

25  were secured.  *Id.* ¶ 146-49, 151-52.

26          Consistent with their experience, Hoffmann focused on securities law compliance

27  issues, while Quarles partner Robert Bornhoft analyzed whether RB had a perfected secured

28  interest in ML's assets.  *Id.* ¶ 149.  As discussed further below, Hoffmann concluded that RB

1  *was* selling unregistered securities and that no exemption applied (*Id.* ¶¶ 152, 254); Bornhoft

2  concluded that, notwithstanding its contrary representations to investors, RB and its investors

3  did *not* have a perfected security interest in ML's assets.  *Id.* ¶¶ 252, 278.

**B.     Quarles Told RB To Stop Selling Securities.**

5  In conducting its factual diligence and legal research, Quarles reviewed the offering and

6  transactional documents RB previously used – and still was using – to sell its securities.  *Id.*

7  ¶ 148.  Those documents, prepared by RB itself long before it retained Quarles, primarily

8  consisted of a "Direction To Purchase," which, according to Plaintiffs, failed to disclose

9  numerous material facts, including that RB was selling unregistered securities, operating as an

10  unlicensed securities dealer, and violating securities laws.  *Id.* ¶¶ 79-82, 90-91.  The Direction

11  To Purchase also inaccurately represented that the "investment[s] [were] collateralized by the

12  beneficial interest under various deeds of trust held by Mortgages Ltd."  *Id.* ¶ 98.

13  After conducting its factual and legal research, Quarles concluded that RB's past and

14  ongoing sales of securities were in violation of federal and state securities laws.  *Id.* ¶¶ 151-52.

15  Accordingly, in a conference call with Hirsch and the other RB principals on May 2, 2007,

16  ***Hoffmann advised RB that it was violating the securities laws and that it had to stop selling***

17  ***securities***.  *Id.* ¶¶ 21, 153, 254.  Hoffmann further advised RB to ***disclose the violations to the***

18  ***SEC and the Arizona Securities Division***, and to retain criminal and civil counsel to deal with

19  past violations.  *Id.* ¶¶ 21, 153, 254.  Although Hoffmann did not repeat this advice in a written

20  letter or memo to RB (*Id.* ¶ 153), his advice is documented in a script he prepared in advance

21  of the call and in his contemporaneous notes from the call, both of which the SEC questioned

22  him about during his deposition.  *See* Ex. A at 164-204 & Exs. B, C.[2]  Notwithstanding

---

25  [2]  Exhibit A to this Motion is a copy of the transcript of Hoffmann's sworn deposition
testimony at the January 13, 2009 deposition conducted by the SEC in connection with its
26  investigation into RB.  Exhibits B and C are Exhibits 205 and 206, respectively, to Hoffmann's
deposition transcript.  For ease of reference, citations to the Bates-numbered pages of
27  Hoffmann's deposition transcript have been abbreviated to use only the final three digits (*i.e.*,
"ACC019###" is referred to as "###").

(Continued...)

1   Hoffmann's advice, Hirsch said he did not want to disclose the past violations to the regulators,

2   but did want to become compliant with the securities laws going forward.  Compl. ¶¶ 22, 154.

3   Based on his discussions with the RB principals, Hoffmann assumed that RB would stop

4   selling securities and focused his efforts on trying to bring RB into compliance with the

5   securities laws.  *Id.* ¶ 255.

6   **C.      Quarles Began Drafting Disclosure Documents For Use In a Future**

7   **Compliant Securities Offering.**

8       Just as Hoffmann concluded that RB was not in compliance with the securities laws,

9   Bornhoft concluded that RB's representations to its investors that they had a perfected security

10  interest in ML's assets were incorrect.  *Id.* ¶¶ 20, 252, 278.  Thus, as discussed further below,

11  Bornhoft set out trying to obtain for RB a perfected security interest in ML's assets.  In the

12  meantime, Hoffmann and associate Gary Shullaw continued trying to figure out a way to bring

13  RB into compliance with the securities laws on a going forward basis.  *Id.* ¶¶ 180-81.  In that

14  vein, they began preparing various disclosure documents for use with future investors (*Id.*

15  ¶ 180), although, as Hoffmann testified at his SEC deposition, Quarles recognized that no

16  securities could be sold to new investors until RB obtained a perfected security interest in

17  ML's loans.  Ex. A at 198-202.  In other words, Quarles drafted transaction documents that

18  were to be used **only after** RB and ML had reached an agreement granting RB a security

19  _____

20  (...Continued)

21  Throughout the Complaint, Plaintiffs cite and refer to numerous documents not attached to the
    Complaint, including Hoffmann's SEC deposition transcript.  *See, e.g.,* Compl. ¶¶ 250, 255.  It

22  is well settled in the Ninth Circuit that "documents whose contents are alleged in a complaint
    and whose authenticity no party questions, but which are not physically attached to the

23  pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.  Such
    consideration does 'not convert the motion to dismiss into a motion for summary judgment.'"

24  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (quotation omitted), *overruled on other
    grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002); *Glenbrook

25  Capital Ltd. P'ship v. Kuo*, No. C07-02377 MJJ, 2008 U.S. Dist. LEXIS 80888, at **15-17
    (N.D. Cal. Apr. 3, 2008) ("Even where judicial notice is not appropriate [under Federal Rule of

26  Evidence 201], courts may also properly consider documents 'whose contents are alleged in a
    complaint and whose authenticity no party questions, but which are not physically attached to

27  the [plaintiff's] pleadings.'") (quoting *Branch*).  The court may consider the **entire document**,
    not just the parts quoted in the complaint.  *In re Stac Elecs. Sec. Litig*., 89 F.3d 1399, 1405, n.4

28  (9th Cir. 1996).

1   interest in ML's assets, and only as part of a program that fully complied with the securities

2   laws. *Id.* at 198-202, 218-28.  Thus, for example, Quarles prepared draft interim risk

3   disclosures (Compl. ¶ 259), but never intended or stated that RB could use those disclosures –

4   and, indeed, expressly instructed RB ***not*** to provide any draft documents to any investors until

5   after they were finalized and a fully compliant program that included a perfected security

6   interest in ML's assets was in place.  Ex. A at 221-22; 272-75.

7           According to Plaintiffs, however, RB lifted certain risk disclosure language from the

8   draft "interim risk-disclosures" drafted by Quarles and inserted them into its own revised

9   investor forms.  Compl. ¶ 259.  There is, however, no allegation that Quarles approved of or

10  even knew that RB used this draft language, or that this language or any other document

11  prepared in whole or in part by Quarles, or with Quarles' name on it, ever was provided to an

12  RB or ML investor.

13      **D.**     **Quarles Spent Months Fruitlessly Trying To Structure a Perfected Security**

14              **Interest in ML Assets.**

15          While Hoffmann was working through the issues related to RB's securities compliance,

16  Bornhoft was attempting to document for RB a perfected security interest in ML's assets.  *Id.*

17  ¶ 265.  Before Quarles was retained, ML had provided RB with UCC forms showing that the

18  investments were secured by the assets of ML (*Id.* ¶ 98), but, upon its own review, Quarles

19  determined that those UCC forms were invalid.  *Id.* ¶¶ 11, 252.

20          On April 25, 2007, Bornhoft began negotiating with Kant by sending him a draft Term

21  Sheet outlining a security interest in favor of RB.  *Id.* ¶¶ 252, 279-80.  Plaintiffs allege,

22  however, that ML essentially stonewalled Quarles' attempts to document any security interest

23  because they knew ML's "insolvency and lack of liquidity prevented it from paying" RB

24  investors.  *Id.* ¶¶ 281-83.  In fact, according to the Complaint, ML had no intention of

25  documenting a security interest between ML and RB.  ML president Michael Denning himself

26  stated that there was "'[n]ot a snowball's chance in you know where' that [ML] would grant

27  the security interest belatedly sought by [RB]."  *Id.* ¶ 282.

28

**E.      The Draft RB Private Offering Memorandum Never Was Finalized or Provided to Investors.**

On August 13, 2007, ML and RB representatives held a meeting at which they discussed alternative plans to legalize RB's securities offerings, including "a new plan under which Radical Bunny's notes would be converted to LLC interests and sold under a POM of the type used for limited–liability companies that Mortgages Ltd. managed." *Id.* ¶ 266.  Kant already had prepared 11 previous private offering memoranda ("POM"s) for ML dating back to 2006 (*Id.* ¶ 198) and offered to prepare a POM for RB.  *Id.* ¶ 267.

Over the next several weeks, drafts of the POM for RB were circulated among Greenberg, ML, Quarles, and RB (*Id.* ¶ 267-69), but, as Plaintiffs allege, "[n]either Quarles nor Greenberg ever completed a private-offering memorandum for Radical Bunny."  *Id.* ¶ 172. There simply is no allegation that the POM Kant assisted in preparing for RB, or any version of any POM that any Quarles attorney saw, ever was finalized or provided to any RB or ML investor.

**F.      Quarles Formally Terminated Its Representation of RB in June 2008.**

On June 3, 2008, the day after ML's CEO, Scott Coles, committed suicide, Hirsch contacted Bornhoft about representing RB in connection with an expected "run on the bank" by investors.  *Id.* ¶ 292.  During a June 9, 2008 call between Quarles and the RB principals, Hirsch "acknowledged that Radical Bunny had continued to sell securities on behalf of Mortgages Ltd. since the time Quarles began representing Radical Bunny more than a year earlier." *Id.* ¶ 294.  There is no allegation that Hirsch or any other RB principal ever told Hoffmann or any other Quarles lawyer before that call that RB had continued to sell securities. Indeed, Hoffmann testified before the SEC that he did ***not*** know RB had continued to sell securities following his May 2007 advice that it should stop selling until it had become compliant with the securities laws.  Ex. A at 243-46, 250-52.  The day after the call, on June 10, Bornhoft sent a termination letter to RB.  Compl. ¶ 295.

1        **G.      Bankruptcy and Regulatory Investigation.**

2            As of July 18, 2008, ML owed RB investors $197,232,758, which included the principal

3    balance on 99 loans RB made to ML from September 2005 to June 2008. *Id.* ¶¶ 15, 124. ML

4    filed for bankruptcy in June 2008, and RB filed in October 2008. *Id.* ¶ 123. After the collapse

5    of ML and RB, various regulatory agencies investigated ML and RB and filed enforcement

6    actions against those entities and their principals. *Id.* ¶¶ 27, 125. The Arizona Corporation

7    Commission, after a joint investigation with the SEC, found that RB had begun violating the

8    Arizona securities laws at least as far back as December 2005 (*Id.* ¶ 126), over a year before

9    RB retained Quarles. No regulatory agency made any adverse findings regarding Quarles.

10   **III.    ARGUMENT**

11        **A.      Plaintiffs Fail To Meet the Pleading Requirements of *Twombly* and *Iqbal*.**

12           Plaintiffs' failure to allege facts that would allow this Court to "draw [a] reasonable

13   inference" that Quarles is liable to Plaintiffs justifies dismissal of all of Plaintiffs' claims

14   against Quarles. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Where a complaint pleads

15   facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

16   possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*,

17   550 U.S. 547, 556-57 (2007) (Where plaintiff fails to "nudge [his] claims across the line from

18   conceivable to plausible, [the] complaint must be dismissed.")). In reviewing a motion to

19   dismiss under Rule 12(b)(6), the Court need not accept as true "unreasonable inferences or

20   conclusory legal allegations cast in the form of factual allegations." *Sprewell v. Golden State*

21   *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Grand v. Nacchio*, No. CV-09-0317-PR, 2010

22   Ariz. LEXIS 35, at *10, n.1 (D. Ariz. Aug. 5, 2010) ("In evaluating motions to dismiss,

23   Arizona courts consider only the 'well-pled facts,' not legal conclusions."). A court should

24   "draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

25           Moreover, because each of Plaintiffs' claims against Quarles sounds in fraud, each must

26   satisfy the demanding pleading requirements of Rule 9(b), which applies to all allegations of

27   "fraud or mistake." Fed. R. Civ. P. 9(b); *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1157 (D.

