1  Marty Harper  (#003416)
   Katherine V. Brown (#026546)
2  **POLSINELLI SHUGHART PC**
   Security Title Plaza
3  3636 North Central Avenue, Suite 1200
   Phoenix, Arizona 85012
4  Telephone: (602) 650-2000
   Facsimile: (602) 264-7033
5  E-Mail: mharper@polsinelli.com
   E-Mail: kvbrown@polsinelli.com

6  David F. Adler
   James R. Wooley
7  Louis A. Chaiten
   Eric E. Murphy
8  Katie M. McVoy
   **JONES DAY**
9  North Point
   901 Lakeside Avenue
10 Cleveland, Ohio 44114
   Telephone:  (216) 586-3939
11 Facsimile:  (216) 579-0212
   *Of Counsel* (admitted pro hac vice)

12
   *Attorneys for Defendants*
13 *Mayer Hoffman McCann P.C.,*
   *CBIZ, Inc., and CBIZ MHM, LLC*
14
15              **UNITED STATES DISTRICT COURT**

16                    **DISTRICT OF ARIZONA**

17 ROBERT FACCIOLA, et al., individually
   and on behalf of all others similarly
18 situated,
                                        Case No. 2:10-cv-01025-NVW
19
                   Plaintiffs,
20                                      **DEFENDANTS MAYER HOFFMAN**
   vs.                                  **MCCANN, P.C., CBIZ, INC., AND**
21                                      **CBIZ MHM, LLC's JOINT MOTION**
   GREENBERG TRAURIG, LLP, et al.,      **TO DISMISS COMPLAINT**
22
23                 Defendants.

24        Defendants Mayer Hoffman McCann P.C., CBIZ, Inc., and CBIZ MHM, LLC, by

25 and through their undersigned counsel, respectfully move this Court, pursuant to Rule

26
27
28
                                        1

12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiffs' claims against them.  A supporting memorandum is attached.

DATED August 16, 2010.                    Respectfully submitted,


By: /s/ *Katherine V. Brown*
Marty Harper
Katherine V. Brown
Polsinelli Shugart, PC
Security Title Plaza
3636 North Central Avenue, Suite 1200
Phoenix, AZ  85012
*Local Counsel*


David F. Adler
James R. Wooley
Louis A. Chaiten
Eric E. Murphy
Katie M. McVoy
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
*Of Counsel*

Attorneys for  Defendants
Mayer Hoffman McCann P.C., CBIZ, Inc., and
CBIZ MHM, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM-ECF system and served the following parties by U.S. mail:

Jeremy James Christian
Richard Glenn Himelrick
Tiffany & Bosco PA
Camelback Esplanade II
2525 E. Camelback Road, 3rd Floor
Phoenix, AZ 85016

Andrew S. Friedman
Bonnett Fairbourn Friedman &
Balint PC
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311

Ellen E. Oberwetter
Kevin M. Downey
Patrick J. Houlihan
Williams & Connolly LLP
725 12th St NW
Washington, DC 20005

Isabelle Carrillo Smith
Robert E. Gooding, Jr.
Scott Garner
Howrey LLP
4 Park Plaza, Suite 1800
Irvine, CA 92614-2559

Efren A. Compean
Thomas A. Ortiz
Garrett & Tully PC
225 S. Lake Avenue, Suite 1400
Pasadena, CA 91101-4869

David J. Ouimette
Mariscal Weeks McIntyre &
Friedlander PA
2901 N. Central Avenue, Suite 200
Phoenix, AZ 85012-2705

Thomas E. Littler, Esq.
GORDON SILVER
40 N. Central Avenue, Suite 2100
Phoenix, AZ 85004

Martin R. Galbut
Michaile J. Berg
GALBUT & GALBUT PC
2425 E. Camelback Road, Suite 1020
Phoenix, AZ 85016-4216

Francis J. Burke, Jr.
Michella A. Kras
STEPTOE & JOHNSON LLP
Collier Center
201 E. Washington St., 16th Floor
Phoenix, AZ 85004

/s/ Katherine V. Brown

1  Marty Harper  (AZ #003416)
   Katherine V. Brown (AZ #026546)
2  **POLSINELLI SHUGHART PC**
   3636 North Central Avenue, Suite 1200
3  Phoenix, Arizona 85012
   Telephone: (602) 650-2000
4  Facsimile: (602) 264-7033
   E-Mail: mharper@polsinelli.com
   E-Mail: kvbrown@polsinelli.com
5  *Local Counsel*

6  David F. Adler (Ohio #0037622)
   James R. Wooley (Ohio #0033850)
7  Louis A. Chaiten (Ohio #0072169)
   Eric E. Murphy (Ohio #0083284)
8  Katie M. McVoy (Ohio #0080860)
   **JONES DAY**
9  Northpoint
   901 Lakeside Avenue
10 Cleveland, Ohio 44114
   Telephone:  (216) 586-3939
11 Facsimile:  (216) 579-0212
   *Of Counsel* (admitted pro hac vice)
12
   *Attorneys for Defendants*
13 *Mayer Hoffman McCann P.C.,*
   *CBIZ, Inc., and CBIZ MHM, LLC*
14

15              **IN THE UNITED STATES DISTRICT COURT**

16                 **THE DISTRICT OF ARIZONA**

17 ROBERT FACCIOLA, et al., individually
   and on behalf of all others similarly
18 situated,
                                          Case No. 2:10-cv-01025-NVW
19                Plaintiffs,

20 vs.

21 GREENBERG TRAURIG, LLP, et al.,       **DEFENDANTS MAYER HOFFMAN**
                                          **MCCANN P.C., CBIZ, INC., AND CBIZ**
22                Defendants.             **MHM, LLC's JOINT MEMORANDUM**
                                          **IN SUPPORT OF MOTION TO**
23                                        **DISMISS COMPLAINT**

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ -iv-

INTRODUCTION.......................................................................................... 1

STATEMENT OF FACTS ............................................................................. 5

ARGUMENT ................................................................................................. 7

I.    PLAINTIFFS' CLAIMS MUST BE DISMISSED
      BECAUSE THEY ARE IMPROPERLY DERIVATIVE ............................ 7

      A.   Investors In An Entity Cannot Directly Recover
           For Harms Suffered By The Entity ...................................................... 8

      B.   Plaintiffs' Claims Are Improperly Derivative
           Because The Seek Recovery For Injuries To The
           LLC In Which They Invested That Are Shared
           By All Investors In That LLC ........................................................... 10

II.   PLAINTIFFS HAVE NOT STATED A COGNIZABLE
      CLAIM AGAINST MAYER HOFFMAN UNDER THE
      ARIZONA SECURITIES ACT ................................................................ 11

      A.   Plaintiffs Have Not Stated A Claim Against Mayer
           Hoffman Under § 44-2203(A) Because The Firm
           Did Not "Ma[k]e, Participate[] In, Or Induce[]"
           Sales Of The Securities At Issue ....................................................... 12

      B.   Plaintiffs Do Not Adequately State A Claim For
           Aiding And Abetting Securities Fraud Against
           Mayer Hoffman ................................................................................. 15

           1.   The Act does not prohibit aiding and abetting
                securities fraud ........................................................................ 15

## TABLE OF CONTENTS

Page

2. Plaintiffs have not shown that Mayer Hoffman "made, participated in, or induced" securities sales .......................................................................16

3. The Complaint fails to establish a "strong inference" that Mayer Hoffman knowingly assisted ML's alleged fraud ...................................17

III. PLAINTIFFS CANNOT BRING A NEGLIGENT-MISREPRESENTATION CLAIM AGAINST MAYER HOFFMAN ........................................................................19

A. As A Matter Of Law, Mayer Hoffman's Annual All-Purpose Audits Did Not Create A Duty Of Care To Plaintiffs.............................................................20

B. Plaintiffs Do Not Allege That They Reasonably Relied On Any Mayer Hoffman Audit Reports...............................23

IV. PLAINTIFFS CANNOT HOLD MAYER HOFFMAN LIABLE UNDER THE ARIZONA INVESTMENT MANAGEMENT ACT ..........25

A. Plaintiffs Cannot State A Claim Directly Against Mayer Hoffman Under § 44-3241(B) ...........................................25

1. Mayer Hoffman's audit reports were not made in connection with investment advisory services .....................25

2. Plaintiffs have not adequately alleged that their losses were "incurred" "as a result of" Mayer Hoffman's audits ................................................................28

B. Plaintiffs Have Not Adequately Alleged That Mayer Hoffman Aided And Abetted An Investment Management Act Violation.................................................................................28

## TABLE OF CONTENTS

Page

1.   The Management Act neither prohibits aiding and abetting nor establishes a private remedy for that conduct..................................................................29

2.   Plaintiffs have not established plausible grounds that Mayer Hoffman aided and abetted ML's and Radical Bunny's violation of the Management Act..........................................................................29

V.   PLAINTIFFS CANNOT HOLD CBIZ VICARIOUSLY LIABLE FOR MAYER HOFFMAN'S ALLEGED CONDUCT ..............................30

A.   Plaintiffs Do Not State An Adequate Control-Person Claim Against CBIZ Under The Arizona Securities Act ................30

   1.   Because Plaintiffs' claims against Mayer Hoffman under the Securities Act cannot stand, its claim against CBIZ also fails............................................31

   2.   Plaintiffs fail to allege that CBIZ participated in or induced the securities sales at issue..................................31

   3.   The Complaint concedes that CBIZ did not control Mayer Hoffman's auditing practices.........................32

B.   Plaintiffs Do Not State A Claim Against CBIZ Under A Joint-Venture Theory ........................................................35

   1.   Since Plaintiffs cannot bring *primary* liability claims against Mayer Hoffman, they cannot bring a *vicarious* liability claim against CBIZ ......................35

   2.   A joint venture did not exist between Mayer Hoffman and CBIZ because CBIZ had no right to control Mayer Hoffman's audits ......................................36

CONCLUSION .........................................................................................37

## <u>TABLE OF AUTHORITIES</u>

Pages

### <u>Cases</u>

*Albers v. Guthy-Renker Corp.,*
92 Fed. Appx. 497 (9th Cir. 2004) .................................................................... 8

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ..................................................... 3, 7, 12, 21-23

*Barabe v. Apax Partners Europe Managers, Ltd.,*
359 Fed. Appx. 82 (11th Cir. 2009) .................................................. 35

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................... 7, 15, 23

*Bills v. U.S. Fid. & Guar. Co.,*
280 F.3d 1231 (9th Cir. 2002) ............................................................. 15

*Bily v. Arthur Young & Co.,*
834 P.2d 745 (Cal. 1992) ................................................................ 2, 20-22

*Brazlin v. W. Sav. & Loan Ass'n,* No. 91-0078-PHX,
1994 WL 374286 (D. Ariz. Jan. 28, 1994) .................................. 2, 8-11

*Brown v. Enstar Group Inc.,*
84 F.3d 393 (11th Cir. 1996) ............................................................. 4, 32

*Burritt v. NutraCea,* No. CV-09-00406-PHX-FJM,
2010 WL 668806 (D. Ariz. Feb. 25, 2010) ......................................... 12

*Caviness v. Derand Res. Corp.,*
983 F.2d 1295 (4th Cir. 1993) ............................................................ 28

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) ......................................................... 4, 15-16, 29

*Chill v. Gen. Elec. Co.,*
101 F.3d 263 (2d Cir. 1996) .............................................................. 30

*Dawson v. Withycombe,*
163 P.3d 1034 (Ariz. Ct. App. 2007) ................................................. 19

*DiLeo v. Ernst & Young,*
901 F.2d 624 (7th Cir. 1990) ........................................................ 19, 30

*E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,*
79 P.3d 86 (Ariz. Ct. App. 2003) ...................................................... 32

*Ellis v. Grant Thornton LLP,*
530 F.3d 280 (4th Cir. 2008) ............................................................ 20

## TABLE OF AUTHORITIES

Pages

*Estate of Hernandez ex rel. Hernandez-Wheeler v. Flavio*,
  930 P.2d 1309 (Ariz. 1997)..........................................................................4, 36-37

*Ferrell v. Indus. Comm'n of Ariz.*,
  288 P.2d 492 (Ariz. 1955)................................................................................. 16

*Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*,
  223 P.3d 664 (Ariz. 2010)................................................................................. 20

*Fromkin v. Indymac Bank FSB*, No. 10-CV-8014-PCT-PGR,
  2010 WL 2541167 (D. Ariz. June 18, 2010) ...................................................... 24

*Funk v. Spalding*,
  246 P.2d 184 (Ariz. 1952)................................................................................... 8

*Gillespie v. Schneider*, No. 94-55995,
  1996 WL 111593 (9th Cir. Mar. 13, 1996)......................................................... 20

*Glenn K. Jackson, Inc. v. Roe*,
  273 F.3d 1192 (9th Cir. 2001)............................................................................ 20

*Goodman v. Newzona Inc. Co.*,
  421 P.2d 318 (Ariz. 1966).................................................................................. 36

*Grand v. Nacchio*, No. CV-09-0317-PR,
  2010 WL 3034515 (Ariz. Aug. 05, 2010).........................................4, 13-15, 29-31

*Grand v. Nacchio*,
  217 P.3d 1203 (Ariz. Ct. App. 2009) ....................................................... 14, 17, 31

*Grant Thornton LLP v. Prospect High Income Fund*, No. 06-0975
  2010 WL 2636124 (Tex. Jul. 02, 2010)......................................................... 22, 24

*Hall v. Paine, Webber, Jackson & Curtis, Inc.*, No. 82 Civ. 2840,
  1984 WL 812 (S.D.N.Y. Aug. 27, 1984) ......................................................... 3, 25

*Hamid v. Price Waterhouse*,
  51 F.3d 1411 (9th Cir. 1995)........................................................................... 8, 10

*Helfenbein v. Barae Inv. Co., Inc.*,
  508 P.2d 101 (Ariz. Ct. App. 1973) ................................................................... 36

*Hoffman v. Greenberg*,
  767 P.2d 725 (Ariz. Ct. App. 1988) ................................................................... 22

*Howard v. Everex Systems, Inc.*,
  228 F.3d 1057 (9th Cir. 2000)............................................................................ 32

*Hunt v. U.S. Tobacco Co.*,
  538 F.3d 217 (3d Cir. 2008)...................................................................... 3, 23, 28

# <u>TABLE OF AUTHORITIES</u>

Pages

*In re Asia Pulp & Paper Secs. Litig.*,
   293 F. Supp. 2d 391 (S.D.N.Y. 2003)....................................................34-35

*In re Ceridian Corp. Sec. Litig.*,
   542 F.3d 240 (8th Cir. 2008)...................................................................18

*In re Parmalat Secs. Litig.*,
   377 F. Supp. 2d 390 (S.D.N.Y. 2005)........................................................37

*In re Software Toolworks Inc.*,
   50 F.3d 615 (9th Cir. 1994)......................................................................18

*In re Sunrise Secs. Litig.*,
   916 F.2d 874 (3d Cir. 1990)..............................................................2, 8-11

*Karpov v. Insight Enter., Inc.*, No. CV 09-856-PHX-SRB,
   2010 WL 2105448 (D. Ariz. Apr. 30, 2010) .........................................4, 18

*Kassover v. UBS AG*,
   619 F. Supp. 2d 28 (S.D.N.Y. 2008)......................................................25, 27

*Kaufman v. i-Stat Corp.*,
   754 A.2d 1188 (N.J. 2000)........................................................................24

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005)...................................................................34

*Kuehn v. Stanley*,
   91 P.3d 346 (Ariz. Ct. App. 2005)........................................................20, 23

*Linder v. Brown & Herrick*,
   943 P.2d 758 (Ariz. Ct. App. 1997)...........................................................23

*Lindquist v. Farmers Ins. Co. of Ariz.*, No. CV 06-597-TUC-FRZ,
   2008 WL 343299 (D. Ariz. Feb. 06, 2008)............................................4, 35

*Maher v. Durango Metals, Inc.*,
   144 F.3d 1302 (10th Cir. 1998).................................................................32

*Martin v. Althoff*,
   557 P.2d 187 (Ariz. Ct. App. 1976) ..........................................................29

*McPeak v. Indus. Comm'n*,
   741 P.2d 699 (Ariz. Ct. App. 1987)...........................................................29

*Mining Inv. Group, LLC v. Roberts*,
   177 P.3d 1207 (Ariz. Ct. App. 2008).........................................................36

*Murry v. W. Am. Mortgage Co.*,
   604 P.2d 651 (Ariz. Ct. App. 1979)...........................................................36

## <u>TABLE OF AUTHORITIES</u>

Pages

*Nahom v. Blue Cross & Blue Shield of Ariz., Inc.,*
   885 P.2d 1113 (Ariz. Ct. App. 1994) ................................................... 36

*New Sun Bus. Park, LLC v. Yuma County,*
   209 P.3d 179 (Ariz. Ct. App. 2009) .................................................... 16

*Patches v. Indus. Comm'n of Ariz.,*
   204 P.3d 437 (Ariz. Ct. App. 2009) .................................................... 29

