Martin R. Galbut, Esq. (#002943)
Michaile J. Berg, Esq. (#027166)
GALBUT & GALBUT, P.C.
2425 East Camelback Road, Suite 1020
Phoenix, Arizona 85016
Telephone: (602) 955-1455
Facsimile: (602) 955-1585
docket@galbutlaw.com

Kevin M. Downey, Esq. (#438547)
Ellen E. Oberwetter, Esq. (#480431)
Patrick J. Houlihan, Esq. (#502396)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
kdowney@wc.com
eoberwetter@wc.com
phoulihan@wc.com
Admitted *Pro Hac Vice*

*Attorneys for Greenberg Traurig, LLP*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Facciola, *et al.*, | ) Case No.: 2:10-cv-01025-NVW |
| | ) |
| | ) |
| Plaintiffs, | ) **GREENBERG TRAURIG LLP'S** |
| | ) **MOTION TO DISMISS COMPLAINT** |
| vs. | ) **PURSUANT TO RULES 12(b)(6) AND** |
| | ) **9(b)** |
| Greenberg Traurig LLP, *et al.*, | ) |
| | ) (Assigned to Hon. Neil V. Wake) |
| Defendants. | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

FACTS AND BACKGROUND ............................................................................................ 3

ARGUMENT ................................................................................................................... 8

I.    Count One Fails To State a Claim for Securities Fraud. ............................................ 8

    A.    Plaintiffs Have Not Adequately Alleged GT Participated In or Induced the Fraudulent Sale of Securities Under § 44-2003(A). ......................................... 8

    B.    Plaintiffs Fail To State a Cognizable Claim Under § 44-1991(A). ................ 11

        1.    Plaintiffs Fail To Allege Conduct Supporting A Claim Under § 44-1991(A). ....................................................................................................... 11

        2.    Because GT Owed No Duty to Plaintiffs, Plaintiffs Cannot State a Claim Based on Nondisclosures. ......................................................... 13

        3.    Plaintiffs' Conclusory "ML-RB Joint Venture" Theory Cannot Cure the Absence of Pleaded Facts To Support a Fraud Claim. ......................... 15

    C.    Count One Fails § 44-2082 and Rule 9(b)'s Heightened Pleading Standards. 16

        1.    Plaintiffs Have Not Pled Their § 44-1991(A) Claims With Sufficient Particularity. .......................................................................................... 16

        2.    Plaintiffs Have Failed To Plead Facts Giving Rise To a Strong Inference of Scienter. ........................................................................... 18

II.    Count Two Does Not State a Claim for Control Person Liability as to GT. ............. 21

III.    Count Three Fails To State a Claim for Aiding and Abetting Securities Fraud. ........ 22

    A.    Aiding and Abetting Securities Fraud Is Not a Viable Cause of Action in Arizona. ...................................................................................................... 22

    B.    Plaintiffs Have Not Stated a Claim for Aiding and Abetting Securities Fraud. ............................................................................................................ 25

IV.    Count Four for Aiding and Abetting Breach of Fiduciary Duty Fails. ...................... 27

    A.    Plaintiffs Have Not Alleged Facts Showing a Fiduciary Relationship ........... 27

    B.    Plaintiffs Do Not Allege GT Knew of and Substantially Assisted Any Breach. ............................................................................................................ 29

V.    Count Five for Negligent Misrepresentation Should Be Dismissed Because Plaintiffs Have Not Alleged GT Had a Duty to Plaintiffs. ......................................................... 31

VI.    Plaintiffs Have Not Alleged a Primary Violation of the Arizona Investment Management Act. ................................................................................................... 34

VII.    Plaintiffs Cannot Establish GT's Liability Under Arizona's Investment Management Act Based on an Aiding and Abetting Theory. ........................................................ 37

CONCLUSION ............................................................................................................... 38

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937 (2009) ............................................. 8, 36

*Austin v. Bradley, Barry, & Tarlow, P.C.*, 836 F. Supp. 36 (D. Mass. 1993) ...... 14, 26, 27

*Barker v. Henderson, Franklin, Starnes & Holt*
    797 F.2d 490 (7th Cir. 1986) ................................................................. 21, 26, 27, 32

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................ 8

*Broad-Bussell Family L.P. v. Bayou Grp. LLC*, (*In re Bayou Hedge Funds Invest. Litig.*), 472 F. Supp. 2d 528 (S.D.N.Y. 2007) ................................................................. 14

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*
    511 U.S. 164 (1994) ................................................................. 2, 23, 37

*Chiarella v. United States*, 445 U.S. 222 (1980) ................................................................. 13, 14

*Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991) ............................ 36

*DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........... 36

*Decker v. Glenfed, Inc. (In re GlenFed, Inc. Sec. Litig.)*
    42 F.3d 1541 (9th Cir. 1994) ................................................................. 17, 18

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982) ....................................... 26

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009) ..................................... 13

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ..................................................... 26

*Durrett v. Pauley*, 558 F. Supp. 2d 718 (E.D. Tex. 2007) ................................................ 15

*El Camino Resources, Ltd. v. Huntington Nat'l Bank*, __ F. Supp. 2d __, 2010 WL 2651617 (W.D. Mich. July 1, 2010) ................................................................. 29, 31

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ............................................................. 19

*Freeman v. DirecTV*, 457 F.3d 1001 (9th Cir. 2006) ......................................................... 37

*Garza v. Am. Home Mortg.*, 2009 WL 1139594 (E.D. Cal. Apr. 28, 2009) ..................... 36

*Hildenbrandt v. Indianapolis Life Ins. Co.*, , 2009 WL 877713 (N.D. Tex. Mar. 31, 2009) ................................................................. 35

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) .............................. 21, 25

*In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ..................................... 12

*In re TASER Int'l S'holder Derivative Litig.*, 2006 WL 687033 (D. Ariz. March 17, 2006)........................................................................................................................... 29

*Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1 (1st Cir. 2007).......... 14

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)............................................12

*Levine v. Diamanthuset, Inc.*, 950 F.2d 1478 (9th Cir. 1991) ..................................... 25, 26

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ...................................................... 19

*Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685 (D. Ariz. 2006)............................ 31

*Mann v. GTCR Golder Rauner, L.L.C.*, 483 F. Supp. 2d 884 (D. Ariz. 2007)................. 37

*Marshall v. Quinn-L Equities, Inc.*, 704 F. Supp. 1384 (N.D. Tex. 1988) ....................... 22

*Moore v. Fenex, Inc.*, 809 F.2d 297 (6th Cir. 1987) ......................................................... 26

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989) ........................ 18

*Nat'l Retail Dev. Partners I v. Maness (In re Mortgages Ltd.)*, 405 B.R. 669 (D. Ariz. 2009),............................................................................................................................. 4, 7

*Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199 (2d Cir. 1989).................................... 26

*Orthologic Corp. v. Columbia/HCA Healthcare Corp.* 2002 WL 1331735 (D. Ariz. 2002) ..................................................................16, 18, 19

*Reis v. Barley, Snyder, Senft & Cohen L.L.C.*, 667 F. Supp. 2d 471 (E.D. Pa. 2009)...... 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .................................. 20

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267 (S.D.N.Y. 2009) ..................................................................................... 14

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003)..................................................... 36

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................. 18, 29

*Wenneman v. Brown*, 49 F. Supp. 2d 1283 (D. Utah 1999)............................................... 22

*Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005)................................................ 23

*Yourish v. Cal. Amplifier*, 191 F.3d 983 (9th Cir. 1999) .................................................. 18

**STATE CASES**

*Aaron v. Fromkin*, 994 P.2d 1039 (Ariz. Ct. App. 2000) ................................... 11

*Art Capital Grp., L.L.C. v. Neuhaus*, 896 N.Y.S.2d 35 (N.Y. App. Div. 2010)..........29, 31

*Champlin v. Sargeant In and For County of Maricopa*, 965 P.2d 763 (Ariz. 1998)........ 25

*Chase Manhattan Mortgs. Corp. v. Scott, Royce, Harris, Bryan, Barra, & Jorgensen, P.A.*, 694 So. 2d 827 (Fla. Dist. Ct. App. 1997)........................................... 15

*Dawson v. Withycombe*, 163 P.3d 1034 (Ariz. Ct. App. 2007) .................................. 32, 38

*E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n.*, 79 P.3d 86 (Ariz. Ct. App. 2003)...... 21

*Estate of Hernandez v. Flavio*, 930 P.2d 1309 (Ariz. 1997)........................................... 15

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976 (N.Y. 2009)............. 14

*First Nat'l Bank at Paris v. Adair*, 854 S.W.2d 358 (Ark. Ct. App. 1993) ..................... 15

*Gainesville Carpet Mart v. First Fed. Sav. & Loan Ass'n of Gainesville*, 174 S.E.2d 230 (Ga. Ct. App. 1970) ...................................................................................15

*Gerlach v. Wergowski*, 584 N.E.2d 1220 (Ohio Ct. App. 1989) ...................................... 10

*Gould v. Mellick & Sexton*, 819 A.2d 216 (Conn. 2003).................................................. 14

*Grand v. Nacchio*, __P.3d __, 2010 WL 3034515 (Ariz. Aug. 5, 2010).................. passim

*Grand v. Naccio*, 217 P.3d 1203, 1205 (Ariz. Ct. App. 2009) .................................. passim

*Grant v. Arthur Andersen, L.L.P.*, 2001 WL 35976018 (Ariz. Super. Ct. Feb. 16, 2001).............................................................................................................. 36

*Grubaugh v. DeCosta*, 1999 WL 137640 (Ariz. Ct. App. Mar. 16, 1999)...................... 23

*Hertz & Lewis, Inc. v. Union Bank*, 528 P.2d 188 (Ariz. Ct. App. 1974)  ..................... 27

*Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571 (Tex. Ct. App. 2007) .................31

*Martinez v. Indus. Comm'n of Ariz.*, 962 P.2d 903 (Ariz. 1998)...................................... 23

*McAlister v. Citibank (Ariz.)*, 829 P.2d 1253 (Ariz. Ct. App. 1992) ............................... 28

*McCartney v. Universal Elec. Power Corp.*, 2005 WL 2020559 (Ohio Ct. App. 2005).. 10

*Miller v. Udall, Shumway, Blackhurst, Allen, & Lyons, P.C.*, 2000 WL 35730146 (Ariz. Ct. App. May 11, 2000) ................................................................. 13, 27, 32, 33

*Napier v. Bertram*, 954 P.2d 1389 (Ariz. 1998) ..................................................... 34

*Paradigm Ins. Co. v. Langerman Law Offices*, 24 P.3d 593 (Ariz. 2001) ................ 32, 33

*PLM Tax Certificate Program 1991-92 L.P. v. Schweikert*, 162 P.3d 1267 (Ariz. Ct. App. 2007) ........................................................................................................31,  34

*Spinner v. Nutt*, 631 N.E.2d 542 (Mass. 1994) ....................................................... 31

*Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317 (Ariz. Ct. App. 1996) .................................................................... passim

*Stanley v. McCarver*, 92 P.3d 849 (Ariz. 2004) ...................................................... 33

*State v. Gunnison*, 618 P.2d 604 (Ariz. 1980) ............................................. 18, 22, 23, 24

*State v. Superior Court*, 599 P.2d .......................................................................... 25

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12 (Ariz. 2002) ........................................ 29, 38

*Wetherill v. Basham*, 3 P.3d 1118 (Ariz. Ct. App. 2000) .......................................... 32, 33

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179 (Minn. 1999) .................. 29, 31

## OTHER AUTHORITIES

17 C.F.R. § 230.405 .................................................................................................. 21

15 U.S.C. § 78u-4(b) ................................................................................................ 16

A.R.S. § 44-1991(A) ............................................................................................... passim

A.R.S. § 44-1999(B) ............................................................................................... 2, 21

A.R.S. § 44-2001(B) ............................................................................................... 19

A.R.S. § 44-2003(A) ............................................................................................... passim

A.R.S. § 44-2082 ............................................................................. 16, 18, 19, 21, 25

A.R.S. § 44-3241(A) ............................................................................................... 35

A.R.S. § 44-3241(B) ............................................................................................... 37

Arizona Corporation Commission, *Raising Capital: Overview of Registration of, and Exemptions from Registration for, Securities Offerings* (August 2005) ....................... 4

Memorandum "Strike-everything Amendment to H. B. 2271" (Mar. 24, 1994) ........35, 36

Ohio Rev. Code Ann. § 1707.431(A) (2010) ...................................................... 10

Restatement (Second) of Torts § 874 cmt. a. ...................................................... 28

Sales of Securities-Litigation-Fraud, Unlawful Activity, Etc., Chapter 197, 1996
        Ariz. Legis. Serv. 1168 ............................................................................24

Securities Exchange Act of 1934, § 10(b) ................................................. 19, 23

Securities Exchange Act of 1934, § 20(a) ...................................................... 21

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant Greenberg Traurig, LLP ("GT") hereby moves to dismiss Plaintiffs' putative class action complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

This case stems from the collapse of real estate lender Mortgages Ltd. in the midst of the severe downturn in the Arizona real estate market in 2007 and 2008.  Plaintiffs are real estate investors who allege that they lost money on their investments when the market collapsed.  One group of plaintiffs invested in commercial real estate projects arranged through Mortgages Ltd. and its broker-dealer, Mortgages Ltd. Securities.  The other group of plaintiffs made investments in real estate through a company called Radical Bunny, which the Complaint alleges loaned money to Mortgages Ltd.  Many of the real estate developers in whose projects the investors had invested ran into difficulties repaying their loans, and ultimately failed.  Mortgages Ltd. and, later, Radical Bunny, went bankrupt.  *See In re Mortgages Ltd.*, 2:08-bk-07465-RJH (Bankr. D. Ariz.); *In re Radical Bunny L.L.C.*, 2:08-bk-13884-CGC (Bankr. D. Ariz.).

Plaintiffs have now filed this lawsuit in an attempt to recoup their alleged investment losses from the former officers and professional firms who had relationships with Mortgages Ltd. and Radical Bunny, including Mortgage Ltd.'s former outside counsel, GT.  Plaintiffs' allegations against GT are replete with factual inaccuracies, and are based on gross distortions of the advice that GT rendered to its client.  But accepting Plaintiffs' alleged facts as true, as must be done on a motion to dismiss, Plaintiffs' claims fail both as a matter of Arizona law, and because Plaintiffs' factual allegations are inadequate to state a claim under either the pleading standards set forth in *Ashcroft v. Iqbal* or the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Arizona Securities Act.

First, Plaintiffs' securities fraud claims (Counts I-III) rest on a serious misconception about the scope and purposes of the Arizona Securities Act ("ASA").  On the facts alleged, GT is not the type of entity against which the ASA creates a private right of action.  The ASA is explicit that professionals performing services for their clients in the ordinary course

are not liable under the Act for the conduct of their clients, and Plaintiffs have failed to allege facts sufficient to demonstrate that GT "induced" or "participated" in a fraud along with its client.  Plaintiffs' securities fraud claims are also subject to dismissal because they are predicated on the erroneous assumption that GT had a duty to disclose allegedly negative facts about its client to investors.  To the contrary, law firms like GT owe duties of confidentiality to their clients, and do not typically owe duties to nonclient investors.  Plaintiffs have identified no facts that would support an exception to this basic rule.

Plaintiffs also have failed to plead facts supporting "control person" liability against GT within the meaning of A.R.S. § 44-1999(B), and likewise are not entitled to assert a securities fraud claim against GT under an "aiding and abetting" theory of liability.  Not only is it highly unlikely that the Arizona Supreme Court would recognize an aiding and abetting cause of action after the United States Supreme Court's decision in *Central Bank of Denver*, 511 U.S. 164, 177-78 (1994), but even if such a cause of action existed, Plaintiffs have failed to allege facts as to GT that would support such a claim.

<u>Second</u>, Plaintiffs' claim for aiding and abetting Mortgages Ltd. and Radical Bunny's supposed breach of fiduciary duty (Count IV) is also legally flawed.  Plaintiffs have not alleged facts sufficient to show a breach of any fiduciary duty by Mortgages Ltd. or Radical Bunny in the first instance—much less have they pleaded facts sufficient to show that GT was aware of any such breach, or that it assisted in actions that constituted the breach.  Accordingly Count IV should be dismissed.

<u>Third</u>, Plaintiffs' claim for negligent misrepresentation suffers from a number of the same problems as their securities fraud claims:  most significantly, Plaintiffs have failed to identify any facts that would support an exception to the rule that a lawyer does not owe duties to nonclient third parties.  Plaintiffs' theory that GT should have "blown the whistle" on its client is, for good reason, contrary to law.

<u>Fourth</u>, Plaintiffs' claims under the Arizona Investment Management Act (Counts VI and VII) appear to be without precedent, and ignore the plain language of the statute and the legislative history of the statute—both of which suggest that the statute is intended to cover

the conduct of professional *investment advisers* who assist clients in investment advisory transactions—not the conduct of outside counsel to a company that issues securities.

Finally, however flawed the claims of Mortgages Ltd. investors are against GT, the claims of the Radical Bunny investors are even weaker, and unquestionably subject to dismissal.  Those investors were not clients of GT; they did not buy securities of Mortgages Ltd. (*see infra* at p. 4-5); and Plaintiffs have not alleged that GT played any role in communicating information to those investors or that those investors were even aware of GT's existence.  As set forth below in discussing the individual counts, the claims of the Radical Bunny investors against GT must be dismissed.

## FACTS AND BACKGROUND[1]

*Mortgages Limited*

From 1964 until 2008, Mortgages Ltd. was a private mortgage lender based in Arizona.  Compl. ¶ 55.  The company was family owned and operated.  Beginning in 1997, Scott Coles, the son of the founder of Mortgages Ltd., Charles J. Coles, served as CEO and Chairman of the company.  *Id*.

Mortgages Ltd.'s primary business was making high-interest secured loans to real estate developers in need of capital for their projects.  *Id*. ¶¶ 56-57.  To finance these loans, Mortgages Ltd. raised money from private investors, and sold the investors direct or indirect fractional interests in the secured promissory notes signed by the real estate developers who borrowed money from Mortgages Ltd.  *Id*. ¶ 58.[2]  Mortgages Ltd. sold securities to investors through a brokerage firm called Mortgages Ltd. Securities, LLC.  *Id*. ¶ 75.  As the Bankruptcy Court has previously explained, the investments were in the nature of "financing transaction[s] akin to the resale of collateralized debt obligations in the securities

---

[1] The facts described are as alleged in the Complaint, taken as true only for purposes of this motion.

[2] Although the nature of the interest varied depending on the nature of the investment program, GT takes Plaintiffs' description as true for purposes of this motion to dismiss.

markets.  [They were] not, for example, a purchase of the business of Mortgages Ltd." *See Nat'l Retail Dev. Partners I v. Maness (In re Mortgages Ltd.)*, 405 B.R. 669, 673 (D. Ariz. 2009), *aff'd sub nom.*, *PDS Los Arcos, LLC v. Adams (In re Mortgages Ltd.)*, 427 B.R. 780 (D. Ariz. 2010).  Participation interests sold by Mortgages Ltd. yielded high historical interest rate returns of 9% to 10.5% per annum, with interest paid by Mortgages Ltd. or the Mortgages Ltd. Opportunity Funds to the investors on a periodic basis.  *See* Compl. ¶ 77.

Although private offering memoranda ("POMs") are not required for the type of private offerings that Mortgages Ltd. made, *see* Arizona Corporation Commission, *Raising Capital: Overview of Registration of, and Exemptions from Registration for, Securities Offerings*, at 11 (August 2005), the company used POMs to describe the real estate interests available to investors.  Compl. ¶ 78.  GT did not begin advising Mortgages Ltd. on the POMs until May 2006.  *Id.*

*Radical Bunny*

Plaintiffs allege that in the course of Mortgages Ltd.'s investment and loan programs, Mortgages Ltd. formed a relationship with a company called Radical Bunny.  Radical Bunny was formed in 1999 by four individuals to assemble investors who would invest in various real estate projects, including pass-through interests in loans originated by Mortgages Ltd.  *Id.* ¶ 59.

According to the Complaint, Mortgages Ltd.'s relationship with Radical Bunny changed beginning in late 2005.  *Id.* ¶ 60.  At that time, Scott Coles proposed to Radical Bunny that instead of directly investing in particular pass-through real estate assets, Radical Bunny would loan money directly to Mortgages Ltd., which would allow Mortgages Ltd. to have access to an unsecured line of credit.  *Id.* ¶¶ 60-61.  Radical Bunny is alleged to have ultimately made a number of loans to Mortgages Ltd. pursuant to this arrangement.  *Id.* ¶ 63-64.

The Complaint affixes conclusory labels to the relationship between Mortgages Ltd. and Radical Bunny, including "joint venture," *id.*  ¶ 67, "common enterprise," *id.*, and "Ponzi scheme," *id.* ¶ 11.  But the pleaded facts are merely that Radical Bunny loaned

1   money to Mortgages Ltd.  Plaintiffs allege, for example, that "[a]s explained . . . by Mayer

2   Hoffman's audit partner, the Radical Bunny note program was 'almost like a *revolving line*

3   *of credit*,'" *id.*  ¶ 61 n.2 (emphasis added); that the loans assisted Mortgages Ltd. with its

4   liquidity position by providing an "unsecured credit line," *id.* ¶ 61; and that Mortgages Ltd.

5   made interest payments to Radical Bunny on the amounts "loaned," *id.* ¶ 148.

6          According to the Complaint, attorney Bob Kant of GT believed the relationship was a

7   lending relationship.  *Id.* ¶ 133 ("Kant knew from discussions with Defendants Denning,

8   Brown, and Newman that Mortgages Ltd. was heavily dependent upon Radical Bunny as a

9   source of funds, having *already borrowed* over $128 million from Radical Bunny."); *id.* ¶

10  166 (as alleged in the Complaint, Kant believed that Radical Bunny's lawyers were "acting

11  as 'if Radical Bunny were Citibank.'").  The Complaint does not allege that Kant knew or

12  believed that Radical Bunny had a "joint venture" with Mortgages Ltd.

13         Plaintiffs' allegations are contradictory with respect to their conclusory assertion that

14  Radical Bunny operated as an unauthorized securities broker or "shadow dealer" for

15  Mortgages Ltd., *id.* ¶ 75, and that it sold "Mortgages Ltd. securities to prospective

16  investors," *id.* ¶ 79.  After affixing this label, the Complaint alleges as fact a statement by

17  the SEC that:  "[f]rom at least December 2006, [Radical Bunny] represented to offerees and

18  Participants that the Participants were investing 'in MLtd notes and deeds of trust' *when, in*

19  *fact, the Participants were investing in [Radical Bunny]*."  *Id.*  ¶ 126(a) (emphasis added).

20  In other words, the Radical Bunny investors invested directly in Radical Bunny—not

21  Mortgages Ltd. securities.

22         By late 2006, Kant allegedly learned both that Mortgages Ltd. had a business

23  relationship with Radical Bunny, *id.* ¶ 133, and that Radical Bunny might have securities

24  law compliance problems, *id.* ¶ 45.  According to Plaintiffs, upon learning of the potential

25  issues at Radical Bunny, Kant participated in a meeting with management of both

26  Mortgages Ltd. and Radical Bunny.  *Id.* ¶ 137.  Plaintiffs allege that at the meeting, Kant

27  told the participants that the way Radical Bunny was raising investor money was "not

28  valid," was "wrong," and that it "violated the law."  *Id*.  Kant expressed concern that Scott

1     Coles' picture could end up on the front page of the *Arizona Republic* alongside Radical

2     Bunny principal Tom Hirsch's if Radical Bunny did not fix its model of doing business. *Id.*

3     ¶ 138. Kant also referred Radical Bunny to securities counsel at another respected law firm

4     (Quarles & Brady) "to address Radical Bunny's noncompliance with the securities laws."

5     *Id.* ¶ 141. Radical Bunny then retained Quarles & Brady, which became Radical Bunny's

6     counsel. *Id.* ¶¶ 254, 262.

7         On August 13, 2007, the management of Mortgages Ltd. and Radical Bunny met

8     again with Kant, this time with Radical Bunny's attorneys from Quarles & Brady in

9     attendance. *Id.* ¶ 161. Plaintiffs affirmatively allege efforts by Kant to discourage any

10     unlawful conduct by Radical Bunny. They say that Kant "again ma[d]e a point of Radical

11     Bunny's continuing securities violations." *Id.* To "make [his] point in front of [Radical

12     Bunny's] lawyer," Kant told Hirsch that "[t]hey put people in jail for this," or "someday

13     you're going to jail for this if you don't stop." *Id.*

14         Plaintiffs allege that after the meeting, Radical Bunny's lawyers at Quarles & Brady

15     "*thanked Kant for making the point*." *Id.* (emphasis added). Plaintiffs allege as fact that

16     Radical Bunny's compliance problems meant that any money it loaned to Mortgages Ltd.

17     would be "tainted," "unlawful," or would create a contingent liability for Mortgages Ltd.

18     *Id.* ¶¶ 24, 86, 109. But these allegations rest implicitly on conclusions of law, and the

19     Complaint does not identify what underlying law would have created liability for Mortgages

20     Ltd., or the entity or entities to which Mortgages Ltd. would be liable. The Complaint also

21     fails to allege that Kant or anyone at GT determined that Radical Bunny's alleged securities

22     compliance issues in fact created a contingent liability or civil or criminal exposure for

23     Mortgages Ltd.

24     *Mortgages Ltd.'s Financial Condition and Bankruptcy*

25         A number of Plaintiffs' other allegations relate to alleged non-disclosures of financial

26     information about Mortgages Ltd. and the real estate investments at issue. Plaintiffs allege

27     that by fiscal year end 2005 Mortgages Ltd. was insolvent, *id.* ¶ 86; by summer of 2007, it

28     had ceased its core business of making new loans, *id.* ¶¶ 112-113; and that if booked at fair

value, Mortgages Ltd.'s real-estate assets would have required substantial writedowns, *id*. ¶ 86.  While Plaintiffs allege repeatedly that the POMs should have contained disclosures on these topics, Plaintiffs notably do not allege that GT had knowledge of these alleged "facts," much less how or when GT came into possession of such knowledge.

Plaintiffs also allege that as the real estate projects that Mortgages Ltd. funded began to suffer, Mortgages Ltd. rewrote loans and extended loan terms when borrowers encountered trouble.  *Id.* ¶ 206.  Notably, the Complaint does not allege which loans were rewritten and when, nor do they allege whether or when GT became aware of such rewrites relative to the issuance of any POM.

In 2008, Mortgages Ltd. experienced a "financial collapse."  *Id.* ¶ 27.  Plaintiffs allege that Scott Coles triggered Mortgages Ltd.'s demise by "abandon[ing] the conservative underwriting practices that had served [Mortgages Ltd.] well" in an attempt to "score ever bigger, ever riskier deals with greater profits."  *Id.* ¶ 2.  Coles committed suicide as his company faced growing financial difficulties, *id.* ¶ 123, and Mortgages Ltd. entered bankruptcy soon thereafter.  As the Bankruptcy Court has described it, Mortgages Ltd.'s demise was precipitated by the collapse of the real estate market and its inability to continue funding loans.  *See Nat'l Retail Dev. Partners I*, 405 B.R. at 670 ("Unfortunately it continued to make such loans even after a serious decline in Arizona's real estate market and ultimately committed to more loans than it could fund.").

Among the facts Plaintiffs allege as "evidence" of GT's supposed knowledge of and role in alleged fraud is an e-mail Kant sent to Coles just days before Coles' suicide, expressing confidence in Coles' efforts to protect his investors.  As recited in the Complaint, the e-mail read:

> Scott, I had a meeting with my team . . . .  We have a plan, which I want to discuss with you.  I did want you to know that everyone at the meeting had nothing but great things to say about you, including how smart you are and *how hard you are working to protect your investors*.  We do not always see that in situations like this.  Let's chat.

Compl. ¶ 242 (emphasis added).

**ARGUMENT**

The Complaint should be dismissed because of numerous legal infirmities as well as factual gaps and reliance on conclusory allegations.  As the Supreme Court explained in *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1953 (2009), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint offering only "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" does not meet the federal pleading standards.  *Id.* (alteration and quotation marks omitted).  Allegations that create "a sheer possibility that a defendant has acted unlawfully" do not suffice, *id.*; rather, the complaint must allege facts that "*show[]* that the pleader is entitled to relief, *id.* at 1950 (emphasis added and quotation marks omitted)*.*  The Complaint does not meet these standards, much less the more stringent standards for pleading fraud that apply to many of its claims.

**I.      Count One Fails To State a Claim for Securities Fraud.**

The Complaint purports to assert securities fraud claims against GT on behalf of Radical Bunny and Mortgages Ltd. investors, but the claims of both groups fail. [3]

**A.      Plaintiffs Have Not Adequately Alleged GT Participated In or Induced the Fraudulent Sale of Securities Under § 44-2003(A).**

The Arizona Securities Act ("ASA") authorizes a purchaser of securities to bring a private civil action for a violation of Arizona's securities fraud statute, § 44-1991(A), against "any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase."  A.R.S. § 44-2003(A); *see also Grand v. Nacchio*, __P.3d __, 2010 WL 3034515, at *3 (Ariz. Aug. 5, 2010).  "[T]o assert a direct claim of liability under § 44-2003(A)," a plaintiff must allege that the defendant "made, participated

---

[3] The term "Mortgages Ltd. investors" is not technically accurate, as Plaintiffs do not allege that they invested in Mortgages Ltd. itself, but rather directly and indirectly purchased fractional interests in secured promissory notes signed by Mortgages Ltd.'s borrowers.  *See* Compl. ¶ 58; *supra* at p. 3.

in or induced the unlawful sale or purchase." *Grand v. Nacchio*, 217 P.3d 1203, 1205 (Ariz. Ct. App. 2009) (quotation marks omitted), *aff'd*, __P.3d __, 2010 WL 3034515 (Ariz. Aug. 5, 2010).

Section 44-2003(A) contains a safe harbor provision, which provides that a professional performing his or her services in the "ordinary course" in connection with a sale of securities cannot be found to have "participated" in the sale. A.R.S. § 44-2003(A) ("No person shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase."); *see also Grand v. Nacchio*, 2010 WL 3034515, at *3, *5 (noting the safe harbor provision of § 44-2003(A) is an exception to the scope of liability).

Here, the alleged facts against GT are well within the scope of this "ordinary course" carveout. Aside from conclusory allegations reciting the required elements of § 44-2003(A), which carry no weight,[4] the Complaint's only allegations of fraudulent conduct by GT are that it (1) failed to advise Mortgages Ltd. to make certain disclosures in its offering documents; (2) helped Mortgages Ltd. cover up its alleged fraud by assisting it in the structuring of a new product (the Value-to-Loan Fund in 2008) and advising it that additional disclosures were unnecessary; and (3) rendered advice and assistance to Mortgages Ltd. in connection with the termination of an employee. *See* Compl. ¶¶ 198-246. Allegations of rendering professional advice without direct promotion, solicitation, or financial participation in the sale are not sufficient to satisfy § 44-2003(A)'s participation-or-inducement requirement. *See Grand v. Nacchio*, 2010 WL 3034515, *4 (holding defendants did not "participate in" the sale where they did not play any role in the sale transaction between plaintiffs and sellers of stock); *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 332 (Ariz. Ct. App. 1996) (holding defendant accounting firm did not participate in the sale where it did not partake in or have a stake in the sale of the

---

[4] *See Grand v. Nacchio*, 2010 WL 3034515, at *3 n.1 ("[I]t is not sufficient that a pleading alleges 'participation' if the facts alleged do not support that theory.") (applying Arizona Rule of Civil Procedure 12(b)(6)).

stock).[5]

Even apart from the clarification offered by this safe harbor, Plaintiffs' allegations against GT are in any case insufficient to state a direct securities fraud claim against GT. Plaintiffs do not allege that GT "made" the unlawful sale, *see* Compl. ¶ 397, nor do their allegations against GT show that the firm participated in or induced any sale.  It is not sufficient to merely "influence" the decision to purchase a security, as the Arizona Court of Appeals made clear in *Standard Chartered*, 945 P.2d at 332-33.  Rather, to "induce" another is to "persuade" or "prevail."  *See id.* (quotation marks omitted); *see also Grand v. Nacchio*, 2010 WL 3034515, at *4 (noting in dicta that defendants' active and direct encouragement to plaintiffs to buy stocks is "classic inducement").  Moreover, "the legislature did not mean, by use of the word 'induce,' to stretch civil liability under the Security Act to collateral actors such as [the defendant accounting firm], remote from the transaction, who neither financially participate, nor promote or solicit the transaction, but merely provide information that contributes to a buyer or seller's decision to close the deal."  *Standard Chartered*, 945 P.2d at 333.  Plaintiffs' theory of securities fraud liability against GT is precisely the stretching of liability that the statute does not contemplate.

The Radical Bunny investors also purport to bring a claim against GT for securities fraud.  The claim made by the Radical Bunny plaintiffs lacks any support in the pleaded facts.  But the Complaint contains no factual allegations that GT had any involvement in the sale of securities to Radical Bunny investors.  Plaintiffs allege only that GT helped draft a

---

[5] An analogous professional safe harbor provision under Ohio law supports this position. Ohio's securities fraud statute provides in part that "[a]ny attorney, accountant, or engineer whose performance is incidental to the practice of the person's profession" "shall not be deemed to have effected, participated in, or aided the seller in any way in making, a sale or contract in violation of [the Ohio Securities Act]."  Ohio Rev. Code Ann. § 1707.431(A) (2010).  Ohio's courts have interpreted the safe harbor provision to "immunize[] attorneys acting as legal counsel, and not as salesman, from . . . securities fraud liability." *McCartney v. Universal Elec. Power Corp.*, 2005 WL 2020559, at *2 (Ohio Ct. App. 2005); *see also Gerlach v. Wergowski*, 584 N.E.2d 1220, 1222 (Ohio Ct. App. 1989) ("A corporate officer who has not participated in a sale of unregistered securities other than performing his normal duties, for example, as an attorney, may not be liable to the purchaser . . . .").

1    Radical Bunny private offering memorandum that was never completed or used, Compl. ¶¶

2    164, 172-173; that GT attorney Kant referred Radical Bunny to counsel, *id.* ¶ 144; and that

3    he warned Radical Bunny principals that they may not be in compliance with securities

4    laws, *id.* ¶ 161.   None of these allegations comes close to showing participation in or

5    inducement of the fraudulent sale of securities to Radical Bunny investors, as required by §

6    44-2003(A).

