Richard G. Himelrick, #004738
J. James Christian, #023614
**Tiffany & Bosco, P.A.**
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

Attorneys for Plaintiffs Robert Facciola; The Robert Maurice
Facciola Trust Dated December 2, 1994; Honeylou C. Reznik;
The Morris Reznik and Honeylou C. Reznik Trust; Jewel Box
Loan Company, Inc.; Jewel Box, Inc.; H-M Investments, LLC

Andrew S. Friedman, #005425
**Bonnett, Fairbourn, Friedman & Balint, P.C.**
2901 N. Central Avenue. Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com

Attorneys for Plaintiffs Fred C. Hagel and Jacqueline M. Hagel
Revocable Living Trust Dated March 15, 1995; Judith A. Baker

# United States District Court

## District of Arizona

|  |  |
|---|---|
| Robert Facciola, et al.,<br><br>                     Plaintiffs,<br>  vs.<br><br>Greenberg Traurig, LLP, et al.,<br><br>                     Defendants. | No. 2:10-cv-01025-MHM<br><br>**Lead Plaintiffs' Response to Defendant Greenberg Traurig's Motion to Dismiss** |

## Table of Contents

1.   Introduction .................................................................................................. 1

2.   Argument .................................................................................................... 3

    A.   The Arizona Supreme Court has rejected Greenberg's arguments
        regarding A.R.S. § 44-2003(A) ............................................................. 3

        1.   Complaints need not analyze § 44-2003(A) .................................... 3

        2.   Section 44-2003(A) does not narrow liability for § 44-1991(A)
            violations ...................................................................................... 4

        3.   Participation, inducement, and making liability are in any event
            supported by the Complaint's allegations ...................................... 6

        4.   *Grand II*'s recognition of inducement by omission covers
            Greenberg's acts ........................................................................... 7

        5.   Greenberg is also liable as a statutory seller who made the
            unlawful sales ............................................................................... 8

        6.   *Grand II* narrowed § 44-2003(A)'s safe harbor .............................. 9

        7.   Kant acted beyond the ordinary course by knowingly assisting his
            clients' crimes and fraud .............................................................. 9

    B.   Greenberg's arguments regarding the scope of § 44-1991(A) do not
        withstand scrutiny. .............................................................................. 11

        1.   Arizona's securities laws are more remedial than federal law ....... 12

        2.   Arizona courts will not follow federal decisions that do not
            adequately protect the public. ...................................................... 12

        3.   Federally created narrowing doctrines are contrary to Arizona's
            public-protection goals ................................................................ 12

        4.   Greenberg is selectively citing federal cases that advance
            especially restricted interpretations of Rule 10b-5 ...................... 14

    C.   Greenberg violated all three subsections of § 44-1991(A) ...................... 15

    D.   Under the registration and disclosure laws, the Mortgages Ltd. and
        Radical Bunny offerings were integrated securities offerings .................. 18

    E.   The Complaint is pleaded with the factual specificity required by Rule
        9(b) and § 44-2082 ............................................................................. 20

        1.   The Complaint is properly pleaded ............................................... 20

        2.   Lead Plaintiffs sufficiently plead scienter (knowledge or
            recklessness) under § 44-1991(A)(1) ........................................... 20

F.  Counts Three and Four properly plead claims for aiding and abetting securities and fiduciary fraud ...................................................................21

1.  Liability for aiding and abetting securities fraud is the law in Arizona ...................................................................................................21

2.  Aiding-and-abetting liability is textually supported by § 44-2003(A) .................................................................................................22

3.  Aiding-and-abetting liability is supported by the ACC's administrative interpretations ..........................................................23

4.  The Complaint pleads the facts needed to support aiding-and-abetting liability .................................................................................24

a.  The Complaint adequately pleads Greenberg's knowledge ...............................................................................24

b.  The Complaint adequately pleads substantial assistance by Greenberg .............................................................................27

c.  Greenberg fails to cite relevant authority...........................29

G.  The Complaint adequately pleads a fiduciary relationship ......................31

1.  The Complaint pleads fiduciary relationships by Mortgages Ltd. and Radical Bunny in three ways ......................................................31

2.  Lead Plaintiffs have sufficiently pleaded a joint venture between co-promoters ....................................................................................33

H.  The Complaint properly states a claim for negligent misrepresentation ...35

I.  The Complaint properly pleads a claim for fraud under the Investment Management Act .....................................................................................36

J.  The text of § 44-3241 supports aiding-and-abetting liability ..................38

3.  Conclusion...........................................................................................................39

# Table of Authorities

## Cases

*Aaron v. Fromkin*, 196 Ariz. 224, 994 P.2d 1039 (App. 2000) ................................. 12, 13

*Affiliated UTE Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ........................................ 13

*Barnes v. Vozack*, 113 Ariz. 269, 550 P.2d 1070 (1976) ........................................ 8, 38, 39

*Bullard v. Garvin*, 1 Ariz. App. 249, 401 P.2d 417 (1965) .......................................... 37

*Central Bank v. First Interstate Bank,* 511 U.S. 164 (1994) ..................................... 22, 23

*Chalpin v. Snyder*, 220 Ariz. 413, 207 P.3d 666 (App. 2008) ................................. 15, 30

*Continental Casualty Co. v. Signal Ins. Co.*, 119 Ariz. 234,
   580 P.2d 372 (App. 1978) ............................................................................... 35

*Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206 Ariz. 399,
   79 P.3d 86 (App. 2003) ............................................................................. 8, 12, 13

*Ellingson v. Sloan*, 22 Ariz. App. 383, 527 P.2d 1100 (1974) ................................. 34, 41

*Elliott v. Videan*, 164 Ariz. 113, 791 P.2d 639 (App. 1989) ........................................ 31

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) ........................ 20

*Fed. Deposit Ins. Corp. v. O'Melveny & Myers,* 969 F.2d 744
   (9th Cir. 1992) ..................................................................................... passim

*Felts v. Nat'l Account Sys. Assoc., Inc.*, 469 F. Supp. 54 (N.D. Miss. 1978) ................. 35

*Finegan v. Autotransportes Tufesa S.A. De C.V.*, No. CV 07-693-TUC-FRZ,
   2009 WL 331349 (D. Ariz. Feb. 11, 2009) ......................................................... 34

*Gephardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003) ................................. 25

*Grand v. Nacchio* ("*Grand I*"), 222 Ariz. 498, 217 P.3d 1203 (App. 2009) .......... 4, 6, 15

*Grand v. Nacchio* ("*Grand II*"), 225 Ariz. 171, 236 P.3d 398 (2010) ..................... passim

*Grant v. Arthur Andersen, LLP*, No. CV1999-019093,
   2001 WL 35976018 (Ariz. Super. Ct. Feb. 16, 2001) ........................................ 38

*Grubaugh v. DeCosta*, No. CA-CV 97-0477, 1999 WL 137640
   (Ariz. App. Mar. 16, 2000) ............................................................................ 22

*Hildebrandt v. Indianapolis Life Ins. Co.*, No. CV 08-825-PHX-MMM,
   2009 WL 2870024 (N.D. Tex. Sept. 8, 2009) ................................................... 32

*Hoffer v. State,* 113 Wash. 2d 148, 776 P.2d 963 (1989) .......................................... 8, 12

*In re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.*,
   794 F. Supp. 1424 (D. Ariz. 1992) .............................................................. passim

*In re Am. Microtel, Inc.*, No. S-2876-I, 1992 WL 409823
 (Ariz. Corp. Comm'n Dec. 9, 1992) ......................................................8, 19, 23

*In re Arthur Andersen L.L.P.*, No. S-03386A-00-0000, 2000 WL 35730980,
 (Ariz. Corp. Comm'n Sept. 27, 2000) ..............................................................23

*In re Estate of Hernandez,* 187 Ariz. 506, 930 P.2d 1309 (1997).......................34

*In re John E. Shannon*, No. S-03580A-04-0000, 2005 WL 1580402
 (Ariz. Corp. Comm'n June 9, 2005)................................................................25

*In re John Edward Tencza*, No. S-20483A-06-0661, 2007 WL 2478687
 (Ariz. Corp. Comm'n Aug. 13, 2007) ............................................................23

*In re Judith Marie Otto*, No. S-2896-I, 1993 WL 353421
 (Ariz. Corp. Comm'n Aug. 11, 1993) ............................................................18

*In re Lost Dutchman Invs., Inc.*, No. S-2299-I, 1993 WL 173726
 (Ariz. Corp. Comm'n Apr. 8, 1993)..................................................................8

*In re Melvin Lee Cline*, No. S-03431A-01-0000, 2001 WL 798620
 (Ariz. Corp. Comm'n June 28, 2001) ............................................................25

*In re The 12 Percent Fund I, L.L.C.*, No. S-20472A-06-0535,
 2008 WL 827744 (Ariz. Corp. Comm'n March 10, 2008) ..............................25

*In re Tomasian*, No. S-20566A-07-0655, 2007 WL 4364246
 (Ariz. Corp. Comm'n November 20, 2007)......................................................25

*In re W. Universal Fund Co., LLC*, No. S-3154-I,
 1998 WL 34076963 (Ariz. Corp. Comm'n Apr. 8, 1998) ..............................19

*Johnson v. Nychyk,* 21 Ariz. App. 186, 517 P.2d 1079 (1974) ..................32, 33

*King v. Pope*, 91 S.W.3d 314 (Tenn. 2002) ........................................................12

*Koehler v. Pulvers*, 614 F. Supp. 829 (S.D. Cal. 1985) ........................................9

*Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004) ..........................................26

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
 416 F.3d 940 (9th Cir. 2005).........................................................................36

*McGann v. Ernst & Young,* 95 F.3d 821 (9th Cir. 1996) ....................................38

*Miller v. Udall, Shumway, Blackhurst, Allen & Lyons, P.C.*,
 No. 1 CA-CV 99-0261, 2000 WL 35730146 (Ariz. App. May 11, 2000)......13, 35

*Oster v. Kirschner*, 905 N.Y.S.2d 69 (App. Div. 2010).............................6, 7, 28

*Paradigm Ins. Co. v. Langerman Law Offices, PA,* 200 Ariz. 146,
 24 P.3d 593 (2001) .............................................................................14, 15, 35

*Pinter v. Dahl*, 486 U.S. 622 (1988) ....................................................................8

*Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040 (11th Cir. 1986) ..............................31

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) ..........................................................14, 15, 26

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ...................................................18

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ....................................................19

*SEC v. Rogers*, 790 F.2d 1450 (9th Cir. 1986) ..................................................13

*Siporin v. Carrington*, 200 Ariz. 97, 23 P.3d 92 (App. 2001) ...........................12, 13

*St. Josephs Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307,
    742 P.2d 808 (App. 1987) ...................................................................36

*Standard Chartered, PLC v. Price Waterhouse*, 190 Ariz. 6,
    945 P.2d 317 (App. 1997) ...........................................................passim

*State v. Baumann*, 125 Ariz. 404, 610 P.2d 38 (1980) ......................................12

*State v. Goodrich*, 151 Ariz. 118, 726 P.2d 215 (App. 1986) ..........................25

*State v. Gunnison*, 127 Ariz. 110, 618 P.2d 604 (1980) .....................................3

*State v. Superior Court (Davis)*, 123 Ariz. 324, 599 P.2d 777 (1979) ...............passim

*Strom v. Black,* 22 Ariz. App. 102, 523 P.2d 1339 (1974) ................................36

*Thompson v. Paul*, 657 F. Supp. 2d 1113 (D. Ariz. 2009) ...............................36

*Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548,
    733 P.2d 1131 (App. 1986) ................................................................13

*Wells Fargo Bank v. Arizona Laborers and Teamsters*,
    201 Ariz. 474, 38 P.3d 12 (2002) ...........................................23, 29, 30

*Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005) .............................22

**Statutes**

A.R.S. § 44-1991 ..........................................................................passim

A.R.S. § 44-2001 ...............................................................................5, 22

A.R.S. § 44-2003 ..........................................................................passim

A.R.S. § 44-2082 ...................................................................................20

A.R.S. § 44-3241 ..........................................................................passim

15 U.S.C. § 77l .....................................................................................15

17 C.F.R. § 240.10b-5 ("Rule 10b-5") .....................................12, 13, 14, 31, 38

Ariz. R. of Prof. Conduct, E.R. 1.16 ...................................................................29, 30

Ariz. R. of Prof. Conduct, E.R. 1.2 .....................................................10, 14, 15, 31, 35

Ariz. R. of Prof. Conduct, E.R. 1.6 ..............................................................................31

Ariz. R. of Prof. Conduct, E.R. 4.1 ..............................................................................31

Ariz. R. of Prof. Conduct, E.R. 8.4 ..............................................................................10

Securities Act of Arizona, ch. 18, § 20, 1951 Ariz. Sess. Laws. 46 .................................5

Fed. R. Civ. P. 9(b).......................................................................................................20

Fed. R. Civ. P. 12(b)...........................................................................................5, 34, 36

## Additional Authorities

RESTATEMENT (THIRD) OF AGENCY § 1.01 (2005) ........................................................32

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 (2000) ...............15, 30

