Richard G. Himelrick, #004738
J. James Christian, #023614
**Tiffany & Bosco, P.A.**
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

Attorneys for Plaintiffs Robert Facciola; The Robert Maurice
Facciola Trust Dated December 2, 1994; Honeylou C. Reznik;
The Morris Reznik and Honeylou C. Reznik Trust; Jewel Box
Loan Company, Inc.; Jewel Box, Inc.; H-M Investments, LLC

Andrew S. Friedman, #005425
**Bonnett, Fairbourn, Friedman & Balint, P.C.**
2901 N. Central Avenue. Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com

Attorneys for Plaintiffs Fred C. Hagel and Jacqueline M. Hagel
Revocable Living Trust Dated March 15, 1995; Judith A. Baker

# United States District Court

## District of Arizona

| | |
|---|---|
| Robert Facciola, et al., | No. 2:10-cv-01025-MHM |
| Plaintiffs, | |
| vs. | **Lead Plaintiffs' Response to Defendant Quarles & Brady LLP's Motion to Dismiss** |
| Greenberg Traurig, LLP, et al., | |
| Defendants. | |

## Table of Contents

1.  Introduction ............................................................................................1

2.  Summary of Lead Plaintiffs' Claims Against Quarles ...........................1

3.  Applicable Pleading Standard ..............................................................7

4.  Legal Argument......................................................................................8

   A. The Hoffmann transcript and exhibits must be disregarded............8

   B. Lead Plaintiffs nevertheless state actionable claims against Quarles...............9

      1.  Lead Plaintiffs have alleged an actionable primary liability
          Claim against Quarles under Section 1991...........................11

         a.  Quarles' conduct violated Section 1991...................................11

         b.  There is no need to parse Quarles' status under Section
             2003(A)...................................................................13

         c.  Lead Plaintiffs have nevertheless alleged actionable
             claims against Quarles under Section 2003(A) ........................14

             i.      Quarles "induced" the ongoing sales to the
                     investors .................................................14

             ii.     Quarles "participated in" the ongoing sales to
                     the investors ............................................15

             iii.    The "course of professional capacity" exclusion
                     to "participation" liability is not applicable as
                     a matter of law ..........................................17

         d.  Lead Plaintiffs have alleged a "strong inference" of
             Quarles' *scienter* under Section 1991(A)(1) ...........................20

      2.  Lead Plaintiffs have alleged actionable claims against Quarles
          under the Arizona Investment Management Act.................................20

      3.  Lead Plaintiffs have alleged actionable "aiding and abetting"
          claims against Quarles ...................................................22

      4.  Lead Plaintiffs have alleged an actionable claim for negligent
          misrepresentation and nondisclosure...................................26

   C. Lead Plaintiffs have alleged plausible claims with ample particularity
      under Rule 9(b) ...........................................................28

5.  Conclusion............................................................................29

**Table of Authorities**
**Cases**

*Ashcroft v. Iqbal*, ___U.S. ___, 129 S.Ct. 1937 (2009) .......................................7

*Aetna Cas. & Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519 (6th Cir. 2000) ...........24

*Affiliated UTE Citizens of Utah v. U.S.,* 406 U.S. 128 (1972) .........................................27

*Barnes v. Vozack*, 113 Ariz. 269, 550 P.2d 1070 (1976) .........................................13, 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................7, 28

*Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC,  2010 WL 1526394
    (N.D.Cal. Ap. 15, 2010) .......................................................................................26

*Bosse v. Crowell Collier and Macmillian*, 565 F.2d 602 (9th Cir. 1977) .........................8

*Camp v. Dema*, 948 F.2d 455 (8th Cir. 1991) ...............................................................24

*Chalpin v. Snyder*, 220 Ariz. 413, 207 P.3d 666 (App. 2008) .........................................26

*Dawson v. Withycombe*, 216 Ariz. 84, 163 P.3d 1034 (Ct. App. 2007) ...........................23

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .........................29

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................................................7

*Fed. Deposit Ins. Corp. v. O'Melveny & Myers,* 969 F.2d 744
    (9th Cir. 1992) .............................................................................................4, 19, 27

*Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824  (8th Cir. 2003) .....................................28

*Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200 (C.D. Cal. 2006) ................24

*Grand v. Nacchio ("Grand I")*, 222 Ariz. 498, 217 P.3d 1203 (App. 2009) .................15

*Grand v. Nacchio ("Grand II")*, 225 Ariz. 171, 236 P.3d 398 (2010) ....................passim

*Hines v. FiServ, Inc.*, No. 8:08-cv02569-T-30AEP, 2010 WL 1249838
    (M.D. Fla. Mar. 25, 2010) ...................................................................................24

*Howard v. Everex Systems*, 228 F.3d 1057 (9th Cir. 2000) ...........................................17

*In re Am. Cont'l Corp/Lincoln Sav. and Loan Sec. Litig.*, 794 F. Supp. 1424
    (D. Ariz. 1992) .........................................................................................3, 18, 25

*In re Am. Microtel, Inc.*, No. S-2885-I, 1992 WL 409823
    (Ariz. Corp. Comm'n Dec. 9, 1992) ...............................................................13, 23

*In re Arthur Andersen L.L.P.*, No. S-03386A-00-0000, 2000 WL 35730980
    (Ariz. Corp. Comm'n Sept. 27, 2000) ..................................................................23

*In re John Edward Tencza*, No. S-20483A-06-0661, 2007 WL 2478687
    (Ariz. Corp. Comm'n Aug. 13, 2007) .................................................................. 23

*In re Judith Mario Otto*, No. S-2896-I, 1993 WL 353421
    (Ariz. Corp. Comm'n Aug. 11, 1993) ............................................................ 12, 17

*In re Lost Dutchman Invs., Inc.*, No. S-2299-I, 1993 WL 173726
    (Ariz. Corp. Comm'n Apr. 8, 1993) ................................................................... 13

*In re Radical Bunny, L.L.C.*, Arizona Corporation Commission,
    Docket No. S-20660A-09-0107 .......................................................................... 2

*In re Sharp*, 802 So.2d 588 (La. 2001) ...................................................................... 18

*In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615 (9th Cir. 1994) .......................... 11

*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*,
    113 F.3d 1484 (8th Cir. 1997) ........................................................................... 25

*In re William R. Carter & Charles J. Johnson*, 74 S.E.C. 471,
    1981 WL 384414 (Feb. 28, 1981) .................................................................... 3, 17

*Koehler v. Pulvers*, 614 F. Supp. 829, 843-44 (S.D. Cal. 1985) ..................................... 12

*Kronenberg v. Katz*, 872 A.2d 568  (Del. Ch. 2004) ...................................................... 5

*Little v. First Cal. Co.*, No. Civ. 74-71 Phx, 1977 WL 1055
    (D. Ariz. Oct. 17, 1977) ..................................................................................... 16

*Lopes v. Vieira*, 543 F. Supp. 2d  1149 (E.D. Cal. 2008) ................................................ 12

*Metge v. Baehler*, 762 F.2d 621  (8th Cir. 1985) .......................................................... 25

*Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009) .............................................. 7

*Nathel v. Siegel*, 592 F. Supp. 2d 452 (S.D.N.Y. 2008) ................................................ 26

*N.Y. City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987
    (N.D. Cal. 2009) ............................................................................................... 12

*Oster v. Kirshner*, 905 N.Y.S.2d 69 (App. Div. 2010) ....................................... 24, 26, 28

*Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144
    (2d Cir. 2010) ................................................................................................... 15

*Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 200 Ariz. 146,
    24 P.3d 593 (2001) ........................................................................................... 27

*Rhoads v. Wash. Mut. Bank, F.A.*, No. CV10-0197-PHX-NVW,
    2010 WL 1408888 (D. Ariz. Apr. 7, 2010) .......................................................... 7

*Rose v. Dobras*, 128 Ariz. 209, 624 P.2d 887 (App. 1981) ............................................ 16

*Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040 (11th Cir. 1986) ...................... 13, 26

*SEC v. Collins & Aikman*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ................................. 12

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) ......................................................... 3, 19, 20, 23

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ................................................. 5, 12, 17

*SEC v. Nacchio,* 614 F. Supp. 2d 1164 (D. Colo. 2009) .................................... 25

*Security Title Agency, Inc. v. Pope*, 219 Ariz. 480,  200 P.3d 977
   (App. 2008) ....................................................................................... 23, 26

*St Josephs Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307,
   742 P.2d 808 (1987) .................................................................................. 27

*Standard Chartered, PLC v. Price Waterhouse,* 190 Ariz. 6, 945 P.2d 317
   (App. 1997) ............................................................................................ 15

*State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 726 P.2d 215
   (App. 1986) ............................................................................................. 28

*State ex rel. Okla. Bar Ass'n v. Golden*, 201 P.3d 862 (Okla. 2008) ................ 19

*Stern v. Charles Schwab & Co.*, No. CV-09-1229-PHX-DGC,
   2009 WL 3352408 (D. Ariz. Oct. 16, 2009) ................................... 24, 26

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.,*
   633 F. Supp. 2d 763 (D. Ariz. 2009) ........................................................ 8

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.,*
   690 F. Supp. 2d 959 (D. Ariz. 2010) ........................................................ 8

*Thompson v. Paul*, 657 F. Supp. 2d 1113 (D. Ariz. 2009) .............................. 27

*Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 733 P.2d 1131 (App. 1986) .......... 16, 27

*Walters v. U.S.*, 256 F.2d 840 (9th Cir. 1958) .................................................. 12

*Wells Fargo Bank v. Arizona Laborer and Teamsters*, 201 Ariz. 474,
   38 P.3d 12 (2002) ........................................................................... 23, 24, 25

