1  Robert E. Gooding, Jr. (*admitted pro hac vice*)
   Scott B. Garner (*admitted pro hac vice*)
2  Isabelle Carrillo Smith (*admitted pro hac vice*)
   Shawn M. Kennedy (*admitted pro hac vice*)
3  goodingr@howrey.com
   garners@howrey.com
4  smithi@howrey.com
   kennedys@howrey.com
5  HOWREY LLP
   4 Park Plaza, Suite 1700
6  Irvine, CA  92614
   Telephone:  (949) 721-6900
7  Facsimile:  (949) 721-6910

8  Francis J. Burke, Jr. (SBN 010570)
   Michella A. Kras (SBN 022324)
9  fburke@steptoe.com
   mkras@steptoe.com
10 STEPTOE & JOHNSON LLP
   Collier Center
11 201 East Washington Street
   16th Floor
12 Phoenix, AZ  85004
   Telephone:  (602) 257-5200
13 Facsimile:  (602) 257-5299

14 Attorneys for Defendant QUARLES & BRADY LLP

15

16                UNITED STATES DISTRICT COURT

17                    DISTRICT OF ARIZONA

18

19 ROBERT FACCIOLA, *et al*.          ) Case No. 2:10-cv-01025-MHM
                                       )
20          Plaintiffs,                ) **DEFENDANT QUARLES & BRADY**
                                       ) **LLP'S REPLY BRIEF IN SUPPORT OF**
21       vs.                           ) **MOTION TO DISMISS PLAINTIFFS'**
                                       ) **COMPLAINT**
22 GREENBERG TRAURIG, LLP, *et al*.    )
                                       ) **[Oral Argument Requested]**
23          Defendants.                )
                                       )
24 ─────────────────────────────────── )

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ................................................................................................1

II.    ARGUMENT ......................................................................................................3

A.     Plaintiffs' Primary Liability Claim under Sections 44-
       1991(A) and 44-2003(A) Fails. .............................................................3

       1.     Plaintiffs Fail To Plead Facts Showing That Quarles
              Participated in or Induced RB's Sales under Section
              44-2003(A)......................................................................................3

              a.     Quarles Did Not "Participate in" the Sale of
                     Securities. ............................................................................4

                     (1)    Quarles' Conduct Was Consistent with a
                            Law Firm Acting in Its Professional
                            Capacity....................................................................5

                     (2)    The "Ordinary Course of Professional
                            Capacity" Exclusion Precludes
                            Participation Liability. .............................................9

              b.     Quarles Did Not "Induce" Investors To
                     Purchase Securities.............................................................11

       2.     Plaintiffs Fail To Plead Facts Showing That Quarles
              Violated Section 44-1991(A)........................................................13

B.     Plaintiffs Fail To State a Primarily Liability Claim against
       Quarles under the Arizona Investment Management Act..................17

C.     Plaintiffs Fail To State a Claim against Quarles for Secondary
       Liability for Aiding and Abetting. .....................................................18

       1.     Plaintiffs Have Not Sufficiently Alleged Quarles'
              Knowledge of the Primary Violation.........................................18

       2.     Plaintiffs Have Not Sufficiently Alleged That Quarles
              Substantially Assisted RB's Primary Violation........................20

D.     Plaintiffs Have Failed To State an Actionable Claim of
       Negligent Misrepresentation and Nondisclosure against
       Quarles................................................................................................22

III.   CONCLUSION .................................................................................................23

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## **CASES**

4

*Barnes v. Vozack,*
       113 Ariz. 269 (1976)....................................................................................14

5

6

*Benson v. JPMorgan Chase Bank, N.A.,*
       No. C-09-5272 EMC,
       2010 U.S. Dist. LEXIS 37465 (N.D. Cal. Apr. 15, 2010)............................21

7

8

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
       511 U.S. 164 (1994)..............................................................................10, 18

9

*Federal Deposit Ins. Corp. v. O'Melveny & Myers,*
       969 F.2d 744 (9th Cir. 1992)..................................................................22, 23

10

*Grand v. Nacchio,*
       225 Ariz. 171, 236 P.3d 398 (Ariz. 2010) ...........................................passim

11

12

*Hildebrandt v. Indianapolis Life Ins. Co.,*
       No. 3:08-CV-1815-B,
       2009 U.S. Dist. LEXIS 27753 (N.D. Tex. Mar. 31, 2009)...........................17

13

14

*Horne v. U.S. Dep't of Educ.,*
       No. CV-08-1141-PHX-MHM,
       2009 U.S. Dist. LEXIS 24016 (D. Ariz. Mar. 23, 2009)................................2

15

16

*In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.,*
       794 F. Supp. 1424 (D. Ariz. 1992).................................................9, 10, 11

17

18

*In re Software Toolworks Inc. Sec. Litig.,*
       50 F.3d 615 (9th Cir. 1995).........................................................................14

19

*Lopes v. Vieira,*
       543 F. Supp. 2d 1149 (E.D. Cal. 2008) ......................................................14

20

21

*McDaniel v. Compania Minera Mar de Cortes,*
       528 F. Supp. 152 (D. Ariz. 1981)..................................................................8

22

*N.Y. City Emps. Ret. Sys. v. Berry,*
       616 F. Supp. 2d 987 (N.D. Cal. 2009)........................................................14

23

24

*Pacific Inv. Mgmt. Co. v. Mayer Brown LLP,*
       603 F.3d 144 (2d Cir. 2010)........................................................................13

25

*Rose v. Dobras,*
       128 Ariz. 209 (App. 1981).............................................................................8

26

27

*Rudolph v. Arthur Andersen & Co.,*
       800 F.2d 1040 (11th Cir. 1986)...................................................................14

28

*Schneider v. Cal. Dep't. of Corr.,*
       151 F.3d 1194 (9th Cir. 1998).......................................................................3

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3   *SEC v. Collins & Aikman Corp.,*
     524 F. Supp. 2d 477 (S.D.N.Y. 2007) ....................................................15
4
  *SEC v. Fraser,*
5      No. CV-09-00443-PHX-GMS,
     2010 U.S. Dist. LEXIS 7038 (D. Ariz. Jan. 28, 2010)........................15, 16
6
  *SEC v. Holschuh,*
7      694 F.2d 130 (7th Cir. 1982).................................................................17

8   *SEC v. Lucent Techs., Inc.,*
     610 F. Supp. 2d 342 (D.N.J. 2009)........................................................15
9
  *Simpson v. AOL Time Warner, Inc.,*
10      452 F.3d 1040 (9th Cir. 2006)...............................................................16

11   *Simpson v. Homestore.com,*
     519 F.3d 1041 (9th Cir. 2008)...............................................................16
12
  *Standard Chartered PLC v. PriceWaterhouse,*
13      190 Ariz. 6 (Ct. App. 1996) ...............................................................4, 12

14   *Stern v. Charles Schwab & Co.,*
     No. CV-09-1229-PHX-DGC,
15      2009 U.S. Dist. LEXIS 96697 (D. Ariz. Oct. 15, 2009).........................21

16   *Strom v. Black,*
     22 Ariz. App. 102 (1974) .........................................................................7
17
  *Trimble v. Am. Sav. Life Ins. Co.,*
18      152 Ariz. 548 (App. 1986) .......................................................................8

19   *Wells Fargo Bank v. Ariz. Laborers,*
     201 Ariz. 474 (Ariz. 2002) .....................................................................20
20
  *Wojtunik v. Kealy,*
21      394 F. Supp. 2d 1149 (D. Ariz. 2005) ...................................................13

22   *Woodward v. Metro Bank of Dallas,*
     522 F.2d 84 (5th Cir. 1975).....................................................................20
23

**STATUTES**

24
  A.R.S. § 44-1991(A) ...................................................................passim
25
  A.R.S. § 44-2003(A) ...................................................................passim
26
  A.R.S. § 44-2082(A) ........................................................................13
27
  A.R.S. § 44-3241(A) ........................................................................17
28
  Fed. R. Civ. P. 9(b).....................................................................13, 17

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3

**OTHER AUTHORITIES**

4

Ariz. Ethics Op. No. 01-04 (Mar. 2001) ........................................................................11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.      INTRODUCTION**

2          In support of their overarching argument that Quarles & Brady LLP's ("Quarles") mere

3    representation of Radical Bunny ("RB") with knowledge of RB's wrongdoing gives rise to

4    liability under the Arizona securities laws, Plaintiffs misstate the fundamental nature of

5    Quarles' role in the representation of RB.  In so doing, they fail to support with actual

6    allegations from their Complaint a claim that Quarles committed a primary or secondary

7    violation of the Arizona securities laws (or any other claim).

