**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Robert Facciola, et al.,                              )      No. CV-10-1025-PHX-FJM
                                                      )
              Plaintiffs,                             )      **ORDER**
                                                      )
vs.                                                   )
                                                      )
                                                      )
Greenberg Traurig LLP, et al.,                        )
                                                      )
              Defendants.                             )
                                                      )
_____)

       This action was reassigned to the undersigned on March 31, 2011 (doc. 161).  It came
with fully briefed, ripe motions, all of which were over-sized, repetitious, needlessly complex
and burdensome.  They are defendant Quarles & Brady LLP's ("Quarles") motion to dismiss
(doc. 102), plaintiffs' response (doc. 106), and Quarles' reply (doc. 136); defendant
Greenberg Traurig LLP's ("Greenberg") motion to dismiss (doc. 104), plaintiffs' response
(doc. 105), and Greenberg's reply (doc. 135); plaintiffs' supplemental citation in support of
opposition to motions to dismiss (doc. 144), Greenberg's response (doc. 145), and Quarles'
response (doc. 146); defendant Mayer Hoffman McCann, P.C., CBIZ Inc., and CBIZ MHM,
LLC's (collectively "Accountant Defendants") motion to dismiss (doc. 103), plaintiffs'
response (doc. 107), and the Accountant Defendants' reply (doc. 134).

                                         **I. Background**

       Plaintiffs filed this action on behalf of individuals who purchased investment products

offered by Mortgages, Ltd. ("ML") and Radical Bunny, LLC ("RB") between 2005 and 2008.  One set of plaintiffs invested through ML ("ML Plaintiffs"), which gave them pass-through interests in the loans that ML made to real estate developers.  The other set of plaintiffs invested in RB ("RB Plaintiffs"), an entity that loaned funds to ML.  Both RB and ML allegedly made false and misleading statements to Plaintiffs by failing to disclose, among other things, that ML had adopted a "Ponzi" scheme allowing it to hide its insolvency and remain in business by finding new investors to pay existing debt.  Plaintiffs seek to recover their lost investments from former managers of the two companies, as well as Quarles, legal counsel for RB, Greenberg, legal counsel for ML, and the Accountant Defendants, outside auditors for ML

According to the Complaint,[1] ML was a private mortgage lender based in Arizona and in the business of making high-interest bridge loans to real estate developers.  Complaint ¶ 56.[2]  To finance these loans, ML raised money from private investors, who initially received fractional interests, or "pass-through interests" in the secured promissory notes executed by the developers who had borrowed money from ML.

Defendants Tom Hirsch, Howard and Berta Walder, and Harish Shah formed RB in 1999.  RB solicited investors for various real estate projects, including investors in pass-through interests in loans originated by ML.  Beginning in late 2005, ML's CEO Scott Coles proposed a new relationship under which RB stopped investing in ML's pass-through investments, and instead lent money directly to ML at high-interest rates.  ¶ 60.  This new "direct-loan program" eased ML's growing liquidity problems by providing the company with what amounted to an unsecured line of credit.  ¶ 61.  Although RB purported to sell mortgage-backed securities under documents called *Directions to Purchase*, the investments were in reality unsecured, the securities were not registered, and the principals of RB were

---

[1]The facts described are as alleged in the Complaint and are taken as true for purposes of these motions to dismiss.

[2]All ¶ symbols refer to the Complaint.

1   not licensed to sell securities—all in violation of Arizona securities law.  ¶¶ 92-93.  During

2   the period from September 1, 2005 through June 3, 2008, ML and RB together raised over

3   $900 million from more than 2,000 investors nationwide.  ¶ 83.

4          Precipitated by the collapse of the real estate market and ML's inability to continue

5   funding loans, ML experienced financial collapse in 2008.  ML CEO Scott Coles committed

6   suicide in June 2008, and ML filed bankruptcy two weeks later.  RB filed bankruptcy in

7   October 2008.  ¶ 123.

8                                    **II.  The Claims**

9          Plaintiffs assert six counts[3] against Quarles and Greenberg: Count 1 (primary liability

10  under the Arizona Securities Act, A.R.S. §§ 44-1991(A) and 44-2003(A); Count 3 (aiding

11  and abetting violation of the Arizona Securities Act); Count 4 (aiding and abetting breach of

12  fiduciary duty); Count 5 (negligent misrepresentation); Count 6 (primary violation of the

13  Arizona Investment Management Act (AIMA"), A.R.S. § 44-3241; and Count 7 (aiding and

14  abetting violation of the AIMA).

15         Plaintiffs also name Mayer Hoffman in Count 1 (violation of Arizona Securities Act),

16  Count 3 (aiding and abetting securities fraud), Count 5 (negligent misrepresentation), Count

17  6 (violation of the AIMA), and Count 7 (aiding and abetting violation of the AIMA).[4]

18  Plaintiffs also allege in Count 2 that CBIZ, Inc. and CBIZ MHM, LLC, acting as statutory

19  control persons, are liable for Mayer Hoffman's violations of the Arizona Securities Act, and

20  in Count 8 are liable for all claims against Mayer Hoffman under a joint venture theory.

21

22

23         [3]Plaintiffs clarify that they do not assert statutory control person liability claims
24  against Greenberg or Quarles.  See Response to Greenberg Motion at 3; Response to Quarles
    Motion at 7 n.3.

