Richard G. Himelrick, #004738
J. James Christian, #023614
**Tiffany & Bosco, P.A.**
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

*Attorneys for Plaintiffs Robert Facciola; The Robert Maurice Facciola Trust Dated December 2, 1994; Honeylou C. Reznik; The Morris Reznik and Honeylou C. Reznik Trust; Jewel Box Loan Company, Inc.; Jewel Box, Inc.; H-M Investments, LLC*

Andrew S. Friedman, #005425
**Bonnett, Fairbourn, Friedman & Balint, P.C.**
2901 N. Central Avenue. Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com

*Attorneys for Plaintiffs Fred C. Hagel and Jacqueline M. Hagel Revocable Living Trust Dated March 15, 1995; Judith A. Baker*

United States District Court

District of Arizona

| | |
|---|---|
| ROBERT FACCIOLA, et al.,<br><br>  Plaintiffs,<br><br> vs.<br><br>GREENBERG TRAURIG, LLP, et al.,<br><br>  Defendants. | No. 2:10-cv-01025-FJM<br><br>**Lead Plaintiffs' Reply re Mayer Hoffman and CBIZ's Opposition to Motion to Amend** |

# Table of Contents

Table of Authorities...................................................................................................ii

Memorandum .......................................................................................................1

1.    Mayer Hoffman helped Mortgages Ltd. solicit Plaintiffs' investments..................1

2.    *Standard Chartered* involved a two-party business sale in which no investor solicitation occurred ........................................................................................2

3.    Unlike *Standard Chartered,* this case involves audits used to solicit 100s of investors.................................................................................................2

4.    Section 44-2003(A) is satisfied .......................................................................3

5.    Aiding and abetting is properly pleaded ...........................................................3

6.    Mayer Hoffman acted with the scienter .............................................................4

7.    CBIZ's liability is properly pleaded..................................................................6

    A.    CBIZ controls Mayer Hoffman ..............................................................6

    B.    Control liability is not limited by § 44-2003(A) ........................................8

    C.    CBIZ's joint-venture liability is properly pleaded.....................................8

8.    Conclusion...............................................................................................9

1

# Table of Authorities

2

**Cases**

3
*Barnes v. Vozack*, 113 Ariz. 269, 550 P.2d 1070 (1976) .........................................8

4
*In re Beacon Assocs. Litig.,* 745 F. Supp. 2d 386 (S.D.N.Y. 2010)................................2

5
*Continental Casualty Co. v. Signal Ins. Co.*, 119 Ariz. 234,
6    580 P.2d 372 (App. 1978) .........................................................................9

*Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206 Ariz. 399,
7    79 P.3d 86 (App. 2003) .....................................................................7, 8

8
*Ellingson v. Sloan*, 22 Ariz. App. 383, 527 P.2d 1100 (1974) .........................................8

9
*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) .........................9

10
*In re Estate of Hernandez,* 187 Ariz. 506, 930 P.2d 1309 (1997) .........................................9

11
*FDIC v. O'Melveny & Myers*, 969 F.2d 744 (9th Cir. 1992)...........................................1

12
*Grand v. Nacchio*, 225 Ariz. 171, 236 P.3d 398 (2010) .........................................3

13
*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir. 1990) .........................7

14
*Nahom v. Blue Cross and Blue Shield of Arizona, Inc.*, 180 Ariz. 548,
15    885 P.2d 1113 (App. 1994) .....................................................................9

*New Mexico State Inv. Council v. Ernst & Young, LLP,*
16    641 F.3d 1089 (9th Cir. 2011) ("*Broadcom*")................................................4, 5, 6

17
*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005)...............................7, 9

18
*Standard Chartered PLC v. Price Waterhouse,* 190 Ariz. 6,
19    945 P.2d 317 (App. 1996) .................................................................2, 3

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons*
20    *Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 38 P.3d 12 (2002)................3

21

22

**Statutes**

23
A.R.S. § 44-1991(A) .........................................................................3

24
A.R.S. § 44-1991(B) .........................................................................3

25
A.R.S. § 44-1999(B).........................................................................7

26
A.R.S. § 44-2003(A) .....................................................................3, 8

27
A.R.S. § 44-2003(B).........................................................................8

28

A.R.S. § 44-2003(P)(1) ........................................................................................3

A.R.S. § 44-2082(A), (B), and (C).......................................................................3

**Other Authorities**

Restatement (Second) of Torts § 433 (1977) .......................................................2

Restatement (Third) of Agency § 1.02 (2005) .....................................................9

Richard M. Weinroth et al., *Reformation of the Arizona Securities
     Act: A Brief Summary*, Ariz. Att'y, Aug.-Sept. 1996, at 26..................................8

1

**Memorandum**

2          As explained below, Mayer Hoffman and CBIZ's futility arguments will not

3   withstand analysis.