28   Ariz. 2005) ("a § 44-1991 claim is subject to the same strict pleading requirements as a § 10(b)

1   claim"); *Sweeney v. Darricarrere*, No. 2:09-cv-00266 JWS, 2009 U.S. Dist. LEXIS 61720, at

2   \*38, n.109 (D. Ariz. July 14, 2009) ("Both fraud and negligent misrepresentation must meet

3   the heightened pleading standard of Rule 9(b).").

4       **B.      Plaintiffs Fail To State a Claim That Quarles Is Primarily Liable for**

5               **Violation of the Arizona Securities Laws Because They Do Not Allege That**

6               **Quarles Made, Participated in or Induced the Unlawful Sale of Securities.**

7       Plaintiffs allege in Count One that Quarles is primarily liable under A.R.S. §§ 44-

8   1991(A) and 44-2003(A) by participating in or inducing the unlawful sale of securities to

9   Plaintiffs.  Compl. ¶ 398.  Section 44-1991(A) provides in relevant part that it is a fraudulent

10  practice to "[e]ngage in any transaction, practice or course of business which operates or would

11  operate as a fraud or deceit" in connection with a transaction involving the purchase or sale of

12  securities.  A.R.S. § 44-1991(A).  Section 44-2001(A) expressly allows a purchaser injured by

13  a violation of Section 44-1991(A) to bring a private right of action.  But Section 44-2003(A)

14  *limits* those persons against whom an action pursuant to Section 44-2001 may be brought to

15  "any person . . . who *made, participated in or induced* the unlawful sale or purchase . . . ."

16  A.R.S. § 44-2003(A) (emphasis added).  Thus, Plaintiffs only can bring a claim against

17  Quarles if they allege facts demonstrating that Quarles *made, participated in or induced* the

18  sale of securities to Plaintiffs.  Plaintiffs' allegations against Quarles do not meet this statutory

19  requirement.

20       **1.      Plaintiffs Fail To Plead That Quarles "Made" or "Induced" Illegal**

21               **Sales or Purchases.**

22       As an initial matter, Plaintiffs do not even attempt to allege that Quarles "made" any

23  sale of securities.  Nor do they plead sufficient facts to support their allegation that Quarles

24  "induced" any purchase of securities.  To "induce" a purchase or sale of securities under

25  Section 44-2003(A), a defendant must engage in a purposeful effort to "persuade" or "prevail

26  upon" the plaintiff to purchase the securities.  *Standard Chartered PLC v. PriceWaterhouse*,

27  190 Ariz. 6, 21 (Ct. App. 1996).  Mere collateral involvement in a securities transaction or

28  provision of information that contributes to a buyer's decision to close the deal is not enough to

-9-

1    state a claim that the defendant "induced" the sale. *Id.* ("[P]rovid[ing] information that

2    foreseeably contributed to, and thereby *influenced*, a buyer or seller's decision to engage in the

3    transaction" is not "inducement" of an unlawful sale.) (emphasis in original).

4         Plaintiffs have failed to allege that Quarles did anything to induce sales – that is,

5    "persuade" or "prevail upon" any investor to purchase securities.  To the contrary, Plaintiffs

6    allege that Quarles took steps to ***prevent*** sales by affirmatively advising RB to stop selling

7    securities and to disclose its past misconduct to investors and regulators.  Under the facts as

8    alleged, Quarles could not have "induced" the purchase or sale of securities under Arizona law.

9              **2.    Plaintiffs Fail To Plead Sufficient Facts To Show That Quarles**

10                  **"Participated in" the Sale of Securities to Plaintiffs.**

11        Because Plaintiffs cannot and do not allege that Quarles made or induced any illegal

12   sales, the crux of Plaintiffs' claim under Sections 44-1991(A) and 44-2003(A) is that Quarles

13   "participated in" RB's illegal sales of securities.  In *Standard Chartered*, the court defined

14   "participate" as "to take part in something (as an enterprise or activity) . . . in common with

15   others," or "to have a part or share in something." *Id.*  Applying that definition, *Standard*

16   *Chartered* held that an outside auditing firm that had issued allegedly misleading audited

17   financial statements and made them available to a plaintiff who bought stock in the audited

18   company had not, as a matter of law, "participated in" the stock sale. *Id.*  The court

19   emphasized that the auditing firm "had no stake in the sale" beyond its performance of

20   professional services. *Id.*  Plaintiffs have not pleaded facts to support a theory that Quarles

21   "shared in," "took part in" or "had a stake in" – *i.e.*, participated in – the unlawful sales to

22   Plaintiffs alleged in the Complaint.

23        Moreover, to properly allege that Quarles participated in the illegal sales under

24   Section 44-2003(A), Plaintiffs must allege that Quarles did more than merely act in its

25   professional capacity as counsel for RB.  Section 44-2003(A) expressly provides that "***[n]o***

26   ***person shall be deemed to have participated in any sale or purchase solely by reason of***

27   ***having acted in the ordinary course of that person's professional capacity in connection with***

28   ***that sale or purchase***."  A.R.S. § 44-2003(A) (emphasis added).  Plaintiffs fail to allege any

-10-

1    facts showing that Quarles was acting in anything other than its professional capacity as

2    counsel for RB.

3       In *Grand v. Nacchio*, plaintiff trustee of a living trust alleged, in part, that defendant

4    corporate executives and entities had "targeted" the trustee with a stream of reassuring emails,

5    favorable analyst reports, and press releases, and misled the trustee into purchasing aftermarket

6    stock through a fraudulent scheme.  2010 Ariz. LEXIS 35, at **7-8.  Just two weeks ago, on

7    August 5, 2010, the Arizona Supreme Court, applying the definition of "participate" from the

8    *Standard Chartered* case, held that the conduct alleged by plaintiffs was insufficient to state a

9    claim that defendants "participated in illegal sales."  *Id.* at **11-15.  In so ruling, the Supreme

10   Court forcefully reaffirmed the earlier decision in *Standard Chartered.*

11       Here, Plaintiffs' allegations that Quarles "participated in" the sales of securities to the

12   RB or ML investors are even more attenuated than those in *Grand* and *Standard Chartered*.  In

13   Paragraphs 196-97 of the Complaint, Plaintiffs list a number of ways that Quarles allegedly

14   participated in illegal sales of securities.  Compl. ¶¶ 196-97.  Even if taken as true for the

15   purposes of this motion, not one of the alleged acts or omissions by Quarles, alone or together,

16   demonstrate that Quarles "took part in" or "had a share in" the alleged unlawful purchases.

17   Indeed, they show that Quarles attorneys did nothing more than act in the ordinary course of

18   their professional capacity while representing RB.

19       **First**, Plaintiffs allege that Quarles participated in the sales of securities by "[p]reparing

20   documents for Radical Bunny to use in soliciting new investors."  Compl. ¶ 196.  Significantly,

21   what Plaintiffs do not allege – because they cannot – is that any of the draft documents

22   prepared by Quarles ever were finalized or actually provided to investors, or that any investor

23   ever actually relied on a Quarles-prepared document in purchasing securities.  Plaintiffs fail to

24   identify even one document prepared by Quarles (as opposed to by RB itself) that contained an

25   alleged misrepresentation or omission that ever was provided to an investor or that the

26   investors actually relied on.

27       For example, in an attempt to support their claims, Plaintiffs allege that Quarles revised

28   and/or gave comments on a draft POM that Greenberg drafted for RB.  But Plaintiffs also

1  expressly allege that this POM never was completed.  *Id.* ¶ 172.  Thus, there is no plausible

2  basis to contend that this draft POM could constitute Quarles' participation in RB's illegal

3  securities sales.

4        The only Quarles-drafted language that Plaintiffs allege RB actually used was the

5  "interim risk-disclosure language" that RB allegedly lifted from one of Quarles' draft

6  documents and placed into its own investor form.  *Id.* ¶ 259.  Plaintiffs allege that it was

7  misleading to include in the interim risk disclosure language "that the investments being sold

8  by Radical Bunny were secured with a lien on the assets of Mortgages Ltd," when Quarles

9  knew they were not.  *Id.* ¶ 260.  They also allege it was misleading not to include a disclosure

10  about RB's past and current securities violations.  *Id.* ¶¶ 260, 271.

11        But it is clear in context that Quarles prepared this and other draft disclosure language

12  only to be used with a future offering by RB that was in compliance with the securities laws,

13  and only after RB had obtained a perfected security interest in ML's assets.  There is no

14  allegation that Quarles knew or approved of RB's premature use of the language in its own

15  forms.  Indeed, Hoffmann testified before the SEC that Quarles told RB that Quarles could

16  prepare early drafts of documents, but affirmatively advised RB that they only could be used at

17  a later time when RB had a compliant securities offering in place with a perfected security

18  interest in ML's assets.  Ex. A at 198-202, 218-28, 221-22, 272-75.  Thus, Quarles never

19  instructed or permitted RB to use the unfinished drafts.  In fact, Quarles specifically told RB

20  ***not*** to use them.  Ex. A at 221-22, 272-75.  Moreover, Plaintiffs fail to allege that any investors

21  that invested after Quarles sent RB the draft disclosure language even saw, let alone relied on,

22  the language.

23        **Second**, Plaintiffs allege Quarles participated in the sales of securities by "[p]reparing

24  loan documents to facilitate Radical Bunny's relationship with Mortgages Ltd."  Compl. ¶ 196.

25  Specifically, Plaintiffs allege that Quarles tried to document and formalize the perfected

26  security interest RB had told its investors it had with ML.  But, as alleged, because ML was

27  insolvent and could not pay out if the RB investors called in the loans, it stonewalled Quarles

28  and RB by refusing to document a security interest in ML's assets.  In contrast, Plaintiffs allege

-12-

1  that Quarles tried in every way it could think of to **protect** the RB investors.  Since Plaintiffs

2  acknowledge that the loan documents never were finalized (*Id.* ¶¶ 279-86), the investors could

3  not have relied on them or any language regarding a perfected security interest contained in

4  them.  And Quarles hardly "participated in" any illegal securities sales merely by trying to get

5  ML to document a perfected security interest in favor of RB and its investors.

6       <u>Third</u>, Plaintiffs allege Quarles participated in the sales of securities by "[r]eviewing

7  and evaluating for Radical Bunny the loan documents that Mortgages Ltd. proposed for use in

8  the ongoing ML-RB Joint Venture."  *Id.* ¶ 196.  Again, there is no allegation that any alleged

9  loan documents reviewed by Quarles ever were finalized or given to investors.