*Pozez v. Ethanol Capital Mgmt., L.L.C.,* No. 07-cv-00319-TUC-CKJ,
   2009 WL 2176574 (D. Ariz. July 21, 2009) ....................................... 26

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP,*
   551 F.3d 305 (4th Cir. 2009)............................................................... 18

*Reiger v. Price Waterhouse Coopers LLP,*
   117 F. Supp. 2d 1003 (S.D. Cal. 2000) ............................................... 19

*Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,*
   81 F.3d 606 (5th Cir. 1996) ............................................................ 22-23

*SEC v. Nat'l Executive Planners, Ltd.,*
   503 F. Supp. 1066 (M.D.N.C. 1980) ................................................... 27

*Smolen v. Deloitte, Haskins & Sells,*
   921 F.2d 959 (9th Cir. 1990).............................................................. 28

*Standard Chartered PLC v. Price Waterhouse,*
   945 P.2d 317 (Ariz. Ct. App. 1997) ......................................... 2, 12-14

*State v. Gunnison,*
   618 P.2d 604 (Ariz. 1980)................................................................... 16

*State v. Peek,*
   195 P.3d 641 (Ariz. 2008)................................................................... 16

*State v. Superior Ct. of Maricopa County,*
   599 P.2d 777 (Ariz. 1979).................................................................. 15

*Stern v. Charles Schwab & Co., Inc.,* No. CV-09-1229-PHX-DGC,
   2010 WL 1250732 (D. Ariz. Mar. 24, 2010) ......................... 17, 19, 30

*Tanner Cos. v. Superior Court,*
   696 P.2d 693 (Ariz. 1985)................................................................... 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ........................................................................... 18

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
   444 U.S. 11 (1979).............................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

Pages

*Van Buren v. Pima Cmty. Coll. Dist. Bd.*,
  546 P.2d 821 (Ariz. 1976)..................................................................... 19

*Washington v. Baenziger*,
  656 F. Supp. 1176 (N.D. Cal. 1987) ...................................................... 27

*Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons*
  *Local No. 395 Pension Trust Fund*, 38 P.3d 12 (Ariz. 2002) ............... 4, 17, 30

*Wojtunik v. Kealy*,
  394 F. Supp. 2d 1149 (D. Ariz. 2005) ................................................... 15

*Ziemba v. Cascade Intern., Inc.*,
  256 F.3d 1194 (11th Cir. 2001)............................................................. 18

*Zinn v. Parrish*,
  644 F.2d 360 (7th Cir. 1981).............................................................. 26-27

### <u>Rules</u>

AICPA, Code of Prof'l Conduct § 101-3 .................................................. 33

AICPA, Code of Prof'l Conduct § 101-14 ................................................ 33

### <u>Statutes and Regulations</u>

A.R.S. § 12-812 ....................................................................................... 16

A.R.S. § 14-1399(B) ............................................................................... 16

A.R.S. § 32-731(A)(2) ............................................................................ 33

A.R.S. § 40-491(f) ................................................................................... 16

A.R.S. § 40-492 ....................................................................................... 16

A.R.S. § 44-1991(A) ................................................... 6, 11-12, 15-17, 30-31

A.R.S. § 44-1999(B) ............................................................... 7, 30-31

A.R.S. § 44-2001(A) ........................................................................ 12, 31

A.R.S. § 44-2003(A) ............................................. 11-13, 16-17, 31-32

A.R.S. § 44-2032 ..................................................................................... 32

A.R.S. § 44-2082(B) ............................................................................... 17

## **TABLE OF AUTHORITIES**

Pages

A.R.S. § 44-3101 ............................................................................... 3, 25-27

A.R.S. § 44-3241 ......................................................................... 3, 25-26, 28-29

Ariz. Admin. Code § R4-1-455(A) ............................................................ 4, 33

Ariz. Admin. Code § R4-1-455.04 ............................................................... 33

### **Other**

1996 Ariz. Sess. Laws, ch. 197, § 11(C) ........................................................ 32

Restatement (Second) of Torts § 541 (1977) .................................................. 24

Restatement (Second) of Torts § 552 (1977) .......................................... 2, 19-21

W. Page Keeton, Prosser & Keeton on Torts § 108 (5th ed. 1984) ............... 23

Webster's New World Roget's 21st Century Thesaurus 412 (3d ed. 1999).............. 14

Webster's New World Roget's 21st Century Thesaurus 571 (3d ed. 1999).............. 13

Webster's Third New Int'l Dictionary 1191 (1969) ....................................... 26

Webster's Third New Int'l Dictionary 1154 (1969) ....................................... 13

Webster's Third New Int'l Dictionary 1646 (1969) ....................................... 13

Webster's Third New Int'l Dictionary 1937 (1969) ....................................... 28

Webster's Third New Int'l Dictionary 2426 (1969) ....................................... 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Plaintiffs—who invested in investment products offered by Mortgages Ltd. ("ML") and Radical Bunny, LLC, between 2005 and 2008—bring this putative class action against former managers and outside professionals of those entities.  (Doc. 1, Compl., ¶¶ 33-36, 49 (hereinafter "Compl.").)  One set of Plaintiffs ("ML Plaintiffs") invested through ML's limited liability companies ("LLCs"), which gave them fractional interests ("Pass-Through Interests") in the loans that ML, a mortgage broker, made to real-estate developers.  (*Id.* ¶¶ 58, 334.)  The other set ("Radical Bunny Plaintiffs") invested in Radical Bunny, an entity that loaned funds to ML.  (*Id.* ¶¶ 60, 90).  Both entities allegedly made false statements to Plaintiffs, failing to disclose that ML had adopted a "Ponzi platform" in which it stayed afloat by relying on new investors and Radical Bunny loans to pay old investors and business expenses.  (*Id.* ¶¶ 55-128.)  Plaintiffs seek to recover these lost investments from third parties, including Defendants Mayer Hoffman McCann P.C., CBIZ, Inc., and CBIZ MHM, LLC.

None of those Defendants had any contact with Plaintiffs.  As for Mayer Hoffman, it performed annual audits of ML's financial statements.  (*Id.* ¶¶ 298, 300.)  ML attached its audited financials to some Private Offering Memoranda ("POMs") given to ML Plaintiffs.  (*Id.* ¶ 99.)  It also gave its audited financials to Radical Bunny managers.  (*Id.*)  At bottom, Plaintiffs allege that Mayer Hoffman misrepresented that ML's financial statements reflected its financial health and comported with Generally Accepted Accounting Principles ("GAAP"), and that Mayer Hoffman's ML audit followed Generally Accepted Auditing Standards ("GAAS").  (*Id.* ¶¶ 302, 316-75.)  Plaintiffs conclusorily allege that CBIZ, Inc., and CBIZ MHM, LLC (collectively "CBIZ") controlled Mayer Hoffman's audits.  (*Id.* ¶¶ 378-90.)

Plaintiffs appear to assert the following counts against Mayer Hoffman: (1) violations of the Arizona Securities Act ("Securities Act") (*id.* ¶¶ 399, 403); (2) aiding and abetting violations of the Securities Act (*id.* ¶ 418); (3) negligent

1   misrepresentation (*id.* ¶¶ 430-35); (4) violations of the Arizona Investment Management

2   Act ("Management Act") (*id.* ¶¶ 441-42); and (5) aiding and abetting violations of the

3   Management Act (*id.* ¶ 445).   Plaintiffs assert two counts against CBIZ: (1) control-

4   person liability under the Securities Act (*id.* ¶¶ 410-12), and (2) vicarious liability on a

5   joint-venture theory (*id.* ¶¶ 448-49).   Numerous deficiencies in all of these counts,

6   however, require the dismissal of Mayer Hoffman and CBIZ from this litigation.

7       Derivative Injury.   To begin, Plaintiffs' claims must be dismissed as improperly

8   derivative.   Investors in an entity may not maintain a direct action for an injury to it that

9   affects all investors the same.   *Brazlin v. W. Sav. & Loan Ass'n*, No. 91-0078-PHX, 1994

10   WL 374286, at *3 (D. Ariz. Jan. 28, 1994); *In re Sunrise Secs. Litig.*, 916 F.2d 874, 882

11   (3d Cir. 1990).   The Complaint alleges that Plaintiffs invested in LLCs, which, in turn,

12   invested in developer-loans through ML or loaned money to ML.   The LLCs'

13   investments failed, affecting all of their investors similarly.   Any claim against Mayer

14   Hoffman or CBIZ for losses caused by that injury, therefore, is derivative, and the

15   decision whether to bring it must be made by the LLCs themselves—which are currently

16   controlled by bankruptcy trustees.

17       Securities Act.   A plaintiff may only bring a claim under the Securities Act against

18   those "who made, participated in or induced the unlawful sale" of securities.   A.R.S.

19   § 44-2003(A).   In *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317 (Ariz. Ct.

20   App. 1997), the court held that an *outside auditor* did not participate in or induce a

21   securities sale by merely providing information to investors.   *Id.* at 332-33.   This case is

22   even easier than *Standard Chartered* because, unlike the accountants in *Standard*

23   *Chartered*, Mayer Hoffman did not communicate directly with any investors.   *Id.* at 325.

24       Negligent Misrepresentation.   Arizona follows Restatement (Second) of Torts

25   § 552 for negligent misrepresentation.   Under § 552, "an auditor retained to conduct an

26   annual audit and to furnish an opinion for no particular purpose generally undertakes no

27   duty to third parties." *Bily v. Arthur Young & Co.*, 834 P.2d 745, 758 (Cal. 1992).   Here,

28

1   providing annual audits is all Mayer Hoffman did.  (Compl. ¶¶ 298, 300.)  To remedy this

2   defect, Plaintiffs *conclusorily* assert that the reports were intended to provide investor

3   assurances.  But those are classic legal conclusions.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

4   1951 (2009).  After they are disregarded, as they must be, the Complaint at most suggests

5   that it was foreseeable that investors would rely on the reports—an insufficient

6   allegation.

7       Nor have Plaintiffs provided plausible facts showing that they *relied* on the

8   reports.  The Radical Bunny Plaintiffs did not even *receive* them, only *Radical Bunny*

9   managers did.  (Compl. ¶ 99.)  The ML Plaintiffs assert only that ML attached the reports

10  to POMs.  (*Id.* ¶ 99.)  They do not provide sufficient allegations to establish that they

11  made investments because of the audit reports or that relying on the audited financials of

12  *ML*, as opposed to information about *the loans themselves*, was justifiable.  (*Id.* ¶ 58.)

13      <u>Management Act</u>.  Recognizing the precedent foreclosing a Securities Act claim,

14  Plaintiffs attempt to turn the Management Act—which regulates transactions involving

15  investment advice—into a junior-varsity Securities Act.  But the Management Act

16  prohibits only false statements "in connection with a transaction . . . involving the

17  provision of investment advisory services."  A.R.S. § 44-3241(A).  Plaintiffs transacted

18  for *securities*, not *investment advice*.  (Compl. ¶¶ 58, 90.)  And they fail "[to] establish by

19  more than conclusory allegations that [ML or Radical Bunny] [were] investment

20  adviser[s]."  *Hall v. Paine, Webber, Jackson & Curtis, Inc.*, No. 82 Civ. 2840, 1984 WL

21  812, at *2 (S.D.N.Y. Aug. 27, 1984).  To qualify, Plaintiffs must have paid these entities

22  for advice.  A.R.S. § 44-3101(5).  They did not.  In any event, the Act permits Plaintiffs

23  to recover only for losses incurred "as a result of" audit reports.  A.R.S. § 44-3241(B).

24  That phrase incorporates a reliance element.  *See Hunt v. U.S. Tobacco Co.*, 538 F.3d

25  217, 227 (3d Cir. 2008).  But Plaintiffs have not adequately alleged reliance.

26      <u>Aiding and Abetting Counts</u>.  The aiding-and-abetting claims fail because, just

27  like their federal equivalents, the Securities and Management Acts nowhere prohibit

28

1    aiding and abetting.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver,*

2    *N.A.*, 511 U.S. 164, 177-78 (1994).  While a prior Arizona Supreme Court case suggested

3    the Securities Act impliedly incorporates aiding-and-abetting liability (based on federal

4    cases that were overruled by *Central Bank*), that court just recently called it an open

5    question.  *Grand v. Nacchio*, No. CV-09-0317-PR, 2010 WL 3034515, at *5 (Ariz. Aug.

6    05, 2010).  At any rate, because scienter is required for aiding and abetting, *Wells Fargo*

7    *Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust*

8    *Fund*, 38 P.3d 12, 23 (Ariz. 2002), Plaintiffs must plausibly show Mayer Hoffman

9    *knowingly* assisted the alleged fraud, which is all but impossible to establish against an

10   outside auditor.  At best, Plaintiffs have asserted negligent violations of GAAP and

11   GAAS.  But "violations of GAAP or GAAS, without more, . . . can never establish

12   scienter."  *Karpov v. Insight Enter., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 2105448,

13   at *5 (D. Ariz. Apr. 30, 2010).

14        <u>Control Counts</u>.  Plaintiffs' two counts against CBIZ fail because the underlying

15   claims against Mayer Hoffman fail.  *Grand*, 2010 WL 3034515, ¶ 29;  *Lindquist v.*

16   *Farmers Ins. Co. of Ariz.*, No. CV 06-597-TUC-FRZ, 2008 WL 343299, at *10 (D. Ariz.

17   Feb. 06, 2008).  Even if the underlying claims were viable, moreover, control-person

18   liability requires that CBIZ have the *power* to control the specific Mayer Hoffman

19   activities alleged to be unlawful—its audit practices.  *See Brown v. Enstar Group, Inc.*,

20   84 F.3d 393, 396 (11th Cir. 1996); *Estate of Hernandez ex rel. Hernandez-Wheeler v.*

21   *Flavio*, 930 P.2d 1309, 1312 (Ariz. 1997).  The Complaint shows, however, that CBIZ

22   lacked this control, both legally and contractually.  Legally, professional-accounting

23   standards require Mayer Hoffman's independence.  *See Ariz. Admin. Code* § R4-1-

24   455(A); (Compl. ¶¶ 376, 378).  Contractually, the Complaint incorporates by reference

25   the terms in an Administrative Services Agreement.  (Compl. ¶ 379.)  It fails to mention,

26   however, that the Agreement requires audit services to "be under the *direction, control,*

27   *and supervision* of . . . [Mayer Hoffman]."  Admin. Servs. Agreement ("ASA") § 4

28

4

1  (attached as Ex. A) (emphasis added).  As such, all claims against Mayer Hoffman and

2  CBIZ must be dismissed.

3  ### STATEMENT OF FACTS

4  As a licensed mortgage broker, ML originated, sold, and serviced mortgage real-

5  estate loans.  (Comp. ¶¶ 7, 57.)  To obtain the funds for these loans, ML turned to private

6  investors.   According to the Complaint, ML sold the ML Plaintiffs Pass-Through

7  Interests through its LLCs.  (*Id.* ¶¶ 58, 75, 334.)  ML generated its revenue from fees

8  charged to its borrowers.  (*Id.* ¶ 8.)  It sold the loans to investors, who bore the risk of

9  defaults, poor underwriting, and declines in real-estate value.  (*Id.*)

10  In late 2005, ML began to deteriorate.  (*Id.* ¶ 9.)  The Complaint alleges that it thus

11  adopted a "Ponzi scheme" in which investments from new investors paid interest due old.

12  (*Id.* ¶ 11.)  Radical Bunny is alleged to have facilitated this scheme by making large loans

13  to ML at a thirteen-percent interest rate.  (*Id.* ¶¶ 60-65.)  It obtained the funds for these

14  loans from the Radical Bunny Plaintiffs, retaining two percentage points of the interest

15  paid by ML.  (*Id.* ¶¶ 63-64, 75.)  To maintain the scheme, ML and Radical Bunny

16  allegedly made false statements or material omissions to Plaintiffs.  (*See id.* ¶¶ 92-110.)

17  With respect to ML, for example, a series of POMs failed to indicate that its business

18  depended on the Radical Bunny loans and a "Ponzi platform."  (*Id.* ¶ 86.)  With respect to

19  Radical Bunny, its offering documents are alleged to have misled investors into believing

20  that its loans to ML were backed by security interests.  (*Id.* ¶ 91.)

21  According to the Complaint, the Ponzi scheme collapsed in 2008.  (*Id.* ¶¶ 122-23.)

22  ML filed for bankruptcy in June 2008 and Radical Bunny did so soon thereafter.  (*Id.*

23  ¶ 123.)  All told, between September 2005 and June 2008, ML and Radical Bunny raised

24  over $900 million from about 2,000 investors.  (*Id.* ¶ 83.)  In this lawsuit, individuals who

25  invested in ML's Pass-Through Interests and in Radical Bunny seek to recover from third

26  parties, including Mayer Hoffman and CBIZ.