7         Because Plaintiffs do not allege facts showing that GT solicited investors or

8    otherwise promoted the sales of securities to Mortgages Ltd. or Radical Bunny investors, or

9    that it had a financial stake in or partook in the sales, Count One should be dismissed.

10   **B.    Plaintiffs Fail To State a Cognizable Claim Under § 44-1991(A).**

11        Even if Plaintiffs alleged facts showing that GT participated in or induced the sale of

12   securities, the Complaint fails to allege the required elements of securities fraud.

13   **1.    Plaintiffs Fail To Allege Conduct Supporting A Claim Under § 44-1991(A).**

14        Plaintiffs assert securities fraud claims against GT under all three subsections of §

15   44-1991(A), *see* Compl. ¶ 97, which make it unlawful for a person, "in connection with a

16   transaction or transactions within or from this state involving an offer to sell or buy

17   securities," to:  (1) "[e]mploy any device, scheme or artifice to defraud"; (2) "[m]ake any

18   untrue statement of material fact, or omit to state any material fact necessary in order to

19   make the statements made, in the light of the circumstances under which they were made,

20   not misleading"; or (3) "[e]ngage in any transaction, practice or course of business which

21   operates or would operate as a fraud or deceit."  A.R.S. § 44-1991(A).

22        Plaintiffs' actual allegations, however, do not fall within the bounds of the plain

23   language of § 44-1991(A).  *See Aaron v. Fromkin*, 994 P.2d 1039, 1042 (Ariz. Ct. App.

24   2000) ("The elements of securities fraud are articulated within the statute itself.").  Plaintiffs

25   assert that GT prepared POMs "that contained false or misleading statements," Compl. ¶

26   198, "helped Mortgages Ltd. cover-up the Company's fraud" and "helped mask the

27   Company's insolvency," *id.* at 64 & ¶ 221.  The Complaint does not allege that GT *itself*

28   "employ[ed]" a scheme to defraud, "ma[de]" a fraudulent misstatement or omission, or

1    "engage[d]" in any transaction or course of business that operated as a fraud.  Rather,

2    Plaintiffs allege that "*Mortgages Ltd. and Radical Bunny* jointly engaged in the unlawful

3    integrated sale of securities . . . in violation of A.R.S. §§ 44-1991(A)(1) and (3)" and that

4    "*Mortgages Ltd. and Radical Bunny* jointly made misleading representations and omissions

5    in connection with the integrated sale of securities in violation of A.R.S. § 44-1991(A)(2)."

6    Compl. ¶¶ 395, 396 (emphases added).

7          Plaintiffs make additional conclusory assertions of GT's alleged "encouragement"

8    and "concealment" of fraud but the specific factual allegations do not support these

9    conclusions.  Plaintiffs allege only that GT handled regulatory inquiries for Mortgages Ltd.

10   and represented Mortgages Ltd. in the related bankruptcy proceeding, *id.* ¶¶ 243-246 —

11   alleged facts that do not plausibly support an inference of a "cover-up."  Plaintiffs also

12   allege that GT "helped" Mortgages Ltd. terminate a whistleblower, *see* Compl. ¶¶ 228-240,

13   but the Complaint does not assert that this action occurred in connection with a securities

14   transaction as required under § 44-1991(A).  These allegations cannot logically support an

15   inference that GT participated in a scheme to defraud anyone.  Accordingly, Plaintiffs have

16   failed to state a claim against GT under any subsection of § 44-1991(A).

17         Plaintiffs' claims under subsections (1) (fraudulent schemes) and (3) (fraudulent

18   course of business) of § 44-1991(A) fail for the additional and independent reason that they

19   are based on allegations of misrepresentations and omissions, which do not give rise to a

20   claim under § 44-1991(A)(1) or (3).   Federal courts interpreting the parallel federal

21   securities fraud provision of Rule 10b-5 have held that where the primary ground for a

22   securities fraud claim is misrepresentations or omissions, a plaintiff has no claim under Rule

23   10b-5(a) (fraudulent schemes) or (c) (fraudulent course of business), because those

24   subsections address conduct that does not involve speaking.  *See Lentell v. Merrill Lynch &*

25   *Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (holding plaintiffs cannot make out a claim under

26   Rule 10b-5(a) or (c) where the sole basis for their claim is alleged misrepresentations or

27   omissions); *In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005) (noting

28   subsections (a) and (c) of Rule 10b-5 do not provide "a back door into liability for those

who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5").  Because the Arizona Supreme Court likely would follow the lead of the federal courts in interpreting these provisions of Arizona's securities laws, Plaintiffs' attempt to shoehorn allegations of misstatements or omissions into claims under § 44-1991(A)(1) and (3) should be rejected.  *See*, *e.g.*, Compl. ¶ 206 (asserting that the alleged "incomplete statements" in the POMs "operated as a fraudulent course of business").

Moreover, the Radical Bunny plaintiffs cannot state a claim against GT under § 44-1991(A) for the additional reason that the Complaint does not allege any facts showing that GT had any involvement whatsoever in the sale of securities to Radical Bunny investors. *See id.* ¶¶ 198-246; *supra*, at p.10-11.

## 2. Because GT Owed No Duty to Plaintiffs, Plaintiffs Cannot State a Claim Based on Nondisclosures.

A second and independent reason that Plaintiffs' claim for securities fraud fails is that they do not allege facts showing that GT owed them any duty.  Plaintiffs' claims against GT are based principally on GT's alleged advice to Mortgages Ltd. in connection with its POMs, which Plaintiffs assert "contained false or misleading statements and failed to disclose material facts necessary for the statements to be not misleading."  Compl. ¶ 198. The specific allegations regarding the content of the POMs, however, list only nondisclosures and do not point to any affirmatively false statements.  *See id.* ¶¶ 86, 87, 200, 202-206, 209-211, 214, 215, 220, 241.

A claim for securities fraud based on nondisclosures is viable only if the defendant had a duty of disclosure to the particular plaintiff.  *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (per curiam) ("The person who omitted the material information must have had a duty to disclose it to the person supposedly harmed by the omission."); *see also Miller v. Udall, Shumway, Blackhurst, Allen, & Lyons, P.C.*, 2000 WL 35730146, at *5 (Ariz. Ct. App. May 11, 2000) (affirming summary judgment for attorneys where they had no duty of

disclosure to plaintiffs).  A duty of disclosure exists "when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."  *Chiarella*, 445 U.S. at 228 (alteration and quotation marks omitted).  In Arizona, a fiduciary relationship is "a confidential relationship whose attributes include great intimacy, disclosure of secrets, or intrusting of power."  *Standard Chartered*, 945 P.2d at 335 (alteration and internal quotation marks omitted).

        As set forth in further detail *infra* Part V, GT did not owe any duty to Plaintiffs, fiduciary or otherwise.[6]  Courts are in agreement that company counsel has no duty to nonclient investors absent special circumstances not alleged here, such as the issuance of opinion letters or other direct representations made by the attorney to the investors.  *See, e.g.*, *Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 13 (1st Cir. 2007) (granting summary judgment for defendants and holding that attorney for corporation has no duty to investors in corporation); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 286 (S.D.N.Y. 2009) (corporation's outside counsel has no duty to investment funds who purchased corporation's stock); *Broad-Bussell Family L.P. v. Bayou Grp. LLC*, (*In re Bayou Hedge Funds Invest. Litig.*), 472 F. Supp. 2d 528, 531 (S.D.N.Y. 2007) (attorney for funds owes no duty of disclosure to investors in funds); *Austin v. Bradley, Barry, & Tarlow, P.C.*, 836 F. Supp. 36, 38 (D. Mass. 1993) (law firm has no duty to disclose client's insolvency to investors); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 981 (N.Y. 2009) (counsel for hedge fund has no duty to prospective investors); *Gould v. Mellick & Sexton*, 819 A.2d 216, 218, 223-24 (Conn. 2003) (law firm representing partnership has no duty to investors in partnership).  These decisions comport with those by Arizona courts carefully limiting the scope of an attorney's duty to non-clients.  *See infra* Part V.  Because Plaintiffs have not alleged facts giving rise to a duty to disclose, Plaintiffs cannot state a claim for securities fraud.

---

[6] Plaintiffs' assertion of a claim for "aiding and abetting breach of fiduciary duty" rather than a direct claim for breach of fiduciary duty in Count Four underscores their inability to allege a direct fiduciary relationship between GT and Plaintiffs.

3.     **Plaintiffs' Conclusory "ML-RB Joint Venture" Theory Cannot Cure the Absence of Pleaded Facts To Support a Fraud Claim.**

As a shortcut to avoid having to plead specific facts about what GT knew about the relationship between Mortgages Ltd. and Radical Bunny, and to create the impression that professionals retained by one entity should be liable to investors of the other, Plaintiffs assert that Mortgages Ltd. and Radical Bunny operated as a joint venture beginning in late 2005.  Compl. ¶ 60.  At the least, Counts One, Two (control person liability), Three (aiding and abetting securities fraud), Four (aiding and abetting breach of fiduciary duties), Five (negligent misprepresentation and nondisclosure), and Seven (aiding and abetting violations of the Investment Management Act) of the Complaint all expressly depend on the existence of this alleged "ML-RB Joint Venture."  *Id.*  ¶¶ 396, 405, 414, 422, 430, 445.  Plaintiffs' pleaded facts, however, fail to show, and indeed contradict the existence of, a joint venture—much less do they show that GT believed there was a joint venture.

A joint venture requires five elements:  "(1) an agreement, (2) a common purpose, (3) a community of interest, (4) an equal right of control, and (5) participation in profits and losses."  *See Estate of Hernandez v. Flavio*, 930 P.2d 1309, 1312 (Ariz. 1997).  Plaintiffs' allegations do not show a right to share profits or an obligation to share losses, nor do they show an equal right of control.  Rather, the alleged facts are that the relationship between Mortgages Ltd. and Radical Bunny was a lender-borrower relationship.  *See* Compl. ¶¶ 60-61, 63, 121, 133, 147, 148, 166, 179; *supra*, at p. 4-5.

Courts consistently have held that a lender-borrower relationship does not constitute a joint venture.  *See First Nat'l Bank at Paris v. Adair*, 854 S.W.2d 358, 361 (Ark. Ct. App. 1993) ("The primary attribute and necessary condition for a joint venture is the element of joint, not several, profit sharing.  Thus, it is generally understood that the relationship of borrower and lender does not establish a joint venture." (citations omitted)); *see also Durrett v. Pauley*, 558 F. Supp. 2d 718, 722 (E.D. Tex. 2007) (holding mortgage lender and borrowers were not in a joint venture); *Chase Manhattan Mortgs. Corp. v. Scott, Royce, Harris, Bryan, Barra, & Jorgensen, P.A.*, 694 So. 2d 827, 831-32 (Fla. Dist. Ct. App. 1997) (no joint venture between lender and financial institution which acquired loan); *Gainesville*

*Carpet Mart v. First Fed. Sav. & Loan Ass'n of Gainesville*, 174 S.E.2d 230, 233 (Ga. Ct. App. 1970) (no joint venture between construction contractor and savings and loan association which provided financing).

Plaintiffs have failed to plead a joint venture.  Moreover, Plaintiffs have failed to allege facts demonstrating that anyone at GT knew that the relationship between Mortgages Ltd. and Radical Bunny was a joint venture.  To the extent Count One relies on the existence of a "ML-RB Joint Venture," it fails.

## C.    Count One Fails § 44-2082 and Rule 9(b)'s Heightened Pleading Standards.

An additional and independent reason requiring dismissal of Count One is its failure to meet the applicable pleading standards.  Plaintiffs do not allege facts showing why the alleged misstatements or omissions were misleading or how GT's conduct was fraudulent.

## 1.    Plaintiffs Have Not Pled Their § 44-1991(A) Claims With Sufficient Particularity.

Securities fraud actions brought under § 44-1991(A) are subject to heightened pleading requirements substantially the same as those imposed on federal securities actions by the Private Securities Litigation Reform Act of 1995 ("PLSRA").  *See* A.R.S. § 44-2082 (2010).[7]  *Cf.* 15 U.S.C. § 78u-4(b).  Section 44-2082(A) requires that a plaintiff alleging misrepresentations or omissions "specify each alleged untrue statement or material omission and the reason or reasons why the statement or omission is misleading or the omission is material."  Because the Complaint does not meet this standard, Count One should be dismissed.  *See* A.R.S. § 44-2082(C)(1) (failure to meet § 44-2082(A) requires dismissal upon motion by the defendant).

Plaintiffs allege that each of the eleven private offering memoranda issued by Mortgages Ltd. or the Mortgages Ltd. Opportunity Funds between May 2006 and February 2008 "contained false or misleading statements and failed to disclose material facts

---

[7] The heightened pleadings standards of § 44-2082(A) and (B) apply to "any private action arising under § 44-1991."  A.R.S. § 44-2082(A) & (B); *see also Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, 2002 WL 1331735, *5 (D. Ariz. 2002) (dismissing plaintiff's § 44-1991 claim for failure to satisfy § 44-2082(A)).

necessary for the statements to be not misleading." Compl. ¶ 198; *see also id.* ¶ 199. The Complaint does not point to any affirmatively false statements in the POMs.[8] Instead, the Complaint asserts a laundry list of alleged omissions. *See id.* ¶ 86. Plaintiffs assert that the POMs issued between March 2007 and February 2008 did not disclose Radical Bunny's "unremedied securities violations." *Id.* ¶ 202; *see also id.* ¶ 203. Similarly, Plaintiffs allege that money loaned to Mortgages Ltd. by Radical Bunny would create contingent liability for Mortgages Ltd. *See id.* ¶ 136. Plaintiffs also allege that the "generalized description" of Mortgages Ltd.'s business "made it impossible for an investor to understand" the inner-workings of Mortgages Ltd., *id.* ¶ 204, and that the POMs failed to disclose the "increase in rewrites," "degraded underwriting standards," and loan extensions, *id.* ¶¶ 209-210. However, Plaintiffs do not specify any statement contained in the POMs that was misleading in light of this omitted information, or the reasons why any statement was misleading, as required by § 44-2082(A).

The Complaint also alleges that the POMs failed to disclose various "material facts" which did not arise until after many of the POMs were issued, *id.* ¶¶ 86, 204, 206, and other "material facts" that had not even happened by the time the last POM was issued in February 2008, *see id.* ¶ 86 (alleging POMs failed to disclose the "efforts by Robert Furst" to make disclosures); *id.* ¶¶ 230-231 (alleging Mortgages Ltd. contacted GT about Furst's concerns in March 2008). Plaintiffs do not allege facts connecting the alleged omissions to any statement in the POMs. Consequently, Count One should be dismissed for failure to specify the reasons why the alleged misstatements or omissions were misleading as required under § 44-2082(A).

Count One also fails to satisfy the standard of Rule 9(b), which extends not only to misstatements and omissions but also to fraudulent scheme and fraudulent course of business claims. Rule 9(b) requires the plaintiff to "set forth what is false or misleading about the statement, and why it is false." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec.*

---

[8] *See supra*, Part I.B.2 at p.13.

*Litig.*), 42 F.3d 1541, 1548 (9th Cir. 1994), *superseded by statute on other grounds*; *see also Yourish v. Cal. Amplifier*, 191 F.3d 983, 994 (9th Cir. 1999) (plaintiff may not simply "identify certain statements that they claim were misrepresentations, without providing particularized facts about the circumstances constituting the fraud"). Plaintiffs have fundamentally failed to allege how any statement in a POM was misleading at the time the POM was issued. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1549 (complaint must provide "an explanation as to why the disputed statement was untrue or misleading *when made*"). The Complaint also fails to allege facts showing which POMs Plaintiffs received. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (complaint deficient for failure to "specify which plaintiff received which prospectus").

Further, Plaintiffs fail to allege the "who, what, when, where, and how" of GT's alleged misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation marks omitted). Plaintiffs' theory is that "Mortgages Ltd. and Radical Bunny could not have perpetuated and concealed a fraud so massive without the complicity of lawyers and accountants," Compl. ¶ 16, and, therefore, GT and other professional defendants must have participated in the fraudulent scheme allegedly carried out by the two companies. This logic cannot survive Rule 9(b): the Complaint does not set forth facts showing how *GT's* alleged actions operated as a fraud on Plaintiffs. *See Moore*, 885 F.2d at 540 (Rule 9(b) requires the complaint to "allege the time, place or nature of the defendants' allegedly fraudulent conduct."). Count One should be dismissed in its entirety for failure to meet Rule 9(b).

## 2.    Plaintiffs Have Failed To Plead Facts Giving Rise To a Strong Inference of Scienter.

Claims of fraudulent schemes brought under § 44-1991(A)(1) require proof of scienter, *see Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, 2002 WL 1331735, at *5 (D. Ariz. Jan. 7, 2002),[9] and are therefore subject to § 44-2082(B)'s heightened pleading

---

[9]   *See also State v. Gunnison*, 618 P.2d 604, 606-07 (Ariz. 1980) (holding scienter is not an element of claims under subsection (2) but noting it may be an element of subsection (1)).

standard, which requires that the complaint "state with *particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind."  A.R.S. § 44-2082(B) (emphasis added).

The Arizona Supreme Court has not ruled on whether scienter is required for fraudulent course of business claims under § 44-1991(A)(3), but it likely would follow the lead of federal courts interpreting Rule 10b-5 to find such a requirement.  Rule 10b-5, promulgated under § 10(b) of the 1934 Securities and Exchange Act, has nearly identical language to § 44-1991(A) and requires proof of scienter for fraudulent course of business claims.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976).  Although a district court in *Orthologic Corp.*, 2002 WL 1331735, *5, relied on the United State Supreme Court's opinion in *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980) to hold that scienter was not required for fraudulent course of business claims under subsection (3), *Aaron* is distinguishable.  *Aaron* was a civil enforcement action interpreting § 17(a) of the 1933 Securities Act, which has similar language to § 44-1991(A) but does not create a private right of action.  *See Maldonado v. Dominguez*, 137 F.3d 1, 7 (1st Cir. 1998) (noting the Courts of Appeals are in agreement that § 17(a) does not give rise to a private cause of action).  Unlike § 44-1991(A), § 17(a) is only enforceable through an injunction or a criminal prosecution. *See id.*  In contrast, dispensing with the scienter requirement for § 44-1991(A)(3) would create a strict liability standard for private civil securities fraud actions, a consideration that is not applicable to actions brought under § 17(a).[10]  For that reason, *Aaron* is not applicable to claims under § 44-1991(A)(3).  Accordingly, Plaintiffs' § 44-1991(A)(3) claim is also subject to A.R.S. § 44-2082(B)'s heightened pleading standard.

The Complaint fails § 44-2082(B)'s pleading standard.  The United States Supreme

---

[10] Although Arizona courts have interpreted § 44-1991(A)(2) to not require proof of scienter for misstatements or omissions, this is not akin to strict liability, as the statute creates an affirmative defense to liability "if the person did not know and in the exercise of reasonable care could not have known of the untrue statement or misleading omission." A.R.S. § 44-2001(B).  The statute does not provide a similar affirmative defense to fraudulent course of business claims.

Court has interpreted the parallel provision of the PSLRA to require that the plaintiff allege a "cogent" and "compelling" inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 324 (2007).  It is not enough that a plaintiff "allege[s] facts from which an inference of scienter rationally could be drawn"; plaintiffs are required "to plead with particularity facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference." *Id.* at 323.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

Plaintiffs fail to allege facts giving rise to a cogent and compelling inference that any GT attorney acted with scienter in conducting an alleged fraudulent scheme or engaging in a fraudulent course of business.  The core premise of the claim against GT is that GT allegedly knew of illegal conduct by Radical Bunny; that GT should have inferred from this knowledge that Mortgages Ltd. was also engaged in some (unspecified) illegal activity; that GT knew that this unspecified illegal activity would give rise to liability of Mortgages Ltd.; and that GT thereby committed several violations of law by not causing Mortgages Ltd. to disclose to Mortgages Ltd. investors certain facts about Radical Bunny.

This premise fails.  Although Plaintiffs attempt to make much of various statements by Kant allegedly showing that he believed that Radical Bunny—an entity that was not GT's client—was violating certain registration provisions of the securities laws, Plaintiffs allege no facts that any GT lawyer concluded that Mortgages Ltd. had its own civil or criminal exposure by borrowing funds from Radical Bunny.  Plaintiffs do not even identify from what laws such exposure would derive.

Plaintiffs also fail to allege that any GT attorney knew of any of the alleged "materially adverse facts" regarding Mortgages Ltd.'s financial condition, *see* Compl. ¶¶ 86, 112-113, except for the single allegation that Kant knew of borrower defaults by mid-January 2008, *id.* ¶ 213.  Plaintiffs do not connect to this allegation to any fraudulent scheme or course of business, or provide any explanation as to how this defrauded them.  As a result, Plaintiffs have failed to meet the heightened pleading requirements for scienter, and

therefore their § 44-1991(A)(1) and (3) claim should be dismissed.  *See* A.R.S. § 44-2082(C)(1).

For the foregoing reasons, Plaintiffs have failed to state a claim under § 44-1991(A)(1), (2), or (3), and Count One should be dismissed.

## II.    Count Two Does Not State a Claim for Control Person Liability as to GT.

Although GT is listed in paragraph 412 as one of the defendants allegedly liable as a statutory control person under A.R.S. § 44-1999(B), Count Two includes no other mention of GT.  *See* Compl. ¶¶ 404-412.  It therefore appears likely that GT was mistakenly listed in paragraph 412, and that Count Two was not intended to apply to GT.  To the extent that Count Two is intended to state a claim against GT, it must be dismissed because it does not allege even in conclusory terms that GT controlled any entity that allegedly violated § 44-1991 or 44-1992.  *See* A.R.S. § 44-1999(B) (providing for liability for "[e]very person who . . . controls any person liable for a violation of § 44-1991 or 44-1992").

Nor could Plaintiffs state a control-person claim against GT.  To "control" a primary violator, a defendant must have "'the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'"  *See E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n.*, 79 P.3d 86, 99 (Ariz. Ct. App. 2003) (emphasis omitted) (quoting 17 C.F.R. § 230.405); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1572 n.16 (9th Cir. 1990).[11]  Applying this standard in the attorney context, courts have held that an outside law firm, like GT, does not "control" its client based merely on the provision of legal services—even where the law firm may have some persuasive influence over the client's decision-making.  *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (rejecting plaintiff's attempt to assign control liability to defendant law firm and noting that the

---

[11]  Arizona courts have recognized that A.R.S. § 44-1999(B) and Section 20(a) of the Securities Exchange Act of 1934 are substantially similar, and that Arizona law may look to federal courts' interpretations of Section 20(a) for guidance in interpreting A.R.S. § 44-1999(B).  *See E. Vanguard Forex, Ltd.*, 79 P.3d at 97.

"ability to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to *direct* the actions of the people who issue or sell the securities"); *Wenneman v. Brown*, 49 F. Supp. 2d 1283, 1290 (D. Utah 1999) (allegation that defendant law firm had influence over the client (and primary violator) was insufficient to survive dismissal of claim brought under § 20(a)); *Marshall v. Quinn-L Equities, Inc.*, 704 F. Supp. 1384, 1390–91 (N.D. Tex. 1988) (defendant law firm's influence on decisions did not suffice).  Count II, therefore, must be dismissed.

## III.   Count Three Fails To State a Claim for Aiding and Abetting Securities Fraud.

Count Three, which purports to state a claim for aiding and abetting violation of § 44-1991(A), fails on two grounds.  First, although the Arizona Supreme Court has not recently had occasion to address the question, it almost certainly would not recognize a cause of action for aiding and abetting securities fraud under Arizona law.  The Arizona Securities Act does not provide for aiding and abetting liability, and the United States Supreme Court has held that the nearly identical provisions of the federal securities laws do not allow for a private cause of action for aiding and abetting securities fraud.  Second, even assuming there is still a cause of action for aiding and abetting securities fraud, Plaintiffs fail to state a claim.

### A.   Aiding and Abetting Securities Fraud Is Not a Viable Cause of Action in Arizona.

Although the Arizona Supreme Court recognized aiding-and-abetting liability under § 44-1991 in a case decided more than 30 years ago, intervening case law of the United States Supreme Court would cause Arizona courts to no longer recognize that cause of action.  The statutory text of the ASA and a statement of legislative intent issued after the United States Supreme Court's decision would also dictate such an outcome.

Section 44-1991 is modeled on and very similar to federal securities statutes.  In *State v. Superior Court*, 599 P.2d 777, 784 (Ariz. 1979), *overruled on other grounds by State v. Gunnison*, 618 P.2d 604, 607 (Ariz. 1980), the Arizona Supreme Court recognized a claim for aiding and abetting a violation of § 44-1991 in reliance on a then-existing body of

federal case law permitting a claim for aiding and abetting securities fraud under federal securities law.  *See id.* (citing cases recognizing aiding-and-abetting liability under § 10(b) of the Securities Exchange Act of 1934).  In so ruling, the Court did not point to any independent rationale under Arizona law for its decision; instead, the Court concluded that given the similarity between the federal securities laws and § 44-1991, it would interpret the statutes consistently and permit liability for aiding and abetting.  *See id.*

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 177-78 (1994), however, the United States Supreme Court overturned those lower federal decisions that had recognized aiding and abetting liability and held that there is no private cause of action for aiding and abetting federal securities fraud.  Because the text of the statute does not expressly prohibit aiding and abetting securities fraud, the Court reasoned, a private plaintiff has no claim against one who engages in that conduct.  *Id.*  The Court also observed that extending the reach of securities fraud liability to aiders and abettors would create unclear rules and generate excessive litigation that could hurt even the intended beneficiaries of securities fraud statutes.  *Id.* at 189.

Because *State v. Superior Court*'s holding rested entirely on federal precedent that was later overruled by the United States Supreme Court, it is doubtful that aiding-and-abetting-securities-fraud liability still exists in Arizona.  Notably, the Arizona Supreme Court expressed its disapproval of a decision by the Court of Appeals that had rejected *Central Bank's* holding and recognized a claim for aiding and abetting under § 44-1991 by ordering the opinion depublished, thereby stripping the opinion of precedential value.  *See Grubaugh v. DeCosta*, 1999 WL 137640, at *13 (Ariz. Ct. App. Mar. 16, 1999), *review denied and ordered depublished* (Jan. 4, 2000); *see also Martinez v. Indus. Comm'n of Ariz.*, 962 P.2d 903, 905-06 (Ariz. 1998) (depublication orders indicate the Supreme Court's disapproval of the Court of Appeals' analysis).  The Arizona Supreme Court recently declined to re-affirm *State v. Superior Court*, instead noting that the legislature left the question open in the 1996 Amendments to the ASA.  *See Grand v. Nacchio*, 2010 WL 3034515, at *6.  *But see Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005)

(noting in dicta that *State v. Superior Court* is still good law).

The legislative history of the ASA is consistent with a finding that aiding and abetting liability should no longer exist under Arizona securities laws.  In enacting the 1996 Amendments to the ASA, the legislature declined to provide a textual basis for aiding-and-abetting liability following *Central Bank*, and "expressly left open" the question.  *Grand v. Nacchio*, __P.3d __, 2010 WL 3034515, * 5.  The statement of legislative intent clarified that "[n]othing in this act creates or ratifies any implied private right of action, [or] determines whether or in what circumstances aiding and abetting liability exists under [the ASA]."  *See* Sales of Securities-Litigation-Fraud, Unlawful Activity, Etc., ch. 197, 1996 Ariz. Legis. Serv. 1168, 1189 (West).

The Arizona Supreme Court likely would follow the lead of the *Central Bank* decision.  The Arizona Supreme Court has indicated that the ASA should be interpreted harmoniously with the federal securities laws.  *See State v. Gunnison*, 618 P.2d 604, 606-07 (Ariz. 1980) ("Unless there is a good reason for deviating from the United States Supreme Court's interpretation, we will follow the reasoning of that court in interpreting sections of our statutes which are identical or similar to federal securities statutes.").  In passing the 1996 Amendments to the ASA, the Arizona legislature contemplated that courts interpreting the ASA would look to opinions interpreting similar provisions of the federal securities laws for guidance.  *See* Sales of Securities-Litigation-Fraud, Unlawful Activity, Etc., ch. 197, 1996 Ariz. Legis. Serv. 1168, 1189 (West) ("[T]he courts may use as a guide the interpretations given by the securities and exchange commission and the federal or other courts in construing substantially similar provisions in the federal securities laws of the United States.").

The reasoning of *Central Bank* applies with equal if not greater force to the ASA.  In contrast to the federal scheme, where private civil liability is implied, the ASA expressly provides purchasers of securities a remedy for rescission or damages against not just sellers of securities but "any person, including any dealer, salesman or agent, who made, participated in, or induced the unlawful sale" in violation of § 44-1991.  A.R.S. § 44-

2003(A); *see also id.* § 44-2001(A); *Grand v. Nacchio*, 2010 WL 3034515, at *2 (noting remedy is not limited to sellers).  Aiders and abettors are not included among the class of persons against whom a private securities fraud action may be brought.  Thus, not only does the ASA's text not proscribe aiding and abetting, but it expressly defines the class of persons who may incur private civil liability for securities fraud to exclude aiders and abettors.  *See Champlin v. Sargeant In and For County of Maricopa*, 965 P.2d 763, 766 (Ariz. 1998) ("[T]he expression of one or more items of a class indicates an intent to exclude omitted items of the same class.").  Accordingly, the Arizona Supreme Court would follow *Central Bank*'s rejection of aider-and-abettor liability.

Consequently, Count Three should be dismissed for failure to state a claim upon which relief may be based.

**B.    Plaintiffs Have Not Stated a Claim for Aiding and Abetting Securities Fraud.**

Separately, Plaintiffs have failed to state facts to support a claim against GT under a theory of aiding and abetting securities fraud, even assuming one were to exist.[12]  In *State v. Superior Court*, 599 P.2d at 784, the Arizona Supreme Court followed the test articulated by the federal courts, requiring plaintiffs to prove:  "(1) a primary violation has occurred; (2) knowledge of or a duty of inquiry with regard to the primary violation by the person charged; and (3) a necessary contribution to the underlying scheme by the person charged."  Plaintiffs fail to plead facts against GT to support the second and third elements.

The knowledge element—which is subject to the ASA's heightened pleading standard, s*ee* A.R.S. § 44-2082(B)—requires either "actual knowledge or reckless disregard by the alleged aider and abettor of the wrong and of his or her role in furthering it."  *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991).  "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . ."  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (alteration and

---

[12] As noted in Part I.B.3 *supra*, to the extent Count Three relies on the existence of a joint venture between Mortgages Ltd. and Radical Bunny, it fails to state a claim.

quotation marks omitted); *see also Levine*, 950 F.2d at 1484 (applying *Hollinger* extreme recklessness standard to aiding and abetting); *Decker v. Massey-Ferguson*, *Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) (the aider and abettor's scienter "must . . . approximate an actual intent to aid in the fraud being perpetrated by the [primary violator]").

Where, as here, the allegations are based primarily on silence or inaction by the alleged aider and abettor and the defendant is under no duty of disclosure,[13] courts require a heightened level of scienter. *Levine*, 950 F.2d at 1484 n.4; *see also Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir. 1989) ("inaction can provide a basis for liability, in the absence of a duty to act, only when designed intentionally to aid [in] the primary fraud" (internal quotation marks omitted); holding defendant surety was not liable for aiding and abetting securities fraud where defendant knew of and failed to disclose misrepresentations in offering documents but had no duty of disclosure to plaintiff); *Moore v. Fenex, Inc.*, 809 F.2d 297, 303-04 (6th Cir. 1987) (analysis of the knowledge and assistance elements "must be particularly exacting in cases involving non-disclosure[;]" "plaintiffs must show that that the silence of the accused aider and abettor was consciously intended to aid the securities law violation" (internal quotation marks omitted)); *Austin v. Bradley, Barry & Tarlow, P.C.*, 836 F. Supp. 36, 39 (D. Mass. 1993) (unless there is an independent duty to speak, defendant "can only be liable as an aider and abettor if its silence was consciously intended to further the principal violation").

To show a defendant had a conscious intent to assist the primary violator, "the plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators." *Barker*, 797 F.2d at 497; *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990). In making this assessment, courts look to "whether the fraud (or cover-up) was in the interest of the defendants," *Barker*, 797 F.2d at 497; that is, "whether the alleged aider-and-abettor benefitted from such silence," *Austin*, 836 F. Supp. at 40 (quotation marks omitted). Here, Plaintiffs have not alleged any facts

_____

[13] *See supra* at p.13-14 and *infra* at p.31-34.

showing that GT benefitted from the alleged fraud or cover-up.  *See Barker*, 797 F.2d at 497 ("Law firms and accountants may act or remain silent for good reasons as well as bad ones, and allowing scienter or conspiracy to defraud to be inferred from the silence of a professional firm may expand the scope of liability far beyond that authorized [by the Supreme Court]"); *Austin*, 836 F. Supp. at 40 (concluding that merely receiving legal fees for services performed cannot demonstrate intent to aid fraud); *see also Miller*, 2000 WL 35730146, at *6 (plaintiffs could not viably claim that attorney was secondarily liable for "'aiding and abetting' or 'participating'" in the seller's securities fraud, because § 44-2003(A) "precludes imposition of any type of secondary liability on [defendants]").

Because Plaintiffs have failed to allege two of the required elements of aiding and abetting securities fraud, Count Three should be dismissed.

## IV.   Count Four for Aiding and Abetting Breach of Fiduciary Duty Fails.

Plaintiffs do not allege that GT breached any fiduciary duty owed to them.  Instead, Plaintiffs allege that GT aided and abetted Mortgages Ltd. and Radical Bunny in breaching their fiduciary duties of "full disclosure, loyalty, good faith, and fairness."  Compl. ¶ 422. This claim fails.  Plaintiffs do not allege the basis for a fiduciary relationship between either Mortgages Ltd. or Radical Bunny and Plaintiffs; and, even assuming there were such a relationship, Plaintiffs do not allege facts showing GT knowingly assisted Mortgages Ltd. or Radical Bunny in a breach of those fiduciary duties.