*District of Columbia Ethics Op*. 180 (1987) ...................................................................31

*District of Columbia Ethics Op*. 186 (1987) ...................................................................31

*Virginia Ethics Op*. 983 (1987) .....................................................................................31

2 THOMAS L. HAZEN, THE LAW OF SECURITIES REGULATION § 4.36[2][c]
       (6th ed. 2009) ........................................................................................................19

12 JOSEPH LONG, BLUE SKY LAW § 1.42 (2009) ....................................................12, 23

HIMELRICK & SCHULMAN, ARIZONA SECURITIES FRAUD LIABILITY:
       STATUTORY AND COMMON-LAW REMEDIES, § 5.1.3.2
       (Arizona State Bar 3d ed. 2009).............................................................................21

Richard G. Himelrick, *Arizona Securities Fraud Liability:*
       *Charting a Non-Federal Path*, 32 ARIZ. ST. L. J. 203 (2000)................................21

Richard G. Himelrick, *The Importance of Statutory Text:*
       *from Scienter to Nonstatutory Defenses under Arizona Securities Law*,
       41 ARIZ. ST. L.J. 49 (2009)....................................................................................23

**1.    Introduction**

From September 2005 to June 2008, Scott Coles and Defendants Hirsch, Walder, and Shah ("the Hirsch Defendants") jointly engaged in a criminal enterprise that raised hundreds of millions of dollars from unwitting investors through companies they controlled known as Mortgages Ltd. and Radical Bunny.  Some of the money raised from Radical Bunny investors was used to pay other investors, in classic Ponzi-scheme fashion; the rest gave Mortgages Ltd. the false appearance of financial solvency.   Because Mortgages Ltd. was insolvent, a continuing flow of money from Radical Bunny was essential.  Without this money, Mortgages Ltd. could not maintain the false appearance of financial stability that it needed to raise funds directly from its own investors—money that Mortgages Ltd. raised through private offering memorandums ("POMs") that were drafted by Defendant Greenberg Traurig LLP ("Greenberg").  *Compl.* ¶¶ 5-13, 17, 66, 73-74.

Radical Bunny raised its funds by selling mortgage-backed securities under documents called *Directions to Purchase* that represented that the note participations were secured by "various deeds of trust."  *Compl.* ¶¶ 66, 79.  The Hirsch Defendants were not licensed to sell such securities, did not register the securities, and sold the securities to both accredited and unaccredited investors—all in violation of Arizona securities law.  *Id.* ¶¶ 92-93, 135, 145, 173.   Worse, Radical Bunny investors were not told that their investments were in reality unsecured (there was no security agreement), that Mortgages Ltd. was insolvent, or that Mortgages Ltd. was not even obligated to pay back the notes in cash.  *Id.* ¶¶ 11, 79, 81-82.

In short, Radical Bunny committed the securities-law crimes needed to raise the money and Mortgages Ltd. used the crime proceeds to fund its operations.  *Compl.* ¶¶ 9-10, 18-20.   Mortgages Ltd. was able to stay in business only by reliance on Radical Bunny's criminally tainted money.  *Id.* ¶¶ 12-14, 73.  Because Mortgages Ltd. never repaid the principal it borrowed from Radical Bunny (*id.* ¶ 11), Radical Bunny's attorneys at Defendant Quarles & Brady LLP ("Quarles") questioned whether the entire enterprise had a "Ponzi feel."  *Id.* ¶ 20.

1    Indeed, experienced securities attorneys at Greenberg and Quarles realized that

2    Radical Bunny was committing securities-law crimes.  *Compl.* ¶¶ 18-23.  "They put

3    people in jail for this," Greenberg attorney Bob Kant told the Hirsch Defendants.  *Id.*

4    ¶ 161.  But like the securities attorneys held accountable in the Lincoln Savings (Keating)

5    fraud, Greenberg and Quarles did nothing to stop or report the illegality and fraud.  *See In*

6    *re Am. Cont'l Corp./Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424 (D. Ariz. 1992).

7    Instead—astonishingly—Greenberg drafted *new* POMs that raised millions *more*

8    from investors.  *Compl.* ¶ 198.  The POMs did not disclose Mortgages Ltd.'s dependency

9    on the illegally raised Radical Bunny funds or the fact that Mortgages Ltd. had been

10   forced to cease its core loan-origination business for lack of cash to fund even its existing

11   commitments.  *Id.* ¶¶ 202-04.  Under the first POM alone, Kant's omission of Radical

12   Bunny's crimes (and Mortgages Ltd.'s receipt of millions from those crimes) induced over

13   $88 million in *new* investments.  *Id.* ¶ 201.  Greenberg also met with the Hirsch

14   Defendants and Quarles to devise ways to retain the illegally raised funds (which

15   Mortgages Ltd. had no means to return) through various schemes to roll them without

16   disclosure into new investments offered by Mortgages Ltd. or Radical Bunny.  *Id.* ¶¶ 162,

17   164-72, 176, 178-79, 218-23.  Greenberg even agreed to ghost-write a Radical Bunny

18   POM in an effort to perpetuate the fraud.  *Id.* ¶¶ 167-70.

19   Greenberg was all along acutely aware that Radical Bunny and Mortgages Ltd.

20   were continuing to raise funds for Mortgages Ltd. without disclosing the illegality and

21   fraud, let alone Mortgages Ltd.'s own drastic change in financial condition, including over

22   $100 million in developer-loan defaults.  *Id.* ¶¶ 130, 156, 206.  Greenberg also knew that

23   there was "not a snowball's chance" that Mortgages Ltd. would agree to collateralize the

24   Radical Bunny funds as the Hirsch Defendants had represented to the Radical Bunny

25   investors.  *Id.* ¶ 282.  Incredibly, though, Greenberg never materially changed the

26   disclosure language in the eleven POMs it drafted during the class period.  *Id.* ¶¶ 198, 205.

27   Based on the continued participation and substantial assistance by Greenberg,

28   despite its admitted knowledge of the criminality and fraud, Lead Plaintiffs allege the

following claims against Greenberg:  statutory claims of primary, antifraud liability under the Arizona Securities Act ("the Securities Act"), A.R.S. § 44-1991(A)(1), (2), and (3) and under the Arizona Investment Management Act, A.R.S. § 44-3241(A)-(B).  *See* Counts One and Six.  Secondary liability for aiding and abetting violations of sections 44-1991(A) and 44-3241(A)-(B) is also pled.  *See* Counts Three and Seven.  Lead Plaintiffs also allege a common-law negligent non-disclosure (Count Five) and aiding-and-abetting fiduciary fraud (Count Four).  Lead Plaintiffs do not assert control-liability against Greenberg.

In its effort to defend the indefensible, Greenberg has moved to summarily dismiss all claims against it.  It does so largely by citing inapplicable federal cases and parsing its status under A.R.S. § 44-2003(A), contrary to the Arizona Supreme Court's recent holding in *Grand v. Nacchio*, 225 Ariz. 171, 236 P.3d 398 (2010) ("*Grand II*").  Greenberg also asks this Court to ignore controlling Arizona Supreme Court authority upholding secondary securities fraud liability under an aiding-and-abetting theory.  *State v. Superior Court (Davis)*, 123 Ariz. 324, 599 P.2d 777 (1979), *overruled in part on other grounds by State v. Gunnison*, 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980).  This Memorandum responds to all of the arguments in Greenberg's Motion to Dismiss ("G. Memo").  This Response addresses much of what other Defendants argue as well due to their repeat arguments.

## 2. Argument

### A. The Arizona Supreme Court has rejected Greenberg's arguments regarding A.R.S. § 44-2003(A).

#### 1. Complaints need not analyze § 44-2003(A).

In *Grand II*, the Arizona Supreme Court flatly held that in the ordinary case courts are *not* required to parse the language of § 44-2003(A) to decide whether a person violating A.R.S. § 44-1991(A) engaged in conduct that can be separately characterized as "making," "participating in," or "inducing" the unlawful purchase or sale.  *Grand II*, ¶ 18.  Nor is a plaintiff required to plead compliance with § 44-2003(A).  *Id*.  All that is required at the pleading stage is an alleged violation of the primary-fraud statute, § 44-1991(A).  *Id.*

*Grand II* was not the ordinary case.  There, addressing "participation" liability was necessary because the plaintiff made the "unusual" affirmative decision to narrow his claims to a theory of participant liability (*id.* ¶ 20), thereby disavowing other theories of liability.  *Id.*  But this case presents the ordinary case in which parsing § 44-2003(A) is unnecessary, for Lead Plaintiffs here claim the full benefit of the "sweeping rescissionary remedy for violations of § 44-1991."  *See id* ¶ 17.  Lead Plaintiffs likewise claim full investor protection through "the sweeping language of inclusion" in § 44-2003(A), which the Arizona legislature directed the courts to "liberally construe[]."  *Id.* ¶¶ 16 & 18.

### 2.    Section 44-2003(A) does not narrow liability for § 44-1991(A) violations.

Greenberg and all other Defendants advance the mistaken argument that § 44-2003(A) somehow narrows the range of persons liable for violating § 44-1991(A).  That may have been *Standard Chartered*'s holding, where the court expressed concern that otherwise "we might *sweep* within the statute" collateral actors who only acted to foreseeably contribute to or influence a sale.  *Standard Chartered, PLC v. Price Waterhouse*, 190 Ariz. 6, 21, 945 P.2d 317, 332 (App. 1997) (emphasis added).  The Court of Appeals in *Grand II* followed this thinking.  *See Grand v. Nacchio*, 222 Ariz. 498, 502, ¶ 10, 217 P.3d 1203, 1206 (App. 2009) ("*Grand I*").

But the Supreme Court in *Grand II* replaced *Standard Chartered's* narrowing interpretation with a *sweeping* interpretation.  To broaden the statute, the Supreme Court adopted the very word—*sweep*—that *Standard Chartered* used to narrow the statute.  Unlike the *Standard Chartered* court, which seems to have been unaware of the 1951 legislative Statement of Intent, the Supreme Court informed its statutory analysis with that legislative intent.[1]  From it, the Court concluded that the Securities Act is a "remedial

---

[1]   The 1951 legislative Statement of Intent requires that the Securities Act be construed liberally as a remedial measure to protect the investing public:

> Sec. 20: INTENT AND CONSTRUCTION.  The intent and purpose of this Act is for the protection of the public, the preservation of fair and equitable business practices, the

measure" that is to be "liberally construed" for the "protection of the public." *Grand II* ¶ 16. According to the Court § 44-2001(A) therefore provides a "sweeping rescissionary remedy" for violations of § 44-1991(A). *Id.* ¶ 17. The purpose of § 44-2003(A)'s "broad terms" (¶ 17) is not to narrow remedies for violations of § 44-1991(A), but to "appl[y] the § 44-2001 rescissionary remedy to those other than the seller of securities." *Id.* ¶ 13. Far from excluding some § 44-1991(A) violators from liability, then, § 44-2003(A) fosters public protection by extending § 44-2001(A)'s remedies through "sweeping language of inclusion." *Id.* ¶ 18.

The sweep of § 44-2003(A) is so broad that the Supreme Court assumed that any violation of § 44-1991(A)(3) would be covered by some part of § 44-2003(A). *Id.* ¶ 18. This was unsurprising because by the time *Grand II* reached the Supreme Court, the defendants had conceded that § 44-2003(A) was broader than the interpretation given the statute in *Standard Chartered* and the *Grand II* Court of Appeals. *See Grand II* Transcript of Oral Argument, Exhibit A, at 35. A remedy for all violations of § 44-1991(A) was also consistent with the point that Judge Swann made in oral argument: "44-1991(B) states on its face that a private action exists for violations of 44-1991(A)(2)." *Id.* at 29-30. (Judge Swann sat in place of Justice Bales, who recused himself.)

In summary, because all violations of § 44-1991(A) are remedied by § 44-2001(A), there is no need to parse the language of § 44-2003(A). Accordingly, Defendants' arguments concerning inducement and participation are not a proper basis for Rule 12(b) motions attacking the sufficiency of the Complaint.

---

suppression of fraudulent or deceptive practices in the sale or purchase of securities, and the prosecution of persons engaged in fraudulent or deceptive practices in the sale or purchase of securities. *This Act shall not be given a narrow or restricted interpretation or construction, but shall be liberally construed as a remedial measure in order not to defeat the purpose thereof.*

Securities Act of Arizona, ch. 18, § 20, 1951 Ariz. Sess. Laws. 46, 75 (emphasis added).

**3.      Participation, inducement, and making liability are in any event supported by the Complaint's allegations.**

Although Lead Plaintiffs are not required to include a making, inducement, or participation analysis in their pleading, the Complaint nevertheless contains ample facts that show plausible liability under all three categories.  The sales to Mortgages Ltd. and Radical Bunny's investors were issuer sales.  On the Mortgages Ltd. side, these sales were made through the POMs.  On the Radical Bunny side, the sales were made through the Directions to Purchase.  *Compl.* ¶ 79; Exhibit B (examples of Directions to Purchase).[2]

A POM is by its nature a solicitation to invest.  *See Fed. Deposit Ins. Corp. v. O'Melveny & Myers,* 969 F.2d 744, 746 (9th Cir. 1992) (hereinafter "*O'Melveny*") (explaining that law firm prepared POMs were "designed to induce outside investors" to buy the securities); *Oster v. Kirschner*, 905 N.Y.S.2d 69, 73 (App. Div. 2010) (upholding an aiding-and-abetting claim against securities counsel and explaining that the attorney-prepared POMs were "the very mechanism by which investments such as Cobalt are placed in the marketplace, and the admitted 'but for' cause of the plaintiffs' investment losses.").  The Directions to Purchase used by Radical Bunny served the same purpose, as sales documents designed to solicit and induce purchases.