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975) ................... 25

*YF Trust v. JP Morgan Chase Bank,* No. CV 07-567-PHX-MHM ,
   2008 WL 821856 (D. Ariz. March 26, 2008) ...................................... 8, 28

### Statutes

A.R.S. § 44-1991 ................................................................................... passim

A.R.S. § 44-2003 ................................................................................... passim

15 U.S.C. §77l ................................................................................................. 11

17 C.F.R. § 240.10b-5 ("Rule 10b-5") ................................................ 11, 12, 13

Ariz. R. of Prof. Conduct, E.R. 1.16 ...................................................................18

Ariz. R. of Prof. Conduct, E.R. 1.2 .....................................................................18

Ariz. R. of Prof. Conduct, E.R. 1.6 ..............................................................18, 19

Ariz. R. of Prof. Conduct, E.R. 4.1 ..............................................................18, 19

Fed. R. Civ. P. 9(b).........................................................................................7, 28

## Additional Authorities

RESTATEMENT (SECOND) OF TORTS §552 (1977)....................................................27

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 56 (2000) ......................26

*Ariz. Ethics Op.* 01-04 (Mar. 2001)....................................................................18

*Ariz. Ethics Op*. 91-02 (Jan. 1991) ....................................................................19

*District of Columbia Ethics Op*. 180 (1987) ......................................................19

*District of Columbia Ethics Op*. 186 (1987) ......................................................19

*Virginia Ethics Op.* 983 (1987) .........................................................................19

ABA/BNA Lawyers' Manual on Professional Conduct § 91:2414 ..................19

American Bar Association, *Statement of Policy Regarding Lawyers'
     Responses to Auditors' Requests for Information*, 1, 10 (1976) ...........17

HIMELRICK & SCHULMAN, ARIZONA SECURITIES FRAUD LIABILITY:
     STATUTORY AND COMMON-LAW REMEDIES, § 5.1.3.2
     (Arizona State Bar 3d ed. 2009)...................................................22

Martin I. Kaminsky, *Post-Transaction Evidence in Securities Litigation,*
     19 B.C. L. REV. 617 (1978) ................................................................17

1. **Introduction**

In its bid for summary dismissal from this action, Defendant Quarles & Brady LLP ("Quarles") (a) grossly understates its alleged role in the unlawful and fraudulent sale of securities to both the Radical Bunny investors and the Mortgages Ltd. investors, (b) severely overstates Lead Plaintiffs' pleading requirements following the Arizona Supreme Court's recent holding in *Grand v. Nacchio*, 225 Ariz. 171, 236 P.3d 398 ("*Grand II*"), and (c) squarely contradicts the allegations of Lead Plaintiffs' Complaint ("*Compl.*") using a statement given by Quarles' attorney Christian Hoffmann ("Hoffmann") to the federal Securities Exchange Commission ("SEC") that –

    (1)    is not properly considered on a motion to dismiss,

    (2)    completely ignores the actions of other Quarles attorneys to whom Hoffmann says the representation was turned over after June 2007, and

    (3)    is in any event is genuinely disputed.

For each and all of these reasons addressed in further detail below, Quarles' Motion to Dismiss Lead Plaintiffs' Complaint [Dkt. # 75-1] ("Q. Memo") is not well-taken and should be denied in its entirety.

2. **Summary of Lead Plaintiffs' Claims Against Quarles**

Quarles' alleged liability rests on far more than just turning a "blind eye" on the unlawful joint fundraising activity by Radical Bunny and Mortgages Ltd., as Quarles contends.  To the contrary, Lead Plaintiffs' Complaint lays out in painstaking detail how Quarles – with knowledge of past and ongoing *criminally* fraudulent securities sales – acted in concert with Radical Bunny, with Mortgages Ltd., and with Mortgages Ltd.'s counsel Greenberg Traurig, LLP ("Greenberg") to mislead *both* Radical Bunny investors and Mortgages Ltd. investors into investing millions of dollars in one of the largest fraudulent schemes in Arizona history.[1]

---

[1] A detailed narrative of Quarles' actions is set forth in the attached Exhibit A, which illustrates the additional factual detail that could be added by Lead Plaintiffs should the Court in any way conclude that the factual allegations of the Complaint lack sufficient particularity as to Quarles.

1    Upon its initial retention by Radical Bunny, Quarles quickly recognized that

2  Radical Bunny's managers ("the Hirsch Defendants") had raised some $140 million

3  through the unlicensed sale of unregistered mortgage-backed securities of Mortgages Ltd.

4  to unaccredited investors, securities which Radical Bunny furthermore had falsely

5  portrayed as collateralized by a non-existent security interest in Mortgages Ltd. "deeds of

6  trust." *Compl.* ¶¶ 251-52, 277-281.  Quarles also sensed the "Ponzi-scheme feel" to

7  Radical Bunny's relationship with Mortgages Ltd..  *Id.* ¶¶ 20, 250.  On May 2, 2007,

8  Quarles advised the Hirsch Defendants that Radical Bunny's securities sales had been

9  unlawful and fraudulent, and advised them to retain criminal counsel. *Id.* ¶¶ 152-53, 254.

10 Accordingly, there is no dispute that *all* of Quarles' subsequent actions were taken with

11 *actual knowledge* of the prior criminal and fraudulent misconduct. *Id.* ¶¶ 255, 256.

12   What happened next is disputed (although Quarles faces liability under either

13 version of events).

14   Hoffmann contends that he *orally* told Radical Bunny that it must stop selling the

15 securities, must make disclosure to the existing investors and to the government

16 regulators, and must offer rescission to the Radical Bunny investors.  *Compl.* ¶ 153; Q.

17 Memo, at 14:13-15.  There is, however, absolutely no written communication to Radical

18 Bunny memorializing any such momentous imperatives – and Radical Bunny *denies*

19 Quarles said any such thing.  *Compl.* ¶ 153.  Indeed, in a declaration filed with the

20 Arizona Corporation Commission just days before the filing of the Complaint, Radical

21 Bunny manager Tom Hirsch testified:

> In the fourth quarter in 2006, a concern was raised as to whether Radical
> Bunny was required to take some action under the Securities laws.  Radical
> Bunny interviewed a variety of lawyers.  Radical Bunny eventually hired
> Quarles & Brady.  The entire representation proceeded along the lines of
> what action was necessary to "fix" any problems Radical Bunny may have
> had.  *No lawyer ever told [Radical Bunny's managers] to stop taking
> participants money.*[2]

---

[2]   Declaration of Tom Hirsch, filed April 30, 2010, in *In re Radical Bunny, L.L.C.*, Arizona Corporation Commission, Docket No. S-20660A-09-0107, copy attached as Exhibit B.  This testimony will be used should the Court require Lead Plaintiffs to allege Radical Bunny's contravention of Quarles' contentions with more specificity.

What actually took place remains for fulsome discovery and trial.  What is undisputed, though, is that Radical Bunny unequivocally indicated to Quarles that had *no intention* of making *any* disclosure to investors or to regulators, yet nevertheless sought Quarles' assistance "going forward."  *See, e.g., Compl.* ¶¶ 22, 153-55, 255.

No non-fraudulent future securities offering could possibly be made without disclosure of the past crimes.  *SEC v. Fehn*, 97 F.3d 1276, 1289-91 (9th Cir. 1996) (failure to disclose contingent liabilities stemming from earlier securities-law violations itself constituted securities fraud).  Likewise, as Quarles concedes, "no securities could be sold to new investors until Radical Bunny obtained a perfected security interest in Mortgages Ltd.'s loans."  Q. Memo, at 5:17-18.

Once informed of the intended concealment of the criminal and fraudulent fundraising activities, Quarles was obligated to insist upon disclosure before any further participation on its part.  *In re William R. Carter & Charles J. Johnson*, 74 S.E.C. 471, 1981 WL 384414, at *30 (Feb. 28, 1981) ("When a lawyer with significant responsibilities in the effectuation of a company's compliance with the disclosure requirements of the federal securities laws becomes aware that his client is engaged in a substantial and continuing failure to satisfy those disclosure requirements, his continued participation violates professional standards unless he takes prompt steps to end the client's noncompliance."); *see also Fehn*, 97 F.3d at 1293-95 (securities counsel "substantially assisted" client by rendering legal services without the disclosure of earlier securities law violations; *In re Am. Cont'l Corp.*, 794 F. Supp. 1424, 1453 (D. Ariz. 1992) ("Where a law firm believes the management of a corporate client is committing serious regulatory violations, the firm has an obligation to actively discuss the violative conduct, urge cessation of the activity, and withdraw from representation where the firm's legal services may contribute to the continuation of such conduct.").

Quarles neither withdrew nor disclosed.  Instead, in May 2007 Quarles agreed to represent Radical Bunny on a "going forward" basis, even though it knew that Radical Bunny was operating as an unlicensed securities dealer for Mortgages Ltd..  *Compl.* ¶¶

-3-

147, 152, 155.  Quarles completely acquiesced in Radical Bunny's refusal to disclose the past misconduct, and furthermore, in the face of that refusal, undertook to assist Radical Bunny and Mortgages Ltd. in developing ways to retain the illegally raised funds while raising *new funds* – all *without* disclosure to the regulators or to any investors, old or new. *Id.* ¶¶ 155, 260.  In particular, Quarles attorney Robert Moya, who Hoffmann says took over for him in about June 2007, was at least twice told by Greenberg attorney Robert Kant that Radical Bunny was continuing to raise funds in an unlawful manner: once at an August 13, 2007 meeting (in which Kant, with Moya's concurrence, candidly told the Hirsch Defendants that "people go to jail" for raising funds as Radical Bunny was doing), and once in a September 8, 2007 e-mail (reminding Moya that Radical Bunny was "still operating in a questionable manner").  *Compl.* ¶¶ 161, 286.