8          Contrary to Plaintiffs' suggestion in their Response, Quarles was not retained as RB's

9    "securities counsel" to represent RB "as an issuer" in the traditional sense.  Lead Plaintiffs'

10   Response to Defendant Quarles & Brady LLP's Motion to Dismiss ("Rsp."), at 4, 19.

11   Rather, by the time Quarles was retained in February 2007, RB had a well-established

12   investment program through which it already had raised more than $140 million from investors

13   using an existing set of forms with an existing pattern of disclosures about the nature of the

14   investments.  Compl. ¶¶ 59-65, 79, 102, 111, 145, 147.  RB came to Quarles as a result of its

15   having been advised by Mortgages Ltd. ("ML") and its counsel that its existing program

16   violated the securities laws.  *Id.* ¶¶ 135-45.  As a result, RB retained Quarles "for advice in

17   addressing the securities violations earlier identified" by ML's counsel.  *Id.* ¶ 149.  Quarles'

18   role on the RB engagement also included examining whether RB's loans to ML were properly

19   collateralized, as RB previously had represented to investors.  *E.g., id.* ¶¶ 149, 155, 252.

20         It is neither remarkable nor disputed that Quarles determined early on that RB in fact

21   had been violating the securities laws by, among other things, selling unregistered securities,

22   and that, contrary to RB's representations to its investors, RB's loans to ML were not secured.

23   *Id.* ¶¶ 152, 252, 254, 278.  Similarly, it is undisputed that Quarles communicated its

24   conclusions on those issues to RB by at least May 2007.  *Id.* ¶¶ 21, 152, 252.  The Complaint

25   itself alleges that Quarles "expressly and forcefully" advised RB that its fundraising activities

26   violated the securities laws (*id.* ¶ 95) and that RB stated it "want[ed] to be compliant going

27

28

1  forward."[1]  *Id.* ¶ 22.

2          There can be no dispute that Quarles, armed with the knowledge of RB's past

3  misconduct, had the right to continue to represent RB in working towards a future, compliant

4  securities offering and in seeking to properly document a perfected security interest for RB, as

5  long as Quarles did not somehow participate in or induce the fraudulent sale of securities.  A

6  contrary rule would prevent a wrongdoing party from ever hiring counsel to assist in putting

7  things right.  For that reason, Arizona law recognizes that a lawyer's mere representation of a

8  client cannot be deemed "participation" in the client's fraud for purposes of the Arizona

9  Securities Act.

10         The salient question, therefore, is whether Plaintiffs have alleged facts sufficient to

11  show that Quarles went beyond its legitimate role as counsel for RB and participated in,

12  induced, or substantially assisted the ongoing fraudulent sale of securities.  They have not.  As

13  discussed in more detail below, the facts alleged in Plaintiffs' Complaint are in stark contrast to

14  the kind of conduct found sufficient to state claims in the cases cited in Plaintiffs' Response.

---

17  [1] Plaintiffs also allege that Quarles attorney Chris Hoffmann testified before the SEC that he advised the RB principals that "they needed to stop selling the securities, disclose their securities violations to the SEC and the Arizona Securities Division, and comply with the securities-registration statutes before any new sales occurred."  Compl. ¶ 153. Notwithstanding this allegation, and the many other references in their Response to Hoffmann's SEC testimony, Plaintiffs argue that Quarles' citation to Hoffmann's SEC deposition transcript was improper.  Rsp. at 8-9.  As discussed in Quarles' opening brief ("Br." at 4-5 n.2), however, Quarles' citation to the Hoffmann transcript was perfectly appropriate because, notwithstanding Plaintiffs' erroneous contention that they only refer to Hoffmann's testimony in "but two paragraphs" of the Complaint (Rsp. at 8), the Complaint repeatedly makes reference to the contents of that transcript.  *See* Compl. ¶¶ 21-22, 153-54, 250, 254-55. Ironically, Plaintiffs proceed in the very next section of their brief to block quote even more of Hoffmann's transcript.  Rsp. at 9-10.

In a further attempt to counter Hoffmann's SEC testimony, Plaintiffs allege that RB principal Tom Hirsch disputed Hoffmann's testimony (Compl. ¶ 153) and, to make their point, improperly attach to their Response a declaration by Tom Hirsch.  Rsp. at 2 n.2 & Ex. B.  But, unlike the referenced and quoted Hoffmann deposition transcript, Plaintiffs may not rely on the Hirsch declaration on a motion to dismiss.  *See Horne v. U.S. Dep't of Educ.*, No. CV-08-1141-PHX-MHM, 2009 U.S. Dist. LEXIS 24016, at *14 (D. Ariz. Mar. 23, 2009) (Murguia, J.) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quotation omitted).  And, in any event, Plaintiffs hardly can argue that Hirsch is a credible witness, considering that they are suing him for fraud in this very lawsuit and that he is the subject of ongoing enforcement actions by the SEC and ACC alleging fraud.

1 **II.    ARGUMENT**

2    **A.    Plaintiffs' Primary Liability Claim under Sections 44-1991(A) and**

3        **44-2003(A) Fails.**

4    Plaintiffs have not properly alleged facts that, if proven, would demonstrate that Quarles

5 "participated in" or "induced" the sale of securities.[2]  Consequently, Plaintiffs cannot state a

6 claim against Quarles under Section 44-1991(A).

7        **1.    Plaintiffs Fail To Plead Facts Showing That Quarles Participated in**

8            **or Induced RB's Sales under Section 44-2003(A).**

9    Section 44-2003(A) limits the class of persons against whom a Section 44-1991(A)

10 violation can be brought to those who "made, participated in or induced the unlawful sale or

11 purchase" of securities.  A.R.S. § 44-2003(A).  As explained in Quarles' moving papers,

12 Arizona law – including the recent Supreme Court decision *Grand v. Nacchio*, 225 Ariz. 171,

13 236 P.3d 398 (Ariz. 2010) ("*Grand II*") – requires a far greater showing under Section 2003(A)

14 than Plaintiffs have alleged here.

15    Attempting to salvage some benefit from *Grand II*, Plaintiffs stretch the bounds of

16 credulity by suggesting that the case actually supports their overreaching legal argument about

17 what constitutes participation in an unlawful sale or purchase.  Specifically, Plaintiffs argue

18 that because *Grand II* says in *dicta* that there is "no need to parse Quarles' status under

19 Section 2003(A)," Plaintiffs can plead a claim under Section 1991(A) without having to allege

20 facts to show that Quarles made, participated in, or induced the fraudulent sale of securities as

21 required under Section 2003(A).  Rsp. at 13-14, 29.  Indeed, Plaintiffs go so far as to assert that

22

23 _____

24 [2] Faced with the inadequacy of the factual allegations in their Complaint, Plaintiffs resort to filing an exhibit with over 30 pages of detailed allegations that they argue they would include in an amended complaint, if given leave to amend.  Rsp. at 1 n.1 & Ex. A.  Plaintiffs' exhibit is

25 procedurally improper on a motion to dismiss.  *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a

26 court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").  Moreover, it is tantamount

27 to an admission that the current operative complaint fails to allege facts supporting Plaintiffs' claims.  In any event, Quarles declines to address at this time the specifics of those additional

28 allegations.