25         [4]Plaintiffs concede that the Complaint mistakenly lists the Accountant Defendants in
26  Count 3, aiding and abetting securities fraud.  Response at 17.  Moreover, Plaintiffs do not
27  respond to the Accountant Defendants' motion to dismiss Count 7, aiding and abetting
    violation of the AIMA, thereby waiving the claim.  See LRCiv 7.2(i).  Therefore, Counts 3
28  and 7 are dismissed as against the Accountant Defendants.

**A.  Arizona Securities Act, A.R.S. § 44-1991(A)**

**Greenberg, Quarles, Mayer Hoffman**

The Arizona Securities Act, A.R.S. § 44-1991(A), makes it unlawful for a person, in connection with the sale or purchase of securities, to do any of the following:

(1) Employ any device, scheme or artifice to defraud.

(2) Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(3) Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44-1991(A). Section 44-2001(A) creates a private cause of action for rescission or damages for violations of § 44-1991(A).  The Act extends private civil liability beyond the parties to the sale, but only to persons " who made, participated in or induced the unlawful sale or purchase."  A.R.S. § 44-2003(A).  Plaintiffs allege that Quarles, Greenberg, and Mayer Hoffman are primarily liable under A.R.S. § 44-1991(A) and 44-2003(A) by participating in or inducing the unlawful sale of securities to Plaintiffs.

To "participate in" means "to take part in something" or "have a part or share in something."  Grand v. Nacchio, 222 Ariz. 498, 500-01, 217 P.3d 1203, 1205-06 (Ct. App. 2009) (Grand I) (quoting Standard Chartered PLC v. Price Waterhouse, 190 Ariz. 6, 21, 945 P.2d 317, 332 (Ct. App. 1996)).  "Participation" under A.R.S. § 44-2003(A) requires something more than activities that are merely "tangentially related to and concurrent with [an] ongoing sale."  Standard Chartered, 190 Ariz. at 21, 945 P.2d at 332.

"Induce" under the Act means to "persuade" or "prevail."  Id.  However, the statute is not so broad as to encompass "any outsider to a securities transaction–no matter how remote from the transaction–who provided information that foreseeably contributed to, and thereby *influenced*, a buyer or seller's decision to engage in the transaction."  Id. (emphasis in original).  Instead, some "purposeful persuasive effort" is required.  Id. at 22, 945 P.2d at 333.

Claims arising under § 44-1991(A) must also satisfy § 44-2082(A) and (B), which

contain a heightened pleading standard similar to Rule 9(b), Fed. R. Civ. P.[5]  Section 44-2082(A) requires that a plaintiff alleging misrepresentations or omissions "specify each alleged untrue statement or material omission and the reason or reasons why the statement or omission is misleading or the omission is material."  To the extent that scienter is an element of the offense, a complaint must also plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 44-2082(B).  Scienter is an element of claims raised under A.R.S. § 44-1991(A)(1) only—not § 44-1991(A)(2) or (3).  See Orthologic Corp. v. Columbia HCA Healthcare Corp., 2002 WL 1331735, at *5 (D. Ariz. Jan. 7, 2002) (citing State v. Gunnison, 127 Ariz. 110, 113, 618 P.2d 604, 607 (1980)).

### 1. Greenberg

Greenberg was retained as legal counsel by ML in April 2006, ¶¶ 17, 131.  Robert Kant was the senior Greenberg lawyer responsible for the overall representation of ML  ¶ 131.  Plaintiffs allege that Greenberg participated directly or indirectly in the ML-RB fraudulent scheme by preparing false and misleading private offering memoranda[6] ("POMs") used to solicit investors, and by providing securities advice to both ML and RB in order to further ongoing securities sales.  Beginning with a May 15, 2006 POM and ending with a February 11, 2008 POM, Kant prepared a series of 11 POMs without disclosing that (1) RB and its managers were illegally acting as unlicensed securities dealers in violation of state and federal securities law, ¶ 135; and (2) that ML's business was rapidly failing.  ¶ 211.

In December 2006, Kant arranged a meeting with ML and RB senior management and explained that RB's securities sales violated state and federal securities laws.  Kant knew that

---

[5]Plaintiffs do not argue that the state pleading standard is only procedural and therefore not applicable to these diversity claims.  We therefore, assume, but do not decide, that the state pleading standard applies.

[6]A POM, by its nature, is a solicitation to invest.  They are "designed to induce outside investors" to buy securities.  See FDIC v. O'Melveny & Myers, 969 F.2d 744, 746 (9th Cir. 1992).

1 ML was using RB as an unlicensed dealer to sell interests in notes that ML issued to RB, ¶

2 135, and that ML's ongoing business was dependent on obtaining funds from RB. ¶¶ 133-34.

3 Therefore, ML management was interested in devising a strategy to remedy RB's past and

4 continuing securities violations without disrupting ML's source of funds. ¶ 139.  In January

5 2007, as part of a remedial strategy, Kant arranged for RB to retain Quarles as counsel and

6 proposed that Tom Hirsch, RB's manager, register as a securities dealer under ML's

7 securities license.  ¶¶ 141-42.