4   **1.      Mayer Hoffman helped Mortgages Ltd. solicit Plaintiffs' investments.**

5          A POM is a solicitation that is "designed to induce outside investors" to invest.

6   *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 746 (9th Cir. 1992).  By agreeing to make its

7   audit reports part of Mortgages Ltd.'s POMs, Mayer Hoffman helped Mortgages Ltd.

8   solicit investors.  Mayer Hoffman's agreement to include its audit reports in the POMs is

9   shown by its workpapers, FAC [Dkt. # 217] ¶¶ 464-76, including POMs filed in the

10  workpapers.  *See id.* ¶¶ 466.[1]  Exhibits A-2, B-2, and C-2 to this Reply are three POM

11  examples from the workpapers.  The related engagement forms agreeing that audited

12  financials would be included in the POMs are submitted as Exs. A-1, B-1, and C-1.

13         These POMs are examples of what Mayer Hoffman's Response calls Pool LLCs.

14  Each of these Pool POMs—produced from the workpapers with Mayer Hoffman's control

15  numbers—include Mortgages Ltd.'s audited financials, not Pool financials.  These are

16  examples of the POMs under which Plaintiffs and others invested.  For each POM the

17  workpapers include an Engagement Acceptance Form stating that, "Audited financial

18  statements will be included in the private offering memorandum for the Mortgage Fund."

19  See FAC ¶ 465 & Exs. A-1, B-1, & C-1.  These POMs and engagement forms irrefutably

20  show that Mayer Hoffman agreed that Mortgages Ltd.'s audited financials, not Pool

21  audits, would be used to solicit investors.  Mayer Hoffman made this risky decision for its

22  own reasons—not because any statute or normal business practice required it to accredit

23  the POMs with an auditor's assurance.

24         Mayer Hoffman also agreed to Mortgages Ltd.'s use of its audits to solicit money

25  from Radical Bunny.  The auditors knew that Radical Bunny was Mortgages Ltd.'s largest

26

27  _____

28         [1] All cites to the FAC are to the FAC lodged as a clean copy at Dkt. #217.

1

investor.  *Id.* ¶ 477.  Mayer Hoffman's audit partner was familiar with Radical Bunny's investment program.  *Id.* ¶ 478.  The auditors knew that Radical Bunny operated like a mutual fund in raising its money from a base of investors.  *Id.* ¶ 479.  They answered questions from Radical Bunny's managers to reassure them about the collateral for their loans and Mortgages Ltd.'s compliance with its loan covenant to Radical Bunny.  *Id.* ¶¶ 480, 490.  The auditors thus knew that their audits were being used to solicit Radical Bunny's managers (*id.* ¶¶ 479-81, 490), who were in turn acting as agents for Radical Bunny's investor base.  *Id.* ¶¶ 484-88 (describing the agency).  On the agency, see *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 408 (S.D.N.Y. 2010) (holding under Rule 10b-5 that fraud on an investor's agent is fraud on the investor); RESTATEMENT (SECOND) OF TORTS § 433 (1977) (similar under the common law).

**2.  *Standard Chartered* involved a two-party business sale in which no investor solicitation occurred.**

        *Standard Chartered* was a two-party transaction in which one bank was buying another.  The auditor—Price Waterhouse—had no role in inducing the transaction.  The banks had signed a merger agreement for the purchase before Price Waterhouse's audits were given to the plaintiff bank.  *See* 196 Ariz. at 23, 945 P.2d at 324.  Distribution of Price Waterhouse's audits and all of the contact between Price Waterhouse and the plaintiff occurred after the purchase documentation was signed.  On these facts— involving an auditor's post-solicitation conduct in supplying audits as part of a business sale—the Court of Appeals was understandably reluctant to apply the securities laws.  It concluded that the law of negligent misrepresentation was the proper remedy for any falsity in the audits.  *See id.* at 28-31, 945 P.2d at 339-42.