10       <u>Fourth</u>, Plaintiffs allege Quarles participated in the sales of securities by "[a]llowing

11  Radical Bunny to use Quarles & Brady's name and reputation in connection with offering

12  documents to be used to solicit new investors and in connection with Radical Bunny's investor

13  communications and meetings."  Compl. ¶ 196.  But there are no specific allegations to back

14  this up.  As noted above, Plaintiffs never allege that Quarles told RB it could provide to

15  investors drafts of any of the loan or disclosure documents it was preparing.  And, as testified

16  by Hoffmann, Quarles actually told RB **not** to provide any documents to investors until an

17  offering in compliance with the securities laws was in place.  Ex. A at 221-22, 272-75.

18  Moreover, there is no allegation that Quarles ever met with or communicated with any RB or

19  ML investor or that any investor relied on the alleged use of Quarles' name in deciding to

20  purchase securities.  Accordingly, Plaintiffs' vague allegations about RB's use of Quarles'

21  name cannot support their claim of primary liability for securities fraud.

22       <u>Fifth</u>, Plaintiffs allege Quarles participated in the sales of securities by "[h]elping to

23  arrange for Radical Bunny to pay Greenberg's fees in drafting a POM for Radical Bunny's use

24  under the ML-RB Joint Venture" and "[a]greeing to allow Radical Bunny's managers to meet

25  and work directly with Greenberg to negotiate deal points for the ongoing ML-RB Joint

26  Venture."  Compl. ¶ 196.  But, as noted above, there is no allegation that the POM Greenberg

27  prepared for RB ever was finalized or provided to investors, or relied on by them in deciding to

28  purchase securities.  In fact, Plaintiffs themselves expressly allege that the POM never was

finalized.  *Id.* ¶ 172.  Thus, whether or not Quarles allegedly "help[ed] to arrange for RB to pay Greenberg's fees" for Greenberg's preparation of that POM is irrelevant.  And, in any event, it does not add up to "participation."

**Sixth**, Plaintiffs allege Quarles participated by "[e]valuating various ways to create a registration exemption for Radical Bunny in the midst of past and ongoing registration violations."  *Id.* ¶ 196.  Quarles tried to find a way that RB could continue its business ***legally*** by, among other things, researching various potential registration exemptions.  There is no allegation that Quarles ever advised RB, however, that any exemptions were available, or that RB ever proceeded under the impression that they were.

**Finally**, Plaintiffs allege Quarles participated in the sales of securities by failing to either blow the whistle or withdraw from representing RB when RB refused to inform its existing investors of past and ongoing securities laws violations and misrepresentations regarding security for their investments.  *E.g.*, *id.* ¶¶ 196-97.  Plaintiffs also allege, however, that Quarles ***advised RB*** to disclose its past violations to investors and regulators.  *Id.* ¶¶ 21, 153, 254.

Plaintiffs' allegations regarding Quarles' failure to withdraw do not amount to – or serve as a substitute for – actual participation in RB's alleged fraud.  According to Section 44-2003(A), a lawyer cannot be deemed to have participated in a client's sale of securities by reason of having acted in the ordinary course of his professional capacity.  Simply put, Plaintiffs cannot rely upon Quarles' continued representation of RB as a proxy for factual allegations showing that Quarles participated in RB's fraud.  Instead, Plaintiffs must plead facts showing actual participation – something they have failed to do.

In any event, Plaintiffs' allegations about Quarles' failure to withdraw are baseless because Arizona's ethical rules only mandate withdrawal where the representation will result in the violation of an ethical rule or the law, as where the representation will result in the lawyer's participation in fraud.  Rules of Prof. Conduct, ER 1.16(a), 1.2(d).  For example, in Ethics Opinion 91-02, the Arizona Bar examined the ethical obligations of a lawyer who unwittingly had accepted erroneously high workers' compensation payments on behalf of his

1  client and, upon discovering the error, was instructed by the client to continue accepting

2  payments without disclosing the error to the insurer.  *See* Arizona Ethics Opinion No. 91-02

3  (Jan. 15, 1991) (available online at http://www.myazbar.org/ethics/pdf/91-02.pdf).  The Bar

4  opined that the lawyer would not have been required to withdraw under Rules 1.16(a) and

5  1.2(d) if he simply had been asked not to disclose the error to the insurer.  But because the

6  attorney's representation involved actually accepting monthly checks from the insurer and

7  collecting his fee from those checks, to continue that activity would constitute assistance of his

8  client's fraud.  The lawyer therefore was required to withdraw under Rules 1.16(a) and 1.2(d).

9      Here, because Plaintiffs have failed to allege facts showing that Quarles actually

10  participated in RB's alleged fraud, there is no basis for arguing that Quarles was obligated to

11  withdraw, much less for basing a securities law claim on Quarles' continued representation.

12  *See also In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1452

13  (D. Ariz. 1992) (finding that the standard for mandatory withdrawal under Rule 1.16(a) is

14  consistent with obligations imposed under the securities laws in that an attorney must withdraw

15  "[w]hen the attorney knows the client is engaged in a course of conduct designed to deceive

16  others, ***and*** where it is obvious that the attorney's compliant legal services may be a

17  ***substantial factor*** in permitting the deceit to continue") (emphasis added).

18      Similarly, Plaintiffs' allegations regarding Quarles' duty to disclose are beside the point

19  because Plaintiffs cannot equate Quarles' mere maintenance of RB's confidences regarding its

20  past misconduct with participation in RB's alleged ongoing or future fraud.  As a general

21  matter, lawyers have a duty to maintain client confidences.  ER 1.6(a).  Rule 4.1 provides

22  certain narrow exceptions where a lawyer could be obligated to disclose a client's

23  misrepresentation: "In the course of representing a client, a lawyer shall not knowingly . . . fail

24  to disclose a material fact when disclosure is necessary to avoid assisting a criminal or

25  fraudulent act by a client, unless disclosure is prohibited by E.R. 1.6."  ER 4.1(b).  Similarly,

26  comment 11 to Rule 1.2 provides that "[i]n extreme cases, a lawyer may be required to disclose

27  information relating to the representation to avoid being deemed to have assisted the client's

28  crime or fraud."  Rule 4.1 and comment 11 to Rule 1.2 both are based upon the lawyer's

-15-

1   *assistance in* the crime or fraud; they have no application where the lawyer does not engage in

2   such conduct.  Again, because Plaintiffs have not pleaded facts showing that Quarles

3   participated in RB's fraud, there is no basis for applying Rule 4.1 or 1.2(d) to Quarles.

4   Moreover, in the absence of such participation, Quarles did not even have the discretion

5   to disclose RB's alleged fraud.  Rule 1.6 provides certain exceptions where the lawyer *may*

6   reveal his client's confidences in order to prevent the commission of a crime or fraud.

7   ER 1.6(c) and (d).  But Ethics Opinion 91-02 indicates that a lawyer only may reveal his

8   client's intent to commit a wholly *future* crime under Rule 1.6(c); a lawyer is not allowed to

9   reveal either a *past* or even *continuing* crime.  Because the worker's compensation claimant's

10  fraud against the insurer was continuing, his attorney was not allowed to disclose the error to

11  the insurer or anyone else.  Under Rule 1.6(d), on the other hand, a lawyer only may reveal a

12  client's intention to commit certain financial crimes or frauds where the crime or fraud was

13  committed "*using the lawyer's services*."  ER 1.6(d) (emphasis added).  Here, because

14  Plaintiffs allege that RB engaged in a continuing fraud but have failed to plead facts showing

15  that Quarles knew RB used its services in committing fraud, Quarles would not have been

16  allowed to blow the whistle to Plaintiffs or anyone else.  And in any event, Plaintiffs still could

17  not supply the missing element of participation by pointing to Quarles' failure to exercise a

18  permissive right to disclose RB's fraud.

19  In sum, Plaintiffs' allegations add up to no more than that Quarles was retained to

20  examine existing client conduct that had been ongoing for years, to determine whether it

21  violated the securities laws, to advise the client whether it was possible in the future to

22  conform its conduct to the requirements of law, and, if so, to prepare documentation that could

23  be used for that purpose going forward.  Nothing Quarles is alleged to have done or failed to

24  do amounts to "participation" within the meaning of Arizona securities laws.

25          **3.      Plaintiffs Fail To State with Particularity Facts Giving Rise to a**

26                  **Strong Inference of Scienter.**

27  Claims arising under Section 44-1991 also must satisfy Section 44-2082(A) and (B),

28  which have a heightened pleading standard similar to that in Rule 9(b) and the Private

-16-

Securities Litigation Reform Act.  A.R.S. §§ 44-1991 & 44-2082(A) & (B); Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1) & (b)(2).  Section 44-2082(B) requires that the "complaint shall state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  A.R.S. § 44-2082(B).  Plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Wojtunik*, 394 F. Supp. 2d at 1158 (requiring the pleading of facts that come closer to demonstrating intent) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)).  "It is not enough for [the plaintiff] to state facts giving rise to a mere speculative inference, or even a reasonable inference of deliberate recklessness."  *Id*. at 1169.

Plaintiffs' allegations against Quarles fall far short of showing that Quarles had the requisite state of mind as to the alleged fraudulent and deceptive acts.  In fact, the allegations show the exact opposite – that Quarles told RB to **stop** selling securities, to disclose its prior misconduct to investors and regulators, to take the steps necessary to come into compliance with the securities laws going forward, and not to use any draft disclosure documents until a perfected security interest in ML assets could be obtained and appropriate disclosure documents finalized.

**C.      Plaintiffs Fail To State a Claim That Quarles Is Primarily Liable Under the Investment Management Act.**

Arizona's Investment Management Act prohibits a person from committing fraud in connection with investment advisory services.  A.R.S. § 44-3241(A).  Specifically, a person can be liable under Section 44-3241(A) if he commits fraud in connection with a transaction "involving the provision of investment advisory services."  *Id.*

As an initial matter, it is doubtful whether the Investment Management Act even was meant to apply to a party, like Quarles, that is not alleged to have provided any investment advisory services to anyone.  Even so, Plaintiffs' claim still fails as a matter of law because they have not alleged facts showing that Quarles ever committed fraud, much less in connection with investment advisory services.  Neither have Plaintiffs alleged that Quarles ever gave investment advice or provided any legal services in connection with an investment

-17-

advisory transaction.  Plaintiffs allege only that Quarles is primarily liable to Plaintiffs under Section 44-3241 for "providing incomplete and misleading information that was used in connection with the investment advisory services that Radical Bunny (and its managers) provided to Radical Bunny investors."  Compl. ¶ 441.

Although there are no published Arizona cases interpreting Section 44-3241, the statutory language cannot be stretched to impose liability on a lawyer who merely drafts documents, portions of which are then used by his client in connection with giving fraudulent investment advice to a third party.  At a minimum, Plaintiffs must show some conduct by Quarles that constitutes participation, assistance, inducement, or some other level of involvement beyond merely performing legal services in the ordinary course.  As demonstrated above, Plaintiffs have failed to allege sufficient facts to show that Quarles actually committed any fraudulent act or participated with RB in its alleged fraud.  Thus, they have not sufficiently pleaded a claim for violation of Section 44-3241.