27

28

Mayer Hoffman was ML's auditor. It performed annual audits in 2005, 2006, and 2007. (*Id.* ¶¶ 298-300.) Its reports indicated that ML's financial statements fairly presented ML's financial position and conformed with GAAP. (*Id.* ¶ 302.) The Complaint alleges both assertions were false. (*Id.* ¶¶ 316-75.) It further alleges that Mayer Hoffman failed to adhere to GAAS. (*Id.* ¶¶ 311-19.) Plaintiffs generally allege that ML attached its audited financials—the audited financials of the originator and servicer of the loans in which Plaintiffs invested, not the loans themselves—to POMs. (*Id.* ¶¶ 58, 99.) According to the Complaint, ML sold the loans to investors, and it was the loans themselves that determined a particular investment's success or failure. (*Id.* ¶ 8.) Plaintiffs also allege that ML gave its audited financials to Radical Bunny managers, but not to the Radical Bunny Plaintiffs themselves. (*Id.* ¶ 99.)

The Complaint acknowledges that CBIZ cannot provide audit services due to professional standards. (*Id.* ¶ 378.) Under an Administrative Services Agreement, CBIZ instead provided Mayer Hoffman with personnel, equipment, office space, and support and billing services, and received 85% of Mayer Hoffman's gross revenue. (*Id.* ¶¶ 379, 383, 385, 388.)

Plaintiffs asserts four or five—it is unclear—counts against Mayer Hoffman. They claim that Mayer Hoffman violated the Securities Act by making material misstatements in violation of A.R.S. § 44-1991(A). (Count I.) (*See id.* ¶ 399.) They also make a passing, and apparently inadvertent, reference to Mayer Hoffman (*id.* ¶ 418) in the count (Count III) specifically alleging that *other* Defendants aided and abetted ML's and Radical Bunny's violation of the Securities Act (*see id.* ¶¶ 413-18). Plaintiffs next seek to hold Mayer Hoffman liable for negligent misrepresentation, alleging that it negligently asserted that ML's financial statements complied with GAAP and accurately presented the company's financial condition (Count V). (*Id.* ¶¶ 430-33.) Finally, Plaintiffs seek to recover under the Management Act. They claim both that Mayer Hoffman made material misstatements in connection with investment-advisory services

(Count VI) (*id.* ¶¶ 440-41), and that it aided and abetted ML's and Radical Bunny's own violations of that Act (Count VII) (*id.* ¶ 445).

Plaintiffs assert two counts against CBIZ. They allege that it violated the Securities Act's control-person provision by controlling Mayer Hoffman within the meaning of A.R.S. § 44-1999(B) (Count II). (*Id.* ¶ 411.) They also claim that Mayer Hoffman and CBIZ were "joint venturers" in connection with audit reports. (*Id.* ¶ 448.) Plaintiffs thus seek to hold CBIZ vicariously liable for those reports (Count VIII). (*Id.* ¶ 449.)

**ARGUMENT**

None of Plaintiffs' counts against Mayer Hoffman or CBIZ can survive under the controlling standards for a motion to dismiss. The Court must accept as true all well-pleaded facts, but not conclusory allegations. *Iqbal*, 129 S. Ct. at 1949. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Further, the well-pleaded facts must show "plausible grounds" for every element. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). If, by contrast, the facts "are merely consistent with a defendant's liability," the complaint must be dismissed. *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted). Here, the Court should dismiss all claims against Mayer Hoffman and CBIZ because the well-pleaded facts do not plausibly establish liability.

**I.    PLAINTIFFS' CLAIMS MUST BE DISMISSED BECAUSE THEY ARE IMPROPERLY DERIVATIVE.**

Plaintiffs' claims must be dismissed as improperly derivative. Under Arizona law, investors in an entity cannot recover for harms suffered similarly by all of its investors. But that is precisely what Plaintiffs seek to do. According to the Complaint, Plaintiffs invested in LLCs, which, in turn, invested in developer-loans through ML or loaned money to ML. Those investments declined precipitously in value, affecting all LLC investors similarly. Any claim against Mayer Hoffman or CBIZ for losses caused by that

injury, therefore, is derivative, and the decision whether to bring it must be made by the LLCs themselves—which are currently controlled by bankruptcy trustees.

### A.   Investors In An Entity Cannot Directly Recover For Harms Suffered By The Entity.

In Arizona, as elsewhere, investors in an entity may not maintain a direct action for an injury to the entity that affects all investors similarly. *Brazlin v. W. Sav. & Loan Ass'n*, No. 91-0078-PHX, 1994 WL 374286, at *3 (D. Ariz. Jan. 28, 1994) (citing *Funk v. Spalding*, 246 P.2d 184, 186-88 (Ariz. 1952)). "[W]here the harm is to all the members," the Ninth Circuit has explained, "and the injuries claimed by the plaintiffs are not separate and distinct from those to shareholders or depositors generally, the . . . claim is derivative," and must be brought by the entity itself. *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1419 (9th Cir. 1995). The policy reasons for this rule are twofold. *Brazlin*, 1994 WL 374286, at *4. "The primary purpose is to avoid multiple actions." *Id.* The secondary purpose is "based on the concept of distinct corporate identities." *Id.* Where an injury affects all of an entity's investors similarly, the entity must control any litigation, unless the investors meet stringent requirements for a derivative action. *Id.*

That rule applies to equity holders and noteholders alike. Thus, for example, corporate shareholders may not sue for injuries to the corporation that affect all shareholders similarly. *Id.* And LLC members may not sue for injuries to the LLC that affect all members similarly. *Albers v. Guthy-Renker Corp.*, 92 Fed. Appx. 497, 498-99 (9th Cir. 2004). But equally true, the "the rights of noteholders to pursue direct actions for injury that similarly affected all noteholders is also limited." *Brazlin*, 1994 WL 374286, at *3; *see, e.g., In re Sunrise Sec. Litig.*, 916 F.2d 874, 882 (3d Cir. 1990).

This Court's decision in *Brazlin* aptly illustrates these principles. There, plaintiffs had invested in notes issued by Western Savings and Loan Association. Western subsequently failed and entered receivership under the Resolution Trust Corporation (RTC). Plaintiff noteholders filed a class action against Western and various third-party

defendants, including Western's accounting firm, alleging that defendants violated Arizona securities laws and engaged in fraud and civil conspiracy. Specifically, plaintiffs alleged that "[d]efendants 'caused Western to execute a series of highly speculative, risky, and non-traditional direct investments . . . in order to book more stockholders equity and thus give the false appearance of Western's solvency.'" 1994 WL 374286, at *1. They alleged that, "[a]s Western's financial condition deteriorated, . . . [d]efendants . . . 'undertook a scheme and course of conduct . . . to obtain additional capital, resulting in the issuance of the Notes . . . and thereafter . . . conceal[ed] from [p]laintiffs . . . the true state of Western's financial condition.'" *Id.* They further alleged that "part of the [d]efendants' scheme included issuance of an offering circular that was false and misleading . . . and the issuance of numerous statements and reports . . . that contained misleading statements and omissions." *Id.* And they alleged that, "[a]s a result of this conduct, the plaintiffs . . . were induced to purchase notes and to refrain from selling them." *Id.* The Court held, however, that plaintiffs' securities fraud, common-law fraud, and civil conspiracy claims were derivative, because "[t]he alleged resulting injury was to Western and similarly affected all creditors." *Id.* at *8. Accordingly, the claims "belong[ed] to the RTC as Western's successor in interest." *Id.*; *see id.* at *6 (distinguishing cases where, for example, "the fraud was directed solely toward [an individual] and was not a claim shared by other shareholders").

Decisions by other courts are in accord. In *In re Sunrise Securities Litigation*, for example, plaintiffs brought a fraudulent inducement claim against former directors, officers, attorneys, and auditors of a failed savings and loan from which they had purchased certificates of deposit. 916 F.3d at 876. Plaintiffs alleged that defendants misrepresented the institution's financial soundness. *Id.* at 882. In particular, plaintiffs alleged that defendants failed to disclose "that a substantial portion of [the savings and loan's] portfolio consisted of risky real estate construction loans, which . . . were structured . . . to defer classification of the loans as delinquent," and that the institution's

"financial statements . . . overstated net worth" and "understated the value of nonperforming loans." *Id.* The court held that a fraudulent inducement claim based on these allegations was derivative, and belonged to the savings and loan's receiver rather than individual creditors, because the harm affected all depositors similarly. *Id.* at 884-85; *see also Hamid*, 51 F.3d at 1419 (approving of *In re Sunrise*).

**B.      Plaintiffs' Claims Are Improperly Derivative Because They Seek Recovery For Injuries To The LLC In Which They Invested That Are Shared By All Investors In That LLC.**

Measured by the these standards, Plaintiffs' claims are derivative, and the decision whether to sue must be made by the particular LLC in which a Plaintiff invested. Plaintiffs do not allege that they *directly* invested in *ML*. They instead claim to have *invested in LLCs*, which, in turn, invested in loans or notes through ML. The ML Plaintiffs claim to have become members of various LLCs that purchased Pass-Through Interests in loans made and serviced by ML. (Compl. ¶¶ 58, 75, 334.)   And the Radical Bunny Plaintiffs allege that they invested in promissory notes issued by Radical Bunny LLC (*id.* ¶¶ 127, 135), which, in turn, invested in ML (*id.* ¶ 60).

Each Plaintiff's injury, therefore, was suffered as a result of an LLC's investment in ML or ML-originated loans, and was an injury suffered by every member of the LLC in which that Plaintiff invested. The Complaint contains no allegations that any investor in a given LLC suffered an injury distinct from every other investor in the LLC. And Plaintiffs have not even attempted to meet the stringent requirements for suing in the place of the LLCs, which are currently controlled by bankruptcy trustees.

It makes no difference that Plaintiffs have attempted to frame their claims in fraudulent-inducement terms.   As *Brazlin* and *In re Sunrise* establish, fraudulent-inducement claims can be derivative.  Similarly to the plaintiffs in those cases, Plaintiffs claim to be the victim of a scheme to create the false appearance that ML was solvent. (*See, e.g.*, Compl. ¶¶ 10, 14.)   The scheme involved concealing the true financial condition of ML from investors, including—both here and in *In re Sunrise*—by avoiding

classifying increasingly risky real-estate construction loans as delinquent. (*See id.* ¶¶ 10, 368.) Defendants are alleged to have made false and misleading statements in offering circulars that fraudulently induced Plaintiffs' investment in LLCs. (*See id.* ¶¶ 17, 24-25.) But, as in *Brazlin* and *In re Sunrise*, the injuries affected all investors in a given entity (here, an LLC) and were "inextricably linked to the insolvency of [ML]." 916 F.3d at 887. Thus, "that the [Defendants'] alleged fraud may have induced all of the [investors] to make their original [investment]" in an LLC "does not justify bypassing [an] equitable and common-sense system for recovery" (*id.*)—leaving it to the bankruptcy trustee in control of the LLC to determine whether the LLC should sue. This result is not only legally correct, but sensible, because it avoids multiple, overlapping actions by both individual LLC investors and the trustee who controls the LLCs themselves.

## II.   PLAINTIFFS HAVE NOT STATED A COGNIZABLE CLAIM AGAINST MAYER HOFFMAN UNDER THE ARIZONA SECURITIES ACT.

The Court should dismiss all counts against Mayer Hoffman under the Arizona Securities Act. That Act makes it unlawful for a person, "in connection with a transaction . . . involving . . . a sale . . . of securities," to (1) "[e]mploy any device, scheme or artifice to defraud"; (2) "[m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (3) "[e]ngage in any transaction, practice or course of business which operates or would operate as a fraud or deceit." A.R.S. § 44-1991(A). Plaintiffs assert two counts alleging a violation of § 44-1991(A). In Count I, they sue Mayer Hoffman under A.R.S. § 44-2003(A), which authorizes a private action against those who make, participate in, or induce unlawful securities sales. (Compl. ¶ 399.) In Count III, Plaintiffs hint that they may seek to hold Mayer Hoffman liable for aiding and abetting violations of § 44-1991(A). (*Id.* ¶ 418.)

Both counts fail as a matter of law. As for Count I, Mayer Hoffman did not make, participate in, or induce securities sales, as required by § 44-2003(A). As for Count III,

the Securities Act does not reach aiding and abetting, and, in any event, Plaintiffs have not pleaded sufficient facts to show that Mayer Hoffman knowingly did so.

**A.   Plaintiffs Have Not Stated A Claim Against Mayer Hoffman Under § 44-2003(A) Because The Firm Did Not "Ma[k]e, Participate[] In, Or Induce[]" Sales Of The Securities At Issue.**

The Court must dismiss Count I against Mayer Hoffman.  Plaintiffs claim that Mayer Hoffman violated § 44-1991(A), and bring suit under § 44-2001(A), which establishes a private action for such a violation.  (*See* Compl. ¶¶ 399, 403.)  The Securities Act, however, permits suit only against certain defendants.  Specifically, a plaintiff may sue only a "person, including any dealer, salesman or agent, who *made, participated in or induced* the unlawful sale." A.R.S. § 44-2003(A) (emphasis added).

Here, Plaintiffs do not allege that Mayer Hoffman "made" sales of Pass-Through Interests or Radical Bunny securities; rather, they allege only that it "participated in or induced [those] sales." (Compl. ¶ 399.) That "[t]hreadbare recital[] of the elements of [their] cause of action," however, does not suffice, and the Court must look to their specific allegations.  *Iqbal*, 129 S. Ct. at 1949.  Those allegations assert that Mayer Hoffman issued error-laden audit reports that ML used "to provide independent assurances" to investors and creditors. (Compl. ¶¶ 99, 304, 314, 319.)

Under Arizona law, however, Mayer Hoffman did not "participate[] in" or "induce[]" securities sales merely because its audit reports were given to Plaintiffs.  A.R.S. § 44-2003(A).  In fact, the Arizona Court of Appeals has held that an auditor does not "participate in" or "induce" sales even if investors rely on its audits.  *Standard Chartered*, 945 P.2d at 332-33; *see Burritt v. NutraCea*, No. CV-09-00406- PHX-FJM, 2010 WL 668806, at *11 (D. Ariz. Feb. 25, 2010) (noting that the Act "does not reach outsiders to a securities sale who merely provide information that foreseeably contributes to, and thereby influences, a purchaser's decision."). In *Standard Chartered*, an investor contemplated the purchase of a company. 945 P.2d at 325. It "decided to rely" on Price Waterhouse, the company's auditor, for "financial information about [it]." *Id.* Despite

1    Price Waterhouse's knowledge of that fact, the court held that the firm could not be liable

2    because it "neither financially participate[d] [in], nor promote[d] or solicit[ed] the

3    transaction, but merely provide[d] information that contribute[d] to [the] buyer['s]

4    decision."  *Id.* at 333.  The definitions of "participate" and "induce" in *Standard*

5    *Chartered* have since been cited approvingly by the Arizona Supreme Court.  *See Grand*,

6    2010 WL 3034515, at *4-5.  They govern here.

7       Participate.  Mayer Hoffman did not "participate in" the securities sales.  As

8    ordinarily understood, "participate" means "'to take part in something . . . in common

9    with others,' or 'to have a share or part in something.'"  *Grand*, 2010 WL 3034515, at *4

10    (quoting *Standard Chartered*, 945 P.2d at 332); *see* Webster's Third New Int'l Dictionary

11    1646 (1969).  A party does not participate in a securities sale, therefore, unless it "ha[s] a

12    hand in" it.  Webster's New World Roget's 21st Century Thesaurus 571 (3d ed. 1999).

13    Here, the Complaint makes no claim that Mayer Hoffman had any share, part, or hand in

14    the sales of the Pass-Through Interests or Radical Bunny securities.  *See Grand*, 2010

15    WL 3034515, at *4 (referencing *Standard Chartered*'s holding "that a certified public

16    accounting firm that had issued allegedly misleading audited financial statements and

17    made them available to a plaintiff who bought stock in the audited firm had not

18    'participated' in a sale").

19       Indeed, Mayer Hoffman falls within an "exception" to "participate" under the Act.

20    *Id.* at *2.  Section 44-2003(A) indicates that "[n]o person shall be deemed to have

21    participated in any sale . . . solely by reason of having acted in the ordinary course of that

22    person's professional capacity in connection with that sale."  *Id.*  Since audits are

23    undertaken "in the ordinary course of [an auditor's] professional capacity," *id.*, the

24    reports cannot subject Mayer Hoffman to liability under § 44-2003(A).

25       Induce.  Mayer Hoffman also did not "induce" the securities sales.  As ordinarily

26    understood, "induce" means "to move and lead (as by persuasion or influence)."

27    *Standard Chartered*, 945 P.2d at 332 (quoting Webster's Third at 1154).  To "induce" a

28

1    securities sale, therefore, the party must "coax," "convince," or "persuade" the purchaser.

2    Roget's at 412.   These synonyms illustrate an "active construction," requiring the

3    "overcoming [of] indifference, hesitation, or opposition" or "an appeal, entreaty, or

4    expostulation" on the part of the defendant. *Standard Chartered*, 945 P.2d at 332-33

5    (internal quotation marks omitted).