### A.   Plaintiffs Have Not Alleged Facts Showing a Fiduciary Relationship.

A fiduciary relationship is a "confidential relationship whose attributes include great intimacy, disclosure of secrets, or intrusting of power."  *Standard Chartered PLC*, 945 P.2d at 335 (alteration and internal quotations marks omitted).[14]  The fiduciary must "hold[]

---

[14] *See also Hertz & Lewis, Inc. v. Union Bank*, 528 P.2d 188, 190 (Ariz. Ct. App. 1974) (defining confidential relationship as a "[a] relationship which arises by reason of kinship between the parties, or professional, business, or social relations that would reasonably lead an ordinarily prudent person in the management of his business affairs to repose that degree of confidence in another which largely results in the substitution of that other's will for his in the material matters involved in the transaction" (quoting *In re Guardianship of Chandos*, 504 P.2d 524, 526 (Ariz. App. 1972))).

superiority of position over the beneficiary," *id.* (internal quotation marks omitted), and the beneficiary must agree to substitute the will of the fiduciary for its own or depend on the fiduciary to such an extent that "it cease[s] [to] act[] on its own behalf and cede[s] that function to [the fiduciary]," *id.* at 336; *see also* Rest. (Second) of Torts § 874 cmt. a ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."); *McAlister v. Citibank (Ariz.)*, 829 P.2d 1253, 1258 (Ariz. Ct. App. 1992) (holding no fiduciary relationship between a bank and its customer without a showing that bank acted as customer's financial advisor and customer relied on bank's financial advice). Plaintiffs do not allege facts showing they entered into a fiduciary relationship with either Mortgages Ltd. or Radical Bunny.

Plaintiffs allege that Mortgages Ltd. "was a manager or agent with fiduciary discretion to act . . . on behalf of investors," but do not point to any facts supporting this conclusory allegation. Compl. ¶ 420. Plaintiffs also allege that "[t]he Company's investors were dependent on Mortgages Ltd. for the managerial skill needed to run the Company." *Id.* Plaintiffs make similar allegations with respect to the relationship between Radical Bunny and its investors. *Id.* ¶ 421. But a unilateral assertion of dependence or reliance does not show a fiduciary relationship. *See Standard Chartered PLC*, 945 P.2d at 336 ("[T]rust, confidence, and reliance, though necessary components, do not suffice to establish a fiduciary relationship.").[15] Because Plaintiffs do not point to any facts supporting their assertion that Mortgages Ltd. or Radical Bunny and Plaintiffs entered into a fiduciary relationship, they cannot state a claim for aiding and abetting a breach of fiduciary duty.

---

[15] Plaintiffs also allege that Mortgages Ltd. owed both Radical Bunny and Mortgages Ltd. investors fiduciary duties in its capacity "[a]s manager[] or agent[] of the ML-RB Joint Venture." Compl. ¶ 422. As discussed in Part I, s*upra*, Plaintiffs have not pled facts to show the existence of a joint venture, and therefore cannot assert that Mortgages Ltd. owed either Mortgages Ltd. or Radical Bunny investors a fiduciary duty arising from its participation in the purported joint venture.

**B.      Plaintiffs Do Not Allege GT Knew of and Substantially Assisted Any Breach.**

Even if Plaintiffs could allege facts sufficient to show that Mortgages Ltd. or Radical Bunny owed and breached a fiduciary duty to Plaintiffs, they must additionally allege that (1) GT knew that the conduct constituted a breach of fiduciary duty; (2) GT substantially assisted or encouraged Mortgages Ltd. or Radical Bunny in the achievement of that breach; and (3) Mortgages Ltd.'s or Radical Bunny's breach injured Plaintiffs.  *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002).[16]  Plaintiffs' allegations fail to meet at least the first two elements.

Plaintiffs allege Mortgages Ltd. and Radical Bunny breached their fiduciary duties by "conducting a Ponzi scheme and failing to disclose to Class members . . . materially adverse facts  . . . and the deceptive and unfair acts or course of business."  Compl. ¶ 423.  The Complaint further asserts that all of the defendants, without differentiation, "knowingly aided and abetted and participated in the fiduciary breaches by Mortgages Ltd., Radical Bunny, and the ML-RB Joint Venture."  *Id.*  Because Plaintiffs' claim is premised on allegations of fraud, it is subject to Rule 9(b)'s heightened pleading standards.  *See Vess*, 317 F.3d at 1103-05; *In re TASER Int'l S'holder Derivative Litig.*, 2006 WL 687033, at *15 (D. Ariz. March 17, 2006) (applying Rule 9(b) to breach of fiduciary claim where based on

_____

[16] Courts apply special scrutiny to claims that an outside professional should be liable for its client's tortious conduct, to protect lawyers and other professionals from the threat of liability each time a client is alleged to have engaged in unlawful conduct.  *See El Camino Resources, Ltd. v. Huntington Nat'l Bank*, __ F. Supp. 2d __, 2010 WL 2651617, at *29 (W.D. Mich. July 1, 2010) ("To prevent banks, attorneys, and others from incurring near-strict liability for the torts of their clients, a high degree of scienter is necessary to extend fraud liability on an aiding-and-abetting theory." (internal quotation marks omitted)); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186, 187 (Minn. 1999) (noting "applying aiding and abetting liability to professionals has the potential to undermine the trust essential to any professional-client relationship" and "narrowly and strictly interpret[ing] the elements of the claim and requir[ing] the plaintiff to plead with particularity facts establishing each of these elements"); *see also Art Capital Grp., L.L.C. v. Neuhaus*, 896 N.Y.S.2d 35, 37 (N.Y. App. Div. 2010) ("[P]ublic policy demands that attorneys, in the exercise of their proper functions as such, shall not be civilly liable for their acts when performed in good faith and for the honest purpose of protecting the interests of their clients.").

allegations of fraudulent conduct).

Plaintiffs do not identify the elements of a "Ponzi scheme," which is an inherently conclusory label, nor do they allege that any GT attorney knew either Mortgages Ltd. or Radical Bunny was operating a Ponzi scheme.  Plaintiffs also do not allege that any GT attorney knew the "materially adverse facts" alleged by Plaintiffs regarding Mortgages Ltd.'s financial trouble or alleged insolvency.  *See id.* ¶¶ 86, 112, 113, 204, 206, 207, 208, 210.  Plaintiffs allege only that Kant knew that Mortgages Ltd. changed its redemption practices in accordance with the discretion granted to it in the governing documents (which Plaintiffs do not allege was unlawful or otherwise formed the basis for a breach of fiduciary duty), *id.* ¶ 212, and that certain Mortgages Ltd. borrowers were defaulting in January 2008, *id.* ¶ 213.  These allegations do not show that GT knew Mortgages Ltd. was in breach of any fiduciary duty to investors—or that GT even believed that Mortgages Ltd. had such duties to its investors.  Moreover, Plaintiffs' allegation that Kant sent Coles an e-mail in June 2008 commending Coles for "how hard [he] [was] working to protect [his] investors" contradicts any allegation that Kant knew Mortgages Ltd. was breaching a fiduciary duty to its investors.  *Id.* ¶ 242.  Thus, Plaintiffs have not pleaded facts establishing that GT knew Mortgages Ltd.'s alleged conduct constituted a breach of any fiduciary duty.  Plaintiffs have likewise failed to allege any facts tending to show that GT had any awareness of the relationship between Radical Bunny and its investors, much less that Radical Bunny was engaged in conduct that would constitute a breach of fiduciary duty.

Plaintiffs have also failed to plead facts showing that GT substantially assisted Mortgages Ltd. or Radical Bunny in any breach.  Like elsewhere in the Complaint, Plaintiffs baldly assert that GT "knowingly aided and abetted and participated in" Mortgages Ltd.'s and Radical Bunny's fiduciary breaches, *id.* ¶ 424, but do not allege facts supporting their conclusory allegations.  As previously noted, the facts alleged in the Complaint show that GT encouraged Radical Bunny to comply with the applicable laws, Compl. ¶¶ 137, 144, 161, and that GT advised Mortgages Ltd. on the preparation of its offering documents and provided other legal services for Mortgages Ltd.  These allegations do not amount to

substantial assistance by GT in aiding and abetting a breach of fiduciary duty.  *See Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685, 699 (D. Ariz. 2006) (holding no liability for law firm where plaintiff did not allege any acts by defendant that amounted to aiding and abetting the primary tortfeasor in the alleged breach of a fiduciary duty).[17]  Thus, the alleged facts fail to show GT substantially assisted either Mortgages Ltd. or Radical Bunny in any alleged breach.  Accordingly, Count Four should be dismissed for failure to state a claim upon which relief may be based.

## V.   Count Five for Negligent Misrepresentation Should Be Dismissed Because Plaintiffs Have Not Alleged GT Had a Duty to Plaintiffs.

Count Five is based in negligence, and alleges that GT "negligently gathered, compiled, and communicated information in the POMs," which were distributed by Mortgages Ltd. to prospective investors.  Compl. ¶ 428.  Plaintiffs' claim fails on the threshold requirement of a duty between GT and Plaintiffs.

Claims for negligent misrepresentation or nondisclosure are only actionable where the defendant owed a duty to the plaintiff.  *PLM Tax Certificate Program 1991-92 L.P. v. Schweikert*, 162 P.3d 1267, 1270 (Ariz. Ct. App. 2007) ("To be liable, the person charged with negligent misrepresentation must have owed a duty to the injured party."); *see also Dawson v. Withycombe*, 163 P.3d 1034, 1059 (Ariz. Ct. App. 2007) ("A necessary element

---

[17] *See also Reis v. Barley, Snyder, Senft & Cohen L.L.C.*, 667 F. Supp. 2d 471, 493 (E.D. Pa. 2009) (law firm not liable for aiding and abetting breach of fiduciary duty where "its conduct did not fall outside the normal provision of legal services"); *El Camino Res., Ltd.*, ___ F. Supp. 2d___, 2010 WL 2651617, at *34 ("[S]ubstantial assistance means something more than merely providing routine professional services that aid the tortfeasor in remaining in business, but do not proximately cause the plaintiffs' harm."); *Spinner v. Nutt*, 631 N.E.2d 542, 546 (Mass. 1994) ("An allegation that the [client] acted under the legal advice of the [attorney], without more, is insufficient to give rise to a claim that an attorney is responsible to third persons for the fraudulent acts of his clients."); *Art Capital Grp., L.L.C.*, 896 N.Y.S.2d at 37 (attorney not liable for aiding and abetting breach of fiduciary duty where acting within her capacity as an attorney); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580-81 (Tex. Ct. App. 2007) (declining to recognize a claim for aiding and abetting breach of fiduciary duty "by a non-client based upon the rendition of legal advice to a tortfeasor client"); *Witzman*, 601 N.W.2d at 189 ("substantial assistance means something more than the provision of routine professional services").

1    of any negligence claim is the existence of a duty.").

2         Under Arizona law, attorneys generally owe a duty of care only to their clients.  *See*

3    *Paradigm Ins. Co. v. Langerman Law Offices*, 24 P.3d 593, 601 (Ariz. 2001) (recognizing

4    applicability of general rule that "a professional owes no duty to a non-client unless special

5    circumstances require otherwise" to actions brought against attorneys (quotation marks

6    omitted)); *see also Miller*, 2000 WL 35730146, at *3 (Ariz. Ct. App. May 11, 2000)

7    (unpublished opinion) (cautioning that an obligation to a non-client "should be found only

8    where the weightiest of policy considerations require it").  Plaintiffs do not allege that they

9    were clients of GT, and the Complaint fails to allege any relationship between GT and

10   Plaintiffs that would satisfy an exception to this rule.

11        First, an attorney has no duty to a non-client where the interests of the non-client and

12   the client are adverse.  *See Wetherill v. Basham*, 3 P.3d 1118, 1128 (Ariz. Ct. App. 2000)

13   ("We envision no benefit and much potential mischief from imposing on attorneys a duty to

14   exercise reasonable care to nonclient third parties whose interests are directly adverse to

15   those of the attorney's client.").  Here, Plaintiffs are non-client investors who were arm's

16   length counterparties to Mortgages Ltd.'s and Radical Bunny's securities transactions.  In a

17   factually analogous case, the Arizona Court of Appeals held that corporate counsel does not

18   owe a duty to non-client shareholders where the interests of the non-client and the client are

19   potentially adverse.  *Miller*, 2000 WL 35730146, at *3.  To hold otherwise and permit

20   liability for an attorney's failure to "blow the whistle" on its client would threaten the

21   attorney-client relationship and place the attorney in an untenable position.  *See id.* at *2

22   ("[T]he effect of imposing such a duty [to third parties who deal with the client at arm's

23   length] would be the eradication of attorney-client confidentiality, the creation of a conflict

24   of interest, and the consequent destruction of the attorney-client relationship."); *see also*

25   *Barker*, 797 F.2d at 497 ("Neither lawyers nor accountants are required to tattle on their

26   clients in the absence of some duty to disclose.  To the contrary, attorneys have privileges

27

28

not to disclose." (citations omitted)).[18]

Second, Plaintiffs plead no facts showing that GT's representation of Mortgages Ltd. was for Plaintiffs' benefit or protection. *Cf. Paradigm Ins. Co.*, 24 P.3d at 601 (holding attorney hired by insurer to represent insured has duty to the insured "[w]hen the interests of insurer and insured coincide" and "the lawyer's duties to the insured are [] discharged for the full or partial benefit of the nonclient"). They have not alleged that any GT attorney made any oral or written statements to Plaintiffs or to members of the proposed classes, or otherwise provided any form of legal advice to, or promised to take any actions on behalf of, prospective or existing Mortgages Ltd. and Radical Bunny investors. As in *Miller*, GT "[was] not hired by Plaintiffs, did not act as Plaintiffs' agent, and had no contractual relationship with Plaintiffs." 2000 WL 35730146, at *4. Because Plaintiffs make no allegation that GT took any action for *their* benefit (rather than for the benefit of its client, Mortgages Ltd.), they cannot state a claim for negligent misrepresentation. *See Wetherill*, 3 P.3d at 1128 (attorney not liable where plaintiff was "not the intended beneficiary of the services for which [the attorney] was retained").

Third, the Complaint does not allege that GT had any pre-existing relationship or direct contact with any Mortgages Ltd. or Radical Bunny investor, or that GT made any direct representations to investors in the form of verbal assurances or written opinion letters.

---

[18] Throughout the Complaint, Plaintiffs couch their allegations in terms of alleged violations of the Arizona Rules of Professional Conduct, asserting the GT had a duty to "blow the whistle" on its client. While this may make for good theatrics, the law is otherwise. The Preamble to the Rules of Professional Conduct and a recent decision of the Arizona Supreme Court make clear that violations of the ethical rules do not give rise to any form of civil liability. Ariz. R. Prof'l Conduct, Preamble, ¶ 20 ("Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . The Rules . . . are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."); *Stanley v. McCarver*, 92 P.3d 849, 854 n.6 (Ariz. 2004) ("We have . . . declined to use the court's own ethical standards as a basis upon which to impose legal malpractice liability. While rules of professional conduct may provide evidence of how a professional would act, they do not create a duty or establish a standard of care as a matter of law." (citation omitted)).

*See* Part I.B.2, *supra* at p. 14 (noting courts are in agreement there is no duty in these circumstances).  Permitting Plaintiffs' claim to go forward on the facts alleged would expose attorneys to liability to any third party who received a statement made by the attorney's client for which the attorney allegedly had an advisory role, even where the interests of the third party and the client were in conflict or at arm's length.  *Cf. Napier v. Bertram*, 954 P.2d 1389, 1394-95 (Ariz. 1998) (declining to require duty where doing so would impose on all insurance agents a duty "to a vast number of non-clients" and would "work a fundamental change in [the] law").

As a separate basis for dismissing Plaintiffs' negligent misrepresentation claim, even if Plaintiffs could allege that GT owed them a duty, they fail to allege that they relied on any POM—which is the category of document upon which their claims against GT are based. *See PLM Tax Certificate Program 1991-92 L.P.*, 162 P.3d at 1270 (negligent misrepresentation requires, *inter alia*, that the "recipients of the information [] incur damages because they justifiably relied on the false information").  The Complaint's conclusory allegation that "[t]he Defendants named in this Count . . . . are subject to liability for pecuniary loss caused to Plaintiffs and the Classes by their justifiable reliance upon the information," Compl. ¶ 433, must be disregarded under *Iqbal*.  Plaintiffs do not otherwise allege reliance, or even that they read any POM.

Because Plaintiffs have not stated any facts upon which a duty from GT to Plaintiffs could be based, and further because they have not alleged to have relied on any statement allegedly prepared by GT, Count Five should be dismissed.

## VI.   Plaintiffs Have Not Alleged a Primary Violation of the Arizona Investment Management Act.

Plaintiffs' Count Six alleges that GT is liable under section 44-3241 of the Investment Management Act ("IMA"), which addresses fraud in the provision of investment advisory services.  Not only is the IMA an inappropriate vehicle for bringing claims against an outside law firm like GT, but Plaintiffs have also failed to plead facts to identify what investment advisory services they believe they were given.

In order to state a claim under section 44-3241 of the IMA, a plaintiff must allege that the defendant, "in connection with a transaction or transactions within or from this state involving the provision of investment advisory services, directly or indirectly," participated in certain fraudulent acts set forth in A.R.S. § 44-3241(A)(1)–(4).  Plaintiffs claim that GT is liable under subparts (1) ("[e]mploy any device, scheme or artifice to defraud"), (2) ("[m]ake any untrue statement of material fact, or fail to state any material fact necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading"), or (4) ("[e]ngage in any transaction, practice or course of business that operates or would operate as a fraud or deceit").  These substantive provisions largely duplicate the claims for fraudulent conduct discussed *supra*, Part I.C at 16-21 (discussing the pleading standard for fraud), and GT incorporates those arguments by reference here.  The heightened pleading requirements of Rule 9(b) similarly apply to claims brought under the IMA.  *See Hildenbrandt v. Indianapolis Life Ins. Co.*, 2009 WL 877713, at *7 (N.D. Tex. Mar. 31, 2009) (applying Arizona law).

But beyond the pleading deficiencies GT has already identified in connection with the substance of the fraud claims, Plaintiffs' IMA claim fails to adequately state a claim against GT for additional reasons.  First, Plaintiffs have not alleged, and cannot allege, that GT provided investment advisory services to anyone—whether directly or indirectly.  Indeed, the Complaint alleges only (in conclusory fashion) that Mortgages Ltd. Securities and Radical Bunny provided investment advice to Plaintiffs.  *See* Compl. ¶¶ 438, 441.  Even if Plaintiffs had attempted to allege such facts as to GT, the legislative history of the IMA suggests that the Arizona legislature never intended the Act to encompass non-investment advisers such as GT.  A pre-floor vote memorandum prepared for circulation to all members of the Arizona State Senate described the "Purpose" behind the proposed legislation as, "[r]equir[ing] licensure *for investment advisers* and establish[ing] rules and procedures regulating *their business practices*."  Ex. 1 (Memorandum "Strike-everything Amendment to H. B. 2271," at 1 (Mar. 24, 1994) (emphases added)).  The "Background" section of the memorandum also suggests that persons or entities like GT who are not in the business of

giving investment advice and who were already subject to professional regulation—by a state bar, for example—were outside the intended scope of the Act. *Id.* at 1. *But see Grant v. Arthur Andersen, L.L.P.*, 2001 WL 35976018 (Ariz. Super. Ct. Feb. 16, 2001).

Second, Plaintiffs' primary IMA claim fails because, although they recite language from the statute that they received "investment advisory services," Compl. ¶ 438, they have failed to identify any facts in support of that label, including what "advice" they allegedly received. With nothing more than these perfunctory recitations, Plaintiffs fall well short of pleading a basic element of an IMA claim. *See Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim]"); *see also DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *16–18 (S.D.N.Y. July 27, 2009) (dismissing claims under the federal Investment Advisers Act of 1940 based on plaintiffs' failure to allege interactions that rose to the level of investment advice). In fact, the POMs contained express language that warned that they should not be construed by potential investors as investment advice:

> PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR THE MANAGER, OR ANY OF THEIR OFFICERS, EMPLOYEES, OR REPRESENTATIVES AS LEGAL OR TAX ADVICE OR AS INFORMATION NECESSARILY APPLICABLE TO A PROSPECTIVE INVESTOR'S INDIVIDUAL FINANCIAL SITUATION. EACH INVESTOR SHOULD CONSULT THE INVESTOR'S OWN FINANCIAL ADVISOR, COUNSEL, AND ACCOUNTANT AS TO TAX AND RELATED MATTERS CONCERNING THE INVESTOR'S INVESTMENT.

*See* Ex. 2, at 2 (Sample POM).[19]

---

[19] Because Plaintiffs rely on and incorporate the POMs in connection with their allegations, the POMs are properly before the Court on a motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) (content of offering agreements and stock purchase agreement were properly before the court on a Rule 12(b)(6) motion to dismiss); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Garza v. Am. Home Mortg.*, 2009 WL 1139594, at *2 (E.D. Cal. Apr. 28, 2009).

Finally, even if the Complaint could state a claim against GT under the IMA, at least a portion of Plaintiffs' claims are barred by the statute of limitations.  Many of the transactions listed in the "Schedules of Transactions" attached as exhibits to the Complaint allegedly took place in or before 2006.  Yet A.R.S. § 44-3241(B) provides that "[a] civil action under this section is barred unless it is brought within three years after the violation or within two years after discovery of the facts constituting the violation, whichever occurs first."  Thus, Plaintiffs' claims under the IMA are time-barred to the extent they arise out of transactions that occurred three years or more prior to the filing of the Complaint on May 11, 2010 (or, in the case of plaintiffs Robert Facciola and the Robert Maurice Facciola Trust Dated December 2, 1994, more than three years prior to the entry of a tolling agreement with GT).

## VII.   Plaintiffs Cannot Establish GT's Liability Under Arizona's Investment Management Act Based on an Aiding and Abetting Theory.

Through their Count Seven, Plaintiffs ask this Court to create an entirely new category of liability for aiding and abetting another's breach of the IMA, despite the absence of any statutory language or judicial precedent to support such a theory.  There is no basis for doing so.

The IMA contains no language providing for secondary liability—aiding and abetting or otherwise—for another party's alleged primary violation of the Act.  Without language in the statute providing for such liability, none should be recognized.  *See Mann v. GTCR Golder Rauner, L.L.C.*, 483 F. Supp. 2d 884, 917–19 (D. Ariz. 2007) (no aiding and abetting liability under Arizona's Uniform Fraudulent Transfer Act in the absence of any statutory language to support such a theory); *see also Cent. Bank of Denver, N.A.*, 511 U.S. at 175–77 ("If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.  But it did not."); *Freeman v. DirecTV*, 457 F.3d 1001, 1004–06 (9th Cir. 2006) (no aiding and abetting liability where plain language of statute did not provide for it).  To date, no Arizona court has recognized

1   secondary liability in the context of the IMA, and Plaintiffs can offer no statutory

2   justification for breaking new ground.

3          Moreover, even if aiding and abetting liability could, in theory, exist under the IMA,

4   Plaintiffs would still have failed to state a claim under the general pleading standard for

5   aiding and abetting claims under Arizona law.  First, Plaintiffs' failure to allege the "who,

6   what, when, where and how" necessary to support a claim for a primary violation of the

7   IMA against GT under Rule 9(b) is equally fatal to their claim for aiding and abetting a

8   violation of that Act.  Second, Plaintiffs have not alleged that GT had knowledge that the

9   conduct it allegedly aided and abetted was a violation of the IMA, as is required to plead

10  aiding and abetting liability.  *See Wells Fargo Bank*, 38 P.3d at 23; *Dawson*, 163 P.3d at

11  1052–53.  Here, Plaintiffs have alleged no more than that GT provided legal advice on the

12  preparation of the POMs that Mortgages Ltd. Securities, in turn, "used in connection with

13  the investment advisory services that ML Securities (and its managing directors) provided to

14  Mortgages Ltd. investors."  *See* Compl. ¶ 445.  This allegation is wholly lacking in detail

15  regarding GT's knowledge about the contours of the alleged primary violation by Mortgages

16  Ltd. and Radical Bunny, particularly given the language in the POMs that Mortgages Ltd.

17  disclaimed any role as an investment advisor.  *See supra* at p. 36.

18         Consequently, Plaintiffs' Count Seven should be dismissed.

## **CONCLUSION**

20         For the reasons set forth above, GT respectfully requests that the Court dismiss

21  Plaintiffs' Complaint pursuant to Rules 12(b)(6) and 9(b).

1  RESPECTFULLY SUBMITTED this 17th day of August, 2010.

2
3                                        **GALBUT & GALBUT, P.C.**

4                                        By:/s/ Martin R. Galbut_____
                                              Martin R. Galbut, Esq.
5                                             Michaile J. Berg, Esq.

6                                        **WILLIAMS & CONNOLLY LLP**

7
8                                        By:/s/ Ellen E. Oberwetter_____
                                              Kevin M. Downey, Esq.
9                                             Ellen E. Oberwetter, Esq.
                                              Patrick J. Houlihan, Esq.
10                                            Attorneys for Defendant Greenberg Traurig

11
12                                 **NOTICE OF ELECTRONIC FILING**

13          I hereby certify that on August 17, 2010, I electronically filed the foregoing with the

14 Clerk of Court for filing and uploading to the CM/ECF system which will send notification

15 of such filing to all parties of record.

16

17   /s/ N. Sunshine Nye_____

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**ARIZONA STATE SENATE**

For Caucus & Floor Action

**M E M O**

March 24, 1994

To:     MEMBERS OF THE SENATE

From:   TAMI RYALL, Assistant Legislative Research Analyst
        Senate Commerce and Economic Development Committee

Re:     <u>Strike-everything Amendment to H.B. 2271</u>

<u>Purpose</u>

Requires licensure for investment advisers and establishes rules and procedures regulating their business practices.

<u>Background</u>

Presently, investment advisers are not regulated by the state.  However, certain financial institutions, securities dealers, and insurance companies providing investment advisory services as an incidental part of their business are presently regulated by the state or the federal government.  Further, attorneys and certified public accountants providing investment advisory services as an incidental part of their practice or profession are presently regulated through the state bar and the state respectively.

Consumer groups such as the American Association of Retired Persons have expressed concern with the absence of state regulation of investment advisers. In 1992, the Governor's Advisory Council on Aging created a financial fraud task force to study these concerns. The task force recommended legislation be enacted to regulate investment advisors.

This legislation requires persons giving investment advice for compensation to be licensed by the Corporation Commission, and subject to prescribed regulations

<u>Provisions</u>

**DEFINITIONS**

● Defines "investment adviser" as any person who, for compensation, engages in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing or selling securities and as a part of regular business issues analyses or reports concerning securities.

● Defines "investment adviser representative" as any partner, officer or director of an investment adviser, any person who occupies a status or performs functions similar to a partner or any other individual employed by or associated with an investment adviser who does any of the following:

· renders advice regarding securities;
· manages account or portfolios of client;
· is a member of an investment advisory committee determining general investment advice to be given to clients;
· sells investment advisory services;

- O V E R -

Memo to Members of the Senate
March 24, 1994
Page 2

- supervises employees performing investment advisory services;
- performs similar investment services as designated by rule or order of the Corporation Commission.

● Defines "investment company" as any issuer that either:

- holds itself out as being engaged primarily in the business of investing or trading securities;
- engages in the business of issuing mutual funds;
- engages in the business of investing or trading in securities and owns or proposes to acquire investment securities with a value exceeding forty per cent of the value of the issuer's total assets, excluding government securities and cash items.

## EXCLUSIONS

● Specifies for purposes of licensure, an investment advisor does not include:

- depository institutions;
- lawyers or certified public accountants;
- publishers, employees or columnists of financial publications if investment advice is in general context and not on the basis of the specific investment situation of each client;
- insurance companies or licensed insurance agents who sell annuities for insurance purposes;
- licensed real estate salespeople or brokers;
- licensed mortgage brokers or mortgage bankers;
- chartered financial consultants;
- other persons designated by rule or order of the Corporation Commission.

● ludes from licensure requirements, investment advisors registered or not required to be registered under the Investment Adviser's Act of 1940. This exemption applies if the investment advisor does not have a place of business in this state and meets certain conditions regarding clientele. Additionally, a dealer or salesman registered under the Arizona Securities Act is exempted.

## LICENSURE

● Directs investment advisers required by this legislation to be licensed to submit the prescribed application and fee to the Securities Division of the Corporation Commission before September 1, 1994.

● Prohibits unlicensed individuals from transacting business in this state as an investment adviser or investment adviser representative. Persons who knowingly violate this requirement are guilty of a class one misdemeanor.

Memo to Members of the Senate
March 24, 1994
Page 3

● Specifies applicants for licensure as investment advisers must submit a uniform application, proof of compliance with uniform written examination requirements, financial reports, a licensure fee and other information the Commission may request.

● Specifies applicants for licensure as investment adviser representatives must submit a uniform application, proof of compliance with uniform written examination requirements, a licensure fee and other information the Commission may request. An investment adviser representative must be employed by an investment advisor to be licensed. Provisions are included for the transfer of licensure of investment adviser representatives to accommodate changes in employment.

● Provides all licenses expire on December 31 of each year unless renewed prior to expiration.

● Requires investment advisers and investment adviser representatives to file the following with the Commission to retain licensure:

    · a supplemental statement in the event any material changes of fact occur;
    · an audited balance sheet if a licensed investment adviser has custody of client monies or requires payment of advisory fees six months or more in advance and in excess of five hundred dollars;
    · an annual audited balance sheet at the end each fiscal year investment adviser has discretionary authority over client monies.

● Provides annual license fees and transfer fees. The annual license fee for each investment adviser is two hundred fifty dollars and annual license fees for each investment advisor representative is forty dollars. Transfer fees are forty dollars.

Specifies conditions for license denial, revocation and suspension. Provides before entering an order denying, suspending or revoking the license of an investment adviser or investment adviser representative, the Commission must notice the individual and provide an opportunity for a hearing.

● Prescribes notification procedures and administrative hearing guidelines.

CORPORATION COMMISSION

● Authorizes the Corporation Commission to:

    · conduct investigations and examine the affairs of investment advisors;
    · administer oaths and affirmations, subpoena witnesses, take evidence and require the production of documents;
    · hold hearings for enforcement and fact finding purposes;
    · assess an administrative penalty of up to one thousand dollars;
    · issue cease and desist orders in the event of violation discovery;

- O V E R -

Memo to Members of the Senate
March 24, 1994
Page 4

- apply to the Superior Court in Maricopa County for an injunction restraining an individual from any violation activity;
- apply to the Superior Court in Maricopa County for an order restoring monies or property to respective owners in the event of violation activity;
- negotiate agreements with the administrators of the securities laws of other states, Canada, Mexico and the North American Securities Administrators Association.

● Allows the Corporation Commission to adopt rules allowing businesses meeting the requirements of Securities and Exchange Commission Rule 504 (applying to certain small businesses) to make public offerings of up to $1 million per year (the amount allowed by Securities and Exchange Commission Rule 504) to accredited investors, which include certain large institutional investors and individuals having a substantial net worth or income. This provision allows the Corporation Commission to adopt rules which will let a small business take advantage of Rule 504 without subjecting the small business to the substantial limitations imposed by the securities laws in the case of offerings of securities to nonaccredited investors.

● Permits the Corporation Commission to adopt rules allowing solicitations of interest for the sale of securities by businesses under Securities and Exchange Commission Regulation A and Section 44-1902. This provision allows the Corporation Commission to adopt rules in coordination with Securities and Exchange Commission and other states allowing a small business to determine whether there is any investor interest in a securities offering the small business proposes to undertake, prior to incurring the substantial expenses associated with a securities offering.

● Requires the Corporation Commission to administer an investment management regulatory and enforcement fund, established in the State Treasury. Fees collected are to be deposited in this fund. If the balance in the fund exceeds $500,000, the amount in excess of $500,000 reverts to the state general fund. Beginning with the fiscal year starting on July 1, 1996, monies in the fund are subject to annual legislative appropriation.

## ENFORCEMENT

● Specifies the following fraudulent acts constitute a class four felony and individuals committing such acts are liable for all resulting losses, interest, court costs and attorneys' fees:

- employing any device, scheme or artifice to defraud;
- making any untrue statements of material fact or failing to state a material fact when necessary;
- engaging in any transaction that operates or would operate as a fraud or deceit.
- misrepresenting any professional qualifications with the intent that the client rely on the misrepresentation.

Memo to Members of the Senate
March 24, 1994
Page 5

● Authorizes the Corporation Commission to transmit any evidence of fraudulent acts to the Attorney General.

● Provides the Attorney General may petition the Superior Court in Maricopa County for the appointment of a conservator or receiver to administer the affairs of the violator.

● Authorizes the Attorney General to recover costs associated with attorney fees and investigative expenses, at the discretion of the court.

### REGISTRATION OF SECURITIES

● Prescribes procedures for the registration of an indefinite amount of securities issued by open-end companies and unit investment trusts, including:

- the amount and term of securities rendered;
- the filing of sales reports;
- initial registration and renewal fees.

● Specifies that fees collected for the registration of securities issued by open-end companies and unit investment trusts are deposited as follows:

- 80% in the state general fund;
- 10% in the capital markets account of the commerce and economic development commission fund;
- 10% in the investment management regulatory and enforcement fund.

● Provides, until one year after the date of enactment, five per cent of the fees collected pursuant to this legislation will be deposited into the capital markets account and fifteen per cent will be deposited into the investment management regulatory and enforcement fund.

### MISCELLANEOUS

● Defines additional terms.

● Requires an affirmative vote of at least two-thirds of the members of each house of the legislature and is effective immediately on the signature of the Governor.

● Makes technical changes.

Amendments Adopted by Committee

● A strike-everything amendment was adopted.

Senate Action

CED   3/23/94     DPA   8-0-0

dj/lhj

# Exhibit 2

Copy Number _____

# PRIVATE OFFERING MEMORANDUM

March 30 , 2007

---

# MORTGAGES LTD. OPPORTUNITY FUND MP15 L.L.C.,
## an Arizona Limited Liability Company

- **$500,000,000 of Membership Interests**

- **Minimum Initial Investment - $500,000**

Mortgages Ltd. Opportunity Fund MP15 L.L.C. (the "Company") was formed by Mortgages Ltd., an Arizona corporation (the "Manager"), to acquire all or portions of loans ("Loans") to various persons, corporations, limited liability companies, partnerships, and other entities ("Borrowers") secured by deeds of trust or mortgages on residential, commercial, and industrial real estate. Substantially all the Loans will be secured by real estate located in Arizona. The Manager has the exclusive right to manage the business and affairs of the Company, including deciding the Loans in which the Company will acquire an interest.

The Company is offering, to "accredited investors" as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act") up to $500,000,000 in Membership Interests ("Interests") in the Company (the "Offering"). The Offering will continue until terminated by the Company.