In *Grand II*, Mr. Grand bought shares in both the aftermarket and in an initial public offering (IPO).  The IPO stock was sold under a prospectus much like the POMs used to sell Mortgages Ltd.'s securities.  The trial court in *Grand II* had no trouble concluding that the defendants' involvement in preparing the IPO prospectus was participation in Mr. Grand's purchases.  *See* Exhibit C, at 6-7 (trial court order denying motion to dismiss claims involving IPO purchases); *see also Grand I*, 222 Ariz. at 500, 217 P.3d at 1205 (noting the trial court's refusal to dismiss the IPO purchases).  In short, *Grand II* recognized that third-party assistance in preparing a misleading document that an issuer uses to solicit investments amounts to statutory participation.

---

[2]   The court may consider the Direction to Purchase under the incorporation-by-reference doctrine discussed in Greenberg's Memorandum.  G. Memo at 36 n.19.

1    Similarly, a law firm or auditor that helps prepare the information used in an

2   offering document is acting as an inducer.  *See O'Melveny*, 969 F.2d at 746-49 (holding

3   that issuer's POMs were "designed to induce sales" and that as securities counsel for the

4   issuer, the law firm owed a duty of care to investors regarding the POMs' disclosures);

5   *Oster*, 905 N.Y.S.2d at 72 (concluding that regardless of whether the lawyers had full

6   knowledge of the Ponzi scheme, the POMs that they prepared were "the admitted vehicle

7   by which investment in the Ponzi scheme was carried out").

8    Greenberg was directly involved in preparing the POMs that were used to induce

9   sales in integrated offerings.  Whether viewed as a statutory participant, inducer, or even

10   maker, Greenberg's work in undertaking the due diligence and drafting of the POMs that

11   were used to solicit purchases in integrated offerings brings the firm under § 44-2003(A).

12   And as a firm that was retained by Radical Bunny to provide securities advice (*Compl.*

13   ¶¶ 164-70, 268), Greenberg was at least indirectly a participant or inducer of Radical

14   Bunny's sales even without integration liability.

15           **4.    *Grand II*'s recognition of inducement by omission covers
                     Greenberg's acts.**

16   *Grand II* advanced an interpretation of inducement that is broader than the

17   "persuasion" and "prevailing upon" definition used in *Standard Chartered*.  The Supreme

18   Court accepted *Standard Chartered*'s interpretation as one way to induce.  But it went

19   beyond *Standard Chartered* in the definition that it applied, holding that inducement can

20   occur through "acts and omissions" that encourage purchases.  *Grand II* ¶ 24.  Inducement

21   by omission is expansive and consistent with the broad reading the legislature intended.

22   Similarly, inducement by acts covers fraudulent activities such as a 1991(A)(1) scheme or

23   a fraudulent course of activities under 1991(A)(3), which is what Grand's complaint was

24   based on.  If liberally interpreted as *Grand II* requires, inducement under § 44-2003(A) is

25   pleaded through Greenberg's "acts and omissions":  no reasonable investor would have

26   invested if the POMs had disclosed $100 million in loan defaults (*Compl.* ¶ 213) or

27   Mortgages Ltd.'s receipt of over $100 million from Radical Bunny's crimes (¶ 162).

28

5.     **Greenberg is also liable as a statutory seller who made the unlawful sales.**

Section 44-2003(A) covers sellers.  *Cf. Barnes v. Vozack*, 113 Ariz. 269, 550 P.2d 1070 (1976) (upholding § 44-1991 liability against both direct and indirect sellers).  Sellers make sales.  Anyone who is a seller under Arizona's substantial-participation test is therefore a person who makes a sale under 44-2003(A).

Before *Pinter v. Dahl*, 486 U.S. 622 (1988), federal courts generally held that substantial involvement in a sale made a person a seller.  Although *Pinter* rejected the substantial-participation test for seller liability, the Arizona Corporation Commission ("ACC") and other states continue to apply the substantial-participation test under state blue-sky laws.  These courts and regulators reason that state securities law is broader and more remedial than federal law.  *See, e.g., Hoffer v. State,* 113 Wash. 2d 148, 776 P.2d 963 (1989).  In *Hoffer*, the Washington Supreme Court declined to reconsider its position on substantial participation after *Pinter* was decided.  Noting that it was not bound by U.S. Supreme Court decisions, *id.* at 149, 776 P.2d at 964, the Court held that the substantial-factor test better advanced the remedial goals of Washington's Securities Act.  *Id.* at 152, 776 P.2d at 965.  The ACC has followed the lead of Washington in its administrative decisions.[3]  Because this interpretation of the Securities Act comes from the agency charged with enforcing and applying it, the ACC decisions are entitled to "great deference."[4]

The ACC and Washington interpret "seller" broadly to cover persons whose conduct is a substantial factor in causing the sale.  As explained by the ACC, this standard treats as sellers those persons whose participation is a but-for cause of the unlawful sale and whose participation was more than *de minimus*.  *See In re Lost Dutchman Invs., Inc.*,

---

[3]  *In re Am. Microtel, Inc.*, No. S-2876-I, 1992 WL 409823, at * 9 (Ariz. Corp. Comm'n Dec. 9, 1992); *In re Lost Dutchman Invs., Inc.*, No. S-2299-I, 1993 WL 173726, at *7 (Ariz. Corp. Comm'n Apr. 8, 1993).

[4]  *Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206 Ariz. 399, 410 ¶ 35, 79 P.3d 86, 97 ¶ 35 (App. 2003) (hereinafter "*Eastern Vanguard*") (holding as to the ACC's interpretation of the securities statutes that "we give great deference to the agency's interpretation and application").

1   1993 WL 173726, at *7.

2       As alleged in the Complaint, Greenberg's participation was anything but *de*

3   *minimus*.  Greenberg's conduct in assembling the information used in the POMs (and in

4   deciding how and what was disclosed) was under any reasonable view a substantial factor

5   in the sales to Plaintiffs and other investors.  But for Greenberg's assisting Mortgages Ltd.

6   and Radical Bunny in selling their securities by providing securities advice, coordinating

7   meetings and activities between the two issuers, and conducting due diligence in

8   connection with the POMs it prepared for Radical Bunny and Mortgages Ltd., sales to

9   investors could not have continued as they did.  Under the ACC's substantial-participation

10  test, Greenberg was a substantial participant and is therefore accountable as a person who

11  made the sales.  *See Koehler v. Pulvers*, 614 F. Supp. 829, 843-44 (S.D. Cal. 1985)

12  (holding attorney for issuer's general partner liable under the substantial-participation test

13  in connection with series of integrated offerings).

14          **6.      *Grand II* narrowed § 44-2003(A)'s safe harbor.**

15      The last sentence of section § 44-2003(A) contains a safe harbor for professionals

16  whose work is limited to ordinary professional services.

17          No person shall be deemed to have *participated* in any sale or purchase
    solely by reason of having acted in the ordinary course of that person's
18          professional capacity in connection with that sale or purchase.

19  (Emphasis added).  This carveout is limited to statutory *participation*.  *Grand II* ¶ 23.  No

20  safe harbor exists for inducement or making liability.  *Id.* ¶ 23.  By implication, then, even

21  ordinary professional services by a lawyer or auditor in preparing a POM or audit report

22  that induces sales may lead to liability.  *See id.*  Such liability is tempered—if at all—by

23  the comparative fault rules in A.R.S. § 44-2003(C)-(E).

24          **7.      Kant acted beyond the ordinary course by knowingly assisting his
                     clients' crimes and fraud.**
25

26      Greenberg's suggestion that § 44-2003(A) contains a carveout for all forms of

27  ordinary professional services was rejected in *Grand II*.  *See* ¶ 23.  Besides that, an

28  attorney like Kant who knowingly takes part in fraud, is acting unethically and by

definition beyond the pale of ordinary professional services.  *See* E.R. 1.2(d) & 8.4(c) (prohibiting fraudulent conduct).

Kant knew that Radical Bunny and its managers were committing criminal securities violations—violations for which Kant himself told them they could go to jail. *Compl.* ¶ 18.  Kant also knew that Mortgages Ltd. and Coles were profiting from Radical Bunny's crimes and that the crimes were ongoing during 2007 and 2008.  *Id.* ¶¶ 130, 156. Even so, Kant prepared POMs for Mortgages Ltd. and Radical Bunny in 2007 and 2008 without any disclosure of management's crimes.  *Id.* ¶¶ 167, 170, 194.  In this way, Greenberg actively assisted both Radical Bunny and Mortgages Ltd. in misleading their investors.  Because of the financial dependence of Mortgages Ltd. and Radical Bunny on one another (*Compl.* ¶¶ 73-74), disclosure of the criminal conduct to regulators (or disclosure to either company's investors) would have ended the sales to both groups of investors.

In other ways as well, Greenberg helped Radical Bunny and Mortgages Ltd. conceal Radical Bunny and Mortgages Ltd.'s fraud:

- First, to facilitate the continuing flow of illegal Radical Bunny money, Kant met privately with Radical Bunny's managers to negotiate new offering terms.  *Compl.* ¶¶ 169-70, 196.  After which, he prepared three versions of POMs to be used by affiliates of Radical Bunny as issuers.  *Id.* ¶ 268.  He worded the POMs so that they did not disclose the past registration and disclosure fraud and crimes that Kant knew Radical Bunny had committed.  *Id.* ¶ 271.  He then tried to obscure his role in drafting the misleading POMs by (1) listing Quarles as counsel to the manager in the POMs and (2) having Mortgages Ltd. rather than him forward the POMs to Quarles.  *Id.* ¶¶ 164, 167, 268.

- Second, Kant advised Mortgages Ltd.'s president, Defendant Denning, on Radical Bunny's need to register as a securities dealer, which led to a plan to try to evade the violation by having Defendant Hirsch register as a securities dealer under Mortgages Ltd. Securities' broker-dealer license.  *Id.* ¶¶ 109-10, 142.

- Third, in March and April 2008, Kant and a Greenberg employment-law partner named Lomax implemented a plan to suppress the 14 disclosure issues raised by managing director Robert Furst in an e-mail that Greenberg received.  *Id.* ¶¶ 228-41.  Among the issues were payment defaults to certain investors, discriminatory redemption practices among investors, defaults on loans to developers who

-10-

borrowed from Mortgages Ltd., and Mortgages Ltd.'s solvency.  *See id.*  Rather than address these defaults and their impact on Mortgages Ltd.'s solvency, Kant and Lomax mapped a plan for Mortgages Ltd. to fire Furst because he "may have misrepresented his credentials" and "may not be well suited to work for us [ML]."  *Id.* ¶¶ 235-38.  Kant did this even though he knew Furst had identified matters on which material facts were not being disclosed.  *Id.* ¶ 239.

- Fourth, at about the same time as the $100 million in loan defaults, Kant helped Mortgages Ltd. mask its inability to pay its debts by creating a new product to raise money to loan to the LLCs that had sold Mortgages Ltd.'s note participations.  *Id.* ¶¶ 218-23.  The new product, known as the VTL Fund, was formed even though the Fund's creation as a lending vehicle violated the terms of the LLCs' operating agreements.  *See id.* ¶ 219.  The new Fund had nothing to do with Mortgages Ltd.'s loan-origination business.  *Id.* ¶ 221.  The Fund's purpose was to raise money to keep Mortgages Ltd. afloat in the midst of the undisclosed financial crisis.  *Id.* ¶¶ 221-23, 194.

None of this conduct by Greenberg can reasonably be characterized as the acts of a professional in the ordinary course of a lawyers' professional capacity, let alone as a matter of law on a motion to dismiss.

**B.   Greenberg's arguments regarding the scope of § 44-1991(A) do not withstand scrutiny.**

Greenberg argues that its conduct is not covered by § 44-1991(A) by both arguing the facts and misstating the law.  Contrary to its factual assertions (G. Memo, at 11-12), Greenberg did make numerous misleading omissions and statements through the POMs it prepared.  *See* discussion *infra* at 15-18.  Greenberg either "directly or indirectly" (*see Grand II* ¶ 17), engaged in a fraudulent course of business by preparing the misleading POMs and by providing securities advice to both Radical Bunny and Mortgages Ltd. as clients.  *See infra* at 24.  The advice and preparation of POMs for both Radical Bunny and Mortgages Ltd. was done to further ongoing securities sales.  *Compl.* ¶¶ 163-64.  Greenberg (Kant) did this despite knowledge that Radical Bunny was raising money through securities-law crimes and that Mortgages Ltd. was receiving and relying upon the proceeds of the crimes—over $100 million, ultimately $197 million.  *See infra* at 21 & 28.