Quarles nevertheless agreed to represent Radical Bunny as an issuer, undertaking to review "new materials being used by Radical Bunny" to solicit investors, and later to draft Radical Bunny's own private-offering memorandum ("POM").  *Compl.* ¶¶ 184, 257-76. Quarles thereby assumed still further duties of disclosure to both Radical Bunny and its investors.  *F.D.I.C. v. O'Melveny & Myers,* 969 F.2d 744, 748-49 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994) (securities counsel for an issuer owes duties both to client and to investors).  But that is not all.  Quarles also simultaneously worked with Mortgages Ltd.'s counsel to restructure the Mortgages Ltd.-Radical Bunny relationship in an attempt to "legalize" the earlier sales and to retroactively collateralize the earlier investments.  *Compl.* ¶¶ 277-91; Q. Memo at 7:4.  Quarles furthermore and supplied Radical Bunny with interim language to use pending the restructuring – language that, once again, *did not* disclose the past illegal sales or the lack of collateral.  *Id.* ¶¶ 259-60.

Even more astounding, despite the fact that it knew of Radical Bunny's refusal to disclose its past crimes and demonstrated lack of management integrity, Quarles allowed Radical Bunny to announce at several semi-annual investor meetings that Quarles was assisting Radical Bunny in connection with its investment offerings, and even counseled Radical Bunny as to what its investors should be told at those meetings – gatherings at

which the fraud was concealed as new funds were solicited.  *Compl.* ¶¶ 261-64, 272, 275.

In particular, Quarles agreed that Radical Bunny could tell its investors at the May 2007

meeting that Quarles was acting as Radical Bunny's securities counsel.  *Id.*  ¶ 262.  In this

way, Quarles linked itself to Radical Bunny's lack of integrity – unquestionably a matter

of material interest to Radical Bunny and Mortgages Ltd. investors – compounding the

non-disclosure of the past criminality and fraud.  *Cf. Kronenberg v. Katz*, 872 A.2d 568,

586 (Del. Ch. 2004) ("[N]o reasonable investor would  have proceeded to invest in [the

company] if she knew that one of the key fiduciaries" had a criminal background).

Quarles' alleged continued assistance to a client known to be engaging in

continuing criminal and fraudulent conduct is by definition conduct *beyond* the ordinary

course of actions taken in a professional capacity, easily amounting to its plausible

"substantial participation" in or "substantial assistance" with an ongoing fraudulent

scheme.  *SEC v. Holschuh*, 694 F.2d 130, 143-44 (7th Cir. 1982) (post-sale efforts were

properly considered as part of the scheme).  And Quarles does not contest Lead Plaintiffs'

allegation that the Mortgages Ltd. securities sold by Mortgages Ltd. and those sold by

Radical Bunny constituted an integrated offering.  *Compl.* ¶¶ 73-83.  Certainly it is a

reasonable inference that an experienced, 35-year securities attorney like Moya (*id.* ¶ 150)

understood the law of integration, and thus knew that the Mortgages Ltd. and Radical

Bunny securities sales would be deemed integrated for purposes of registration and

disclosure.  *See* Lead Plaintiffs' Response to Greenberg Motion, at 18-20.

The fundamental factual premise to Quarles' Motion to Dismiss – that it

supposedly did not know of the continued securities sales by Radical Bunny and

Mortgages Ltd. – is not only squarely disputed by Lead Plaintiffs' allegations, it is

completely implausible.   During the course of its representation, Quarles attorneys

watched as the sums raised for Mortgages Ltd. by Radical Bunny continued to grow:

- On January 25, 2007, Quarles was told that over 700 investors had invested $139 million in Radical Bunny, with $4-5 million coming in each month.  *Compl.* ¶¶ 145, 147.

- On March 1, 2007, Radical Bunny provided Quarles a loan list

showing that $144.5 million dollars had been loaned to Mortgages Ltd. and that none of the principal had been repaid. *Id.* ¶ 249.

- On May 10, 2007, Quarles sent a Security Agreement to Greenberg acknowledging that the notes payable from Mortgages Ltd. to Radical Bunny had swelled to $152 million, consistent with the prior forecast. *Id.* ¶ 179.

- On August 13, 2007, Quarles and Greenberg conducted an all-hands meeting at which Kant and Moya, among others, discussed the fact Radical Bunny had raised another $20 million in new sales using practices for which "people go to jail." *Id.* ¶¶ 162, 163, 185.

During period of continued securities sales, therefore, Quarles specifically considered ways to collateralize the ever-increasing level of funds being raised by Radical Bunny. Again, Quarles even received and reviewed "materials currently being used" by Radical Bunny. *Compl.* ¶ 265. Notably Quarles also received and reviewed copies of *Mortgages Ltd.*'s offering documents, which not only showed that Radical Bunny was still raising money, but which also confirmed that Mortgages Ltd. was likewise concealing the wrongdoing from the Mortgages Ltd. investors. *Id.* ¶ 175.

Quarles thus knew that *both* Radical Bunny and Mortgages Ltd. were continuing to raise funds from investors without any disclosure of illegal and fraudulent conduct admittedly known to Quarles. *Compl.* ¶¶ 174-78. Yet Quarles did not disclose, did not withdraw, did not even take steps to stop Radical Bunny from continuing to use Quarles' name in connection with its investor meetings and fundraising activities; instead, Quarles assisted in those efforts, even agreeing that its name could be used in a new Radical Bunny POM being ghostwritten by Kant for Quarles. *Id.* ¶¶ 164, 262, 267-68, 275.

No less implausible is Quarles' disputed assertion that it *orally* instructed Radical Bunny not to use the interim offering materials Quarles supplied to Radical Bunny after reviewing and revising that current sales material. *Compl.* ¶¶ 257-260; Q. Memo, at 6:2 & 12:11-22. Once again, there is absolutely no written communication to Radical Bunny corroborating this purported factual defense; there is only the self-serving statement of Hoffmann (who by his SEC account was out of the picture by this time), a statement which again is contradicted by the allegations of the Complaint (*Compl.* ¶¶ 257-260) and the testimony and other evidence developed by the SEC (Exhibit A).

1    In short, Lead Plaintiffs' claims are premised on far, far more than Quarles' "mere

2    maintenance of Radical Bunny's confidences."   Q. Memo, at 15:19.   Based on its

3    continued participation and assistance despite actual knowledge of the criminality and

4    fraud, Lead Plaintiffs allege against Quarles statutory claims of primary liability under the

5    Arizona Securities Act, A.R.S. § 44-1991(A)(1), (2) and (3) (collectively, "Section 1991")

6    and under the Arizona Investment Management Act, A.R.S. § 44-3241.   Lead Plaintiffs

7    further allege secondary liability claims for aiding and abetting primary violations of both

8    Section 1991 and the AzIMA.   Finally, Lead Plaintiffs allege common-law claims of

9    negligent non-disclosure. As shown below, all of these claims are both actionable and

10   pleaded with sufficient particularity as against Quarles.[3]

11   **3.    Applicable Pleading Standard**

12   Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*,

13   ___U.S. ___, 129 S.Ct. 1937 (2009), Lead Plaintiffs need only allege sufficient facts to

14   support a *plausible* inference that the defendant is liable for the misconduct alleged.   *See*

15   *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("for a complaint to

16   survive a motion to dismiss, the non-conclusory 'factual content' and reasonable

17   inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff

18   to relief").   As this Court has recognized, "[t]he plausibility standard is not akin to a

19   'probability requirement,' but it asks for more than a sheer possibility that a defendant has

20   acted unlawfully."   *Rhoads v. Wash. Mut. Bank, F.A.*, No. CV10-0197-PHX-NVW, 2010

21   WL 1408888, at *1 (D. Ariz. Apr. 7, 2010).   As underscored in *Erickson v. Pardus*, 551

22   U.S. 89, 93 (2007), the complaint "need only give the defendant fair notice of what the …

23   claim is and the grounds upon which it rests."

24   Rule 9(b) requires that Plaintiffs plead the circumstances constituting an alleged

25   fraud with sufficient particularity "so that the defendant can prepare an adequate answer

26

27   [3]   Quarles is correct that the reference to Quarles in *Compl.* ¶ 412 was inadvertent, and

28   that Lead Plaintiffs assert no control-person liability against Quarles in Count Two.   Q. Memo, at 24-25.

from the allegations." *See YF Trust v. JP Morgan Chase Bank,* No. CV 07-567-PHX-MHM, 2008 WL 821856, at *5 (D. Ariz. March 26, 2008) (Murguia, J.) (quoting *Bosse v. Crowell Collier and Macmillian*, 565 F.2d 602, 611 (9th Cir. 1977)).

**4.   Legal Argument**

   **A.   The Hoffmann transcript and exhibits must be disregarded.**

   Quarles impermissibly relies on the self-serving testimony and unauthenticated notes of Quarles attorney Hoffmann to controvert allegations of the Complaint that it simultaneously purports to accept as true (Q. Memo, at 2 n.1) -- for example, asking the Court to summarily conclude that Quarles in fact "tried to *prevent* continuing sales of securities." Q. Memo, at 1:26-27 (emphasis original). Quarles supports this factual assertion (and a slew of others) by citation to answers Hoffman gave in response to SEC questioning (*see, e.g.*, Q. Memo at 12:11-22, 13:15-17). Quarles attempts to justify its reliance on testimony outside the pleading because Lead Plaintiffs, in but two paragraphs of the 449-paragraph Complaint, refer to certain statements Hoffmann made to the SEC. Q. Memo, at 4-5 n.2 (citing *Compl.* ¶¶ 250, 255).