1   Quarles' argument that its alleged conduct does not fit within the "inducement" or

2   "participation" prongs of  Section 2003(A) is "flatly inconsistent with Arizona securities law as

3   just expressed by its Supreme Court."  *Id.* at 14.  This is a fundamental misinterpretation of the

4   holding in *Grand II* that would effectively read Section 2003(A) out of existence.  To the

5   contrary, by dismissing the plaintiff's securities fraud claim for not meeting the requirements

6   of Section 2003(A), *Grand II* strongly reinforced the importance of Section 2003(A) in

7   Arizona securities law and strongly reaffirmed *Standard Chartered*.  *Grand II*, 236 P.3d at 403

8   (*discussing Standard Chartered PLC v. PriceWaterhouse*, 190 Ariz. 6 (Ct. App. 1996)).

9        Nowhere does the *Grand II* court state or even suggest that a plaintiff can plead a

10  Section 44-1991(A) claim without pleading facts that show the defendant falls within at least

11  one of the three categories articulated in Section 2003(A).  In fact, relying on *Standard*

12  *Chartered*, the court specifically stated that "participation and inducement are commonly

13  understood to involve separate factors" and, although there may be the "possibility of overlap,

14  if all inducers were thereby also automatically participants, use of the term 'induces' in § 44-

15  2003(A) would be unnecessary."[3]  *Id*. at 402.  The court made it crystal clear that, to find civil

16  liability for securities fraud under Arizona law, the alleged conduct must fit under one of the

17  three categories of Section 44-2003(A) – made, participated in or induced.  *Id.* at 402-03.

18  Plaintiffs' reading of *Grand II* is completely at odds with the court's actual holding.

19        **a.    Quarles Did Not "Participate in" the Sale of Securities.**

20        Plaintiffs' Response makes explicit what was implicit in their Complaint: They assert

21  that Quarles' mere "continued representation of and assistance to" RB with knowledge of RB's

22

23  [3] Because the plaintiff in *Grand II* made a conscious decision to "forswear" an inducement
    theory, and instead relied entirely on the theory that defendants' had participated in the sale of
24  securities within the meaning of Section 44-2003(A), the Supreme Court's only task was to
    determine whether the complaint sufficiently alleged "participation."  *Id.* at 402.  There was no
25  dispute that the conduct alleged in the complaint constituted "inducement" under
    Section 2003(A).  *Id.*  To get out from under its lawyer's tactical choice, plaintiff was relegated
26  to arguing that participation is coterminous with inducement under Section 2003(A).  *Id.*  The
    court rejected this argument, concluding that, although the legislature intended the Arizona
27  Securities Act as a broad "remedial measure" to be "liberally construed" for the "protection of
    the public," conduct that constituted "classic inducement" did not also necessarily amount to
28  "participation" as earlier defined in *Standard Chartered*.  *Id.* at 403.

-4-

wrongdoing is enough to hold Quarles liable for ***participating in*** the fraudulent sales. Rsp. at 17.  If that were true, an issuer who may have violated the securities laws could never hire counsel to diagnose its problem and seek to find a solution, lest that counsel be deemed to have participated in fraudulent sales simply by representing the issuer.  For that reason, Arizona law recognizes that attorneys should not be deemed to have participated in sales of securities simply by rendering professional services.  A.R.S. § 44-2003(A).  Something more is required – actual participation in the fraudulent sale of securities.

### (1)     Quarles' Conduct Was Consistent with a Law Firm Acting in Its Professional Capacity.

Plaintiffs plead in considerable detail the facts leading up to RB's retention of Quarles and the true nature of Quarles' engagement.  RB came to Quarles after having conducted a years-long program of subscribing investors using existing documentation and disclosures, raising $140 million before Quarles even came on the scene.  Compl. ¶¶ 59-65, 79, 145, 147. RB was referred to Quarles by ML after ML's counsel informed RB's principals that they had been violating federal and state securities laws.  *Id.* ¶¶ 142, 144-45, 147.  RB hired Quarles not to help it continue its existing program, but to (a) examine that program to determine whether RB had been violating the securities laws by, among other things, selling unregistered securities; and (b) if so, to advise RB on how to change its conduct in the future so that it could raise funds in full compliance with the securities laws.  *Id.* ¶¶ 149, 152.  The scope of the engagement also came to include (a) examining whether RB's loans to ML were properly collateralized; and (b) if not, negotiating with ML to establish proper collateral for its loans so that RB could truthfully represent in the future that its investors were fully collateralized.  *Id.* ¶¶ 149, 277-83.

Plaintiffs have not pled facts showing that Quarles went beyond the legitimate bounds of that engagement and actually participated in the fraudulent sale of securities.  Plaintiffs argue that they have alleged Quarles' participation in RB's sales beyond mere continued representation in a few narrow ways, but none of the facts as alleged amount to participation.

1    **First**, Plaintiffs argue that they have alleged Quarles met with RB and ML to devise

2    ways to retain unlawfully raised funds and raise new funds.  Rsp. at 16.  The only allegations

3    to which they point to support this argument are paragraphs 258-60, 265-71, and 276 of the

4    Complaint, all of which deal either with Quarles' review of a draft POM that was part of a

5    contemplated new investment program for RB or with certain interim disclosure language

6    included in a draft document provided by Quarles.  With respect to the draft POM, as discussed

7    in Quarles' opening brief and as alleged in the Complaint, neither that plan nor the

8    accompanying draft POM ever went anywhere.  Compl. ¶ 172 ("Neither Quarles nor

9    Greenberg ever completed a private-offering memorandum for Radical Bunny.").  Plaintiffs

10   cannot seriously attempt to hold Quarles liable for securities fraud for its part in reviewing and

11   commenting on a draft POM that never was used in any way, much less to raise money for RB.

12   **Second**, Plaintiffs argue – both in connection with their "unlawful retention of funds"

13   argument discussed above and as an independent point – that Quarles participated in RB's

14   sales by sending certain interim draft disclosure documents to RB.  Rsp. at 16.  Plaintiffs do

15   not allege (because they cannot) that Quarles authorized Plaintiffs to use in connection with

16   ongoing sales to new investors any of the draft documents Quarles had prepared for a future,

17   fully compliant, adequately collateralized securities offering.  Neither do Plaintiffs allege that

18   RB actually used Quarles' draft documents in raising money.  The most they can allege is that

19   RB revised its own forms to incorporate certain language that Quarles drafted.  Even with

20   respect to these revised forms, Plaintiffs do not allege they ever were provided to an investor.

21   In short, none of this amounts to Quarles' participation in the fraudulent sale of securities.

22   **Third**, Plaintiffs argue that Quarles participated in RB's sales by giving RB authority to

23   use its name in connection with RB's investor meetings and on the draft POM.  Rsp. at 16.

24   Plaintiffs do not, however, allege any facts tying Quarles' alleged authorization to use its name

25   to any actual sales of securities.  As discussed above, Plaintiffs have not alleged that RB ever

26   used the draft POM, so whether or not Quarles gave RB permission to use its name is of no

27   moment.  With respect to investor meetings, Plaintiffs allege that Quarles advised RB to

28   control admittance at its May 2007 meeting and agreed that Hirsch could tell the investors that

1   RB was being represented by Quarles on securities issues and that a new investment program

2   would be forthcoming.  Compl. ¶ 262.  If indeed Quarles advised RB to control admittance at

3   its May 2007 meeting, that cannot serve as a basis for a finding of participation in RB's sales.

4   In addition, if indeed Quarles agreed that Hirsch could tell the investors that Quarles

5   represented RB on securities issues and that a new investment program would be forthcoming,

6   such agreement could not constitute participation in the fraudulent sales, for the reasons

7   discussed below in Section II.A.1.b.

8       **Fourth**, Plaintiffs argue that Quarles participated in RB's sales by reviewing certain ML

9   "offering documents prepared by Greenberg," citing paragraphs 175 and 210 of the Complaint.

10  Rsp. at 16.  This argument is nonsensical.  Paragraph 175 refers, once again, to the Greenberg-

11  prepared draft POM that never was completed, while paragraph 210 deals with ML insiders'

12  review of draft POMs that Greenberg prepared for ML.  It is difficult to imagine how those

13  allegations – whether true or not – add up to Quarles' participation in the sale of securities.