8 　　　By at least mid-January 2008, Greenberg knew that ML borrowers had defaulted on

9 over $100 million in ML development loans.  Greenberg lawyers prepared default notices

10 for ML to send to defaulting borrowers.  ¶¶ 213-15.  Kant also knew that ML was becoming

11 increasingly incapable of honoring investors' redemption requests.  He advised ML CEO

12 Scott Coles to invoke language in governing documents giving ML discretion to reject

13 redemption requests.  ¶ 212.  Despite his knowledge of ML's insolvency, Kant prepared

14 POMs for two new 2008 securities offerings, without disclosing the risks associated with

15 ML's inability to fund loan commitments, or the growing defaults on the loans held by ML.

16 ¶ 217.  Instead, the POM disclosures from May 15, 2006 through February 2008 are virtually

17 identical, despite the dramatic decline in ML's financial stability.  ¶¶ 202, 205.  One of the

18 2008 offerings was a new product that Kant helped structure, called a Value-to-Loan

19 Opportunity Fund ("VLT Fund"), allegedly designed to cover up ML's inability to pay its

20 debts as they came due.  ML raised over $7 million through the VLT Fund. More than 55%

21 of the money was used to pay interest on money owed to earlier ML investors.  ¶ 222.

22 During 2007, ML raised approximately $127 million from its investors, and in 2008 raised

23 another $70 million, all solicited by POMs drafted by Kant.  ¶ 203.

24 　　　The Complaint also alleges that Greenberg actively participated in concealing RB and

25 ML's fraud.  In March and April 2008, Kant and a Greenberg employment lawyer devised

26 a plan to terminate ML's managing director Robert Furst for "misrepresenting his

27 credentials" when he sought to expose Mortgages, Ltd's securities violations."  ¶¶ 235-39.

28 　　　We conclude that, based on these allegations and others, Plaintiffs have adequately

1   pled facts showing that Greenberg either participated in or induced securities transactions in

2   violation of A.R.S. § 44-1991(A) and § 44-2003(A).  We need not decide whether this

3   conduct is better classified as "participation in" or "inducement" under A.R.S. § 44-2003(A).

4   See Grand v. Nacchio, 225 Ariz. 171, 174, 236 P.3d 398, 401 (2010) (Grand II) ("[C]ourts

5   are not ordinarily required to parse whether a person violating § 44-1991(A)(3) should be

6   separately characterized under § 44-2003(A) as having 'made,' 'participated in,' or 'induced'

7   the unlawful purchase or sale.").

8           In so holding, we reject Greenberg's argument that it is entitled to immunity under the

9   safe harbor provision of A.R.S. § 44-2003(A), which provides that "[n]o person shall be

10   deemed to have participated in any sale or purchase solely by reason of having acted in the

11   ordinary course of that person's professional capacity in connection with that sale or

12   purchase." A.R.S. § 44-2003(A). This case is distinguishable from Standard Chartered, 190

13   Ariz. at 21, 945 P.2d at 332, where the court held that an accounting firm did not "participate

14   in" the sale of securities by preparing a negligent audit when it prepared the audit in the

15   normal course of its professional duties, and would have prepared the audit without regard

16   to securities transactions.  In contrast, Greenberg was retained in large part to prepare

17   documents that were primarily designed to solicit investors.  This work is not merely

18   "tangentially" related to the sale of the securities, but instead is a key component to the

19   investor solicitation. See id. We reject Greenberg's argument that § 44-2003(A) immunizes

20   any lawyer when acting as a lawyer, even if he participates in his client's fraudulent scheme.

21   Allegations that Greenberg knowingly assisted in ML's fraud are obviously acts beyond the

22   ordinary course of Greenberg's professional duties.  A lawyer may not continue to provide

23   services to a client when the lawyer knows that the client is engaged in a course of conduct

24   designed to deceive others, and where it is obvious that the lawyer's compliant legal services

25   may be a substantial factor in permitting the deceit to continue.  Rules of Prof. Conduct, ER

26   1.16.  Greenberg's alleged participation in the fraudulent scheme does not fit within the safe

27   harbor of A.R.S. § 44-2003(A).

28           Greenberg also argues that it cannot be liable for nondisclosures because it had no

duty to non-client investors.  Generally, to the extent that fraud is based on nondisclosure, it must be shown that the defendant had a duty to disclose.  <u>Dunahay v. Struzik</u>, 96 Ariz. 246, 248, 393 P.2d 930, 932 (1963).  However, a party may be liable for nondisclosures if he "substantially participated" in the preparation of a materially false or misleading statement. <u>Howard v. Everex Sys.</u>, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).  Plaintiffs allege that Greenberg played a substantial role in drafting, preparing, and reviewing the allegedly misleading statements in the ML POMs.  Greenberg, as the primary drafter of the language in the POMs, had a duty to exercise reasonable care to ensure that the statements it made, or substantially participated in making, were not false or misleading.  <u>FDIC v. O'Melveny & Myers</u>, 969 F.2d 744, 749 (9th Cir. 1992) ("An important duty of securities counsel is to make a 'reasonable, independent investigation to detect and correct false or misleading materials.'").  Therefore, to the extent Greenberg knew those statements to be false or misleading Greenberg had a duty not to make them and to disclose facts undermining those statements.

We also conclude that Plaintiffs have adequately pled sufficient facts giving rise to a strong inference that Kant acted with the requisite degree of scienter.  There are more than sufficient well-pled facts to infer that Kant was aware of the ongoing securities violations, knew the representations made in the POMs were both false and misleading, and nevertheless continued to participate in the fraudulent scheme.