**3.  Unlike *Standard Chartered*, this case involves audits used to solicit 100s of investors.**

        In this case, we have sales to 100s of public investors who Mayer Hoffman agreed could be solicited with POMs bundled with its audit reports.  FAC ¶¶ 464-80.  Concurrently, Mayer Hoffman knew Radical Bunny was soliciting $5 to $10 million a

1   month from investors to loan to Mortgages Ltd.  *Id.* ¶ 480.  To facilitate this fundraising,

2   Mayer Hoffman provided its audit reports and answered questions about the audits for

3   Radical Bunny's managers, who acted as agents for the Radical Bunny investors in

4   investigating Mortgages Ltd.'s financial condition.  *Id.* ¶¶ 484, 488-91.  In these ways,

5   Mayer Hoffman purposely interjected itself into the solicitation activities through which

6   Mortgages Ltd. and Radical Bunny raised money from 100s of public investors.

7   **4.      Section 44-2003(A) is satisfied.**

8          Whether Mayer Hoffman's conduct is best viewed as inducement or participation

9   need not be decided.  *See Grand v. Nacchio*, 225 Ariz. 171, 174 ¶ 18, 236 P.3d 398, 401

10  ¶ 18 (2010).  Parsing § 44-2003(A) is unneeded because the statute's language is "broad,"

11  "sweeping," and "inclusive" of § 44-1991(A).  *See id.* ¶¶ 17-18.

12         It is important too that in 1996—the same year *Standard Chartered* was decided—

13  the legislature amended the securities statutes to explicitly recognize the right to sue under

14  A.R.S. § 44-1991(A).  Five statutory provisions added in 1996 refer to the existence of a

15  private action under § 44-1991(A).  *See* A.R.S. § 44-1991(B), 44-2003(P)(1), 44-2082(A),

16  (B), and (C).  The Supreme Court's description in *Grand* of 44-2003(A) as "inclusive" of

17  44-1991(A) takes into account the 1996 amendments and implicitly recognizes that private

18  remedies exist for all § 44-1991(A) violations.  If § 44-2003(A) at one time narrowed the

19  private action for § 44-1991(A) violations, that ended after the 1996 amendments.

20  **5.      Aiding and abetting is properly pleaded.**

21         In *Grand*, the Supreme Court defined inducement in a way that overlaps with

22  aiding and abetting liability.  The Court held that "acts and omissions [that] encouraged"

23  securities sales are "classic inducement."  *Grand*, at 176 ¶ 24, 236 P.3d at 403 ¶ 24.  This

24  tracks the third element of aiding and abetting under Arizona law:

25                  (3)  the defendant must substantially assist *or encourage* the
                    primary tortfeasor in the achievement of the breach.

26  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension*

27  *Trust Fund,* 201 Ariz. 474, 485 ¶ 34, 38 P.3d 12, 23 ¶ 34 (2002) (emphasis added).  By

28

1   including its audit reports in Mortgages Ltd.'s POMs, Mayer Hoffman encouraged and

2   helped Mortgages Ltd. promote its securities.  FAC ¶¶ 464-76.  Mayer Hoffman provided

3   similar encouragement and inducement when it answered the Radical Bunny managers'

4   audit questions and allowed its audits to be provided to these managers to induce them to

5   raise investor money to loan to Mortgages Ltd.  FAC ¶¶ 477-91.  These facts satisfy any

6   inducement, participation, or substantial assistance needed for aiding and abetting.

7   **6.      Mayer Hoffman acted with the scienter.**

8           Analysis of whether Mayer Hoffman acted with the knowledge needed for aiding

9   and abetting is facilitated by the Ninth Circuit's *Broadcom* decision.  *See New Mexico*

10  *State Inv. Council v. Ernst & Young, LLP*, 641 F.3d 1089, 1099 (9th Cir. 2011) (for short,

11  *Broadcom*).  *Broadcom* holds that an auditor's knowledge may be inferred when the

12  auditor's conduct involves large deviations from GAAP and GAAS coupled with red flags

13  that would require a reasonable auditor to take a "hard look" at transactions.  *See id.* at

14  1097-99, 1102.  It is no answer in the face of large GAAS violations and red flags to

15  claim, like Mayer Hoffman, that the audit failures were mere negligence.  *See id.* at 1099,

16  1102.