**D.     Plaintiffs Fail To State a Claim for Aiding and Abetting.**

Plaintiffs allege that Quarles aided and abetted RB's and ML's (1) primary violations of the Arizona securities fraud statutes (Count Three); (2) breaches of fiduciary duty (Count Four); and (3) primary violations of the Investment Management Act (Count Seven).  Plaintiffs fail to plead facts that meet the required elements of an aiding and abetting claim under Arizona law.

**1.     Aiding and Abetting Securities Fraud No Longer Should Be Recognized in Arizona.**

As an initial matter, there is a substantial question whether the Arizona Supreme Court would recognize the continued validity of civil aiding and abetting liability under the Arizona securities statutes.  In *State v. Superior Court (Davis)*, 123 Ariz. 324, 331-32 (1979), the Arizona Supreme Court first recognized aiding and abetting liability in Arizona.  *Davis*, however, relied on federal law that was expressly overruled in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), which held that no private right of action exists for aiding and abetting violations of Section 10(b) of the Securities Exchange Act

of 1934.  Following the decision in *Davis*, the Arizona legislature expressly left open whether aiding and abetting liability exists under the Arizona Securities Act.  *See Grand*, 2010 Ariz. LEXIS 35, at *16 (quoting 1996 Ariz. Sess. Laws, ch. 197, § 11(B): "Nothing in this act . . . determines whether or in what circumstances aiding and abetting liability exists under Title 44, chapter 12, Arizona Revised Statutes.").  And, although no Arizona case has since ruled that aiding and abetting liability no longer exists in Arizona, the Arizona Supreme Court tellingly de-published an Arizona Court of Appeals case holding that a private right of action for aiding and abetting securities fraud does exist in Arizona, notwithstanding the lack of such a claim under federal law.  *Grubaugh v. DeCosta*, 291 Ariz. Adv. Rep. 11, at *39 (Ariz. Ct. App. Mar. 16, 1999) (indicating that the opinion's publication status changed to unpublished on February 3, 2000, pursuant to Rule 111(g) of the Arizona Rules of the Supreme Court).

Although the Arizona Supreme Court as recently as two weeks ago saw no need to confront the issue (*Grand*, 2010 Ariz. LEXIS 35, at *17), it is not at all clear that the Arizona Supreme Court would continue to recognize civil liability for aiding and abetting violations of the Arizona securities statutes when the issue is properly presented.

## 2. Plaintiffs Have Not Sufficiently Pled That Quarles Aided and Abetted RB's or ML's Securities Fraud.

Even assuming a private cause of action for aiding and abetting securities fraud exists, a plaintiff must plead with particularity three elements: (1) the primary actor committed securities fraud; (2) the defendant "***knew***" that the primary actor's conduct constituted securities fraud; and (3) the defendant "***substantially assisted or encouraged***" the primary actor's securities fraud.  *Stern v. Charles Schwab & Co.*, No. CV-09-1229-PHX-DGC, 2010 U.S. Dist. LEXIS 38395, at *22 (D. Ariz. Mar. 24, 2010) (granting motion to dismiss aiding and abetting securities fraud and other claims for failure to plead facts showing knowledge of fraud) (emphasis added).  Plaintiffs do not meet the second and third of these elements.

-19-

**a.      Plaintiffs Do Not Plead Facts Showing That Quarles Had
Actual Knowledge RB Was Continuing To Sell Securities.**

Quarles cannot be liable for aiding and abetting if it did not know RB was committing securities fraud – in this case, by continuing to sell to investors after Quarles advised it that it must stop.  Relying on Arizona Supreme Court authority, this court has found that aiding and abetting liability requires ***actual knowledge*** of the primary tortfeasor's wrongful conduct. *Stern*, 2010 U.S. Dist. LEXIS 38395, at \*23 ("[A]iding and abetting liability is based on proof of scienter . . . the defendants must ***know*** that the conduct they are aiding and abetting is a tort.") (quoting *Wells Fargo Bank v. Ariz. Laborers*, 201 Ariz. 474, 485 (Ariz. 2002) (ellipsis and emphasis in original)).  "[M]ere knowledge of suspicious activity is not enough.  The defendant must be aware of the fraud."  *Stern v. Charles Schwab & Co.*, No. CV-09-1229-PHX-DGC, 2009 U.S. Dist. LEXIS 96697, at \*20 (D. Ariz. Oct., 2009).  In *Stern*, the defendant financial institutions were aware of "suspicious activity" and other facts that might lead them to infer fraudulent activity might be afoot, but the court held that such suspicions were insufficient to meet the scienter requirement of aiding and abetting – *i.e.*, actual knowledge of the fraud.  *Id.* at \*\*20-21.

Here, Plaintiffs do not plead facts sufficient to establish that Quarles had actual knowledge that RB was continuing to sell securities after May 2007, when Quarles advised it to stop.  The general allegations in the Complaint – presence at meetings and receipt of reports obliquely referring to increases in the dollar amount of loans outstanding from RB to ML (*e.g.*, Compl. ¶¶ 162, 179) – are insufficient to show actual knowledge of continuing securities sales. Significantly, nowhere do Plaintiffs allege that RB informed Quarles prior to June 2008 that it still was selling.  Neither do Plaintiffs allege facts that would allow the Court to draw the reasonable inference that Quarles actually knew RB still was continuing to sell.  In fact, one reasonable inference to be drawn from the Complaint is that any alleged increase in the loan balance from RB to ML after May 2007 – which Plaintiffs suggest should have led Quarles to be suspicious that RB was continuing to sell new securities – was caused by accelerating accrued interest on the debt rather than by new sales of securities.  *See* Compl. ¶ 118 ("By the

1   end of 2007, the notes payable to Radical Bunny had increased to 172.6 million.  ***Annual***

2   ***interest expense on the debt alone was $22.4 million and growing***.") (emphasis added).  But

3   allegations of facts that arguably should have made Quarles suspicious are not enough,

4   particularly where Plaintiffs themselves allege a plausible interpretation for the increasing loan

5   balance inconsistent with continuing securities sales.  Thus, Plaintiffs have not alleged that

6   Quarles actually knew RB was continuing to illegally sell.

7               **b.       Plaintiffs' Allegations Against Quarles Do Not Rise to the Level**

8                        **of "Substantial Assistance" Required under Arizona Law.**

9               Even if Plaintiffs could allege with the requisite specificity that Quarles had actual

10  knowledge of ongoing illegal securities sales, Plaintiffs still must allege with the requisite

11  specificity that Quarles substantially assisted or encouraged RB to commit securities fraud.

12  *Stern*, 2010 U.S. Dist. LEXIS 38395, at *23.

13              Substantial assistance requires more than "a little aid."  *Ariz. Laborers*, 201 Ariz. at 488.

14  Rather, "[p]roof of substantial assistance requires a showing that [Quarles'] conduct was 'a

15  ***substantial factor*** in causing the [Plaintiffs'] harm.'"  *Stern*, 2009 U.S. Dist. LEXIS 96697, at

16  *23 (emphasis added) (quoting *In re Am. Cont'l Corp*., 794 F. Supp. at 1434-35).  The factual

17  allegations in the Complaint do not show that Quarles' conduct was a "substantial factor" in

18  causing the RB or ML investors to purchase securities or to lose their investments.  In fact, the

19  Complaint shows the exact opposite.  The alleged Ponzi scheme started well before Quarles

20  was retained by RB.  Quarles' alleged "assistance" is not the reason ML and RB were able to

21  continue their illegal activities.  There is no allegation that any investor relied on any

22  representation by Quarles in deciding to invest.  Similarly, there is no allegation that any of the

23  draft offering documents Quarles worked on ever were finalized, provided to investors, or

24  relied upon by investors in deciding to purchase securities.  In fact, Quarles specifically told

25  RB ***not*** to use any of the draft documents.  And the loan documents Quarles began to prepare

26  (but never completed) were for the purpose of documenting a perfected security interest to

27  protect investors, not to defraud them.  In any event, Plaintiffs themselves allege that those

28  loan documents never were finalized, and there is no allegation that any investor relied on

-21-

1  them.  Simply put, there are no facts that show RB's alleged fraud would have stopped had it

2  not retained Quarles; Quarles simply was not a substantial factor in RB's (or ML's) fraud or in

3  any damages suffered by Plaintiffs.

4        Moreover, as discussed above, whatever alleged assistance Quarles provided to RB was

5  carried out in the ordinary course of Quarles' representation of its client.  Operating in the

6  ordinary course of its legal representation as a matter of law does not constitute substantial

7  assistance unless Quarles had an "extraordinary economic motivation to aid in the fraud."

8  *Stern,* 2009 U.S. Dist. LEXIS 96697, at *23 (quoting *Ariz. Laborers,* 201 Ariz. at 488).  In

9  *Stern*, plaintiffs alleged no more than that the defendant engaged in "typical banking

10  transactions" in which it benefitted by the receipt of "ordinary account fees and credit interest."

11  *Id.* at **23-24.  That was not the kind of "extraordinary economic motivation," the court held,

12  that amounted to substantial assistance.  *Id.*  Similarly, there is no allegation here that Quarles

13  had any motivation other than the receipt of regular hourly legal fees for its legal advice in the

14  ordinary course of its legal representation.

15        Nor can Plaintiffs support their aiding and abetting claim by alleging that Quarles

16  should have withdrawn from representing RB or blown the whistle when it allegedly

17  discovered that RB still was engaged in illegal sales.  As discussed above, Plaintiffs cannot

18  prop up their failure to plead actual participation or substantial assistance by equating Quarles'

19  continued representation of RB with substantial assistance of RB's alleged fraud.  Quarles did

20  not have a duty to withdraw from representing RB and had no duty or even right to blow the

21  whistle on RB for the same reason it cannot be held liable for aiding and abetting RB's fraud:

22  Quarles did not participate in or substantially assist RB's conduct.  Accordingly, because

23  Plaintiffs have not presented enough facts to state a claim that Quarles aided and abetted a

24  violation of Sections 44-1991(A) and 44-2003(A), Count Three should be dismissed.

25                    **3.      Plaintiffs Fail To State a Claim for Aiding and Abetting Breach of**

26                    **Fiduciary Duty or Violation of the Investment Management Act.**

27        In addition to alleging that Quarles aided and abetted ML's and RB's primary violations

28  of Arizona's securities fraud statutes, Plaintiffs also allege that Quarles aided and abetted

-22-

1  breaches of fiduciary duty by ML, RB, and the ML-RB Joint Venture (Count Four) and aided

2  and abetted those defendants' violations of the Investment Management Act (Count Seven).

3      To plead claims for aiding and abetting breach of fiduciary duty and violation of the

4  Investment Management Act, Plaintiffs must plead the same three elements referred to above,

5  including knowledge and substantial assistance.  *See Stern*, 2010 U.S. Dist. LEXIS 38395, at

6  *23 (using the same reasoning in analyzing claims for aiding and abetting breach of fiduciary

7  duty, common law fraud, and securities fraud).  For the same reasons Plaintiffs have failed to

8  state a claim against Quarles for aiding and abetting securities fraud, they have not alleged

9  sufficient facts to state a claim that Quarles aided and abetted another defendant's breach of

10 fiduciary duty or violation of the Investment Management Act.