6         Comparing *Standard Chartered* and *Grand* illustrates this definition's scope.   In

7    *Standard Chartered*, the auditor did not induce any securities sales because it merely

8    "provide[d] information that contribute[d] to [the buyer's] decision to close the deal." *Id.*

9    at 333.   In *Grand*, by contrast, the defendants induced purchases where they actively

10   "*encouraged* [the purchaser] to buy stock from others in the aftermarket." *Grand*, 2010

11   WL 3034515, at *4 (emphasis added); *see Grand v. Nacchio*, 217 P.3d 1203, 1206 (Ariz.

12   Ct. App. 2009) (noting that defendants had "targeted" plaintiff).

13        Here, Mayer Hoffman, an outside auditor, falls squarely on the *Standard*

14   *Chartered* side of the line.   The Complaint makes no allegation that Mayer Hoffman

15   "coax[ed]" or "persuade[d]" Plaintiffs.   Roget's at 412.   To the contrary, the ML

16   Plaintiffs did not allege even a single communication with Mayer Hoffman.   Instead, they

17   claim ML merely attached audited financials to POMs.   (Compl. ¶ 99.)   The Radical

18   Bunny Plaintiffs did not even allege that much.   Instead, they claim that the financials

19   "were provided to Radical Bunny's managers." (*Id.*) This case, therefore, is even easier

20   than *Standard Chartered*.   In *Standard Chartered*, there was no inducement even though

21   Price Waterhouse allegedly made misrepresentations *not only* in audit reports *but also* in

22   direct communications with the investor and in comfort letters to the investor's financers.

23   945 P.2d at 325-26.   Here, by contrast, the Complaint makes no similar claim.

24        In sum, Count I fails to state a claim against Mayer Hoffman because the

25   Complaint's well-pleaded allegations do not establish that the firm "participated in" or

26   "induced" the sales of the Pass-Through Interests or Radical Bunny securities.

27

28

**B.      Plaintiffs Do Not Adequately State A Claim For Aiding And Abetting Securities Fraud Against Mayer Hoffman.**

In Count III, Plaintiffs allege that various entities aided and abetted ML's and Radical Bunny's violations of § 44-1991(A).   That Count contains numerous specific allegations against management defendants (Compl. ¶¶ 416-17) and lawyer defendants (*id.* ¶ 415), but *no* allegations against Mayer Hoffman.   Count III concludes, however, by suggesting that the management defendants, lawyer defendants, *and* "Mayer Hoffman" are liable "under this Count."   (*Id.* ¶ 418).   This passing reference to Mayer Hoffman is insufficient to give notice whether Plaintiffs bring an aiding-and-abetting claim against it. *See Twombly*, 550 U.S. 555 (noting that complaint must "give the defendant fair notice of what the claim is") (internal quotation marks and alterations omitted).   In any event, to the extent Count III attempts this claim against Mayer Hoffman, it fails.

**1.      The Act does not prohibit aiding and abetting securities fraud.**

As the Arizona Supreme Court confirmed just days ago, it is an "open" question whether the Securities Act prohibits aiding and abetting. *Grand*, 2010 WL 3034515, at *5.   In 1979, that court permitted such a claim. *See State v. Superior Ct. of Maricopa County*, 599 P.2d 777, 784 (Ariz. 1979).   But it relied on federal law that has since been overruled by *Central Bank of Denver*, which held that the federal securities laws do not prohibit aiding and abetting.   511 U.S. at 177-78.   Also since *Sharp*, the Arizona Legislature has "expressly left open whether aiding and abetting liability exists under the [Securities Act]." *Grand*, 2010 WL 3034515, at *5 (citing 1996 Ariz. Sess. Laws, ch. 197, § 11(B)).[1]   This Court must predict how the Arizona Supreme Court would rule. *Bills v. U.S. Fid. & Guar. Co.*, 280 F.3d 1231, 1234 n.2 (9th Cir. 2002).

Since that court would conclude that aiding-and-abetting liability does not exist, this Court must do the same.   Most notably, nothing in the "Fraudulent Practices" article

---

[1]   In *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005), the court suggested that *Sharp* was "the law currently controlling this issue."   The recent *Grand* decision, however, confirms that the question is open. *Grand*, 2010 WL 3034515, at *5.

of the Act proscribes aiding and abetting a violation. *See* A.R.S. §§ 1991-2000. Section 44-1991(A)—the provision on which Plaintiffs rely—nowhere even mentions aiding and abetting. Accordingly, to permit Plaintiffs' aiding-and-abetting claim, the Court needs to create an implied prohibition against aiding and abetting securities violations. But this Court is "not at liberty to rewrite the statute under the guise of judicial interpretation." *New Sun Bus. Park, LLC v. Yuma County*, 209 P.3d 179, 183 (Ariz. Ct. App. 2009).

Two other textual clues confirm that the Securities Act does not impose aiding-and-abetting liability. One, the Arizona Legislature knows how to prohibit aiding and abetting, *see* A.R.S. § 12-812; *id.* §§ 40-491(f), 492, illustrating that it likely acted intentionally by omitting aiding-and-abetting liability here. *See State v. Peek,* 195 P.3d 641, 644 (Ariz. 2008). Two, the Act imposes other types of secondary liability on those who "control" a primary violator. *See* A.R.S. § 14-1399(B); *infra* Section V.A. "The fact that the legislature saw fit specifically to include [control persons] within the limits of the Act would seem to indicate, under the expressio unius rule, that the legislative intent was to exclude other groups," including aider and abettors, from liability. *Ferrell v. Indus. Comm'n of Ariz.*, 288 P.2d 492, 495 (Ariz. 1955).

Finally, the Arizona Supreme Court has indicated that, "[u]nless there is a good reason for deviating from the United States Supreme Court's interpretation, [it] will follow the reasoning of that court in interpreting sections of [Arizona] statutes which are identical or similar to federal securities statutes." *State v. Gunnison*, 618 P.2d 604, 606 (Ariz. 1980). The U.S. Supreme Court has held that the federal securities laws do not prohibit aiding and abetting. *See Central Bank*, 511 U.S. at 177-78.

### 2. Plaintiffs have not shown that Mayer Hoffman "made, participated in, or induced" securities sales.

Even if the Securities Act prohibited aiding and abetting, any potential claim against Mayer Hoffman cannot proceed because Plaintiffs have not shown that it "made, participated in or induced the unlawful sale" of securities. A.R.S. § 44-2003(A); *see*

*supra* Section II.A.  As the Arizona Court of Appeals found, a private plaintiff may only bring suit against an aider and abettor if they make that showing.  *Grand*, 217 P.3d at 1211.  That is because no provision in the Act authorizes private parties to sue aiders and abettors.  Rather, they may only sue individuals identified in § 44-2003(A).  To permit an aiding-and-abetting claim without requiring factual allegations establishing participation or inducement would "gut the limitations . . . that the Arizona legislature imposed on civil liability for violations of § 44-1991 and allow parties that are unable to satisfy the requirements of § 44-2003(A) to simply allege that the defendant aided and abetted a violation of § 44-1991."  *Grand*, 217 P.3d at 1211 (internal quotation marks omitted).  Because Plaintiffs have not shown that Mayer Hoffman participated in or induced securities sales, Plaintiffs cannot seek remedies against it as an aider and abettor.

### 3. The Complaint fails to establish a "strong inference" that Mayer Hoffman knowingly assisted ML's alleged fraud.

Any potential aiding-and-abetting claim against Mayer Hoffman also must be dismissed because Plaintiffs have not met the stringent requirements for pleading that Mayer Hoffman knowingly assisted ML's and Radical Bunny's securities violations.  Plaintiffs must show not only that ML and Radical Bunny violated § 44-1991(A) and that Mayer Hoffman substantially assisted or encouraged that violation, but that it "*kn[e]w* that the conduct [it was] aiding and abetting [violated § 44-1991(A)]."  *Wells Fargo*, 38 P.3d at 23; *see Stern v. Charles Schwab & Co. Inc.*, No. CV-09-1229-PHX-DGC, 2010 WL 1250732, at *8 (D. Ariz. Mar. 24, 2010).

In addition, since aiding and abetting liability requires proof of a scienter, *Wells Fargo*, 38 P.3d at 23, this count triggers the Act's heightened pleading standards.  *See* A.R.S. § 44-2082(B).  To state a claim, a "complaint [must] state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *Id.* (emphasis added).  Under this standard, as the U.S. Supreme Court has held for an identical provision, "[a] complaint will survive . . . only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "When this type of claim is brought against an outside auditor . . . [this] pleading standard is especially stringent." *Karpov v. Insight Enter., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 2105448, at *4 (D. Ariz. Apr. 30, 2010).

Here, Plaintiffs have fallen well short of these requirements. At best, Plaintiffs have alleged that Mayer Hoffman failed to follow GAAP and GAAS. (*See* Compl. ¶¶ 311-375.) As a matter of law, however, these errors do not suffice because "violations of GAAP or GAAS, without more, may establish negligence but can *never* establish [a greater] scienter," including the knowledge required for aiding and abetting. *Karpov*, 2010 WL 2105448, at *5 (emphasis added); *see In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) (noting that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter"). That is the case no matter how many errors are alleged. *See Karpov*, 2010 WL 2105448, at *7 ("It is improper for a court to infer scienter simply based on the size of the allegedly fraudulent scheme."); *see also In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 246 (8th Cir. 2008) (holding that "an amalgam of unrelated GAAP violations, without more," is insufficient).

Nor do any of the supposed "red flags" that Plaintiffs identify (Compl. ¶ 322) create a strong inference that Mayer Hoffman knowingly assisted ML's and Radical Bunny's fraud. These red flags range from "the resignation of three members of senior management" to "[a] weakening economy." (*Id.*) None "suggest[s] actual awareness by [Mayer Hoffman] of any fraud," and Plaintiffs "have pointed to no 'tips,' letters, or conversations" with Mayer Hoffman about it. *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001). As one example, "[t]here are many possible reasons other than fraud for [the] high personnel turnover" that Plaintiffs allege. *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 316 (4th Cir. 2009). In any

event, even if a party "knew of red flags," that illustrates only that it "had reason to be suspicious about" another's activity. *Stern*, 2010 WL 1250732, at *11. Arizona cases on aiding and abetting, however, "make clear . . . that mere knowledge of suspicious activity is not enough." *Id.* at *9 (internal quotation marks omitted); *see Dawson v. Withycombe*, 163 P.3d 1034, 1052-53 (Ariz. Ct. App. 2007).

Finally, Plaintiffs have not made any allegations suggesting that Mayer Hoffman had an incentive to assist the alleged $900-million fraud scheme.   Without any explanation *why* Mayer Hoffman would "[have] thrown in [its] lot with the primary violators," *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) (internal quotation marks omitted), Plaintiffs' complaint fails.   Indeed, courts have recognized that "a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud." *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007 (S.D. Cal. 2000).  Here, for example, "[f]ees for [three] years' audits could not approach the losses [Mayer Hoffman] would suffer from a perception that it would muffle a client's fraud." *DiLeo*, 901 F.2d at 629.  Even assuming Plaintiffs seek to hold Mayer Hoffman for aiding-and-abetting, and that such a claim exists under the Securities Act, Plaintiffs' claim nevertheless would fail.

## III.   PLAINTIFFS CANNOT BRING A NEGLIGENT-MISREPRESENTATION CLAIM AGAINST MAYER HOFFMAN.

Plaintiffs' next count against Mayer Hoffman, a negligent-misrepresentation claim, fails to allege all necessary elements. Arizona has adopted Restatement (Second) of Torts § 552 to govern negligent misrepresentation. *See Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 546 P.2d 821, 823 (Ariz. 1976). Section 552 requires, among other things, that the plaintiff fall within the "limited group of persons" to which the defendant owes a duty and that the plaintiff "justifiabl[y] rel[y]" on the defendant's representations. Restatement (Second) of Torts § 552(1), (2)(a). The Complaint satisfies neither element.

**A.**   **As A Matter Of Law, Mayer Hoffman's Annual All-Purpose Audits Did Not Create A Duty Of Care To Plaintiffs.**

Plaintiffs cannot bring a negligent-misrepresentation claim against Mayer Hoffman because their Complaint cannot establish that ML requested audits for the *specific* purpose of providing assurances to Plaintiffs, as opposed to "all-purpose" audits.

Restatement (Second) of Torts § 552 imposes a "deliberatively restrictive" rule of liability "to encourage the free flow of commercial information." *Ellis v. Grant Thorton LLP*, 530 F.3d 280, 289 (4th Cir. 2008). To recover, "the plaintiff [must fall] within the limited class of persons to whom the defendant owes a duty." *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664, 672 (Ariz. 2010). A defendant that supplies information to another does not owe a duty to all third parties that the defendant knows "'might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon on it.'" *Kuehn v. Stanley*, 91 P.3d 346, 350 (Ariz. Ct. App. 2005) (quoting Restatement (Second) of Torts § 552 cmt. h). Rather, the defendant's duty flows only to the third parties in "the limited group of persons for whose benefit and guidance [the defendant] . . . knows that the recipient intends to supply" the information. Restatement (Second) of Torts § 552(2)(a).

Applying this dichotomy to accountants, "an auditor retained to conduct an annual audit and to furnish an opinion for no particular purpose generally undertakes no duty to third parties." *Bily*, 834 P.2d at 758 (adopting § 552). That is the case even though the auditor knows "[its audit reports] may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like." Restatement (Second) of Torts § 552, illus. 10. For an auditor to face liability to a company's investors, therefore, the investors must show not simply that the auditor knows that they may use the audit reports but also that the certain investors are the "*specifically intended* beneficiaries of [those] reports." *Gillespie v. Schneider*, No. 94-55995, 1996 WL 111593, at *2 (9th Cir. Mar. 13, 1996) (emphasis added) (internal quotation marks omitted); *see Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1201 n.2 (9th Cir. 2001) (noting that "in order to recover under a theory of

negligent misrepresentation, the plaintiff must be an intended beneficiary"). To make that determination, § 552 "creates *an objective standard* that looks to the specific circumstances (*e.g.*, supplier-client engagement and the supplier's communications with the [group of investors])." *Bily*, 834 P.2d at 769.

Here, Plaintiffs cannot show that they were specifically intended beneficiaries of Mayer Hoffman's audit reports. Indeed, the Complaint concedes that Mayer Hoffman served as ML's general auditor for a decade, providing yearly audits of ML's financial statements for general purposes. (Compl. ¶¶ 298-300); *see Bily*, 834 P.2d at 768. And despite the "30 sworn witness statements and production of hundreds of thousands of documents" in the investigation preceding this case (Compl. ¶ 126), Plaintiffs make no assertion that the engagement letters between ML and Mayer Hoffman acknowledged Plaintiffs' use of the reports. *See Bily*, 834 P.2d at 769 (analyzing "supplier-client engagement"). Nor do Plaintiffs make any claim that they directly communicated with Mayer Hoffman. *See id.* (analyzing "supplier's communications with the third party"). Finally, Plaintiffs do not cite a single meeting, letter, or conversation in which ML told Mayer Hoffman that it needed the audit reports to provide assurances to identifiable investors or creditors.

To be sure, the Complaint attempts to satisfy this "duty" element through *conclusory* assertions that Mayer Hoffman knew that ML and Radical Bunny used the audits to attract investors. It claims, for example, that "Mayer Hoffman knew its audit reports would be used and relied upon by . . . investors" and "that a central purpose of its audits" was to provide these assurances. (Compl. ¶¶ 302, 304, 430.) But the Court must disregard these conclusory allegations as they "are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1951. Indeed, Plaintiffs' allegations concerning Mayer Hoffman's knowledge and consent are *identical* to allegations rejected in *Iqbal*. There, the complaint alleged that the defendants "'knew of'" and "'agreed to'" the plaintiff's

1    "'conditions of confinement.'"   *Id.*   The Court refused to accept these conclusory

2    assertions to satisfy the scienter element.  *Id.*  That decision controls here.

3         That leaves Plaintiffs with a Mayer Hoffman risk assessment that allegedly

4    indicated that ML's "'financial statements'" (but not Mayer Hoffman's reports) "would

5    be used to secure additional funding and to provide evidence of financial stability to

6    investors.'" (Compl. ¶ 301.)  That allegation, however, just shows that it was reasonably

7    foreseeable that investors, creditors, and other sources of financing would look to ML's

8    financial statements, the precise type of allegation insufficient to create a duty under

9    § 552.  *See Bily*, 834 P.2d at 768.  "[T]o interpret the 'limited group' requirement as

10   including *all potential investors* would render that requirement meaningless."  *Scottish*

11   *Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 613 (5th Cir. 1996)

12   (emphasis added); *see Grant Thornton LLP v. Prospect High Income Fund*, No. 06-0975,

13   2010 WL 2636124, at *6 (Tex. Jul 02, 2010).  But that is exactly what the ML Plaintiffs

14   seek to do here.  Worse still, Plaintiffs seek to hold Mayer Hoffman liable not only for

15   investors in ML's *securities*, but also for investors in ML's *creditor* (Radical Bunny).