The currently anticipated range of yields on the Interests is from 9.75% to 11.00% per annum. There is no assurance that this or any other return will be achieved.

---

AN INVESTMENT IN THESE SECURITIES IS HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS. SEE "RISK FACTORS," BEGINNING ON PAGE 10.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED OR RECOMMENDED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER REGULATORY AUTHORITY NOR HAS THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ADEQUACY OR ACCURACY OF THIS PRIVATE OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE BEING OFFERED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT IN ACCORDANCE WITH THE PROVISIONS OF SECTION 4(2) AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER BY THE SECURITIES AND EXCHANGE COMMISSION, AND STATE SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION, OR EXEMPTION THEREFROM.

|  | Offering Price | Selling Commissions (1) | Net Proceeds to Company (2) |
|---|---|---|---|
| Minimum per Person (3) | $     500,000 | $     -0- | $     500,000 |
| Total Offering | $500,000,000 | $     -0- | $500,000,000 |

(1) The Interests will be offered through Mortgages Ltd. Securities, L.L.C. ("MLS"), an affiliate of the Manager, on a best efforts basis. Neither the Members nor the Company will be required to pay MLS a securities commission. The Manager will pay MLS a placement fee, and the Manager and MLS are parties to an expense sharing agreement. The Manager also may pay placement fees to other registered broker-dealers.

(2) The initial offering expenses, including legal fees and printing costs but excluding any filing fees, is currently estimated at $30,000 and will be advanced by the Manager. The Company will reimburse the Manager for such amount in 12 equal monthly installments, with interest accruing thereon 10% per annum until paid in full. In addition, the Company will also pay the Manager a one-time organizational fee of $15,000, which will be paid in 12 equal monthly installments.

(3) The Company, in its sole discretion, may change or adjust the minimum investment per person, at any time.

THE INTERESTS ARE BEING OFFERED AND SOLD IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933 AND STATE SECURITIES LAWS.  THE COMPANY RESERVES THE RIGHT, IN ITS SOLE AND ABSOLUTE DISCRETION, TO REJECT ANY SUBSCRIPTION.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE COMPANY OR THE MANAGER, OR ANY OF THEIR OFFICERS, EMPLOYEES, OR REPRESENTATIVES AS LEGAL OR TAX ADVICE OR AS INFORMATION NECESSARILY APPLICABLE TO A PROSPECTIVE INVESTOR'S INDIVIDUAL FINANCIAL SITUATION.  EACH INVESTOR SHOULD CONSULT THE INVESTOR'S OWN FINANCIAL ADVISOR, COUNSEL, AND ACCOUNTANT AS TO TAX AND RELATED MATTERS CONCERNING THE INVESTOR'S INVESTMENT.

NO DEALER, SALESMAN, OR OTHER PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION IN CONNECTION WITH THE OFFERING OTHER THAN AS SET FORTH IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS BEING AUTHORIZED.  THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM SUCH OFFER WOULD BE UNLAWFUL.

| TABLE OF CONTENTS | PAGE |
|---|---|
| WHO MAY INVEST | 3 |
| SUMMARY | 5 |
| RISK FACTORS | 10 |
| SOURCE AND ESTIMATED USE OF PROCEEDS | 27 |
| COMPENSATION TO THE MANAGER AND ITS AFFILIATES | 28 |
| CONFLICTS OF INTEREST | 31 |
| THE MANAGER | 33 |
| FIDUCIARY RESPONSIBILITY OF THE MANAGER | 35 |
| INVESTMENT AND OPERATING POLICIES | 36 |
| FEDERAL INCOME TAX CONSEQUENCES | 41 |
| ERISA ASPECTS OF THE OFFERING | 53 |
| SUMMARY OF THE OPERATING AGREEMENT | 57 |
| TERMS OF THE OFFERING | 62 |
| RESTRICTIONS ON TRANSFER | 62 |
| LEGAL MATTERS | 62 |
| ADDITIONAL INFORMATION | 63 |
| SUPPLEMENTAL SALES LITERATURE | 63 |
| LITIGATION | 63 |

**EXHIBIT A:**   Operating Agreement of Company
**EXHIBIT B:**   Subscription Agreement
**EXHIBIT C:**   Purchaser Representative Questionnaire
**EXHIBIT D:**   Financial Statements of Mortgages Ltd.
**EXHIBIT E:**   Subscription for Additional Interests for Existing Members Only

# WHO MAY INVEST

**Investor Suitability Requirements**

An investment in Interests involves a high degree of risk and is suitable only for persons of substantial financial means that have no need for liquidity in their investments. Interests will be sold only to investors that (1) buy at least $500,000 of Interests, subject to certain exceptions, in the discretion of the Company, and (2) represent in writing that they meet the investor suitability requirements established by the Company and required under federal or state law.

The written representations you make will be reviewed to determine your suitability. The Company may, in its sole and absolute discretion, refuse an offer to purchase Interests in whole or in part if it believes that an investor does not meet the applicable investor suitability requirements, or Interests are otherwise an unsuitable investment for the investor, or for any other reason.

You must represent in writing that you meet, among others, all of the following requirements:

- you have read and fully understand this Memorandum and are basing your decision to invest on the information contained in this Memorandum;

- you have relied only on the information contained in this Memorandum and have not relied on any representations made by any other person;

- you are an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act. An accredited investor is an investor that meets any of the following tests:

  ➢ any natural person who has (i) an individual net worth, or joint net worth with his or her spouse, of more than $1,000,000; or (ii) individual income in excess of $200,000, or joint income with

his or her spouse in excess of $300,000, in each of the two most recent years and has a reasonable expectation of reaching the same income level in the current year;

➢ any corporation, Massachusetts or similar business trust, partnership, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring Interests, with total assets over $5,000,000;

➢ any trust, with total assets over $5,000,000, not formed for the specific purpose of acquiring Interests and whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in Interests as described in Rule 506(b)(2)(ii) under the Securities Act;

➢ any broker-dealer registered under Section 15 of the Securities Exchange Act of 1934, as amended;

➢ any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940;

➢ any small business investment company licensed by the Small Business Administration under Section 301(c) or (d) or the Small Business Investment Act of 1958;

➢ any employee benefit plan within the meaning of ERISA, if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of ERISA), which is either a bank, savings and loan association, insurance company, or

registered investment advisor, or if such employee benefit plan has total assets over $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors;

➢ any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

➢ any bank as defined in Section 3(a)(2) of the Securities Act, any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity, or any insurance company as defined in Section 2(13) of the Securities Act;

➢ any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets of more than $5,000,000;

➢ any executive officer of the Company; or

➢ any entity in which all of the equity owners are accredited investors.

For purposes of calculating your net worth, "net worth" is defined as the difference between total assets and total liabilities, including home, home furnishings, and personal automobiles. In the case of fiduciary accounts, the net worth and income suitability requirements must be satisfied by the beneficiary of the account, or by the fiduciary, if the fiduciary directly or indirectly provides funds for the purchase of Interests.

- you are acquiring Interests for your own account and for investment purposes only and have no present intention, agreement, or arrangement for the distribution, transfer, assignment, resale, or subdivision of Interests;

- you have such knowledge and experience in financial and business matters that you are capable of evaluating the merits and risks of investing in Interests and have the ability to protect your own interests in connection with such investment or are utilizing the services of a "purchaser representative" that has such knowledge and experience;

- you understand that an investment in Interests is highly speculative and involves substantial risks, and you are fully cognizant of and understand all of the risks relating to an investment in Interests, including those risks discussed under "Risk Factors";

- your overall commitment to investments that are not readily marketable is not disproportionate to your individual net worth, and your investment in Interests will not cause such overall commitment to become excessive;

- you have adequate means of providing for your financial requirements, both current and anticipated, and have no need for liquidity in this investment; and

- you can bear and are willing to accept the economic risk of losing your investment in the Interests you are purchasing.

# SUMMARY

The following summary is qualified in its entirety by the more detailed information appearing elsewhere in this Memorandum. Prospective purchasers and their attorneys, accountants, or business advisors should thoroughly review this entire Memorandum prior to the purchase of Interests.

**The Company and the Manager**.

The Company is an Arizona limited liability company formed in March 2007.

The manager of the Company (the "Manager") is Mortgages Ltd., an Arizona corporation that is an Arizona licensed mortgage banker. Scott M. Coles is the Chairman and Chief Executive Officer of the Manager. The Manager has the exclusive right to manage the business and affairs of the Company in accordance with the operating agreement of the Company (the "Operating Agreement"), a copy of which is attached hereto as Exhibit A. In such capacity, the Manager will, among other things, determine the Loans in which the Company will acquire an interest.

The principal offices of the Company and the Manager are located at 55 East Thomas Road, Phoenix, Arizona 85012; telephone (602) 277-5626, and facsimile (602) 264-9374.

**Objectives of the Company**.

The Company's primary objectives are (1) to preserve the Company's capital; (2) to provide its Members with monthly cash distributions from interest payments on the loans in which the Company owns an interest; and (3) return the Members' investments upon the winding up of the Company. The Company cannot assure that these objectives will be met.

**Investments of the Company**.

The Company will acquire all or a portion of loans ("Loans") to various persons, corporations, limited liability companies, partnerships, and other entities ("Borrowers") secured by deeds of trust or mortgages on residential, commercial, and industrial real estate. It is anticipated that substantially all of the Loans will be secured by real estate located in Arizona, although loans also may be made on real estate located in California, Colorado, and New Mexico.

**Securities Offered**.

The Company is offering up to $500,000,000 in Interests (the "Offering"). The Offering will continue until terminated by the Company.

The currently anticipated range of yields on the Interests is from 9.75% to 11.00% per annum. There is no assurance that this or any other return will be achieved.

The Interests will be offered through Mortgages Ltd. Securities, L.L.C. ("MLS"), an affiliate of the Manager that is a member of the National Association of Securities Dealers ("NASD"), on a best efforts basis. Interests also may be offered through other broker-dealers that are members of the NASD. Neither the Members nor the Company will be required to pay MLS a securities commission. The Manager, however, will pay MLS or any other broker-dealer a placement fee, and the Manager and MLS will share certain expenses under an expense sharing agreement. The Manager also may pay placement fees to other broker-dealers. *Once an investment has been accepted, it may not be revoked.* Upon the acceptance of a subscription, the investor will be admitted as a Member. The Company, in its discretion, may accept subscriptions for less than $500,000 and may accept subscriptions for fractional Interests above $500,000.

**Method of Subscription**.

Each person or entity desiring to purchase Interests must execute and deliver the following to MLS:

- a Subscription Agreement substantially in the form of Exhibit B;

5

- a Purchaser Representative Questionnaire, if applicable, substantially in the form of Exhibit C; and
- a check or wire transfer payable to "Mortgages Ltd. Opportunity Fund MP15 L.L.C." in an amount equal to the purchase price of the Interests to be purchased in the initial minimum amount of $500,000. After making an initial investment of at least $500,000, an investor may thereafter invest additional funds with the Company, with each such additional investment to be for a minimum of at least $1,000.

A purchase is subject to timely receipt of the required documents, the full payment of the subscription price, and the Company's review and acceptance of the documents. The Company, in its absolute discretion, may reject any subscription for Interests in whole or in part.

**Suitability of Interests**.

The purchase of Interests is suitable only for investors of substantial means that have no need for liquidity in their investments. Interests will be sold only to "accredited investors" as defined in Regulation D under the Securities Act, except in the sole discretion of the Manager in very limited circumstances.

**Cash Distributions**.

The Company will distribute 100% of its Cash Available for Distribution to the Members on a monthly basis in proportion to their respective ownership interests ("Participation Percentages") at the time of the distribution. Cash Available for Distribution generally means the interest payments received by the Company on Loans less the sum of (1) amounts used to pay the Company's operating expenses, including fees and compensation to the Manager, and (2) amounts used to pay debts and liabilities of the Company. The Company generally intends to reinvest the proceeds from principal payments on Loans in new Loans.

The Company may also allow Members the option to elect to reinvest the monthly distributions that the Member would otherwise receive from the Company as additional Capital

Contributions (the "Reinvestment Option"). Any reinvested distributions will be credited to a Member's Account with the Company on the first day of the following month. Therefore, a Member's Participation Percentage in the Company will be recalculated each month based upon the proportion that that Member's Account balance bears to the aggregate balances of all Members' Capital Accounts that month. Once the Reinvestment Option is elected, it can be revoked with 30 days advance written notice. Subject to the availability of funds and the sole discretion of the Company, a Member can elect annually to receive a return of all or a portion of the funds of the Member that were reinvested over the preceding year, provided written notice is received by the Company by March 15. Distributions will occur by April 15.

**Allocation of Profits and Losses**.

The Company's Profits and Losses will be allocated 100% to the Members in proportion to their respective Participation Percentages at the time of the allocation. A Member's Participation Percentage may fluctuate each month due to the Reinvestment Option, the admission of new Members, and permitted redemptions.

**Interest Rates on the Loans.**

Each Loan will bear interest at a rate determined at the time the Manager makes or acquires the Loan. Interest payments will be due at such time or times as the Manager determines, generally monthly.

Some of the Loans will bear fixed interest rates throughout their term. Other Loans will bear variable or adjustable interest rates under which the interest rate will be based on the prime or other benchmark rate published by a designated institutional lender or organization and will be periodically adjusted as such prime or other benchmark rate is adjusted, typically subject to a minimum interest rate.

**Principal Payments on the Loans.**

Some of the Loans will be "interest only" loans while other Loans will be "amortizing" Loans.

6

An interest only Loan has no principal repayment requirements during its term with a balloon of the full principal obligation due upon the Loan's maturity. An amortizing Loan may either have periodic principal payments, such that the principal is repaid in full by such periodic reductions by the Loan's maturity date, or periodic principal reductions that result in a partially reduced principal amount by maturity, requiring a "balloon" payment of less than the original principal amount, such as in the case of a loan with principal payments based on a 20-year amortization but only a three-year term.

**Security for the Loans.**

Each Loan will be secured by a deed of trust or mortgage on residential, commercial, or industrial real estate. The deed of trust or mortgage may be subordinate or subject to one or more existing liens or encumbrances on the real estate. The Company generally will not require an appraisal of the real estate certified by an independent appraiser.

In certain cases, the only collateral securing the Loan will be the real estate or other property underlying the Loan. In other cases, the Loan will be secured by personal or corporate guarantees or may be secured by one or more items of real or personal property in addition to the property constituting the primary security for the Loan. Nevertheless, the primary security for a Loan in most cases will be the property underlying the Loan. The ability of the Borrower to pay the outstanding balance of a Loan (particularly a non-amortizing Loan) upon maturity will depend primarily upon the Borrower's ability to obtain sufficient funds by the refinancing, sale, or other disposition of the underlying property.

**Terms of the Loans.**

The length of maturity of the Loans generally will range between one and three years although certain Loans may have shorter or longer maturities.

**Principal Amount of Loans; Loan Advances.**

Other than the funding in connection with certain specialized loan programs, each Loan will be in a principal amount equal to the funds advanced at the time the Loan is originated, including any interest reserve; any amounts advanced for costs incurred in connection with the acquisition, financing, or refinancing of the underlying property; and title insurance fees, escrow fees, casualty insurance premiums, and other such items. Except for specialized loan programs, such as delayed funding construction loans and certain revolving loan plans, in which funds may be drawn upon in periodic amounts, the entire principal amount will be funded at the closing of the Loan and will earn interest at the agreed upon rate from such date. Although construction loans may be made, the Company will fund a draw to a Borrower under such a Loan for payment to a contractor or subcontractor only after the Company has a lien waiver executed by the Borrower, general contractor, or subcontractor, as appropriate, and the Company or its agent has authorized the release of the funds.

In addition, the Borrower may prepay a Loan in whole or in part, at any time, subject to whatever prepayment penalties the Company may negotiate.

In connection with the sale of the property that secures a Loan, the Company may consent to the sale subject to the Loan or may make a new Loan to the purchaser of the property. In other cases, a Loan may require payment upon sale of all or a portion of the property. The Company may qualify its "due on sale" clause by providing release provisions, so that a portion of the collateral may be released from the related deed of trust or mortgage by payment of an agreed upon principal portion of a Loan. In determining whether to allow partial releases to a Borrower on a particular Loan, the Company generally will allow such releases upon payment of a sum equal to 130% or more of the pro-rata portion of the principal amount of the Loan secured by the released property although the release price may be a lesser pro-rata portion in certain instances.

**Title Insurance on the Loans.**

The Company requires title insurance for all newly originated Loans in accordance with

industry standards. Title insurance endorsements are obtained to insure against title risks when appropriate. In most cases, the Company requires an insured first lien position for the subject property. A second lien position is permitted in certain circumstances.

**Hazard Insurance on the Loans.**

Each Borrower will be obligated to maintain hazard insurance for a Loan secured by improved property, insuring the underlying property against risk of loss or damage by fire or other hazards in an amount not less than the full insurable replacement value of the property, exclusive of land and other items normally excluded under a standard hazard insurance policy. No earthquake, flood, or other insurance will be maintained on the property unless such insurance is available and is required by applicable laws and regulations. Any hazard losses not covered by standard hazard insurance will not be insured and, therefore, will be borne directly by the Borrower and may result in default or delinquency under the Loan.

**Compensation of the Manager.**

The Manager will receive certain compensation for services rendered regardless of the amount of sums distributed to the Members. See "Compensation to the Manager and its Affiliates" and "Conflicts of Interest." The compensation to be received by the Manager has been determined by the Manager without arms'-length negotiations with the Company.

- a payment by a Borrower, generally 1.0% of the requested Loan amount, to compensate the Manager for a portion of its underwriting expenses (the "Loan Commitment Fee"), which is credited to the Borrower in the event the Loan is originated;
- a nonrefundable fee from the Borrower to compensate the Manager for a portion of its costs to conduct a physical inspection of the property to secure the Loan (the "Property Inspection Fee") in an amount that varies with the location of the property;
- an Administration Fee payable by the Company at an annual rate (payable in equal

monthly installments) equal to 0.25% of the assets of the Company for providing accounting and other services to the Company;
- Origination Points, payable by the Borrower, on each Loan in which the Company acquires an interest, generally ranging between 3% to 6.5% of the principal amount of the Loan;
- a portion of the interest payments on each Loan in which the Company acquires an interest in an amount determined by the Manager at the time of the origination of the Loan (the "Interest Rate Spread");
- a Servicing Fee, payable by the Borrower, for servicing each Loan in which the Company acquires an interest, typically ranging from $10.00 to $50.00 per month;
- the difference between the interest rate on a Loan and the interest rate provided for in the event of a default on the Loan, which is currently 27% (the "Default Interest Spread");
- an early withdrawal fee as a result of any redemption of Interests prior to the end of the Minimum Investment Period (as described below) equal to the greater of 5% of the redemption amount or $5,000 (the "Early Withdrawal Fee");
- a fee as a result of the transfer of a Member's Interests equal to 5% of the transferred amount ("Member Transfer Fee");
- any Prepayment Penalty for the early payment of any Loan in which the Company acquires an interest; and
- a Late Charge on any Loan in which the Company owns an interest.

**Conflicts of Interest.**

There will be various conflicts of interest in connection with the Manager's management and operation of the Company. See "Conflicts of Interest."

**Liquidity.**

A Member may request that the Member's Interests be redeemed in whole or in part without penalty upon 30 days prior notice given at any time after the first anniversary of the purchase of such Interests (the "Minimum Investment Period"), subject to a minimum

redemption request of $50,000, thereby requiring a one-year holding period for any Interests before they can be redeemed without penalty. The Company expects to satisfy redemption requests promptly. The period to fulfill redemption requests at any time, however, may be affected by the levels of redemption requests received at that time, the amount of cash then held by the Company, the then principal payments on Loans as a result of Loan maturities and prepayments, and the ability of the Manager at that time to sell Loans without a loss to provide funds for redemptions. In fulfilling redemption requests, the Manager, in its sole discretion, may effect such redemption requests with a combination of cash and fractional undivided interests in Loans valued at their unpaid principal balances. The fractional undivided interests may include non-performing Loans held by the Company. Any distribution of non-performing Loans to a redeeming Member must be in the same percentage of the total non-performing Loans that the redeeming Member's interest in the Company bears to the total of all Members' interests in the Company. The Company will have the right, in its sole discretion, to redeem all Interests held by a member to the extent a redemption request would leave the Member with a total balance in the Member's Account of less than $500,000.

Any requests for redemption prior to the end of the Minimum Investment Period will be satisfied only in the sole discretion of the Company and the payment by the Member of an early withdrawal fee in an amount equal to the greater of 5% of the redemption proceeds or $5,000 (the "Early Withdrawal Fee"). The Company will subtract the Early Withdrawal Fee from the redeemed proceeds prior to distributing the redeemed proceeds to the electing Member. In exercising its discretion whether or not to honor a redemption request prior to the end of the Minimum Investment Period, the Company may consider, among other factors, the amount of cash held by the Company, the Company's Loan portfolio, and other redemption requests by Members.

A return of a portion of a Member's balance in the Member Account will result in a recalculation of such Member's Participation Percentage in the Company. The Member would then receive distributions attributable to such recalculated Participation Percentage.

**Voting Rights of the Members.**

The Manager will control the operations of the Company, including the Loans in which the Company will acquire an interest. The Members will have the right to vote only on certain matters affecting the Company, including (with the approval of the Manager) the amendment of the Operating Agreement, the removal of the Manager for cause, and the election of a successor Manager. Voting rights are based upon the Participation Percentage held by each Member at the time of the vote. See "Summary of the Operating Agreement."

**Limited Liability of Members.**

Members will not be liable for any debts of the Company beyond the amount of their investment and, in certain circumstances, distributions. See "Summary of Operating Agreement."

**Term of the Company.**

The Company will commence dissolution, winding up, and termination on the earliest of January 31, 2032, the determination of the Manager, or the sale of substantially all its assets. The Company currently anticipates that it will terminate no later than December 31, 2031. See "Summary of the Operating Agreement."

**Risk Factors.**

An investment in Interests is speculative and involves a high degree of risk. See "Risk Factors."

**Fiscal Year of the Company.**

The fiscal year of the Company will be January 1 to December 31.

# RISK FACTORS

The purchase of Interests is speculative and involves a high degree of risk. In addition to the general investment risks described throughout this Memorandum, a prospective investor should carefully consider the risk factors set forth below. Prospective investors should realize, however, that factors other than those set forth below may ultimately affect their investment in Interests.

### Income Tax Risks:

### Circular 230 Notice.

The following was not intended or written to be used, and it cannot be used, for the purpose of avoiding U.S. federal, state, or local tax penalties that may be imposed on a Member. This Memorandum was written to support the promotion or marketing of the transaction or matter addressed in this Memorandum. A prospective Member should seek advice based on the Member's particular circumstances from an independent tax advisor.

### General.

The following is a brief summary of what the Company believes are the most significant federal income tax risks involved in an investment in Interests. An unfavorable outcome with respect to any tax risk factor may have an adverse effect on an investment in Interests.

The tax considerations involved in an investment in the Company that should be significant to Members are discussed under "Federal Income Tax Consequences." Those considerations involve additional tax risks not discussed below. Each prospective investor is urged to review that material and to discuss with the investor's own tax advisor the tax consequences to the investor of an investment in Interests.

### Tax Liabilities in Excess of Cash Distributions.

Generally, each Member will be required to pay federal and state income taxes at the Member's individual rate on the Member's allocable share of the Company's taxable income. In some situations, the cash distributions received by a Member may be less than the tax attributable to the Member's Interests. Such a situation can occur for three reasons. First, it can occur because the amount of Profits allocated to a Member in a Fiscal Year may exceed the amount of cash distributed to that Member in that same Fiscal Year. Second, it can occur if the Company has phantom income with respect to any Fiscal Year. For example, the original issue or market discount rules may require the Company to report interest income with respect to a Loan in a Fiscal Year when such interest is not received by the Company in that Fiscal Year.

Finally, a situation in which a Member's share of taxable income exceeds the Member's share of cash distributions can occur if a deduction of the Company is disallowed for use by a Member. For example, the Internal Revenue Code of 1986, as amended (the "Code") limits the deductibility by an individual of miscellaneous itemized deductions, including expenses incurred indirectly through a pass–through entity, such as the Company. Such deductions, which include expenses incurred for the production of income, are deductible only to the extent that they exceed 2% of the individual's adjusted gross income. Because the Company believes it will not be regarded as being engaged in a trade or business, substantially all or all of its operating expenses are likely to be classified as expenses incurred for the production of income. A pro rata portion of such expenses will be allocated to the Members to be deducted to the extent permissible. Although it is possible that a Member's tax liability with respect to the Company may exceed cash distributions, the Company does not anticipate that this will occur.

### Investment by Tax–Exempt Entities.

A tax–exempt holder of Interests, including IRAs, Keogh Plans, and other qualified retirement plans ("Tax–Exempt Entities"), should understand that its allocable share of the Company's taxable income may result in such Tax–Exempt Entity having unrelated business taxable income ("UBTI") if such income and any other unrelated

business income or debt–financed income of the exempt entity exceeds $1,000 in any year.

### Characterization of Certain Fees and Expenses.

No opinion has been or will be received with respect to the deductibility of fees paid by the Company. Although the Company believes the amount of fees that will be charged will be reasonable based on the services to be provided, no assurance can be given that the IRS will not seek to treat the fees as constituting an allocation of income or a distribution of capital of the Company, rather than as a capitalizable or deductible expense of the Company. Expenses of organizing the Company and of promoting the sale of Interests must be capitalized by the Company. Although the Company may elect to treat certain organizational expenses (but not offering expenses) as deferred expenses and amortize them over a period of 180 or more months, some of the expenses that will be incurred by the Company will be difficult to classify under the treasury regulations. Accordingly, no opinion has been or will be received regarding the capitalization, deduction, or amortization of the various organizational and offering fees.

### Potential Dealer Status.

If the Company sells Loans, it could be characterized as a "dealer" with respect to such Loans. In that event, income from the sale of the Loan would be ordinary income. The characterization of the Company as a dealer for federal income tax purposes would have an adverse effect on Tax–Exempt Entities that are Members because any gain resulting from the disposition of Loans would constitute unrelated business income to such Tax–Exempt Entities. Such a characterization also could affect the application of the passive activity rules to taxable investors. Although the Manager does not intend to sell Loans to the extent that such sales could cause the Company to be characterized as a dealer, no opinion will be received regarding the status of the Company as a dealer and no assurance can be given that the Company will not be deemed to be a dealer in Loans.

### Investment in the Company by qualified plans may result in the Company's assets being treated as plan assets under ERISA.

The Company's assets may be "plan assets" as such term is used in the U.S. Department of Labor regulations under the Employee Retirement Income Security Act of 1974 ("ERISA") for purposes of the prohibited transaction rules set forth in Section 406 of ERISA and Internal Revenue Code Section 4975.

### If an investor is investing through a pension or profit-sharing trust, the investor needs to consider the ERISA Regulations.

In considering an investment in Interests with a portion of the assets of a qualified pension, profit-sharing, or other retirement trust, a fiduciary, taking into account the facts and circumstances of such trust, should consider, among other things, (1) the definition of "plan assets" under ERISA and the labor regulations regarding the definition of "plan assets"; (2) whether the investment satisfies the diversification requirements of Section 404(a) of ERISA; and (3) whether the investment is prudent, considering the nature of an investment in Interests. The fiduciary should also consider the fact that there is not expected to be a market created in which to sell or otherwise dispose of Interests. See "ERISA Aspects of the Offering."

### Investments in the Company by qualified plans are subject to Department of Labor Regulations.

If investing through a Qualified Plan, the investor should be aware that, under certain circumstances, the U.S. Department of Labor or others could contend that the assets of the Company will be treated as assets of the Qualified Plan for purposes of testing compliance with the fiduciary responsibility provisions of ERISA. The Department of Labor has adopted regulations pursuant to ERISA concerning the definitions of plan assets and concerning the fiduciary obligations of Qualified Plan trustees. Although there are exemptions from the application of such regulations, in the event the exemptions do not apply to an investor, the investor's investment in the Interests could result in various ERISA

violations and in penalties being levied against the Qualified Plan fiduciaries, and/or suits being brought by Qualified Plan participants or by the Department of Labor against the Qualified Plan or its fiduciaries. See "ERISA Aspects of the Offering."

### Investment Risks:

**Investors must be willing to rely on the Manager.**

The Manager will have the right to make all decisions with respect to the management and operation of the business and affairs of the Company, including selecting, evaluating, negotiating, acquiring, making, servicing, and disposing of Loans and operating, holding, and disposing of any properties acquired by the Company upon default and foreclosure of any Loans. Among other things, the Manager will have the right to revise the terms of outstanding Loans regardless of their performance, which may include increasing the principal amount, modifying the interest rate and payment terms, changing the collateral, adding fees and costs to the principal balance, or substituting borrowers. Under the Operating Agreement, the Members will have no right or power to take part in the management of the Company, except for certain voting rights that may arise under extraordinary circumstances. See "Summary of the Operating Agreement." Accordingly, no investor should purchase Interests unless such investor is willing to entrust all aspects of the management of the Company to the Manager. See "Manager."

**Investors will not be able to evaluate the merit of the Loans in which the Company subsequently acquires an interest.**

Investors should not purchase Interests unless willing to entrust the selection, negotiation, and consummation of investments in Loans to the Manager. Investors must be willing to bear the risk that the terms of the Loans in which the Company may acquire an interest cannot be identified at this time. Therefore, investors will not be able to evaluate the merits of the individual Loans in which the Company may acquire an interest in the future. In particular, the rate of return on such Loans is not known. There can be

no assurance that the Company will be able to acquire interests in Loans on terms that are advantageous to the Company. The Company's inability to acquire interests in suitable Loans may result in delays in investment of the Company's assets and a reduction in the rate of return to the Members.

**The profitability of the Company depends on its acquiring interests in favorable Loans.**

The success of the Company in large part will depend upon its ability to keep its assets continuously invested in Loans with favorable terms. The failure of the Company to keep its assets so invested may result in lower rates of return to the Members.

**The Company will compete with other entities for Loans.**

The Company will compete for lending opportunities with many others engaged in real estate financing that have similar objectives, including banks, insurance companies, savings and loan associations, mortgage bankers, pension funds, real estate investment trusts, investment bankers, and other lenders. The Company's competitors may also include Affiliates of the Manager. Some of those competitors have greater marketing, financial, and other resources than the Company and may have longer and stronger relationships than the Company with potential borrowers. Such competition may impede the Company's ability to acquire interests in favorable Loans. Moreover, an increase in the availability of funds for lending may increase competition for Loans and reduce the yields available therefrom.

**The risk of the Company's Loans will increase with any increases in their loan-to-value ratios.**

The risk of a Loan will increase with any increase in the ratio of the amount of the Loan to the value of the property securing such Loan because the property will possess less protective equity in the event of a default by the Borrower. The Manager will make an assessment of the loan-to-value ratio prior to making or acquiring a Loan. In making its assessment of the value of the property to secure a Loan, the Manager may review any

available appraisals of the property by qualified appraisers, the purchase price of the property, recent sales of comparable properties, and a wide variety of other factors. The Manager generally will not retain an independent third party to conduct a formal appraisal, but will rely on its own assessment of the value of a property. It should be noted that appraisals are estimates of value and not a measure of true worth or realizable value. Neither the Company nor the Manager are real estate appraisers, however, and the absence of an independent appraisal removes an independent estimate of value. There can be no assurance that the Manager's estimated values will be comparable or bear any relation to the actual market value of a property or the amount that could be realized upon the refinancing, sale, or other disposition of a property. As a result, the amount realized in connection with the refinancing, sale, or other disposition of the property in the ordinary course of business or at or following a foreclosure sale may not equal the then outstanding balance of the related Loan.

**The Company may not have adequate security for certain Loans.**

Certain Loans may be made on a nonrecourse basis. In such a case, the Company will be required to rely for its security solely on the value of the underlying property and will not have any right to make any claims for repayment personally against the Borrower. Other Loans may be full recourse loans, may be secured by personal or corporate guarantees, or may be secured by one or more items of real or personal property in addition to the property constituting the primary security for the Loan. Nevertheless, the property underlying the Loan in most cases will be the primary source for repayment of the Loan upon maturity or in the event of a default. The ability of the Borrower to pay the outstanding balance of a Loan (particularly a non-amortizing Loan) at maturity will depend primarily upon the Borrower's ability to obtain sufficient funds by refinancing, sale, or other disposition of the underlying property.

If the Company acquires the property underlying a Loan, there can be no assurance that the amount realized in connection with the sale of the property in the ordinary course of business or at a

foreclosure sale will equal the Company's assessment of the value of the property or the then outstanding principal amount of the related Loan.

**Balloon payment Loans entail greater risks than amortizing Loans.**

The ability of a Borrower to repay the outstanding principal amount of a Loan that does not provide for the payment of all or any part of its principal prior to maturity will depend primarily upon the Borrower's ability to obtain, by refinancing, sale, or other disposition of the underlying property or otherwise, sufficient funds to pay the outstanding principal balance of the Loan at a time when such funds may be difficult to obtain, with the result that the Borrower may default on its obligation to repay the amount of the Loan in accordance with its terms. In addition, a substantial reduction in the value of the property securing a Loan could precipitate or otherwise result in the Borrower's default. Any such default could result in a loss to the Company of all or part of the principal or interest on such Loan.

**Development and construction Loans involve greater risk than conventional Loans.**

Any development and interim construction Loans in which the Company acquires an interest may generate higher rates of return than other types of Loans, but may entail greater risks. Such a Loan will be subject to substantial risk because the ability of the Borrower to complete or dispose of the project being developed or constructed on the underlying property, and the repayment of the Loan may be affected by various factors described below relating to the risks of real estate, including adverse changes in general economic conditions, changes in interest rates, the availability of permanent mortgage funds, and local conditions, such as excessive building resulting in an excess supply of real estate, a decrease in employment reducing the demand for real estate in the area, and the Borrower's ability to control costs and to conform to plans, specifications, and time schedules, which will depend upon the Borrower's management and financial capabilities and which may also be affected by strikes, adverse weather, and other conditions beyond the Borrower's control. Such contingencies and adverse factors could deplete the Borrower's

funds and working capital and could result in substantial deficiencies precluding compliance with specified conditions of commitments for permanent mortgage funds relied on as a primary source of repayment of the Loan.