We explain initially Greenberg's mistaken attempt to use liability-narrowing federal cases to limit the plain language and remedial purposes of Arizona's express-liability statutes.

1    **1.      Arizona's securities laws are more remedial than federal law**.

2        First, Greenberg fails to acknowledge that Arizona's securities laws are broader

3    and more remedial than federal law.  "[S]tate and federal securities law were adopted to

4    serve different purposes."  *King v. Pope*, 91 S.W.3d 314, 319 (Tenn. 2002).  The central

5    aim of the federal securities laws is to ensure full disclosure and honest markets.  *See id.;*

6    12 JOSEPH LONG, BLUE SKY LAW § 1.42 (2009) (explaining the federal policy of full

7    disclosure).  State securities law, while promoting disclosure, has investor protection as its

8    overarching purpose.  *See King*, 91 S.W.3d at 319 ("[S]tates enacted securities regulation

9    to protect investors.").  Like other state courts, *see, e.g., Hoffer, supra,* Arizona's courts

10   have repeatedly held that the purpose of the Arizona Securities Act is broad public

11   protection.  *E.g., Grand II,* ¶ 16; *State v. Baumann*, 125 Ariz. 404, 411, 610 P.2d 38, 45

12   (1980) (explaining that state securities laws are "designed to protect the public from fraud

13   and deceit arising in [securities] transactions.").

14        **2.      Arizona courts will not follow federal decisions that do not
15                 adequately protect the public.**

16        Second, in citing narrow, federal interpretations of Rule 10b-5, Greenberg does not

17   acknowledge that Arizona will follow federal law only when federal law adequately

18   protects investors.  *See Eastern Vanguard,* 206 Ariz. at 411-12, 414 ¶¶ 40-41, 50, 79 P.3d

19   at 98-99, 101 ¶¶ 40-41, 50 (declining to follow Ninth Circuit interpretations of control

20   liability that do not adequately protect the investing public); *Siporin v. Carrington*, 200

21   Ariz. 97, 103 ¶¶ 28-29, 23 P.3d 92, 98 ¶¶ 28-29 (App. 2001) (refusing to follow restrictive

22   federal precedent on the meaning of investment contracts).

23        **3.      Federally created narrowing doctrines are contrary to Arizona's
                 public-protection goals.**

24        Third, Greenberg overlooks the differences between express liability under § 44-

25   1991(A) and implied liability under Rule 10b-5.  *See Grand II,* ¶ 12.  Because Rule 10b-5

26   is an implied cause of action, federal courts often use common-law fraud rules to define

27   and narrow liability.  In contrast, liability under § 44-1991(A) is express liability that is

28   governed by the words of the statute.  *See Aaron v. Fromkin*, 196 Ariz. 224, 227 ¶ 13 994

1   P.2d 1039, 1042 ¶ 13 (App. 2000).  This means that "[t]he elements of securities fraud are

2   articulated within the statute itself."  *Id.*  On its face, A.R.S. § 44-1991(A) imposes on all

3   persons an affirmative duty not to mislead.  *Id.* ¶ 15; *Trimble v. Am. Sav. Life Ins. Co.*, 152

4   Ariz. 548, 553, 733 P.2d 1131, 1136 (App. 1986).

5      Thus, Greenberg's arguments that liability for misleading nondisclosure exists only

6   when a duty to disclose exists make no sense under Arizona's statutory scheme.  *Aaron*

7   and *Trimble* confirm that the Arizona statute itself imposes an affirmative duty not to

8   mislead.  Similarly, Greenberg's use of the unpublished *Miller* decision[5] is misguided

9   because *Miller* makes statements about the possible need for a duty on the basis of federal

10   cases without analyzing contrary law in published Arizona cases like *Aaron* and *Trimble*.

11   Besides that, *Miller* was decided before *Siporin v. Carrington*, 200 Ariz. 97, 103 ¶¶ 28-29,

12   23 P.3d 92, 98 ¶¶ 28-29 (App. 2001).  Until *Siporin,* Arizona's courts seem to have been

13   unaware of the 1951 Statement of Intent.  Since *Siporin,* Arizona's courts have

14   consistently relied upon this legislative statement in reaching a broad, investor-protective

15   interpretation of the Securities Act.  *See, e.g., Grand II,* ¶ 16; *Eastern Vanguard,* ¶ 36.  In

16   sum, *Miller* is not only non-precedential, it is poorly reasoned and outdated.

17      Another misleading use of precedent exists in the cases Greenberg cites for its

18   argument that a duty to disclose does not exist under subsections (a) and (c) of Rule 10b-

19   5.  G. Memo at 12-13.  The cited cases do not come close to supporting Greenberg's

20   statement.  Among the many contrary decisions are the Supreme Court's decision in

21   *Affiliated UTE Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972) (holding that a scheme

22   under Rule 10b-5(a) or (c) can be carried out by inducing sales "without disclosing . . .

23   material facts"); *see also SEC v. Rogers*, 790 F.2d 1450, 1459 (9th Cir. 1986) (holding

24   that a 10b-5 duty to disclose may arise from participating in a scheme).  Under the

25   affirmative duty created by § 44-1991(A) and the liberal interpretation given Arizona's

26

27   [5] *Miller v. Udall, Shumway, Blackhurst, Allen & Lyons, P.C.*, No. 1 CA-CV 99-0261, 2000 WL 35730146 (Ariz. App. May 11, 2000).  *Miller* is not citable precedent under

28   Ariz. R. Civ. App. Proc. 28; the case states on its face that "This Decision Does Not Create Legal Precedent."

statute, it would make absolutely no sense to deny relief where a scheme or fraudulent course of business is implemented through the omission of material facts from the sales documents.

### 4. Greenberg is selectively citing federal cases that advance especially restricted interpretations of Rule 10b-5.

Fourth, the law under Rule 10b-5 varies from Circuit to Circuit and within districts. Greenberg chooses its federal cites selectively, by drawing on the most restrictive federal decisions. Doing so violates the Arizona legislature's mandate to avoid narrow or restricted interpretations of Arizona's securities fraud statute. *See* note 1 *supra*. An example is provided by the cluster of federal cases that Greenberg cites to supposedly show judicial agreement that "company counsel has no duty to nonclient investors absent special circumstances." G. Memo, at 14. In Arizona, by contrast, such special "circumstances are found in a myriad of contexts." *Paradigm Ins. Co. v. Langerman Law Offices, PA,* 200 Ariz. 146, 154 ¶ 27, 24 P.3d 593, 601 ¶ 27 (2001).

In the Ninth Circuit, *O'Melveny* holds that securities counsel who prepares a POM for an issuer has special responsibilities of disclosure to both the issuer and its investors. 969 F.2d at 749. These responsibilities require securities counsel like Greenberg to act with due diligence to ensure full disclosure. *Id.* A similar analysis was made in *SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996). There, the Ninth Circuit found securities violations by a public company's securities counsel. It held that the securities laws depend upon "securities lawyers such as Fehn properly advising their clients of the disclosure requirements . . . ." *Id.* at 1294. "[I]t is incumbent on practitioners like Fehn to be highly familiar with the disclosure requirements and to *insist upon* their client's compliance." *Id.* (emphasis added); *accord In re Am. Cont'l*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992) (also stating that securities attorney must insist upon compliance). These disclosure duties do not interfere with client confidentiality. They track the ethical obligation to avoid assisting client fraud. *See* E.R. 1.2(d). Fulfilling that obligation means that an attorney may not prepare fraudulent documents and may be required to give notice withdrawing a

-14-

1    fraudulent document and disclosing a client's fraud.  *See* E.R. 1.2(d) cmt. 11 (making

2    these points).

3          Defendants also fail to cite relevant Arizona law.  Since 2001, Arizona has

4    followed the rules on duties to nonclients in the Restatement (Third) of the Law

5    Governing Lawyers (2000).  *See Paradigm,* 200 Ariz. at 153 ¶ 23, 24 P.3d at 601 ¶ 23.

6    Restatement Section 56 bars an attorney from taking part in a client's fraud and provides

7    that "lawyers have no special privilege against civil suit."  *Chalpin v. Snyder*, 220 Ariz.

8    413, 424 ¶ 44, 207 P.3d 666, 677 ¶ 44 (App. 2008).  *Paradigm* reaffirmed "our cases that

9    recognize that a professional has a duty to third parties who are foreseeably injured by the

10   lawyer's negligent actions."  *Paradigm*, 200 Ariz. at 154 ¶ 28, 24 P.3d at 601 ¶ 28.  This

11   rule is especially apropos with a "foreseeable non-client whose protection depended on the

12   actor's conduct."  *Id.* ¶ 27.  Thus, securities counsel has special responsibilities to detect

13   and correct mispresentations.  *O'Melveny*, 969 F.2d at 749.  Attorneys cannot, without

14   liability, continue rendering compliant securities services when confronted with an

15   ongoing fraud.  *See Fehn*, 97 F.3d at 1294; *Am. Cont'l*, 794 F. Supp. at 1442-43.

16         **C.     Greenberg violated all three subsections of § 44-1991(A).**

17         "A.R.S. § 44-1991(A)(1) and (A)(3) broadly prohibit fraudulent schemes."  *Grand*

18   *I*, 214 Ariz. at 23 ¶ 45, 147 P.3d at 777 ¶ 45. Those "sections police a broader range of

19   fraud than § 44-1991(A)(2) and 15 U.S.C. §77l, broadly prohibiting all deception by

20   schemes, artifices and misleading practices."  *Id*. at 26, ¶ 59, 147 P.3d at 780 ¶ 59 (internal

21   quotations omitted).  Accordingly, violations under all three subsections are properly

22   pleaded.  The Complaint describes a long-running scheme to sell securities.  The scheme

23   involved a roster of deception implemented through misleading omissions (*Compl.* ¶¶ 86,

24   91), misrepresentations (*id.*), undisclosed registration violations (*id.*), lulling letters (*id.* ¶¶

25   103, 113), and cover-up attempts (*id.* ¶¶ 162, 164-72, 176, 178-79, 218-23); *see also infra*

26   Parts 2(E), (F), & (G) (describing Greenberg's knowledge and facilitation of the scheme).

27         The scheme involved a joint venture and integrated offerings in which Mortgages

28   Ltd.  and  Radical  Bunny  jointly  sold  fractionalized  note  participations  that  were

-15-

represented to be collateralized by deeds of trust.[6]   Greenberg refuses to accept the Complaint's joint-venture allegations and claims only a lender-borrower relationship is pleaded.   Part (2)(G)(2) *infra* shows that a factual basis for the joint venture is pleaded. Nor is there any contradiction in Plaintiffs' allegations about what Radical Bunny was selling.  The Complaint describes in detail the Directions to Purchase under which Radical Bunny investors purchased fractional note participations that were represented to be backed by "various deeds of trust" originated by Mortgages Ltd.  *Compl.* ¶¶ 79, 90-91, 98. To create the investment, Mortgages Ltd. signed notes and agreed to back them with deeds of trust.  Through the joint venture, Mortgages Ltd. received the notes' sale proceeds, and Radical Bunny was paid the note interest for selling the note participations and 2% of the interest was divided among the Hirsch Defendants for their investment services.  Although an element of lending was associated with the note participations, that is true of all mortgage-backed securities.  The lending element hardly means that Radical Bunny was not acting as Mortgages Ltd.'s securities dealer in selling a product created by Mortgages Ltd.   To the contrary, Kant, as well as Quarles, recognized that Radical Bunny was illegally acting as an unlicensed securities dealer.  *Id.* ¶¶ 135, 152.  That led to efforts to have Hirsch register under Mortgages Ltd. Securities' license.  *Id.* ¶¶ 109-10, 142.

Greenberg argues that the fraudulent scheme is described only with the conclusory label "Ponzi" scheme.  G. Memo, at 4 & 30.  This argument cannot be made without ignoring Paragraphs 355-61 of the Complaint.   Those paragraphs provide a detailed financial analysis of Mortgages Ltd.'s insolvency from late 2005 through its collapse. They plead specific numbers quantifying Mortgages Ltd.'s negative net worth, cash-flow insolvency, liquidity deficiencies, and extraordinary debt-to-equity ratios.

The POMs that Greenberg prepared represented that they disclosed the risks specific to the offering but, as alleged in the Complaint, the Risk Factors were formulaic disclosures that were so generalized that they were nearly worthless as disclosures.  *See*

---

[6]   The law on integration is discussed in Part 2(D) below.  The law and facts showing a joint venture are described in Part 2(G)(2).

*Compl.* ¶¶ 202-03, 205.  The same Risk Factors were repeated in each of the POMs that Greenberg prepared.  *Compl.* ¶ 205.  None of the POMs disclosed the financial risks associated with Mortgages Ltd.'s continued borrowing of tens of millions in illegal Radical Bunny money, defaults on $100 million in loans, the company's inability to fund investor redemptions, and its inability to stay current on Greenberg's fees.  *Compl.* ¶¶ 203-04, 209-17.  By representing that Risk Factors were being disclosed without disclosing these risks, the representation of Risk-Factor disclosure was a misrepresentation.