   Documents not physically attached to the complaint may be considered by the Court under Rule 12(b) motion, but only if: (1) the complaint refers extensively to the document; (2) the document is central to plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the motion. *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 775 (D. Ariz. 2009), *vacated in part on other grounds upon reconsideration*, 690 F. Supp. 2d 959 (D. Ariz. 2010). Here, (1) the Complaint does not refer to Hoffman's others answers (nor to the two selected exhibits), (2) neither the Hoffman transcript nor the two exhibits constitute the "central" premise of Lead Plaintiffs' claims, and (3) Lead Plaintiffs dispute the credibility of Hoffmann's testimony and the authenticity of the exhibits. The mere reference in a pleading to a witness' sworn statement on one point hardly authorizes the submission of an entire transcript to support factual assertions made in a motion to dismiss contravening numerous other allegations of the complaint. The two paragraphs of the Complaint that

mention Hoffman's testimony were included not to show the truth of what Hoffman had said but to show his knowledge of a possible Ponzi scheme and criminal conduct.

It is thus a gross abuse of the incorporation doctrine for Quarles to submit a document referenced to prove its state of mind as substantive evidence in contravention of numerous other allegations of the Complaint. This is particularly true given the statutory stay under A.R.S. § 44-2081 that precludes any cross-examination of Hoffmann (or of Moya, who was never interviewed by the SEC) until after the Court rules on the pending motions to dismiss.

Therefore, if the Court considers the transcript of Hoffmann's answers to SEC questioning for anything other than confirming the accuracy of Lead Plaintiffs' allegations in ¶ 250 and ¶ 255 of the Complaint, Quarles' motion must be treated as one for summary judgment under Rule 12(b) and Lead Plaintiffs must be afforded a reasonable opportunity to discover and present controverting evidence, including the contrary testimony of other witnesses questioned by the SEC and documentary evidence such as that supporting the demonstrative narrative attached as Exhibit A.

**B.    Lead Plaintiffs nevertheless state actionable claims against Quarles.**

Even overlooking the impropriety of Quarles' evidentiary submission of Hoffmann's SEC statement, that statement itself confirms that Radical Bunny communicated to Quarles its unequivocal *refusal* to make the disclosure that Quarles itself concluded was necessary:

> Q.  When you told Tom Hirsch and Bunny and Howard Walder by phone the conclusions that you had reached about Radical Bunny's securities-related activities, what was their reaction?
> A.  They said --
> MR. DARMER:    "They"?
> THE WITNESS:    I'm sorry.  Tom [Hirsch] said, we understand, and what we want to do going forward is the reason we retained your firm, is we want to be compliant.  At that point, I said, well, you understand, Tom, that -- and this gets to my Note 5, that for all of your past actions, probably the only way out of that, and you may have civil and maybe criminal liability, depending upon how -- what the facts are, and the best thing would be to go to the federal and state authorities, to the SEC and to Arizona Corporation Commission, tell them what happened and say, look, we want to correct it. We inadvertently we were dumb.  We made a mistake.  We didn't know that we were incurring -- that we were violating laws, so we want to make it right.

And he said, I -- *we don't want to do that.  We want to go forward.*
BY MR. BROWN:
Q.   Mr. Hirsch said, we don't want to go to the regulators.  We want to do what?
A.    *That we don't want to go to the regulators, but we do want to be compliant going forward.*
Q.   All right.  With respect to your comment to Mr. Hirsch about these possible civil and criminal liabilities that attaches to Radical Bunny and its managing members, did he have a reaction to your statement?
A.   Well, at that point, I said -- when he said we don't -- we want to deal with just going forward; *we don't want to deal with the past, then there was a bit of a discussion if we were compliant going forward, what implication would that have on the past?  At that point, I said, well, it depends how you do that.* I'm saying you need to have contact with federal and state authorities, and then we'll see what the implications are. At that point, I said I can refer you to other lawyers, a criminal lawyer and -- which let me know and I'll refer you to somebody, and they can assess what issues or liabilities you may have probably both civilly and on a criminal basis.
Q.   Did Mr. Hirsch ever request that referral?
A.   No, no, because *his response to me was, well, we you know, what's past is done.  We want to be compliant going forward.*

Q. Memo, Ex. A at ACC019184-88 (emphasis added). To the extent considered, therefore, the Hoffmann SEC Transcript only confirms Lead Plaintiffs' allegation that Quarles took its affirmative acts assisting Radical Bunny and the Mortgages Ltd. *with actual knowledge* that Radical Bunny had no intention of making disclosure to investors or regulators.

What is more, by his own account Hoffman turned representation of Radical Bunny over to Moya in June 2007. Q. Memo, Ex. A, at ACC019129-30 & 019236-38.  After that, Hoffman supposedly had no involvement with Hirsch and Radical Bunny for nearly a year.  *Id.* From that point forward, Moya was the "Chosen One."  *Compl.* ¶ 269.  Thus, Hoffmann's statements do not undermine Lead Plaintiffs' allegations that Quarles knew about the continuing sales without disclosure, and particularly that attorney Moya was explicitly told about them during the meeting of August 13, 2007.  *Id.* ¶¶ 161-163.

Quarles' factual assertions that it was unaware of the continuing sales and that it instructed Radical Bunny not to use its revisions for ongoing sales are, therefore, not only disputed, but utterly implausible given the overall allegations of the Complaint detailing Quarles' continued role as Radical Bunny's securities counsel.  A fair reading of the Complaint as a whole certainly allows a plausible inference that Quarles – acting with actual knowledge of the fraud – substantially participated in the fraudulent scheme

without any disclosure to regulators or to either Radical Bunny or Mortgages Ltd. investors.   Quarles' knowing conduct is actionable under all of Lead Plaintiffs' alleged causes of action against Quarles, each of which is addressed in turn.

### 1.   Lead Plaintiffs have alleged an actionable primary liability claim against Quarles under Section 1991.

#### a.   Quarles' conduct violated Section 1991.

Section 1991(A) declares it unlawful for any person – directly or indirectly – in connection with the offer or sale of securities within Arizona (1) to employ "any device, scheme or artifice to defraud," (2) to make any untrue statement of material fact or omit any material fact necessary in order to make the statements made not misleading under the circumstances, or (3) to "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit." A.R.S. § 44-1991(A); *Grand II*, 236 P.3d at 400-401 ¶¶ 11, 17.   Subsection (A)(1) provides for so-called "scheme liability," Subsection (A)(2) prohibits materially misleading statements and omissions, and Subsection (A)(3) presents sweeping language prohibiting fraudulent courses of business that is even broader than Subsection (A)(2).   *Grand v. Nacchio*, 214 Ariz. 9,  26 ¶ 59, 147 P.3d 763,  780 ¶ 59 (Section 1991(A)(1) and (3) "police a wider range of fraud than § 44-1991(A)(2) and 15 U.S.C. §77l, broadly prohibiting all deception by schemes, artifices and misleading practices.") (internal quotations omitted).

Primary liability under Section 1991 thus easily encompasses liability under federal Rule 10b-5.  As *Central Bank of Denver, NA v. First Interstate Bank of Denver, NA* made clear, even under narrower Rule 10b-5 liability, "[a]ny person or entity, including a *lawyer*, accountant, or bank ... may be liable as a primary violator under 10b-5...." 511 U.S. 164, 191 (1994) (emphasis added).   A secondary actor such as Quarles who substantially participates in the offer or sale of securities can be primarily liable for statutory securities fraud.   *See e.g., In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994) (substantial participation in drafting of material misrepresentation was sufficient to establish primary liability under Section 10(b)); *N.Y.*

*City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 992-94 (N.D. Cal. 2009) (allegation that defendant, general counsel, "substantially participated" in securities fraud by drafting false and misleading SEC filings and financial statements were sufficient to state a claim for primarily liability under Rule 10b-5); *Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1177 (E.D. Cal. 2008) (denying attorney-defendants' motion to dismiss where the attorneys drafted and reviewed misleading documents).

This case presents a criminal scheme, identified as such by both Greenberg and Quarles, in which Quarles substantially participated on a "going forward" basis after May 2, 2007, which would be enough to impose primary liability even if Radical Bunny were not continuing to raise money used to give Mortgages Ltd. the false appearance of financial stability.   *Holschuh*, 694 F.2d at 143-44 (post-sale efforts were properly considered as part of the scheme); *Walters v. U.S.*, 256 F.2d 840, 843 (9th Cir. 1958) ("a scheme to defraud may well include later efforts to avoid detection of the fraud"); *see also In re Judith Mario Otto*, No. S-2896-I, 1993 WL 353421 (Ariz. Corp. Comm'n Aug. 11, 1993) (holding that false assurances that a bond was performing well after it was sold violated A.R.S. § 44-1991.3 (now A.R.S. § 44-1991(A)(3)); *see generally SEC v. Collins & Aikman*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) (false statements made to corporation's audit committee to conceal fraudulent transactions established defendants' participation in a deceptive scheme under Section 10(b)); *Koehler v. Pulvers*, 614 F. Supp. 829, 843-44 (S.D. Cal. 1985) (holding attorney for issuer's general partner liable under the substantial-participation test in connection with series of integrated offerings).

Furthermore, by allowing Radical Bunny to use its name to assure investors in connection with Radical Bunny's ongoing securities sales, Quarles was "directly or indirectly" inducing and encouraging sales by deceptive "acts and omissions" as to Radical Bunny's past crimes, its ongoing crime and its misrepresentation of the offered investments as secured when Quarles knew that they were not in fact secured.  *See Grand II*, 236 P.3d at 403 ¶ 24 (holding that "acts and omissions" in connection with a fraudulent course of business that encourages investors to buy stock is "classic inducement"); *see*

*also Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir. 1986) (10b-5 primary liability claim stated against professional: "Standing idly by while knowing one's good name is being used to perpetrate a fraud is inherently misleading.").