14      Throughout their Response, Plaintiffs argue that Quarles' continued representation of

15  RB with knowledge of wrongdoing by itself satisfies the definition of participation.  *E.g.*, Rsp.

16  at 17.  Plaintiffs are incorrect as a matter of law.  Under the Arizona Securities Act and the

17  cases that have interpreted it, participation requires more than mere knowledge of wrongdoing.

18  In *Grand II*, the Supreme Court squarely held that the conduct alleged in that case

19  (summarized in Section II.A.1.) did not describe participation in the illegal sales.  One of the

20  keys to the court's holding was that "the complaint alleges no relationship whatsoever between

21  the sellers of the KPNQ aftermarket shares and the defendants."  *Grand II*, 236 P.3d at 403.

22  The court also noted the lack of any allegation that "the defendants played any role in the

23  transactions between the Trust and the sellers . . . ."  *Id.*  In contrast, the court pointed to *Strom*

24  *v. Black*, 22 Ariz. App. 102 (1974), a case in which both inducement and participation were

25  found.  There, as the Supreme Court emphasized, "the defendants not only persuaded the

26  plaintiffs to buy stock, but then also drafted the sales agreement, received funds from the

27  plaintiffs, and took a commission from the sales."  *Grand II*, 236 P.3d at 403.  No such conduct

28  – or anything close – is alleged here.

1    As pointed out in Quarles' opening brief (Br. at 11-14), none of the conduct alleged in

2    the Complaint demonstrates any kind of relationship or connection between Quarles and the

3    RB or ML investors as described in *Grand II*.[4]  Quarles is not alleged to have played any role

4    whatsoever in any of the transactions between RB (or ML), on the one hand, and the plaintiffs

5    who purchased RB (or ML) securities, on the other.  There is no allegation that Quarles drafted

6    any form of sales agreement or offering memorandum that ever actually was sent to or

7    received by any of the Plaintiffs, that Quarles ever had any contact or connection with any of

8    the Plaintiffs, or that Quarles made any type of representations to potential investors.  Indeed,

9    the Complaint affirmatively alleges that all the RB sales of securities were made through

10   "Directions to Purchase," which indisputably were prepared by the RB principals long before

11   Quarles was on the scene.  Compl. ¶ 79; *see* Ex. B to Lead Plaintiffs' Response to Defendant

12   Greenberg Traurig's Motion to Dismiss.  There is no allegation – nor could there be – that

13   Quarles "took part in" or had a role in drafting the Directions to Purchase or distributing them

14   to investors.  Nor is there any allegation that Quarles ever received any funds (apart from

15   ordinary legal fees) or took any kind of commission or other form of compensation from the

16   sales – that is, had "a share or stake in" the sales.  Absent such allegations, Quarles cannot be

17   found to have "participated in" the challenged sales.

18

19

---

20   [4]  Plaintiffs attempt to downplay this lack of a relationship or connection between Quarles and
     any investors, arguing that reliance is not an element of a claim under the Arizona Securities
21   Act.  Rsp. at 16.  Their argument is beside the point.  Reliance is not the determinative issue in
     addressing participation under Section 44-2003(A).  Instead, under the Arizona cases referred
22   to above, the determinative factor is some allegation of participation in RB's fraudulent sale of
     securities to investors.  Moreover, Plaintiffs have cited no authority that would support their
23   novel contention that they could make out a claim under Section 1991(A) without alleging that
     they relied upon a misrepresentation that actually was communicated to them.  *See Trimble v.*
24   *Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 552 (App. 1986) ("federal courts have interpreted § 44-
     1991 to require a plaintiff in a **non**public action to prove he reasonably relied on defendant's
25   misstatements and was unaware of the untruth or omission of fact") (emphasis added) (citing
     *McDaniel v. Compania Minera Mar de Cortes*, 528 F. Supp. 152, 166 (D. Ariz. 1981)).
26   Because this is just such a private (nonpublic) action by investors, some element of reliance is
     required.  The court's decision in the other case cited by Plaintiffs, *Rose v. Dobras*, 128 Ariz.
27   209 (App. 1981), explicitly was limited to "the circumstances of [the] case," where a seller of
     securities made explicit misrepresentations and omissions to the aggrieved buyer.  *Id.* at 214;
28   Rsp. at 16.

1    In sum, because none of Quarles' actions rise to the level of participation in RB's

2    fraudulent sale of securities, Plaintiffs' claims must fail.  Contrary to Plaintiffs' contention,

3    Quarles cannot be held liable for securities fraud simply by continuing to act as RB's attorney.

4                    **(2)      The "Ordinary Course of Professional Capacity"**

5                               **Exclusion Precludes Participation Liability.**

6        While Plaintiffs apparently have abandoned their argument that Quarles' alleged

7    violation of the Rules of Professional Conduct gives rise to an actionable claim under the

8    securities laws, Plaintiffs now argue instead that Quarles' violation of its supposed

9    "professional obligations to (a) withdraw, and (b) disclose" means that Quarles cannot be

10   protected by the safe harbor in Section 2003(A) for conduct in the ordinary course of one's

11   professional capacity.  Rsp. at 17-20.  As discussed in detail in Quarles' opening brief,

12   Plaintiffs' argument is entirely circular.  Plaintiffs cannot argue that Quarles participated in

13   RB's conduct (and thus falls outside the bounds of Section 2003(A)) by violating an ethical

14   rule that itself only applies where the attorney participates in the client's wrongful conduct.

15       In support of their argument, Plaintiffs rely heavily on *In re American Continental*

16   *Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424 (D. Ariz. 1992).  But that case had

17   nothing to do with Section 2003(A) and, in any event, arose on facts strikingly different than

18   those alleged here.  The law firm involved in the *Lincoln Savings* case was initially retained to

19   conduct a regulatory compliance review concerning the regulation of savings and loan

20   institutions by what was then known as the Federal Home Loan Bank Board ("FHLBB").  *Id.*

21   at 1450.  As a result of that review, the firm found multiple regulatory violations by its client,

22   Lincoln Savings.  Instead of advising its client to stop its unlawful conduct, as Quarles did

23   here, there was evidence that the law firm "tacitly consented to removal of harmful documents

24   from Lincoln files," instructed its client "in how to rectify deficiencies so that they would not

25   be apparent to FHLB[B] examiners," and "participated in creating corporate resolutions to

26   ratify forged and backdated corporate records."  *Id.*  The evidence showed that the law firm

27   provided detailed advice on how to set up the fraudulent debenture sale program that was at the

28   heart of the case.  Moreover, there was evidence that the law firm made political contributions

1    on behalf of its client in exchange for the client's consent that the law firm could "bill

2    liberally." *Id.* at 1451-52.  In the face of this overwhelming egregious evidence, the court not

3    surprisingly denied the law firm's motion for summary judgment on a claim of aiding and

4    abetting a violation of the federal securities laws.

5         In rejecting the law firm's argument that it could not be held liable for counseling its

6    client, the court stated: "An attorney may not continue to provide services to corporate clients

7    when the attorney knows the client is engaged in a course of conduct designed to deceive

8    others, and where it is obvious that the attorney's **compliant legal services** may be [a]

9    substantial factor in permitting the deceit to continue." *Id.* at 1452 (emphasis added).  The

10   court made it clear, however, that the "compliant legal services" it focused on went far beyond

11   merely counseling the client.  *Id.*

12        In short, although the *Lincoln Savings* case arose in a different context,[5] the "compliant

13   legal services" on which the court focused in denying the law firm's motion for summary

14   judgment showed that the law firm had "participated in" an ongoing fraud.  The law firm "took

15   part in" the sale of the unlawful debentures at issue in the case and "had a share" or a stake in

16   those sales in common with others.  There was little doubt on the evidence that the law firm's

17   culpability arose from far more than mere knowledge of Lincoln Saving's fraudulent activities.