Finally, Greenberg argues that it cannot be liable to RB Plaintiffs because the Complaint "contains no factual allegations that Greenberg had any involvement in the sale of securities to RB investors."  We agree that the allegations with respect to Greenberg's involvement in RB securities transactions are insufficient to state a claim under A.R.S. § 44-1991(A).  The Complaint alleges that in December 2006, Kant warned RB managers that their conduct violated federal and state securities laws, and in September 2007, Kant tried to remedy RB's ongoing securities violations by negotiating with RB a $20,000 fee to prepare an RB POM.  ¶¶ 164-70, 268.  Kant prepared drafts of RB POMs in September and October 2007 that were circulated to Quarles and senior management of both ML and RB.

1   ¶ 267.  However, the draft RB POMs were never completed or shared with any RB investor.

2   ¶ 172.  Based on these scant allegations, we conclude that the RB Plaintiffs have failed to

3   allege sufficient conduct by Greenberg to support a claim under § 44-1991(A) or § 44-

4   2003(A).

5        We deny Greenberg's motion to dismiss § 1991(A) claims by ML plaintiffs and grant

6   Greenberg's motion to dismiss § 1991(A) claims by RB investors.

7                                  **2.  Quarles**

8        The allegations asserted against Quarles are more attenuated.  Quarles was retained

9   by RB in February 2007 upon the recommendation of Greenberg lawyer Robert Kant in order

10  to address RB's presumed securities violations. ¶ 149.  Quarles quickly confirmed that RB's

11  business raised serious securities compliance concerns.  On May 2, 2007, Quarles advised

12  RB's management (the "Hirsch Defendants") that RB was engaging in the unlicensed sale

13  of unregistered securities and had falsely represented that RB investors had a perfected

14  security interest in ML's assets.   ¶¶ 152-53, 252.   Quarles lawyers advised the Hirsch

15  Defendants to retain criminal counsel.  Quarles' lawyer Christian Hoffman told the Hirsch

16  Defendants that they should disclose the securities violations to regulators, and comply with

17  the securities registration regulations before any new sales occurred.  ¶¶ 153, 254.  He also

18  claims to have told RB to immediately stop selling securities until they were compliant.

19  ¶ 153.  Plaintiffs dispute this allegation.  ¶ 153.  At all events, RB responded that it had no

20  intention of making any disclosures to investors or regulators regarding past violations, but

21  that it wanted to retain Quarles' assistance in order to be "compliant going forward."  ¶¶ 22,

22  154-55, 255.

23       Quarles lawyers began work by attempting to structure a perfected security interest

24  for RB in ML's assets ¶ 265, discussing plans to legalize RB's securities offerings, ¶ 266,

25  and preparing various disclosure documents for use with future investors, ¶¶ 180, 265.  For

26  example, in mid-May 2007, Quarles prepared draft interim risk disclosures to be "used with

27  new investors."  ¶ 259.  Quarles lawyer Hoffman claims that he assumed, based on his

28  discussion with the Hirsch Defendants, that RB had stopped selling securities.  ¶ 255.

1   According to Plaintiffs, RB, on its own initiative, revised its investor forms using the interim

2   risk disclosure language drafted by Quarles.  ¶ 259

3        ML CEO Scott Coles killed himself on June 2, 2008.  The next day Hirsch told

4   Quarles lawyer Bornhoft that he expected a "run on the bank."  ¶ 292.  On June 9, 2008,

5   "Hoffman and Hirsch both acknowledged that [RB] had continued to sell securities on behalf

6   of [ML] since the time Quarles began representing [RB] more than a year earlier."  ¶ 294.

7   On June 10, 2008, Quarles sent a letter to RB terminating their representation.  ¶ 295.

8        Plaintiffs allege in Count 1 that Quarles is primarily liable under A.R.S. §§ 44-

9   1991(A) and 44-2003(A) by participating in or inducing the unlawful sale of securities to

10  Plaintiffs.  To "induce" a purchase or sale of securities under § 44-2003(A), a defendant must

11  engage in a purposeful effort to "persuade" or "prevail upon" the plaintiff to purchase

12  securities.  Standard Chartered, 190 Ariz. at 21, 945 P.2d at 332.  Collateral involvement in

13  a securities transaction is not enough to show inducement.  Id.  There is no allegation that

14  Quarles ever met or communicated with any RB or ML investor, or that any document

15  prepared by Quarles was ever finalized, provided to, or relied upon by investors in deciding

16  to purchase securities.  Accordingly, Plaintiffs have not sufficiently alleged that Quarles

17  "induced" a securities transaction.

18       Instead, the crux of Plaintiffs' claim under §§ 44-1991(A) and 44-2003(A) is that

19  Quarles "participated in" RB's illegal sales of securities.  We conclude that Plaintiffs' have

20  not asserted sufficient allegations that Quarles "took part in [an enterprise] in common with

21  others," or "ha[d] a part in or share in something."  Standard Chartered, 190 Ariz. at 21, 945

22  P.2d at 332.

23       Plaintiffs allege that Quarles worked with Greenberg to restructure the ML-RB

24  relationship in an attempt to "legalize" the earlier securities sales by evaluating ways to

25  create a registration exemption for RB, ¶ 196, and to retroactively collateralize the earlier

26  investments.  ¶¶ 277-86.  Investigating ways to allow RB to conduct its business legally does

27  not amount to participation in securities fraud.