17          The FAC provides detailed allegations of multi-million dollar GAAP violations.

18  *See* FAC ¶¶ 406-07, 414, 417-20, 426-48, 455-62.  These GAAP violations occurred with

19  an insolvent company (*id.* ¶¶ 442-48) that the auditors knew was borrowing $5 to $10

20  million a month from Radical Bunny even though its loan business had dried up seven

21  months earlier.  FAC ¶¶ 480, 516, 521-22.  Despite these jarring facts, Mayer Hoffman

22  violated GAAS by not even conducting a proper going concern analysis for 2006 or 2007.

23  *Id.* ¶¶ 441-49.  Additional GAAS violations are pleaded in detail including disregarding

24  the related-party scrutiny required for Mortgages Ltd.'s $100 million-plus Radical Bunny

25  indebtedness.  *See id.* ¶¶ 401-14, 419, 438, 441, 448-49, 505, 510-11, 524-48.

26          Contrary to GAAS, Mayer Hoffman did not expand its audit procedures despite

27  knowledge of material weaknesses in Mortgages Ltd.'s internal controls (*id.* ¶¶ 417-19,

28

4

453).  This is part of the holistic evidence of scienter.  *Broadcom*, 641 F.3d at 1094, 1101-02.  One weakness was that unlike other companies, Mortgages Ltd. did not obtain updated appraisals or valuations.  FAC ¶ 453.  Another was that Mortgages Ltd.'s CFO was incompetent and could not be relied upon to comply with GAAP.  FAC ¶¶ 503-05, 509-11.  Because of the CFO's incompetence, Mayer Hoffman wrote and audited its own footnote disclosures.  *Id.* ¶¶ 506-07, 511, 530-33.  The auditors likewise prepared and audited their own financial schedules.  *Id.* ¶¶ 505, 522.  These facts, coupled with the lack of a going-concern analysis, show there was no independent audit at all.  That is, Mayer Hoffman substantially created Mortgages Ltd.'s financial statements and then decided how much of its work to audit.  *Compare Broadcom*, 641 F.3d at 1100 ("audit amounted to no audit at all").

On top of this, Mayer Hoffman's actual knowledge of facts foreshadowing Mortgages Ltd.'s financial collapse is pleaded.  The FAC pleads that the auditors knew (because the CFO, Olson, told them) and because of loan schedules that they prepared, that Mortgages Ltd.'s core business—loan originations—ended seven months before the audit was finished.  FAC ¶¶ 516, 521-22.  The FAC also pleads Mayer Hoffman's knowledge from Olson that loan redemptions had ended, that the profit-sharing plan was terminated, and that the company was having trouble meeting its loan commitments.  *Id.* ¶¶ 25, 410, 516.  The engagement partner admitted in SEC testimony that these were important facts that the audit team should have considered.  *Id.* ¶ 410.  The auditors wrote footnotes representing that Radical Bunny's loans were collateralized by Mortgages Ltd. assets without any documentation to show a security agreement.  *Id.* ¶¶ 434-35, 511, 530, 535.  They made this representation even though the audit partner knew from his audit of a Radical Bunny investor that this investor's investment was unsecured.  *Id.* ¶¶ 532, 538.  Why was the investor's interest in Radical Bunny's Mortgages Ltd. note unsecured if the Radical Bunny notes were collateralized?  Despite this glaring inconsistency, the auditors did not ask for the security agreement that would show the alleged security.  *Id.* ¶¶ 532,

5

538.  If they had, they would have found that none existed.  *Id.* ¶¶ 533-34.  Failure to ask for documentation in the face of inconsistent information on a $100 million transaction is evidence of scienter.  *Compare Broadcom,* at 1099, 1102 (finding strong scienter inference where auditor ignored missing documentation on major transactions).

In the face of all this, Mortgages Ltd.'s president, Denning, and chief operations officer, Brown, resigned in the middle of the 2007 audit.  *Id.* ¶¶ 517-19.  Yet Mayer Hoffman never spoke to Denning or Brown about their reasons for leaving.  *Id.* ¶¶ 514-15, 519, 534.  Just months before Denning had told Kant that there wasn't a "snowball's chance in [hell]" that he would sign a security agreement.  *Id.* ¶ 295.  More evidence that the auditors were deliberately avoiding knowledge that would force it to disclose Mortgages Ltd.'s financial collapse occurred when they violated GAAS by failing to investigate (1) a warning from a Mortgages Ltd. insider (Furst), *id.* ¶¶ 541-44 and (2) a $12.5 million lawsuit by a Mortgages Ltd. borrower (*id.* ¶¶ 545-48).