11         **E.      Plaintiffs Fail To State a Claim for Negligent Misrepresentation and**

12                   **Nondisclosure.**

13     Plaintiffs allege that "Quarles negligently gathered, compiled, and authorized the

14 distribution of information used in the investor meetings and materials through which Radical

15 Bunny unlawfully offered, sold, or described securities to Plaintiffs and members of the

16 proposed Class of Radical Bunny investors."  Compl. ¶ 429.  They also allege that "[t]he

17 Defendants . . . in the course of their business, profession, or employment, thus supplied false

18 information for the guidance of the named Plaintiffs and other members of the proposed

19 Classes in their business transactions relating to the purchase and retention of Mortgages Ltd.'s

20 securities."  *Id*. ¶ 433.

21     Quarles cannot be held liable for negligent misrepresentation unless it supplied false

22 information to the investors with the intent that they justifiably rely on that information in

23 deciding to make investments, and the investors in fact did justifiably rely.  *See Merrick Bank*

24 *Corp. v. Savvis, Inc*., No. CIV 09-1088-PHX-CKJ, 2010 U.S. Dist. LEXIS 6421, at **18-19

25 (D. Ariz. Jan. 8, 2010) (citing *Standard Chartered*, 190 Ariz. at 29 and RESTATEMENT

26 (SECOND) OF TORTS § 552(2) (1977)).  Moreover, because the gravamen of Plaintiffs'

27 negligent misrepresentation claim sounds in fraud, Rule 9(b)'s heightened pleading standard

28 applies.  *See Merrill Lynch Bank USA v. Wolf*, No. CV09-734-PHX-JAT, 2010 U.S. Dist.

1   LEXIS 34854, at *11 (D. Ariz. Apr. 8, 2010); *Sweeney*, 2009 U.S. Dist. LEXIS 61720, at *38,

2   n.109.

3          Plaintiffs' negligent misrepresentation claim fails for at least two reasons.

4   First, Plaintiffs fail to allege that the investors ***actually relied*** on any information – false or

5   otherwise – provided to them, directly or indirectly, by Quarles.  Second, Plaintiffs fail to

6   allege that Quarles ***intended*** for the investors to rely on any alleged false information.  The

7   only language Quarles drafted that Plaintiffs allege RB actually used was the "interim risk-

8   disclosure language" that RB allegedly lifted from Quarles' draft document and placed into its

9   own investor form.  Compl. ¶ 259.  As explained above, this language cannot form the basis of

10  a negligent misrepresentation and nondisclosure claim because there are no allegations that

11  Quarles knew RB was using that language, that Quarles intended the language to be shown to

12  investors or that investors actually saw or relied on the language.  Accordingly, Plaintiffs fail

13  to state a claim against Quarles for negligent misrepresentation and nondisclosure.

14          **F.      Plaintiffs Fail to Allege Control Person Liability.**

15          In Count Two, Plaintiffs include "Quarles" in a list of Defendants whom Plaintiffs

16  allege "are liable as statutory control persons . . . ."  *Id.* ¶ 412.  Quarles, however, is not

17  referred to in any of the other seven paragraphs of Count Two, and Plaintiffs have not included

18  any specific allegation in Count Two suggesting that Quarles "controlled Radical Bunny" or

19  "the ML-RB Joint Venture."  *Id*. ¶¶ 405-11.  By contrast, Plaintiffs do allege that "Defendants

20  Hirsch, the Walders, and Shah controlled Radical Bunny" and "Defendants Denning, Brown,

21  Newman, Olson, Hirsch, the Walders, and Shah controlled the ML-RB Joint Venture . . . ."

22  *Id*. ¶¶ 408-09.  It appears that Plaintiffs may have inadvertently included Quarles in

23  Paragraph 412.

24          In any event, Count Two should be dismissed as against Quarles because Plaintiffs have

25  failed to plead the requisite control necessary for Quarles to be liable as a control person.

26  Arizona courts have interpreted Section 44-1999(B) "as imposing presumptive control liability

27  on those persons who have the power to directly or indirectly control the activities of those

28  persons or entities liable as primary violators of §§ 44-1991 and -1992."  *Eastern Vanguard*

1  *Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, 412 (2003); *Wojtunik v. Kealy*, No. CV-03-

2  2161-PHX-PGR, 2006 U.S. Dist. LEXIS 73448, at *15 (D. Ariz. Sept. 30, 2006).  Here,

3  Plaintiffs plead no facts demonstrating Quarles' ability to exercise control over the activities of

4  RB or the ML-RB Joint Venture on which the primary violations of RB and/or the ML-RB

5  joint venture are based.

6  **IV.    CONCLUSION**

7        For the reasons set forth above, Quarles respectfully requests the Court to grant its

8  motion to dismiss all claims against Quarles, with prejudice.

9        Respectfully submitted this 18th day of August, 2010.

11                                            /s/ Francis J. Burke, Jr.
                                             Francis J. Burke Jr.
12                                            Michella A. Kras
                                             STEPTOE & JOHNSON LLP
13
                                             Robert E. Gooding, Jr.
14                                            Scott B. Garner
                                             Isabelle Carrillo Smith
15                                            HOWREY LLP

16                                            Attorneys for Defendant
                                             QUARLES & BRADY LLP

-25-

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


/s/ Beth E. Gibson
Legal Secretary

DM_US:23360007_19

# Exhibit A

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:              )

4                    ) File No. LA-03521-A

5   MORTGAGES LIMITED          )

6

7   WITNESS:  Christian J. Hoffmann

8   PAGES:    1 through 150

9   PLACE:    Arizona Corporation Commission

10        1300 W. Washington Street, 3rd Floor

11        Phoenix, Arizona  85007

12   DATE:    Tuesday, January 13, 2009

13

14        The above-entitled matter came on for hearing,

15   pursuant to notice, at 9:10 a.m.

16

17

18

ACC018994

1   copy me on.

2      Q   Right.

3      A   But he did receive copies of a number of items as

4   the representation continued.

5      Q   So as he was going back and forth with either

6   Radical Bunny on one hand or Mortgages Limited counsel on

7   the other about the terminology and the term sheet, he would

8   keep you advised, as far as you know, as to what was

9   happening with the drafts of those documents?

10     A   He generally would keep me advised by copying me

11  on that, even though he knew I wasn't involved in that

12  aspect of it, because we were working as a team, of course.

13     Q   Speaking of that, let me show you a document

14  entitled Corporate Action Items for Radical Bunny, LLC,

15  bearing a date of May 2, 2007 at the top.  And I'm going to

16  mark this as Exhibit 205.  It bears Bates No. Q&BSEC 41.

17                 (SEC Exhibit No. 205 was marked for

18                 identification.)

ACC019164

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19        BY MR. BROWN:

20    Q   Do you recognize this?

21    A   Yes, I do.

22    Q   Does this document contain your handwritten

23  notes?

24    A   Yes, it does.

25    Q   Can you describe the circumstances under which

ACC019165

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1  you've made the notations on this exhibit?

2     A   This is the base action item list that we talked

3  about earlier dated April of '07, and this was prepared in

4  preparation for a conference call that I was going to have

5  later that day with the principals of Radical Bunny.  We

6  had, at this point, answered the key questions that we had

7  been researching and struggling with over the last two

8  months or so.  And so I made notes on this to -- that I

9  could use at the time that we were conducting the conference

10  call.

11    Q   So were your notes made in anticipation of the

12  conference call?

13    A   Yes.  Yes.  Some of them I had -- you know, they

14  were based upon the research that Gary had done, so

15  that's -- anyhow, it was made prior to the call.  Sometimes

16  I have a practice of this, when I have important messages to

17  deliver to a client, because I want to make sure that I

18  cover all of the points.

ACC019166

19   Q   So this was like an agenda for you?

20   A   A script.

21   Q   Even better.

22   A   An agenda and a script.

23   Q   Because you had important items to discuss with

24   Radical Bunny?

25   A   Yes.

ACC019167

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1    Q    Let's go through your notes here, and then we can

2    then get into the substance of the meeting.  Item 1 is,

3    "Determination of whether participations offered are

4    securities."  Your handwritten note was "Yes"?

5    A    Correct.

6    Q    That signified what to you as you were using this

7    as a script?

8    A    We had concluded after our research and after

9    looking at various alternatives; again, we're talking what

10   are you doing now and what could you do in the future.  So

11   we were looking at various alternatives of -- that the

12   client could possibly do in the future.  And we concluded

13   that there was no way with the way the program had been

14   structured and the way that they wanted to conduct it in the

15   future, that they were not selling securities.

16        So I wanted to give them the message that this

17   brings you forward from our February meeting, and we said we

18   were going to research these items.  And we're giving them

ACC019168

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   the results of our research, which is what you are selling,

20   even though you're calling them participations in notes that

21   Mortgages Limited issued to Radical Bunny, that that's not a

22   commercial transaction.  It's a security.  It's an investment

23   contract.

24      Q   The subparts to the first action item, it talks

25   about "Creating a summary of findings and, if yes,

ACC019169

1  presumably if securities are being offered, determine

2  exemption upon which to rely."  There's further subparts,

3  little i, little 1, little 2?

4     A   Uh-huh.

5     Q   You wrote "Check"?

6     A   Right.

7     Q   Well, what did you signify?

8     A   The check there means that we never -- other than

9  the conversations that we had with them, nobody really ever

10  checked, meaning Radical Bunny, with its investors, never

11  checked whether -- and we knew that based on discussions

12  with them, as to whether or not their investors were

13  accredited or not.  So they needed to check.

14     Q   So this was a note to yourself that --

15     A   We need to say, you need to check it; Radical

16  Bunny.

17     Q   Item 5, "That all investors must be accredited,

18  determine transition plan for current non-accredited

ACC019170

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19  investors." Your note was "Register recision offer?"

20    A   This picks up the thread from, again, the

21  February meeting, where I raised the possibility and maybe

22  probability that the -- that one way out of this if we

23  determine that they were selling unregistered securities was

24  to have a registered recision offer which, of course, would

25  mean as I explained to them then and in the call, this 5/2

**ACC019171**

1  call, it would mean going to the State Securities Division

2  and to the SEC and saying that we see that we violated the

3  securities laws, but we want to now become compliant.  And

4  one possibility might be to do a registered recision offer.

5  To register the participations on the federal and state

6  level.

7      Q    The six items listed towards the bottom of the

8  page in your handwriting for your script/agenda, could you

9  read those, please.

10     A    Yes.  First item is, "Stop selling securities in

11  violation of federal/state securities laws."  Secondly --

12     Q    I'll stop you there.

13         You were prepared to tell Radical Bunny that in

14  the call that was about to take place?

15     A    Yes.  This is my script.

16     Q    Just double checking.

17     A    This is my script I use.

18         BY MR. BLAU:

ACC019172

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19    Q    These aren't notes you were taking during the phone

20   call.  These were notes you handwrote before the phone call?

21    A    These were in preparation for the call.  This was

22   an important message we were delivering.

23         MR. DARMER:  And there were several notes you

24   took during the call?

25         THE WITNESS:  Yes.

ACC019173

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1     BY MR. BROWN:

2     Q   We'll get to those next.

3     A   The next one is, "They would need to restructure

4  their investment program in order to comply with the

5  securities laws."

6         Third, "Provide appropriate disclosure documents

7  - PPM."

8         Next, "Correct the status of the liens on the

9  underlying collateral."