16   Section 552 was adopted for the very purpose of ensuring that auditors do not face

17   liability to all who rely on audit reports.

18        This case, therefore, falls squarely within Illustration 10 to § 552, which explains

19   that an accountant's "annual audit of the customary scope"—like the annual audits that

20   Mayer Hoffman performed—does not establish the accountant's duty to foreseeable

21   creditors or investors who may receive and rely on the audit report.  Even though the

22   auditor "knows that the financial statements, accompanied by an auditor's opinion, are

23   customarily used in a wide variety of financial transactions by the corporation and that

24   they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the

25   like, in numerous possible kinds of transactions," the auditor "is not liable."  Restatement

26   (Second) of Torts § 552, illus. 10; *see Hoffman v. Greenberg*, 767 P.2d 725, 727-28

27   (Ariz. Ct. App. 1988).  Because Plaintiffs have not alleged facts plausibly establishing

28

that they were *specifically intended beneficiaries* of Mayer Hoffman's audit reports, their negligent-misrepresentation claim fails.

**B.     Plaintiffs Do Not Allege That They Reasonably Relied On Any Mayer Hoffman Audit Reports.**

Plaintiffs also have failed to allege that they justifiably relied upon Mayer Hoffman's audit reports when making investment decisions.   A plaintiff "must show 'justifiable reliance' to prevail on a claim for negligent misrepresentation." *Kuehn*, 91 P.3d at 350. "[J]ustifiable reliance comprises two elements:  (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable." *Scottish Heritable*, 81 F.3d at 615. A failure to adequately plead this element requires dismissal. *See Linder v. Brown & Herrick*, 943 P.2d 758, 765 (Ariz. Ct. App. 1997).

Plaintiffs have not pleaded specific facts plausibly establishing that they relied on any Mayer Hoffman audit report, let alone all of them. *Twombly*, 550 U.S. at 555. Plaintiffs assert in conclusory fashion that Mayer Hoffman is liable "for pecuniary loss caused to Plaintiffs . . . by their justifiable reliance." (Compl. ¶ 433.) This "[t]hreadbare recital[] of the [reliance] element[]," however, does "not suffice." *Iqbal*, 129 S. Ct. at 1949; *see Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008).

None of the named ML Plaintiffs alleges that he even reviewed a Mayer Hoffman audit report.   Rather, the Complaint alleges generically that "[a]udited financial statements of [ML] were provided to [ML]  investors (and their financial advisors) through [ML's] POMs."  (Compl. ¶ 99.)  That is unacceptable, because the reliance element is gauged by "an *individual standard* of the plaintiff's own capacity and . . . knowledge." W. Page Keeton, Prosser & Keeton on Torts § 108, at 751 (5th ed. 1984) (emphasis added).  No Plaintiff, for example, identifies the audit report that he reviewed; the investment that he made because of it; or any other fact plausibly showing reliance. Indeed, Plaintiffs fail to allege facts explaining why it would important to rely on the audited financial statements of ML—which was the originator and servicer of the loans in

which Plaintiffs invested—rather than financial information about the loans themselves or the particular LLC's in which Plaintiffs invested. (Compl. ¶¶ 58, 99.) According to the Complaint, the loans themselves determined a particular investment's success or failure. (*Id.* ¶ 8.) None of the Plaintiffs alleges that he received or relied on any statements by Mayer Hoffman about the particular loans in which he was investing. Instead, the Court is left to speculate about "facts establishing justifiable reliance on the part of Plaintiff[s]." *Fromkin v. Indymac Bank FSB*, No. 10-CV-8014-PCT-PGR, 2010 WL 2541167, at *7 (D. Ariz. June 18, 2010).

The Radical Bunny Plaintiffs' position is even less plausible. They do not allege they received the audit reports, as is necessary to show reliance. *See Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000) ("The actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission."). Instead, they claim that "audited financial statements were provided to Radical Bunny's *managers*," who "acted as the Radical Bunny investors' *agents*." (Compl. ¶ 99 (emphases added).) They thus resort to a theory of indirect reliance based on the managers' reliance. But they cannot do so. The principals to a transaction cannot claim an agent's "reliance as their own while simultaneously asserting that [the agent's] knowledge should not bind them." *Grant Thornton*, 2010 WL 2636124, at *9. If the Radical Bunny Plaintiffs seek to rely on the Radical Bunny managers' reliance, they must accept the managers' knowledge, including of the falsity of the representations. (*See* Compl. ¶¶ 18, 90, 100.) Any reliance, therefore, was not justifiable. *See* Restatement (Second) of Torts § 541 ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false.").

## IV.   PLAINTIFFS CANNOT HOLD MAYER HOFFMAN LIABLE UNDER THE ARIZONA INVESTMENT MANAGEMENT ACT.

Plaintiffs also attempt to shoehorn their claims into the Arizona Investment Management Act, which governs investment advisers. *See* A.R.S. § 44-3101, et seq. Section 44-3241 of that Act prohibits "a person, in connection with a transaction . . . involving the provision of investment advisory services," from employing schemes to defraud, making material misstatements or omissions, or engaging in a practice that operates as a fraud. A.R.S. § 44-3241(A)(1)-(2), (4). Plaintiffs assert that Mayer Hoffman violated this provision (Count VI), and that it aided and abetted ML's and Radical Bunny's violation (Count VII). (Compl. ¶¶ 441, 445.) Neither Count can stand.

### A.   Plaintiffs Cannot State A Claim Directly Against Mayer Hoffman Under § 44-3241(B).

Plaintiffs' direct claims against Mayer Hoffman fail for two reasons: (1) Mayer Hoffman did not issue audits "in connection with . . . investment advisory services" and (2) Plaintiffs did not incur losses "as a result of" the audits. A.R.S. § 44-3241(A)-(B).

#### 1.   Mayer Hoffman's audit reports were not made in connection with investment advisory services.

Plaintiffs cannot proceed against Mayer Hoffman under § 44-3241(A) because its audits were not made "in connection with a transaction . . . involving the provision of investment advisory services." A.R.S. § 44-3241(A). Here, Plaintiffs assert in conclusory fashion that salespeople for ML, ML Securities (ML's broker-dealer), and Radical Bunny provided them "investment advisory services." (Compl. ¶¶ 438-39.) But "Plaintiffs must establish by more than conclusory allegations" that investment advisory services are at issue. *Hall v. Paine, Webber, Jackson & Curtis, Inc.*, No. 82 Civ. 2840, 1984 WL 812, at *2 (S.D.N.Y. Aug. 27, 1984); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 33 (S.D.N.Y. 2008). They have not.

*First*, the Complaint fails to identify the "transaction or transactions involving" investment advisory services. That language requires Plaintiffs to show a "business deal" that "ha[s] within or as part of itself" the provision of investment advisory services.

Webster's Third at 1191, 2426 (defining "transaction" and "involve"). The deal must "contain," as at least one of its terms, the provision of those services. *Id.* at 1191. Here, however, the Complaint's specific allegations assert that the deals involved *only* the sale of securities, not the sale of services by an investment adviser. As for ML and its salespeople, they sold investors "fractional interests called pass-throughs in the secured promissory notes signed by the developers." (Compl. ¶ 58.)   Nowhere does the Complaint allege that the ML salespeople sold investment advisory services in connection with their sale of the Pass-Through Interests. The same holds true for the Radical Bunny Plaintiffs.   They purchased interests in loans, not investment advice. (Compl. ¶ 90.)   Since the transactions were not about investment advice, they are not covered by § 44-3241(A).

*Second*, even if the transaction had contained some unidentified advice as part of the deal, that advice would not constitute "investment advisory services," *i.e.*, the services of an "investment adviser."   That is because ML, ML Securities, and Radical Bunny did not qualify as "investment advisers" under the Act.   It defines "investment adviser" as:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.

A.R.S. § 44-3101(5). Because the statute reaches only those "engage[d] in the business of advising others," the defendant must *regularly* provide investment advice to qualify. *Id.*   On the other hand, investment advice "incident to the main purpose" of the defendant's business does not trigger the statute. *Zinn v. Parrish*, 644 F.2d 360, 364 (7th Cir. 1981) (discussing similar federal statute); *see Pozez v. Ethanol Capital Mgmt., L.L.C.*, No. 07-cv-00319-TUC-CKJ, 2009 WL 2176574, at *6 (D. Ariz. July 21, 2009). Further, the defendant must receive "compensation" for that advice.   A.R.S. § 44-

3101(5). If, by contrast, a defendant provides investment advice at no charge, receiving compensation for other conduct, it does not qualify. *SEC v. Nat'l Executive Planners, Ltd.*, 503 F. Supp. 1066, 1074 (M.D.N.C. 1980); *see Washington v. Baenziger*, 656 F. Supp. 1176, 1177 (N.D. Cal. 1987) (noting that the federal statute reaches only "those who receive consideration for rendering investment advice").

Plaintiffs have not provided a factual basis for concluding that any of the entities involved was an investment adviser. *Kassover*, 619 F. Supp. at 33. As for ML and ML Securities, Plaintiffs make no claim that they paid them "compensation" for any reason, let alone for advising them about securities. A.R.S. § 44-3101(5). Indeed, the Complaint expressly indicates that ML generated its revenue, not from investment advice, but through mortgage-related fees, "including loan origination, servicing, and processing fees." (Compl. ¶ 8.) Nor do the ML Plaintiffs allege that ML or ML Securities *regularly* provided investment advice. They allege only that ML Securities sold securities (*id.* ¶ 75) and that ML operated as a private mortgage lender (*id.* ¶ 55). Any potential securities advice was "incident to [their] main purpose." *Zinn*, 644 F.2d at 364.

What is more, ML falls squarely within a safe harbor. The Act expressly excludes licensed "mortgage brokers" from the definition of investment adviser as long as the "performance of any investment advisory service is solely incidental to the conduct of [its mortgage] business" and it "receives no special compensation for providing investment advisory services." A.R.S. § 44-3101(5)(h). The Complaint concedes that ML, until its collapse in 2008, "operated as an Arizona-based mortgage broker." (Compl. ¶ 7; *see id.* ¶ 55.) Nowhere does it allege that ML provided "investment advisory services" that were unrelated to its mortgage business or that *ML* received special compensation for investment advice. (*Id.* ¶ 65; *see id.* ¶ 73.)

Nor does Radical Bunny meet the Act's definition of investment adviser. It did not provide investment advice to Radical Bunny Plaintiffs for compensation. Indeed, the only compensation those Plaintiffs allegedly paid Radical Bunny were the "redemption

fees" required if they redeemed interests early. (*Id.* ¶ 65.) Radical Bunny's other compensation—"two percentage points" of the total interest on ML's loans—came from ML, not Radical Bunny Plaintiffs. ML paid Radical Bunny that compensation because Radical Bunny provided it "an unsecured credit line," *i.e.*, "generated the funds that allowed [it] to operate." (*Id.* ¶¶ 61, 65).

        **2.**    **Plaintiffs have not adequately alleged that their losses were "incurred" "as a result of" Mayer Hoffman's audits.**

Nor can Plaintiffs show that their losses were caused by Mayer Hoffman's audit reports. Section 44-3241(B) only permits a person to recover "losses incurred by that person *as a result of* [the defendant's] violation." A.R.S. § 44-3241(B) (emphasis added). The plaintiff's loss must be a "consequence" of the defendant's violation, which requires a causal connection between the injury and the violation. *See* Webster's Third at 1937 (defining "result" as "something that results as a consequence, effect, issue, or conclusion"). Justifiable reliance is a traditional component of causation. *See Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 964 (9th Cir. 1990) (noting that "element of causation" requires "actual and justifiable reliance"). Not surprisingly, then, courts interpreting statutes with similar language have incorporated this reliance requirement. *See Hunt*, 538 F.3d at 227 (noting that a statute using "'as a result of'" language required "justifiable reliance"); *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993) (noting that a statute using similar "by reason of" language required reliance). Here, as already explained, *see supra* Section III.B, Plaintiffs have not adequately pleaded their justifiable reliance on Mayer Hoffman's audit reports. That failure dooms their Management Act claim as well.

    **B.**    **Plaintiffs Have Not Adequately Alleged That Mayer Hoffman Aided And Abetted An Investment Management Act Violation.**

Plaintiffs' aiding-and-abetting claim under the Management Act fails because the Act does not prohibit aiding and abetting. Nor have Plaintiffs stated plausible grounds.

1.    **The Management Act neither prohibits aiding and abetting nor establishes a private remedy for that conduct.**

By their aiding-and-abetting claim, Plaintiffs seek to hold Mayer Hoffman liable for ML's and Radical Bunny's alleged violations of § 44-3241. They cannot. To begin, § 44-3241 nowhere mentions "aiding and abetting." Under no reasonable construction, therefore, can § 44-3241 be read to proscribe that conduct. *Cf. Central Bank*, 511 U.S. at 177-78. This unambiguous language must be enforced as written. *See McPeak v. Indus. Comm'n*, 741 P.2d 699, 701 (Ariz. Ct. App. 1987). Extending the statute to reach aiding and abetting "must be accomplished by the legislature, not the courts." *Patches v. Indus. Comm'n of Ariz.*, 204 P.3d 437, 440 (Ariz. Ct. App. 2009).

In addition, § 44-3241's private right of action covers only "[a] person who violates this section." A.R.S. § 44-3241(B). Plaintiffs seek a remedy against not only persons who violate § 44-3241, but also against persons who aid and abet another's violation of it. "[W]here a statute expressly provides a particular remedy or remedies," however, "a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19-20 (1979) (refusing to expand the reach of the federal equivalent). To allow an additional remedy in the face of an express remedy, therefore, threatens to upset the legislature's compromises on the scope of potential remedies. *See Martin v. Althoff*, 557 P.2d 187, 190 (Ariz. Ct. App. 1976) ("[G]eneral sanctions imposed by statutes are exclusive and no cause of action or liability should be implied absent language to that effect."). Since the Management Act neither prohibits nor provides a remedy for aiding and abetting, the aiding-and-abetting claim against Mayer Hoffman necessarily fails.

2.    **Plaintiffs have not established plausible grounds that Mayer Hoffman aided and abetted ML's and Radical Bunny's violation of the Management Act.**

Even if aiding-and-abetting liability existed under the Management Act, Plaintiffs have failed to present plausible grounds that Mayer Hoffman aided and abetted violations of it. There can be no aiding and abetting liability without a primary violation. *Grand,*

2010 WL 3034515, at *5.  And because ML and Radical Bunny were not investment advisers, *see supra* Section IV.A.1, Plaintiffs have not alleged a primary violation.

Nor have Plaintiffs plausibly alleged aiding and abetting's "scienter" element, for the same reasons that they failed to allege scienter for purposes of their aiding-and-abetting claim under the Securities Act. *Wells Fargo*, 38 P.3d at 23; *see supra* Section II.B.3.  To overcome a motion to dismiss, the Complaint "must afford a basis for believing that [P]laintiffs could prove scienter." *DiLeo*, 901 F.2d at 629.  They cannot for the reasons already discussed.  Violations of GAAP and GAAS are legally insufficient to establish the scienter.  "Red flags" show at most that Mayer Hoffman had reason to be suspicious, not that it knew about fraud.  And Mayer Hoffman had nothing to gain—and a lot to lose—from covering up fraud.  *See, e.g., DiLeo*, 901 F.2d at 629; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *Stern*, 2010 WL 1250732, at *9, *11.  The Complaint's well-pleaded allegations do not plausibly establish that Mayer Hoffman knowingly assisted in violating the Management Act.

## V.   PLAINTIFFS CANNOT HOLD CBIZ VICARIOUSLY LIABLE FOR MAYER HOFFMAN'S ALLEGED CONDUCT.

Plaintiffs' claims against CBIZ—Count II and Count VII—also legally fail.  The first seeks to hold CBIZ "jointly and severally liable for Mayer Hoffman's violations of 44-1991(A)" under the Arizona Securities Act because CBIZ allegedly "controlled Mayer Hoffman within the meaning of A.R.S. § 44-1999(B)."  (Compl. ¶ 411.)  The second attempts to hold CBIZ vicariously liable for Mayer Hoffman's alleged Securities Act violation, Management Act violation, and negligent misrepresentation by resort to a common-law joint-venture theory.  (*Id.* ¶¶ 448-49.)  Both counts cannot proceed, however, because CBIZ lacked control over Mayer Hoffman's audit practices.

### A.   Plaintiffs Do Not State An Adequate Control-Person Claim Against CBIZ Under The Arizona Securities Act.

Count II seeks to hold CBIZ "jointly and severally liable for Mayer Hoffman's violations of 44-1991(A)" because it "controlled Mayer Hoffman within the meaning of

A.R.S. § 44-1999(B)."  (Compl. ¶ 411.)  Section 44-1999(B) provides that anyone who "directly or indirectly, controls any person liable for a violation of section 44-1991 or 44-1992 is liable jointly and severally with and to the same extent as the controlled person . . . ."  The Court should dismiss this claim against CBIZ for three independent reasons.