### Loans on leasehold interests are subject to the termination of the ground leases.

A default under a Loan secured by a lien on a leasehold interest in a property that gives the Borrower the right to develop or use the underlying property under a ground lease gives the owner of the property the right to terminate the ground lease. Any termination of a ground lease on the property underlying a Loan generally would leave the Company as an unsecured creditor of the Borrower. The risk is increased if the landlord under the leasehold Loan does not agree to give the Company notice of any default in the ground lease and afford the Company the right to cure, on behalf of the Borrower, any default under the ground lease.

### Uninsured losses may adversely affect the properties underlying the Loans.

Although the Company will require Borrowers to carry comprehensive insurance, including liability, fire, and extended coverage for the properties underlying the Loans, there are certain types of losses, such as earthquakes, floods, wars, or terrorism, that are either uninsurable or not economically insurable. Inflation, changes in building codes and ordinances, environmental considerations, and other factors also may make it unfeasible to use insurance proceeds to replace a property if damaged or destroyed.

### Partial releases will reduce the security for Loans.

The Company generally allows partial releases of portions of a property underlying a Loan upon prepayment of a sum typically equal to at least 130% of the pro rata portion of the principal amount of the Loan. By allowing partial releases, there is a risk that over time the remaining collateral securing the Loan may not be as valuable as the remaining unpaid balance of the Loan.

### Junior Loans entail greater risks of default than senior Loans.

The Company may hold a relatively small number of junior mortgage Loans, which generally entail greater risks than a senior mortgage Loan on the same property. In the event of default under a senior Loan, the holder of a junior Loan may be forced to cure the default on the senior Loan in order to prevent the sale of the underlying property or to discharge the senior Loan entirely by paying the entire amount of principal and interest then outstanding in the event of the acceleration of the senior Loan. There can be no assurance that the Company will have sufficient funds to pay amounts owing on the related senior Loan to prevent default, to discharge the senior Loan entirely, or to dispose of the Loan without incurring a significant loss. If the Company decides to cure a default under a senior mortgage Loan or purchases an underlying property at a foreclosure or trustee's sale, the Company will be subject to the risks of ownership of real property.

### Joint venture Loans entail special risks.

Although not typical, the Company may enter into joint ventures, partnerships, and loan participations with third parties for the purpose of acquiring interests in Loans, which entail special risks. Joint ventures, partnerships, and loan participations involve the potential risk of impasse on decision making in situations in which no single party fully controls the Loan with the result that neither the Company nor any other party will be able to exercise full authority with respect to the protection of the investment in the Loan. In addition, although the Company or another party to the transaction often will have the right to purchase the interest of any other party in the Loan, the party seeking to acquire the interest of another party may not have sufficient funds to do so. There also is a risk that the Company will become a tenant in common with its joint venture partners following a foreclosure and that disagreements may arise regarding the disposition of the property.

**There will be a lack of geographic diversity of the properties underlying the Loans.**

It is anticipated that the overwhelming number of the Loans will be secured by properties located in the state of Arizona, resulting in a geographically concentrated Loan portfolio. Any downturn in the economy or the real estate market in Arizona may reduce the value of the properties securing the Loans and increase the default rate of the Loans. Such circumstances would reduce the return on the Loans.

**There will be a concentration of Loans among Borrowers.**

The Company's portfolio of Loans can be expected to be to a relatively small number of Borrowers as a result of the amount of funds available to the Company. Therefore, the Company may be subject to an increased degree of risk to the extent that a single Borrower or a small number of Borrowers default with respect to Loans.

**Loans may permit prepayments, which could affect the Company's return.**

In the event that a Borrower prepays all or a portion of the principal amount of a Loan before its maturity, the amount of interest that the Company will receive in the future may decrease if an appropriate reinvestment is not made, thereby reducing the amount of the return to the Members.

**The Company will be subject to the risks of leverage to the extent it incurs debt.**

The Operating Agreement gives the Manager the authority to cause the Company to borrow money and pledge its assets, including its interest in Loans, as collateral for such borrowings. Although the Company does not generally intend to employ leverage, should it do so, the amount and terms and conditions of any borrowings will affect the profitability of the Company and the funds that will be available to satisfy its obligations. Interest will be payable on any borrowings regardless of the profitability of the Company. The Company's ability to increase its return through borrowings will depend in part upon its ability to generate income from its borrowed funds based upon the difference between its return on investment from such borrowed funds and interest rate charged by its lender on such borrowings. Adverse economic conditions also could increase the Company's borrowing costs and cause the terms on which borrowed funds become available to be unfavorable. In such circumstances, the Company could be required to liquidate some of its interests in Loans at a significant loss.

**The absence of sinking funds may adversely affect Loans.**

No sinking fund generally will be provided by a Borrower for repayment of a Loan. Therefore, the sources for repayment of a specific Loan will depend primarily upon the economic viability of a Borrower or the successful refinancing, sale, or other disposition of the underlying property. No assurance can be given that a Borrower will remain economically viable or that a refinancing, sale, or other disposition can be accomplished at a time when the principal amount of a Loan is required to be paid on terms that will permit its repayment or that a Borrower will have sufficient funds to satisfy its obligation under a Loan from other sources.

**The presence or absence of a due on sale clause may affect the ability to sell a property underlying a Loan.**

A due on sale clause in a Loan may make the underlying property less marketable, thereby making it more difficult for a Borrower to repay the Loan. The absence of a due on sale provision will enable a Borrower to sell the underlying property subject to the lien of the Company's deed of trust or mortgage, which may subject the Company to the risk that the knowledge, experience, and financial resources of the new purchaser are not equal to that of the original Borrower, thereby affecting the potential successful refinancing, sale, or other disposition of the underlying property or otherwise impairing the chances of repayment of the Loan.

**The interest rates on the Loans will be subject to ceilings under usury statutes.**

State and federal usury laws govern the rate of interest and the amount and types of fees, including maximum interest charges, that lenders may charge borrowers. Certain ambiguities in the language and structure of the usury laws make it unclear whether certain charges and fees that may be imposed in connection with a Loan constitute violations of such laws. If a Loan were found to be usurious or in violation of usury laws, the Company might be subject to certain penalties and liabilities under such laws, including restitution of excess interest and unenforceability of the Loan.   Such penalties would reduce the Company's return on the Loan and therefore the return on Interests.   The Manager does not intend to make or acquire loans on behalf of the Company at usurious rates, but uncertainties in determining the legality of rates of interest and other borrowing charges may result in inadvertent violations.

**The policy of the Company of reselling defaulted Loans may adversely affect the Company's returns.**

The Manager, on behalf of the Company, typically sells for its unpaid principal amount any Loan in which the Company owns an interest that is in default in the payment of principal or interest.  As a result, the Company will not have the opportunity to receive interest at a default interest rate, which typically is a rate of 27% per annum, or to make a profit as a result of a sale of the underlying property at a foreclosure sale.  While such sales are intended to protect the Company's capital, there is no assurance that any sale of such Loan can be made at a price equal to the unpaid principal amount.

**Real estate market conditions will affect the Loans.**

The Loans will be secured by real estate.  Real estate is speculative in nature.  The Company will be subject to the high degree of risks generally incident to the ownership of and investment in real estate because of the impact of such risks on the ability of a Borrower to repay a Loan and the ability to refinance, resell, or dispose of the underlying property for an amount at least equal to the Loan.  These risks include the following:

- the investment climate for real estate investments;
- the availability and cost of financing in connection with the purchase, sale, or refinancing of properties;
- the demand for and supply of competing properties;
- the illiquid nature of real estate and real estate investments;
- local market conditions;
- the availability and cost of necessary utilities and services;
- real estate tax rates and other operating expenses;
- costs to maintain, renovate, refurbish, and maintain properties;
- the level of interest rates, real estate taxes, and other operating expenses in relation to revenue;
- unanticipated holding costs;
- the ratio of fixed operating expenses to those that vary with revenues;
- an increase in vacancy rates, which may result from tenants deciding not to renew existing leases or discontinuing operations;
- an increase in tenant payment defaults;
- a decline in rental rates as leases are entered into, renewed, or extended;
- a decline in the financial condition of a major, anchor, or sole tenant;
- the age, design, and construction quality of any structures on the property;
- perceptions regarding the safety, convenience, and attractiveness of the property;
- the characteristics of the neighborhood where the property is located;
- the adequacy of the property's management and maintenance;
- national, regional, or local economic conditions, including plant closings, industry slowdowns, and unemployment rates;
- customer tastes and preferences;
- retroactive changes in building codes;

- fiscal policies and governmental rules and regulations, including rent, wage, and price controls, zoning and other land use regulations, and environmental controls;
- any costs necessary to bring a property in compliance with the Americans with Disabilities Act of 1990 and the possibility of fines by the federal government or an award of damages in private litigation resulting from noncompliance;
- the treatment for federal and state income tax purposes of income derived from real estate;
- natural disasters and civil disturbances, such as earthquakes, hurricanes, floods, eruptions, or riots, including those that may result in uninsured losses; and
- other factors beyond the control of the Company.

In recent years, the presence of hazardous substances or toxic waste has adversely affected real estate values in certain circumstances and resulted in the imposition of costs and damages to real estate owners and lenders. In addition, certain expenses related to properties, such as property taxes and insurance, tend to increase over time. These and other factors could increase the cost of holding properties or adversely affect the terms and conditions upon which properties underlying Loans may be refinanced, sold, or otherwise disposed of. In addition, all mortgage loans, including the Loans, are subject to loss resulting from the priority of real estate tax liens, mechanic's liens, and materialmen's liens. Therefore, the success of the Company will depend in part upon events beyond its control.

**The types and concentrations of properties underlying the Loans in which the Company acquires an interest may subject an investment in Interests to special risks.**

The types and concentration of properties underlying the Loans in which the Company acquires interests may subject the Company to special risks in addition to the general real estate risks described above.

*Unimproved Properties.*

Factors affecting the value of unimproved properties include the following:

- the Company will be subject to a greater risk of loss in the event of delinquency or default by a Borrower on a Loan secured by a deed of trust, mortgage, or similar instrument on unimproved real property than if such Loan were secured by a deed of trust, mortgage, or similar instrument on improved real property;
- a Loan secured by unimproved real property involves a particularly high degree of risk since the property generally does not have access to utilities, such as water, sewer, electricity, or cable, and may not be zoned or subdivided for its highest and best use; and
- an unimproved property does not generate income other than as the result of a refinancing, sale, or other disposition and the Borrower's Loan payments generally will be the Company's source of cash flow on the Loan until a sale, refinancing, or other disposal of the property.

*Multifamily Rental Properties.*

Factors affecting the value and operation of a multifamily rental property include the following:

- the physical attributes of the property, such as its age, appearance, and construction quality;
- the types of amenities and services offered at the property;
- the location of the property;
- the characteristics of the surrounding neighborhood, which may change over time;
- the rents charged for dwelling units at the property relative to the rents charged for comparable units at competing properties;
- the ability of the owner to provide adequate maintenance and insurance;
- the level of mortgage interest rates, which may encourage tenants to purchase rather than lease housing;
- competition from existing or new alternative residential properties, including other apartment buildings, manufactured housing

17

communities, mobile home parks, and single-family houses;

- the tenant mix and whether the property is primarily occupied by workers from a particular company or type of business, personnel from a local military base, or students;
- the extent to which the cost of operating the property, including the cost of utilities and required capital expenditures, may increase;
- the extent to which increases in operating costs may be passed through to tenants;
- local, regional, or national economic conditions, which may limit the amount that may be charged for rents and may result in a reduction in timely rent payments or a reduction in occupancy levels;
- state and local regulations, which may impose rent controls or otherwise affect the property owner's ability to increase rents;
- the extent to which the property is subject to land use restrictive covenants or contractual covenants that require that units be rented to low income tenants; and
- the applicability of state "Unfair and Deceptive Practices Acts" and other general consumer protection statutes for coercive, abusive, or unconscionable leasing and sales practices.

*Condominiums.*

Factors affecting Loans on a condominium project include the following:

- a default on a Loan on a condominium will not allow the holder of the Loan the same flexibility in realizing on its collateral as is generally available with respect to multifamily rental properties that are not condominiums; and
- the rights of other unit owners, the governing documents of the condominium owners' association, and the state and local laws applicable to condominiums must be considered and respected.

*Cooperatively Owned Apartment Buildings.*

Factors affecting cooperatively owned apartment buildings include the following:

- the rights of a tenant/shareholder to occupy a particular apartment unit under a long-term lease or occupancy agreement;
- a cooperative corporation's ability to meet debt service obligations on a Loan secured by, and to pay all other operating expenses of, the cooperatively owned property depends primarily upon the receipt of maintenance payments from the tenant/shareholders and any rental income from units or commercial space that the cooperative corporation might control;
- the ability of a cooperative corporation to impose special assessments on the tenant/shareholders in order to pay unanticipated expenditures; and
- the existence of any non-eviction plan, allowing a tenant at the time of conversion who chooses not to purchase shares to reside in the unit as a subtenant of the owner of the shares allocated to the apartment unit.

*Retail Properties.*

The success of a retail property depends on a number of factors, including the following:

- the ability to attract and retain tenants, particularly significant tenants that are able to meet their lease obligations;
- the number and type of customers that tenants will be able to attract;
- competition from other retail properties;
- perceptions regarding the safety, convenience, and attractiveness of the property and the surrounding area;
- demographics of the surrounding area;
- the strength and stability of the local, regional, and national economics;
- traffic patterns and access to major thoroughfares;
- the visibility of the property;
- the availability of parking;
- the particular mix of the goods and services offered at the property;
- customer tastes, preferences, and spending patterns; and
- the drawing power of other tenants.

*Office Properties.*

Factors affecting the value and operation of an office property include the following:

- the number and quality of the tenants, particularly significant tenants, at the property;
- the physical attributes of the building in relation to competing buildings, including age, condition, and design;
- the location of the property with respect to the central business district or population centers;
- demographic trends within the metropolitan area to move away from or towards the central business district;
- social trends combined with space management trends, which may change towards options, such as telecommuting or "hoteling," to satisfy space needs;
- tax incentives offered to businesses or property owners by municipalities adjacent to or near where the property is located;
- local competitive conditions, such as the supply of office space or the existence or construction of new competitive office buildings;
- vacancy levels;
- the quality of property management;
- access to mass transportation;
- changes in zoning laws;
- competitive factors affecting office properties, including rental rates; and
- amenities offered to tenants, including sophisticated building systems, such as fiber optic cables, satellite communications, or other technological features.

*Hospitality Properties.*

Factors affecting the economic performance of a hospitality property include the following:

- the location of the property and its proximity to major population centers or attractions;
- the seasonal nature of business at the property;
- the level of occupancy and room rates relative to those charged by competitors;

- local, regional, and national economic conditions, which may limit the amount that can be charged for a room and may result in a reduction in occupancy levels;
- the existence or construction of competing hospitality properties;
- the nature and quality of the services and facilities;
- the financial strength and capabilities of the owner and operator;
- the need for continuing expenditures for modernizing, refurbishing, and maintaining existing facilities;
- increases in operating costs, which may not be offset by increased room rates;
- the property's dependence on business and commercial travelers and tourism;
- changes in travel patterns caused by changes in economic conditions, vacation patterns, energy prices, labor strikes, the relocation of highways, the construction of additional highways, and other factors; and
- in the case of a franchised property, the strength and reputation of the franchisor and the ability of the franchisee to operate the property in accordance with the franchise agreement, including operating standards, maintenance, and capital improvement requirements.

*Casino Properties.*

Factors affecting the economic performance of a casino property include the following:

- the location of the property, including proximity to or easy access from major population centers;
- appearance;
- local, regional, and national economic conditions, which may limit the amount of disposable income that potential patrons may have for gambling;
- the ability to attract patrons by providing alternate forms of entertainment, such as performers and sporting events, and offering low-priced or free food and lodging;
- the existence or construction of competing casinos;
- dependence on tourism;

- local or state governmental regulation covering various matters, such as requirements to maintain or transfer necessary licenses; and
- the need to modernize, refurbish, and maintain existing facilities.

*Health Care-Related Properties.*

Factors affecting the economic performance of a health-care related facility include the following:

- the dependence for a substantial portion of revenues from government reimbursement programs, primarily Medicaid and Medicare;
- governmental cost-containment measures that affect payments to health care providers;
- regulations under federal, state, and local law that can increase the cost of operation, limit growth, and, in extreme cases, require or result in suspension or cessation of operations;
- federal and state licensing requirements, facility inspections, rate setting, and reimbursement policies; and
- laws relating to the adequacy of medical care, distribution of pharmaceuticals, use of equipment, personnel operating policies, and maintenance of and additions to facilities and services.

*Industrial Properties.*

The success of an industrial property depends on the following:

- the demand for industrial space occasioned by conditions in a particular industry segment or by the strength of the economy;
- the location and desirability of the property, which may depend on a variety of factors, including the availability of labor services;
- proximity to supply sources and customers;
- accessibility to various modes of transportation and shipping, including railways, roadways, airline terminals, and ports;
- the quality and creditworthiness of individual tenants; and

- environmental risks depending upon the nature of the business conducted at the property.

*Warehouse, Mini-Warehouse, and Self-Storage Facilities.*

The successful operation of a warehouse, mini-warehouse, or self-storage property depends on a variety of factors, including the following:

- building design;
- competition;
- location and visibility;
- efficient access to the property;
- proximity to potential users, including apartment complexes or commercial users;
- services provided, such as security;
- the property's age, appearance, and improvements; and
- the quality of management.

*Restaurants and Taverns.*

Factors affecting the economic viability of an individual restaurant, tavern, or other establishment that is part of the food and beverage service industry include the following:

- the cost, quality, and availability of food and beverage products;
- perceptions by prospective customers of safety, convenience, service, and attractiveness;
- competition with the operators of comparable establishments in the area in which the property is located;
- negative publicity resulting from instances of food contamination, food-borne illness, crime, and similar events;
- changes in neighborhood demographics, consumer habits, and traffic patterns;
- the ability to provide or contract for capable management;
- retroactive changes to building codes, similar ordinances, and other legal requirements; and
- in the case of a franchised property, the strength and financial condition of the franchisor, actions and omissions of the

20

franchisor, including management practices that adversely affect the nature of the business or that require renovation, refurbishment, expansion, or other expenditures, and the degree of support the franchisor provides or arranges.

*Manufactured Housing Communities, Mobile Home Parks, and Recreational Vehicle Parks.*

Factors that affect the successful operation of a manufactured housing community, mobile home park, or recreational vehicle park include the following:

- the number of competing properties in the local market;
- the age, appearance, and reputation of the property;
- the quality of management;
- the types of facilities and services it provides;
- competition against alternative forms of residential housing, including multifamily rental properties, cooperatively owned apartment buildings, condominium complexes, and single-family residential developments; and
- governmental regulations, including rent controls.

*Recreational and Resort Properties.*

Factors affecting a recreational or resort property include the following:

- the location and appearance of the property;
- the appeal of the recreational activities offered;
- the existence or construction of competing properties, whether or not offering the same activities;
- the need to make capital expenditures to maintain, refurbish, improve, or expand facilities in order to attract potential patrons;
- geographic location and dependence on tourism;
- changes in travel patterns caused by changes in energy prices, strikes, location of highways, construction of additional highways, and similar factors;

- the seasonality of the business, which may cause periodic fluctuations in operating revenues and expenses;
- sensitivity to weather and climate;
- local, regional, and national economic conditions; and
- statutes and government regulations that govern the use of, and construction on, rivers, lakes, and other waterways affecting a marina or other recreational or resort property located adjacent to water.

*Arenas and Stadiums.*

The success of an arena or stadium generally depends on its ability to attract patrons to a variety of events, such as sporting events, musical concerts, theatrical presentations, animal shows, and circuses, which depend on such factors as the following:

- the appeal of events at the facility;
- the cost of admission;
- perceptions by prospective patrons of the safety, convenience, services, and attractiveness of the property;
- perceptions by prospective patrons of the safety of the surrounding area;
- alternative forms of entertainment available in the particular locale; and
- the ability to attract and keep a sporting team as a tenant.

*Churches and Other Religious Facilities.*

Factors affecting a church or other religious facility include the following:

- the level of charitable donations to meet expenses and pay for maintenance and capital expenditures;
- social, political, and economic factors affecting attendance and the willingness of attendees to make donations; and
- local, regional, and national economic conditions affecting donations.

*Parking Lots and Garages.*

Factors affecting the success of a parking lot or garage include the following:

- the number of rentable parking spaces and rates charged;
- the location of the lot or garage and its proximity to places where large numbers of people work, shop, or live;
- the amount of alternative parking spaces in the area;
- the availability of mass transit; and
- perceptions of the safety, convenience, and services of the lot or garage.

**A Borrower's bankruptcy may adversely affect payment on its Loan and therefore the return on the Interests.**

The United States Bankruptcy Code ("Bankruptcy Code") and state insolvency laws may interfere with or affect a lender's ability to realize upon collateral or to enforce a deficiency judgment. For example, under the Bankruptcy Code, the filing of a petition in bankruptcy by or against a Borrower will stay the sale of the property securing a Loan, as well as the commencement or continuation of a foreclosure action. In addition, if a court determines that the value of the property securing a Loan is less than the principal balance of the Loan it secures, the court may reduce the amount of secured indebtedness to the then-value of the property. Such an action would make the Company, as the lender, a general unsecured creditor for the difference between the then-value of the property securing a Loan and the amount of the related Loan. A bankruptcy court also may take any of the following actions:

- grant a debtor a reasonable time to cure a payment default on a Loan,
- reduce monthly payments due under a Loan,
- permit the debtor to cure a loan default by paying the arrearage over a number of years,
- change the rate of interest due on a Loan, or
- extend or shorten the term to maturity or otherwise alter the Loan's repayment schedule.

Under the Bankruptcy Code, a tenant has the option of assuming or rejecting any unexpired lease. If the tenant rejects the lease, the landlord's claim for breach of the lease would be a general unsecured claim against the tenant unless there is collateral securing the claim. The claim would be limited to the following:

- the unpaid rent under the lease for the periods prior to the bankruptcy petition or any earlier surrender of the leased premises, plus
- an amount equal to the rent under the lease for the greater of one year or 15% (but not more than three years) of the remaining lease term.

Additionally, the Borrower, as debtor-in-possession, or its bankruptcy trustee has certain special powers to avoid, subordinate, or disallow debts. In certain circumstances, the claims of a secured lender, such as the Company, may be subordinated to financing obtained by a debtor-in-possession subsequent to its bankruptcy.

Under the Bankruptcy Code, a lender will be stayed from enforcing a Borrower's assignment of rents and leases. The Bankruptcy Code also may interfere with a lender's ability to enforce lockbox requirements. The legal proceedings necessary to resolve these issues can be time consuming and may significantly delay the receipt of rents. Rents also may escape an assignment to the extent they are used by a Borrower to maintain its property or for other court authorized expenses.

As a result of the foregoing, the Company's recovery, as a lender, with respect to a Borrower in bankruptcy proceedings may be significantly delayed, and the total amount ultimately collected may be substantially less than the amount owed on the Loan.

**The Company will have limited remedies upon default by a Borrower.**

Loans are subject to the risk of default, in which event the Company would have the added responsibility of foreclosing and protecting its Loans. In the state of Arizona, where it is anticipated that the overwhelming number of the properties securing the Loans will be located, the Company will have a choice of two alternative and mutually exclusive remedies in the event of

default by a Borrower with respect to a Loan secured by a deed of trust. In such case, the Company can either proceed to cause the trustee under the deed of trust to exercise its power of sale under the deed of trust and sell the collateral at a non-judicial sale or it can choose to have the deed of trust judicially foreclosed as if it were a mortgage. In the event of default by a Borrower with respect to a Loan secured by a mortgage, the Company will have no election of remedies and will be required to foreclose the mortgage judicially. Remedies in other states in which the Company may hold interests in loans could vary significantly from those available in Arizona.

A judicial foreclosure usually is a time-consuming and potentially expensive undertaking. Under judicial foreclosure proceedings, the borrower does not have a right to reinstate the loan, but can cure its default by either paying the entire accelerated sum owing under the note before the judicial sale or by redeeming the property within six months after the date of the judicial sale.

A non-judicial trustee's sale conducted under the power of sale provided to the trustee may not take place until 90 days after notice of default has been given to the borrower and a notice of sale has been recorded. Before a trustee's sale, the borrower under a deed of trust has a right to reinstate the contract and deed of trust as if no breach or default had occurred by payment of the entire amount then due, plus costs and expenses, reasonable attorney's fees actually incurred, the recording fee for a cancellation of notice of sale, and the trustee's fee. The accelerated portion of the loan balance need not be paid in order to reinstate. As a result, a borrower could repeatedly be in default under a deed of trust and use its right to reinstate the loan under successive non-judicial sale proceedings. Nonetheless, the borrower's right to reinstate a deed of trust without payment of the accelerated portion of the loan balance can be cut off upon the filing of an action to judicially foreclose the deed of trust as a mortgage.

In the case of both judicial and non-judicial foreclosure, if a proceeding under the Bankruptcy Code is commenced by or against a person or other entity having an interest in the real property that secures payment of the loan, then the foreclosure will be prevented from proceeding until authorization to foreclose is obtained from the Bankruptcy Court. During the period when the foreclosure is stayed by the Bankruptcy Court, it is possible that payments, including payments from any interest reserve account, may not be made on the loan if so ordered by the Bankruptcy Court. The length of time during which the foreclosure is delayed as a result of the bankruptcy, and during which the payments may not be made, is indefinite. In addition, under the Bankruptcy Code, the Bankruptcy Court may render a portion of the loan unsecured if it determines that the value of the real property that secures payment of the loan is less than the balance of the loan and, under other circumstances, may modify or otherwise impair the lien of the lender in connection with the defaulted mortgage or deed of trust. In addition, in certain areas, lenders can lose priority of liens to mechanics' liens, materialmen's liens, and real estate tax liens.

The Company will have the right to bid on and purchase the property underlying a Loan at a foreclosure or trustee's sale following a default by the Borrower. If the Company is the successful bidder and purchases a property underlying a Loan, the Company's return on such Loan will depend upon the amount of cash or other funds that can be realized by refinancing, selling, or otherwise disposing of the property. There can be no assurance that the Company will be able to refinance, sell, or otherwise dispose of such a property on terms favorable to the Company, particularly in the event of unfavorable real estate market conditions. Conditions in real estate loan markets may affect the availability and cost of real estate loans, thereby making real estate financing difficult and costly to obtain and impeding the ability of real estate owners to sell their properties at favorable prices. Such conditions may adversely affect the ability of the Company to sell the property securing a Loan in the event that the Company deems it in the best interests of the Company to foreclose upon and purchase the property. To the extent that the funds generated by such actions are less than the amounts advanced by the Company for such Loan, the Company may realize a loss of all or part of the principal and interest on the loan. Thus, there can

be no assurance that the Company will not experience financial loss upon a default by a Borrower.

**The presence of hazardous substances or toxic waste may adversely impact real estate values.**

The Company cannot provide any assurance as to the accuracy of any environmental testing conducted on the underlying property in connection with the origination of any Loan. Moreover, the Company cannot guarantee that the results of environmental testing will be accurately evaluated in all cases; that the related Borrowers have implemented or will implement all operations and maintenance plans and other remedial actions recommended by an environmental consultant that conducted the testing at the related real properties; or that any recommended remedial action will fully remediate or otherwise address all the identified adverse environmental conditions and risks.

The presence of hazardous substances or toxic waste may adversely impact property values. These and other factors could adversely affect the terms and conditions upon which a Borrower may sell, refinance or otherwise dispose of the property and ultimately the Borrower's ability to repay the Loan.

Furthermore, if there are hazardous substances or toxic waste present on a property and an obligor defaults on its obligations under the Loan, the Company, if it forecloses on such property, may be responsible (depending on certain circumstances) for the costs of clean up of any such waste. The owner's liability for any required remediation generally is unlimited and could exceed the value of the property and/or the total assets of the owner (which could be the Company in the event of a foreclosure or the Borrower prior to a foreclosure). In addition, the presence of hazardous or toxic substances, or the failure to remediate the adverse environmental condition, may adversely affect the owner's or operator's ability to use the affected property. Contamination of the property may give rise to a lien on the property to ensure the costs of cleanup. In some states, this lien has priority over the lien of an existing mortgage. In addition, third parties may seek recovery from owners or operators of real property for personal injury associated with exposure to hazardous substances, including asbestos and lead-based paint. Persons who arrange for the disposal or treatment of hazardous or toxic substances may be liable for the costs of removal or remediation of the substances at the disposal or treatment facility.

The Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, commonly referred to as "CERCLA," together with certain other federal and state laws, provide that a secured lender, such as the Company, may be liable as an "owner" or "operator" of a property, regardless of whether the Borrower or a previous owner caused the environmental damage, under the following conditions:

- agents or employees of the lender are deemed to have participated in the management of the borrower, or
- under certain conditions, the lender actually takes possession of a borrower's property or control of its day-to-day operations, including through the appointment of a receiver or foreclosure.

Although recently enacted legislation clarifies the activities in which a lender may engage without becoming subject to liability under CERCLA and similar federal laws, that legislation has no applicability to state environmental laws. Moreover, future laws, ordinances, or regulations could impose material environmental liability.

Property owners may be liable for injuries to their tenants or third parties resulting from exposure under various laws that impose affirmative obligations on property owners of residential housing containing lead-based paint.

**The Company's method for maintaining Member Accounts may not be based on the time that the Member owns Interests.**

The Company will maintain Member Accounts in a manner that attempts to most accurately

reflect each Member's proportional interest in the Company. However, certain methods used by the Company could, in certain circumstances, result in an allocation that is not based on the time a Member owns Interests. For example, if a property securing a Loan is foreclosed upon by the Company, the Member's Account will be allocated the Member's Participation Percentage of the profit or loss (as compared to the original amount of the Loan that was secured by such property) that results from resale of such property only if the Member was a Member at the time of such sale. Any purchase money debt on the property carried by the Company will not be credited to a Member's Member Account until collection (to the extent such debt reflects a purchase price in excess of the principal amount of the original Loan).

**There is no assurance that the Company will not become subject to mortgage banker regulations.**

The Company will not be subject to the regulations governing mortgage bankers so long as the Company does not accept compensation (i.e. points) for making Loans, which the Operating Agreement prohibits it from doing. However, there can be no assurance that changes in applicable mortgage banking regulations or changes in the Company's business will not subject the Company to mortgage banking regulations in the future.

**Members may be liable to return distributions made to them in certain circumstances.**

A Member's capital contributions are subject to the risks of the Company's business. Assuming that the Company is operated in accordance with the terms of the Operating Agreement, Members generally will not be personally liable for the liabilities of the Company in excess of their capital contributions, including additional capital contributions, that the Member elects to reinvest pursuant to the Reinvestment Option, and the Member's share of undistributed profits.

Despite the anticipated limited liability as a Member, a Member will be liable to repay any distributions made to the Member for one year to the extent necessary discharge the Company's liabilities to creditors that extended credit to the Company while the Member's capital was invested in the Company even though such distribution was properly made. See "Summary of the Operating Agreement."

**Transactions between the Manager, its Affiliates, and the Company may create conflicts of interest.**

The Company will be subject to various conflicts of interest arising out of the relations between the Manager, its Affiliates, and the Company. See "Conflicts of Interest."

**There is no public market for the Interests, and none is expected to develop.**

No public market for Interests currently exists or will result from the Offering. In addition, the Interests are being offered pursuant to exemptions from registration under federal and applicable state securities laws, which will subject the Interests to substantial restrictions on transfer. In addition, the Operating Agreement imposes limitations on the transfer of Interests, subject to limited redemption options. Accordingly, Interests may be transferred only under appropriate exemptions and only if the transferee provides the Company with an opinion of counsel that is satisfactory to the Company to the effect that the proposed transfer is in compliance with appropriate exemptions from the registration requirements of federal and any relevant state securities laws. Consequently, holders of Interests may not be able to liquidate their investment in the event of an emergency or for any other reason, and Interests may not be readily accepted as collateral for a loan. The purchase of Interests, therefore, should be considered only as a long-term investment. See "Restrictions on Transfer."

**The Offering does not include the presence of an independent underwriter.**

Under federal securities laws, underwriters of securities offered to investors may be expected to take such steps as may be necessary to insure that the information contained in a private offering

memorandum is accurate and complete. These steps are typically taken by a "lead underwriter" or "dealer manager" that participates in the preparation of the private offering memorandum and is independent of the issuer. Because there is no independent lead underwriter or dealer manager for the offering of Interests being made by this Memorandum, investors will not have the benefit of an independent review and must rely on the Company regarding the information contained in this Memorandum.

**The Company will not be registered as an investment company under the Investment Company Act of 1940.**

The Company will not be registered as an investment company under the Investment Company Act of 1940, but instead intends to conduct its business so as not to become regulated as an investment company under that act. Accordingly, the Company will not be subject to the rules for the protection of investors that require investment companies to have a majority of disinterested directors, that mandate segregation of securities held in custody from the securities of any other person, and that govern the relationship between an investment advisor and an investment company. The management and investment practices of the Company will not be supervised or regulated by any federal or state authority. The Investment Company Act of 1940 exempts entities that are primarily engaged in the business of purchasing or other acquiring mortgages and other liens on, and interests in, real estate. If the Company fails to qualify for this exemption, it would be unable to conduct its business as described in this Memorandum.

## SOURCE AND ESTIMATED USE OF PROCEEDS

|  | **Dollar Amount** | **Percentage of Gross Proceeds** |
|---|---|---|
| Gross Proceeds | $500,000,000 | 100.00% |
| Offering Expenses (Legal, Accounting, Offering and Printing Expenses) (1) | $30,000 | .00006% |
| Organizational Fee (2) | $15,000 | .00003% |
| Total Amount Available for Investment in Loans (3) | $499,955,000 | 99.9999% |

(1)     The Manager will advance all expenses in connection with the Offering, estimated to be $30,000, including legal fees, printing costs, other miscellaneous offering expenses (other than filing fees). The Company will be responsible for any expenses in excess of this amount.  The Company will reimburse the Manager for all such expenses in equal installments over the 12-month period immediately following the Initial Closing, with interest at the rate of 10% per annum.

(2)     The Manager is entitled to a $15,000 one-time organizational fee, which will also be paid by the Company in equal installments over the 12-month period immediately following the Initial Closing.

(3)     All of the offering proceeds will be available for investment in Loans pursuant to the policies of the Company.  See "Investment and Operating Policies."