Beyond all this, the Complaint pleads examples of risk disclosures that were misleading because they were described as risks that *might* occur when in reality the risk *had* already occurred.  *Compl.* ¶ 206.  For example, the Risk Factors in each POM state that the "[l]oans are subject to a risk of default" but fail to disclose that by January 2008, more than $100 million in loans were in default.  *Id.* ¶ 206.  Greenberg knew about these defaults because it initiated collection demands regarding them.  *Id.* ¶ 213.  Yet no disclosure was made by amending outstanding POMs that were in use or in two new POMs that Kant prepared in late January and mid-February 2008.  *See id.* ¶ 198.

It is no answer to argue that Kant and Greenberg were unaware of the undisclosed facts.  For one thing, Kant and Greenberg had a duty to investigate and detect misrepresentations and misleading facts in the POMs.  *See O'Melveny,* 969 F.2d at 749 ("The reasons for O'Melveny's lack of success in designing an accurate offering document constitute a triable issue of fact.").  For another, the Complaint pleads specific facts regarding the firm's knowledge of the omitted facts.  Thus, the Complaint shows Kant knew that Radical Bunny was violating the registration and disclosure laws.  *Compl.* ¶¶ 133-43.  Kant also knew that this created liability risks for Mortgages Ltd.; that is why, in December 2006, he warned Coles that Coles could end up with his picture on the front page of the Arizona Republic.  *Id.* ¶ 19.  That is also why Kant tried to patch the ongoing violations by taking the remarkable step of negotiating a $20,000 fee to prepare a POM for Radical Bunny.  *Id.* ¶¶ 164-70.  At least three drafts of POMs reflecting changes discussed with Hirsch and Mortgages Ltd. were circulated.  *Id.* ¶ 268.

-17-

1   Finally, it misses the point to argue that the POMs were never finished or that they
2   were not used in certain sales.  Conduct that is in furtherance of a scheme is relevant to
3   show participation in the scheme even if it occurs after sales are made.  Kant was
4   preparing POMs for Radical Bunny at the same time he was preparing new POMs for
5   Mortgages Ltd.  *Compl.* ¶¶ 164-70, 194.  The Radical Bunny POMs were in furtherance of
6   the scheme perpetrated through the Mortgages Ltd. POMs.  *See SEC v. Holschuh*, 694
7   F.2d 130, 143-44 (7th Cir. 1982) (holding that post-sale efforts to hide a scheme were
8   properly considered as part of the scheme); *In re Judith Marie Otto*, No. S-2896-I, 1993
9   WL 353421 (Ariz. Corp. Comm'n Aug. 11, 1993) (holding that false assurances that a
10  bond was performing well after it was sold violated A.R.S. § 44-1991.3).

### D.  Under the registration and disclosure laws, the Mortgages Ltd. and Radical Bunny offerings were integrated securities offerings.

Greenberg claims Radical Bunny was not its client.  But this is just a factual argument.  The Complaint pleads facts showing that Radical Bunny was Greenberg's client:  for a $20,000 fee, Kant advised Radical Bunny and Hirsch on disclosure issues and prepared disclosure documents (POMs) for new entities through which Radical Bunny could solicit investors.  *See Compl.* ¶¶ 164-70, 268 and discussion *supra* at 17.

Moreover, Mortgages Ltd. and Radical Bunny were financially dependent companies whose survival depended on one another.  *Compl.* ¶¶ 11, 73-74, 355.  Their offerings were integrated and raised money Mortgages Ltd. needed for its operations.[7] The flow of money to Mortgages Ltd. (over $900 million) is depicted in Exhibit D (copy of Complaint's Ex. A).  This chart shows how Mortgages Ltd. received money from three forms of mortgage-backed securities.  Each of these was a fixed-income note participation that was supposedly secured by deeds of trust from Mortgages Ltd.'s loan originations:

- Note participations secured by deeds of trust that were described as pass-through participations.  Mortgages Ltd. was itself the issuer.

---

[7]  If needed, Lead Plaintiffs are prepared to plead the more than three dozen references to integration research and discussion in Greenberg's billings to Mortgages Ltd.

-18-

- Note participations secured by deeds of trust that were sold to Radical Bunny's investors.  Mortgages Ltd. issued the notes as general obligations backed by various deeds of trust.

- Note participations secured by deeds of trust that were purchased by LLCs that Mortgages Ltd. managed.  Investors purchased membership interests in the LLCs.

The value of each of these investments was inextricably tied to Mortgages Ltd.'s loan-origination business and its creditworthiness.  Although some offerings like the LLC offerings nominally had different issuers, the Ninth Circuit looks to economic realities.  The leading case is *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), which has been followed by the ACC in its administrative proceedings.  *See In re Am. Microtel, Inc.*, No. S-2876-I, 1992 WL 409823, at *9-10 (Ariz. Corp. Comm'n Dec. 9, 1992).

In applying the integration doctrine, *Murphy* recognizes that identifying the true issuer is often the central issue.[8]  The true, rather than nominal issuer, is the company or person who is the "key to success or failure."  *Id.* at 643.  The issuer is "the entity about which the investors needed information."  *Id.* at 673-74.  Thus, when a promoter-entity organizes multiple entities for whose success the promoter-entity is responsible, the promoter-entity is the issuer.  In *Murphy,* the promoter-entity was a company named Intertie that provided product (cable systems) for about 30 limited partnerships with a variety of general partners.  *Murphy* integrated all of the offerings and treated them as a unified offering to finance Intertie's business.  *Id.* at 645-46.  The court recognized that Intertie was substantively the entity responsible for the success of the ventures and the company about which investors needed information.  *Id.* at 646.

In this case, Radical Bunny and Mortgages Ltd. were acting as co-promoters under a joint venture to raise money for Mortgages Ltd.  *Compl.* ¶¶ 60-83 and *infra* Part 2(G)(2)

---

[8]  *See also* 2 THOMAS L. HAZEN, THE LAW OF SECURITIES REGULATION § 4.36[2][c], at 76 (6th ed. 2009) (explaining that integration "is not limited to successive offerings by the same issuer . . . .  Successive offerings by issuers having separate forms but economic interdependence may also be integrated."); *In re W. Universal Fund Co., LLC*, No. S-3154-I, 1998 WL 34076963, at *4 (Ariz. Corp. Comm'n Apr. 8, 1998) (integrating a series of limited partnerships).

(discussing the joint venture).  The substantive issuer about whom all investors needed accurate financial information was Mortgages Ltd.  As Mortgages Ltd.'s bankruptcy proved, all of the offerings were economically intertwined and dependent on Mortgages Ltd.  When Mortgages Ltd. collapsed, Radical Bunny and the LLCs also collapsed.

In sum, Lead Plaintiffs plead a clear case of economically interdependent offerings that call for integration.  All of the offerings were part of a common plan to finance Mortgages Ltd.'s operations.  *Compl.* ¶¶ 60-61, 67, 73.  The core securities (secured note participations) that Mortgages Ltd. and Radical Bunny offered were the same for all investors.  *Id.* ¶ 77.  Without integration, Mortgages Ltd. could bypass accredited investor requirements, side-step critical financial disclosures, and use unlicensed dealers like Radical Bunny to sell its note participations in nonexempt offerings.

**E.   The Complaint is pleaded with the factual specificity required by Rule 9(b) and § 44-2082.**

**1.   The Complaint is properly pleaded.**

The Complaint describes in detail the fraudulent scheme (*Compl.* ¶¶ 55-128), Mortgages Ltd.'s related insolvency (*id.* ¶¶ 355-61), and the roster of omissions and misleading risk disclosures (*id.* ¶¶ 84-91) through which the investors were defrauded. These allegations are summarized above in Parts 1, 2(A)(7), and 2(C).  Kant's knowledge and facilitation of the fraud is also described in Parts 2(E)(2) and F(4)(A) below.  No point would be served by repetition.  The Complaint amply pleads the factual basis for the claims against Greenberg.  If more detail is needed, leave to amend is respectfully requested to address any perceived deficiencies.[9]

**2.   Lead Plaintiffs sufficiently plead scienter (knowledge or recklessness) under § 44-1991(A)(1).**

Lead Plaintiffs agree that § 44-1991(A)(1) requires proof of scienter at trial.  But Greenberg again cites federal cases to the exclusion of controlling Arizona law.  G.

---

[9]   *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend is to be allowed with "extreme liberality," especially in securities fraud cases).

Memo, at 18-21.   The controlling law is statutory.   In 1996, the Arizona legislature amended A.R.S. § 44-2003 to add proportionate-liability provisions.   Under these amendments, any defendant who acts "knowingly or recklessly" is jointly and severally liable for violations of 44-1991(A).   *See* A.R.S. § 44-2003(B).   Through § 44-2003(B), the legislature ensured that recklessness would suffice to establish joint-and-several liability for all securities violations under the Arizona Securities Act.   *See* Richard G. Himelrick, *Arizona Securities Fraud Liability: Charting a Non-Federal Path*, 32 ARIZ. ST. L. J. 203, 218 (2000).

Throughout the Complaint and this brief Lead Plaintiffs have described the facts showing Kant and Greenberg knew they were participating in and assisting fraud.   Those facts show conscious wrongdoing.   As such, they certainly suffice at the pleading stage to show the highly unreasonable conduct needed for recklessness.   For example, Kant knew (but did not disclose in the POMs) that Mortgages Ltd. was funding its operations with the proceeds from Radical Bunny's securities-law crimes.

### F.   Counts Three and Four properly plead claims for aiding and abetting securities and fiduciary fraud.

Lead Plaintiffs respond here, in Part 2(F), to Greenberg's contentions regarding Counts Three (aiding and abetting securities fraud) and Four (aiding and abetting fiduciary fraud).   In Part 2(G) below we explain the factual and legal basis for fiduciary duties.

### 1.   Liability for aiding and abetting securities fraud is the law in Arizona.

As Greenberg notes, in 1979 the Arizona Supreme Court recognized liability for aiding and abetting securities fraud.   *State v. Superior Court (Davis)*, 123 Ariz. at 331-32, 599 P.2d at 184-85.   In 1996, proposed amendments to the Arizona Securities Act would have overruled *Davis* and eliminated civil aiding-and-abetting liability.   HIMELRICK & SCHULMAN, ARIZONA SECURITIES FRAUD LIABILITY:   STATUTORY AND COMMON-LAW REMEDIES, § 5.1.3.2, at 111 (Arizona State Bar 3d ed. 2009).   Instead, the legislature passed a statutory note, quoted by Greenberg (G. Memo, at 24), stating that the legislature takes no position on the existence of aiding-and-abetting liability.   The legislature thus left

*Davis* intact.   As explained by a 2005 decision, "[T]he Arizona Supreme Court's recognition in 1979 of a private right of action for aiding and abetting in the [*Davis*] case stands as the law currently controlling" the issue of aiding-and-abetting violations under A.R.S. § 44-1991(A).  *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005).

Nothing in *Grand II* or *Grubaugh v. DeCosta*, No. CA-CV  97-0477 1999 WL 137640 (Ariz. App. Mar. 16, 2000) changes Arizona law on aiding and abetting.  *Grand II* found it unnecessary to decide defendants' argument that *Central Bank v. First Interstate Bank,* 511 U.S. 164 (1994). warranted a new interpretation.  As unpublished decisions, the *Grubaugh* decision and depublication order are not properly cited under Arizona's rules.  But that aside, the Petition for Review and Motion to Depublish in *Grubaugh* show that the merits of aiding and abetting were not even raised in the Arizona Supreme Court.  The basis for the Petition for Review and Motion to Depublish was that one of the Court of Appeals judges had a financial conflict of interest that tainted the panel's opinion.  *See* Exhibit E (*Grubaugh* Petition for Review with Motion to Depublish).  Thus, nothing in the depublication of *Grubaugh* suggests Arizona Supreme Court disapproval of its earlier holding in *Davis*.

### 2.    Aiding-and-abetting liability is textually supported by § 44-2003(A).

Greenberg argues that because the words aiding and abetting do not appear in the Securities Act, textual support for aiding-and-abetting liability somehow does not exist.  But this is a narrow interpretation of the Act that the legislature directed the courts to avoid.  *See supra* note 1 (quoting 1951 Statement of Intent).  In *Grand II*, the Supreme Court concluded that a liberal interpretation required that the words "made, participated in or induced" be read expansively to fully remedy the fraudulent conduct for which A.R.S. § 44-2001(A) provides a "sweeping rescissory remedy."  *See id.* ¶¶ 17-18.

If participation and inducement are "liberally construed," without the "narrow or restricted interpretation" that the drafters admonished against, the words are without doubt broad enough to cover persons who knowingly provide substantial assistance to a primary

violator.  This is all Arizona law requires for aiding-and-abetting liability.[10]  As Professor Long concludes, "Participation is certainly one way of aiding in the sale."[11]  This reading of § 44-2003(A) is especially compelling after *Grand II*, which (1) expanded inducement to include "acts or omissions [that] encourage[]" purchases, (*id.* ¶ 24), and (2) expanded participation by explain that *to participate* is either,

- "to take part in something (an enterprise or activity) . . . in common with others"; or

- "to have a share or part in something."