Lead Plaintiffs' allegation that Quarles actually authored some misleading language used with Radical Bunny investors supplies a further, independent basis for primary liability under Section 1991, under Arizona's broad statutory seller theory. *See In re Lost Dutchman Invs., Inc.*, No. S-2299-I, 1993 WL 173726, at *7 (Ariz. Corp. Comm'n Apr. 8, 1993) ("sellers" include those persons whose participation is a but for cause of the unlawful sale and whose participation was more than *de minimus*); *In re Am. Microtel, Inc.*, No. S-2885-I, 1992 WL 409823, at *9 (Ariz. Corp. Comm'n Dec. 9, 1992) (adhering to "substantial factor" test). *See* Lead Plaintiffs' Response to Greenberg Motion, at 8-9.

Contrary to Quarles' assertion, direct communication with the defrauded investors is not a prerequisite to primary liability under Section 1991. *See, e.g., Barnes v. Vozack*, 113 Ariz. 269, 273-74, 550 P.2d 1070, 1074-75 (1976) (affirming judgment against three defendants who indirectly and fraudulently sold stock to investor contrary to A.R.S. § 44-1991, despite the lack of any direct communication with the plaintiff).   Indeed, the Arizona Supreme Court has just reiterated that Section 1991 liability extends liability beyond immediate sellers, *Grand II*, 236 P.3d at 401 ¶ 13, completely consistent with this long-standing Arizona law extending liability to all those who "directly or indirectly" take part in the securities fraud.

### b.    There is no need to parse Quarles' status under Section 2003(A).

The Arizona Supreme Court in *Grand II* reiterated that the Arizona Securities Act must be liberally construed to accomplish the Arizona Legislature's "broad intent to sanction wrongdoing in connection with the purchase or sale of securities."  *Grand II*, 236 P.3d at 401 ¶¶ 16-17.  Accordingly, the Supreme Court stated:

[C]ourts are not ordinarily required to parse whether a person violating §44-1991(A)(3) should be separately characterized under § 44-2003(A) as having 'made,' 'participated in,' or 'induced' the unlawful purchase or sale.  *Nor need complaints asserting claims under § 44-2003(A) ordinarily engage in*

-13-

*such an analysis.*

*Id.* at 402 ¶ 18 (emphasis added).[4]   Quarles' attempt to parse Lead Plaintiffs' claims under Section 2003(A) -- the very heart of its motion to dismiss, *see* Q. Memo at 9-16 -- is thus flatly inconsistent with Arizona securities law as just expressed by its Supreme Court.

### c.   Lead Plaintiffs have nevertheless alleged actionable claims against Quarles under Section 2003(A).

Although alleged violations of Section 1991 are actionable without the need to specify whether a particular defendant "made," "induced" or "participated in" the fraudulent scheme, Lead Plaintiffs have in any event amply alleged Quarles' liability under Section 2003(A).

### i.   Quarles "induced" the ongoing sales to the investors.

Quarles' alleged actions satisfy the "induced" prong under Section 2003(A), especially under Arizona's statutory scheme which frames inducement in terms of comparative fault.  A.R.S. § 44-2003(C)-(E).  Quarles lent its name and reputation to the Radical Bunny's unlawful securities sales, without requiring disclosure, thereby at least indirectly encouraging Radical Bunny to continue selling and Radical Bunny investors to continue investing.  Quarles for example agreed to allow Radical Bunny to tell investors at the May 2007 investors meeting that Radical Bunny was being represented by Quarles on securities issues and that a new investment program, prepared by Quarles, would be forthcoming.  *Compl.* ¶¶ 261-62.  Radical Bunny with Quarles' consent reiterated that Quarles was representing Radical Bunny on securities issues at the November 2007 and May 2008 investor meetings, *id.*  ¶¶ 272, 275 – well after the August 2007 meeting at which (a) Kant railed against Radical Bunny's illegal conduct and (b) Kant and Moya considered ways to collateralize the tens of millions in new funds raised by Radical Bunny.  The reassurance that a well-known national law firm was overseeing Radical

---

[4] *Grand II* itself was an exception to this rule, for there the plaintiffs had specifically limited their theory of liability to "participation" liability, even though the Supreme Court suggested the defendants' conduct amount to classic "inducement" liability.  236 P.3d at 402-3 ¶¶ 20, 24.

Bunny's securities sales constitutes an inducement to invest in Radical Bunny's securities. *See, e.g., Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 156 (2d Cir. 2010) ("Where statements are publicly attributed to a well-known national law or accounting firm, buyers and sellers of securities (and the market generally) are more likely to credit the accuracy of those statements.  Because of the firm's imprimatur, individuals may be comforted by the supposedly impartial assessment and, accordingly, be induced to purchase a particular security.").

Quarles construes "induced" too narrowly, arguing that it must have made purposeful effort to "persuade" or "prevail upon" an investor to purchase the securities beyond mere collateral participation or provision of information.  Q. Memo at 9-10 (citing *Standard Chartered, PLC v. Price Waterhouse,* 190 Ariz. 6, 21, 945 P.2d 317, 332-33 (App. 1997)).  Quarles' cramped interpretation is inconsistent with the Supreme Court's recognition in *Grand II* that the Arizona Securities Act is a "remedial measure" that must be "liberally construed" for the "protection of the public."  *Grand II*, 236 P.3d at 401 ¶ 16. *Grand II* advanced an interpretation of inducement that is broader than the "persuasion" and "prevailing upon" definition used in *Standard Chartered*.  Although acknowledging *Standard Chartered*'s interpretation as *one way* to induce, the Supreme Court went beyond *Standard Chartered* in the definition that it applied in *Grand II*: it held that "classic inducement" occurs through "acts and omissions" that encourage purchases.  *Id.* at 403 ¶ 24.  *See* Lead Plaintiffs' Response to Greenberg Motion, at 7.

### ii.     Quarles "participated in" the ongoing sales to the investors.

*Grand II* did adopt *Standard Chartered*'s dictionary definition of "participate:" "'to take part in something (an enterprise or activity) … in common with others' or 'to have a share or part in something.'"  *Id.* at 402 ¶ 21 (quoting *Standard Chartered*, 190 Ariz. at 21, 945 P.2d at 332).  The trial court in *Grand II* had no trouble concluding, however, that the defendants' involvement in preparing the IPO prospectus amounted to participation in Grand's purchases.  *Grand v. Nacchio*, 222 Ariz. 498, 500, 217 P.3d 1203, 1205 (App.

2009) (noting the trial court's refusal to dismiss the IPO purchases); *see* Lead Plaintiffs' Response to Greenberg's Motion, at 6 & Ex. C.  Accordingly, third-party assistance in preparing a misleading document used by an issuer to solicit investments can constitute statutory "participation" under Section 2003(A).

Lead Plaintiffs' Complaint amply alleges how Quarles similarly "took part in" the continuing fraudulent securities sales to Radical Bunny and Mortgages Ltd. investors. Again, Quarles agreed to assist Radical Bunny "going forward," *Compl.* ¶¶ 22, 148, 153-55, 250, and its lawyers did so.  Quarles met with Radical Bunny and Mortgages Ltd. to devise ways to retain the unlawfully raised funds and to raise new funds, without disclosure to investors or regulators.  *Compl.* ¶¶ 258-60, 265-71, 276.  Quarles specifically approved the use of its name at the investor meetings and on the draft Radical Bunny offering documents.   *Id.* ¶¶ 196, 262, 267-68, 275.   Quarles sent disclosure related documents to Radical Bunny with a "process summary sheet to be used for new investors."  *Id.* ¶ 259.  Quarles also reviewed the Mortgages Ltd. offering documents prepared by Greenberg.  *Id.* ¶¶ 175, 210.

Quarles essentially argues that participation is not alleged because, even assuming that it participated in the alleged fraudulent scheme, none of the documents it worked on were ever given to or relied on by Lead Plaintiffs.  Q. Memo at 11-14.  But reliance is not required under the Arizona Securities Act.  *See, e.g., Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (App. 1981); *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 552-53, 733 P.2d 1131, 1135-36 (App. 1986).  Nor does Quarles cite any case requiring direct contact with the investors for participation liability, because Arizona case law is in fact to the contrary.  *See Barnes*, 113 Ariz. at 273-74, 550 P.2d at 1074-75 (evidence showed Section 1991 liability despite the lack of any direct communication with the plaintiff); *see also Little v. First Cal. Co.*, No. Civ. 74-71 Phx, 1977 WL 1055, at * 8 (D. Ariz. Oct. 17, 1977) (denying bank's motion for summary judgment, reasoning that direct or indirect participation in fraud creates liability under Section 2003).

Moreover, the definition of participate endorsed in *Grand II* requires only that

Quarles "take part in [Radical Bunny's and Mortgages Ltd.'s illegal] enterprise or activity."  *Grand II*, 236 P.3d at 402 ¶ 21.  Quarles' alleged continued representation of and assistance to Radical Bunny and Mortgages Ltd. with knowledge of the ongoing wrongdoing easily satisfies that definition.  *Howard v. Everex Systems*, 228 F.3d 1057, 1061, n.5 (9th Cir. 2000) ("substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actually making of the statements").  It is not even necessary that Quarles' conduct precede the unlawful and fraudulent sales; any conduct in furtherance of a scheme is relevant to show participation in the scheme. *Holschuh*, 694 F.2d at 143-44; *In re Judith Mario Otto*, 1993 WL 353421, at * 4 (false assurances that a bond was performing well after it was sold violated Section 1991(A)(3)); *see generally* Martin I. Kaminsky, *Post-Transaction Evidence in Securities Litigation,* 19 B.C. L. REV. 617 (1978).

         **iii.**       **The "course of professional capacity" exclusion to "participation" liability is not applicable as a matter of law.**

Quarles' contention that it is under Section 2003(A) immune to liability for actions taken "in the course of [its] professional capacity …" fails on several levels.  Q. Memo, at 10-11 & 14-16.  First and foremost, this exclusion applies only to a theory of "participation" liability.  *Grand II*, 236 P.3d at 403 ¶ 23.