18   None of the allegations of the Complaint in this case comes close to alleging the same kind of

19   conduct by Quarles.

20        Unlike the situation in *Lincoln Savings*, Quarles was retained to provide legal

21   counseling and advice in addressing securities violations that already had been identified, to

22   attempt to properly collateralize the loans from RB to ML, and to work towards a future

23   securities offering that would comply with the securities laws.  Quarles did not take any actions

24   similar to those of the law firm in *Lincoln Savings* that could be considered "compliant" with

25

26   _____

27   [5] As noted above, the case involved aiding and abetting an alleged violation of the federal
     securities laws **prior to** the United States Supreme Court's decision in *Central Bank of Denver,*
     *N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), holding that there is no
28   basis for civil liability for aiding and abetting.

1   or in furtherance of RB's fraud.  To the contrary, Quarles "expressly and forcefully" advised

2   its client that it was in violation of the securities laws.  Compl. ¶¶ 95, 152.[6]  Thus, *Lincoln*

3   *Savings* does not take Quarles out from under the protection of the "ordinary course" exclusion

4   of Section 2003(A).

5         Plaintiffs also cite Arizona Ethics Opinion 01-04 for the proposition that a lawyer must

6   withdraw from representing a client if the client refuses to discontinue her wrongful conduct.

7   Rsp. at 18.  Ethics Opinion 01-04, however, examined the ethical duties of a lawyer whose

8   client provides him with privileged documents improperly taken from the opposing party.

9   Ariz. Ethics Op. No. 01-04 (Mar. 2001).[7]  The State Bar opined that, as long as the lawyer does

10  not "review or make use of the information in the documents, the lawyer's continuing

11  representation of the client will not by itself violate any of the Ethical Rules."  *Id.*  The State

12  Bar concluded that withdrawal would be required only "if the client insists that the lawyer

13  review the documents or use the information in them" – in other words, if the client insists on

14  the lawyer's active complicity in the client's wrongful conduct.  *Id.*[8]  Nothing like that is

15  alleged here.

16         **b.    Quarles Did Not "Induce" Investors To Purchase Securities.**

17         In addition to attempting to attach liability to Quarles through the "participation" prong

18  of Section 2003(A), Plaintiffs also argue that they meet the "inducement" prong of

19

---

20  [6]  Indeed, the stark contrast between Quarles' conduct and the conduct of the law firm in
    *Lincoln Savings* is highlighted not only by the absence of alleged facts suggesting participation
21  by Quarles, but also by the allegations about the advice Quarles gave to its client upon
    concluding its research, as discussed above and in Quarles' opening brief.  Br. at 4; Compl.
22  ¶¶ 21, 152-53, 254.

23  [7]  Available online at http://www.myazbar.org/ethics/opinionview.cfm?id=272.

24  [8]  In a parenthetical, Plaintiffs quote from a portion of the State Bar's Opinion, citing *Lincoln
    Savings,* to the effect that if a client refuses to follow a lawyer's advice about conduct that
25  violates the law, the lawyer must withdraw.  Rsp. at 18.  It is clear in context, however, that
    this statement by the Arizona State Bar applies to the specific situation before it – that is,
26  where a lawyer would be forced to use improperly obtained privileged information if he
    continued in his representation.  Such specific facts shed no light on the issue here.  Moreover,
27  that Ethics Opinion 01-04 relies on *Lincoln Savings* for this point only further demonstrates
    that the lawyer's complicity in his client's fraud – something that is not adequately alleged
28  here – is a prerequisite to any lawyer's obligation to withdraw.  *Lincoln Savings*, 794 F. Supp.
    at 1452.

Section 2003(A).  Under *Standard Chartered*, as Quarles argued in its Opening Brief, to "induce" a purchase of securities under Section 2003(A), a defendant must engage in a purposeful effort to "persuade" or "prevail upon" the plaintiff to purchase the securities.  Br. at 9-10.  In their Response, Plaintiffs argue that Quarles construes "induced" too narrowly and that its "cramped interpretation" is inconsistent with *Grand II*.  Rsp. at 15.  Plaintiffs assert that "*Grand II* advanced an interpretation of inducement that is broader than the 'persuasion' and 'prevailing upon' definition used in *Standard Chartered*."  *Id*.  But there is utterly no basis for this assertion in the language or holding of *Grand II*.  The complaint in *Grand II* alleged that one of the defendants (Nacchio) visited Arizona in 1999 and, in a face-to-face dinner meeting, urged the plaintiff (Grand) "to purchase aftermarket shares without disclosing the Qwest accounting fraud."  236 P.3d at 401.  It also alleged that two joint venture partners "sent various communications to Grand and the investing public, falsely describing the financial health of the joint venture."  *Id*.  The court, explicitly referring to the definition of inducement set forth in *Standard Chartered*, found that this alleged conduct constituted "classic inducement" because the defendants, through their acts and omissions, "***encouraged*** the Trust to buy stock from others in the aftermarket."  *Id.* at 403 (emphasis added).  Once again, the court broadly reaffirmed *Standard Chartered* and by no means narrowed the definition of "induce" under Section 2003(A).

There is no similar or comparable conduct by Quarles alleged in the Complaint in this case – or anything that even comes close.  In an effort to show inducement, Plaintiffs point to their allegation that Quarles agreed to allow RB to tell investors at a May 2007 investor meeting that RB was being represented by Quarles and that a new investment program, prepared by Quarles, would be forthcoming at some point in the future.  Rsp. at 26; Compl. ¶¶ 261-62.  But, even if accepted as true, nothing about that amounts to "persuasion," "prevailing upon" or "encouragement" to purchase securities as required under the inducement prong.  It is undisputed that Quarles was not even present at the May meeting (or any of the other meetings of RB investors) and certainly did not say anything or make any representations to any potential investors.  Plaintiffs do not allege that Quarles ever met with any RB or ML

1   investors, spoke with them, encouraged them, made any representations to them, or in any way

2   "persuaded" or "prevailed upon" them to purchase securities.  Plaintiffs also fail to allege that

3   any individual who attended the May 2007 investor meeting purchased securities from RB as a

4   result of ***anything*** said at that meeting – whether attributed to Quarles or not.  In short, on the

5   alleged facts, there is no basis for finding that Quarles "induced" the purchase of securities.[9]

6             **2.    Plaintiffs Fail To Plead Facts Showing That Quarles Violated**

7                    **Section 44-1991(A).**

8             Whether or not Plaintiffs have pleaded sufficient facts to attach Section 44-1991(A)

9   liability to Quarles through one of the prongs of Section 44-2003(A), Plaintiffs still have to

10  plead that Quarles actually violated Section 1991(A) because it: (1) employed a "device,

11  scheme or artifice to defraud"; (2) made an "untrue statement" or omission "of material fact";

12  or (3) engaged in a "transaction, practice or course of business" that operated as a "fraud or

13  deceit."  A.R.S. § 44-1991(A); Rsp. at 11.  Those facts must be pled with the same strict

14  particularity as required by Section 44-2082(A) and Rule 9(b).  A.R.S. § 44-2082(A); Fed. R.

15  Civ. P. 9(b); *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1157 n.4 (D. Ariz. 2005).

16            Plaintiffs argue that Quarles can be held primarily liable for making an untrue statement

17  or omission of material fact under Section 1991(A)(2) by "substantially participating" in the

18  drafting of certain documents for RB to use in a potential future, compliant securities offering.

19  Rsp. at 11, 13.  Even assuming the Ninth Circuit's substantial participation test applies here

20  (which Quarles does not concede), none of those documents are alleged to have been

21

22

_____

23  [9] Plaintiffs' citation to the Second Circuit decision in *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010), lends no support to their inducement argument.  *See* Rsp. at

24  15.  If anything, the decision cuts the other way.  Applying the "bright line" attribution standard, the Second Circuit affirmed the dismissal of a federal securities fraud claim against

25  the law firm of Mayer Brown.  The court found no basis for primary liability on the ground that, even though some offering documents reflected that Mayer Brown represented Refco, no

26  particular piece of false information was directly attributed to the law firm or its attorneys at the time of dissemination. *Id.* at 158.  "Mayer Brown is not identified as the author of any

27  portion of the documents.  Nor can the mere mention of the firm's representation of Refco be considered an 'articulated statement' by Mayer Brown adopting Refco's statements as its

28  own." *Id.*  Here, the Complaint fails to allege that Quarles ever made a false statement to any investor or that any false statements were attributed to Quarles upon dissemination to investors.