28       Quarles also "prepared documents for RB to use in soliciting new investors," ¶ 196,

reviewed "materials currently being used" by RB," ¶ 184, and provided RB with interim disclosure language "that could be used with new investors," ¶¶ 259-60. Plaintiffs argue that these allegations are sufficient to show that Quarles knew that RB was continuing to unlawfully sell securities. But the question remains whether Quarles reviewed the documents and drafted the language as part of its assessment of RB's past conduct and efforts to help RB become compliant going forward, or whether Quarles was knowingly participating in RB's ongoing fraud. Conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. <u>Cholla Ready Mix, Inc. v. Civish</u>, 382 F.3d 969, 973 (9th Cir. 2004). A complaint must allege enough facts to state a claim that is "plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

The Complaint acknowledges that Quarles was retained specifically "to address [RB's] noncompliance with the securities laws," ¶ 141, and to help RB become "compliant going forward," ¶ 22. Allegations relying on the meaning of "new investors" or "currently being used" suggest nothing more than a "sheer possibility" that Quarles was knowingly participating in securities fraud. These allegations are insufficient to satisfy the heightened pleading standards required for securities fraud.

Plaintiffs also allege that Quarles participated in the fraudulent scheme by allowing RB to announce at a May 2007 investors' meeting that Quarles was acting as securities counsel for RB, and in doing so benefitted from Quarles' name and reputation in order to solicit investors. ¶ 262. These allegations do not support a claim of primary liability for securities fraud.

Finally, Plaintiffs allege that Quarles "participated in" the fraudulent scheme by failing to either blow the whistle on or withdraw from representing RB when RB refused to inform investors and regulators of past and ongoing securities laws violations. ¶¶ 196-97. But this argument presumes that Quarles knew that RB was continuing to sell securities

1   unlawfully.

2         Mandatory withdrawal is required when "the attorney knows the client is engaged in

3   a course of conduct designed to deceive others, and where it is obvious that the attorney's

4   compliant legal services may be a substantial factor in permitting the deceit to continue." In

5   re American Cont'l Corp, 794 F. Supp. 1424, 1452 (D. Ariz. 1992).  There are insufficient

6   facts pled to show that Quarles knew that RB was continuing to sell securities illegally.

7   There is no allegation, for example, that RB ever discussed with Quarles that it was still

8   selling securities or that Quarles knowingly participated in any aspect of an ongoing sale.

9   Instead, Plaintiffs plead Quarles' knowledge by alleging that during the course of its

10  representation, Quarles was aware that the sums raised by RB for ML continued to grow.

11  ¶¶ 152, 162, 179.  But the Complaint also alleges that the debt was growing by virtue of the

12  "the [$22.4 million] annual interest expense" on ML's debt.  ¶ 118.  Although close, these

13  allegations are insufficient to show "a strong inference that [Quarles] acted with the required

14  state of mind." A.R.S. § 44-2082(B) (emphasis added).

15        We conclude that the allegations asserted against Quarles do not rise to the level of

16  inducement or participation in RB's fraudulent sale of securities.  Quarles' motion to dismiss

17  Count 1 is granted.

### 3. **Mayer Hoffman**

19        Mayer Hoffman, the outside auditor for ML, is alleged to have issued three clean

20  audits for the years 2005, 2006, and 2007, notwithstanding that ML was insolvent throughout

21  this period.  It is alleged that ML attached the audited financials to the POMs used to solicit

22  investors, and also gave the audited financials to RB managers, but not to RB Plaintiffs.  ¶

23  99.  According to Plaintiffs, the 2006 and 2007 audit reports, as well as the restated 2005

24  audit, included financial statements that falsely represented that RB's notes were

25  collateralized by ML's assets, ¶ 99, and that the audit reports were prepared in conformity

26  with GAAP, ¶ 24.  However, none of the reports included a going-concern qualification or

27  disclosure, despite information that ML was experiencing delays in meeting its loan

28  commitments, which exceeded $130 million for 2008.  ¶ 25.  Three months after the 2007

1   audit was issued, ML was forced into bankruptcy.  ¶ 26. Plaintiffs also allege that contrary

2   to GAAP, the audited financials did not disclose the contingent liability that existed because

3   of the potential criminal, regulatory, and civil litigation associated with illegal sales of

4   securities by RB on behalf of ML.  ¶ 24.

5        Although Mayer Hoffman was ML's auditor, it employed no audit CPAs.  Instead all

6   of the CPAs who performed audits under the Mayer Hoffman name were CBIZ[7] employees.

7   Under an administrative services agreement, CBIZ provided Mayer Hoffman with personnel,

8   equipment, office space and billing services, and in return CBIZ received 85% of Mayer

9   Hoffman's gross revenue.  ¶¶ 379, 383.

10       We first reject Mayer Hoffman's argument that Plaintiffs' claims must be dismissed

11   as improperly derivative.  According to Mayer Hoffman, because Plaintiffs invested in LLCs

12   that in turn bought pass-through interests in ML, Plaintiffs' claims are derivative and must

13   be brought by the LLCs on behalf of all the investors.  An action is derivative "if the

14   gravamen of the complaint is injury to the corporation, or to the whole body of its stock or

15   property." Funk v. Spalding, 74 Ariz. 219, 223, 246 P.2d 184, 186 (1952).  Here, however,

16   Plaintiffs do not complain of injury to the corporation as a whole or damage arising from

17   corporate mismanagement. Instead, Plaintiffs' losses were caused by a fraud directed against

18   them individually.  The claim that one was fraudulently induced to make an investment is an

19   individual claim, properly brought in a direct action.  See id.