Viewed holistically, the auditors knew they were dealing with an insolvent company; an incompetent CFO; monthly Radical Bunny borrowings of millions despite insolvency; resignations by top officers; warnings from Olson and Furst; and a $12.5-million borrower lawsuit.  These were in-your-face facts that Mortgages Ltd. was ready to collapse.  *Compare Broadcom*, at 1103 (rejecting auditor's claims that they were only negligent for similar reasons).

**7.     CBIZ's liability is properly pleaded.**

      **A.     CBIZ controls Mayer Hoffman.**

Mayer Hoffman is a financial shell that CBIZ operates as an attestation business unit.  FAC ¶¶ 553-56.  Nearly all of the profits from the Mayer Hoffman's audits flow to CBIZ.  *Id.* ¶ 553.  All of the employees who perform audits are CBIZ employees who reported to the CBIZ manager in the Phoenix office.  *Id.* ¶¶ 552, 562.

CBIZ controlled the CPA's compensation and retained the ability to hire, fire, demote, relocate, reprimand, censure, and discipline the CPAs who performed the audits.

1   *See id.* ¶¶ 557-59.  This power to discipline and control the audit CPAs' compensation is a

2   hallmark of the control needed for agency.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d

3   278, 300-01 (S.D.N.Y. 2005) (concluding that Grant Thorton International's ability to

4   discipline partners in its Italian member firm "suggests that it had the power to direct the

5   policies and practices of that firm—a defining characteristic of agency").  Through its

6   power to terminate and discipline any Mayer Hoffman auditor who committed securities

7   violations, CBIZ controlled indirectly, if not directly, the audit work.

8        The two cases that CBIZ cites in footnote 4 (p. 14) on general versus specific

9   control did not involve a company that assigned its employees to a shell entity and then

10  attempted to disclaim responsibility for securities violations.  One of the legislative

11  concerns that led to control liability was the use of shell companies to avoid responsibility.

12  *Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n,* 206 Ariz. 399, 411-12 ¶¶ 38 & 41,

13  79 P.3d 86, 98-99 ¶¶ 38 & 41 (App. 2003).  Under *Eastern Vanguard*, control is

14  established when the alleged control person has the power, even if indirect, to control the

15  activities of the securities violator.  *Id.* ¶ 42.  As the employer, CBIZ's power to terminate,

16  remove from audit work, reduce compensation, and otherwise discipline its CPA

17  employees shows indirect, if not direct, control over its CPAs and their activities.  *See*

18  *Parmalat,* 594 F. Supp. 2d at 300-01.  Arizona interprets its control-liability statute to

19  require control persons to supervise and implement internal controls over their employees.

20  *Id.* ¶¶ 48, 50.  Performing work through a shell company and disclaiming responsibility to

21  supervise is inconsistent with Arizona law.  *See id.*  Similar attempts to avoid liability

22  through contracts designating a controlled person as an independent contractor have been

23  held ineffective.  *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir.

24  1990).[2]

25

26        [2] CBIZ's arguments are also inconsistent with the language of § 44-1999(B),
27  which requires only that a person, not an activity, be controlled.  *Cf. In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) ("[T]he plain language of Section
28  20(a), requires control only of a person or entity liable under this chapter, not of the transaction constituting the violation.").

7

1    The AICPA's ethics rules that CBIZ mentions have no more relevance to Arizona's

2    interpretation of control liability than the ABA's ethics rules.  The rules of a professional

3    association do not trump the mandatory duty to supervise under *Eastern Vanguard*.

4    Moreover, CBIZ admits in it SEC filings that the SEC treats CBIZ and Mayer Hoffman as

5    one firm for purposes of auditor independence.  *See, e.g.,* Exhibit D (excerpt from CBIZ's

6    2009 SEC Form 10K).

7        **B.    Control liability is not limited by § 44-2003(A).**

8        The purpose of the 1996 amendments that added control liability was to expand

9    securities law liability "to reach a broader group of defendants in state court actions."

10   Richard M. Weinroth et al., *Reformation of the Arizona Securities Act: A Brief Summary*,

11   Ariz. Att'y, Aug.-Sept. 1996, at 26.  Any suggestion that 44-2003(A) limits control

12   liability is inconsistent with the plain language of 44-2003(B) and *Eastern Vanguard*'s

13   holding that liability follows when a control person fails to supervise those it has the

14   power to control.  *See Eastern Vanguard* at ¶¶ 48, 50.