10        Next, "Correct contractual problems with its

11  investors."

12        And last, "Deal with licensing issues, B/D,"

13  meaning broker/dealer, investment advisor, mortgage

14  broker/banker.

15    Q   As you were developing the script and in

16  anticipation of delivering what undoubtedly would be greeted

17  as bad news by Radical Bunny, did you form an opinion as to

18  just how messed up Radical Bunny was, as far as compliance

ACC019174

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   with the securities laws?  Did you think this was just

20   beyond repair, or that this is something that was going to

21   take time and effort, but could be worked out?

22       A    Well, in the call, you know, it was what you've

23   done, you've done.  And I did say this in the call, that

24   liability is affixed to you already, and so --

25       Q    Affixed as in attached to them?

ACC019175

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1    A    Attached to you.  You have created the liability

2  for yourself.  You did this prior to our representation of

3  you.  And I'm telling you now, you know, in no uncertain

4  terms, that you have that liability, and that's the reason

5  that you must stop.  Any further sales, "sales" meaning not

6  only sales to new investors, but rolling notes over like

7  they did as we discussed, where a note would come due and

8  then they -- an investor would re-up or renew for a new

9  participation, that that would be creating -- if they

10  continued to do that, it's just compounding their liability.

11    Q    Did you deliver the script on Exhibit 205 to the

12  Radical Bunny representatives in your call?

13    A    Yes, I did.

14    Q    And would it help in talking about the call to

15  have your notes in front of you?

16    A    Yes.  Thank you.

17    Q    Okay.  As I assemble that, could you tell me

18  where you were when the call had taken place?

ACC019176

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19     A   I was in a conference room on the eighth floor of

20   our firm --

21     Q   Who was there?

22     A   -- on the speakerphone.  I would need to see the

23   notes to see who was on.  Yes; those would be the notes from

24   that call.

25     Q   Radical Bunny's representatives were on the phone

ACC019177

1  from their office, presumably?

2     A   If you show me that, I can tell you who was

3  there.

4                    (SEC Exhibit No. 206 was marked for

5                    identification.)

6     BY MR. BROWN:

7     Q   I've marked as Exhibit 206, Mr. Hoffmann's

8  handwritten notes from May 2, 2007, bearing Bates No. Q&BSEC

9  50 and 51.

10    A   Could I have that other document in front of me,

11  the 5/2 one?

12    Q   Here you go.

13    A   So would you like me to read these first?

14    Q   Let's get the landscape first.  You're in your

15  office.

16    A   I'm on a speakerphone with the participants who

17  were Tom Hirsch, Berta Walder and Howard Walder.  And I

18  believe Gary was with me, Gary Shullaw.  He's not listed

ACC019178

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   here, but I believe that's the case.

20      Q    And Tom, Bunny and Howard are presumably in their

21   office?

22      A    Yes.  And we had arranged the call.  The reason

23   that I did my script is that we were going to deliver an

24   important piece of information to them, and we weren't

25   meeting in person.  We were doing this on a conference call,

ACC019179

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   so I wanted to make sure that I had my points to make.

2       Q    So I gather, then, you had in front of you the

3   native version of what we now have marked as Exhibit 205?

4       A    Yes.

5       Q    And a legal pad which you kept the notes which

6   have now been reduced to Exhibit 206?

7       A    Correct.

8       Q    Okay.  What happened during the call?

9       A    So -- and then as an introduction to these notes,

10  you'll see that there are two -- this is the notes of

11  5/2/07.  It says, telephone call, Tom, Bunny and Howard.

12  That's Tom Hirsch, Bunny Walder and Howard Walder.  There

13  are two sets of notes here, because -- I'm sorry, two types

14  of pens here.  The bold pen is -- are notes that I made

15  prior to the call, because they tied into part of our more

16  detailed explication of part of our recommendation to them.

17      Q    As set forth on Exhibit 205?

18      A    As set forth on 5/2.  So the bold writing that I

ACC019180

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19    had there on Items 1 all the way through 2 in the left

20    margin there, were items that I made in advance of the

21    meeting, because I was going to use those notes, too, as

22    part of the script.  The other notes in normal pen -- in a

23    different pen, not a bold, are notes that I took at the

24    meeting from the conversation.

25        Q    All right.  What did you say during the

ACC019181

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   conference call to the Radical Bunny representatives, Tom,

2   Bunny and Howard?

3      A   So I went down each of these items that are

4   handwritten at the bottom of Exhibit 205.  And I actually

5   started at No. 1.  I said, you've asked us to determine

6   whether participations you're offering are securities.

7   We've determined that they are.  We've looked at a number of

8   possibilities, but we really can't find a way to conclude

9   that what you're doing is not the sale of a security.

10         Then I said as a result of that, you know, you

11   need to stop selling.  You're now informed by legal counsel.

12   You've been informed that you are selling securities.

13   Further sales, you'll violate the federal and state

14   securities laws.

15         Secondly, that you need to restructure your

16   investment program in order to comply with these laws, and

17   we will have some suggestions for you.

18         Thirdly, you need to provide appropriate

ACC019182

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   disclosure documents, including the Private Placement

20   Memorandum.  And you need to correct the status of the liens

21   on your underlying collateral.  That is -- and you probably

22   heard from Bob Bornhoft prior to this, that you do not have

23   a perfected first lien interest in collateral of Mortgages

24   Limited as you say you do.

25          Fourthly, that you need to correct contractual

**ACC019183**

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt (190 of 301)3/2/2009 9:27:17 AM

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   problems with the investors.  That mainly referred to the

2   paperwork that they were using to have investors subscribe

3   or buy participations in the underlying Radical

4   Bunny/Mortgages Limited note.

5        And then finally I said, we are going to need to

6   deal with your licensing issues, because we've concluded

7   that you are an unlicensed broker/dealer.  That you're an

8   unlicensed investment advisor, and you're probably an

9   unlicensed mortgage broker/banker.  We didn't delve as

10  deeply into that issue, but I've had other clients in and

11  among that area, and I felt sure that they were one of

12  those, too.

13   Q   Let me stop you there, if I may, Mr. Hoffmann.

14       When you told Tom Hirsch and Bunny and Howard

15  Walder by phone the conclusions that you had reached about

16  Radical Bunny's securities-related activities, what was

17  their reaction?

18   A   They said --

ACC019184

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19      MR. DARMER:  "They"?

20      THE WITNESS:  I'm sorry.  Tom said, we

21   understand, and what we want to do going forward is the

22   reason we retained your firm, is we want to be compliant.

23   At that point, I said, well, you understand, Tom, that --

24   and this gets to my Note 5, that for all of your past

25   actions, probably the only way out of that, and you may have

ACC019185

1   civil and maybe criminal liability, depending upon how --

2   what the facts are, and the best thing would be to go to the

3   federal and state authorities, to the SEC and to Arizona

4   Corporation Commission, tell them what happened and say,

5   look, we want to correct it.

6        We inadvertently -- we were dumb.  We made a

7   mistake.  We didn't know that we were incurring -- that we

8   were violating laws, so we want to make it right.  And he

9   said, I -- we don't want to do that.  We want to go forward.

10       BY MR. BROWN:

11   Q   Mr. Hirsch said, we don't want to go to the

12   regulators.  We want to do what?

13   A   That we don't want to go to the regulators, but

14   we do want to be compliant going forward.

15   Q   All right.  With respect to your comment to Mr.

16   Hirsch about these possible civil and criminal liabilities

17   that attaches to Radical Bunny and its managing members, did

18   he have a reaction to your statement?

ACC019186

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19    A    Well, at that point, I said -- when he said we

20    don't -- we want to deal with just going forward; we don't

21    want to deal with the past, then there was a bit of a

22    discussion if we were compliant going forward, what

23    implication would that have on the past?  At that point, I

24    said, well, it depends how you do that.  I'm saying you need

25    to have contact with federal and state authorities, and then

ACC019187

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   we'll see what the implications are.

2        At that point, I said I can refer you to other

3   lawyers, a criminal lawyer and -- which let me know and I'll

4   refer you to somebody, and they can assess what issues or

5   liabilities you may have probably both civilly and on a

6   criminal basis.

7   Q    Did Mr. Hirsch ever request that referral?

8   A    No, no, because his response to me was, well, we

9   -- you know, what's past is done.  We want to be compliant

10  going forward.

11       Q    What other conclusions, legal or otherwise, did

12  you provide the Radical Bunny representatives in your

13  conference call on May 2, 2007?

14  A    Well, then they asked, well, what action items

15  would we have if we were going to go forward.  And so then I

16  kind of turned to the bold writing on the 5/2 notes and said

17  we've concluded that going forward, that you would need a

18  new entity, new documents.  I'm reading from my notes.  I

ACC019188

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   guess I should just read those in now.

20   Q   For Exhibit 206.

21   A   I said to them, you'll need a new entity.  New

22   documents.  It's a new program.  New participation

23   arrangement.  And you will need a Private Placement

24   Memorandum, a PPM.  An investor questionnaire.  You can only

25   deal with accredited investors.

ACC019189

1        And you would deal with a specific pool of loans as

2   opposed to what they had been doing; namely, the idea would

3   be selling maybe ten million-dollar pools, and there would be

4   specific loans attached to that pool.  That shuts down, and

5   then a new offering can begin, and that might avoid

6   integration issues.

7        And then as I said, close the offering and fully

8   invest until a new portfolio is available.  So you're

9   basically selling specific pools of loans that have been

10  created by Mortgages Limited.

11  Q   I'm sorry.  Let me interrupt.

12       When you say close the offering, is that the same

13  as, stop doing what you're doing?

14  A   No, no.  This would be going forward.  This is a

15  program.  They said, what could we do.  What program could

16  we do going forward?  What do you recommend going forward?

17  This is the recommendation that could possibly work for you

18  going forward.

ACC019190

19    Q    I understand.  Just the word "close" was unclear

20  to me.

21    A    "Close," meaning close that new discreet offering

22  by a new entity.

23        MR. DARMER:  Do you mean in terms of

24  timeframe, so it would only be open for a particular time?

25        THE WITNESS:  Yes.  Meaning there would be a

ACC019191

1   specific pool of loans they were selling participations in,

2   and then that offering would close and a new one would

3   start.

4        BY MR. BROWN:

5   Q   I'm with you now.

6   A   Then I said to them, though, the risks, however,

7   that all of this -- even if the foregoing that I just

8   recommended, the new entity, new documents, new programs,

9   new participations, even if you did all that, you're still

10  at risk since they didn't want to deal with the old problem,

11  that all of this could just be integrated with the old

12  program.  That's why I say, integration to old program.  You

13  really haven't solved the issue.

14       Then I said also, you can't have -- there's no

15  way you can have any non-accredited investors in this

16  situation.

17       And then I suggested to them that they could

18  register in Arizona for the non-accredited investors.  Do an

ACC019192

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   intrastate public offering in Arizona, which would be

20   registered for non-accredited investors, because they had

21   too many, we thought, we didn't know, that they had too many

22   to satisfy any private placement exemption.  They would be

23   violating -- the numbers count on non-accrediteds in any

24   pool like this that I'm suggesting.