### 1.   Because Plaintiffs' claims against Mayer Hoffman under the Securities Act cannot stand, its claim against CBIZ also fails.

Plaintiffs' count against CBIZ under the Securities Act initially fails because their claims against Mayer Hoffman under that Act must be dismissed.  Section 44-1999(B) imposes liability on a control person "*to the same extent as* the controlled person." *Id.* (emphasis added).  Thus, "a 'control' person is not liable under that statute unless the controlled entity is itself also liable." *Grand*, 2010 WL 3034515, at *5.  Here, for the reasons articulated, *see supra* Section II, Plaintiffs' counts against Mayer Hoffman under the Securities Act do not state a claim.

### 2.   Plaintiffs fail to allege that CBIZ participated in or induced the securities sales at issue.

Plaintiffs' claim against CBIZ also cannot stand because the Securities Act requires them to show not simply that *Mayer Hoffman* "made, participated in or induced the unlawful sale" of securities, but also that *CBIZ* did so.  A.R.S. § 44-2003(A).  Section 44-2003(A) expressly identifies the individuals against whom a private action may be brought under § 44-2001(A), the provision on which Plaintiffs rely.  Nowhere does § 44-2003(A) list "control person" as an individual who may be sued.  Under the plain text of the statute, therefore, if a control person did not make, participate in, or induce the relevant securities sale, a plaintiff may not bring suit against the control person under § 44-2001.  Thus, in *Grand*—which the Arizona Supreme Court affirmed without analysis on this issue—the Court of Appeals held that "the requirements of § 44-2003(A) applied to the complaint's claim of 'control liability.'" 217 P.3d at 1208.[2]

---

[2] Of course, simply because private individuals may not sue every control person does not mean that these individuals can escape liability.  The Arizona Corporation

Plaintiffs do not even attempt to plead that CBIZ "participated in" or "induced" any sales of Pass-Through Interests.  They allege only that CBIZ "controlled Mayer Hoffman." (Compl. ¶ 411.)  That proves fatal to their control-person claim against CBIZ.

### 3.  The Complaint concedes that CBIZ did not control Mayer Hoffman's auditing practices.

Finally, Plaintiffs' claim against CBIZ cannot stand because CBIZ could not control Mayer Hoffman's audit work.  To establish control liability, a plaintiff must show that a control person has "the *power* to directly or indirectly control the activities of those persons or entities liable as primary violators of §§ 44-1991 and -1992." *E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 79 P.3d 86, 99 (Ariz. Ct. App. 2003).  The power to control *unrelated* actions does not suffice.  Rather, as unanimous federal law instructs, the control person must "possess[] the power to control the *specific transaction or activity* upon which the primary violation is predicated." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (emphasis added) (internal quotation marks omitted); *see Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 n.8 (10th Cir. 1998) (noting that "courts generally agree that the plaintiff need[s] [to] show the power to control the transaction underlying the alleged securities violation."); *see also* 1996 Ariz. Sess. Laws, ch. 197, § 11(C) (noting that "courts may use as a guide" analogous federal law).  In *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1067 (9th Cir. 2000), for example, the court granted summary judgment to an alleged control person because, although the person had a "general level of control," he did not have "the requisite actual authority over the" actions that were alleged to have violated the securities laws. *Id.* at 1067.

Here, CBIZ could not legally have "control[led] the specific . . . activity upon which the primary violation is predicated," namely, Mayer Hoffman's audits. *Brown*, 84 F.3d at 396.  To the contrary, the Complaint *concedes* that CBIZ did not control those

Commission may prosecute violations of § 44-1991(A) against "any person," A.R.S. § 44-2032, not simply those who "made, participated in or induced the unlawful sale . . . ," A.R.S. § 44-2003(A).

audits.  Specifically, it indicates that "[a]s a public company, CBIZ . . . cannot provide audit and other attest services." (Compl. ¶ 376.)  Instead, Mayer Hoffman must remain "nominally separate to satisfy *professional standards required for auditor independence*." (*Id.* ¶ 378 (emphasis added).)  As the Complaint makes clear, therefore, CBIZ "disclaim[ed] responsibility for [those] . . . services." (*Id.* ¶ 391.)  These admissions show that CBIZ lacked control over the audits that form the basis for the Counts against Mayer Hoffman.

Indeed, both as a legal and contractual matter, Mayer Hoffman retains the independence acknowledged in the Complaint.  Legally, state and national rules governing Certified Public Accountants ("CPAs") require the independence of accounting firms. *See* Ariz. Admin. Code § R4-1-455(A).  Practicing CPAs, for example, must retain a majority ownership of their accounting firm. *See* A.R.S. § 32-731(A)(2). CBIZ, in other words, cannot direct Mayer Hoffman's audit work through majority control.  And the Code of Professional Conduct of the American Institute of CPAs (AICPA) —which the Arizona Board of Accountancy considers persuasive, *see* Ariz. Admin. Code § R4-1-455.04—suggests that a firm's independence may be impaired in some circumstances where it offers both attest and non-attest services. *See* AICPA, Code of Prof'l Conduct § 101-3.  An accounting firm's relationship to a public company providing non-audit services, therefore, may also impair independence, and thus ethics rules regulate these relationships.  AICPA, Code of Prof'l Conduct § 101-14.  The accounting firm must always be "responsible, financially and otherwise, for all the attest work performed." *Id.*  Here, however, the "alternative practice structure" relationship between CBIZ and Mayer Hoffman alleged in the Complaint is expressly approved by AICPA and grants legally appropriate levels of independence to Mayer Hoffman. *Id.*

Contractually, the Administrative Services Agreement ("ASA") between CBIZ and Mayer Hoffman referenced in the Complaint adhered to these independence rules for Mayer Hoffman's audit work. (*See* Compl. ¶ 379.)  The ASA, for example, requires any

services rendered by any CPA to "be under the *direction, control, and supervision* of one of the owners of [Mayer Hoffman] and . . . rendered in accordance with the [Mayer Hoffman] Manual and other policies and procedures established by [it]." ASA § 4 (attached as Ex. A) (emphasis added).[3] The parties also "agree that certain work that could otherwise be performed by [CBIZ] is, *as a matter of law*, required to be performed by a certified public accountant" and that all such "Accounting Work shall be performed by [Mayer Hoffman]." *Id.* (emphasis added). As a contractual matter, therefore, Mayer Hoffman had complete control over its audits to ensure legal compliance.

Despite these rules, the Complaint still seeks to show the required control by relying on activities *other than* audit work. It points out, for example, that CBIZ provided numerous items to Mayer Hoffman to conduct its audits, including administrative services, equipment, office space, marketing materials, billing and collection services, and accounting personnel. (Compl. ¶¶ 379-90.) It also notes that CBIZ receives 85% of Mayer Hoffman's gross revenue as its services fee (*id.* ¶ 383; ASA § 7), and that Mayer Hoffman pays for certain audit-relating expenses, including continuing professional education, membership dues in professional organizations, and peer reviews of the CPAs under its supervision, (Compl. ¶ 383; ASA § 12.) None of these contractual terms, however, demonstrates that CBIZ controls the specific Mayer Hoffman activity that allegedly violated the Securities Act—its audit practices and procedures. That proves fatal to Plaintiffs' claim as a matter of law. *See Howard*, 228 F.3d at 1067.

Indeed, this case is on all fours with *In re Asia Pulp & Paper Secs. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003). There, the plaintiffs alleged that Arthur Andersen

---

[3] "[T]he 'incorporation by reference' doctrine" "permits [courts] to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks omitted).

Singapore conducted a fraudulent audit and sought to hold its parent company liable as a control person. *Id.* at 393. As here, the plaintiffs alleged that the parent, among other things, marketed a "'one-firm' concept"; had "partner overlap"; "shar[ed] costs and profits"; and maintained a "global infrastructure and administration." *Id.* at 393-94. The court, however, dismissed the control-liability count because the complaint was "bereft of any allegations that [the parent] . . . was able to control or in any way influence the *particular audits* conducted or *opinions* offered by its individual member firms." *Id.* at 396 (emphasis added). The same holds true here. Both legally and contractually, Mayer Hoffman—not CBIZ—controlled its audits.

**B.**    **Plaintiffs Do Not State A Claim Against CBIZ Under A Joint-Venture Theory.**

In Count VII, Plaintiffs attempt to hold CBIZ vicariously liable for Mayer Hoffman's actions by alleging that CBIZ and Mayer Hoffman "joint venturers" in connection with the audits. (Compl. ¶ 448.) Based on that allegation, the Complaint seeks to hold CBIZ liable for Mayer Hoffman's alleged Securities Act violation (Count I), Management Act violation (Count VI), and negligent misrepresentation (Count V). (*Id.* ¶ 449.) But the "joint venture" claim fares no better than the "control person" claim.

**1.**    **Since Plaintiffs cannot bring *primary* liability claims against Mayer Hoffman, they cannot bring a *vicarious* liability claim against CBIZ.**

Plaintiffs' joint-venture claim, like its control-person claim, depends on the viability of the underlying claims against Mayer Hoffman. A "joint venture . . . allegation[]" is a "form[] of derivative liability arising from the underlying substantive cause of action." *Lindquist v. Farmers Ins. Co. of Ariz.*, No. CV 06-597-TUC-FRZ, 2008 WL 343299, at *10 (D. Ariz. Feb. 06, 2008); *see Barabe v. Apax Partners Europe Managers, Ltd.*, 359 Fed. Appx. 82, 84 (11th Cir. 2009) (a "Joint Venture" count did "not plead [an] independent cause[] of action"). For the reasons already articulated, the Court

must dismiss Plaintiffs' claims against Mayer Hoffman under Counts I, V, and VI. *See supra* Sections II-IV. The Court thus must dismiss this joint-venture claim, as well.

### 2. A joint venture did not exist between Mayer Hoffman and CBIZ because CBIZ had no right to control Mayer Hoffman's audits.

Even if Plaintiffs had stated viable claims against Mayer Hoffman, the Court still must dismiss their joint-venture claim against CBIZ. "To constitute a valid joint venture under Arizona law, there must exist: (1) a contract; (2) a common purpose; (3) a community of interest; (4) an equal right to control; and (5) participation in the profits and losses." *Tanner Cos. v. Superior Court*, 696 P.2d 693, 695 (Ariz. 1985). Plaintiffs have not alleged sufficient facts to illustrate a joint venture here. *See Murry v. W. Am. Mortgage Co.*, 604 P.2d 651, 654 (Ariz. Ct. App. 1979) (dismissing complaint that "fail[ed] to allege facts establishing the essential elements of a joint venture").

To begin, because a joint-venture relationship "arises out of [an] express or implied contract," it "arises only where [the parties] intend to associate themselves as such." *Helfenbein v. Barae Inv. Co., Inc.*, 508 P.2d 101, 104 (Ariz. Ct. App. 1973)). It is black-letter law that "[w]here the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto." *Mining Inv. Group, LLC v. Roberts*, 177 P.3d 1207, 1211 (Ariz. Ct. App. 2008) (quoting *Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966)).

Here, while Plaintiffs refer to various provisions of the ASA (Compl. ¶¶ 379-89), they omit (but the Court may consider) the most relevant one. The ASA specifically states that "[t]his agreement does not constitute or involve *a joint venture*." ASA § 3 (emphasis added). The parties' intent could not be clearer. Arizona courts have referred to similar disclaimers when deciding that no joint venture exists. *See Nahom v. Blue Cross & Blue Shield of Ariz., Inc.*, 885 P.2d 1113, 1123 (Ariz. Ct. App. 1994) (relying on statement in participation agreement that parties "are not joint venturers.").

1    Confirming the ASA's plain text, the Complaint fails to show that CBIZ had "an

2  equal right to control" Mayer Hoffman's audit practices, an essential element for any

3  joint venture. *Hernandez*, 930 P.2d at 1312.  To do so, CBIZ must have "some voice or

4  right to be heard" concerning Mayer Hoffman's audit reports. *Id.* at 1313.  As explained

5  in detail above, *see supra* Section V.A, CBIZ did not.  *See In re Parmalat Secs. Litig.*,

6  377 F. Supp. 2d 390, 407 (S.D.N.Y. 2005) (dismissing joint-venture count against

7  "Deloitte Touche" entities for failure to plead firms controlled each other).

8                                      **CONCLUSION**

9    For the foregoing reasons, the Court should dismiss all counts against Mayer

10  Hoffman McCann P.C., CBIZ, Inc., and CBIZ MHM, LLC.

11    DATED August 16, 2010.              Respectfully submitted,

12

13                                        By: /s/ *Katherine V. Brown*
                                          Marty Harper
14                                        Katherine V. Brown
                                          Polsinelli Shughart, PC
15                                        Security Title Plaza
                                          3636 North Central Avenue, Suite 1200
16                                        Phoenix, AZ  85012
                                          *Local Counsel*
17
                                          David F. Adler (admitted pro hac vice)
18                                        James R. Wooley (admitted pro hac vice)
                                          Louis A. Chaiten (admitted pro hac vice)
19                                        Eric E. Murphy (admitted pro hac vice)
                                          Katie M. McVoy (admitted pro hac vice)
20                                        Jones Day
                                          Northpoint
21                                        901 Lakeside Avenue
                                          Cleveland, Ohio 44114
22                                        *Of Counsel*

23                                        Attorneys for Defendants
                                          Mayer Hoffman McCann P.C., CBIZ, Inc., and
24                                        CBIZ MHM, LLC

25

26

27

28

1

## CERTIFICATE OF SERVICE

2 I hereby certify that on August 16, 2010, I electronically filed the foregoing Joint Motion to

3 Dismiss Complaint with the Clerk of the Court using the CM-ECF system and serve the

4 following parties by U.S. mail:

5

6 Jeremy James Christian
Richard Glenn Himelrick
7 Tiffany & Bosco PA
Camelback Esplanade II
2525 E. Camelback Road, 3rd Floor
8 Phoenix, AZ 85016

Andrew S. Friedman
Bonnett Fairbourn Friedman &
Balint PC
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311

9 Ellen E. Oberwetter
Kevin M. Downey
10 Patrick J. Houlihan
Williams & Connolly LLP
11 725 12th St NW
Washington, DC 20005

Isabelle Carrillo Smith
Robert E. Gooding, Jr.
Scott Garner
Howrey LLP
4 Park Plaza, Suite 1800
Irvine, CA 92614-2559

12

13 Efren A. Compean
Thomas A. Ortiz
14 Garrett & Tully PC
225 S. Lake Avenue, Suite 1400
Pasadena, CA 91101-4869

David J. Ouimette
Mariscal Weeks McIntyre &
Friedlander PA
2901 N. Central Avenue, Suite 200
Phoenix, AZ 85012-2705

15

16 Thomas E. Littler, Esq.
GORDON SILVER
17 40 N. Central Avenue, Suite 2100
Phoenix, AZ 85004

Martin R. Galbut
Michaile J. Berg
GALBUT & GALBUT PC
2425 E. Camelback Road, Suite 1020
Phoenix, AZ 85016-4216

18

19 Francis J. Burke, Jr.
Michella A. Kras
20 STEPTOE & JOHNSON LLP
Collier Center
201 E. Washington St., 16th Floor
21 Phoenix, AZ 85004

22

23

24

25 /s/ Katherine V. Brown

26

27

28

# EXHIBIT A

## RESTATED ADMINISTRATIVE SERVICES AGREEMENT
### (Effective January 1, 2002)

This Restated Administrative Services Agreement (the "Agreement") is made and entered into this 13th day of December 2001, by and between Century Business Services, Inc., an Ohio corporation ("Century"), MHM Business Services, Inc., an Ohio corporation ("MHMBiz"), CBIZ of Southern California, Inc., an Ohio Corporation ("CBIZ of SoCal") and Mayer Hoffman McCann P.C., a Missouri Professional Corporation (the "Company"), and its individual owners. Mayer Hoffman McCann P.C. is the successor to Mayer Hoffman McCann L.C., a Missouri limited liability company

### RECITALS

In connection with certain Agreements and Plans of Merger Century, MHMBiz, CBIZ of SoCal (through its predecessor companies) and the Company and its owners agreed that (a) the Company, and its individual owners, would conduct a public accounting business comprised of performing audit, review and compilation services and rendering "attest services" (as such term is commonly defined in the accounting profession) to clients and, from time to time, providing technical and practice development services to other public accounting firms (collectively, the "CPA Business") while Century,MHMBiz, and CBIZ of SoCal (through its predecessor companies) would render a variety of management advisory and business-related services (other than "attest services"), and (b) Century and MHMBiz would provide certain services to the Company, and its individual owners, in connection with the Company's, and its individual owners' conduct of their Public Accounting business  CBIZ of SoCal has been added as a party to this agreement due to the admission of employees of CBIZ of SoCal into the ownership of the Company to be effective January 1, 2002.