While any proceeds are being held by the Company prior to investment in a Loan, prior to distribution to Members, or representing a Company reserve, the Company may invest such proceeds in short-term investments, including U.S. Treasury Bonds and Treasury Bills.

## COMPENSATION TO THE MANAGER AND ITS AFFILIATES

The following table shows all of the types of compensation, fees, and interests that will be received by the Manager and its Affiliates in connection with the operation of the Company, including relating to the Offering:

| Person Receiving Compensation | Form of Compensation | Method and Amount of Compensation |
|---|---|---|
| Manager | Loan Commitment Fee | The Manager will receive from each prospective Borrower a payment, generally equal to 1% of the requested Loan amount (the "Loan Commitment Fee"), to compensate the Manager for a portion of its Loan underwriting expenses, which is credited to the Borrower in the event the Loan is obligated. |
| Manager | Property Inspection Fee | A nonrefundable fee from the Borrower to compensate the Manager for a portion of its costs to conduct a physical inspection of the Property underlying a requested Loan (the "Property Inspection Fee") in an amount that varies with the location of the Property. |
| MLS | Placement Fee and Expense Sharing Agreement with the Manager | Neither any Member nor the Company will be required to pay MLS a commission for the sale of the Interests. The Manager will pay MLS a placement fee, which is a monthly management fee and is subject to adjustment from time to time, as compensation for the sale of the Interests. Moreover, MLS and the Manager have entered into a cost sharing agreement that enables MLS to use the facilities, technology, equipment, support staff, and supplies of the Manager for a fee equal to MLS's proportionate use of such items as calculated under the terms of the agreement. The Company, the Manager, and the Borrowers will not be subject to any payments between the Company and the Manager. |
| Manager | Reimbursement of Offering Expenses | The Manager will advance all legal fees, printing costs, and other expenses relating to the Offering (other than filing fees), estimated to be $30,000. The Company will reimburse all offering expenses to the Manager in equal installments over a 12-month period, with interest at the rate of 10% per annum. |
| Manager | Organizational Fee | The Manager will be entitled to a $15,000 one-time organizational fee (the "Organization Fee"). The Company will pay this fee to the Manager in equal installments over a 12-month period. |
| Manager | Administration Fee | The Company will pay the Manager an administration fee (the "Administration Fee") at an annual rate (payable in equal monthly installments) equal to 0.25% of the |

| Person Receiving Compensation | Form of Compensation | Method and Amount of Compensation |
|---|---|---|
| | | Company's assets based upon the average daily balance as determined at the end of each month. The Administration Fee will compensate the Manager for providing the Company with accounting and other services. |
| Manager | Origination Points | The Manager will receive from each Borrower points ("Origination Points") based on a percentage of the principal amount on each Loan originated or acquired by the Manager in which the Company acquires an interest. The Manager, as a licensed mortgage banker, will retain all Origination Points paid by Borrowers. The Manager will be responsible for payment of any origination amounts to other third-party mortgage brokers or bankers involved in a particular Loan. The Origination Points paid to the Manager for a Loan will depend upon the current market rates for similar loans, but generally will range from 3% to 6.5% of the principal amount of the Loan. |
| Manager | Interest Rate Spread | The Manager will receive a portion of the interest payments on each Loan in which the Company acquires an interest (the "Interest Rate Spread") in an amount determined by the Manager, in its sole and absolute discretion, based upon a percentage of the interest rate charged to the Borrower, but generally equal to between 1% and 4%. |
| Manager | Servicing Fees | The Manager will receive a fee from the Borrower on each Loan in which the Company acquires an interest for servicing the Loan, collecting Loan payments, and paying the expenses associated with the Loan ("Servicing Fee"). A typical Servicing Fee on a Loan is currently in the range of $10.00 up to $50.00 per month. |
| Manager | Prepayment Penalties | The Manager will receive all or any portion that it deems appropriate of any prepayment penalty provided for by the terms of a Loan in which the Company holds an interest. |
| Manager | Default Interest Spread | The Manager will receive all or any portion that it deems appropriate of any additional interest payments ("default interest") provided for in any Loan in which the Company holds an interest above the stated interest rate under the terms of the Loan (the "Default Interest Spread"). The initial default interest rate to be charged on Loans is 27%, but may be changed by the Manager in its sole discretion. |

| Person Receiving Compensation | Form of Compensation | Method and Amount of Compensation |
|---|---|---|
| Manager | Retention of Certain Fees under the Loan | The Manager will be entitled to retain all late charges in the event of a default by the Borrower, all assumption fees in the event of the assumption of a Loan by a new Borrower, any interest on any impound accounts, and any extension or forbearance fees in the event of the reinstatement of a defaulted Loan.   All of the above fees, other than the interest on the impounds, are paid by the Borrower although such amounts will be deducted from the payments received from the Borrower on a Loan. The amount of such fees is subject to change from time to time in the Manager's sole discretion. |
| Manager | Redemption and Member Transfer Fees | The Manager will receive an early withdrawal fee as a result of any redemption of any Interests by a Member prior to the end of the Minimum Investment Period for those Interests equal to the greater of 5% of the redemption amount or $5,000 (the "Early Withdrawal Fee") and a member transfer fee as a result of the transfer of a Member's Interests equal to 5% of the transferred amount ("Member Transfer Fee").  These fees will not be paid by the Company, but will be payable by the redeeming or transferring Member. |
| Manager | Defaulted Loan Acquisition Processing Fee | Upon the Company's acquisition of an existing defaulted Loan, the Company will pay the Manager a processing fee equal to 1.5% of the outstanding principal balance of the defaulted Loan.    This processing fee is to compensate the Manager for time and effort in locating the defaulted Loan as well as processing the paperwork to transfer the Loan. |
| Manager or its Affiliates | Miscellaneous other fees or costs | The Manager or its affiliates may receive other fees for services provided to the Company in lieu of outside, third-party contractors, so long as such services are competently performed and at costs that are not greater than the Company would otherwise pay for such services from unrelated parties.  Without limiting the foregoing, Realty Ltd., an affiliate of the Manager, is an Arizona licensed real estate broker.  Therefore, in the event of foreclosure of the property securing a Loan and a subsequent sale of the underlying property, Realty Ltd. may earn a standard real estate commission. |

## CONFLICTS OF INTEREST

The Company will be subject to various conflicts of interest arising out of the relations between the Company, the Manager, companies owned by or with common ownership of the Manager (its "Affiliates"), and the Members.

**The Manager and its Affiliates render services to other entities, which may reduce the time and effort they can devote to the Company.**

The Manager or its Affiliates currently serve as manager or sponsor of other entities or programs that have the same investment objectives as those of the Company. The Manager also operates a mortgage banking company separate from the Company and other entities sponsored or managed by the Manager. In addition, certain officers, directors, and key employees of the Company are also key employees of MLS, an NASD broker-dealer. As a result, the Manager, its employees, and its Affiliates may experience conflicts of interest in allocating time and management services among the Company and other entities with which they may be involved. The Manager, its Affiliates, and their officers, directors, partners, and employees will devote only such time to the Company as they, in their sole discretion, determine to be reasonably necessary.

The Manager or its Affiliates are not prohibited from providing services to and otherwise doing business with others, including those that deal with the Company, the Interests, or the Members.

**The Manager and its Affiliates will receive fees and other compensation regardless of the profitability of or cash distributions by the Company.**

The Manager will have the sole authority to determine whether or not to consummate a particular Loan on behalf of the Company. In making or acquiring a Loan, the Manager or its Affiliates will receive certain fees. This circumstance creates a potential conflict of interest in that the incentive of the Manager to consummate a particular Loan (i.e. potential fee income) may conflict with the Company's interest in restricting its Loan portfolio to Loans that are well collateralized, have a significant likelihood of repayment, and provide a favorable interest rate return. In addition, the Manager will have substantial discretion in the amount of fees that it and its Affiliates will receive.

**The Company may encounter competition from the Manager and its Affiliates**.

Neither the Manager nor its Affiliates is prohibited from engaging in activities that would either be directly or indirectly in competition with the Company. The Manager will continue to act as a mortgage banker for loans that are not presented to the Company for funding. Although the Manager will be the primary source of available lending opportunities for the Company, there may be any number of circumstances that might cause the Manager not to offer the funding of a particular Loan to the Company. One of those circumstances is the fact that the Manager currently manages a number of other limited liability companies and loan programs with similar business objectives as the Company. To the extent that any of those other limited liability companies or programs has available funds to make loans, an available loan could be offered to such other companies or programs before the Manager offers such Loan opportunity to the Company. In addition, the Manager or its Affiliates could form additional entities or sponsor other loan programs with similar business purposes in the future. All of these possibilities give rise to potential conflicts of interest if the Company were competing with other entities for potential loans, with the lending party being determined solely by the Manager. Moreover, a similar conflict of interest may arise where all or a portion of a Loan owned by the Company is re-sold before its maturity to another limited liability company or program sponsored by the Manager or an individual investor.

31

**The Company and the Manager do not have separate representation.**

The Company and the Manager typically are represented by the same counsel, and it is anticipated that such dual representation will continue in the future. However, should a dispute arise between the Company and the Manager or its Affiliates, or should it be necessary to negotiate any agreement between the Company and the Manager or its Affiliates (other than agreements existing as of the date of or referred to in this Memorandum), then the Company will retain separate counsel relating to such matters. Each investor should be aware that counsel for the Manager and the Company does not purport to represent or have acted independently on behalf of the investors. Each investor must rely upon the investor's own legal counsel for advice in connection with an investment in the Company.

**The Company may acquire interest in Loans by assignment.**

Certain of the Loans that will be acquired by the Company may be by assignment by the holder of such Loans in exchange for Interests in the Company equal to the purchase price for such Loans. Typically, the holder of such Loans will have been a client of the Manager whose interest in assigning such Loan is to spread the risk of ownership of one Loan to Interests in the Company, which will have interests in multiple Loans. The Company may similarly resell Loans in its portfolio to persons or entities that may have relationships with the Manager or its Affiliates. This circumstance can create a conflict of interest for the Manager between its possible desire to satisfy an individual client that wants to spread risk, while at the same time seeking and retaining Loans for the Company that are profitable yet well collateralized.

**The Manager will act as the Tax Matters Partner**.

The Operating Agreement designates the Manager as the "Tax Matters Partner." As a result, the Manager may make various determinations that are binding on all of the Members and the Manager. See "Federal Income Tax Consequences." The Manager or its Affiliates may also serve as the "Tax Matters Partner" of other partnerships or companies. It is possible that issues could arise in which the Manager or its Affiliates, or the partners of such other partnerships, might benefit from the Manager taking positions as "Tax Matters Partner" that are not in the best interests of the Members.

## THE MANAGER

**The Manager.**

The Manager is an Arizona corporation formed in 1963. The Manager is a mortgage banker licensed with the Arizona Department of Banking. As an Arizona licensed mortgage banker, the Manager currently assists borrowers in financing various types of loans secured by deeds of trust or mortgages on residential, commercial, and industrial real estate throughout the state of Arizona. Loan amounts, payment terms, and maturities vary and are structured according to the individual needs of the Borrower. The Manager is the original beneficiary/lender on Loans, but the funds actually used are those of the intended assignee of the Loan through a method referred to as "table funding." The Loans are simultaneously re-sold to the assignee corporations, limited liability companies, partnerships, and other persons, including the Company, following the loan closing.

The history of the Manager's loan originations for its October 31 fiscal year end for the last seven years is as follows:

| Year | Principal Amount Loan Originations |
|------|-----------------------------------|
| 2006 | $670,500,000 |
| 2005 | $429,519,741 |
| 2004 | $256,864,505 |
| 2003 | $189,624,000 |
| 2002 | $135,586,225 |
| 2001 | $ 96,122,550 |
| 2000 | $ 85,040,864 |

The gross income of the Manager for its October 31 fiscal year end for the last seven years was approximately as follows:

| Year | Gross Income |
|------|--------------|
| 2006 | $55,050,089 |
| 2005 | $37,302,182 |
| 2004 | $20,850,000 |
| 2003 | $12,700,000 |
| 2002 | $12,400,000 |
| 2001 | $ 8,900,000 |
| 2000 | $ 6,300,000 |

The Manager uses the accrual method of accounting for financial and tax purposes. The financial statements of the Manager for the period ended December 31, 2006 and the years ended October 31, 2006 and 2005, as audited by Mayer Hoffman McCann, PC, the Manager's independent certified public accountants, are attached hereto as Exhibit D. The financial statements of the Manager have been provided as an indicator of the financial condition of the Manager. The information is not indicative of the return on the Interests. In addition, Members will not acquire any ownership interest in the Manager by purchasing Interests. Members will only be entitled to receive income relating to the particular Loans acquired by the Company.

The Manager will originate most if not all of the Loans in which the Company acquires an interest. However, in some instances, a particular Borrower may have been introduced to the Manager by another licensed mortgage broker or banker, in which case the Manager may pay a portion of its origination points to such third party. In addition to originating the Loan, the Manager will underwrite the Loan. The process of loan underwriting involves physically inspecting the property underlying the Loan and reviewing third-party reports about the Borrower and the underlying property (which may include surveys, title reports, environmental reports, and appraisals) as well as reviewing information about the Borrower (which may include loan applications, financial statements, tax returns, and credit reports) in order to determine whether the Manager should make or acquire the Loan. In order to compensate the Manager for a portion of its expenses for underwriting a potential Loan, the Manager requires the Borrower to pay to the Manager (1) at the time that the Manager issues a loan commitment, a loan commitment fee, which is non-refundable to the Borrower and generally equals 1% of the Loan amount, which is credited to the amount due on other fees in the event the Loan is funded; and (2) at the time of the inspection, an inspection fee, the amount of which varies depending primarily on the location of the underlying property, which fee is

also non-refundable to the Borrower but is not credited toward amounts due for other loan fees. Both of these fees are retained by the Manager as part of its compensation for underwriting the potential Loan and examining the underlying property, and are not passed on to the Company.

In addition, the Manager will act as the servicer of each Loan on behalf of the Company. As the servicer, the Manager will (1) collect the periodic payments from the Borrower on the Loan; and (2) disburse those funds pursuant to the terms of the Loan to pay expenses associated with the Loan, and (3) distribute interest payments to the Company.

The sole shareholder of the Manager is SMC Revocable Trust dated 12/22/94, whose sole trustee is Scott M. Coles. Mr. Coles is sole director of the Manager.

**Scott M. Coles.**
Scott M. Coles, age 47, is the Chairman and Chief Executive Officer of the Manager. He is the chief underwriter and manager of Beneficiary/Investor relations. In addition, Mr. Coles is responsible for money procurement, marketing mortgages, and research and development. He graduated from the University of Arizona in 1982 with a Bachelor's Degree in general business and has successfully completed the Harvard University Business School's Owner/President Management Program.

Mr. Coles joined the Manager in 1987 and became President in 1992. He has assisted in the Manager's growth from acting as a mortgage banker on $5 million in loans to its 2005 production of $429.5 million in loans. He is a member of the Arizona Mortgage Brokers Association, the Arizona Mortgage Lenders Association and Kivel Nursing Association. He is a licensed real estate broker, holds an insurance license and is a designated party under the Manager's mortgage banker's license. He is also a Principal of, and ACCSD and NASD registered securities salesman for, MLS.

**Michael Denning.**
Michael Denning, Ph.D., age 63, is the President of the Manager. He joined the Manager in

November 2005 and has primary responsibility for all administrative, operating, and planning functions. Dr. Denning has previously founded and/or managed a number of successful firms, is a faculty member of Arizona State University's W. P. Carey School of Business, and has been a consultant to a number of chief executives. He also serves as a Director or Trustee of several non-profit organizations. He is a ACCSD and NASD registered principal of MLS. Dr. Denning's accomplishments have been recognized by membership in many honor societies and he is profiled in Who's Who.

**Christopher Olson.**
Christopher Olson, age 40, is the Chief Financial Officer of the Manager. As the Chief Financial Officer, he is responsible for the accounting and loan servicing departments of the Manager, including financial statement preparation, annual financial audits, and all loan processing functions. He is a graduate of Minnesota State University, where he earned a Bachelor of Science Degree in accounting and is a certified public accountant. He is also licensed as a real estate salesperson. He is also a registered principal of MLS with the NASD and the Arizona Corporation Commission Securities Division.

**Todd Brown**
Todd Brown, age 50, has been Senior Vice President of Operations of the Manager since November 2006. Mr. Brown was the President of Brown Capital Advisors, Inc., an advisory services company providing strategic planning, transactional assistance, due diligence, and financial management services, from November 1999 until November 2006. Mr. Brown was Senior Vice President, Chief Financial Officer, and a director of Phoenix Restaurant Group, Inc. (formerly DenAmerica Corp.) a public company that was the largest franchisee of Denny's restaurants, from March 1996 until November 1999 and Vice President, Chief Financial Officer, and a director of its predecessor from September 1994 until March 1996. Mr. Brown was employed by Deloitte & Touche from 1980 until September 1994, most recently as an audit manager. Mr. Brown holds a Masters in Business Administration from the University of

Missouri and a Bachelor's degree from Southern Methodist University.

**Jeffrey A. Newman**

Jeffrey A. Newman, age 45, has been Senior Vice President of the Manager and President of Mortgages Ltd. Securities, LLC since November 2006. Mr. Newman held various positions with American Southwest Financial Corporation and its affiliated companies from July 1985 until November 2006, including 11 years as President. American Southwest is an issuer and administrator of mortgage-backed securities. Mr. Newman has been involved in the issuance of over $11 billion in mortgage-backed securities and in the administration of an additional $8 billion. Transactions involved the securitization of both residential and commercial mortgages, including the first multi-participant Collateralized Mortgage Obligation, the first public re-securitization, and issuances for mortgage REITs. Mr. Newman is a 1984 graduate of Arizona State University with a major in Finance.

**Mortgages Ltd. Securities LLC.**

Mortgages Ltd. Securities LLC ("MLS") is an Arizona limited liability company. MLS is a member of the NASD and is registered as a broker-dealer with the Arizona Corporation Commission Securities Division.

The sole purpose of MLS is to sell the Interests and interests in loans to other similar companies sponsored by the Manager as well as whole or fractional interests in loans through MLS's exclusive placement agreement with the Company. MLS will not receive any commission for the sale of the Interests. Rather, the Manager will pay MLS a flat-rate monthly management fee, which is subject to adjustment from time to time. Moreover, MLS and the Manager have entered into a cost-sharing agreement that permits MLS to use the facilities, technology, equipment, support staff, and supplies of the Manager for a fee equal to MLS's proportionate use of such items as calculated under the terms of such agreement. The employees of MLS are also employees of the Manager, and as such they will maintain their current office arrangement and will conduct their duties as the need arises during the normal course of operations for the Manager.

## FIDUCIARY RESPONSIBILITY OF THE MANAGER

The Manager is accountable to the Company as a fiduciary and consequently is required to exercise good faith and integrity in handling the affairs of the Company. The Operating Agreement provides that the Manager will not be liable, responsible, or accountable in damages or otherwise to the Company or the Members for any act or failure to act in connection with the Company and its business unless the act or omission is attributed to fraud, willful misconduct, or gross negligence. Subject to such limitation, the Company will indemnify the Manager against judgments and claims against it relating to any liability or damage incurred by reason of any act performed or omitted to be performed by it in connection with the business of the Company as well as attorneys' fees as incurred in connection with the defense of any action based on any such act or omission. The satisfaction of any indemnification will be from and limited to the Company's assets, and no Member will have any personal liability on account thereof. See "Summary of the Operating Agreement." Accordingly, the Members may have a more limited right of action than would otherwise be the case absent such provisions. In the opinion of the Securities and Exchange Commission, indemnification for liabilities arising under the Securities Act is contrary to public policy and therefore unenforceable.

## INVESTMENT AND OPERATING POLICIES

**General.**

The Company was formed to acquire all or portions of Loans to various Borrowers, including persons, corporations, limited liability companies, partnerships, and other entities secured by deeds of trust or mortgages on residential, commercial, and industrial real estate. Substantially all the Loans will be secured by real estate located in Arizona.

The Manager will have the exclusive right to manage the business and affairs of the Company. The Manager will originate or acquire substantially all of the Loans in which the Company acquires an interest. The Manager then will convey all or a portion of the Loans it so originates or acquires to the Company and other entities and individuals with which it has various relationships together with an assessment of all or a portion of the promissory note evidencing the Loan and the deed of trust or mortgage securing the Loan on the underlying property. In connection with its origination of a Loan, the Manager will also provide various due diligence and loan underwriting functions, including preparing and negotiating all loan documents and evaluating and obtaining any third-party evaluations of the real estate securing the Loan.

The Manager also will act as servicer for the Loans on behalf of the Company, which includes the collection and disbursement of Loan payments.

**Investment Objectives of the Company.**

The investment objectives of the Company are as follows:

- to preserve the Company's capital;
- to provide the Members with monthly cash distributions through interest payments on the Loans; and
- to reinvest in new Loans from the repayment of principal on Loans in order to further enhance the Members' returns.

There can be no assurance that these objectives will be achieved.

**Source of Loans.**

Loan applications are submitted to the Manager directly by property owners or by third-party correspondents. Correspondents consist of a network of mortgage professionals that rely on the Manager to fund loans for their clients. They include real estate professionals, mortgage brokers, mortgage bankers, community banks, regional banks, and national banks. Certain types of correspondents may charge an origination fee as compensation for their services. Applicants or correspondents may submit loan requests by phone or by written loan packages.

**Loan Criteria.**

The following sets forth the parameters for all Loans:

- minimum initial principal balance in excess of $1,000;
- secured by a first or second lien on real estate located in the states of Arizona, Colorado, Nevada, or California;
- term of not less than three months nor more than 30 years from funding, subject to the ability of the Manager to extend the maturity date;
- maintenance by the Borrower of such insurance for general liability and property casualty and loss and other matters as the Manager may determine; and
- maintenance by the Borrower of an extended lender's ALTA title insurance policy on the property.

The Manager may change the above lending criteria. Investors will receive periodic information regarding the Company's Loans, which shall be deemed a part of this Memorandum.

**Types of Properties Underlying the Loans.**

The Company may acquire Loans on a wide variety of real estate properties, including the following:

- unimproved properties;

- multifamily rental properties, including apartment houses, condominium projects, and cooperative apartments;
- retail properties, including shopping centers, factory outlet centers, shopping malls, department stores, grocery stores, convenience stores, specialty stores, automotive sales and service centers, movie theatres, fitness centers, bowling alleys, beauty salons, dry cleaners, and other consumer oriented businesses.
- hospitality properties, including full-service hotels, resort hotels, limited service hotels, and other lodging facilities;
- healthcare properties, including hospitals, nursing homes, emergency centers, and congregate care facilities;
- industrial properties;
- warehouse, mini-storage, and self- storage facilities;
- restaurants and taverns;
- manufactured housing communities, mobile home parks, and recreational vehicle parks; and
- churches and other religious facilities.

**Principal Amount of Loans; Loan Advances.**

Other than the funding of certain specialized loan programs, each Loan will be in a principal amount equal to the funds advanced at the time the Loan is originated, including any interest reserve; any amounts advanced for costs incurred in connection with the acquisition, financing, or refinancing of the underlying property; and title insurance fees, escrow fees, casualty insurance premiums, and other such items.  Except for specialized loan programs, such as delayed funding construction loans and certain revolving loan plans that may be drawn upon in periodic amounts, the entire principal amount will be that at the closing of the Loan and will earn interest at the agreed upon rate from such date.  Although construction loans may be made, the Company will deliver a draw to a Borrower for payment to a contractor only after the Company has provided a lien waiver to be executed by the Borrower, general contractor, or subcontractor, as appropriate, and the Company or its agent has authorized the release of the funds.

**Interest Rates on the Loans.**

Each Loan will bear interest at a rate determined at the time the Manager makes or acquires a Loan.  Interest payments will be due at such time or times as the Manager determines, generally monthly, but not less frequently than on an annual basis.

Some of the Loans will bear a fixed interest rate throughout the Loan term.  Other Loans will bear a variable or adjustable interest rate under which the interest rate will be based on the prime or other benchmark rate published by a designated institutional lender or organization and will be periodically adjusted as such prime or other benchmark rate is adjusted, typically, subject to a minimum interest rate.  The adjustability of the interest rate with respect to a Loan generally will reduce the Company's exposure to and enhance its returns in the event of increases in market interest rates.  In the event of a general decline in such market rates of interest, however, such adjustability will result in a lowering of the Company's return on investment, subject to the minimum interest rate.

**Security for the Loans.**

The Loans will be secured by a first lien or a second lien on the fee title of, or by a beneficial interest in, the real estate acquired, held, owned, developed, improved, or refinanced with the Loan proceeds or on a long-term leasehold interest in such property or on such other property as determined by the Manager in its sole discretion.  Initially, the Company intends that all Loans will be secured by real estate located in Arizona, although it may later decide to acquire interests in Loans secured by real estate in California, Colorado, and Nevada.  Additional liens may be taken on additional real property, either as additional collateral or as the primary collateral.

In all events, the Company will obtain such evidence as it deems satisfactory to reflect the condition of the title to the property that secures a Loan and the priority of the lien securing such Loan.  The Company will obtain an extended lender's ALTA title insurance policy or commitment as to the priority of the deed of trust

or other equivalent instrument and the condition of title and will record its interest in the property.

Certain of the Loans may be made on a nonrecourse basis. In such a case, the Company will be required to rely for its security solely on the value of the underlying property and will not have any right to make any claims for repayment personally against the Borrower. Certain other Loans will be full recourse loans, may be secured by personal or corporate guarantees, or may be secured by one or more items of real or personal property in addition to the property constituting the primary security for the Loan. Nevertheless, the primary security for a Loan in most cases will be the property underlying the Loan. The ability of the Borrower to pay the outstanding balance of a Loan (particularly a non-amortizing Loan) upon maturity will depend primarily upon the Borrower's ability to obtain sufficient funds by refinancing, sale, or other disposition of the underlying property.

**Principal Payment Terms.**

Some of the Loans will be "interest only" loans while other Loans will be "amortizing" Loans. An interest only Loan has no principal repayment requirements during its term with a balloon of the full principal obligation due upon the Loan's maturity. An amortizing Loan may either have periodic principal payments, such that by the Loan's maturity the principal has been repaid in full by such periodic reductions, or periodic principal reductions that result in a partially reduced principal amount by maturity, requiring a "balloon" payment of less than the original principal amount, such as a loan with principal payments based on a 20-year amortization but only a three-year term.

In addition, the Borrower may prepay a Loan in whole or in part, at any time, subject to whatever prepayment penalties the Manager may negotiate.

In connection with the sale of the property that secures a Loan, the Company may consent to such sale subject to such Loan or may make a new Loan to the purchaser. In addition, a Loan may require payment upon sale of all or a portion of the property. The Company may qualify its "due on sale" clause by providing release provisions, so that a portion of the collateral may be released from the related deed of trust or mortgage by payment of an agreed upon principal portion of a Loan. In determining whether to allow partial releases to a Borrower on a particular Loan, the Company generally will allow such releases upon payment of a sum equal to 130% or more of the pro-rata portion of the principal amount of the Loan secured by the released property although the release price may be a lesser pro-rata portion in certain instances.

To the extent that a Loan provides for an interest payment date other than the first day of a month, the Manager may advance interest from that payment date through the last day of the month, assuming each month consists of 30 days. Any such advance will be recovered by the Manager on the next interest payment date, whether or not the payment is received by the borrower.

**Underwriting of Loans.**

In originating Loans, the Manager will have the discretion to determine the terms of the Loans, including matters such as interest rate, term, security, release schedules, partial releases, and other similar matters. In addition, the Manager will conduct certain due diligence relating to each Loan in order to evaluate various factors that it considers material to such determination, including the condition and use of the property that will secure the Loan, its potential for appreciation, and the operating history, capitalization, and creditworthiness of the Borrower.

The Manager reviews various factors in connection with making or acquiring Loans on behalf of the Company. These factors will vary with individual Loans, but may include the following:

- review of sale comparables and other market research;
- review of credit reports, credit references, character references, and bank references on the Borrower;
- analysis of pro forma budgets and marketing plans for the property;

- review and analysis of any leases for the property;
- verification of zoning and special use permits for the property;
- verification that the proposed use of the property conforms with local ordinances and building codes;
- verification of all necessary approvals from the applicable city or county for site plans, plats, and utilities;
- verification of all utilities available to service the property;
- review of deed, purchase contract, property liens, entity formation documents, and other title related documentation for the property;
- verification of flood insurance status;
- verification of other assets, sources of payments, and third-party financing for the Borrower;
- determination of the Borrower's strategy for repayment of the Loan;
- review and analysis of any general contractor;
- review of development and construction plans;
- review of development and construction budget;
- review of pro forma - gross sales revenue less cost of acquisition, development, construction, financing, marketing, sales, and general and administrative dynamics;
- review of absorption estimates;
- review of third-party reports on soil, drainage, surveys, contractor experience, and financial statements;
- review of development stipulations and requirements;
- review of third-party contracts with the general contractor, utility agreements, architectural contracts, and engineering contract; and
- a physical inspection of the property.

The Manager utilizes a variety of sources to gather information about the property underlying a Loan. Sources of property information include the county assessor's data, MLS data, local real estate brokers, planning and zoning offices, and third-party property inspectors. The Manager makes a final determination of the condition of the property and the local market through a property inspection.

The Manager may obtain copies of the Borrower's tax returns, financial statements, and credit report to make a determination of the Borrower's financial condition and ability to repay the proposed Loan. Consideration is given to the Borrower's cash liquidity, other debt obligations, and cash flow. Inquiries are made to other creditors and business relationships in order to determine the Borrower's character and ability to perform. When applicable, the Borrower's experience with similar projects is evaluated.

**Title Insurance.**

The Manager obtains title insurance for all newly originated Loans according to industry standards. Title insurance endorsements are obtained to insure against title risks when appropriate. In most cases, the Manager requires an insured first lien position for the subject property. A second lien position generally is permitted in the following limited circumstances:

- when additional collateral is included;
- when the Manager records a junior lien on the subject property, subject to a first mortgage originated by the Manager; and
- in rare instances, when the first mortgage was not originated by the Manager and the holder is unaffiliated with the Manager.

Preliminary title reports are reviewed to determine the status of liens, assessments (existing and proposed), taxes, property vesting, surveys, easements, property access, legal descriptions, and other items that may effect the quality of the Loan. Title insurance endorsements are required to address specific areas of title concern for each Loan. Recording instructions, which are prepared as the final instruction to the title company at loan closing, address each "subject to" item listed in Schedule B and each requirement listed in the preliminary Title report. As an additional quality control point, the Manager monitors and reviews all title policies, as they are received, for accuracy.

**Defaulted Loans.**

Under limited circumstances, the Company may acquire interests in Loans with payments currently in default if the Manager anticipates that the Loans will ultimately exceed the then-current market rate of return. There is no assurance, however, that the return will ultimately be as anticipated by the Manager.

The Manager may choose, at any time subsequent to the Company's acquisition of an interest in a Loan, to dispose of the Loan by sale to a third party for any reason, including as a result of the failure to pay principal or interest. In such event, the Manager will attempt to substitute a Loan similar in aggregate outstanding principal and type for the Loan sold.

**Revolving Mortgage Line of Credit Program.**

The Manager's revolving loan program allows a Borrower the opportunity to request additional advances during the term of the Loan without having to go through a new, formal loan origination process. The Borrower can generally pay down the Loan principal balance, subject to the pre-payment period, and re-borrow the funds up to the maximum amount of the Loan, subject to the terms and conditions of the program.

The revolving loan program currently has the following requirements (although the Manager may change any such terms in its sole discretion):

- minimum Loan amount of $250,000
- minimum initial funding amount at close of escrow of the greater of 25% of the principal or $250,000;
- maximum Loan term of 10 years;
- first requested advance not more than 91 days from initial funding;
- minimum subsequent advance of the lesser of 25% of initial funding or $150,000;
- prepayment penalties;
- discount points based on the greater of initial Loan funding amount or $3,750; and
- minimum principal balance equal to the greater of 25% of the initial funding amount or $25,000.

**Participating Loans.**

The Company may participate with other affiliated and unaffiliated lenders in investing in Loans. In particular, the Company may own a participation interest in a Loan with another lending entity similar in form and structure to the Company or a loan program that was formed or sponsored by the Manager.

**"Section 32 Mortgages."**

A Section 32 Mortgage is a type of mortgage that has certain parameters and requires certain disclosures as set forth in Section 226.32 of Regulation Z, as adopted by the Board of Governors of the Federal Reserve System, which implements the Truth in Lending Act. Section 32 Mortgage legislation regulates closed-end consumer credit, which is credit primarily for personal family, or household purposes to a consumer who is a natural person and whose principal dwelling acts as security for the credit advanced. The legislation applies to single-family and owner-occupied properties and excludes residential purchase money mortgages and deeds of trust or debt secured by the consumer's principal dwelling to finance the acquisition of such residence or initial construction of the dwelling, as long as there is no existing debt on the property.

**Loans from Another Lender.**

Depending on the interest rate payable with respect to an existing outstanding loan originally made by another party (including another entity or program managed or sponsored by the Manager), the Company may acquire all or a portion of such loan for either its principal balance or an amount less than its principal balance. The Company may realize additional revenues from Loans acquired at a discount at the time such Loans are repaid. The additional revenue would be equal to the difference between the amount paid by the Company to acquire such Loans and the principal amount. This revenue, when added to revenue from interest payable on Loans, could increase the effective yield on the Company's investment in such Loan.

# FEDERAL INCOME TAX CONSEQUENCES

*The following was not intended or written to be used, and it cannot be used, for the purpose of avoiding U.S. federal, state or local tax penalties that may be imposed on the Members. This Memorandum was written to support the promotion or marketing of the transaction or matter addressed in this Memorandum. A prospective Member should seek advice based on the Member's particular circumstances from an independent tax advisor.*

**General**.

The following summary of the tax aspects is based on the Internal Revenue Code of 1986, as amended (the "Code"), on existing Treasury Department regulations ("Regulations"), and on administrative rulings and judicial decisions interpreting the Code. Significant uncertainty exists regarding certain tax aspects of limited liability companies taxed as partnerships. Such uncertainty is due, in part, to continuing changes in federal tax law that have not fully been interpreted through regulations or judicial decisions. Tax legislation may be enacted in the future that will affect the Company and a Member's investment in the Company. Legislative or administrative changes and judicial decisions could modify or change completely statements and opinions expressed below about the federal income tax consequences of an investment in the Company. Additionally, the interpretation of existing law and regulations described herein may be challenged by the IRS during an audit of the Company's information return. If successful, such a challenge likely would result in adjustment of a Member's individual return.