*Id.* ¶ 21 (internal citations omitted).  The first definition squarely covers substantially assisting fraudulent activity in common with a primary violator.

### 3. Aiding-and-abetting liability is supported by the ACC's administrative interpretations.

After the 1979 *Davis* decision, the ACC adopted the *Davis* holding on aiding and abetting as the proper interpretation of the Securities Act.  *In re Am. Microtel, Inc.*, No. S-2885-I, 1992 WL 409823, at *12-*13 (Ariz. Corp. Comm'n Dec. 9, 1992).  Even after *Central Bank*, the ACC continues to interpret the Act to support aiding-and-abetting liability.  *See In re John Edward Tencza*, No. S-20483A-06-0661, 2007 WL 2478687, at *4 (Ariz. Corp. Comm'n Aug. 13, 2007) (aiding and abetting registration violations); *In re Arthur Andersen L.L.P.*, No. S-03386A-00-0000, 2000 WL 35730980, at *19-20 (Ariz. Corp. Comm'n Sept. 27, 2000) (aiding and abetting registration and 44-1991 violations).

---

[10]  *See Grand II* ¶ 30; *Wells Fargo Bank v. Arizona Laborers and Teamsters*, 201 Ariz. 474, 485 ¶ 34, 38 P.3d 12, 23 ¶ 34 (2002) (defining aiding and abetting as knowingly providing substantial assistance or encouragement to a primary violator).

[11]  12A JOSEPH C. LONG § 9:71.1, at 9-135 (2009); *see also* Richard G. Himelrick, *The Importance of Statutory Text: from Scienter to Nonstatutory Defenses under Arizona Securities Law*, 41 ARIZ. ST. L.J. 49 (2009) (reasoning that "knowingly providing substantial assistance to fraud, is reasonably viewed as one way to culpably participate in a securities sale.").

1

**4.     The Complaint pleads the facts needed to support aiding-and-abetting liability.**

2

**a.     The Complaint adequately pleads Greenberg's knowledge.**

3      Under the standard for aiding and abetting adopted in *Davis* and quoted in *Grand II*

4  (¶ 30), either knowledge or a duty of inquiry will satisfy the second prong of aiding-and-

5  abetting liability.  *Davis*, 123 Ariz. at 331, 599 P.2d at 784.  Kant was an experienced

6  securities attorney.  *Compl.* ¶ 150.  In that capacity he represented both Mortgages Ltd.

7  and its LLCs in preparing POMs.  *Id.* ¶ 164-70, 194.  He was also retained by and

8  provided securities advice to Radical Bunny and its managers regarding their offerings.

9  *Id.* ¶¶ 164, 240, 267.  As securities counsel for issuers, Kant had special duties that

10  included a duty to investigate the issuers' offering materials to detect and correct

11  misleading statements.  *O'Melveny*, 969 F.2d at 749.

12      Kant realized by December 2006 that Radical Bunny was violating the securities

13  registration and disclosure laws, *Compl.* ¶¶ 109, 133-38, and acting as an illegal

14  unregistered securities dealer, *id.* ¶¶ 135, 142.  He knew that Radical Bunny's investors

15  were being falsely told that their investments were secured.  *Id.* ¶¶ 100, 193.  He knew too

16  that Radical Bunny's investors weren't told that Mortgages Ltd. could pay its notes in

17  kind rather than cash, i.e., it could pay by assigning deeds of trusts.  *Id.* ¶ 287.

18      Greenberg is thus wrong when it suggests the Complaint fails to plead facts

19  showing that Kant knew Radical Bunny was misleading its investors.  G. Memo, at 30.

20  Greenberg is stretching things even more when it says the Complaint fails to plead facts to

21  show the firm had any awareness of Radical Bunny's relationship with its investors.  Kant

22  met with Quarles' attorneys precisely to discuss Radical Bunny's investors (*Compl.* ¶ 164)

23  and separately met with Hirsch and his partners to plan POMs for Radical Bunny's

24  investors.  *Id.* ¶¶ 169-70.  Rather than insist that Radical Bunny and Mortgages Ltd.

25  disclose the securities crimes that Radical Bunny was committing, Kant assisted them in

26  preparing POMs by listing purported Risk Factors without disclosing the crimes.  *Id.* ¶

27  271.  Nor did Greenberg's POMs disclose the related misrepresentation to Radical Bunny

28  investors that the notes were secured.  *Id.* ¶ 99.  Nor did the POMs Kant wrote disclose

-24-

1    that the participations could be paid through assignments rather than cash.  *See id.* ¶ 287.

2         Contrary to Greenberg's suggestions that Radical Bunny's securities violations

3    were not an issue for Mortgages Ltd., the Complaint describes SEC testimony by Kant in

4    which he stated that he was "very concerned about" Radical Bunny's violations.  *Compl.* ¶

5    138.  That is why Kant warned Coles that his picture could end up on the front page of the

6    Republic alongside Hirsch.  *Id.*  No reasonable attorney, particularly a securities attorney,

7    could believe that an issuer's ongoing receipt of crime proceeds need not be disclosed.

8         A company's willingness to fund its operations with the proceeds of crimes shows

9    its management is dishonest.  Facts showing management's lack of integrity are highly

10    material.  As illustrated by the footnoted cases, the ACC has held that prior securities

11    violations, bankruptcies, and criminal convictions of management must be disclosed,[12] and

12    that misrepresentations regarding management's qualifications are material.[13]  These facts

13    are material because they bear on management's integrity.  Moreover, the duty to disclose

14    facts bearing on integrity may extend to facts regarding related companies.  Thus, the

15    Arizona Court of Appeals has held that prior cease-and-desist orders involving related

16    companies and their officers are material facts that must be disclosed.[14]  Integrity is

17    essential because reasonable investors do not invest in companies run by crooks or

18

19

20    [12]  *In re Melvin Lee Cline*, No. S-03431A-01-0000, 2001 WL 798620, at *2 (Ariz. Corp.

21    Comm'n June 28, 2001) (securities violations); *In re The 12 Percent Fund I, L.L.C.*, No. S-20472A-06-0535, 2008 WL 827744 (Ariz. Corp. Comm'n Mar. 10, 2008)

22    (bankruptcies); *In re John E. Shannon*, No. S-03580A-04-0000, 2005 WL 1580402, at *3 (Ariz. Comm'n June 9, 2005) (convictions).

23    [13]  *In re Melvin Lee Cline*, No. S-03431A-01-0000, 2001 WL 798620, at *2-3 (Ariz. Corp.

24    Comm'n June 28, 2001) (misrepresentation regarding CEO's education); *In re Tomasian*, 2007 WL 4364246, at *3 (Ariz. Corp. Comm'n Nov. 20, 2007) (finding material the

25    failure to disclose "any salient financial or background information" about management).

26    [14]  *See State v. Goodrich*, 151 Ariz. 118, 126, 726 P.2d 215, 223 (App. 1986) ("[W]e find

27    that these facts would have been important to an investor's decision."); *see also Gephardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829-30 (8th Cir. 2003) (holding that an affiliated

28    subsidiary's fraud raised questions about the integrity of the parent's senior managers that a reasonable investor would probably find important).

1    managers who affiliate with criminal securities violators. [15]

2        Furthermore, Kant was familiar with FASB 5 and its provisions on disclosing

3    contingent liabilities. *Compl.* ¶ 186.  Liabilities from past securities violations may give

4    rise to contingent liabilities that must be disclosed.  *See Fehn*, 97 F.3d at 1290-91 (holding

5    securities counsel liable for not disclosing contingent liabilities regarding company's past

6    securities violations).  A reasonable fact finder could readily conclude that Kant willfully

7    ignored the contingent liabilities associated with Mortgages Ltd.'s receipt of money from

8    Radical Bunny's crimes.

9        It is also a reasonable inference that Kant, as an experienced securities attorney,

10   understood the law on integration.  (If necessary, Lead Plaintiffs are prepared to plead the

11   *three dozen* references to integration research and discussion made in Greenberg's

12   billings.)   It is an equally reasonable inference that Kant realized that because of the

13   financial interdependence of Mortgages Ltd. and Radical Bunny, there was a substantial

14   risk, requiring disclosure, that Radical Bunny's securities offering would be integrated

15   with those of Mortgages Ltd.  This is at least an issue of fact raised by the Complaint.

16   And if integrated, Radical Bunny's securities violations would, as alleged in Paragraph 86

17   (second bullet point), undermine Mortgages Ltd.'s claim of a Reg D offering.  *See also*

18   *Compl.* ¶ 135 (Kant knew that Radical Bunny sold to unaccredited investors).  Thus, under

19   the integration doctrine, Mortgages Ltd. was selling securities without a registration

20   exemption.  This fact too, or at least the risk that Mortgages Ltd.'s offerings were not

21   registration compliant, should have been disclosed.  *See id.*  (If necessary, Lead Plaintiffs

22   are also prepared to plead Mortgages Ltd.'s in-house calculations of the number of

23   Radical Bunny investors who were unaccredited.)

24       By contrast, the law firm that represented Mortgages Ltd. before Greenberg

25   recognized and *disclosed* in the pre-Greenberg POMs that there was a contingent liability

26

27   [15]     *Cf. Kronenberg v. Katz*, 872 A.2d 568, 586 (Del. Ch. 2004) ("[N]o reasonable
28   investor would have proceeded to invest in the [the company] if she knew that one of the
     key fiduciaries" had a criminal background and personal bankruptcies.).

associated with rescissory liability for registration violations under prior offerings.  *Id.* ¶ 200.  But Kant deleted even this general disclosure from the POMs that he prepared.  *Id.*

These allegations of specific fact all show Kant's knowledge that investors were being misled.  Despite that knowledge Kant failed to disclose adverse facts concerning Mortgages Ltd.'s financial condition.  Kant knew by January 2008 that borrowers on over $100 million in loans Mortgages Ltd. had underwritten had defaulted.  *Id.* ¶¶ 206, 213.  In the same month, a Mortgages Ltd. officer asked Kant if the Company's problems in funding its loan commitments needed to be disclosed.  *Id.* ¶ 227.  Kant told the officer no.  *Id.*  Kant then prepared new POMs in late January 2008 and mid-February 2008 without disclosing the defaults or the funding difficulties.  *See id.* ¶ 217.

Kant knew that the loan defaults coincided with other Mortgages Ltd. financial problems.  Thus, he knew that shortly before the $100 million default, Mortgages Ltd. had ended investor-redemption requests.  *Id.* ¶¶ 212-13.  He also knew Mortgages Ltd. was having problems funding its loan commitments.  *Id.* ¶ 227.  He also knew by December 2007 that Mortgages Ltd. was unable to pay Greenberg's bills without a workout plan.  *Id.* ¶¶ 216, 239.  On about April 1, 2008, Kant received an e-mail from one of Mortgages Ltd. Securities' managing directors, Robert Furst, listing 14 disclosure issues.  *Id.* ¶ 67.  Among these was disclosure of (1) defaults on payments to pay some investors, (2) conduct favoring some investors over others on redemptions, (3) Mortgages Ltd.'s defaults on loans to developers, and (4) doubt as to Mortgages Ltd.'s solvency.  *Id.*  When Kant refused to address Furst's concerns, Furst's attorney, a securities-law partner at Snell & Wilmer, wrote to Kant to tell him that the securities regulators would be informed.  *Id.* ¶ 236.  Two months later, regulators began their securities investigations.  *Id.* ¶ 27.

### b.   The Complaint adequately pleads substantial assistance by Greenberg.

It is only as to the claim for aiding and abetting fiduciary breaches (not aiding and abetting securities violations) that Greenberg argues substantial assistance is not pleaded.  But the law on aiding and abetting (1) securities fraud and (2) nondisclosures and

1   fraudulent practices by fiduciaries is essentially the same as to securities counsel.

2          This is shown by a decision issued this summer by New York's Appellate Division.

3   In *Oster v. Kirschner*, 905 N.Y.S.2d 69 (App. Div. 2010), the Appellate Division reversed

4   dismissal of an investor action against securities counsel.   The court held that,

5   "Preparation of PPMs [private placement memorandums] constitutes 'substantial

6   assistance.'"   *Id.* at 72.   The court recognized that the PPMs that the attorneys prepared

7   were the "vehicle by which the Ponzi scheme was carried out."   *Id*.   Like Greenberg, the

8   attorneys denied knowledge of the Ponzi scheme.   But the attorneys had knowledge of

9   material omissions in the PPMs used in the scheme.   They knew but did not disclose, for

10  example, that the issuer was claiming a Reg D private-offering exemption while selling to

11  investors who did not meet Reg D criteria.   *Id.*   Plaintiffs here allege Mortgages Ltd. did

12  the same thing by selling to Radical Bunny's investors.   These sales to Radical Bunny's

13  investors are alleged to have destroyed Mortgages Ltd.'s claimed Regulation D

14  exemption.   *Compl.* ¶ 86 (second bullet point).   Nondisclosure of this fact is alleged to be

15  a material omission here (*id.*) just as it was in *Oster*, 905 N.Y.S.2d at 70 (explaining that

16  the PPMs falsely represented that all investors were accredited).