Second, Quarles' continued services to Radical Bunny fall *outside* of the course of Quarles' professional capacity because doing so in light of Radical Bunny's staunch refusal to disclose its wrongdoing violates Quarles' independent professional obligations to (a) withdraw, and (b) disclose.  *In re Carter*, 47 S.E.C. 471, 1981 WL 384414, at *30 (counsel has a professional obligation to take affirmative steps to avoid the inference that he has been co-opted willingly or unwillingly into a scheme of non-disclosure); American Bar Association, *Statement of Policy Regarding Lawyers' Responses to Auditors' Requests for Information*, 1, 10 (1976) ("[A] lawyer has an obligation not knowingly to participate in any violation by the client of the securities laws.") (*available at*

*http://www.abanet.org/buslaw/attorneyclient/policies/aicpa.pdf*).        Withdrawal    is
mandatory when the lawyer's services assist the client in committing or carrying out the
fraud.   *See, e.g., In re Sharp*, 802 So.2d 588, 591-93 (La. 2001) (lawyer who assisted
client in persuading victim to drop criminal charges violated Rule 1.2, and failure to
withdraw violated Rule 1.16).

Excellent guidance in this respect is supplied by *In re American Continental Corp./Lincoln Savings and Loan Securities Litigation*, 794 F. Supp. 1424 (D. Ariz. 1992). There, Judge Bilby upheld claims for aiding and abetting securities violations against securities counsel for an issuer.  *Id*. at 1449-50.  The attorneys, like Quarles, argued that professional standards requiring preservation of client confidences insulated them from liability.  *Id*.  Judge Bilby disagreed and denied the law firm's motion for summary judgment.  *Id.* at 1452.  In doing so, Judge Bilby summarized the law in words that describe precisely the type of "compliant" legal services that Quarles provided for Radical Bunny with knowledge that matters such as prior securities violations and the lack of collateralization:

> An attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others, and where it is obvious that the attorney's compliant legal services may be a substantial factor in permitting the deceit to continue.

*Id.*; *see also Ariz. Ethics* Op. 01-04 (Mar. 2001) ("the lawyer must counsel the client about the possible legal consequences of her conduct and tell her to discontinue it.  If she refuses, the lawyer must withdraw from further representation." (*citing Am. Cont'l*, 794 F. Supp. at 1452)).

Contrary to Quarles' contention, the Ethical Rules actually *require* disclosure of Radical Bunny's fraud.  Lawyers must under ER 4.1(b) disclose material facts when disclosure is "necessary to avoid assisting a client's fraud," and Rule 1.6 permits such disclosure to (1) prevent a client from committing a fraud that may reasonably result in substantial financially injury to a third party, and (2) to mitigate financial injury reasonably certain to result, when the client has used or is using the lawyers services.  ER

1.6(d)(1) & (2).[5]  When the lawyer's services are involved in the prospective or ongoing fraud, Rule 4.1 transforms the permissive disclosure into required disclosure.  *See* ABA/BNA Lawyers' Manual on Prof'l Conduct § 91:2414 ("The net effect of Rule 4.1, therefore, is that it takes a subset of disclosures permitted by Rule 1.6 and makes them mandatory.").[6]  Thus, when a client refuses despite attorney insistence to end fraudulent conduct, the attorney must disclose material facts to avoid assisting the fraud through continued representation.  *See, e.g., Fehn*, 97 F.3d at 1291, 1294-95 (the statutory duty of disclosure trumps withholding what otherwise might be confidential information); *State ex rel. Okla. Bar Ass'n v. Golden*, 201 P.3d 862 (Okla. 2008) (attorney's failure to disclose client's fraud violated Rules of Professional Conduct).

Moreover, once Quarles assumed the role of Radical Bunny's securities counsel in connection with new offerings "going forward" the need to protect client confidences gives way, for at that point the interest of Radical Bunny as an issuer and the interest of Radical Bunny's investors are completely aligned, because an issuer must disclose material facts to the investors.  *O'Melveny,* 969 F.2d at 748-49 (securities counsel for an issuer owes duties both to client and to investors).

Ultimately Quarles illogically argues that it did not have a duty to withdraw or disclose because it did not in fact participate in or substantially assist Radical Bunny's conduct.  Q. Memo, at 22:19-22.  This tautology only begs Lead Plaintiffs' factual allegation that Quarles *did* in numerous ways in fact substantially participate in the fraudulent scheme.  The Court cannot not summarily adjudicate Quarles' professional

---

[5] Quarles' reliance on Arizona Ethics Opinion 91-02 (Jan. 1991) is sorely misplaced.  Q. Memo, 14-16.  This opinion was issued before the 2003 amendments to Rule 1.6.  As it currently stands, Rule 1.6 permits disclosure to rectify or mitigate financial injury from past, ongoing, and future financial frauds where the lawyer's services were used.  *See* E.R. 1.6(d)(2); *id.* cmt. [9] ("Paragraph (d)(1) . . . applies to both ongoing conduct as well as that contemplated for the future.").

[6] Other jurisdictions have similarly recognized the obligation to disclose.  *See* Virginia Ethics Op. 983 (1987); District of Columbia Ethics Op. 186 (1987); District of Columbia Ethics Op. 180 (1987).

obligations without first resolving genuinely disputed factual issues concerning the full nature and extent of the services Quarles rendered to Radical Bunny and Mortgages Ltd. in the face of Radical Bunny's undisputed refusal to make the disclosure Quarles itself recognized was required.

### d. Lead Plaintiffs have alleged a "strong inference" of Quarles' *scienter* under Section 1991(A)(1).

*Scienter* is not required for Lead Plaintiffs' claims under Section 1991(A)(2) and (A)(3).  *Orthologic Corp. v. Columbia/HCA Healthcare Corp.*, No. CIV 01-0006-PHX-SRB, 2002 WL 1331735, at *5 (D. Ariz. 2002); *State v. Gunnison*, 127 Ariz. 110, 112-13, 618 P.2d 604, 606-07 (1980); *Aaron v. Fromkin*, 196 Ariz. 224, 227, 994 P.2d 1039, 1042 (App. 2000).  Even innocent misrepresentations are actionable under Section 1991(A)(2) and (A)(3).  *Rosier v. First Fin. Capital Corp.*, 181 Ariz. 218, 222, 889 P.2d 11, 15 (App. 1994).

As to Section 1991(A)(1), the statutory state of mind requirement is "knowing or reckless."  *See* A.R.S. § 44-2003(B).  The requisite "strong inference" of knowing or reckless conduct is readily met here by Lead Plaintiffs' allegations showing Quarles' awareness that Radical Bunny steadfastly refused to make disclosure, as illustrated by Quarles' attendance of at least one meeting (on August 13, 2007) in which Kant explicitly assailed the legality of Radical Bunny's ongoing sales – an assertion with which Moya concurred. *Compl.* ¶¶ 161, 266.  Such knowledge readily satisfies the requirements for pleading *scienter* under Section 1991(A)(1) scheme liability. *See, e.g., Fehn*, 97 F.3d at 1295 (*scienter* established where client had informed defendant attorney "in no uncertain terms of his refusal to disclose" earlier securities violations).

### 2. Lead Plaintiffs have alleged actionable claims against Quarles under the Arizona Investment Management Act.

Quarles similarly urges an erroneously narrow interpretation of the Arizona Investment Management Act ("AzIMA").  Q. Memo, at 17-18.  Like its antifraud counterpart under the Arizona Securities Act, the antifraud provisions of the AzIMA are

1    remedial and must be liberally construed to protect the interests of the investing public.

2    *See Grand II*, 236 P.3d at 401 ¶ 16 (holding that a liberal, remedial interpretation of the

3    Securities Act is required); *Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206

4    Ariz. 399, 410, 412,  ¶¶ 36, 42, 79 P.3d 86, 97, 99 (App. 2003) (refusing to adopt narrower

5    federal precedent and construing § 44-1999(B) broadly, in accordance with its remedial

6    purpose).  *See* Lead Plaintiffs' Response to Greenberg Motion, at 36-38.

7         AzIMA liability is not, as Quarles contends, limited to those investment advisors

8    who directly render investment-advisory services.  The antifraud provision of the AzIMA

9    states:  "[i]t is a fraudulent practice and unlawful for a *person*" to commit one of the

10   enumerated illegal acts.  A.R.S. § 44-3241(A) (emphasis added).  The AzIMA expressly

11   reaches all persons who act fraudulently "*in connection with*" transactions involving the

12   provision of investment services.  A.R.S. § 44-3241(A) (emphasis added).  Statutory

13   liability is therefore not limited to immediate brokers or advisors.

14        Moreover, § 44-3241(A)(4) of the AzIMA extends beyond immediate transactions

15   by encompassing not only transactions, but also a "*practice or course of business* that

16   operates or would operate as a fraud or deceit." *Id.* (emphasis added).  Similarly, Section

17   44-3241(A)(2) imposes liability on persons who "[m]ake any untrue statement of material

18   fact, …"

19        Contrary to Quarles' contention, then, there is no statutory requirement that a

20   plaintiff plead or otherwise demonstrate "participation," assistance," or "inducement" to

21   state an AzIMA claim, nor is there any exemption for professional services rendered in the

22   "ordinary course."  Q. Memo, at 18:8-10; *but see Alaface v. Nat'l Investment Co.*, 181

23   Ariz. 586, 592, 892 P.2d 1375, 1381 (Ct. App. 1994) ("The language of a statute is the

24   most reliable indicator of legislative intent."); *see also* A.R.S. § 44-3241(B) (providing,

25   unlike § 44-1991, that "any person who violates this section is liable to any person for

26   losses incurred as a result of the violation").