1   disseminated by Quarles or RB to investors.  All of the cases cited by Plaintiffs finding

2   primary liability against a secondary actor for making a material misstatement include the

3   dissemination of a material misrepresentation to the SEC, the general public, or investors.

4   *See In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 (9th Cir. 1995) (reversing

5   grant of summary judgment where Deloitte played a significant role in drafting and editing a

6   materially misleading letter that was sent to the SEC); *N.Y. City Emps. Ret. Sys. v. Berry*, 616

7   F. Supp. 2d 987, 994-95 (N.D. Cal. 2009) (finding allegations that the defendant actually

8   drafted a materially misleading proxy statement that was distributed to the public were

9   sufficient for liability under Rule 10b-5); *Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1156, 1177

10  (E.D. Cal. 2008) (denying motion to dismiss where plaintiffs pleaded facts showing that the

11  defendant law firm assisted in the formation of the wrongdoing investment company and

12  prepared an offering memorandum and other documents used to sell shares of the company).

13       Plaintiffs have not alleged that Quarles drafted any documents (or substantially

14  participated in the drafting of any documents) that actually were provided to any investors.

15  Neither have they alleged that Quarles knew RB was using documents Quarles authored "to

16  commit a significant fraud," as the accountants in *Rudolph v. Arthur Andersen & Co.* were

17  alleged to have done.  800 F.2d 1040, 1044 (11th Cir. 1986).  In the absence of such

18  allegations, Quarles cannot be liable under Section 1991(A)(2) for making a material

19  misstatement that never was disseminated.[10]

20       Plaintiffs also argue that they have pleaded a claim under Subsections (1) and (3) of

21  Section 1991(A), commonly referred to as "scheme" liability.  As an initial matter, the specific

22  allegations against Quarles in Plaintiffs' Complaint relate only to its alleged drafting of certain

23  documents (none of which were given to investors) and its allowance of the use of its name in

24

25  [10] Plaintiffs' reliance upon *Barnes v. Vozack*, 113 Ariz. 269 (1976), also is misplaced.  In
    finding sufficient evidence that three individual defendants indirectly sold stock to the plaintiff,

26  the court focused on whether there was enough evidence that the individuals controlled the
    company and therefore were responsible for the fraud.  *Id.* at 273-74.  Quarles is not alleged to

27  have owned or controlled RB such that the actions of RB's principals can be imputed to it.
    Indeed, Plaintiffs expressly acknowledged that they were not alleging Quarles was subject to

28  control person liability for RB's actions.  Rsp. at 7 n.3.

1    a May 2007 investor meeting (at which no sales were alleged actually to have occurred).[11]  To

2    the extent Plaintiffs base their Section 1991(A) claim on these allegations, they must live or die

3    with their contention that Quarles violated Section 1991(A)(2) – which, as discussed above,

4    they have failed to sufficiently allege.  That is because where a plaintiff also asserts a claim for

5    misrepresentations or omissions – as Plaintiffs do here – the conduct supporting scheme

6    liability must be more than a mere "reiteration of the misrepresentations and omissions that

7    underlie [the misrepresentation] claim."  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 359-

8    61 (D.N.J. 2009).  Because Plaintiffs fail to plead Quarles' involvement in a scheme separate

9    from the actions underlying their misrepresentation claim, the scheme liability claim fails.

10           Even were Plaintiffs not precluded from using their allegations of misrepresentations

11   and omissions as the basis for their scheme liability claims, those allegations do not state a

12   viable claim under Section 1991(A)(1) and (3).  The parallel sections in Rule 10b-5 address

13   "scheme" liability under the federal securities laws.  In the Ninth Circuit, to be liable for a

14   scheme to defraud, a defendant must have committed a "manipulative or deceptive act in

15   furtherance of the scheme."  *SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2010 U.S. Dist.

16   LEXIS 7038, at *23 (D. Ariz. Jan. 28, 2010) (quotation omitted).  For Quarles to be found to

17   have violated Section 1991(A), Quarles' "***own conduct*** contributing to the transaction or

18   overall scheme must have had a ***deceptive purpose and effect***."  *Id.* at **23-24 (emphasis

19   added, quotation omitted).  The fact that the alleged scheme itself had a "deceptive purpose

20   and effect" does not alone render Quarles liable.  *Id.*  Quarles' conduct also would need to be

21   "***independently*** deceptive or fraudulent" to be deemed participation in a scheme.  *SEC v.*

22   *Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 486 (S.D.N.Y. 2007) (emphasis added).  For

23   that reason, allegations in Plaintiffs' Complaint against Quarles of a "generalized scheme of

24   misconduct" will not suffice to hold Quarles liable under Section 1991(A).  *Fraser*, 2010 U.S.

25

26   _____

27   [11] Plaintiffs also allege that Quarles' wrongdoing included its failure to disclose its client's
     wrongdoing or to withdraw from its representation, but, as explained above and in the opening
     brief, Quarles' decision not to blow the whistle on, and to continue representing, its client is
28   not actionable absent Quarles' participation in its client's wrongful conduct.  Br. at 14-16.

Dist. LEXIS 7038, at *24 (quotation omitted); *see also Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1052-54 (9th Cir. 2006), *vacated on other grounds by Simpson v. Homestore.com,* 519 F.3d 1041, 1041-42 (9th Cir. 2008) (rejecting scheme liability for defendants' role in "round-trip" transactions designed to fraudulently boost another company's revenues because it was not alleged that the defendants themselves committed any independently fraudulent or deceptive act or that they acted with the purpose and effect of creating a false appearance).

Here, Plaintiffs have pleaded – in some detail – the nature of an alleged scheme between RB and ML.  Compl. ¶¶ 55-128.  Plaintiffs, however, plead no facts tying Quarles' conduct to that scheme, other than their highly conclusory allegations that Quarles participated in a "criminal scheme" on a "going forward basis."  Rsp. at 12.  Plaintiffs do not plead, for example, any particularized facts showing that Quarles acted with the ***purpose*** to commit fraud against the RB investors.  To the contrary, Plaintiffs allege that Quarles was engaged to examine whether RB had violated the securities laws and that it "expressly and forcefully" advised RB that its fundraising activities violated the securities laws.  Neither do Plaintiffs allege that anything Quarles did had the ***effect*** of a fraud on the RB investors.  As discussed above, the documents Quarles reviewed and drafted were not alleged to have ever been given to an investor, much less used to make a fraudulent sale.  Similarly, Plaintiffs fail to allege how Quarles' limited advice and authorization to use its name in connection with RB's investor meetings could have acted as a fraud on the investors, especially because the message Quarles allegedly authorized (that RB had hired Quarles to assist with securities issues and would be working toward a new offering in the future) was true.  Although Plaintiffs attempt to smear Quarles with generalized allegations of participation in a fraudulent scheme, they have not pleaded any ***independently fraudulent*** actions by Quarles that would support a scheme liability claim.[12]

---

[12] Plaintiffs cite a number of cases for the proposition that Quarles can be liable for RB's prior sales because it "participated on a 'going forward' basis."  Rsp. at 12.  Unlike here, those cases involved defendants who engaged in fraud both before and after the sales at issue.  *See, e.g.,*

(Continued...)

1    Because Plaintiffs fail to plead facts sufficient to show that Quarles "participated in" or

2  "induced" the sale of securities, or that Quarles violated any subsection of Section 1991(A),

3  their primary liability claims must fail.