20       Plaintiffs claim that Mayer Hoffman violated A.R.S. § 44-1991(A), and participated

21   in or induced the unlawful securities sales within the meaning of § 44-2003(A).  They allege

22   that, with Mayer Hoffman's consent, ML attached the audited financials to the POMs used

23   to solicit investors, and also gave the audited financials to RB managers.  With broad,

24   conclusory statements, Plaintiffs allege that Mayer Hoffman knew that ML and RB used the

25   audit reports to solicit investors.  ¶¶ 69, 301.

26       In Standard Chartered, the court held that an auditor does not "participate in" or

27

28       [7]We refer to both CBIZ, Inc. and CBIZ MHM, LLC as "CBIZ."

"induce" sales even if it knows that investors are relying on its audits.  190 Ariz. at 21-22, 945 P.2d at 332-33.  Individuals "who neither financially participate, nor promote or solicit the transaction, but merely provide information that contributes to a buyer or seller's decision," are not liable under the Act.  Id.  "[P]erforming professional services, without actively soliciting a purchase of the underlying securities, does not give rise to liability."  Moore v. Kayport Package Express, Inc., 885 F.2d 531, 537 n.5 (9th Cir. 1989).

Like the auditing firm in Standard Chartered, Mayer Hoffman had no active role in the sale of securities beyond the performance of its professional services.  There was no "purposeful, persuasive effort" alleged on the part of Mayer Hoffman.  Id. at 22, 945 P.2d at 333.  Mayer Hoffman prepared the audit reports independent of any securities transactions.  This collateral involvement falls within the safe harbor protection of § 44-2003(A).  Mayer Hoffman's motion to dismiss Count 1 is granted.

## B.  Aiding and Abetting Securities Fraud

### Greenberg and Quarles

Defendants first argue that aiding and abetting securities fraud should no longer be considered a cognizable claim under Arizona law.  Because the federal anti-fraud securities statutes no longer allow for aiding and abetting liability, defendants argue that Arizona courts would similarly conclude that such a claim is no longer viable under state law.  See Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S. Ct. 1439 (1994).

The Arizona Supreme Court has recognized a cause of action for aiding and abetting securities fraud under the Arizona Securities Act.  State v. Superior Court, 123 Ariz. 324, 331, 599 P.2d 777, 784 (1979), overruled on other grounds by State v. Gunnison, 127 Ariz. 110, 618 P.2d 604 (1980).  Neither the Arizona Supreme Court nor legislature has overturned that conclusion.  With respect to state claims, we are bound to follow the decisions of a state's court of last resort in interpreting state law.  Sitting in diversity, we are not free to develop state law based on the predictive effect of changes in federal law.

To state a claim for aiding and abetting fraud under Arizona law, a plaintiff must plead (1) a primary violation has occurred; (2) defendant's knowledge of or a duty of inquiry

with regard to the primary violation; and (3) the defendant "substantially assisted or encouraged" the primary actor's violation.  Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons, 201 Ariz. 474, 485, 38 P.3d 12, 23 (2002).  "[M]ere knowledge of suspicious activity is not enough." Stern v. Charles Schwab & Co.., No. CV-09-1229-PHX-DGC, 2010 WL 1250732 (D. Ariz. Mar. 24, 2010).  However, "[a] showing of actual and complete knowledge of the [fraud]" is not necessary to establish aiding and abetting liability. Wells Fargo, 201 Ariz. at 488, 38 P.3d at 26.  Instead, a "general awareness of the fraudulent scheme" is enough.  Id.  Greenberg and Quarles claim that Plaintiffs have failed to sufficiently allege both knowledge and substantial participation.

### 1. Greenberg

Plaintiffs allege that Greenberg engaged in the fraudulent securities scheme by knowingly creating POMs containing false and misleading statements, drafting POMs for RB, participating in the termination of a potential whistleblower, and orchestrating a plan to have RB's manager register as a securities dealer under ML's securities license, all for the purpose of hiding ML's failing financials and keeping ML in business.  ¶¶ 109-10, 142.  Although Greenberg characterizes its alleged conduct as "silence, inaction, and nondisclosure," Greenberg Motion at 26, the Complaint alleges that Greenberg actively and substantially participated in the fraudulent scheme by preparing multiple POMs for the purpose of soliciting investors.  See Oster v. Kirschner, 905 N.Y.S.2d 69, 70, 72 (N.Y. 2010) (holding that lawyer's material omissions in a POM establishes both the knowledge and substantial assistance elements of an aiding and abetting claim).  Plaintiffs have adequately alleged that Greenberg knew of and substantially assisted in the ongoing fraud.  Greenberg's motion to dismiss Count 3 is denied.

### 2. Quarles

Plaintiffs do not plead facts sufficient to establish that Quarles knew that RB was continuing to unlawfully sell securities after it began its representation.  Quarles' presence at meetings and receipt of reports obliquely referring to increases in the amount of outstanding loans from RB to ML, while perhaps properly characterized as suspicious

1   activity, is not sufficient to show that Quarles knew that RB was continuing to sell securities.

2       Nor do Plaintiffs' allegations against Quarles rise to the level of "substantial

3   assistance."  Proof of substantial assistance requires a showing that Quarles' conduct was "a

4   substantial factor in causing the plaintiff's harm."  In re American. Cont'l Corp., 794 F.