15       And even if some element of participation or inducement by CBIZ is required, it is

16   pleaded through allegations that CBIZ indirectly perpetrated the fraud through its CPA

17   employees.  *See Barnes v. Vozack*, 113 Ariz. 269, 274, 550 P.2d 1070, 1075 (1976)

18   (holding that three defendants who controlled the company but never dealt with the

19   plaintiff committed securities fraud indirectly through the company's employee).

20       **C.    CBIZ's joint-venture liability is properly pleaded.**

21       Count Eight alleges that CBIZ is liable as a joint venturer for Mayer Hoffman's

22   securities violations.  CBIZ claims there can be no joint venture because it contractually

23   disclaimed a joint venture and supposedly did not have the equal control needed for a joint

24   venture.

25       This is form over substance.  As explained above, the CPAs who performed audits

26   through the Mayer Hoffman shell were CBIZ employees who CBIZ selected for the audits

27   and whose salaries and other job benefits were set by CBIZ.  FAC ¶¶ 557-59.  CBIZ also

28

8

1   had the right to fire, demote, relocate, and discipline the CPAs.  *Id.* ¶ 557.  This was joint-

2   venture control under any reasonable view.

3        In Arizona, the equal-control element of a joint venture does not require equivalent

4   control.  *See In re Estate of Hernandez,* 187 Ariz. 506, 510, 930 P.2d 1309, 1313 (1997)

5   ("[I]t is sufficient that a venturer has some voice or right to be heard in the control and

6   management of the venture.").  Nor does the equal-right-of-control element prohibit joint

7   venturers from allocating or delegating management or control among themselves.  *See*

8   *Ellingson v. Sloan*, 22 Ariz. App. 383, 386-87 n.1, 527 P.2d 1100, 1103-04 n.1 (1974).

9   CBIZ was not required to control every employee or task performed by the CPAs it

10   assigned to staff the Mayer Hoffman audits.  *See id.*; *Continental Casualty Co. v. Signal*

11   *Ins. Co.*, 119 Ariz. 234, 237, 580 P.2d 372, 375 (App. 1978) (recognizing the right to

12   delegate joint-venture duties).

13        The language in the Administrative Service Agreement that denies a joint venture

14   is not controlling.  The Restatement (Third) of Agency expressly states as much:

15   "[w]hether a relationship is characterized as agency in an agreement between parties . . . is

16   not controlling."  RESTATEMENT (THIRD) OF AGENCY § 1.02 (2005); *see also In re*

17   *Parmalat Sec. Litig.*, 375 F. Supp. 2d 258, 294 (S.D.N.Y. 2005) (holding that disclaimers

18   of agency were not controlling).  The case that CBIZ cites—*Nahom v. Blue Cross and*

19   *Blue Shield of Arizona, Inc.*, 180 Ariz. 548, 885 P.2d 1113 (App. 1994)—is not to the

20   contrary.  Consistent with the Restatement, *Nahom* treated the contract's denial of a joint

21   venture as but one relevant factor to be considered with a variety of other factors before

22   determining whether a joint venture existed.

23   **8.   Conclusion.**

24        Plaintiffs' Motion to Amend should be granted with leave to amend again if

25   needed.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir.

26   2003) (explaining that leave to amend should be granted with "extreme liberality" in

27   securities cases).

28

9

1       Dated:  July 28, 2011.

2                         TIFFANY & BOSCO, P.A.

3

4                         By:___*s/ Richard G. Himelrick*_____
                        Richard G. Himelrick

5                         J. James Christian
                        Third Floor Camelback Esplanade II

6                         2525 East Camelback Road
                        Phoenix, AZ  85016-4237

7                         *Attorneys for Plaintiffs Robert Facciola; The Robert*
                        *Maurice Facciola Trust Dated December 2, 1994;*

8                         *Honeylou C. Reznik; The Morris Reznik and Honeylou*
                        *C. Reznik Trust; Jewel Box Loan Company, Inc.; Jewel*

9                         *Box, Inc.; H-M Investments, LLC*

10                         Andrew S. Friedman

11                         Bonnett, Fairbourn, Friedman
                         & Balint, P.C.

12                         2901 N. Central Avenue
                        Suite 1000

13                         Phoenix, AZ  85012
                        *Attorneys for Plaintiffs Fred C. Hagel and Jacqueline*

14                         *M. Hagel Revocable Living Trust Dated March 15,*
                        *1995; Judith A. Baker*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I will mail the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


      *s/ Shelley Boettge*
      Shelley Boettge


#15283-1  473233