25       Q    Okay.  Keep going with your notes on 206.

ACC019193

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   A   So at that point, though -- well, let me finish

2  the notes.  No. 3 of my notes, these are now -- this is now

3  some information, some exchange I'm writing down between Tom

4  and I, principally.  It says, Scott is borrowing -- says

5  important NB, Nota Bene, NB, that Scott is borrowing from

6  the Mortgages Limited company.  It says, we have all of the

7  loans, and I'm presuming what that means is that Radical

8  Bunny has all of those loans where Scott is borrowing from.

9  That Radical Bunny provided the funds for Scott Coles'

10  loans.  I'm presuming that's what that means.  I don't know

11  what else it would mean.  I'm guessing there, actually.

12  There may be some single family homes of his in there.

13      MR. DARMER:  "His" being?

14      THE WITNESS:  Scott Coles.  And that there

15  are liens, and who are the borrowers, meaning if Coles is

16  doing that, is he doing it through affiliates and that sort

17  of thing.  Now I'm not sure if these loans -- that that

18  means this is prospective, or that they've done it already,

ACC019194

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19  so I'm just guessing here.

20          And then public versus private investors,

21  this gets back to registration.  So it says 50-60

22  out-of-state investors.  Well, they're telling me that my

23  idea of an Arizona intrastate offering wouldn't work for

24  those because there are 50, 60 out-of-staters.  That

25  wouldn't comply with what I told them an intrastate in

ACC019195

1   Arizona offering for non-accredited investors, those people

2   couldn't be taken care of.

3          It says Mortgages Limited's solely in state

4   properties.  That was, again, part of the discussion.  If we

5   had an intrastate only Arizona offering, the investors have

6   to be from Arizona and the properties have to be in the

7   State of Arizona to qualify for that exemption.  That would

8   be a federal exemption, state registration.

9          Accredited versus unaccredited investors, I'm

10  asking how many are there.  You need to find out.  They're

11  telling us May 24th is their meeting of investors.  I'm

12  saying, you're new.  Maybe you can call it a new entity,

13  because I recommended, as you saw, a new entity, not doing

14  these through Radical Bunny, but create new entities maybe

15  to do new mortgage pools.  And maybe you could call that

16  Radical Bunny Security Income Investors 1, for example.

17  Then you do 1, 2, 3, et cetera.

18          Loan applications, Radical Bunny would be the

ACC019196

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   manager of that entity.  We need a questionnaire.  We need a

20   meeting with Mortgages Limited.  And then Tom must have

21   raised this with me, or sell to Mortgages Limited now.

22   Well, if we have all these problems and issues, wouldn't it

23   be easier to sell to Mortgages Limited now.  Mortgages

24   Limited is already licensed.  Then we, meaning Radical

25   Bunny, would just be a management -- operate under a

ACC019197

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   Management Agreement or be a management agent.

2        And then he said we may have to reduce the

3   base.  If we do that and contract the business, meaning they

4   couldn't deal with non-accredited investors anymore.  It

5   says we are in the process -- Tom is saying this, we are now

6   in the process of finding out how many unaccredited

7   investors there are that Radical Bunny is selling

8   participations in the thread there.

9        So having gone through that, the way we -- as

10  you see on our corporate action item list, there were still

11  items to do, such as we had dealt with 1(a) and (b).

12       BY MR. BROWN:

13    Q   You're on Exhibit 205?

14    A   Sorry, I'm on Exhibit 205.  We had dealt with

15  1(a) and (b).  We still needed to prepare a Loan

16  Participation Agreement, which would be new documents for a

17  new program.  We needed to prepare appropriate disclosure

18  documents with risk factors and disclosures regarding

ACC019198

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19    Mortgages Limited.  We had to prepare an investor

20    questionnaire.  And then we -- I talked about recision, a

21    registered recision offering, and what you do with the

22    non-accredited investors, we had dealt with that issue.

23            Evaluate requirements for IRA's.  I'm not sure if

24    we dealt with that one or not, because that was a totally

25    different issue, but it still was whether the beneficiary of

ACC019199

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   the IRA was accredited or not.  Apparently Radical Bunny had

2   no Operating Agreement, so we knew we had to do that yet.

3   And then this No. 8, prepare Right of First Refusal document

4   for the company, Mortgages Limited, that was more along the

5   lines of this buy/sell concept that would -- could Radical

6   Bunny sell itself to Mortgages Limited, and maybe it could

7   give Mortgages Limited a Right of First Refusal to purchase

8   Mortgages Limited.

9          When we got to the end of this, they said, we

10  want you to go forward.  We understand the situation.  We

11  want you to go forward and we would like you to start

12  preparing the appropriate securities documents.  And I said,

13  well, yes, we can do that, but probably the most important

14  thing I'm telling you to do today, or as important, is that

15  you need to correct the status of your liens on the

16  underlying collateral, because my partner has concluded, and

17  I think he's informed you, that these folks are not -- they

18  don't have the benefit of the collateral you told them --

ACC019200

19   told investors that they had.  And they said, yes, we need

20   to, forthwith, do those things.  That's the call.  And we

21   had our marching orders to do both of those things.

22          I did tell them, though, in the -- as we were

23   going down -- as part of this, as we were going down the

24   road, you know, we can go down the road and prepare these

25   other documents, but until your collateral issue is solved,

ACC019201

1   you know, there's nothing really that can go forward on the

2   security side.  We can do drafts and that sort of thing, but

3   until that's solved --

4          And so we never got into -- if you look forward

5   then, we really never got into preparing documents.  We did

6   some drafts, but anything that they could use for investors.

7   And I explained to them that the violations were not only

8   registration violations.  They were selling unregistered

9   securities, but they had -- and I used the laymen's terms,

10  probably fraud, 10b-5, I don't know if I used that.  You

11  know, this would be a fraudulent sale that you're doing, and

12  that you have done if you don't have collateral.

13      Q   Let me stop you there and ask you just a couple

14  of questions about that.

15          Is it your testimony that in discussing with the

16  Radical Bunny representatives what had taken place, that you

17  believed that they may have been committing fraud on their

18  investors, and you told them that?

ACC019202

19      A    Yes.  We had told them that their notes, as they

20   believed were not secured and they were telling the

21   investors they were secured, and that was not true.  They

22   said, we hear you.

23      Q    Did anyone on the Radical Bunny side of the call

24   say, we don't know what you're talking about; please explain

25   it to us, or words to that effect?

ACC019203

1    A   No. No.

2    Q   They gave you the impression that they understood

3  the information you were communicating to them, that they

4  might be lying to their investors about the collateral?

5    A   Well, there are three people on the call.  Let's

6  go over their backgrounds and who I'm talking to.  I'm

7  talking to Tom Hirsch, who's a CPA for many, many years.

8  He's whatever, his 50s or 60s.  He's practiced for many

9  years.  He also does the taxes for -- he told us he did the

10  taxes for Mortgages Limited and Scott Coles.  So he's well

11  aware of Mortgages Limited, Scott Coles.  Has a close

12  relationship with them.  I asked him -- I mean, he has other

13  clients he's representing through third parties, and does

14  have other clients.  He's a CPA.  And as we know, CPA's have

15  a duty to the public, and they should -- they have a certain

16  level of integrity and duties to the public to investors, to

17  third parties when they're doing audits and when they're

18  preparing tax returns and so forth.  I'm talking to --

ACC019204

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1  stop selling securities in light of your advice?

2      THE WITNESS:  As I said, they said we want to

3  do the right thing; something to that effect; therefore, we

4  want to go forward in the future and be compliant.

5      BY MR. BROWN:

6   Q    Subsequent to the May 2, 2007 call, as I have

7  reviewed the Radical Bunny file, an effort was made to

8  prepare various documents for Radical Bunny that was geared

9  towards one day having a compliant securities offering.

10      Is that your recollection of what the next steps

11  were by the firm in representing Radical Bunny?

12   A    On the securities side of things, correct.

13   Q    I don't think I'm going to go through all of

14  those with you, but let me give you the titles of some of

15  the documents.  I'll have you just indicate whether or not

16  this is what happened.

17      Investors' subscription procedures were drafted

18  for Radical Bunny to use at some point in the future?

ACC019218

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   A   Yes.

20   Q   A questionnaire was developed that was intended

21   to be sent to existing investors or prospective investors?

22   A   Yes.

23   Q   An investor record and Disclosure Statement?

24   A   I should be looking at these as you're doing

25   that.

ACC019219

1    Q    Then I'll have to mark them all.  If it helps you

2    remember and recall to testify, then, yes, you should see

3    them.  We can whip through marking these things, but let's

4    just -- I'll just do it.

5                     (SEC Exhibit No. 207 was marked for

6                     identification.)

7        BY MR. BROWN:

8    Q    Exhibit 207 is entitled Radical Bunny, LLC

9    Investor Subscription Procedures.  It's Bates Q&BSECINT

10   74-E.

11   A    We prepared something like this.  I'm not sure --

12   this doesn't have our identifying number in the lower left,

13   so I can't tell if that's our document or not.  We prepared

14   something similar to this.

15   Q    The document that was prepared that was similar

16   to the one that you're looking at, do you recall what the

17   purpose of the procedures document would have been?

18   A    Well, that was along the lines of our advice to

ACC019220

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   them to have a compliant program, you needed to have

20   appropriate disclosure and appropriate documentation of what

21   was -- of what the basic investment was and what the

22   underlying collateral was.

23       Q   Exhibit 207 would be used only when a brand new

24   compliant offering had been established?

25       A   The issue in all of these drafts that we did for

ACC019221

1  them is that they all were grounded on the assumption that

2  security -- that a lien had been obtained in favor of

3  Radical Bunny and its investors against Mortgages Limited

4  without a valid perfected security interest, so all of these

5  recite that the investor is subscribing for participations

6  in or makes reference to "secured promissory notes" and, of

7  course, they weren't.  So they weren't secured.  So they

8  were all based on that assumption that a collateral interest

9  could be obtained.

10              (SEC Exhibit No. 208 was marked for

11              identification.)

12      BY MR. BROWN:

13      Q   How about Investor Record and Disclosure

14  Statement which I've marked as Exhibit 208, Bates Q&BSECINT

15  75-E through 77-E?

16      A   Yes; this was one of the drafts we prepared for

17  them.

18      Q   To be used under the same or similar

ACC019222

19   circumstances as Exhibit 207?

20      A    Right.  This would have been to find out whether

21   or not the investor was accredited or not.  Find out some

22   background from them.  As you see, it's got information

23   relating to net worth and income and so forth.

24                          (SEC Exhibit No. 209 was marked for

25                          identification.)

ACC019223

1       BY MR. BROWN:

2    Q   How about Radical Bunny, LLC Questionnaire, which

3   I've marked as Exhibit 209, Q&BSECINT 71-1E through 73-E?

4    A   Yes; this looks like a draft of a questionnaire

5   that we prepared.  It's somewhat similar to what you showed

6   me, Exhibit 208.

7    Q   Again, a document that shouldn't be used unless

8   and until there is a properly compliant securities offering

9   by Radical Bunny?

10    A   Correct.

11              (SEC Exhibit No. 210 was marked for

12                  identification.)

13       BY MR. BROWN:

14    Q   How about Exhibit 210, Investor Record and

15   Disclosure Statement, Q&BSEC 1844 through 1846?

16    A   This is the same document that we just -- looks

17   like it's the same version as Document-208.

18    Q   All right.

ACC019224

19   A   Another draft.

20           (SEC Exhibit No. 211 was marked for

21           identification.)