1.    Retention of Century, MHMBiz and CBIZ of SoCal. The Company, and its individual owners, hereby retain each of Century, MHMBiz and CBIZ of SoCal to provide certain administrative, personnel, marketing and other support services to the Company (as enumerated more fully below and collectively referred to herein as the "Services") and Century, MHMBiz and CBIZ of SoCal hereby agree to continue to provide, or cause to be provided, such Services on the terms set forth in this Agreement.

2.    Range of Services to Be Provided. The Services to be provided to the Company shall include, but shall not be limited to, the following.

(a)    Provide day-to-day reception, telephone answering, secretarial, office bookkeeping and other administrative services as requested from time to time by the Company;

(b)    Provide assistance in preparing marketing and promotion materials with respect to the Company's business, including brochures, event planning and arranging for media coverage;

(c)    Provide personnel to keep books of accounts and records reflecting the Company's operations;

(d)    Provide personnel to process all invoices on behalf of the Company for materials, goods, equipment, and services purchased by the Company from third parties;

CONFIDENTIAL

MHM022514

(e)     Provide pe~~~nel to invoice and bill the Compa  's clients on behalf of the Company (but not including responsibility for collection of the Company's accounts' receivable or the handling of client engagement letters);

(f)     Make qualified personnel available to the Company so that the Company can handle its client engagements;

(g)     Provide personnel and equipment to handle employee tax returns and related filings;

(h)     Make technology options available to the Company; and

(i)     Provide other specific administrative, marketing or support services as may be mutually agreed upon from time to time.

The Services will be provided in accordance with the Century, MHMBiz and CBIZ of SoCal Quality Control Manuals and the Company Quality Control Document (the "Company Manual")     and procedures, as applicable.

3     Relationship Between the Parties; Independent Contractor Use of Century, MHMBiz and CBIZ of SoCal Personnel. With respect to the relationship between the Company, Century, MHMBiz and CBIZ of SoCal, it is hereby acknowledged and understood that each of the Company, Century, MHMBiz and CBIZ of SoCal is (i) a separate legal entity, with a separate governing body, officers and shareholders, (ii) conducting a separate business (as more fully described in Section 4 below), (iii) responsible for establishing its own policies, its capital budget and operating budgets and making its own investments in its business, and (iv) responsible for selecting, determining the compensation of and terminating of its personnel; and neither the existence of this Agreement, nor the providing of Services hereunder is intended to or shall be deemed to constitute control of the Company by Century, MHMBiz, CBIZ of SoCal or any of its affiliates. It is further understood and agreed that Century, MHMBiz and CBIZ of SoCal shall be rendering the Services to the Company as independent contractors, and that none of their officers or employees (other than those who are also employed by the Company) shall be deemed or construed to be an employee of the Company.  This Agreement does not constitute or involve a joint venture, a partnership or a profit sharing arrangement among the parties hereto  All personnel used in rendering the Services shall be employed by and compensated by Century, MHMBiz or CBIZ of SoCal.

4.     Personnel and Staffing  Each of Century, MHMBiz and CBIZ of SoCal will make its personnel available to provide the Services to the Company, and its individual owners, including, but not limited to, receptionists, secretaries, messengers and technical and computer personnel, as well as professional personnel with the background and experience, including certified public accountants ("CPAs"), to assist the Company and its individual owners in staffing engagements with the clients of the Company and its individual owners.. The Company and its individual owners will provide Century, MHMBiz and CBIZ of SoCal with a copy of its annual staffing plan, so that Century, MHMBiz and CBIZ of SoCal will be able to ensure they have adequate personnel to render the Services needed by the Company and its individual owners during the term hereof.  Century, MHMBiz and CBIZ of SoCal shall be responsible for providing the Services under this Agreement; provided however, that it is agreed and understood that those Services rendered to the Company and its individual owners by any of the CPAs (in his/her respective capacity as such) shall be under the direction, control and supervision of one of the owners of the Company and will be rendered in accordance with the Company Manual and other policies and procedures established by the Company from time to time.  It is further understood and agreed that (i) each of Century, MHMBiz and CBIZ of SoCal does not and will

CONFIDENTIAL

MHM022515

not perform the services ...ided in the CPA Business, but will ...se personnel available so that the Company and its individual owners can render such services to their clients in accordance with the Company's procedures and the Company Manual, and (ii) the Company and its individual owners do not and will not perform or provide any of the business services currently provided or which in the future may be provided by Century, MHMBiz, CBIZ of SoCal or any of their affiliates, except with the express permission of Century.

The parties hereby acknowledge and agree that certain work that could otherwise be performed by Century, MHMBiz or CBIZ of SoCal is, as a matter of law, required to be performed by a certified public accountant ("Accounting Work"). Century, MHMBiz and CBIZ of SoCal hereby acknowledge and agree that all such Accounting Work shall be performed by the Company and its individual owners through only the Company or some other certified public accounting firm affiliated with Century through an administrative service agreement. The parties hereby further acknowledge and agree that all work other than Accounting Work or any other work legally required to be performed by the Company or an individual CPA owner of Company shall be performed by Century, MHMBiz or CBIZ of SoCal.

5.    Equipment. Century, MHMBiz and CBIZ of SoCal will provide all the equipment required by the Company in order to perform the Services under this Agreement

6.    Site and Utilities. In conjunction with the rendering of the Services hereunder, Century, MHMBiz and CBIZ of SoCal will provide sufficient office space for the operation of the Company's business as presently conducted and will provide all electrical power, wiring for equipment, telephone services, custodial services, air ventilation and cooling systems, parking spaces, etc.

7    Service Fee  The Company shall pay Century, MHMBiz and/or CBIZ of SoCal a monthly fee in the aggregate amount of 85% of the Company's gross revenues, net of out-of-pocket costs (including copy charges, word processing, telephone charges, fax charges, travel costs, etc.), which amount represents actual invoiced amounts for the Company's Services, net of out-of-pocket costs. Each of Century, MHMBiz and CBIZ of SoCal will bill the Company for the Services provided during the month based upon gross revenue data, net of out-of-pocket costs, and the amount of fees collected by the Company in the previous month as supplied by the Company, and the Service Fee will be payable in full, within fifteen (15) days from when it is collected from its clients ("the Service Fee"). In the event that a State or other jurisdiction does not permit a service fee based on a percentage of revenues, the Service Fee for the operations conducted in that State's jurisdiction shall be calculated based on the hours worked on attestation engagements by Business Services personnel and a schedule of hourly rates for each individual employed by the Business Services Entity and each Professional CPA candidate staff employed by the Company. However, it is agreed that such Service Fee shall not exceed 85% of the Company's gross revenues, net of out-of-pocket costs, without the mutual consent of the Company, Century, MHMBiz and CBIZ of SoCal. The resulting Administrative Service Fee charge shall be billed monthly and paid by the Company within 15 days from when it is collected from its clients. In the event that amounts are not collected by the Company from its clients the Service Fee calculated above shall be reduced in the aggregate amount of 85% of Service Fee attributable to the uncollectible amounts. The remaining Service Fee due shall be paid by the Company within 30 days of the date the receivable is deemed to be uncollectible. The Service Fee may be modified at any time to the extent agreed to in writing by the parties hereto.

This agreement is based on the following assumptions:

MHM022516

(1)     The Company will be adequately capitalize.. ..ith minimum capital in the amount of the annual aggregate professional liability insurance deductible.

(2)     The Company will maintain professional liability insurance with a policy limit of $20,000,000 and an aggregate annual deductible of $300,000.

A renegotiation of this contract shall be required if the amount of capital in the Company falls below the annual aggregate professional liability insurance deductible after December 31, 2002, or if the availability of professional liability insurance with comparable limits and deductibles is not available at a cost within 25% of the previous year's insurance premiums, as adjusted for the additions and/or reductions in the number of shareholders and the related attest revenues.

In order to permit the parties to monitor each other's compliance with this agreement, the financial statements and/or annual tax returns of Century, MHMBiz, CBIZ of SoCal, and Company that pertain to any time period covered by this agreement shall be made available upon request to any party to this agreement.

The Service Fee does not include any federal, state, local or other governmental sales, use or excise tax (collectively, "Taxes"). Each of Century, MHMBiz and CBIZ of SoCal will not collect Taxes relating to the Service Fee from the Company or remit Taxes to a governmental authority because it is the opinion of the parties hereto that federal, state and local laws do not require Taxes to be levied with respect to the Services In the event any such Taxes are subsequently imposed by any authority, the Company shall be responsible for any amounts relating to such Taxes for the period(s) covered by this Agreement. The provisions of this Section 7 relating to Taxes shall survive the termination of this Agreement.

The MHMBiz shall pay the Company an amount equal to all payroll costs plus burden costs (including but not limited to payroll taxes, health insurance, retirement plan contributions, workmen's compensation insurance, etc.) for all compensation paid to Professional CPA candidates employed by the Company. Such candidates must be only those employed by Company in order for the candidates to obtain experience credit necessary to obtain certification, a permit, or licensing as a CPA. Professional Staff shall not include costs incurred for independent contractors by the Company

Century, MHMBiz and CBIZ of SoCal shall make a best efforts attempt to add or maintain the Company as an additional "named insured" on their employer's liability policies and employee travel insurance policies. If such coverage is not available or not obtained, Century, MHMBiz and CBIZ of SoCal shall reimburse the Company for such insurance coverage or losses.

8.     Term and Termination. Subject to the provisions of Section 9 hereof, the initial term of this Agreement shall be ten (10) years from the date hereof, and shall renew automatically for successive additional ten (10) year terms; provided, however, that written notice of cancellation is not forwarded to by one party to the other party one hundred eighty (180) days prior to the expiration of the initial term or any renewal term of this Agreement.

9     Default or Insolvency. In addition to any other rights any of the parties to this Agreement may have, (i) each of Century, MHMBiz and CBIZ of SoCal shall have the right to terminate this Agreement if at any time the Company fails to pay the Service Fee due hereunder, and if such default continues for a thirty (30) day period after written notice of such default to the Company, (ii) the Company shall have the right to terminate this Agreement if at any time Century or MHMBiz fails to provide the Services to a material extent and such material failure continues for a thirty (30) day period after written notice thereof to Century, MHMBiz or

CONFIDENTIAL

MHM022517

CBIZ of SoCal, as the case may be, and (iii) by the remaining part, one party files a petition in, bankruptcy, is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of its creditors or if a receiver is appointed for it or its business.

10.     Liability Insurance. Each of Century, MHMBiz and CBIZ of SoCal shall be liable to the Company for, and shall defend, indemnify and hold the Company harmless from and against any loss or liability caused by Century, MHMBiz and CBIZ of SoCal's negligence or failure to comply with its obligations hereunder.  The Company shall be liable to Century, MHMBiz and CBIZ of SoCal, and shall defend, indemnify and hold Century, MHMBiz and CBIZ of SoCal harmless from and against any loss or liability caused by the Company's negligence or failure to comply with its obligations hereunder. Each party to this Agreement shall procure and maintain in effect appropriate comprehensive liability insurance and appropriate professional general liability coverage covering the acts and omission of its owners, agents, contractors and employees  Each party shall provide the other parties with certificates of insurance evidencing the coverages required under this Section 10 and providing for not less than thirty (30) days' prior notice of cancellation thereof to the other party to this Agreement.  Since it may be in the best interests of the Company, Century, MHMBiz and CBIZ of SoCal to coordinate their professional general liability with the same insurance company, the parties agree to keep each other informed on plans for selection of an insurance company for professional liability insurance coverage.

11.     Confidentiality.  Each of Century, MHMBiz and CBIZ of SoCal understands that in the performance of the Services under this Agreement, it must conduct its activities in a manner designed to protect information of a proprietary nature and information regarding the Company clients, from improper use or disclosure. Each of Century, MHMBiz and CBIZ of SoCal agrees to use reasonable efforts consistent with practices customary in the public accounting industry in training and supervising its employees and in otherwise performing its duties hereunder to achieve this result  In furtherance of this obligation, Century, MHMBiz and CBIZ of SoCal agrees, at the Company's request, to require its employees to execute written undertakings to facilitate compliance with the foregoing confidentiality provision.

12.     Licenses and Permits; Access to CPAs.  Each party hereby agrees that it and its respective personnel shall comply with all applicable State licensing, and other applicable governmental and legal requirements.  In connection with the Company's licensing with State of Missouri Board of Accountancy and the State of California Board of Accountancy (the "Boards"), other state associations and organizations of which the Company is a member and the American Institute of Certified Public Accountants, it is specifically agreed and understood that Century, MHMBiz and CBIZ of SoCal will make the CPAs available for, and the Company will be responsible for the cost of, peer reviews, continuing professional education and other requirements imposed on the Company and on any individual CPAs used by it pursuant to this Agreement.

Specifically, the Company shall pay for all of the continuing professional education, CPA licensing, memberships in the AICPA and applicable State Societies of CPAs for its owners, employees and those individuals meeting the definition of professionals as defined in the SECPS peer review literature (professional personnel who devote at least 25 percent of their time performing attest engagements, or who have responsibility for the supervision or review of such engagements).   The Company shall not be responsible for the costs of continuing professional education, CPA licensing, AICPA memberships or State Society memberships for those individuals that do not meet the above criteria.

13.     Designation of Liaison.  Century, MHMBiz and the Company will each designate a liaison for the purposes of facilitating the rendering of the Services contemplated by this Agreement. The initial liaisons are as follows:

CONFIDENTIAL

MHM022518

Century                          ᴧael Gleespen
MHMBiz                           J. Timothy Hannan
CBIZ of SoCal                    Mark Luttrell
Mayer Hoffman McCann P.C.        William L. Hancock

14.   Effect of Termination.  Within thirty (30) days after termination of this Agreement, Century, MHMBiz and CBIZ of SoCal shall turn over to the Company all funds, books and records that are the property of the Company. Termination of this Agreement shall not affect the claims of any of the parties for obligations accruing or alleged defaults occurring prior to the termination.

15.   Quality Control System.  Century acknowledges that the Company's relationship with Century, MHMBiz and CBIZ of SoCal through this agreement impacts the system of quality control for the accounting and auditing practice of the Company. As a result, Century, MHMBiz and CBIZ of SoCal agree to establish, operate and monitor an adequate system for the quality control element of independence, integrity and objectivity for Direct Superiors and Indirect Superiors and other Century entities, as defined in AICPA Ethics Interpretation 101-14, or other applicable standard under state law or professional standards.  Results of the independent monitoring results are to be reported to the Company on an annual basis.

In the event of a regulatory challenge of the Company's practice structure by a State Board of Accountancy, the Securities Exchange Commission or other regulatory authority, Century, MHMBiz and CBIZ of SoCal shall provide the defense costs associated with the challenge

16.   Miscellaneous.

(a)   Complete Agreement.  This Agreement contains the entire agreement among the parties relating to the subject matter hereof and memorializes and supersedes any prior discussions, negotiations, representations or agreements among them relating to the matters described herein. No additions or other changes to this Agreement shall be made or be binding on a party unless made in writing and signed by each party to this Agreement

(b)   Assignment; Successors   This Agreement shall not be assignable by the Company without the prior written consent of the other parties; provided however, that each of Century, MHMBiz and CBIZ of SoCal may assign this Agreement to an affiliate without the prior written consent of the Company.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each party to this Agreement.

(c)   Notices.  All statements, notices and other communications to be given under this Agreement will be in writing and will be deemed to have been duly given when delivered in person or via facsimile or mail by registered or certified mail, return receipt requested, to the address set forth below.

(a)   If to Century, MHMBiz or CBIZ of SoCal:

Century Business Services, Inc.
6480 Rockside Woods Blvd., South
Suite 330
Cleveland, Ohio 44131
Phone: (216) 447-9000; Fax: (216) 447-9007
Attn: Michael Gleespen

With a copy to:

CONFIDENTIAL

MHM022519

Akin Gump Strauss Hauer & Feld, LLP
1700 Pacific Avenue
Suite 4100
Dallas, Texas 75201-4675
Phone:  (214) 969-4256
Attn:  Tracy Crum

(b)  If to the Company:

Mayer Hoffman McCann P.C.
420 Nichols Road
Kansas City, Missouri 64112
Phone:(816) 968-1900; Fax:(816) 531-7695
Attn:  William L. Hancock

With a copy to:

Lewis, Rice & Fingersh, L.C.
One Petticoat Lane
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Phone:(816) 421-2500; Fax: (816) 472-2500
Attn:  Stan Johnston, Esq.

(d)    Governing Law.  This Agreement shall be deemed to be an agreement made under the laws of the State of Ohio, and for all purposes shall be construed and enforced in accordance with and governed by the laws of the State of Ohio.

(e)    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(f)    Waivers.  The failure of a party to exercise any of its rights under this agreement on one occasion shall not waive such party's right to exercise its rights on another occasion.

IN WITNESS WHEREOF, the parties, by their duly authorized officers, have executed this Agreement as of the date first above written

CENTURY BUSINESS SERVICES, INC.