This summary assumes that the activities of the Company will be consistent with the description of its proposed activities set forth in this Memorandum and assume the operation of the Company in accordance with the Operating Agreement.

Because the relevant facts are presently unascertainable, and in certain cases there is a lack of clear legal authority, it is not possible to reach a judgment as to the outcome on the merits (either favorable or unfavorable) of certain federal income tax issues and, accordingly, the Company cannot determine (a) whether a Loan may be deemed to be other than a capital asset, thereby resulting, among other circumstances, in the gain therefrom constituting unrelated business income to Members that are Tax-Exempt Entities (as defined below), (b) whether the Company is engaged in a trade or business with respect to Loans, or (c) whether the Company's characterization of certain fees paid by it as immediately deductible or amortizable will be respected, or whether such fees will be required to be capitalized or treated as nondeductible expenditures or Company distributions. See "Investment By Tax-Exempt Entities," "Potential Dealer Status," "Fees Payable to Manager," and "Organization and Syndication Costs" below. Further, no rulings have been requested from the IRS with respect to the matter discussed in this section. The Company does not intend to obtain any such rulings.

The following summary of tax aspects generally assumes that the investor is an individual and is a U.S. citizen or resident. The following discussion is only a summary and is limited to those areas of federal income tax law that are considered to be material to individual investors owning interests in partnerships.

No information regarding state and local taxes is provided, other than a brief summary of some aspects of state tax law set forth under the heading "State and Local Taxes" below. Although the Company will furnish the Members with such information regarding the Company as is required for income tax purposes, each Member will be responsible for preparing and filing the member's own tax return.

**Classification as a Partnership**.

An entity classified as a "partnership" for federal income tax purposes generally incurs no federal income tax liability. Instead, each partner is required to take into account an allocable share of

the partnership's net income or loss and an allocable share of certain specially characterized items (e.g., capital gains and losses) in computing the partner's income tax liability. Distributions by a limited liability company taxed as a partnership to a Member generally are not taxable unless the distributions exceed the Member's adjusted basis in the Member's Interests. The availability to Members of most of the tax treatment described in this summary requires that the Company be classified as a partnership for federal income tax purposes rather than as an association taxable as a corporation under the federal income tax laws.

The Company expects it will be classified for federal income tax purposes as a partnership and not as an association. The Regulations provide that a domestic unincorporated organization, such as a limited liability company, will be treated as a partnership for federal income tax purposes absent an affirmative election to be taxed as a corporation. If the Company is operated in the manner contemplated by the Operating Agreement, the Company will qualify as a partnership for federal income tax purposes.

The Company does not plan to request a ruling from the IRS regarding the Company's status for federal income tax purposes. Thus, despite the Company's expectation that it should be classified as a partnership for federal income tax purposes, there is no assurance that the IRS will not challenge such classification. For example, the Code reclassifies certain "publicly-traded" limited partnerships as corporations for federal income tax purposes, subject to an exception for "publicly-traded" limited partnerships 90% of whose gross income is derived from passive investment sources such as "rental income," dividends, and interest, provided such income generally satisfies certain requirements designed to ensure its passive character status. The definition of "publicly-traded" in the Code is very broad and includes any situation in which a market is effectively made in ownership interests. The Operating Agreement prohibits the Company from recognizing transfers of an Interest if such transfers could result in the Company being treated as a "publicly-traded" partnership. Accordingly, it is unlikely that the Company will be treated as a "publicly-traded" partnership for federal income tax purposes.

The Company would be treated as a taxable mortgage pool, and taxable as a corporation, if (1) substantially all of its assets are debt instruments and more than 50% of those debt instruments are real estate mortgages (the "asset test"), (2) the Company is considered the obligor under debt instruments with two or more maturities (the "maturities test"), and (3) payments on those debt instruments bear a relationship to payments on the mortgage loans that we hold (the "relationship test"). For purposes of the asset test, (a) any mortgage loan held that is considered "seriously impaired" (determined based on the facts and circumstances, including the number of days delinquent, the loan-to-value ratio, and the debt service coverage) is not treated as a debt instrument and (b) if less than 80% of assets consist of debt instruments, then assets will not be treated as consisting substantially all of debt instruments. For purposes of the maturities test, although the Interest is issued as an equity interest, under the Code and Treasury Regulations, equity interests may be treated as debt instruments if the equity interests "correspond to maturity classes of debt." For purposes of the relationship test, payments on debt instruments bear a relationship to payments on the mortgage loans if the timing and amount of payments on the debt instruments are in large part determined by the timing and amount of payments or projected payments on the mortgage loans. The legislative history indicates that the relationship test could be satisfied only where the payments on the debt instruments must be made within a period of time from when payments on the mortgage loans are received. Further, for purposes of the relationship test, payments on the mortgage loans generally include only scheduled payments on mortgage loans and not proceeds on the sale of the mortgage loans.

It is possible that the IRS could assert that an Interest should be treated as a debt obligation for purposes of the maturities test. However, the Company does not believe that the relationship test should be satisfied because the timing and amount of distributions on Interests should not be considered to be in large part determined by the timing and amount of payments or projected payments on the Loans and Interests are not akin to pay—through bonds but rather distributions on the Interest are unrelated to payments on the

Loans. Although no specific authority exists with respect to the foregoing, the Company does not believe that it will be treated as a "taxable mortgage pool" as a result of the issuance of the Interests.

If a Company were to be classified as a corporation for federal income tax purposes, Members would be treated as shareholders of a corporation, with the result, among other things, that (i) items of income, gain, loss, deduction and credit of the Company would not flow through to the Members for reporting on their individual federal income tax returns, (ii) cash distributions, if any, would be treated as distributions by a corporation in respect of its stock, and such distributions would be taxable to the Members as ordinary income to the extent of current or accumulated earnings and profits of the Company, and (iii) the taxable income would be subject to the federal income tax on corporations, thereby reducing cash distributions.

The discussion that follows is based on the assumption that the Company will be classified as a partnership and not as a corporation for federal income tax purposes. The discussion also assumes if the Company has 100 or more Members, the Company will not elect under Code Section 773 the special tax reporting and computation methods of large partnerships. Electing large partnerships combine most items of partnership income, deduction, credit, and loss at the partnership level and pass through that amount to the partners.

**Investment by Tax-Exempt Entities**.

Certain entities, including trusts formed as part of Keogh and pension and profit-sharing plans that are qualified under Code Section 401(a), individual retirement accounts ("IRAs"), and certain charitable and other organizations described in Code Section 501(c), are generally exempt from federal income taxation. Such entities ("Tax-Exempt Entities"), however, are subject to federal income tax to the extent of their unrelated business taxable income ("UBTI").

UBTI is defined as the aggregate gross income derived by a Tax-Exempt Entity from unrelated trades or businesses less the deductions (such as operating expenses and interest) directly connected with such trades or businesses, all subject to certain modifications. For this purpose, if the Company is engaged in a trade or business, the trade or business of the Company is attributable to each of its Members. Although the Company is not expected to be engaged in a trade or business in connection with its Loans, the Company may be considered a "dealer" and no assurance can be given that the Company will not be deemed to be a dealer in Loans. See "Potential Dealer Status" below.

Certain items of income are excluded from the definition of UBTI. The relevant exclusions from UBTI include (1) interest income; (2) most rents from real property; and (3) gains from the sale, exchange, or other disposition of assets held for investment. These exclusions are subject to many conditions and restrictions and generally are not available in the case of debt-financed property. Loans may be considered debt-financed if an investor purchases an Interest with funds that are available for such purpose as a result of borrowings. Tax-Exempt Entities should consult their tax advisors with respect to the debt-financed rules if they are subject to any debt obligations.

A Tax-Exempt Entity that realizes UBTI is taxed on that income at regular trust rates if the entity is a trust and at regular corporate rates if the entity is a corporation. The tax is imposed directly on, and paid out of the assets of, the entity. In computing UBTI, deductions are generally allowed for all expenses that are directly connected with the earning of the income and a specified deduction of $1,000 for each Tax-Exempt Entity. Even if a portion of the income of a Tax-Exempt Entity is UBTI, income from other investments that is not UBTI will continue to be exempt from federal income tax. Thus, the realization of any UBTI from the Company generally will not affect the exempt status of the entity. For certain types of Tax-Exempt Entities, however, the receipt of any unrelated business income could affect the exempt status of the entity. For example, if a charitable remainder annuity trust or a charitable remainder unitrust (as defined in Section 664 of the Code) has UBTI during the year, all of its income from all sources in that year will be taxable. In addition

to possible federal income taxation, any UBTI may be subject to state and local income taxation, which may differ in method of computation and amount from federal income taxation.

**Investment by Taxable Investors**.

*General.*

The discussion that follows is directed primarily to individuals and entities that are subject to federal income taxation. Tax-Exempt Entities should note that the discussion generally is relevant to them if and to the extent that they realize UBTI.

- No federal income tax is generally paid by a limited liability company as an entity. Instead, each member is required to report on the member's income tax return the member's distributive share of a limited liability company's income, gain, loss, deduction, or credit (and items of tax preference), regardless of whether any actual distribution is made to that member during the Member's taxable year. Consequently, a member's share of the limited liability company's taxable income may exceed the cash, if any, actually distributed to that member. Conversely, actual (or constructive) distributions of money from a limited liability company will be taxable only to the extent that such distributions exceed the adjusted basis of the member's interest in the limited liability company, regardless of whether the limited liability company has current income. The characterization of an item of income or loss generally will be the same for the members as it is for the limited liability company; and

- A Member's distributive share of items of income, gain, loss, deduction, or credit will be determined in accordance with the allocations set forth in the Operating Agreement as long as such allocations are recognized for federal income tax purposes. See "Allocations of Income and Losses" below. Subject to the at-risk rules, the passive activity loss rules, the investment interest limitation, and the floor on miscellaneous itemized deductions, each

Member will be entitled to claim as a deduction the Member's distributive share of the Company's net losses, if any, to the extent of that Member's adjusted basis in the holder's Interest as of the end of such taxable year. To the extent that a Member's share of Company losses exceeds the adjusted basis of the Member's Interest, such excess losses cannot be utilized in that year by that Member for any purpose, but are allowed as a deduction (subject to the limitations described above) only when that Member's adjusted basis for the holder's Interest at the end of any year exceeds zero (before reduction by the suspended loss).

*Tax Basis of Interests.*

A Member's basis in the Member's Interests initially will be equal to the amount of the Member's cash contributions to the Company. Subsequently, a Member must adjust his basis to reflect certain Company transactions. A Member's basis will be increased by (1) any additional capital actually paid to the Company by that Member, (2) that Member's distributive share of the Company's income, (3) that Member's distributive share (based on that Member's ongoing interest in Company profits) of any Company indebtedness with respect to which no Member bears the economic risk of loss ("nonrecourse debt"), but such increase will be limited to the fair market value of the Property securing such indebtedness, and (4) that share of the Company's recourse debt, if any, with respect to which that Member bears the economic risk of loss. A Member's basis will be decreased, but not below zero, by (a) the amount of that Member's distributive share of items of Company loss and deduction, (b) the amount of any money distributed, or constructively distributed, to that Member, and (c) the adjusted basis of distributed property other than money. A reduction in the amount of a Member's share of Company debt will be treated as a constructive cash distribution to that Member and will reduce the basis of that Member's Interests.

*Cash Distributions.*

Cash distributions by the Company to a Member will not result in taxable gain to that Member unless the distributions exceed the Member's adjusted basis for the Member's Interests, in which case the Member will recognize gain in the amount of such excess. Gain, if any, resulting from cash distributions by the Company should be treated as gain from the sale or exchange of an Interest. See "Sale of Interest" below.

A reduction in a Member's share of Company debt will be treated as a cash distribution to such Member to the extent of such reduction. If a constructive distribution exceeds a Member's adjusted basis in such Member's Interests at that time, such Member will recognize gain as described above. The Company will not have an obligation to distribute any money to assist the Members in paying the tax on any such gain.

*Property Distribution.*

The Company may distribute a combination of cash and fractional undivided interests in Loans in partial or complete redemption of the Interest of a Member in the company. In the case of a partial redemption, the Member will take a tax basis in the fractional undivided interests in Loans equal to the tax basis of the Company in such fractional undivided interests, not to exceed the Member's tax basis in his Interest after reduction for the cash distribution. In the case of a complete redemption of a Member's Interest, the Member will take a tax basis in the fractional undivided interests in Loans received equal to the tax basis of the Member in his Interest, after reduction for any cash distributions by the Company. Gain or loss with respect to the fractional undivided interests will thereafter be computed based on the adjusted basis of the fractional undivided interests.

*Floor on Miscellaneous Itemized Deductions.*

An individual may deduct certain "miscellaneous itemized deductions" only to the extent that they cumulatively exceed 2% of his adjusted gross income for the year. Miscellaneous itemized deductions include all itemized deductions other than those for interest, taxes, casualty losses, charitable donations, medical expenses, and certain other deductions. This floor applies with respect to nonbusiness deductions incurred indirectly by a taxpayer through a pass-through entity, such as a limited liability company. A member's share of a limited liability company's nonbusiness deductions may not reduce the income of the limited liability company; rather, it must be passed through to the member and may only be deducted by the member to the extent that those deductions, when combined with other miscellaneous itemized deductions, exceeds 2% of the member's adjusted gross income. The application of these rules to a Member will depend on whether the Company is characterized as being engaged in a trade or business. If the Company is not viewed as engaged in a trade or business, each individual Member's share of any "miscellaneous itemized deductions" will be subject to the 2% floor and, as a result, an individual Member's share of taxable income from the Company will likely exceed the holder's share of the Company's Cash Flow from operations. If the Company is engaged in a trade or business, other limitations are applicable. See "Passive Activity Income and Losses" below.

*Passive Activity Income and Losses.*

The Code characterizes certain investment activities as producing either passive or portfolio income or loss. The Code limits the ability to deduct passive losses; generally, losses and credits from passive activities may not be offset against income or tax attributable to active or portfolio activities but may only be offset against income and tax attributable to other passive activities. Interest expense attributable to passive activities will not be subject to the limitation on investment interest expense deductions. See "Limitation on Interest Deductions" below.

Losses and credits disallowed by the passive activity rules are suspended and may be carried forward and treated as losses and credits from passive activities in each successive taxable year until offset by income from passive activities or allowed against other income as a result of the complete disposition of the taxpayer's interest in that activity. When a taxpayer's entire interest in an activity is disposed of in a taxable transaction

(other than to a related party), any remaining suspended loss incurred in connection with that specific activity is allowed in full, first against income or gain from such activity during the year of disposition, second against net income or gain from all other passive activities, and thereafter against income from all sources, including active income. A disposition can occur through a disposition of a passive activity or through a Member's disposition of his entire interest in the Company.

Portfolio income generally includes interest, dividends, and royalties, as well as the gain or loss attributable to the disposition of property that produces such interest, dividends, or royalties, or gain or loss attributable to the disposition of property that is held for investment.

If the Company is not treated as in the trade or business of lending money, net income from Loans will be treated as portfolio income and losses and will not be subject to the passive activity limitation. If the Company is considered as being in the trade or business of lending money, all or a substantial portion of the Company's net income from Loans will likely be treated as passive income and, conversely, any losses will be characterized as passive losses.

*Limitation on Interest Deductions.*

The deductibility of a taxpayer's investment interest expense generally is limited to the amount of the taxpayer's net investment income. Investment interest expense does not include any interest expense that is taken into account in determining the income or loss from a passive activity, but does include (1) interest on indebtedness incurred or continued to purchase or carry property "held for investment," (2) interest expense attributable to portfolio income under the passive loss roles, and (3) the portion of interest expense incurred or continued to purchase or carry an interest in a passive activity to the extent attributable to portfolio income (within the meaning of the passive loss roles). Interest on debt incurred by a Member to purchase or carry Interests also may be investment interest to the extent the Company does not engage in a passive activity (note that Real Estate Investments are a

passive activity). Debt of a taxpayer generally is allocated among the taxpayer's activities by tracing the proceeds of each debt. A detailed analysis of the tracing roles is beyond the scope of this discussion. Consequently, Members that intend to use borrowed funds to purchase their Interests should consult their own tax advisors before borrowing such funds. Members should maintain careful records of any debt they incur to carry or acquire their Interest.

Net investment income includes gross income from property held for investment and amounts treated as gross portfolio income pursuant to the passive loss rules less deductible expenses (other than interest) directly connected with the production of investment income. Qualified dividend income subject to the 15% maximum tax rate will not constitute investment income for this purpose for tax years beginning on or before December 31, 2008, except if the taxpayer so elects. Net capital gain attributable to the disposition of property held for investment is excluded from investment income for purposes of computing the investment income limitation; however, a taxpayer may elect to include the net capital gain in investment income if the taxpayer also reduces the taxpayer's net capital gain by the same amount. Investment interest deductions that are disallowed may be carried forward and deducted in subsequent years to the extent of net investment income in such years.

With respect to any Loan that is considered to be "held for investment," the investment interest rules should be applicable to limit, to the extent of net investment income, the Members' ability to currently deduct both interest paid by the Company, if any, and the interest, if any, paid by the Members to carry an allocable portion of their Interest.

Also, in the case of a Member that holds tax-exempt securities, including shares in a regulated investment company that distributes exempt interest dividends, and that plans to borrow money to purchase Interests, it is possible that the IRS might seek to disallow the deductibility of all or a portion of such investor's interest expenses incurred in connection with such borrowing, claiming that the indebtedness was incurred to

"purchase or carry" tax-exempt securities under Section 265(2) or Section 265(4) of the Code. Such risk would substantially increase for an investor whose tax-exempt obligations were used as security for the debt incurred to purchase an Interest.

*Tax Rates.*

The Code contains a progressive tax rate structure. The maximum stated federal tax rate applicable to individuals for ordinary income for tax years beginning after December 31, 2002 and beginning on or before December 31, 2010 is 35%. For years beginning after December 31, 2010, the maximum rate will be 39.6%. Itemized deductions and personal exemptions are phased out for higher income taxpayers, which can result in a higher effective marginal tax rate. The maximum capital gains rate for property held more than 12 months is generally 15% for tax years commencing on or before December 31, 2010, except that certain capital gain on the disposition of real estate is taxed at 25%. For tax years commencing after December 31, 2010, the maximum capital gain rate will be 20%.

*Economic Motivation of the Transaction.*

Code Section 183 provides that deductions attributable to "activities not engaged in for profit" are allowed only to the extent of (1) interest, taxes, and other deductions allowable under the Code without regard to whether a profit motive exists ("Special Deductions"), and (2) gross income in excess of Special Deductions in connection with such activity. The Regulations issued under Code Section 183 list the following factors that normally are taken into account in determining whether an activity is engaged in for profit: (a) the manner in which the taxpayer conducts the activities; (b) the expertise of the taxpayer or the taxpayer's advisor; (c) the time and effort the taxpayer spends in the activity; (d) the taxpayer's success in similar activities; (e) the taxpayer's history of income or loss with respect to the activity; (f) the profits earned; (g) the taxpayer's financial status; and (h) the expectation that the assets used in the activity may appreciate in value. Additional factors also may be considered. Finally, Code Section 183 contains a safe harbor provision that may be applicable to the Company. This safe harbor presumptively treats an activity as engaged in for profit in the event that the Company's activities generate a profit for tax purposes in any three of five consecutive taxable years.

Ultimately, whether a taxpayer possesses the requisite profit motive in making an investment is a question of fact. With respect to a limited liability company, the profit expectations of the limited liability company, rather than those of the members, generally are determinative. The ultimate economic effect of an investment in the Company depends primarily on the ability of the Company to produce revenue in excess of expenses incurred. Although the Company believes that the Loans will be profitable, the IRS may challenge the Company's deductions based upon an assertion that the activities contemplated herein are not engaged in for profit.

**Alternative Minimum Tax.**

An individual taxpayer is subject to an "alternative minimum tax" if such tax exceeds the individual's regular income tax. Generally, alternative minimum tax is based on the taxpayer's adjusted gross income increased by the amount of certain preference items, less certain itemized deductions. The impact of the alternative minimum tax on a Member's overall federal income tax liability may vary, generally depending on a Member's other items of income, gain, loss, deduction, and credit, from no impact to a substantial increase in tax. Accordingly, each prospective Member should consult with the Member's tax advisor regarding the impact of an investment in the Company on the calculation of his alternative minimum tax, as well as on his overall federal income tax liability.

**Allocations of Income and Losses.**

A Member's distributive share of income, gain, loss, or deduction (or any item thereof) will be determined in accordance with the Operating Agreement only if that allocation has "substantial economic effect" as defined under the Code. In determining whether an allocation has substantial economic effect, the principal considerations are

(1) whether the allocation actually affects the eventual amount of money or other property allocable to a member (i.e., has economic effect), without regard to tax consequences, and (2) whether the effect described in (1) is substantial. If an allocation under an operating agreement does not have substantial economic effect, the IRS will reallocate profits and losses among the members in accordance with their interests in the limited liability company, determined by taking into consideration all facts and circumstances.

The allocations of profits and losses under the Operating Agreement should have economic effect and that effect should be "substantial" as that term is defined in the Regulations. The allocations should have economic effect under the alternative test for economic effect set forth in the Regulations because (a) capital accounts will be maintained in accordance with the standards as set forth in Regulations, and (b) distributions upon liquidation will be made in accordance with positive capital account balances as required by the Regulations. In addition, the Regulations require a limited liability company, in which the members are not required to make up their deficit capital accounts, to have a "qualified income offset" as that term is used in the Regulations. The Operating Agreement contains such a provision.

Although an allocation of losses attributable to nonrecourse liabilities cannot technically have economic effect because no member bears the actual risk of economic loss, an allocation of such losses is deemed to have economic effect if four requirements are met: (a) the economic effect requirements listed above are satisfied throughout the full term of the Company; (b) the allocation of nonrecourse deductions among the members is reasonably consistent with allocations of other significant limited liability company items; (c) a "minimum gain charge-back" (as defined in the Regulations) is provided for in the Operating Agreement; and (d) all other material allocations and capital account adjustments under the Operating Agreement are recognized under the Regulations. These requirements should be satisfied under the terms of the Operating Agreement and if the Company has nonrecourse

deductions, the allocation will have economic effects.

**Tax Treatment of Company Operations.**

*Taxable Year.*

Under the Code, the Company will be required to report its operations on a calendar year basis.

*Market Discount.*

If the Company purchases a Loan for less than the principal amount of the Loan, the difference is considered "market discount," unless such difference is de minims. Under the market discount rules, any gain realized by the Company on a taxable disposition of a Loan having "market discount," as well as any principal payment made with respect to such Loan, will be treated as ordinary income to the extent of the then "accrued market discount" of the Loan. Market discount will accrue ratably from the date of acquisition to the maturity date of the Loan, unless the Company elects to accrue market discount on a constant interest rate method. The constant interest rate method generally requires the accrual of interest at times and in amounts equivalent to the result that would have occurred had the market discount been original issue discount computed from the Company's acquisition of the Loan through the maturity date. In addition, a portion of the interest expense in connection with debt incurred to purchase or carry a Loan with market discount may not be currently deductible.

*Original Issue Discount.*

The Company may acquire interests in Loans for which the stated redemption price at maturity will be greater than the cash advanced to the borrower (the "Issue Price"). For federal income tax purposes, the difference between the Issue Price of a Loan and its stated redemption price at maturity, which stated redemption price is equal to the sum of all payments due under the Loan other than interest based on a fixed rate and payable unconditionally at fixed periodic intervals of one year or less, constitutes "original issue discount" ("OID"). The Company

generally will be required to include a portion of the OID, if any, in gross income annually as interest pursuant to a compounding method, even though the Company will not receive any payment of such amount prior to maturity. The recognition of OID by the Company may result in allocations of income to Members that exceed cash distributions.

*Potential Dealer Status.*

If the Company sells Loans, the Company could be characterized as a "dealer" with respect to such Loans, and any gain from such sales could be treated as ordinary income. Tax rates for ordinary income are significantly higher than for capital gain. See "Tax Rates" above. In addition, the characterization of the Company as a dealer for federal income tax purposes would have an adverse effect on Tax-Exempt Entities that invest in the Company because any gain resulting from the disposition of Loans would constitute unrelated business income to such Tax-Exempt Entities. See "Investment By Tax-Exempt Entities" above. Such a characterization could also affect the application of the passive activity rules to taxable investors. See "Passive Activity Income and Losses" above.

A dealer is one who holds property primarily for sale to customers in the ordinary course of its trade or business. The Company has not been organized to engage in the business of buying and selling Loans and, although the Manager is permitted to sell Loans, it does not intend to sell Loans to the extent that such sales could result in characterization of the Company as a dealer. Because the determination of this issue depends, however, on the facts and circumstances with respect to the conduct of the Company's operations, which facts and circumstances are presently unascertainable, Counsel has not opined on the status of the Company as a dealer and no assurance can be given that the Company will not be deemed to be a dealer in Loans.

*Fees.*

The Company will pay fees for services to be rendered in administering the Company's business and affairs. If questioned, the deduction for such fees will depend, in part, on a factual determination as to the nature of the services actually performed, the results of which cannot be predicted with certainty. Although the Company believes that the amount of the fees will be reasonable based on the services and intends to deduct such fees, no assurance can be given that the IRS will not seek to treat the various fees as constituting an allocation of income or a distribution of capital, rather than as a capital or deductible expense.

*Organizational and Syndication Costs.*

Expenses of organizing the Company and of promoting the sale of Interests must be capitalized by the Company. However, the Company may elect to treat organizational expenses (but not syndication expenses) as deferred expenses and amortize them over a period of 180 months. The Manager intends to make such an election for the Company with respect to organizational expenses. The Code requires that expenses paid in connection with the syndication of interests in the Company be capitalized without the benefit of amortization. Treasury Regulations include within the definition of syndication expenses, legal fees of the issuer for securities law advice, for tax advice pertaining to the "adequacy of tax disclosures" in the private placement memorandum, and accounting fees for the preparation of representations to be included in the offering materials. Some of the expenses that will be incurred by the Company will be difficult to classify under the Treasury Regulations. Accordingly, it is possible that the IRS may attempt to reclassify all or a portion of the organizational expenses as syndication fees or expenses. No assurances can be given that the Manager's allocation of costs between organization and syndication will be respected by the IRS.

**Transfers and Liquidation.**

*Sale of Interest.*

Any gain recognized by a Member on the sale or exchange of an Interest will generally be treated as capital gain. However, gain will be

recharacterized as ordinary income to the extent that it is attributable to "inventory items," which would include Loans held by the Company that are "dealer" property. See "Potential Dealer Status" above. Any gain recharacterized as ordinary income would be considered UBTI to a Tax-exempt Entity. See "Investment by Tax-Exempt Entities" above.

*Liquidation of the Company.*

Upon the Company's liquidation, any gain or loss recognized by a Member with respect to a distribution generally will be considered as gain or loss from the sale or exchange of a capital asset. Gain to a Member on the distribution will be recognized to the extent that any money received, together with any reduction in such Member's share of Company debt, exceeds such Member's adjusted basis in the Member's Interests. A loss cannot be recognized unless the Member receives no property in the distribution other than money, unrealized receivables, or appreciated inventory, and then only to the extent that the money and the basis to the Member of the unrealized receivables and appreciated inventory are less than the adjusted basis of the Member's Interest. Upon the Company's liquidation, any gain or loss recognized from a distribution to the members generally will be considered as gain or loss from the sale or exchange of a capital asset. Gain to a member on the distribution will be recognized to the extent that any money received, together with any reduction in such member's share of Company debt.

*Code Section 754 Election.*

A limited liability company is permitted to make an election under Code Section 754, which results in various items of limited liability company income, gain, loss, deduction, and credit being treated differently for tax purposes than for accounting purposes. The Section 754 election allows for adjustments to the basis of limited liability company property for measuring gain upon distributions of limited liability company property and transfers of any limited liability company interests. The general effect of such an election is that transferees of any

limited liability company interests are treated, for purposes of computing depreciation and gain, as though they had acquired a direct interest in the limited liability company assets and the limited liability company is treated for such purposes, upon certain distributions to members, as though the limited liability company had acquired a new cost basis for such assets. Any such election, once made, cannot be revoked without the consent of the IRS. In view of the inherent tax accounting complexities and the substantial tax expense that would be incurred in making a Code Section 754 election, the Manager does not presently intend to make such an election on the Company's behalf, although the Operating Agreement empowers it to do so. Therefore, no benefits may be available to the Members by reason of such adjustments.

**Administrative and Compliance Matters.**

*Disclosure of Reportable Transactions.*

Section 6111 of the Code requires a "material advisor" with respect to any "reportable transaction" to file an information return identifying and describing the transaction, any potential tax benefits, and other information required by Treasury Regulations. A reportable transaction is a transaction of a type that has been determined as having a potential for tax avoidance or evasion. Section 6707A of the Code requires a taxpayer to include on the taxpayer's tax return information with respect to any reportable transaction. The Company does not believe that an investment in the Company is reportable transaction.

*Audit Risk.*

The IRS has adopted a policy of auditing, selectively, a large number of partnership information returns. In view of the IRS' audit programs, the Company's information return may be selected for audit. If the IRS audits the Company's information return, it is likely that the IRS will make corresponding adjustments to the Members' income tax returns. It is also more likely that the Members' returns also will be audited. It is not expected that the Company will make cash distributions to Members to

50

assist them in paying a tax liability resulting therefrom.

*Resolution of Disputes Involving Company Items.*

Limited liability companies are generally treated as separate entities for purposes of federal tax audits, judicial review of administrative adjustments by the IRS, and tax settlement proceedings. The tax treatment of limited liability company items of income, gain, loss, deduction, and credit are determined at the limited liability company level in a unified proceeding rather than in separate proceedings with the members. The Code provides for one member to be designated as the "Tax Matters Partner" for these purposes. The Operating Agreement appoints the Manager as the Tax Matters Partner for the Company. The Manager must conduct disputes involving Company items, However, the there may not be sufficient funds to defend tax positions of the Company.

The Members generally will be required to treat Company items on their personal federal income tax returns consistent with the treatment of the items on the Company's information return. In general, this consistency requirement is waived if a Member files a statement with the IRS identifying the inconsistency. Failure to satisfy the consistency requirement, if not waived, will result in an adjustment to conform the Member's treatment of the item with its treatment on the Company's information return. Even if the consistency requirement is waived, adjustments to a Member's tax liability with respect to Company items may result from an audit of the Company's or the Member's tax return. Intentional or negligent disregard of the consistency requirement may subject a Member to substantial penalties.

*Potential Penalties.*

Taxpayers are subject to an understatement penalty if the taxpayer's actual federal income tax liability is understated by the greater of $5,000 or 10% of the tax required to be shown on the return. If applicable, the penalty is equal to 20% of the understatement. There are broad

exceptions to this penalty provision, which applies different standards based on whether the item giving rise to the tax understatement resulted from a "tax shelter." The term "tax shelter" is defined to include a partnership if a significant purpose of such partnership is the avoidance or evasion of federal income tax. Although the purpose of a Company is a question of fact, the Company believes that a significant purpose of the Company is not the avoidance or evasion of federal income tax. Therefore, the Company should not be classified as a tax shelter for purposes of the understatement penalty.

Generally, if a tax shelter does not exist, the understatement penalty may be reduced by an amount attributable to the tax treatment of an item if (1) "substantial authority" supports such treatment or (2) the relevant facts affecting the item's tax treatment are adequately disclosed in the tax return and a reasonable basis for such tax treatment exists. The Code does not contain a definition of "substantial authority." The Regulations provide that the standard of "substantial authority" is less stringent than "more likely than not" and more stringent than a "reasonable basis" standard. The position must be "stronger than one that is arguable but fairly unlikely to prevail in court." The Manager could take legal positions in filing the Company's federal income tax information return that authority for a particular legal position is substantial authority for purposes of the penalty. The IRS could challenge such a position. No assurance can be given that the Manager's judgment in such matters would be sustained if tested in court.

If a tax shelter does exist, the understatement penalty will not be reduced even with adequate disclosure of the relevant facts on the tax return. Rather, an understatement with respect to a tax shelter will be reduced only if, in addition to being supported by substantial authority, the taxpayer reasonably believed that treatment of such items on his return was "more likely than not" the proper treatment.

Several other penalties could be applicable to the Company or its members. For example, the

Code contains penalties for failing to include correct information on the Company's information return and for failing to report on a Member's income tax return any amount reported on the Company's information return (which is considered negligence in the absence of clear and convincing evidence to the contrary).

**Possible changes in Federal Tax Laws**.

Significant changes have been made in the Code in recent years.  The Treasury Department's position regarding many of those changes must await publication of interpretive and legislative regulations, some of which may not be forthcoming for some time.

The Code is also subject to further change by Congress, and interpretations of the Code may be modified or affected by judicial decisions, by the Treasury Department through changes in Regulations and by the IRS through its audit policy, announcements, and published and private rulings.

**Investment by Foreign Persons**.

The rules governing the federal income taxation of nonresident alien individuals, foreign corporations, foreign limited liability companies, and other foreign investors ("foreign persons") are complex and have not been addressed in this discussion.  Potential investors that are foreign persons should consult with their tax advisors to fully determine the impact on them of U.S. federal, state and local income tax laws.

**State and Local Taxes**.

The Company plans to pursue business activities almost exclusively in Arizona, but may be subject to taxation in other states.  In general, each state imposes an income tax with respect to (1) all income, regardless of source, of residents of that state, and (2) the income derived from in-state sources earned by a nonresident.

Members may be subject to taxation by their state of residence as well as other states with respect to income derived from the Company. Prospective Members are urged to consult their tax advisors concerning state and local tax matters.

# ERISA ASPECTS OF THE OFFERING

The purchase of Interests may not be appropriate for various tax deferred retirement plans, including any pension, profit sharing, Keogh (H.R. 10) plan, or other employee retirement benefit plans qualified under Section 401(a) of the Code, any retirement plans of 501(c)(3) organizations governed by Section 403(b) of the Code, or any IRA qualified under Code Section 408 (hereinafter referred to as a "Qualified Plan" or "Qualified Plans"). Before purchasing Interests, the trustee or other responsible fiduciary of a Qualified Plan contemplating investment should consider (1) whether the Qualified Plan is considered an "employee benefit plan" subject to certain fiduciary standards of ERISA; (2) whether the investment is in accordance with the documents and instruments governing such Qualified Plan; (3) whether the investment will result in unrelated business taxable income to the Qualified Plan; (4) whether the investment provides sufficient distributions to permit benefit payments to be made as they become due; (5) any requirement that the fiduciary annually value the assets of the Qualified Plan; and (6) whether the investment is prudent, since no public market is expected to develop in which the Interests may be sold or otherwise transferred – consequently, holders of Interests may not be able to readily liquidate or collateralize their investment. The purchase of Interests should be considered as a long-term investment. An employee benefit plan is defined in Section 3(3) of ERISA and includes all Qualified Plans defined above except Keogh plans, owner-only retirement plans and most IRAs ("ERISA Plans").