17         It was also undisclosed in *Oster* that the investments were "sold by persons not

18  qualified to do so," i.e., unlicensed persons.   *Id.* at 73.   Similarly, neither Mortgages Ltd.

19  nor Radical Bunny investors were told that Radical Bunny was selling investments

20  illegally, as an unregistered securities dealer.   *Compl.* ¶¶ 135-36, 152-54.

21         *Oster* also holds that an attorney's knowing nondisclosure in a POM of

22  management's crimes is a material omission that shows both the knowledge and assistance

23  needed for aiding and abetting.   *Oster*, 905 N.Y.S.2d at 72.   In *Oster,* the two managers

24  had been convicted of undisclosed fraud felonies.   In this case, Kant knew that Radical

25  Bunny was committing crimes and that Mortgages Ltd. was operating with the proceeds of

26  those crimes.   *Compl.* ¶¶ 18, 133-43.   He nevertheless prepared POMs for Mortgages Ltd.

27  and Radical Bunny without disclosing management's crimes.   *Id.* ¶¶ 17-18, 164-70.   Kant

28  thus actively assisted Radical Bunny and Mortgages Ltd. in misleading the investors.

In other ways as well, Greenberg helped Radical Bunny and Mortgages Ltd. conceal their fraud.   As shown in Parts 1, 2(A)(7), 2(C) and 2(F)(4)(a), *supra*, the following occurred:

- Kant met personally with the Radical Bunny managers to prepare POMs for Radical Bunny to use in continuing sales.  None of the POMs disclosed the past crimes or fraud.

- Kant and Denning tried to evade Radical Bunny's dealer-registration violation by having Hirsch register under Mortgages Ltd. Securities' license.

- Kant and a Greenberg employment lawyer mapped a plan to terminate Furst, a managing director who wanted to blow the whistle on Mortgages Ltd.'s fraud.

- Kant ignored a warning from Furst's attorney at Snell & Wilmer about the regulator's interest in Furst's information.

- Kant created a new product and POM in early 2008.  The new VTL product violated the operating agreements of other LLCs.   The purpose of the VTL Fund was to raise money to loan to the LLCs to mask Mortgages Ltd.'s insolvency.

In all these ways, Greenberg provided substantial assistance to Mortgages Ltd. and Radical Bunny's united fraud.

### c.      Greenberg fails to cite relevant authority.

Judge Bilby's decision in *American Continental,* which *Wells Fargo* relied upon to define the elements of aiding and abetting, involves many parallels to this case.  Judge Bilby there upheld claims for aiding-and-abetting securities violations against securities counsel for an issuer.  The law firm unsuccessfully advanced arguments similar to those Greenberg advances.   It argued, for example, that professional standards requiring preservation of client confidences insulated them from liability.  *See* 794 F. Supp. at 1449-50.  But Judge Bilby concluded that the "line between maintaining a client's confidence and violating the securities laws is brighter than Jones Day [the law firm] suggests." *Id.* at 1452.  He held (quoting in part from E.R. 1.16):

Attorneys must inform a client in a clear and direct manner when its conduct violates the law.  If the client continues the objectionable activity, the lawyer must withdraw "if the representation will result in violation of the rules of

professional conduct or other law."

*Id.* at 1452.  Judge Bilby denied the law firm's motion for summary judgment.  He summarized the law in words that describe precisely the compliant legal services that Greenberg provided for Mortgages Ltd. when Kant continued preparing POMs without disclosing matters such as prior securities-law crimes and huge loan defaults:

> An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue.

*Id.*

The heightened scienter cases that Greenberg cites are inconsistent with *Wells Fargo*.  G. Memo, at 26.  *Wells Fargo* held that while the defendant must know through "general awareness" that he is aiding fraud, there is no intent-to-commit-fraud requirement.  *Wells Fargo* ¶ 45.  *Wells Fargo* was a case against a bank accused of aiding and abetting by nondisclosure.  The Supreme Court assumed that the bank had no duty to the plaintiffs.  *See id.* ¶¶ 15-17.  Yet the Court upheld the aiding-and-abetting claims because everyone is prohibited from participating in fraud, regardless of a legal duty.  *See id.* ¶¶ 18-21, 45 & 58.  The Court explained the knowledge element of aiding and abetting by summarizing an Eighth Circuit decision as having held that a bank can be liable for aiding and abetting a customer when it has "general awareness" of the customer's scheme "notwithstanding the fact that the bank may not have had actual knowledge of the scheme *or an intent to participate in the fraud*."  *Id.* ¶ 45 (emphasis added).

Greenberg also sidesteps Arizona law when it suggests that heightened standards apply to claims against professionals like attorneys.  G. Memo, at 29 n.6.  In *Chalpin*, the Court of Appeals, relying upon the Restatement (Third) of the Law Governing Lawyers § 56 (2000), held that attorneys are liable for aiding and abetting to the same extent as any other person.  220 Ariz. at 424 ¶ 45, 207 P.3d at 677 ¶ 45.  Attorneys thus have "no special privilege against civil suit."  *Id.* at ¶ 44 (quoting Restatement § 56).

Nor is Greenberg correct in suggesting that ethical rules are irrelevant to the standards that apply to attorney liability.  Judge Bilby's quotation of E.R. 1.16 shows just

-30-

the opposite.  The ERs may not create civil liability, but the Preamble that Greenberg quotes also says that "since the Rules establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of care."  *Accord Elliott v. Videan*, 164 Ariz. 113, 116,791 P.2d 639, 642 (App. 1989) (holding that violation of ethical rules is evidence of malpractice).

Ethical Rule 1.2(d) prohibits an attorney from participating in a client's fraud. When the client refuses to end fraudulent conduct, the attorney must disclose the fraud to avoid assisting the fraud through continued representation.  *See* E.R. 4.1(b) (requiring disclosure when "disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by E.R. 1.6.").  Here, disclosure was not prohibited by E.R. 1.6.  *See* E.R. 1.2(d) cmt. 11 (explaining that an attorney may be required to disclose the client's fraud); *Virginia Ethics Op*. 983 (1987) (concluding that in-house counsel could disclose misleading prospectus to the appropriate authorities if company insisted upon using the prospectus); *District of Columbia Ethics Op*. 180 (1987) (similar); *District of Columbia Ethics Op*. 186 (1987) (similar).  Proper disclosure typically means disclosure to industry regulators.  *See District of Columbia Ethics Op.* 180 (reasoning that disclosure should be to government authorities or others who are in a position to prevent the ongoing or future crime); *cf. Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1044 n.4 (11th Cir. 1986) (holding that auditors could satisfy their Rule 10b-5 disclosure duty by disclosure to the SEC).

## G.   The Complaint adequately pleads a fiduciary relationship.

### 1.   The Complaint pleads fiduciary relationships by Mortgages Ltd. and Radical Bunny in three ways.

Lead Plaintiffs have pleaded that Mortgages Ltd. was their manager or agent in connection with their investments.  *Compl*. ¶ 402.  They have also pleaded that Mortgages Ltd. was an agent with fiduciary discretion to act on behalf of its investors.  *Id.*  Likewise, Plaintiffs have pleaded that Radical Bunny was similarly positioned as a manager or agent for Radical Bunny's ventures.  *Id.* ¶ 421.  In addition, Plaintiffs have pleaded a joint

1  venture between Mortgages Ltd. and Radical Bunny under which the two companies acted

2  as managers with fiduciary responsibilities.  *Compl.* ¶¶ 60, 65, 67-68, 70-72, 421.

3         Promoters like Mortgages Ltd. and Radical Bunny owe fiduciary duties to the

4  investors they solicit.  *See Johnson v. Nychyk,* 21 Ariz. App. 186, 188, 517 P.2d 1079,

5  1081 (1974) (holding that promoters stand in a fiduciary relationship to investors from

6  whom they solicit investments).   Managers of investment companies like Mortgages

7  Ltd.'s LLCs are commonly understood to have fiduciary duties.  *See, e.g., Hildebrandt v.*

8  *Indianapolis Life Ins. Co.*, No. CV 08-825-PHX-MMM, 2009 WL 2870024 (N.D. Tex.

9  Sept. 8, 2009) (applying Arizona law in denying motion to dismiss and holding that

10  investment company's alleged superior knowledge and expertise created fiduciary duties

11  to investor class).   Similarly, agents who have discretion and hence power over a

12  principal's affairs are commonly understood to have fiduciary duties.   *See, e.g.,*

13  RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. e (2005).

14         Moreover, even *Standard Chartered,* which Greenberg cites on fiduciary issues,

15  recognizes that a fiduciary relationship may exist when power is entrusted to another.  *See*

16  190 Ariz. at 25, 945 P.2d at 336.  This is especially so when the other party has superior

17  knowledge that "is beyond the fair and reasonable reach of the alleged beneficiary and

18  inaccessible to the alleged beneficiary through the exercise of reasonable diligence."  *Id.* at

19  24, 945 P.2d at 335.   Just such a relationship existed between Radical Bunny and its

20  investors and Mortgages Ltd. and its investors.

21         The Complaint explains that the LLCs' operating agreements gave Mortgages Ltd.

22  exclusive authority on matters like loan quality, loan terms, loan rewrites, and decisions

23  on declaring defaults.  *Compl.* ¶ 337.  Investors had no right to remove Mortgages Ltd.

24  because of disagreements over its business judgment.  *Id.*  Removal was permissible only

25  if Plaintiffs could prove willful misconduct or fraud.  Even then, a supermajority vote of

26  75% of the widely dispersed LLC members was required.  *Id.* ¶ 338.  These allegations

27  show special dependence and vulnerability on the manager that is a defining attribute of

28  fiduciary relationships.   *See Standard Chartered*, 190 Ariz. at 24, 945 P.2d at 335

-32-

(identifying the "intrusting of power" and "superiority of position" as attributes that may establish a fiduciary relationship).

Similar vulnerability is pleaded as to the Radical Bunny investors. Those investors had no direct contact with Mortgages Ltd.; they were dependent on Mortgages Ltd. and the other Radical Bunny managers to properly bundle the deeds of trust that collateralized their investments. The Directions to Purchase represented that Radical Bunny was acting as the investor's agent in loan placement. *See Compl.* ¶ 90 & Exhibit B (Directions to Purchase). And investors had no control over the quality of the deeds of trust that Mortgages Ltd. selected for collateral. *See Compl.* ¶ 82. Much less did they know, as Kant did, that the loans were not in fact collateralized. *See Compl.* ¶¶ 98-100. Nor did they know that the notes allowed payment in kind through assignments of deeds of trust. Nothing but fiduciary duties of good faith and fair dealing prevented Mortgages Ltd. from assigning impaired, defaulted, or otherwise inferior deeds of trust as collateral. This power, and the investor vulnerability it created, alone creates the special relationship needed to impose fiduciary duties on Mortgages Ltd. as a co-promoter in its business venture with Radical Bunny. *See Johnson*, 21 Ariz. App. at 188, 517 P.2d at 1081.

## 2. Lead Plaintiffs have sufficiently pleaded a joint venture between co-promoters.

Lead Plaintiffs have also sufficiently pleaded a joint-venture relationship. Mortgages Ltd. and Radical Bunny were each operating as co-promoters soliciting hundreds of millions of dollars for Mortgages Ltd.'s operations. The pleaded facts describe a joint enterprise to sell securities to finance Mortgages Ltd. *Compl.* ¶¶ 55-121. As part of the joint venture, Mortgages Ltd. allowed Radical Bunny's managers to attend Mortgages Ltd.'s management meetings (¶ 68) and provided Radical Bunny's managers with Mortgages Ltd.'s internal financial information and management reports, as well as Mayer Hoffman audited financials. *Id.* The economic interdependence of the two companies is also pleaded. *Id.* ¶¶ 73-75. The companies exchanged investor referrals. *Id.* ¶ 76. Some investors held both Radical Bunny and Mortgages Ltd. investments *Id.* The

1   exchange of services between the companies is also described.  Radical Bunny provided

2   accounting and trustee services for Coles and Mortgages Ltd.  *Id.* ¶ 70.  And Mortgages

3   Ltd. made its securities attorney, Kant, available to Radical Bunny.  *Id.* ¶ 71.

4        Contrary to Rule 12(b)(6) standards, Greenberg simply argues the facts and

5   predicts that Plaintiffs ultimately cannot prove an equal right of control or profit sharing.

6   G. Memo, at 15-16, 27-28.  Lead Plaintiffs' allegations, however, are to the contrary.

7   Plaintiffs allege that Radical Bunny was selling fixed-income securities to Mortgages Ltd.

8   and retaining 2% of the interest for its services.  *Compl.* ¶¶ 61, 64.  This is profit sharing.