27        Quarles does not dispute Lead Plaintiffs' allegation that Radical Bunny provided

28   such investment-advisory services to the investors, for which it was charging a flat fee of

2% of the investment.  *Compl.* ¶¶ 67.  Yet Quarles baldy declares that it didn't provide any services in connection with an investment-advisory transaction.  Q. Memo, at 17-18. But, as summarized above, Quarles allegedly took numerous actions "in connection with" Radical Bunny's "practice" or "course of business" that allegedly operated as a fraud or deceit – the same acts supporting primary liability under Section 1991.  That Quarles' disputes the factual occurrence or context of those actions is no basis upon which to summarily dismiss Lead Plaintiffs' AzIMA claims.

### 3. Lead Plaintiffs have alleged actionable "aiding and abetting" claims against Quarles.

At a minimum, Quarles' actions taken in the face of Radical Bunny's and Mortgages Ltd.'s failure and refusal to make disclosure amount to "substantial assistance," supporting secondary liability under an aiding-and-abetting theory.  Arizona has since 1979 recognized secondary liability for aiding-and-abetting violations of Section 1991.  *State v. Superior Court of Maricopa County*, 123 Ariz. 324, 599 P.2d 777 (1979), *overruled on other grounds by State v. Gunnison*, 127 Ariz. 110, 113 618 P.2d 604, 607 (1980); *see, e.g., Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005) (The "*State v. Superior Court* case stands as the law currently controlling this issue.").  Such secondary liability is completely consistent with the broad remedial sweep of Section 1991.  *Grand II*, 236 P.3d at 401-02 ¶ 18.[7]  No inference of disapproval can be drawn from the de-publication of *Grubaugh v. DeCosta*, No. 1 CA-CV 97-0477, 1999 WL 137640 (Ariz. App. Mar. 16, 2000) indeed, the existence *vel non* of aiding-and-abetting liability was *not* the basis upon which the Supreme Court was asked to de-publish the Court of Appeals' decision. *See* Lead Plaintiffs' Response to Greenberg Motion, at 22 & Ex. E.

---

[7]   The Arizona legislature did nothing to change the viability of aiding and abetting liability when it amended the Arizona Securities Act in 1996, rejecting the proposed elimination aiding and abetting liability, and stating instead that "[n]othing in this act . . . determines whether or in what circumstances aiding and abetting liability exists under Title 44, chapter 12, Arizona Revised Statutes …." *See* HIMELRICK & SCHULMAN, ARIZONA SECURITIES FRAUD LIABILITY:  STATUTORY AND COMMON-LAW REMEDIES, § 5.1.3.2, at 111 (Arizona State Bar 3d ed. 2009).

On the other hand, the ACC has meanwhile adopted *Davis'* holding on aiding and abetting as the proper interpretation of the Arizona Securities Act. *In re Am. Microtel, Inc.*, 1992 WL 409823, at *12-13. And even after *Central Bank*, the ACC has continued to interpret the Act to support aiding-and-abetting liability. *See In re John Edward Tencza*, No. S-20483A-06-0661, 2007 WL 2478687, at * 4 (Ariz. Corp. Comm'n Aug. 13, 2007) (aiding and abetting registration violations); *In re Arthur Andersen L.L.P.*, No. S-03386A-00-0000, 2000 WL 35730980, at *19-20 (Ariz. Corp. Comm'n Sept. 27, 2000) (aiding and abetting registration and 44-1991 violations); *Eastern Vanguard*, 206 Ariz. at 410 ¶ 34, 79 P.3d at 97 ("great deference" should be afforded to the ACC's "interpretation and application" of the Arizona Securities Act).

There are but three elements to aiding-and-abetting liability under Arizona law: (1) a primary violation, (2) knowledge of the primary violation, and (3) the rendition of substantial assistance to the wrongdoer. *Grand II*, 236 P.3d at 404 ¶ 30; *Wells Fargo Bank v. Arizona Laborer and Teamsters*, 201 Ariz. 474, 485 ¶ 34, 38 P.3d 12, 23 (2002); *Dawson v. Withycombe*, 216 Ariz. 84, 102 ¶ 50, 163 P.3d 1034, 1052 (Ct. App. 2007). As shown below, Lead Plaintiffs sufficiently allege all three elements here.

**Primary violation.** Quarles does not contest Lead Plaintiffs' allegation of a primary violation. *See, e.g., Fehn*, 97 F.3d at 1290 (non-disclosure of contingent liabilities constituted primary violation of securities fraud statute).

**Knowledge of the primary violation.** The knowledge of the wrongdoing needed to support aiding-and-abetting liability may be inferred from the circumstances. *Wells Fargo*, 201 Ariz. at 485 ¶ 36, 38 P.3d at 23. "Actual and complete knowledge of the tort is not uniformly necessary to hold a secondary tortfeasor liable under an aiding and abetting theory." *Id.*, at 488 ¶ 45, 38 P.3d at 26; *accord, Security Title Agency, Inc. v. Pope*, 219 Ariz. 480, 491 ¶ 45, 200 P.3d 977, 988 (App. 2008) ("Proof of 'actual and complete knowledge' of the primary violation 'is not uniformly necessary[.]'"). The knowledge requirement may be inferred by showing defendant's "'general awareness' of the [primary tortfeasor's] fraudulent scheme." *Wells Fargo*, 201 Ariz. at 488 ¶45, 38 P.3d

at 26 (citation omitted).

As already described in detail above, Lead Plaintiffs have amply alleged Quarles' actual knowledge of the illegality and fraud surrounding Radical Bunny's earlier fund-raising practices. *Compl.* ¶¶ 161, 163, 166, 185, 415. *Compare Oster v. Kirshner*, 905 N.Y.S.2d 69, 2010 N.Y. Slip Op. 05981 (App. Div. 2010) (aiding-and-abetting theory; attorneys had actual knowledge of past criminal violations). Lead Plaintiffs have furthermore amply alleged Quarles' knowledge that Radical Bunny and Mortgages Ltd. were both engaging in ongoing sales despite Radical Bunny's refusal to disclose the wrongful conduct, including over $22.9 million dollars in *new* loans, exclusive of interest including, raised by Radical Bunny during the first eight months Quarles represented it in 2007. *Compl.* ¶ 291. These allegations, including Quarles' attendance at the August 13, 2007 meeting in which Radical Bunny was told "people are put in jail" for such conduct, sufficiently plead the knowledge element for aiding and abetting purposes. *See, e.g., Hines v. FiServ, Inc.*, No. 8:08-cv02569-T-30AEP, 2010 WL 1249838, at *4 (M.D. Fla. Mar. 25, 2010) (plaintiffs' allegation that "FiServ had knowledge of the Pearlman fraud…" sufficiently pleaded actual knowledge for aiding and abetting fraud); *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1207-08 (C.D. Cal. 2006) ("Plaintiffs' allegation that the 'Defendants knew that the Leichners and Midland Entities were engaging in fraud[,]' satisfies the pleading requirements of knowledge.") (alteration in original). Lead Plaintiffs have alleged far more than mere notice of "suspicious activity" deemed insufficient in *Stern v. Charles Schwab & Co.*, No. CV-09-1229-PHX-DGC, 2009 WL 3352408, at *7-8 (D. Ariz. Oct. 16, 2009); there, the bank defendant was merely accused of failing to detect fraudulent activity in one of its customer's accounts.

At a minimum, Lead Plaintiffs' allegations raise a genuine issue of fact, for "the exact level [of knowledge] necessary for liability remains flexible and must be decided on a case-by-case basis." *Aetna Cas. & Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 535 (6th Cir. 2000) (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)).

**Substantial assistance.** In *Wells Fargo* the Arizona Supreme Court favorably

-24-

1    cited *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975), which holds

2    that there is an inverse relationship between the elements of knowledge and substantial

3    assistance.   522 F.2d 85, 97.   The more acute a party's knowledge of the fraudulent

4    activity, the less assistance is required to establish aiding-and-abetting liability.  *Id*.; *see*

5    *also In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484,

6    1495 (8th Cir. 1997) ("We evaluate the second and third requirements in tandem--the

7    stronger the evidence of [aider and abettor's] general awareness of the alleged tortious

8    activity, the less evidence of [aider and abettor's]substantial assistance is required, and the

9    stronger the evidence of substantial assistance, the less evidence of general awareness is

10   required.") (citing *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985)); *SEC v. Nacchio*,

11   614 F. Supp. 2d 1164, 1174 (D. Colo. 2009) ("this Court agrees with *Woodward* in that

12   what constitutes 'substantial assistance' necessarily turns in part on the knowledge of the

13   actor").

14           Quarles' full appreciation of the nature and seriousness of the underlying securities

15   fraud thus drastically lessens the degree of assistance required for aiding-and-abetting

16   liability.  *See, e.g.*, *Nacchio*, 614 F. Supp. 2d at 1173 ("The [complaint] adequately alleges

17   [defendant's] full knowledge of the scheme to fraudulently characterize Qwest's IRU

18   sales.   In such circumstances, the [] burden of showing that [defendant] 'substantially

19   assisted' that scheme is quite low ….").   But in any event, Lead Plaintiffs have by any

20   measure sufficiently alleged "substantial assistance" based on the same facts supporting

21   primary liability under Section 1991.  Specifically:

- Quarles did not withdraw from representation and/or disclose the fraud to regulators fraud.  *See Wells Fargo*, 38 P.3d at 27 ¶ 3 ("But it is not solely the forbearance that creates the problem; it is also the Bank's failure to report Symington's false representations to federal banking officials as required by law, where it was admittedly knowledgeable of the false financial statements."); *Am. Cont'l*, 794 F. Supp. at 1452 ("attorney may not continue to provide services to corporate clients when the attorney knows the client is engaged in a course of conduct designed to deceive others").