4          **B.      Plaintiffs Fail To State a Primarily Liability Claim against Quarles under**

5                  **the Arizona Investment Management Act.**

6          Even if this Court were to determine, as Plaintiffs argue, that Section 44-3241(A)

7  extends beyond investment advisors to other persons who do not provide investment advisory

8  services, the intent of the statute is not, and cannot be, as far reaching as Plaintiffs contend.

9  *See* Memorandum "Strike-everything Amendment to H.B. 2271," at 1 (Mar. 24, 1994),

10  attached as Exhibit 1 to Greenberg Traurig LLP's Motion To Dismiss Complaint (purpose

11  behind the proposed legislation).  There presently are no Arizona cases interpreting or applying

12  Section 3241(A), but Quarles respectfully submits that, if and when the issue arises, the

13  Arizona Supreme Court is unlikely to hold that the statute sweeps so broadly as to ensnare law

14  firms, like Quarles, that were retained merely to advise their client with respect to securities

15  compliance issues, at least without some showing of conduct akin to participation or

16  substantial assistance.

17          In the Complaint, Plaintiffs allege only that Quarles is liable under Section 3241(A)

18  because "[t]hrough the disclosure materials that it prepared Quarles provided incomplete and

19  misleading information that was used in connection with the investment advisor services that

20  Radical Bunny (and its managers) provided to Radical Bunny investors."  Compl. ¶ 441.  This

21  bare, conclusory allegation is insufficient to meet the heightened pleading requirements of

22  Rule 9(b) for a claim brought under Section 3241(A).  *See Hildebrandt v. Indianapolis Life Ins.*

23  *Co.*, No. 3:08-CV-1815-B, 2009 U.S. Dist. LEXIS 27753, at *18 (N.D. Tex. Mar. 31, 2009)

24  (applying Arizona law).  As set forth in Quarles' opening brief and above, Plaintiffs have

25  _____

(...Continued)

26  *SEC v. Holschuh*, 694 F.2d 130, 493-94 (7th Cir. 1982) (rejecting the defendant's argument
     that his post-sale activities could not be considered for purposes of 10b-5 liability because

27  those activities were part of a single fraudulent scheme along with his predominantly pre-sale
     fraudulent conduct, including personal misrepresentations).  Unlike those cases, Quarles is not

28  alleged to have taken part in RB's fraud from the beginning.

1    failed to identify a single document Quarles prepared that actually was provided to RB

2    investors in connection with RB's alleged advisory services.  Plaintiffs do not allege that the

3    draft interim disclosure language RB allegedly lifted and incorporated into its own forms ever

4    was provided to investors.  Without more, the Complaint alleges insufficient facts to state a

5    claim against Quarles for violation of the Investment Management Act.

6         **C.    Plaintiffs Fail To State a Claim against Quarles for Secondary Liability for**

7              **Aiding and Abetting.**

8         Notwithstanding Plaintiffs' argument to the contrary (Rsp. at 22), it is an open question

9    whether the Arizona Supreme Court would continue to recognize a private right of action for

10   civil liability for aiding and abetting under the Arizona securities statutes, particularly in light

11   of the court's recent decision in *Grand II* expressly reserving the issue.  *Grand II*, 236 P.3d at

12   404; Br. at 18-19.  The mere fact that the Arizona Corporation Commission recognizes aiding

13   and abetting liability in administrative enforcement proceedings says nothing about whether

14   ***civil liability*** ultimately will be found to exist.  Rsp. at 23.[13]  In any event, even if a private

15   right of action for aiding and abetting securities fraud were to exist in Arizona, Plaintiffs have

16   failed to allege sufficient facts to support the "knowledge" and "substantial assistance"

17   elements of any such purported claim.

18        **1.    Plaintiffs Have Not Sufficiently Alleged Quarles' Knowledge of the**

19              **Primary Violation.**

20        As an initial matter, Quarles readily concedes it had knowledge that ***in the past*** RB had

21   violated the securities laws by selling unregistered securities.  That is precisely why RB was

22   referred to Quarles in the first place, and that is the essence of what Quarles advised its client

23   on May 2, 2007 – that it was selling unregistered securities and, as Hoffmann testified before

24   the SEC, that "they needed to stop selling the securities, disclose their securities violations to

---

[13] The SEC, too, has long espoused its authority to bring aiding and abetting claims in administrative enforcement proceedings, notwithstanding the United States Supreme Court's decision in *Central Bank* holding that no civil claim for aiding and abetting exists under the federal securities laws.

1   the SEC and the Arizona Securities Division, and comply with the securities-registration

2   statutes before any new sales occurred."  Compl. ¶ 153.[14]

3         The question here is whether the Complaint sufficiently alleges that Quarles actually

4   knew RB was ***continuing*** to sell securities ***after*** Quarles advised it of its violations on May 2,

5   2007.  As explained in Quarles' opening brief, the Complaint does not allege with particularity

6   how Quarles supposedly knew RB had raised more than $22.9 million from ***new*** fraudulent

7   sales of securities, other than by reference to attendance at meetings and receipt of reports

8   obliquely suggesting an increase in the outstanding loan balance from RB to ML.  Compl.

9   ¶ 163.  As Quarles pointed out (Br. at 20-21), the Complaint concurrently alleges that the

10  interest expense on the outstanding debt alone was $22.4 million and growing (Compl. ¶ 118),

11  which easily could have accounted for the increase in the outstanding balance.  Moreover,

12  Plaintiffs' allegations – including all the alleged documentary evidence of increasing loan

13  balances – actually refer to the balance of RB's loans to ML, and ***not*** to the investments made

14  by investors in RB.  *See, e.g., id.* ¶¶ 162-63, 179.  These two balances are not the same, and an

15  increase in one does not necessarily correlate to an increase in the other and thus would not

16  necessarily have raised a "red flag" with the lawyers who had advised RB to stop selling to

17  investors.  Nor does the Complaint allege that the Quarles lawyers had knowledge or

18  appreciation of other "red flags" that might have tipped them off to the alleged underlying

19  scheme between RB and ML – including that ML had been insolvent since 2005, that ML had

20  stopped making new loans to commercial developers, that borrowers had stopped making loan

21  payments, that ML was dependent on new loans from RB to meet its interest obligations and

22

23

---

24  [14] As discussed above, Plaintiffs' reliance on Hoffmann's SEC testimony in their Complaint
    makes the whole of that testimony fair game on a motion to dismiss.  A reasonable inference
    from this testimony, coupled with the explicit allegations in the Complaint that Quarles
25  "expressly and forcefully" advised RB that its fundraising activities violated the securities laws
    (Compl. ¶ 95) and that RB stated it "want[ed] to be compliant going forward" (*id.* ¶ 22), is that
26  – consistent with Hoffmann's SEC testimony – Quarles actually advised its client to stop
    selling securities and to disclose its past violations.  But it is worth noting that, even were the
27  Court to ignore the allegation that Hoffmann gave this advice, Plaintiffs still have not
    sufficiently alleged that Quarles had knowledge of RB's ongoing fraud, as required by
28  Section 2003(A).

1   requests for redemption from prior investors, or that ML was dependent on RB's continuing

2   sales of securities in order to provide a revolving line of credit.  Without more, the allegations

3   about increasing loan balances by themselves do not add up to the necessary element of

4   "scienter," or showing of actual knowledge, necessary for aiding and abetting liability under

5   Arizona law.  *Wells Fargo Bank v. Ariz. Laborers,* 201 Ariz. 474, 485 (Ariz. 2002).

6   **2.      Plaintiffs Have Not Sufficiently Alleged That Quarles Substantially**

7   **Assisted RB's Primary Violation.**

8   Notwithstanding Plaintiffs' disproportionate reliance on Quarles' supposed knowledge –

9   which, as discussed above, falls short – the Complaint fails to plead aiding and abetting

10  liability because it fails to allege Quarles' substantial assistance.[15]  To attempt to show

11  substantial assistance, Plaintiffs base their argument on the "same facts" supporting their claim

12  of participation under Section 2003(A).  Rsp. at 25-26.  For the same reasons the Complaint

13  does not sufficiently allege participation, it does not allege substantial assistance.