5   Supp. at 1434-35.  The allegations in the Complaint do not show that Quarles' conduct was

6   a substantial factor in causing Plaintiffs to purchase the securities, or that Quarles played any

7   material role in the securities transactions.  There is no allegation that any Plaintiff relied on

8   any representation by Quarles in deciding to invest, or that any document prepared by

9   Quarles was ever finalized or provided to any investor.

10      Because the Complaint does not sufficiently plead that Quarles was aware of the

11  ongoing fraudulent scheme or substantially assisted or encouraged RB's fraud, Quarles'

12  motion to dismiss Count 3 is granted.[8]

### C. Aiding and Abetting Breach of Fiduciary Duty

#### Greenberg

15      In order to state a claim for aiding and abetting breach of a fiduciary duty, Plaintiffs

16  must plead sufficient facts to show that (1) ML and RB owed a fiduciary duty to investors,

17  (2) Greenberg knew that ML and RB's conduct constituted a breach of that fiduciary

18  relationship, and (3) Greenberg provided substantial assistance in the breach.  A fiduciary

19  relationship is a "confidential relationship whose attributes include great intimacy, disclosure

20  of secrets, or intrusting of power."  Standard Chartered, 190 Ariz. at 24, 945 P.2d at 335.

21  The fiduciary "holds superiority of position over the beneficiary," such that the beneficiary

22  agrees to substitute the will of the fiduciary for its own.  Id.

23      Plaintiffs broadly allege that ML and RB owed a fiduciary duty to Plaintiffs because

24

25      [8]Plaintiffs' claims for aiding and abetting breach of a fiduciary duty (Count 4) and

26  aiding and abetting violation of the Arizona Investment Management Act (Count 7) also
    require a showing of substantial assistance.  For the same reasons that Plaintiffs have failed

27  to state a claim against Quarles for aiding and abetting securities fraud, we dismiss Plaintiffs

28  claims against Quarles in Counts 4 and 7.

they acted as their "manager," "agent," or "promoter" in connection with their investments. ¶ 421.  While Plaintiffs allege that the Directions to Purchase represented that RB was acting as the investor's "agent" in the loan placement, ¶ 90, no specific allegation explains ML's fiduciary obligation.  These conclusory labels are insufficient to show that a fiduciary relationship existed between ML and RB and their investors.  Moreover, Plaintiffs' conclusory allegations that Defendants had exclusive authority on certain matters relating to the loans and superior knowledge to the individual investors are insufficient to show that Greenberg knew that ML and RB's conduct constituted a breach of a fiduciary duty.  The allegations are simply too attenuated to support this claim.  We grant Greenberg's motion to dismiss the claim for aiding and abetting breach of a fiduciary duty (Count 4).[9]

### D.  Negligent Misrepresentation

### Greenberg, Quarles, Mayer Hoffman

Negligent misrepresentation occurs when a person negligently supplies false information intended for the guidance of another, and the other party justifiably relies on this false information, resulting in damages.  PLM Tax Certificate Program 1191-92, L.P. v. Schweikert, 216 Ariz. 47, 50, 162 P.3d 1267, 1270 (Ct. App. 2007).  To be liable for negligent misrepresentation, the defendant must owe a duty to the injured party.  Id.  The general rule is that a professional owes a duty to a third party only if that third party is within the "limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." Standard Chartered, 190 Ariz. at 29, 945 P.2d at 340 (quoting Restatement (Second) of Torts § 552(2)(a)).

Each of the Defendants contends that the negligent misrepresentation claim must be dismissed because there is no showing of duty or reliance.

### 1.  Greenberg

---

[9]We note that this conclusion is contrary to a holding in the Order dated March 31, 2011 (doc. 160 at 15).  Pursuant to Rule 54(b), Fed. R. Civ. P., we now revise that ruling to conclude that Plaintiffs have insufficiently pled the existence of a fiduciary relationship between ML and RB and their investors.

Greenberg is alleged to have drafted false and misleading POMS for the purpose of soliciting ML investors.  Therefore, ML Plaintiffs are within the limited group of persons to whom Greenberg owed a duty.  Plaintiffs have not sufficiently pled, however, that RB Plaintiffs were the intended recipient of the misleading POMs or that RB Plaintiffs actually relied on the misleading information to their detriment.  Therefore, the RB Plaintiffs have failed to state a claim for negligent misrepresentation against Greenberg.

Greenberg's motion to dismiss the negligent misrepresentation claim (Count 5) is granted with respect to RB Plaintiffs and denied with respect to ML Plaintiffs.

## 2.  Quarles

Plaintiffs allege that "Quarles negligently gathered, compiled, and authorized the distribution of information used in the investor meetings and materials through which Radical Bunny unlawfully offered, sold, or described securities to Plaintiffs," ¶ 429, and that Plaintiffs were injured by their "justifiable reliance upon the information," ¶ 433.  These conclusory allegations are insufficient to state a claim of negligent misrepresentation against Quarles.  Quarles' motion to dismiss Count 5 is granted.