22       BY MR. BROWN:

23   Q   The participation Agreement, which I've marked as

24   Exhibit 211, there are three different drafts, and I tried

25   to assemble these in chronological order.   Q&BSECINT 8-E

ACC019225

1  through 35-E. I'm showing them to you in groupings, showing

2  what looks like the Quarles & Brady draft -- document draft

3  number. They're clipped.

4        Can you explain what those are?

5    A   Yes. Do you want me to go by exhibit number or

6  the Bates?

7    Q   Exhibit 211 appears to be three drafts of the

8  same document, the participant record.

9        MR. DARMER:  May I suggest you look at all

10  three before responding to his question.

11       THE WITNESS:  Yes; they appear to be three

12  drafts of the same Participation Agreement.

13       BY MR. BROWN:

14    Q   Is this another document that was created by

15  Quarles & Brady for Radical Bunny for use, when and if there

16  was a compliant securities offering by Radical Bunny?

17    A   Yes. The drafts, as you can see, progressed.

18  The final version -- final draft has bold in the first

ACC019226

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   paragraph.  It says "First time investors should be given a

20   form of note and form of Security Agreement as well."

21   Paragraph 2 has open items in it which are bolded.

22   Paragraph 3 has bolded information that indicates this is

23   still a draft document.  All three of these, as you see,

24   they're required to have a terms of a note and Security

25   Agreement attached.  My partner, Bob Bornhoft, is working on

ACC019227

1   that side to try and get a Security Agreement in place

2   between Radical Bunny and Mortgages Limited.

3          And so this is part of the two tracks that I said

4   we were going down.  We were going down because Tom Hirsch

5   had said, we want to do the right thing.  Prepare the

6   documents that we need to be compliant.  And so this was

7   part of that effort, the preparation of Participation

8   Agreements, the questionnaires, the Disclosure Statements,

9   and the subscription procedures that you have just shown me

10  in the exhibits.

11  Q   207 through 211?

12  A   Exactly.

13  Q   Okay.

14          MR. BROWN:  Could we go off the record for

15  just a moment?

16          (A discussion was held off the record.)

17                  (SEC Exhibit No. 212 was marked for

18                  identification.)

ACC019228

19  two different documents marked as one.  That was

20  intentional, I guess?

21        MR. BROWN:  Yes.

22        MR. DARMER:  So two documents in one exhibit;

23  okay.

24        BY MR. BROWN:

25     Q   Could you describe the circumstances that led up

ACC019243

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1  to you making these notes; and then the same as before, if

2  you could read them with any appropriate narrative for

3  context.

4      A   This is -- these are notes of my conversation on

5  6/3/08 with Bob Bornhoft.  And Bob is informing me that Tom

6  Hirsch was back.  We hadn't seen this client since

7  December -- some time in December of '07, so six months have

8  passed roughly since at least I, as the person that was

9  looking -- as the billing partner.  There were no time

10  entries through from period through from December until

11  maybe late May.

12      So he's informing me that Tom Hirsch came to him,

13  and Tom is telling him -- Tom is the trustee of Scott Coles'

14  trust.  This must have been right after Scott committed

15  suicide.  And Tom is saying -- Bob's quoting, that I'll have

16  to resign as manager of Radical Bunny or as trustee of the

17  trust.  He sees that there's a conflict there.

18      Then he says, Tom is helping with Scott Coles'

ACC019244

19   funeral.  And he says -- he said; however, Tom is worried

20   because if he resigns as manager, he may have a conflict as

21   a member of Radical Bunny since he's still involved with

22   them as an investor.

23          Tom thinks that this may be more of a personal

24   than a business issue.  And he tells Bob that there's a run

25   on the bank.  That's in quotes.  Those probably would have

ACC019245

1   been Tom's words to Bob.  And Bob's been informed that

2   Radical Bunny is up to 200 million dollars of investor funds

3   through notes.  And these are direct notes from Radical

4   Bunny.  And then the usual, the master note from Mortgages

5   Limited.  So that's when I learned that Radical Bunny had

6   continued to sell, obviously, 'cause they had gone from

7   about 140 or 50 million back in June a year ago, to

8   200 million.

9       Q    Were you surprised?

10      A    Yes.

11      Q    After you had that chat with Mr. Bornhoft, you

12   spoke again with the Radical Bunny representatives; is that

13   right?

14      A    Yes.

15      Q    I'm going to show you what's been Bates stamped

16   Q&BSEC 2802 and 2803.  If you could tell me which came first

17   as between the two, and then I'll mark them.

18      A    So Bates stamp 2802 came before the meeting.  My

**ACC019246**

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1  that representation.  So the meeting on 6/9/08 was to tell

2  Tom and the other folks that we couldn't undertake their

3  representation.

4        The reason I prepared Document-214, was I have

5  learned from the 6/3 meeting with Bob Bornhoft that Radical

6  Bunny had failed to take our advice, and so I wanted to

7  confirm with them what our advice had been and that -- and

8  what we had told them, and see what their reaction was.

9        So I went to my notes from the -- that I used on

10  the 5/3/07 call and --

11        MR. DARMER:  5/2.

12        THE WITNESS:  Or 5/2.  Early May.  May 2nd of

13  '07, and I prepared this document, which really is just a

14  recitation of what I told them a year ago, over a year ago,

15  a year earlier.

16        BY MR. BROWN:

17   Q   Are you talking about the typewritten portion of

18  214, the handwritten, or both?

ACC019250

19    A    And then down below on the right, these were

20    notes to myself just to make sure that I hit the major

21    points.  So this is just a shorthand off of this that I was

22    reading from to say -- so that I -- again, as you saw, this

23    is another little script for me in talking to -- at that

24    point, which is an ex-client, but to say this is what I told

25    you.

ACC019251

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1        You asked me about my -- what did I think when I

2   heard that they continued to sell.  They not only continued

3   to sell, but accelerated the program.  You know, I was

4   surprised and shocked and I wanted to confront them with

5   that.  Say, why didn't you listen to our advice, the things

6   that we told you to do?  And what we now view as the

7   probable outcomes of your failure to follow advice are all

8   coming to pass.  This is an awful thing.  So that was the

9   context.

10       Q   Exhibit 214 was prepared as another script for

11   you to talk to the Radical Bunny representatives?

12       A   Right.  And I went back to my old notes to

13   confirm, you know, this is what we told you.

14       Q   Could you read the handwritten portion of 214?

15       A   Yeah.  214 says, we told you to stop selling.

16   Restructure for future sales.  Provide disclosure documents,

17   in effect.  Correct the status of the liens.  Correct the

18   problems on its contractual documents and deal with your

ACC019252

1  the record or off the record?

2      MR. DARMER:  Off the record.

3      MR. BROWN:  Let's go off the record.

4      (A discussion was held off the record.)

5              (SEC Exhibit No. 216 was marked for

6              identification.)

7      BY MR. BROWN:

8    Q   As we are winding down, there are two more

9  documents, handwritten notes, that I wanted to go over with

10  you.  The first is a set of notes from June 19, 2007, Q&BSEC

11  2812.

12          We're doing this in reverse chronological order.

13  Are those your notes?

14    A   Yes; chronological.

15    Q   What were the circumstances surrounding your

16  creation of them?

17    A   These were attached to a fax of one of the drafts

18  of documents we were doing.  In the event that a new program

ACC019272

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   could ever be constructed, a new securities sales program

20   could ever be constructed and with appropriate

21   documentation.  I wrote on the back of it because we had

22   spent from early May to about mid-June producing drafts of

23   Participation Agreements, investor questionnaires and

24   similar documents to them, and I wanted to make sure that

25   Radical Bunny was not -- the principals of Radical Bunny

ACC019273

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

1   were not going to use those.

2       I didn't think they could use them because they

3   were still in draft form, but we were having a phone call

4   about some questions that they had mainly -- I would have to

5   see my notes, but about some questions they had.  During the

6   course of that, I said I wanted to make sure that they

7   weren't going to use our documents because they weren't

8   final.  They weren't adequate.  And also as of mid-June, the

9   collateral lien issues were not resolved and, of course, they

10  couldn't do anything.  They shouldn't be doing anything.  So

11  I wanted to make sure they weren't using our documents.

12       So I went through and the notes say as follows.

13  To RB, remember no rollovers of existing notes.  No new

14  sales.  Top priority is collateral must be in place for

15  existing notes.  No use of Q&B documents, and we still had

16  to prepare a PPM.  It says PPM must be prepared.  It was

17  just a reiteration of some earlier advice, but I wanted to

18  make sure they weren't going to run off with -- with any of

ACC019274

file:///D|/Hoffman,%20Christian/HOFFMAN_CHRISTIAN_20090113.txt

19   our documents, 'cause they already were told not to sell

20   additional securities.

21        Q    Are you aware that Radical Bunny, in fact, did

22   use some of your documents?

23        A    I'm not aware of that.

24                      (SEC Exhibit No. 217 was marked for

25                      identification.)

ACC019275

# Exhibit B

5/2/07

### Corporate Action Items for Radical Bunny, LLC

1.    Determination of whether participations offered are securities. —— *yes*

     a)    Create summary of findings

     b)    If yes, determine exemption upon which to rely

         i)    Must all investors be accredited?   *Check*

         ii)   Can "offering" be continuous?

2.    Prepare Loan Participation Agreement

3.    Prepare appropriate disclosure documents (i.e. risk factors and disclosures re note with Mortgages Ltd)

4.    Prepare Investor Questionnaire

5.    If all investors must be accredited, determine transition plan for current non-accredited investors    — *registered recission offer?*

6.    Evaluate requirements for IRAs

7.    Prepare Operating Agreement for Company

8.    Prepare right of first refusal document for Company/Mortgages Ltd.

*— stop selling securities in viol. of fed/st. securities laws*

*— restructure investment program in order to comply w sec. laws*

*— provide appropriate legal docs — PPM*

*— correct status of liens on underlying collateral*

*— correct contractual probs with its investors*

*— deal w lic issues — B/D, invest adv., mtg broker/banker*

QBPHX\2084426.1

GOVERNMENT EXHIBIT
205

# Exhibit C

3/22/07
- 11

Tom, Danny or Howard

(1) New Entity — New Docs — New
Program — New Participation —

① PPM
② Investor Quest.
③ Accredited Only
④ Specific Pool of Loans.
⑤ Close Offering — fully
invest until a new loan
portfolio is available +
new program

— Risks — Integration w old program

= Not non-accredited investors

(2) Regist in AZ for non-accredited
investors

(3) Scott is borrowing from the Company   ML

— some we have all of the loan —
— single family homes.

outside
liens —
— who are the borrowers — ??

Roles

Public vs Private Investors

GOVERNMENT
EXHIBIT
206   1/8/09

50 - 60 — out of state investors

ML — solely in state properties

accredited vs. unaccredited investors
— how many — ?

May 24th Mtg

[RB — Secured Income Investors, LLC]

Loan Application ??

Radical Bunny will be mgr.

① questionnaire
② mtg w MLC

Can sell ML now to
→ already licensed —
we are just a mgt agt —

may have to reform the base
contract the business —

we are in process of finding how many
unaccredited

RB is selling participations in

FOIA Confidential Treatment Requested

Q&B-SEC 000051