By: _____
              Leonard Miller

Its: _____

By: _____
              Michael Glaespen

Its: _____

CONFIDENTIAL

Akin Gump Strauss Hauer & Feld, LLP
1700 Pacific Avenue
Suite 4100
Dallas, Texas 75201-4675
Phone: (214) 969-4256
Attn: Tracy Crum

    (b)     If to the Company:

Mayer Hoffman McCann P.C.
420 Nichols Road
Kansas City, Missouri 64112
Phone:(816) 968-1900; Fax:(816) 531-7695
Attn: William L. Hancock

With a copy to:

Lewis, Rice & Fingersh, L.C.
One Petticoat Lane
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Phone:(816) 421-2500; Fax: (816) 472-2500
Attn: Stan Johnston, Esq.

(d)     Governing Law.  This Agreement shall be deemed to be an agreement made under the laws of the State of Ohio, and for all purposes shall be construed and enforced in accordance with and governed by the laws of the State of Ohio.

(e)     Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(f)     Waivers.  The failure of a party to exercise any of its rights under this agreement on one occasion shall not waive such party's right to exercise its rights on another occasion.

    IN WITNESS WHEREOF, the parties, by their duly authorized officers, have executed this Agreement as of the date first above written.


                    CENTURY BUSINESS SERVICES, INC.


                    By:_____
                              Leonard Miller

                    Its:_____

                    By:_____
                              Michael Gherspen

                    Its: Corp. Secretary


CONFIDENTIAL                                      MHM022521

MHM BUSINESS SERVICES, INC

By:_____
                    J. Timothy Hannan

Its:_____

CBIZ OF SOUTHERN CALIFORNIA, INC

By:_____
                    Mark Luttrell

Its:_____

Mayer Hoffman McCann P C

By:_____
                    William L Hancock

Its:_____

CONFIDENTIAL

MHM022522

MHM BUSINESS SERVICES, INC

By: _____
        J. Timothy Hannan

Its: _____

CBIZ OF SOUTHERN CALIFORNIA, INC.

By: _____
        Mark Luttrell

Its: _____

Mayer Hoffman McCann P.C.

By: _____
        William L. Hancock

Its: _____

MHM022523

*I*

## AMENDMENT NO. 1 TO
## RESTATED ADMINISTRATIVE SERVICES AGREEMENT
### (Effective January 1, 2002)

This Amendment No. 1 (the "Amendment") dated as of _August 5_, 2003 amends the Restated Administrative Services Agreement (the "Agreement") made and entered into the 13th day of December 2001, by and between Century Business Services, Inc., an Ohio corporation ("Century"), MHM Business Services, Inc., an Ohio corporation ("MHMBiz"), CBIZ of Southern California, Inc., an Ohio Corporation ("CBIZ of SoCal") and Mayer Hoffman McCann P.C., a Missouri Professional Corporation (the "Company"), and its individual owners. Mayer Hoffman McCann P.C. is the successor to Mayer Hoffman McCann L.C., a Missouri limited liability company.

NOW THEREFORE, in consideration of the mutual covenants contained in this Amendment the parties agree as follows:

A.   Amendments to the Agreement

1.      The following subsection is added to Paragraph 7 of the Agreement:

Service Fee. The Company shall pay Century, MHMBiz and/or CBIZ of SoCal a monthly fee in the aggregate amount of 85% of the Company's gross revenues, net of out-of-pocket costs (including copy charges, word processing, telephone charges, fax charges, travel costs, etc.), which amount represents actual invoiced amounts for the Company's Services, net of out-of-pocket costs (the "Service Fee").

In the event that a State or other jurisdiction does not permit a service fee based on a percentage of revenues, the Service Fee for the operations conducted in that State's jurisdiction shall be calculated based on the hours worked on attestation engagements by Business Services personnel and a schedule of hourly rates for each individual employed by the Business Services Entity and each Professional CPA candidate staff employed by the Company. However, it is agreed that such Service Fee shall not exceed 85% of the Company's gross revenues, net of out-of-pocket costs, without the mutual consent of the Company, Century, MHMBiz and CBIZ of SoCal.

The resulting Administrative Service Fee charge shall be billed or booked monthly. To the extent that the Company collects invoiced amounts from its clients, the Service Fee shall be paid by the Company within five (5) days from the final business day of each month in which it is collected from its clients. MHMBiz, CBIZ of SoCal, or any other subsidiary of Century that is a party to this agreement by adoption will pay, as collection agent for the Company, 15% of the invoiced revenue to Company within five (5) days from the final business day of the month that is ninety (90) days after the invoice date.

In the event that amounts are not collected by the Company from its clients the Service Fee calculated above shall be reduced in the aggregate amount of 85% of Service

CONFIDENTIAL

MHM022524

Fee attributable to the uncollectible amounts. The remaining Service Fee due shall be adjusted and paid by the Company within 30 days of the date the receivable is deemed to be uncollectible. The parties are obligated to commence collection procedures, agreeable to the parties (which agreement shall not be unreasonably withheld), with respect to any unpaid account receivable related to invoiced amounts ninety (90) days following the invoice date.

The Service Fee may be modified at any time to the extent agreed to in writing by the parties hereto.

This agreement is based on the following assumptions:

(1)     The Company will be adequately capitalized with minimum capital in the amount of the annual aggregate professional liability insurance deductible.

(2)     The Company will maintain professional liability insurance with a policy limit of $20,000,000 and an aggregate annual deductible of $300,000.

A renegotiation of this contract shall be required if the amount of capital in the Company falls below the annual aggregate professional liability insurance deductible after December 31, 2002, or if the availability of professional liability insurance with comparable limits and deductibles is not available at a cost within 25% of the previous year's insurance premiums, as adjusted for the additions and/or reductions in the number of shareholders and the related attest revenues.

In order to permit the parties to monitor each other's compliance with this agreement, the financial statements and/or annual tax returns of Century, MHMBiz, CBIZ of SoCal, and Company that pertain to any time period covered by this agreement shall be made available upon request to any party to this agreement.

The Service Fee does not include any federal, state, local or other governmental sales, use or excise tax (collectively, "Taxes"). Each of Century, MHMBiz and CBIZ of SoCal will not collect Taxes relating to the Service Fee from the Company or remit Taxes to a governmental authority because it is the opinion of the parties hereto that federal, state and local laws do not require Taxes to be levied with respect to the Services In the event any such Taxes are subsequently imposed by any authority, the Company shall be responsible for any amounts relating to such Taxes for the period(s) covered by this Agreement. The provisions of this Section 7 relating to Taxes shall survive the termination of this Agreement.

The MHMBiz shall pay the Company an amount equal to all payroll costs plus burden costs (including but not limited to payroll taxes, health insurance, retirement plan contributions, workmen's compensation insurance, etc.) for all compensation paid to Professional CPA candidates employed by the Company. Such candidates must be only

CONFIDENTIAL                                                      MHM022525

those employed by Company in order for the candidates to obtain experience credit necessary to obtain certification, a permit, or licensing as a CPA. Professional Staff shall not include costs incurred for independent contractors by the Company.

Century, MHMBiz and CBIZ of SoCal shall make a best efforts attempt to add or maintain the Company as an additional "named insured" on their employer's liability policies and employee travel insurance policies. If such coverage is not available or not obtained, Century, MHMBiz and CBIZ of SoCal shall reimburse the Company for such insurance coverage or losses.

B.   Miscellaneous

1.   Agreement in Effect.  Except as expressly amended or modified by this Amendment, the Agreement remains unchanged and in full force and effect. The parties to this Amendment represent, warrant and agree that no defense to the enforcement of the Amendment and the Agreement shall be raised based upon the absence of agreement to or signature on this Amendment of any individual or other party who assented to or signed the Agreement.

2.   Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to principles of conflict of laws. The parties hereby irrevocably submit to the jurisdiction of the courts in the state of Ohio (state or federal), with venue in Cuyahoga County, over any dispute or proceeding arising out of this Agreement and agree that all claims regarding such dispute or proceeding shall be heard and determined in such court. The parties to this Amendment hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection they may have to the venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

3.   Construction of Document.  The language of this Amendment shall be construed as a whole according to its fair meaning and not strictly for or against one or any of the parties hereto.

4.   Counterparts.  This Amendment may be executed in counterparts which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written above.

5.   Final Expression.  The Amendment (i) integrates all the terms and conditions mentioned herein or therein or incidental hereto or thereto, (ii) supercedes all negotiations, oral communications, and prior writings with respect to the subject matter hereof and thereof, and (iii) is intended by the parties as the final expression of the agreement with respect to the terms and conditions set forth in this Amendment, and as the complete and exclusive statement of the terms agreed to by the parties of this Amendment.

CONFIDENTIAL                                                                 MHM022526

6. <u>Survival</u>. Should any part, term, provision, or section of this Amendment be declared or determined by any court or other tribunal to be illegal or invalid, the validity of the remaining parts, terms, provisions, or sections shall not be affected thereby and the illegal or invalid part, term, provision, or section shall be deemed not to be a part of this Amendment.

7. <u>Assignment; Successors</u>. This Agreement shall not be assignable by the Company without the prior written consent of the other parties; provided however, that each of Century, MHMBiz and CBIZ of SoCal may assign this Agreement to an affiliate without the prior written consent of the Company. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each party to this Agreement.

8. <u>Waivers.</u> The failure of a party to exercise any of its rights under this agreement on one occasion shall not waive such party's right to exercise its rights on another occasion.

9. <u>Notices</u>. All statements, notices and other communications to be given under this Agreement will be in writing and will be deemed to have been duly given when delivered in person or via facsimile or mail by registered or certified mail, return receipt requested, to the address set forth below.

      (a)    If to Century, MHMBiz or CBIZ of SoCal:

Century Business Services, Inc.
6480 Rockside Woods Blvd., South
Suite 330
Cleveland, Ohio 44131
Phone: (216) 447-9000; Fax: (216) 447-9007
Attn: Michael Gleespen

With a copy to:

Akin Gump Strauss Hauer & Feld, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Phone: (202) 887-4000
Fax: (202) 887-4288
Attn: Paul Belvin

      (b)    If to the Company:

Mayer Hoffman McCann P.C.
420 Nichols Road
Kansas City, Missouri 64112

CONFIDENTIAL

MHM022527

Phone:(816) 968-1900; Fax:(816) 531-7695
Attn: William L. Hancock

With a copy to:

Lewis, Rice & Fingersh, L.C.
One Petticoat Lane
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Phone:(816) 421-2500; Fax: (816) 472-2500
Attn: Stan Johnston, Esq.

IN WITNESS WHEREOF, a duly authorized signatory has signed this Amendment on behalf of each party as of the date first written above.

CENTURY BUSINESS SERVICES, INC.

By: _____
        Leonard Miller

Its: _____

By: _____
        Michael Gleespen

Its: _____

MHM BUSINESS SERVICES, INC.

By: _____
        J. Timothy Hannan

Its: _____

CBIZ OF SOUTHERN CALIFORNIA, INC.

By: _____

MHM022528

Mark Luttrell

Its: _PRESIDENT_____

Mayer Hoffman McCann P.C.

By: _William L. Hancock_____
    William L. Hancock

Its: _President_____

**CONFIDENTIAL**

**MHM022529**

DEC. 30. 2005   9:59AM   MHM BUSINESS SERVICES                    NO.745    P.2/11

## AMENDMENT NO. 2 TO
## RESTATED ADMINISTRATIVE SERVICES AGREEMENT

This Amendment No. 2 (the "Amendment"), dated as of January 1, 2006, amends the Restated Administrative Services Agreement, made and entered into the 13th day of December 2001, by and between CBIZ, Inc., f.k.a. Century Business Services, Inc., an Ohio corporation ("Century"), CBIZ Accounting, Tax & Advisory of Kansas City, Inc., f.k.a. MHM Business Services, Inc., an Ohio corporation ("MHMBiz"), CBIZ of Southern California, LLC, f.k.a. and the successor of CBIZ of Southern California, Inc., an Ohio Corporation ("CBIZ of SoCal") and Mayer Hoffman McCann P.C., a Missouri Professional Corporation (the "Company"), and its individual owners, as amended by Amendment No. 1 to Restated Administrative Services Agreement, dated as of August 5, 2003 (as amended, the "Agreement").

NOW THEREFORE, in consideration of the mutual covenants contained in this Amendment the parties agree as follows:

A. Amendments to the Agreement

1.     Section 8 of the Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"8.     Term and Termination.   Subject to the provisions of Section 9 hereof, the initial term of this Agreement shall commence on the date hereof and continue until March 8, 2019, and shall renew automatically for successive ten (10) year terms; provided, however, that written notice of cancellation is not forwarded by one party to the other party one hundred eighty (180) days prior to the expiration of the initial term or any renewal term of this Agreement.  In the event that either party provides written notice of cancellation to the other party one hundred eighty (180) days prior to the expiration of the initial term or any renewal term of this Agreement, this Agreement shall terminate on the date that is five (5) years after the date of expiration of the initial term or the current renewal term, whichever is longer."

B. Miscellaneous

1. Agreement in Effect. Except as expressly amended or modified by this Amendment, the Agreement remains unchanged and in full force and effect. The parties to this Amendment represent, warrant and agree that no defense to the enforcement of the Amendment and the Agreement shall be raised based upon the absence of agreement to or signature on this Amendment of any individual or other party who assented to or signed the Agreement.

2. Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to principles of conflict of laws. The parties hereby irrevocably submit to the jurisdiction of the courts in the state of Ohio (state or federal), with venue in Cuyahoga County, over any dispute or

**CONFIDENTIAL**

**MHM022530**

DEC.30.2005   9:54AM   MH   'USINESS SERVICES                   NO.745   P.3/11

proceeding arising out of this Agreement and agree that all claims regarding such dispute or proceeding shall be heard and determined in such court. The parties to this Amendment hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection they may have to the venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

3. <u>Construction of Document</u>. The language of this Amendment shall be construed as a whole according to its fair meaning and not strictly for or against one or any of the parties hereto.

4. <u>Counterparts</u>. This Amendment may be executed in counterparts which, taken together, shall constitute one and the same agreement and shall be effective as of the date first written above.

5. <u>Final Expression</u>. The Amendment (i) integrates all the terms and conditions mentioned herein or therein or incidental hereto or thereto, (ii) supercedes all negotiations, oral communications, and prior writings with respect to the subject matter hereof and thereof, and (iii) is intended by the parties as the final expression of the agreement with respect to the terms and conditions set forth in this Amendment, and as the complete and exclusive statement of the terms agreed to by the parties of this Amendment.

6. <u>Survival</u>. Should any part, term, provision, or section of this Amendment be declared or determined by any court or other tribunal to be illegal or invalid, the validity of the remaining parts, terms, provisions, or sections shall not be affected thereby and the illegal or invalid part, term, provision, or section shall be deemed not to be a part of this Amendment.

7. <u>Assignment; Successors</u>. This Agreement shall not be assignable by the Company without the prior written consent of the other parties; provided however, that each of Century, MHMBiz and CBIZ of SoCal may assign this Agreement to an affiliate without the prior written consent of the Company. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each party to this Agreement.

8. <u>Waivers</u>. The failure of a party to exercise any of its rights under this agreement on one occasion shall not waive such party's right to exercise its rights on another occasion.

9. <u>Notices</u>. All statements, notices and other communications to be given under this Agreement will be in writing and will be deemed to have been duly given when delivered in person or via facsimile or mail by registered or certified mail, return receipt requested, to the address set forth below.

      (a)    If to Century, MHMBiz or CBIZ of SoCal:

**CONFIDENTIAL**

Century Business Services, Inc.
6050 Oak Tree Blvd. South, South
Suite 500
Cleveland, Ohio 44131
Phone: (216) 447-9000; Fax: (216) 447-9007
Attn: General Counsel

With a copy to:

Akin Gump Strauss Hauer & Feld, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Phone: (202) 887-4000
Fax: (202) 887-4288
Attn: Tony Renzi

(b)   If to the Company:

Mayer Hoffman McCann P.C.
11440 Tomahawk Creek Parkway
Kansas City, Missouri 66211
Phone:(913) 234-1000; Fax: (913) 234-1100
Attn: William L. Hancock

With a copy to:

Lewis, Rice & Fingersh, L.C.
One Petticoat Lane
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Phone:(816) 421-2500; Fax: (816) 472-2500
Attn: Stan Johnston, Esq.

CONFIDENTIAL

MHM022532

IN WITNESS WHEREOF, a duly authorized signatory has signed this
Amendment on behalf of each party as of the date first written above.

CBIZ, INC.

By: _____
          Michael Gleespen

Its:  Corporate Secretary and General Counsel

CBIZ Accounting, Tax & Advisory of Kansas City, Inc.

By: _____
          J. Timothy Hannan

Its: President

CBIZ OF SOUTHERN CALIFORNIA, LLC

By: _____
          Mark Luttrell

Its: President

Mayer Hoffman McCann P.C.

By: _____
          William L. Hancock

Its: President

CONFIDENTIAL

MHM022533