## Company Assets as Plan Assets.

### General

ERISA imposes certain requirements on employee benefit plans subject to Title I of ERISA (as defined above, "ERISA Plans"). ERISA also imposes certain requirements on entities that are deemed to hold the assets of ERISA Plans and on those persons who are fiduciaries with respect to such plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the plan.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan, as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code (collectively referred to above as, "Qualified Plans"), and certain persons, referred to as "parties in interest" or "disqualified persons," having certain relationships to these plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person that engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code.

Any plan fiduciary that proposes to cause a Qualified Plan to purchase Interests should consult with the fiduciary's counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of Sections 404 and 406 of ERISA and Section 4975 of the Code to such investment, and to confirm that the purchase and holding will not constitute or result in a non-exempt prohibited transaction or any other violation of an applicable requirement of ERISA.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions or the prohibited transaction provisions of ERISA and Code Section 4975, may nevertheless be subject to state or other federal laws or regulations that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any of these plans should consult with their counsel before purchasing Interests to determine the need for, and the availability, if necessary, of any exemption relief under any laws or regulations.

As discussed below, due to a favorable exemption provided under regulations (the "DOL Regulations"), issued by the United States

Department of Labor (the "DOL"), it is expected that the assets of the Company will not be treated under current law as "plan assets" of the ERISA Plans that purchase Interest. However, as further discussed below, if the assets of the Company are considered for whatever reason to be "plan assets" under ERISA, then (1) the fiduciary responsibility standards of ERISA would extend to investments made by the Company; and (2) certain transactions in which the Company might seek to engage might constitute "prohibited transactions" under ERISA and the Code. Furthermore, notwithstanding the DOL Regulations, even if the Company's assets are not "plan assets," as stated above, the responsible fiduciaries of each investing ERISA Plan still must make an independent determination as to whether the purchase of Interests would on a case by case basis comply with the fiduciary standards of ERISA and whether the purchase of Interests would be considered a "prohibited transaction" under Section 4975(c) of the Code or Section 406(a) of ERISA.

*"Plan Asset" Regulations*

In 1986, the DOL published, as a final regulation, Reg. Section 2510.3-101, which describes what constitutes "plan assets" with respect to an ERISA Plan investment in another entity (such as a limited liability company or corporation) for purposes of Title I of ERISA and Code Section 4975. Unless one of the exemptions provided in the DOL Regulations is met, the assets of a limited liability company or other entity in which a Qualified Plan makes an equity investment could be deemed to be assets of the investing plan. This would subject those persons who exercise discretionary control or authority over such entity's assets to certain ERISA fiduciary standards.

If a Qualified Plan acquires an equity interest in an entity that is neither a publicly-offered security nor a security issued by a registered investment companies, its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless (1) the equity interests of certain ERISA Plan investors are not significant or (2) the entity is an operating company.

The Interests will be neither publicly-offered nor issued by a registered investment company. In addition, the Company will not qualify for the operating company exception Thus, the exception referred to in clause (1) above must apply in order for an undivided interest in the assets owned by the Company not to be treated under the DOL Regulations as a plan asset of Qualified Plans holding Interest.

If Interest participation in the Company by Qualified Plans is not significant, then a Qualified Plan investment would not include any of the underlying assets of the Company Equity participation in the Company by a Qualified Plan is "significant" on any date if, immediately after the most recent acquisition of any interest in the entity, 25% or more of the value of any class of equity interests in the Company is held by Qualified Plan investors. For purposes of this 25% rule, the value of any equity interests held by a person (other than a benefit plan investor) that has discretionary authority or control over the assets of the entity, or that provides investment advice for a fee with respect to such assets, or any affiliate of such a person, will be disregarded. As a result, any Interests purchase by the Manager and its affiliates have the effect of reducing the amount and value of the Interests available for purchase by the Qualified Plan investors under the exemption. The Interests will be offered for sale to benefit plans, within the regulatory definition, and to persons not falling within such definition. However, to qualify for this exception, the Manager will limit the number of initial Interests purchased by benefit plan investors to less than 25% of all of the Interests purchased (excluding certain Interests as described above). The Company will make every effort to monitor the resale of Interests to ensure that benefit plan investors own less than 25% of all Interests. The Company makes no representation that such efforts will be successful. If benefit plan investors upon resale own more than 25% of all Interests purchased, the assets would be considered Plan Assets under ERISA. This would require that (a) the fiduciary responsibility standards of ERISA would extend to investments made by the Company, and (b) certain transactions in which the Company might seek to engage might

constitute "prohibited transactions" under ERISA and the Code.

**Plan Asset Consequences.**

ERISA imposes certain obligations on "fiduciaries" that exercise any discretionary authority or control over plan assets of ERISA Plans. Generally, a fiduciary under ERISA is any person that (1) exercises discretionary authority or control over the management (including plan administration) of a plan or its assets, or (2) renders investment advice (or has authority to do so) to a plan for a fee.

ERISA Plan fiduciaries must discharge their responsibilities in accordance with fiduciary standards requiring them to act (a) solely in the interest of the participants and beneficiaries of the plan, (b) with the care, skill, prudence, and diligence of a prudent man familiar with such matters would use when acting in similar circumstances, (c) by diversifying plan investments where prudent to do so, and (d) in accordance with the documents governing the ERISA Plan insofar as such documents are consistent with ERISA. Plan fiduciaries also are prohibited from engaging, either knowingly or negligently, in "prohibited transactions" with "parties in interest." Parties in interest (known as "disqualified persons" in the Code) include plan sponsors, plan fiduciaries, and persons providing services to the plan. A prohibited transaction includes sales, exchanges, leases, loans, and the furnishing of goods and services between a plan and a party in interest. Participating in any of these transactions automatically constitutes a breach of fiduciary duty of which a fiduciary of an investing ERISA Plan may also be held liable as a co–fiduciary. In addition, Code Sections 4975(a) and 4975(d)(2) subject a disqualified person of any investing Qualified Plan who engages in a prohibited transaction to monetary penalties.

In this instance, based upon the applicable DOL Regulations previously discussed and the limit on the number of Interests that Qualified Plans will be initially entitled to purchase, the Company's assets should not be deemed to be "plan assets." As a result, the Manager and its affiliates should not be subject to the ERISA fiduciary responsibility rules and the prohibited transaction rules discussed above with respect to its management of the Company's assets. Therefore, except as provided below, fiduciaries of investing ERISA Plans should not be held liable for the acts of the Manager and its Affiliates if the exemption from plan asset status under the DOL Regulations applies.

**Prohibited Transaction Under Section 4975 of the Code.**

Notwithstanding the applicability of exemption available under section 2510.3 – 101 of the DOL Regulations discussed above, a fiduciary of an investing Qualified Plan in interest is still subject to the prohibited transaction rules of Code Section 4975 (and ERISA Section 406(a) for ERISA Plans). If the IRS determines that an investment in Interests constitutes a prohibited transaction, an excise tax may be imposed on any disqualified person (as defined in Section 4975(e)(2) of the Code) who participates in the prohibited transaction and the transaction may have to be reversed. With respect to IRAs, the tax–exempt status of the IRA will be lost if the IRS determines that the acquisition of Interests by the IRA constitutes a "prohibited transaction" under 4975(c) of the Code.

Prohibited transactions are defined in Section 4975(c) of the Code and Section 406(a) of ERISA. These prohibitions are imposed upon fiduciaries and parties in interest to deter them from exercising the authority, control or responsibility which makes such persons fiduciaries when they have interests that may conflict with the interest of the plans for which they act. AS A RESULT, EACH FIDUCIARY OF AN INVESTING QUALIFIED PLAN INVESTING IN INTERESTS MUST INDEPENDENTLY DETERMINE WHETHER SUCH INVESTMENT CONSTITUTES A PROHIBITED TRANSACTION UNDER SECTION 4975(c) OF THE CODE OR SECTION 406(a) OF ERISA.

**Potential Conflicts Upon Investment.**

Conflicts of interest that could result in violations of one or more of the prohibited transaction rules

could occur if Interests are purchased by Members upon the decision or recommendation of a fiduciary or any other party in interest with respect to investing Qualified Plans in a position to affect the determination as to whether or not to purchase Interest if such party also bears any affiliation to the Manager (other than through the ownership by the Members of Interests purchased from the Manager). The Manager is not in a position to make representations as to the existence or absence of such relationships and, therefore, makes no such representations.

If one or more of the parties responsible for making the investment decisions of, or providing investment advice to a Qualified Plan, do in fact bear an affiliation to the Manager, it may be possible to avoid a violation by vesting with an independent fiduciary the authority to determine whether to make the purchase. However, proscribed transactions that are not specifically excepted by statute or the grant of an exemption by the DOL are prohibited. As no specific exemption will be procured in this case, the Secretary of the DOL could determine the purchase to be a violation of the prohibited transaction rules. Advisory opinions issued by the DOL suggest that it would be predisposed to such position.

**Potential Conflicts in Operation**

If the Manager is deemed to be a fiduciary, the question arises as to whether the performance of the management duties and the receipt of the various commissions and fees by the Manager would violate the prohibited transaction rule against the direct or indirect furnishing of goods, services or facilities between Qualified Plans and parties in interest. Even assuming that the Manager is a fiduciary, the Manager believes that the rendition of such services should not violate the multiple services rule as it would not be exercising its management powers to engage itself or an affiliate to perform additional services. Rather, the Manager would be pre-appointed as a manager and the various fees would be pre-established pursuant to the offering documents, which appointment and fees would be ratified by the named fiduciaries of the investing Qualified Plans through their decision to invest. In addition, such services and fees should fall within the exceptions set forth at Section 408(c)(2) of ERISA and Section 4975(d)(10) of the Code, each of which exempt from the prohibited transaction rules the receipt of reasonable compensation for services rendered or for the reimbursement of expenses properly and actually incurred in the establishment or operation of Qualified Plans. No assurance can be given as to the applicability of those exceptions, however, since they could be deemed to apply only to the payment for services and the reimbursement of expenses incurred in the administration of Qualified Plans as opposed to those incurred in connection with investments.

With respect to each of the potential conflicts of interest described above, the broad manner in which ERISA is drafted precludes the making of a definitive statement as to whether any such potential conflicts would be deemed to be violations of the prohibited transaction rules. If a violation of a prohibited transaction rule occurs, any person participating in such transaction could be subject to prohibited transaction excise taxes under the Code. If a fiduciary participates in the violation, he can be held liable for any losses incurred by the ERISA Plan which are occasioned by the misconduct. Furthermore, all aspects of the activity comprising the violation could be required by the DOL to be reversed.

## SUMMARY OF THE OPERATING AGREEMENT

A Member's rights and obligations as a Member and the various terms and provisions governing the operations of the Company are set forth in the Operating Agreement, a copy of which is attached hereto as Exhibit A.  The following is only a summary of the Operating Agreement and does not purport to be complete.  Prospective Members should carefully review the Operating Agreement for a more complete understanding of its terms and provisions before subscribing for Interests.

**Management of the Company will be controlled by the Manager.**

The Manager has the full, exclusive, and complete power to manage and control the business and affairs of the Company.  In the course of its management, the Manager may, in its absolute discretion, enter into agreements on behalf of the Company as it deems appropriate, and acquire, mortgage, encumber, hold title to, service, pledge, sell, release, or otherwise dispose of Company assets and interests therein, including Loans, when and upon such terms as the Manager determines to be in the best interest of the Company.  Among other things, the Manager will have the right to revise the terms of outstanding Loans regardless of their performance, which may include increasing the principal amount, modifying the interest rate and payment terms, changing the collateral, adding fees and costs to the principal balance, or substituting borrowers.  The Manager may employ such persons, including Affiliates of the Manager, as it deems necessary for the efficient operation of the Company.  Members will not be permitted to participate in or control the management of the Company.

**Members will have limited voting rights.**

Members will have the voting rights set forth in the Operating Agreement.  Members will have the right to cast their Participation Percentages at the time of a vote.  The Participation Percentage of a Member is subject to change as a result of the Reinvestment Option, the admission of new Members, and redemptions of Interests.  Members will have the right to vote on the following matters:

- removal of the Manager for cause, which means the willful misconduct or fraud of the Manager in the performance of its duties or the bankruptcy of the Manager;

- election of an additional or successor Manager;
- amendment of the Operating Agreement except for changes of a ministerial nature, that do not adversely affect the Interest holders in any material respect or are necessary or desirable to comply with applicable law or regulations;
- entering into any contracts between the Company and the Manager or one of its Affiliates unless as provided by the Operating Agreement;
- changing the purpose of the Company;
- using the Company's funds or capital other than for a purpose contemplated by the Operating Agreement; and
- commingling any Company funds or capital with those of any other person or entity.

Except as otherwise provided in the Operating Agreement, the approval of a matter requires the favorable vote of the holders of 75% of the Participation Percentages.

The Manager and its Affiliates will be entitled to vote with respect to any Interests owned by them.

**The Company will indemnify the Manager.**

The Manager will not be liable to the Company or the Members for any act or omission performed or omitted by it in good faith pursuant to the authority granted to it by the Operating Agreement, but will be liable to the Company for fraud, willful misconduct, or gross negligence. The Company will indemnify the Manager for any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including attorneys' fees as incurred in connection with the defense of any action based on any such act or omission of the Manager except to the extent involving fraud, willful

57

misconduct, or gross negligence. Insofar as indemnification for liabilities under the Securities Act may be permitted to the Manager, in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

**The Company will allocate its Profits and Losses and distribute cash entirely to the Members.**

Other than special allocations required under the Internal Revenue Code, all Profits and Losses will be allocated and all distributions will be made to the Members in proportion to their respective Participation Percentages at the time of the allocation or distribution in accordance with the Operating Agreement. Distributions will be made at such times as determined by the Manager. The Participation Percentage of a Member may fluctuate each month due to the Reinvestment Option, the admission of new Members, and redemptions of Interests. To the extent that a Member has fees outstanding to the Manager, including transfer fees, at the time of a distribution, the Manager can elect, in its sole discretion, to deduct such fees from a distribution.

**Members should only have a limited amount of liability relating to the Company's business.**

A Member's investment is subject to the risks of the Company's business. Assuming that the Company is operated in accordance with the terms of the Operating Agreement, a Member will generally not be liable for the liabilities of the Company in excess of the Member's investment and the Member's share of undistributed profits. A Member's investment will include distributions recontributed to the Member's Account to the extent the Member has elected the Reinvestment Option. In addition, a Member will also be liable for a period of one year for any distributions made to the Members in compliance with the Operating Agreement to the extent necessary to discharge the Company's liability to creditors that extended credit to the Company while the Member's capital was invested in the Company.

**A Member may only transfer Interests subject to certain restrictions.**

A Member's Interests may be assigned, subject to certain restrictions on transfer, by an executed and acknowledged written instrument, the terms of which are not inconsistent with or contrary to the provisions of the Operating Agreement, and the form and substance of which are satisfactory to the Company. A purported assignment will not be effective if, in the opinion of counsel, consummation of the requested transfer would cause the Company adverse tax consequences or the assignment would constitute a violation of the Securities Act or other applicable federal or state securities law. Assignments will be effective the day following the date on which the Company receives actual notice of the assignment.

The admission of an assignee of an Interest as a substitute Member is subject to the satisfaction of the following conditions:

- the assignment instruments being in form and in substance reasonably satisfactory to the Company;
- the assignor and assignee named therein executing and acknowledging such other instrument or instruments as the Company may deem necessary or desirable to effectuate such admission;
- the assignee's written acceptance or adoption of all the terms and provisions of the Operating Agreement, including the power of attorney, as the same may have been amended;
- such assignee paying or obligating himself to pay all reasonable expenses connected with such admission, with the amount of such expenses to be determined by the Company;
- a satisfactory legal opinion that such assignment does not violate federal or state securities laws; and
- the consent to such substitution by the Company in its sole and absolute discretion.

An assignee of any Interests will be entitled to receive distributions. Profits, Losses, and credits of the Company will be divided between the assignor and assignee on a calendar year basis based upon the effective date of the assignment or

58

substitution. See "Federal Income Tax Consequences." The Company may charge the assigning Member a reasonable fee to defray the costs of effecting the transfer of his Interests, the payment of which will be a condition precedent to any transfer.

**The Reinvestment Option.**

A Member will have the option to direct the Company to reinvest the monthly distributions that the Member would otherwise receive in the Company as additional Capital Contributions (the "Reinvestment Option"). However, if the Member notifies the Company after the 15th day of any month, the election will be effective for the Cash Available for Distribution in the following month. For example, if a Member makes the election on March 20th, the Member's Cash Available for Distribution in March will be distributed to the Member in April but the Cash Available for Distribution in April will be recontributed as an Additional Capital Contribution in May. A Member can revoke the option to reinvest upon 30-days advance written notice to the Company, in its sole and absolute discretion.

If a Member elects the Reinvestment Option, the Member's aggregate capital in the Company as well as the Member's individual Member Capital balance will be increased by the Member's Participation Percentage of the Cash Available for Distribution earned each month. The increases will be effective the first day of the month following the month in which the Cash Available for Distribution was earned. The Participation Percentages of all Members will be calculated as of the first day of each month as well, and therefore a Member's Participation Percentage in the Company is subject to fluctuation based on the Member's or any other Member's election of the Reinvestment Option as well as the admission of new Members.

If a Member elects the Reinvestment Option, the Member will have the option, during the first quarter of each calendar year, to withdraw all or part of the reinvested amount for the previous year, subject to consent of the Manager.

The Company will enclose the withdrawal request form along with a Member's K-1 each year. A Member will be required to submit any withdrawal request to the Company no later than March 15th of each year in order for the Company to issue the withdrawal check by April 15th. Participation Percentages based on reinvestment of funds that are then withdrawn will be calculated through the last full month in which such funds were held by the Company (e.g., any Member requesting to withdraw their reinvestment funds on March 10th will have Participation Percentages calculated based on the Member Account Balance including the reinvestment funds only through February). Nevertheless, if a Member elects the Reinvestment Option, the Member should be aware that this is the one and only time each year that the Member will be given the option to request the withdrawal of the Member's reinvested amount.

**A Member's investment will have limited liquidity.**

A Member may request that the Member's Interests be redeemed in whole or in part without penalty upon 30 days prior notice given at any time after the first anniversary of the purchase of such Interests (the "Minimum Investment Period"), subject to a minimum redemption request of $50,000, thereby requiring a one-year holding period for any Interests before they can be redeemed without penalty. The Company expects to satisfy redemption requests promptly. The period to fulfill redemption requests at any time, however, may be affected by the levels of redemption requests received at that time, the amount of cash then held by the Company, the then principal payments on Loans as a result of Loan maturities and prepayments, and the ability of the Manager at that time to sell Loans without a loss to provide funds for redemptions. In fulfilling redemption requests, the Manager, in its sole discretion, may effect such redemption requests with a combination of cash and fractional undivided interests in Loans valued at their unpaid principal balances. The fractional undivided interests, may include non-performing Loans held by the Company. Any distribution

of non-performing Loans to a redeeming Member must be in the same percentage of the total non-performing Loans that the redeeming Member's interest in the Company bears to the total of all Members' interests in the Company. The Company will have the right, in its sole discretion, to redeem the Interests held by a Member to the extent that a redemption request would leave the Member with a total balance in the Member's Account of less than $100,000.

Any requests for redemption prior to the end of the Minimum Investment Period will be satisfied only in the sole discretion of the Company and the payment by the Member of an early withdrawal fee in an amount equal to the greater of 5% of the redemption proceeds or $5,000 (the "Early Withdrawal Fee"). The Company will subtract the Early Withdrawal Fee from the redeemed proceeds prior to distributing the redeemed proceeds to the electing Member. In exercising its discretion whether or not to honor a redemption request prior to the end of the Minimum Investment Period, the Company may consider, among other factors, the amount of cash held by the Company, the Company's Loan portfolio, and other redemption requests by Members.

A return of a portion of a Member's balance in the Member Account will result in a recalculation of such Member's Participation Percentage in the Company. The Member would then receive distributions attributable to such recalculated Participation Percentage.

**Resale of defaulted Loans.**

The Manager typically sells for its unpaid principal amount any Loan in which the Company owns an interest that is in default in the payment of principal or interest. As a result, the Company will not have the opportunity to receive interest at a default interest rate, which typically is a rate of 27% per annum, or to make a profit as a result of a sale of the underlying property at a foreclosure sale. While such sales are intended to protect the Company's capital, there is no assurance that any sale of such Loan can be made at a price equal to the unpaid principal amount.

**The Company may be dissolved before the end of its term.**

The Company will continue for a period ending January 31, 2032, but the Company may be dissolved at an earlier date upon the occurrence of the following events.

- the determination of the Manager;
- the sale of all or substantially all of the assets of the Company;
- the occurrence of an event that makes it unlawful or impossible to carry on the business of the Company; or
- the dissolution of the Company by judicial decree.

In the event of the withdrawal, resignation, expulsion, bankruptcy, or dissolution of the Manger, the Members will have the option of selecting a substitute Manager, including one of the Members, subject to the receipt of an opinion from counsel that the Company will, for federal income tax purposes, be considered a partnership and not an association taxable as a corporation, following the substitution.

**Distributions will be made to Members upon the termination of the Company.**

Upon the termination of the Company, the Manager will make liquidating distributions, after payments of debts and liabilities of the Company (including any loans to the Company and accrued interest thereon, expenses of liquidation, and setting up of reserves in an amount determined by the Manager), to the Members in proportion to and to the extent of the positive balances in their respective Capital Accounts, after all allocations of income, gain, loss, deduction, or credit for such year are taken into account. The Company will be considered to be in liquidation in any taxable year in which the disposition of the last remaining Loan occurs.

**The Members will be able to amend the Operating Agreement.**

Except for amendments that are of a ministerial nature, do not adversely affect the Interests holders in any material respect, or are necessary or

desirable to comply with any applicable law or regulation, any amendment to the Operating Agreement will become effective only with the consent by the vote of the holders of more than 75% of the Interests and the consent of the Manager.

**The Company will maintain books, records, and reports.**

The books of the Company will be kept either on the accrual or cash basis, as determined by the Manager, in its sole discretion, and the books and records will be maintained at the office of the Company in Phoenix, Arizona, or such other place as the Manager may determine.

A Member will be entitled to receive as soon as is practical after the end of each fiscal year, all tax reporting information necessary for the preparation of the Member's federal income tax returns.

**The Members will grant a power of attorney.**

Each Member will appoint the Manager and each of its officers and directors as the Member's true and lawful agent and attorney-in-fact (with full power in such attorney to substitute another attorney in such attorney's place and to revoke such substitution), to make, execute, swear to, and acknowledge, amend, file, record, deliver, and publish in the Member's name, place, and stead in any manner which the Member could do if personally present to the extent permitted by law any one or more of the following:

- the Articles of Organization and Operating Agreement of the Company, as well as amendments thereto, under the laws of Arizona and any other state in which a certificate is required to be filed;
- any and all instruments or documents that may be appropriate to reflect: any of the following:

> ➢ a change in the name or the location of the principal place of business of the Company,
> ➢ the disposition by a Member of an interest in the Company or any part thereof,
> ➢ the substitution or addition of a person becoming a Member of the Company,
> ➢ a distribution or reduction in the Capital Contribution of a Member,
> ➢ a change in the capital of the Company,
> ➢ the admission of new Members in accordance with the Operating Agreement, and
> ➢ any and all amendments thereto or modifications or restatements thereof;

- all certificates and other instruments necessary to qualify or continue the Company as a limited liability company in the jurisdictions where the Company may be doing business, including any fictitious or assumed name certificate required or permitted to be filed by or on behalf of the Company;
- any other instrument that is now or which may hereafter be required by law to be filed for or on behalf of the Company;
- all documents and instruments that may be required to effect the dissolution and termination of the Company in accordance with the provisions of the Operating Agreement; and
- all such other documents or instruments, including instruments of conveyance of any Company assets, which the Manager deems necessary or appropriate in the conduct of the Company's business.

## TERMS OF THE OFFERING

**General.**

Pursuant to the terms of this Memorandum, the Company is offering up to $500,000,000 in Interests.

The Company, in its sole discretion, may place the proceeds of the Offering in short-term, highly liquid, interest bearing investments. The Company will retain any interest earned on such funds.

**Duration of Offering.**

The Offering will continue until the earlier of the following:

- the date on all the Interests have been sold; or
- an earlier termination date determined by the Manager.

**Method of Subscription:**

If a prospective investor wishes to purchase Interests, the prospective investor must forward the following to the MLS at 55 East Thomas Road, Phoenix, Arizona 85012:

- a fully executed Subscription Agreement substantially in the form attached as Exhibit B;
- If appropriate, a fully completed and executed Purchaser Representative Questionnaire substantially in the form attached as Exhibit C; and
- a check or wire transfer payable to "Mortgages Ltd. Opportunity Fund MP15 L.L.C." in an amount equal to the purchase price of the Interests to be purchased, in the initial minimum amount of $500,000. The Company may also, in its discretion, accept subscriptions for fractional Interests (e.g., $503,250). After making an initial investment of $500,000, the investor may thereafter invest additional funds with the Company. Each such additional investment must be at a minimum of $1,000 and will require the execution of a Subscription for Additional Interest in the form of Exhibit E. A purchase is subject to timely receipt of these documents and the full payment for the subscription and to the Company's review and acceptance of the documents and payment. The Company may, in its absolute discretion, reject any subscription for Interests in the Offering in whole or in part.

## RESTRICTIONS ON TRANSFER

The Interests offered hereby have not been registered under the Securities Act or any state securities laws. The Interests are being offered and will be sold without registration under the Securities Act or under any state securities laws pursuant to specific exemptions from registration provided by such acts.

Accordingly, each investor, when executing the Subscription Agreement, will be required to acknowledge that the purchase is for investment, solely for the investor's own account, and without any view to the sale or other disposition thereof. Members do not have the right to require the registration of their Interests under either the Securities Act or any state securities laws. In fact, the Company has no present intention to register the Interests, and it is highly unlikely that there will be any such registration in the future. Any transfer of Interests is limited by the terms of the Operating Agreement and by the provisions of the federal and state securities laws discussed above. See "Summary of the Operating Agreement."

## LEGAL MATTERS

The validity of the Interests being offered is being passed on for the Manager by Greenberg Traurig, LLP, Phoenix, Arizona.

## ADDITIONAL INFORMATION

Copies of all documentation described in this Memorandum are available at the offices of the Manager. Upon request, copies of such documentation will be made available at any reasonable time to investors at: 55 East Thomas Road, Phoenix, Arizona 85012.

## SUPPLEMENTAL SALES LITERATURE

In connection with the Offering, the Company may use a brochure or pamphlet that describes certain aspects of the Offering. Such brochure or pamphlet will not contain any material information that is not also set forth in this Memorandum. The Offering will be made only by means of this Memorandum.

## LITIGATION

The Company is unaware of any pending or threatened litigation that would adversely affect the Company or the Manager.

## PRIOR PERFORMANCE

The Manager sponsored the formation of 14 prior companies that raised funds through private offerings to finance the acquisition of loans, similar to the Company. A summary of the performance of each is discussed below. All stated yield calculations assume no compounding of interest. The summary information set forth below is not necessarily indicative of the results that may be experienced by the Company or a Member with respect to your investment in the Interests. Upon making your investment, an investor will only become a Member in the entity known as Mortgages Ltd. Opportunity Fund MP15 L.L.C.

- Pursuant to a Private Offering Memorandum dated January 23, 1995, MP022000 L.L.C., an Arizona limited liability company, raised $4,454,000 and closed in March 1995. All funds raised were loaned to third parties in 42 separate loans by July 1995. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 10.94% during the five-year term of that company. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 10.80% per annum during the five-year term of that company. MP022000 L.L.C. ceased making new loans at the end of January 2000 and was liquidated by the end of July 2000.

- MP102000 L.L.C., an Arizona limited liability company, raised $4,475,000 pursuant to a Private Offering Memorandum dated September 12, 1995, which closed in October 1995. All funds raised were loaned to third parties in 32 separate loans by January 1996. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 10.61% during the five-year term of that company. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 10.43% during the five-year term of that company. MP102000 L.L.C. ceased making new loans at the end of September 2000 and was liquidated by the end of February, 2001.

- Pursuant to a Private Offering Memorandum dated April 15, 1996, MP052001 L.L.C., an Arizona limited liability company, raised $6,735,000 and closed in May 1996. All funds raised were loaned to third parties in 42 separate loans by September 1996. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 10.88% during the five-year term of that company.

After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 10.80% during the five-year term of that company. MP052001 L.L.C. ceased making new loans at the end of April 2001 and was liquidated by the end of August, 2001.

- MP012002 L.L.C., an Arizona limited liability company, through January 1997 raised $10,870,000 pursuant to a Private Offering Memorandum dated December 6, 1996. All funds raised were loaned to third parties in 66 separate loans by April 1997. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 10.21% during the five-year term of that company and subsequent liquidation period. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 10.03% during the five-year term of that company and subsequent liquidation period. MP012002 L.L.C. ceased making new loans on January 1, 2002 and was liquidated by the end of April 2004.

- MP092004 L.L.C., an Arizona limited liability company, raised $15,580,000 through September 1997 pursuant to a Private Offering Memorandum dated August 11, 1997. All funds raised were loaned to third parties in 113 separate loans by January 1998. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.97% during its seven-year term and 9.54% during the subsequent liquidation period. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.65% and 9.21%, respectively, for the periods noted above. MP092004 ceased making new loans in September 2004 and was liquidated in August 2006.

- MP062003 L.L.C., an Arizona limited liability company, pursuant to a Private Offering Memorandum dated June 5, 1998, raised $10,786,000 through July 1998. All funds raised were loaned to third parties in 103 separate loans by August 1998. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 10.08% during the five-year term of that company up through the start of the liquidation period. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.76% during that period. MP062003 L.L.C. ceased making new loans on March 3, 2003 and completely liquidated by August 2005.

- MP032004 L.L.C., an Arizona limited liability company, pursuant to a Private Offering Memorandum dated February 10, 1999, raised $23,794,000 through March 1999. All funds raised were loaned to third parties in 105 separate loans by May 1999. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.55% during the five-year term of that company up through the start of the liquidation period and 8.07% during the subsequent liquidation period. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.26% during that period and 7.67% during the subsequent liquidation period. MP032004 L.L.C. ceased making new loans on March 1, 2004 and completely liquidated by the end of August 2006.

- MP052005 L.L.C., an Arizona limited liability company, pursuant to a Private Offering Memorandum dated May 30, 2000, raised $45,000,500 through March 2004. All funds raised were loaned to third parties in 94 separate loans by April 2004. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 8.93% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an

amount equal to a net average annual return of 8.65% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods, and short term bank interest fluctuations. MP052005 L.L.C. ceased to make new loans on May 1, 2005 and entered into its liquidation phase.

No loans were delinquent as of December 31, 2006, but $2,737,000 remains invested in a property acquired through foreclosure shortly before the company commenced liquidation. The property consists of 199 fully improved residential lots, of which 62 have been sold or are in escrow, a 1.5 acre (approximately) parcel of commercially zoned land, and an 18-hole golf course located in Eagar, Arizona. Sales proceeds have been reducing the invested balance. Marketing efforts for this property are ongoing. This company was liquidated by March 2007.

- MP092009 L.L.C., an Arizona limited liability company, pursuant to a Private Offering Memorandum dated December 10, 2002, raised $36,457,997 through December 2004. All funds raised were loaned to third parties in 54 separate loans by January 2005. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.51% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.27% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods and short-term bank interest fluctuations. No loans were delinquent as of December 31, 2006.

- MP062011 L.L.C. an Arizona limited liability company, pursuant to a Private Offering Memorandum dated June 1, 2004, raised $39,161,000 through June 30, 2006. All funds raised were loaned to third parties in 56 separate loans by June 30, 2006. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in

a gross average annual return of 9.57% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.17% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods and short term bank interest fluctuations. MP062011 L.L.C. closed to new investment on June 30, 2006. No loans were delinquent as of December 31, 2006.

- Mortgage Opportunity Fund MP11 L.L.C. (formerly known as MP122030 L.L.C.) an Arizona limited liability company, pursuant to a Private Offering Memorandum dated August 1, 2005, and amended May 15, 2006, raised $123,046,000 through December 31, 2006. All funds raised were loaned to third parties in 57 separate loans by December 31, 2006. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.33% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.25% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods and short term bank interest fluctuations. No loans were delinquent as of December 31, 2006.

- Mortgage Opportunity Fund MP12 L.L.C. an Arizona limited liability company, pursuant to a Private Offering Memorandum dated July 1, 2006 raised $4,391,000 through December 31, 2006. All funds raised were loaned to third parties in 11 separate loans by December 31, 2006. The interest yields on the separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 8.94% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 8.94% during that period. The yield will continue to vary as a result of loan payoffs,

reinvestment periods and short term bank interest fluctuations. No loans were delinquent as of December 31, 2006.

- Mortgage Opportunity Fund MP13 L.L.C. an Arizona limited liability company, pursuant to a Private Offering Memorandum dated July 1, 2006 raised $1,561,000 through December 31, 2006. All funds raised were loaned to third parties in 8 separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.20% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.20% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods and short term bank interest fluctuations. No loans were delinquent as of December 31, 2006.

- Mortgage Opportunity Fund MP14 L.L.C. an Arizona limited liability company, pursuant to a Private Offering Memorandum dated July 1, 2006 raised $4,082,000 through December 31, 2006. All funds raised were loaned to third parties in 11 separate loans varied and the loan portfolio as a whole resulted in a gross average annual return of 9.17% through December 31, 2006. After payment of expense reimbursement and separate expenses, that company paid its members an amount equal to a net average annual return of 9.17% during that period. The yield will continue to vary as a result of loan payoffs, reinvestment periods and short term bank interest fluctuations. No loans were delinquent as of December 31, 2006.

PHX 327766904v4

66