9   The success and loss sharing of the companies was also intertwined because Mortgages

10  Ltd. was allowed to pay its debt by assigning portions of its portfolio of deeds of trust.

11  Radical Bunny and its investors thus shared the risk of loss on the loans that Mortgages

12  Ltd. originated.  Furthermore, sharing in losses does not require sharing monetary losses.

13  *See Ellingson v. Sloan*, 22 Ariz. App. 383, 386, 527 P.2d 1100, 1103 (1974) (holding that

14  losses are not limited to monetary losses; they also include time expenditures and out-of-

15  pocket expenses).  Clearly, Mortgages Ltd. and Radical Bunny were both contributing

16  time and expenses in selling the securities needed to finance Mortgages Ltd.'s business.

17  Plaintiffs' allegations are sufficient, particularly given the numerous Arizona cases that

18  recognize a joint venture regardless of whether profits and losses are shared.  *See Finegan*

19  *v. Autotransportes Tufesa S.A. De C.V.*, No. CV 07-693-TUC-FRZ, 2009 WL 331349, at

20  *3-4 (D. Ariz. Feb. 11, 2009) (concluding that sharing profits and losses is not needed and

21  collecting the Arizona cases).

22        Equal control does not require equivalent control.  *In re Estate of Hernandez,* 187

23  Ariz. 506, 510 930 P.2d 1309, 1313 (1997) ("[I]t is sufficient that a venturer has some

24  voice or right to be heard in the control and management of the venture.")  Nor does the

25  right-of-control element prohibit joint venturers from allocating or delegating

26  management or control among themselves.  *See Ellingson*, 22 Ariz. App. at 386-87 n.1,

27  527 P.2d at 1103-04 n.1.  There is no requirement that Radical Bunny or Mortgages Ltd.

28  control every employee or aspect of one another's business.  *See id.*; *Continental Casualty*

*Co. v. Signal Ins. Co.*, 119 Ariz. 234, 237, 580 P.2d 372, 375 (App. 1978) (recognizing the right to delegate duties and control in a venture where the venturers "agreed to operate their own [carnival] rides and attend to their own employees.").

### H.   The Complaint properly states a claim for negligent misrepresentation.

Greenberg's no-duty argument has already been refuted above.  *See, e.g., supra* at 2(B)(3) (discussing the duties of securities counsel and the inapplicability of the *Miller* case).  The *Paradigm* case that Greenberg cites for the general rule undermines its own argument.  *Paradigm* holds that there are a "myriad" of special circumstances in which attorneys owe duties to non-clients.  200 Ariz. at 154 ¶ 27, 24 P.3d at 601 ¶ 27.  The special duties of securities counsel for issuers to investigate and detect misleading statements and omissions in offering documents is one such example.  *See O'Melveny*, 969 F.2d at 749.  The duty is a duty owed to both the issuer and its investors.  *Id.*, 969 F.2d at 749.

No ethical conflict divides the attorney's loyalties to the issuer and the attorney's duties to investors.  The interests of the issuer and its investors are aligned.  In the "high specialty field" of securities counsel, attorneys owe duties to both the company marketing securities and to its investors.  *O'Melveny*, 969 F.2d at 749.  The issuer has a duty to avoid misleading disclosure, and its securities counsel is duty-bound to help fulfill that duty by making a "reasonable, independent investigation to detect and correct false or misleading materials."  *Id.* (quoting *Felts v. Nat'l Account Sys. Assoc., Inc.*, 469 F. Supp. 54, 67 (N.D. Miss. 1978).  The disclosure interests of investors and the issuer, at least if the issuer is honest, are thus aligned.  *See id.*; *Am. Cont'l*, 794 F. Supp. 1424, 1452 (D. Ariz. 1992) (rejecting securities counsel's claim that client-confidentiality excused firm's failure to insist that client comply with securities laws).  *See also* E.R. 1.2(d) & cmt. 11 (explaining that attorneys must avoid drafting fraudulent documents and that attorneys may be required to disaffirm documents and to disclose a client's ongoing fraud or crime).

None of this was new to Kant.  As alleged in Paragraph 187, Kant was familiar with the ABA Statement of Policy on Lawyer's Responses to Auditor Requests.  That

1    Statement provides that, "[A] lawyer has an obligation not knowingly to participate in any

2    violation by the client of the securities laws."  And it explains that a "lawyer may also be

3    required . . . to resign his engagement if his advice concerning disclosure is disregarded by

4    the client."  *Compl.* ¶ 187.

5           It is of no consequence that Greenberg did not meet or have direct contact with

6    investors.  Arizona has long rejected privity in negligent misrepresentation and other tort

7    cases.  *See Standard Chartered*, 190 Ariz. at 28, 945 P.2d at 339.

8           Greenberg argues that Plaintiffs fail to allege that they relied on any POM.  G.

9    Memo, at 34.  But in the very next paragraph, Greenberg concedes that the Complaint

10   pleads that Plaintiffs "justifiably relied" on false information.  *Id.*  Rather than accept this

11   allegation, Greenberg makes its stock argument that Plaintiffs need to plead *more* facts.

12   But why?  Greenberg cites no case requiring fact pleading for reliance on a negligent

13   misrepresentation claim.  More important, misrepresentations concerning matters like the

14   existence of security for the note participations sold to Radical Bunny's investors and the

15   false representation of a Regulation D exemption to investors are material on their face.

16   And failure to disclose insolvency or that a business is operating at a loss is material as a

17   matter of law.  *See Strom v. Black,* 22 Ariz. App. 102, 104-05, 523 P.2d 1339, 1341-42

18   (1974).  In Arizona, justifiable reliance is presumed when the facts are material.  *See St.*

19   *Josephs Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 316, 742 P.2d 808, 817

20   (App. 1987); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940,

21   952 (9th Cir. 2005) (reversing Rule 12(b)(6) trial court ruling that decided justifiable

22   reliance on 12(b)(6) motion); *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1123 n.8 (D. Ariz.

23   2009) (holding on reconsideration that the plaintiff's justifiable reliance should not be

24   decided on a Rule 12(b)(6) motion).  Accordingly, at this stage of the case, Lead Plaintiffs

25   have properly pleaded an actionable claim for negligent misrepresentation.

26   **I.    The Complaint properly pleads a claim for fraud under the Investment**
         **Management Act.**

27   Arizona's Investment Management Act ("AzIMA") has both registration and

28

-36-

1   antifraud provisions.  Lead Plaintiffs have sued under the antifraud statute, A.R.S. § 44-

2   3241(A)-(B).  Lead Plaintiffs do not contest that AzIMA claims that arise more than three-

3   years after the violations are barred by § 44-3241(B).

4          The Complaint pleads an investment advisory relationship between Plaintiffs

5   Facciola and Reznik in connection with the managing directors who operated as their

6   brokers or investment advisers.  *Id.* ¶ 438.  The Complaint pleads a similar investment-

7   advisory relationship between the Radical Bunny investors and the Radical Bunny

8   managers (the Hirsch Defendants) who used the audited financials and other financial and

9   management materials from Mortgages Ltd. to recommend investments to Radical Bunny

10  investors.  *Id.* ¶¶ 68-69, 438.

11         As it does so often, Greenberg simply argues the facts concerning the investment

12  advisory relationships alleged in the Complaint.  *See* G. Memo, at 118-19.  That is

13  improper.  The Complaint describes the investment advisory services.  *Compl.* ¶ 438.  It is

14  plausible if not near irrefutable that the in-house brokers Mortgages Ltd. used to sell its

15  products were providing investment advisory services.  *See id.* ¶¶ 73-83.  It is equally

16  plausible that as promoters using Mayer Hoffman's audits to solicit investments, the

17  Hirsch Defendants were soliciting and selling while providing investment advisory

18  services.  *See id.* ¶¶ 68-69.  *See* further discussion of the SEC and ACC findings on the

19  investment services in Plaintiffs' Response to the Auditors' MTD.

20         The scope of Greenberg's liability under the AzIMA is defined by the express-

21  liability provisions of that statute.  The AzIMA and the Securities Act are related acts.

22  They supplement one another in prohibiting fraud in securities and other investment

23  transactions.  As related acts, they should be construed *in pari materia*.  They are both

24  remedial acts designed for investor protection and as such should both be read broadly.

25  *See Bullard v. Garvin*, 1 Ariz. App. 249, 251, 401 P.2d 417, 419 (1965).

26         By its terms, § 44-3241(A) applies to any person, not just investment advisers or

27  persons providing investment services.  It prohibits all such persons from "directly or

28  indirectly" engaging in fraudulent acts, practices, or misleading statements "in connection

-37-

with" a transaction involving investment advisory services.  Much like § 44-1991(A), the words "directly or indirectly" and "in connection with" are designed to broadly sweep within the statute persons who engage in fraudulent acts or omissions in connection with investment advisory services.  *See Grant v. Arthur Andersen, LLP*, No. CV1999-019093, 2001 WL 35976018 (Ariz. Super. Ct. Feb. 16, 2001) (upholding claim against auditor for violations of AzIMA).

The same misleading acts, omissions, and practices that are described in connection with the § 44-1991(A) claims apply to Greenberg's conduct under the AzIMA.  Preparing misleading POMs that omitted the facts described in Paragraph 86 of the Complaint and contained the misleading Risk Disclosures described in Paragraph 206 is one example.  Providing simultaneous securities advice to both Mortgages Ltd. and Radical Bunny without insisting that both companies disclose Radical Bunny past and ongoing fraud and securities-law crimes is another.  Likewise, providing compliant legal services, including drafting new POMs for both Mortgages Ltd. and Radical Bunny's affiliates that papered over past crimes without disclosure, amounts to active participation in a fraudulent course of business involving investment advisory services.

**J.       The text of § 44-3241 supports aiding-and-abetting liability.**

The language of § 44-3241(A) is broad enough to cover persons who knowingly assist fraudulent advisory services.  Like § 44-1991(A), § 44-3241(A) is expansively worded ("directly or indirectly") to reach indirect violators as well as direct violators.  *See Barnes*, 113 Ariz. at 274, 550 P.2d at 1075 (holding defendants liable for indirect fraud under the Securities Act).  Similarly, the "in connection with" phrase broadens the range of liability to eliminate any privity-like requirement that would require the Defendants to actually know or meet the investors.  *Cf. McGann v. Ernst & Young,* 95 F.3d 821, 824-26 (9th Cir. 1996) (interpreting Rule 10b-5).  It is enough that the defendants' fraudulent conduct is "reasonably calculated to influence the investing public."  *Id.* at 828.

A third part of the statute also expands the range of the prohibited conduct and potentially liable actors, through its use of the word "transaction."  Rather than merely

prohibit fraudulent investment advisory services, the statute covers "transactions . . . involving the provision of investment advisory services." *See* A.R.S. § 44-3241(A).

When read as a whole, § 44-3241(A) prohibits fraudulent acts, omissions, or statements that are made "directly or indirectly" "in connection with" a "transaction . . . involving investment advisory services."   This is sweeping language which, liberally construed as it must be to fulfill the statute's remedial goals, easily encompasses fraud by persons who knowingly provide substantial assistance to an investment adviser or other person providing investment advisory services.

In sum, the elements of aiding and abetting a primary violation—knowledge of the violation and providing substantial assistance or encouragement—follow textually from the § 44-3241(A)'s express terms.  Knowingly providing substantial assistance to a person who is providing fraudulent investment advisory services is indirectly committing fraudulent investment advisory services.  *Cf. Barnes*, 113 Ariz. at 274, 550 P.2d at 1075 (holding defendants liable for indirectly violating § 44-1991).

**3.     Conclusion**

For these reasons, Greenberg's motion to dismiss should be denied in its entirety. Alternatively, Lead Plaintiffs respectfully request leave to amend to cure any pleading deficiencies perceived by the Court.

1    Dated:  September 20, 2010.

2                                    **Tiffany & Bosco, P.A.**

3

4                                    By:   _/s/ Richard G. Himelrick_

5                                          Richard G. Himelrick
                                           J. James Christian
6                                          Third Floor Camelback Esplanade II
                                           2525 East Camelback Road
7                                          Phoenix, Arizona 85016-4237

8                                          Attorneys for Plaintiffs Robert Facciola; The
                                           Robert Maurice Facciola Trust Dated December
9                                          2, 1994; Honeylou C. Reznik; The Morris
                                           Reznik and Honeylou C. Reznik Trust; Jewel
10                                         Box Loan Company, Inc.; Jewel Box, Inc.; H-M
                                           Investments, LLC

11                                   Andrew S. Friedman
                                     **Bonnett, Fairbourn, Friedman**
12                                   **& Balint, P.C.**
                                     2901 N. Central Avenue
13                                   Suite 1000
                                     Phoenix, Arizona 85012
14
                                     Attorneys for Plaintiffs Fred C. Hagel and Jacqueline
15                                   M. Hagel Revocable Living Trust Dated March 15,
                                     1995; Judith A. Baker
16

17

18

19

20

21

22

23

24

25

26

27

28

1

CERTIFICATE OF SERVICE

2

I hereby certify that on September 20, 2010, I electronically filed the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such

4

filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby

5

certify that I will mail the foregoing document or paper via the United States Postal

6

Service to the non-CM/ECF participants indicated on the Manual Notice list.

7

I certify under penalty of perjury under the laws of the United States of America

8

that the foregoing is true and correct.

9

10

 s/ *J. James Christian*

11

J. James Christian

12

13

#15283-1  441314.doc

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-41-