- Quarles undertook to serve as securities counsel for Radical Bunny, advising it as to its disclosure obligations and working with Greenberg to draft a Radical Bunny POM in effort to retain tainted funds.

*Rudolph*, 800 F.2d at 1047 ("we can conceive of circumstances in which a party could substantially assist a cover-up, and thus aid and abet a prior sale").

- Quarles lent its name and reputation to the Radical Bunny's securities sales. *See, e.g., Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394, at *4 (N.D.Cal. Ap. 15, 2010) (finding allegation that "[p]laintiffs have asserted that the assistance of the bank gave a false sense of legitimacy to the illicit activities, which allowed Mr. Wise and his associates to defraud [p]laintiffs," *inter alia*, established substantial assistance).

- Quarles counseled Radical Bunny about handling the wrongdoing at its investor meeting. *See Compl.* ¶ 262. *See e.g., Security Title*, 219 Ariz. at 495 ¶ 68, 200 P.3d at 992 ("The jury reasonably could have concluded that Clifford, on behalf of First American, substantially assisted Pope to solicit key Security Title employees by participating in recruiting meetings arranged by Pope.").

- Quarles drafted some of the allegedly misleading disclosure language. *See, e.g., Oster*, 905 N.Y.S.2d at 72 ("Preparation of [Private Placement Memoranda] constitutes 'substantial assistance'"); *Nathel v. Siegel*, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) ("Where the primary fraud claim is predicated on misrepresentations in documents, substantial assistance usually involves assistance in the preparation or dissemination of the documents.").

Again, this is certainly not a case like *Stern*, in which the defendant bank did nothing more than process typical day-to-day banking transactions. *Stern*, 2009 WL 3352408, at *8.

Contrary to Quarles' contention, there is no "ordinary course" exception to aiding-and-abetting liability. *Chalpin v. Snyder*, 220 Ariz. 413, 424 ¶ 45, 207 P.3d 666, 677 ¶ 45 (App. 2008) (holding that attorneys are liable for aiding and abetting to the same extent as any other person, citing § 56 of the Restatement (Third) of the Law Governing Lawyers § 56 (2000)). But even if there were such an "ordinary course" exception, as explained above, Quarles acted in violation of its professional obligations and thus by definition outside the ordinary course of legal services.

### 4. Lead Plaintiffs have alleged an actionable claim for negligent misrepresentation and nondisclosure.

Under Arizona law, a professional who in the course of its business supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused by justifiable reliance on the false information, if the professional failed to exercise reasonable care or competence in gathering or

communicating that information. *St Josephs Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 812 (1987) (following Restatement (Second) of Torts § 552); *see also Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 200 Ariz. 146, 154 ¶ 27, 24 P.3d 593, 601 (2001) (describing the duties of attorneys and stating that a duty of care exists when there is a "foreseeable risk of harm to a foreseeable non-client whose protection depended on the actor's conduct" (quotation omitted)).  As securities counsel for an issuer, Quarles assumed a duty to the investors to look for and disclose misleading statements.  *See O'Melveny,* 969 F.2d at 748-49 (discussing the due diligence obligation of an issuer's securities counsel, which requires counsel to look for fraud and disclose it, not acquiesce in it as Quarles did here).  In dereliction of this duty, Quarles negligently gathered, compiled and authorized for distribution incomplete and materially misleading information used in the Radical Bunny investor meetings and sales materials.  *Compl.* ¶ 429 (incorporating ¶¶ 150, 153-55, 161-66, 172-73, 180-85, 196, 250-52, 258-65, 271-72, 284 and 287-89).

Quarles first argues that Lead Plaintiffs have failed to allege that the investors actually relied on any information – false or otherwise – provided to the, directly or indirectly, by Quarles.  Q. Memo, at 24:3-5.  That is incorrect; Lead Plaintiffs do generally allege justifiable reliance (*Compl.* ¶ 433), and the general allegation is sufficient to withstand a motion to dismiss.  *See e.g., Thompson v. Paul*, 657 F. Supp. 2d 1113, 1123 n.8 (D. Ariz. 2009) (holding on reconsideration that the plaintiff's alleged justifiable reliance should not be decided on a Rule 12(b)(6) motion).

Moreover, justifiable reliance may under Arizona law may be implied or even presumed as to (a) material misrepresentations, *St Joseph's*, 154 Ariz. at  316, 742 P.2d at 817 ("reliance is justifiable where the misrepresentation is material"), and as to (b) material nondisclosures, *Trimble*, 152 Ariz. at 552-53, 733 P.2d at 1135-36 (Ct. App. 1986) (adopting presumption of reliance on a material omission under the Arizona Securities Act, A.R.S. § 44-1991, as in *Affiliated UTE Citizens of Utah v. U.S.,* 406 U.S. 128 (1972)).  And there is no room here for serious dispute that the past wrongdoing by

those offering securities constitutes material information to investors. *See State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 126, 726 P.2d 215, 223 (App. 1986) (prior cease-and-desist orders involving related companies and their officers "would have been facts important to an investor's decision."); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829-31 (8th Cir. 2003) (an affiliated subsidiary's fraud raised questions about the integrity of the parent's senior managers that a reasonable investor would probably find important).

Quarles next argues that Lead Plaintiffs have not alleged that Quarles intended that the Radical Bunny investors to rely on any information supplied by Quarles, again relying on its *disputed* factual defense that it instructed Radical Bunny not to use the language it supplied in its investor form.   Q. Memo, at 24:5-13; *but see Compl.* ¶ 429 (Quarles allegedly authorized the distribution of information used in the investor meetings and materials through which Radical Bunny unlawfully offered, sold or described securities to investors).  Quarles' true state of mind in assisting Radical Bunny once again simply begs the fundamental, disputed question of fact. Q. Memo, at 24:5-13.  And certainly Quarles' contention is inconsistent with its alleged authorization for Radical Bunny to announce Quarles's role as securities counsel at the semi-annual investors meetings. *Compl.* ¶ 262, 275.

### C.     Lead Plaintiffs have alleged plausible claims with ample particularity under Rule 9(b).

Lead Plaintiffs have set forth their claims against Quarles in full compliance with the "plausibility" standard under *Twombly*, and with the "particularity" standard under Rule 9(b).  *Oster*, 905 N.Y.S.2d at 73-75.  This is especially true with respect to their aiding-and-abetting claims, which may be generally averred and as to which Quarles does not even challenge the existence of the alleged primary violations by Radical Bunny and Mortgages Ltd.  *YF Trust,* 2008 WL 821856, at *5 (denying motion to dismiss aiding-and-abetting claim: "Under Rule 9(b), the knowledge element for aiding and abetting may be averred generally.   In addition, such knowledge may be inferred from the circumstances.").

To any extent the Court concludes that more detail specific as to Quarles is required, Lead Plaintiffs respectfully request leave to amend consistent with the illustrative narrative submitted as Exhibit A.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend is to be allowed with extreme liberality); *Apollo Group*, 633 F.Supp.2d at 831-32 (same); *Wojtunik*, 394 F.Supp.2d at 1173 (same).

**5.    Conclusion**

Quarles' motion is squarely premised on factual assertions (a) that Quarles advised Radical Bunny to stop selling securities, (b) that Quarles did not know that Radical Bunny had continued selling securities, and (c) that Quarles had instructed Radical Bunny not to use materials supplied by Quarles for such ongoing sales.  Each and every one of these factual assertions is both implausible and disputed, and thus not resolvable by motion to dismiss, let alone based solely on the self-interested statement of a Quarles lawyer who Lead Plaintiffs have not had the opportunity to depose.  Nor is the fine-tuned parsing of Quarles' status under Section 2003(A) required any longer after *Grand II*.

For these and all of the foregoing reasons, Quarles' motion to dismiss is not well-taken, and should be denied in its entirety.  To the extent the Court perceives any pleading deficiency as to Quarles, Lead Plaintiffs respectfully request leave to amend.

1    Dated:  September 20, 2010.

2                                    **Tiffany & Bosco, P.A.**

3

4                              By:    /s/ *Richard G. Himelrick*
                                     Richard G. Himelrick
5                                    J. James Christian
                                     Third Floor Camelback Esplanade II
6                                    2525 East Camelback Road
                                     Phoenix, Arizona 85016-4237
7
                                     Attorneys for Plaintiffs Robert Facciola; The
8                                    Robert Maurice Facciola Trust Dated December
                                     2, 1994; Honeylou C. Reznik; The Morris
9                                    Reznik and Honeylou C. Reznik Trust; Jewel
                                     Box Loan Company, Inc.; Jewel Box, Inc.; H-M
10                                   Investments, LLC

11                             Andrew S. Friedman
                               **Bonnett, Fairbourn, Friedman**
12                             **  & Balint, P.C.**
                               2901 N. Central Avenue
13                             Suite 1000
                               Phoenix, Arizona 85012
14
                               Attorneys for Plaintiffs Fred C. Hagel and Jacqueline
15                             M. Hagel Revocable Living Trust Dated March 15,
                               1995; Judith A. Baker
16

17

18

19

20

21

22

23

24

25

26

27

28

1

CERTIFICATE OF SERVICE

2

3      I hereby certify that on September 20, 2010, I electronically filed the foregoing

4  with the Clerk of the Court using the CM/ECF system which will send notification of such

5  filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby

6  certify that I will mail the foregoing document or paper via the United States Postal

7  Service to the non-CM/ECF participants indicated on the Manual Notice list.

8      I certify under penalty of perjury under the laws of the United States of America

9  that the foregoing is true and correct.

10

11                                  /s/ *J. James Christian*

12                                   J. James Christian

13

14  #15283-1  441387.doc

15

16

17

18

19

20

21

22

23

24

25

26

27

28