14  •      Plaintiffs argue that Quarles' failure to withdraw and/or disclose RB's wrongful

15         conduct to regulators constitutes substantial assistance.  Rsp. at 25.  Plaintiffs'

16         argument is entirely circular.  For the reasons outlined in Quarles' opening brief

17         (Br. at 22) and above, Plaintiffs cannot argue that Quarles substantially assisted

18         RB's conduct because it violated an ethical rule that itself only applies where the

19         attorney participates in or substantially assists in the client's wrongful conduct.

20  •      Plaintiffs point once again to Quarles' review of a draft POM prepared by ML's

21         counsel as part of a contemplated new investment program from RB.  Rsp. at 25-

---

[15] Contrary to Plaintiffs' argument (Rsp. at 25), they have cited (and Quarles has found) no Arizona cases upholding an "inverse relationship between the elements of knowledge and substantial assistance." Although the Arizona Supreme Court in *Ariz. Laborers* did, as Plaintiffs suggest, cite *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975), it was for an entirely different proposition ('"if [a] … method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.'") – *not* for the proposition asserted by Plaintiffs. *Ariz. Laborers*, 201 Ariz. at 489; Rsp. at 24-25.

1    26.  But, as discussed above, neither that plan nor the accompanying draft POM

2    ever were approved by Quarles, finalized, or provided to RB investors.

3    •    Plaintiffs argue again that Quarles' lending its "name and reputation" to RB's

4    securities sales constitutes substantial assistance.  *Id.* at 26.  But merely allowing

5    RB to make the truthful statement that Quarles had been hired to examine RB's

6    compliance with the securities laws and to assist with future effort to get into

7    compliance does not rise to the level of conduct necessary to show either

8    participation or substantial assistance.  "Proof of substantial assistance requires a

9    showing that [Quarles'] conduct was 'a substantial factor in causing the

10   [Plaintiffs'] harm.'"  *Stern v. Charles Schwab & Co.*, No. CV-09-1229-PHX-

11   DGC, 2009 U.S. Dist. LEXIS 96697, at *23 (D. Ariz. Oct. 15, 2009).[16]

12   •    Pointing to Paragraph 262 of the Complaint, Plaintiffs assert that "Quarles

13   counseled Radical Bunny about handling the wrongdoing at its investor

14   meeting."  Rsp. at 26.  But Paragraph 262 alleges only that Quarles

15   "recommended controlling the persons who attended the May 2007 investor

16   meeting by having Radical Bunny require admittance tickets" and that "Quarles

17   agreed that Hirsch could tell the investors that Radical Bunny was being

18   represented by Quarles on securities issues and that a new investment program,

19   prepared and approved by Quarles, would be forthcoming."  Compl. ¶ 262.  As

20   discussed above, that is not sufficient to allege either participation or substantial

21   assistance.

22

23   [16]  Plaintiffs cite *Benson v. JPMorgan Chase Bank, N.A.,* No. C-09-5272 EMC, 2010 U.S.
     Dist. LEXIS 37465 (N.D. Cal. Apr. 15, 2010), for the proposition that merely "lending its
24   name" to RB's securities sales is sufficient to establish Quarles' substantial participation.
     Rsp. at 26.  In *Benson*, however, the court's finding that plaintiffs adequately pled a bank's
25   substantial assistance in a fraud was based on far more than the bank's mere use of its name
     and reputation.  Rather, the court found that plaintiffs had met the substantial assistance
26   element by "detailing the critical actions taken by the bank to assist the Ponzi participants,"
     including allowing the deposit of investor monies, permitting commingling of funds, allowing
27   the transfer of large amounts of investor monies to offshore accounts, allowing the use of
     investor monies for personal expenses, and authorizing remote banking platforms that
28   prevented oversight.  2010 U.S. Dist. LEXIS 37465, at *13.

1      •     Plaintiffs argue once again that "Quarles drafted some of the allegedly

2         misleading disclosure language."  Rsp. at 26.  But, as discussed above and in

3         Quarles' opening brief, there is no allegation that any such language ever was

4         shown to, let alone relied upon by, RB investors.

5     In short, Plaintiffs have not alleged sufficient facts to show "substantial assistance" for

6 purposes of their claim of secondary liability for aiding and abetting, any more than they have

7 shown "participation" for purposes of their claim for primary liability under Sections 1991(A)

8 and 2003(A).[17]

9     **D.**     **Plaintiffs Have Failed To State an Actionable Claim of Negligent**

10         **Misrepresentation and Nondisclosure against Quarles.**

11     Plaintiffs allege and argue that Quarles is liable under Arizona law for "***suppl[ying]***

12 ***false information*** for the guidance of the named Plaintiffs and other members of the Classes in

13 their business transactions relating to the purchase and retention of Mortgages Ltd's

14 securities."  Compl. ¶ 433 (emphasis added); Rsp. at 26.  But as set forth above and in Quarles'

15 opening brief, Plaintiffs have not alleged that Quarles actually provided ***any*** false information

16 – or, indeed, any information at all – to any RB investors or that the investors relied on Quarles

17 in any way in deciding to purchase or retain securities.  *Federal Deposit Ins. Corp. v.*

18 *O'Melveny & Myers*, 969 F.2d 744 (9th Cir. 1992), relied on by Plaintiffs, is not applicable

19 because it applied California legal malpractice law.  But, in any event, even if the standard

20 applied by the Ninth Circuit in that case were applicable here, it only highlights what is

21 missing from Plaintiffs' allegations.  In that case, the O'Melveny firm prepared two private

22 placement memoranda ("PPMs") that actually were distributed to and relied upon by investors.

23 O'Melveny was identified as counsel for the issuers in the PPMs and "wrote substantial

24 portions of the PPMs, edited other portions and performed a due diligence review to confirm

25

26

27 [17] Because the same elements apply to Plaintiffs' claims for aiding and abetting RB's breach of fiduciary duty and violation of the Investment Management Act, those claims fail as well.

28 *See* Br. at 22-23.  Contrary to Plaintiffs' broad suggestion (Rsp. at 23), Quarles does not concede the existence of a primary violation for either of these claims.

1   the accuracy and completeness of the PPMs' disclosures." *Id.* at 746.  In contrast, Quarles

2   never drafted a POM containing misleading information that ever was provided to investors,

3   and none of the information Quarles allegedly authorized RB to provide at the investor

4   meetings was false.

5        Plaintiffs also argue that their general allegation of justifiable reliance in paragraph 433

6   of the Complaint is sufficient to withstand a motion to dismiss.  Rsp. at 27.  Here, however, the

7   question is not whether Plaintiffs' reliance was ***justifiable***, but whether Plaintiffs ever read,

8   saw, or reviewed any statement (false or otherwise), and thus even had the opportunity to rely.

9   There can be no reliance (justifiable or otherwise) – and thus no basis for a claim of negligent

10   misrepresentation – where Quarles never supplied any information or misinformation to

11   investors.

12   **III.   CONCLUSION**

13        For the reasons set forth above and in Quarles' opening brief, Quarles respectfully

14   requests the Court to grant its motion to dismiss with prejudice all claims against Quarles.

15        Respectfully submitted this 11th day of October, 2010.

16

17   Dated:  October 11, 2010      By:  /s/ Isabelle Carrillo Smith

18            Robert E. Gooding, Jr.
         Scott B. Garner
19            Isabelle Carrillo Smith
         Shawn M. Kennedy
20            HOWREY LLP

21            Attorneys for Defendant
         QUARLES & BRADY LLP

22

23

24

25

26

27

28

1

**Certificate of Service**

2

3        I hereby certify that on October 11, 2010, I electronically filed the foregoing with the

4 Clerk of the Court using the CM/ECF system which will send notification of such filing to the

5 e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have

6 mailed the foregoing document or paper via the United States Postal Service to the non-

7 CM/ECF participants indicated on the Manual Notice list.

8        I certify under penalty of perjury under the laws of the United States of America that the

9 foregoing is true and correct.

10

11

12                         /s/ Serap Karaman Stothers

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28