## 3.  Mayer Hoffman

Mayer Hoffman also argues that Plaintiffs are not within the "limited group of persons" to whom it owed a duty, and thus the negligent misrepresentation claim must be dismissed.  We agree.  Plaintiffs have not sufficiently pled that Mayer Hoffman knew that Plaintiffs were the intended beneficiaries of the audit reports.  Indeed, the Complaint acknowledges that Mayer Hoffman served as ML's general auditor for 10 years, providing annual audits of ML's financial statements for general purposes every year.  ¶¶ 298-300. Plaintiffs' conclusory allegations that Mayer Hoffman "knew" that its audit reports were used to attract investors, ¶¶ 304, 430, are insufficient to plead scienter.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The only specific allegation related to knowledge is Mayer Hoffman's acknowledgment in risk-assessment documents that ML's "financial statements are used to secure additional funding and to provide evidence of

1   financial stability to investors interested in purchasing mortgage backed securities." ¶ 301.

2   But that allegation shows at best that Mayer Hoffman knew that "financial statements . . .

3   may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like."

4   See Restatement (Second) of Torts § 552, illus. 10. The "limited group" requirement cannot

5   be expanded so broadly as to include the general investing public. Id.

6        Even if all investors were properly within the "limited group of persons" to whom

7   Mayer Hoffman owed a duty, we would nevertheless dismiss the claim for Plaintiffs' failure

8   to adequately allege that they relied on the audit reports in making their decision to purchase

9   the securities. RB Plaintiffs concede that they never received the audit reports. Therefore,

10  *a fortiori* they could not have relied on them. ML Plaintiffs allege only that reliance should

11  be presumed or inferred because their claims are based on the omission of material facts.

12  Response at 22. But this is not strictly an omissions claim. Plaintiffs assert numerous

13  allegations of affirmative misrepresentations. ¶¶ 327, 342-43, 374, 431.

14       Because Plaintiffs have not adequately pled that they are within the limited group to

15  whom Mayer Hoffman owed a duty, or that they relied on Mayer Hoffman's

16  misrepresentations, we grant Mayer Hoffman's motion to dismiss Count 5.

17

18         **E.  Arizona Investment Management Act (Counts 6 and 7)**

19         **Greenberg, Quarles, Mayer Hoffman**

20       Plaintiffs assert primary and aiding and abetting liability claims against Greenberg,

21  Quarles, and Mayer Hoffman under the Arizona Investment Management Act ("AIMA"),

22  A.R.S. § 44-3241(A). The AIMA prohibits a person from committing fraud in connection

23  with a transaction "involving the provision of investment advisory services." Id. Plaintiffs

24  claim that the Defendants are liable for (1) "employ[ing] any device, scheme or artifice to

25  defraud, (2) mak[ing] any untrue statement or material fact, or fail[ing] to state any material

26  fact necessary in order to make the statement made . . . not misleading, and (4) engag[ing]

27  in any transaction, practice or course of business that operates or would operate as a fraud

28  or deceit." Id. These substantive provisions largely duplicate the claims for fraudulent

conduct under the Arizona Securities Act but apply to "investment advisory services."

Defendants argue that plaintiffs have failed to state a claim under the AIMA because none of them provided investment advisory services to anyone, either directly or indirectly. We agree.  The Complaint alleges only generally that Plaintiffs "received investment advisory services" from Greenberg through the POMs, from Mayer Hoffman through audit reports, and from Quarles through "incomplete and misleading information."  ¶¶ 438, 441. Plaintiffs' claim for aiding and abetting a violation of the AIMA mirrors these allegations. ¶ 445.  These conclusory allegations are insufficient to meet the heightened pleading requirements of Rule 9(b) for claims brought under § 44-3241(A).  See Williamson v. Allstate Ins. Co., 204 F.R.D. 641, 644 (D. Ariz. 2001).  The Complaint does not identify the transactions involving investment advisory services, or allege that any Defendant received compensation for investment advice.  The Complaint alleges that ML and RB sold securities, not investment advice.  The AIMA does not fit the allegations raised in this Complaint. Counts 6 and 7 are dismissed as against all Defendants.

**F.  Statutory Control Liability (Count 2); Joint Venture Liability (Count 8)**

**CBIZ, Inc., CBIZ MHM, LLC**

Plaintiffs allege that CBIZ, Inc. and CBIZ MHM, LLC (collectively CBIZ) are "jointly and severally liable" for Mayer Hoffman's violation of the Arizona Securities Act, A.R.S. § 44-1991(A), because they controlled Mayer Hoffman within the meaning of A.R.S. § 44-1999(B).  They also assert, under a joint venture theory, that CBIZ is liable for Mayer Hoffman's violations of the Arizona Securities Act, the AIMA and negligent misrepresentation.  Because we have dismissed all primary liability claims against Mayer Hoffman, these vicarious liability claims also fail.  We grant the Accountant Defendants' motion to dismiss Count 2 and 8.

**III.  Conclusion**

Based on the foregoing **IT IS ORDERED GRANTING** Quarles' motion to dismiss (doc. 102).

**IT IS FURTHER ORDERED GRANTING** the Accountant Defendants' motion to

dismiss (doc. 103).

   **IT IS FURTHER ORDERED GRANTING IN PART AND DENYING IN PART** Greenberg's motion to dismiss (doc. 104).   Specifically, it is ordered **GRANTING** Greenberg's motion to dismiss Counts 4, 6, and 7 in their entirety, **GRANTING** the motion to dismiss Counts 1 and 5 with respect to the RB Plaintiffs, and **DENYING** the motion to dismiss Counts 1 and 5 with respect to the ML Plaintiffs.

   DATED this 9th day of June, 2011.


                              _Frederick J. Martone_
                              Frederick J. Martone
                              United States District Judge