Andrew S. Friedman, #005425
**Bonnett, Fairbourn, Friedman & Balint, P.C.**
2901 N. Central Avenue. Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
afriedman@bffb.com

Attorneys for Plaintiffs Fred C. Hagel and Jacqueline M. Hagel
Revocable Living Trust Dated March 15, 1995; Judith A. Baker

Richard G. Himelrick, #004738
J. James Christian, #023614
**Tiffany & Bosco, P.A.**
Third Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103
rgh@tblaw.com; jjc@tblaw.com

Attorneys for Plaintiffs Robert Facciola; The Robert Maurice
Facciola Trust Dated December 2, 1994; Honeylou C. Reznik;
The Morris Reznik and Honeylou C. Reznik Trust; Jewel Box
Loan Company, Inc.; Jewel Box, Inc.; H-M Investments, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Facciola, et al., | No.: 2:10-cv-01025-FJM |
| Plaintiffs, | |
| vs. | **Lead Plaintiffs' Joint Response to Quarles & Brady's Motion to Dismiss First Amended Complaint** |
| Greenberg Traurig, LLP, et al., | |
| Defendants. | |

# Table of Contents

Table of Authorities .................................................................................................. ii

1.    Introduction ...................................................................................................1

2.    ML Investors' secondary liability claims are properly pleaded ...........................1

    A.    Mortgages Ltd. and Radical Bunny jointly perpetrated
        a Ponzi scheme with Quarles' help .............................................................3

    B.    Quarles is attempting to rewrite the law of aiding and abetting ...............6

    C.    Quarles' test for aiding and abetting would erode, if not conflate,
        the difference between primary and secondary liability ...........................8

    D.    The portion of *Standard Chartered* on which Quarles relies is
        obsolete......................................................................................................8

3.    Even before *Standard Chartered*, Arizona's courts accepted
    secondary theories of liability that did not depend on § 44-2003(A) ................10

    A.    Respondent superior....................................................................................10

    B.    Aiding and abetting .....................................................................................11

    C.    Actively aiding securities fraud ..................................................................11

    D.    Indirectly facilitating fraud ........................................................................12

4.    RB Investors' secondary liability claims are properly pleaded ..........................13

5.    Conclusion....................................................................................................16

# Table of Authorities

## <u>Cases</u>

*Allstate Life Ins. Co. v. Robert W. Baird Co., Inc.*
  756 F. Supp. 2d 1113 (D. Ariz. 2010). ............................................................. 8

*Barnes v. Vozak*
  113 Ariz. 269, 550 P.2d 1076 (1976) ........................................................ 7, 12

*Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*
  511 U.S. 164 (1994) ............................................................................................ 2

*Eastern Vanguard Forex, Ltd. v. Arizona Corporation Commission*
  206 Ariz. 399, 79 P.3d 86 (Ct. App. 2003) ................................................... 13

*Facciola v. Greenberg Traurig*
  No. CV-10-1025-PHX-FJM, 2011 WL 5833785 (D. Ariz. Nov. 21, 2011) .................. 1

*Facciola v. Greenberg Traurig*
  No. CV-10-1025-PHX-FJM, 2011 WL 2268950 (D. Ariz. June 9, 2011) ..................... 2

*Facciola v. Greenberg Traurig*
  781 F. Supp. 2d 913, 924 (D. Ariz. 2011) ........................................................ 2

*Geiler v. Tanner*
  24 Ariz. App. 266, 537 P.2d 994 (Ct. App. 1975) ................... 1,2, 7, 10, 11, 13, 14, 15

*Grand v. Nacchio*
  225 Ariz. 171, 236 P.3d 398 (2010) ........................................ 2, 3, 9, 10, 12, 13, 14, 15

*In re Zicam Cold Remedy Mktg., Sales Practices, and Prods. Liability Litig.*
  No. 09-md-2096-PHX-FJM, 2011 WL 977604 (D. Ariz. Mar. 18, 2011) ..................... 1

*Standard Chartered PLC v. PriceWaterhouse*
  190 Ariz. 6, 945 P.2d 317 (Ct. App. 1996) .................................... 2, 6, 7, 8, 9, 10, 12, 13

*State ex rel. Corbin v. Pickrell*
  136 Ariz. 589, 667 P.2d 1304 (1983) .............................................................. 11

*State v. Gunnison*
  127 Ariz. 110, 618 P.2d 604 (1980) .................................................................. 2

*State v. Superior Court*
  123 Ariz. 324, 599 P.2d 777 (1979) ........................................ 1, 2, 3, 11, 12, 13, 14, 15

*Thompson v. Fin. Registers, Inc.*
  CV–11–382–PHX–GMS, 2011 WL 5037028 (D. Ariz. Oct. 24, 2011) ...................... 11

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons
Local No. 395 Pension Trust Fund*
  201 Ariz. 474, 38 P.3d 12 (2002) ............................................... 3, 8, 13, 15

*Wojtunik v. Kealy*
  394 F. Supp. 2d 1149 (D. Ariz. 2005) ......................................................... 2, 14

## **Statutes**

Arizona Revised Statutes § 13-2317 ............................................................................4, 8

Arizona Revised Statutes § 44-1841 ................................................................................ 8

Arizona Revised Statutes § 44-1842 ................................................................................ 8

Arizona Revised Statutes § 44-1991 ................................................2, 8, 9, 10, 11, 12, 13

Arizona Revised Statutes § 44-1999 .............................................................................. 10

Arizona Revised Statutes § 44-2001 .............................................................................. 10

Arizona Revised Statutes § 44-2003 ................................................3, 6, 8, 9, 10, 12, 14, 15

Arizona Revised Statutes § 44-2005 .............................................................................. 10

Arizona Revised Statutes § 44-2082 ................................................................................ 9

1951 Ariz. Sess. Laws, ch. 18, § 20 (1st Reg. Sess.) ................................................ 12, 13

1996 Ariz. Sess. Laws, ch. 197, § 11(B) ................................................................... 14, 15

## **Other Authorities**

AZ Ethics Op. 08-02.......................................................................................................... 6

BRYAN A. GARNER, *Doublets, Triplets, and Synonym-Strings,*
    *in* GARNER ON LANGUAGE AND WRITING 313 (2009)................................................. 12

DAVID MELLINKOFF, THE LANGUAGE OF THE LAW 122 (1963) ....................................... 12

LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4468
    (3d rev. ed. 2004) ................................................................................................... 10

Richard C. Mason, *Civil Liability for Aiding and Abetting*, 61 BUS. LAW.
    1135 (2006).................................................................................................................2

Richard M. Weinroth et al., *Reformation of the Arizona Securities Act:*
    *A Brief Summary,* Ariz. Att'y, Sept. 1996. ............................................................... 8

1. **Introduction**

Quarles & Brady LLP's ("Quarles") Motion to Dismiss First Amended Complaint (Dkt. #294) ("D. Memo") requests dismissal of **only** the secondary liability—aiding and abetting—claims alleged by the Mortgages Ltd. ("ML") and Radical Bunny ("RB") Lead Plaintiffs in the First Amended Complaint (Dkt. #290) ("FAC").  The Motion to Dismiss is in substance a motion for reconsideration of the Court's 11/21/11 Order (Dkt. #289), *reprinted at Facciola v. Greenberg Traurig*, No. CV-10-1025-PHX-FJM, 2011 WL 5833785, at *3 (D. Ariz. Nov. 21, 2011), which held that these claims were properly pleaded.  *See id.* (Dkt. # 289), at 5:11-13 (holding that the FAC sufficiently pleads both the RB and ML aiding-and-abetting claims).

Quarles' motion makes no attempt to meet the standard required for reconsideration.  Instead, it improperly asks the court to rethink its analysis.  *See In re Zicam Cold Remedy Mktg., Sales Practices, and Prods. Liability Litig.*, No. 09-md-2096-PHX-FJM, 2011 WL 977604, at *1 (D. Ariz. Mar. 18, 2011) (denying reconsideration for this reason).  Nowhere does Quarles identify newly discovered evidence, clear error, or a change in controlling law that justifies reconsideration.  *See id.* (summarizing the "highly unusual circumstances" that justify reconsideration).  Far from making the required showing, Quarles offers arguments squarely contradicted by Arizona case law, legislative history, and the statutory structure of the Arizona Securities Act ("ASA").  For these reasons, Quarles' motion should be denied.

2. **ML Investors' secondary liability claims are properly pleaded.**

As early as 1975, Arizona's Court of Appeals set the stage for aiding-and-abetting liability by holding that a defendant who "actively aid[s]" securities fraud may be jointly liable with the seller.  *See Geiler v. Tanner*, 24 Ariz. App. 266, 267, 537 P.2d 994, 995 (Ct. App. 1975).  Four years later, in *State v. Superior Ct.* (*"Davis"*),[1] 123

---

[1]   The underlying action was a class action entitled *Davis v. State of Arizona*.  *Id.* at 327, 599 P.2d at 780.

Ariz. 324, 599 P.2d 777 (1979), *overruled in part on other grounds by State v. Gunnison,* 127 Ariz. 110, 618 P.2d 604 (1980), the Arizona Supreme Court addressed aiding and abetting more formally. *Davis* became then and "stands [today] as the law currently controlling" secondary liability for aiding and abetting securities fraud under A.R.S. § 44-1991(A). *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005). Last year, in *Grand v. Nacchio* ("*Grand II*"), 225 Ariz. 171, 236 P.3d 398 (2010), the Arizona Supreme Court (a) cited *Wojtunik*, (b) quoted the 3-element *Davis* test, and (c) declined to modify *Davis*. 225 Ariz. at 176-77 ¶¶ 30-31, 236 P.3d at 403-04.

In its order denying Quarles' first motion to dismiss, this Court confirmed its earlier ruling that *Davis* remains controlling Arizona law for aiding-and-abetting liability under the ASA. *See* 06/09/11 Order (Dkt. #200), at 14-15, *reprinted at Facciola v. Greenberg Traurig*, No. CV-10-1025-PHX-FJM, 2011 WL 2268950, at *9 (D. Ariz. June 9, 2011) (recognizing the binding effect of *Davis* and explaining that "we are not free to develop state law based on the predictive effect of changes in federal law"); *accord* 03/31/11 Order (Dkt. #160) at 14, *reprinted at Facciola v. Greenberg Traurig*, 781 F. Supp. 2d 913, 924 (D. Ariz. 2011). The Court's rulings are especially appropriate in view of the robust tradition of aiding-and-abetting liability under state securities laws. *See* Richard C. Mason, *Civil Liability for Aiding and Abetting*, 61 Bus. Law. 1135, 1136-37 (2006) (explaining that despite *Central Bank of Denver, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), "claims of aiding and abetting, in areas such as breach of fiduciary duty, commercial fraud, and state securities law, steadily have increased").

Despite the rulings in *Geiler, Davis*, *Wojtunik,* and this case, Quarles asks the Court to rewrite Arizona's law of aiding and abetting to add a fourth element, requiring the defendant's personal or close involvement in a particular sale. For its argument, Quarles provides the Court with no case authority other than *Standard Chartered PLC v. PriceWaterhouse,* 190 Ariz. 6, 945 P.2d 317 (Ct. App. 1996), which was not a secondary liability case and which the Court fully considered and discussed in its two earlier decisions. D. Memo, at 5:13-18.

This proposed fourth element is, as this Court implicitly recognized, contrary to the three-element test articulated in *Davis* and *Grand II*.  Beyond that, the proposed fourth element would (1) conflate secondary liability into a form of primary liability based on A.R.S. § 44-2003(A); (2) ignore statutory amendments that clarify that all violators of § 44-1991(A)—not just those listed in § 44-2003(A)—are civilly liable; and (3) ignore *Grand II*'s holding to the same effect.  *See infra* at pp. 6-15.  In sum, to do what Quarles asks, the Court would have to make sweeping predictions about changes in Arizona law that federal courts consistently eschew; a step this Court has explicitly refused to take on two prior occasions. *See supra* at pp. 2:12-17.

A.   **Mortgages Ltd. and Radical Bunny jointly perpetrated a Ponzi scheme with Quarles' help.**

Under the first and third elements of *Davis*, the plaintiff must show a primary violation and substantial assistance to the underlying scheme by the person charged. *Grand II*, 225 Ariz. at 176-77 ¶ 30, 236 P.3d at 403-04 (*quoting Davis*, 123 Ariz. at 331-32, 599 P.2d at 784-85).  "With respect to the 'substantial assistance' prong, 'the test is whether the assistance makes it 'easier' for the violation to occur, not whether the assistance was necessary.'" 11/21/11 Order (Dkt. #289), at 5:8-10 (citing *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 489, ¶ 54 38 P.3d 12, 27 (2002)).

In this case, the primary violation was a Ponzi scheme perpetrated by two insolvent companies that collapsed in bankruptcy when Scott Coles' death exposed the scheme.  FAC ¶¶55-83.  ML and RB operated as a common enterprise in which ML issued promissory notes to RB in return for money that ML used to capitalize its business.  *Id.* ¶¶60-72.  Through Radical Bunny, nearly $200 million in ML notes were syndicated and sold to RB investors through false representations that the investments were secured.  *Id.* ¶¶10, 265, 305.  In reality, there was no security.  *Id.* ¶265.  The $200 million was critical to ML's survival because ML was insolvent and operating a Ponzi scheme during the period it was issuing the notes.  *Id.* ¶351.  (RB was itself operating a

Ponzi scheme within the ML Ponzi scheme, for RB had no business other than raising money and loaning it to ML.  Because ML never made principal payments on the notes, RB's ability to meet redemption requests from new investors was entirely dependent on its ability to raise more money from new RB investors.  *Id.* ¶349.)

Throughout the proposed class period, RB operated as an unlicensed securities dealer for ML in selling nonexempt, unregistered note participations that funded ML's operations and were, as the SEC found, critical to ML's financial survival.  FAC ¶¶73-83, 123-26.  The full $200 million (less fees to RB's promoters) was transferred to ML.  *Id.* ¶¶10, 265, 305.  Lawyers from both Quarles and Greenberg concluded in 2006 (as to Greenberg) and early 2007 (as to Quarles) that RB was raising the money through criminal securities violations.  *Id.* ¶¶145-69.  Kant from Greenberg told Hirsch and three Quarles lawyers that Hirsch could go to jail for the securities violations RB was committing.  *Id.* ¶¶ 23, 128, 174, 198.  Left unsaid, but equally obvious, was that ML was committing its own crimes by accepting the proceeds of RB's crimes: none of the Defendants' *four* legal experts disputes that ML's acceptance of the illegally raised funds constitutes money laundering under A.R.S. § 13-2317(B)(1).  They merely say that no one has been indicted for money laundering.  Scott Coles, of course, is dead and not subject to indictment.

Independently, Quarles partner Christian Hoffman claims he told Hirsch and his partners in no uncertain terms that they were violating the securities laws and that they needed criminal counsel.  *Id.* ¶¶90, 165, 320-22.  Hoffmann says he offered to recommend a criminal attorney.  *Id.* ¶¶320-22.  At the same time, Hoffmann recognized that no compliant offering could ever be made without making disclosure and offering rescission to the existing investors, something RB refused to do.  *Id.* ¶¶320-27.

Despite knowledge that crimes were occurring and that the funds were being laundered, Quarles continued representing RB for over a year after Hoffmann says he identified the illegal sales (i.e., from May 2, 2007 to June 2008, when Quarles withdrew).  FAC ¶¶156-86.  During this period, Quarles attorneys provided RB with the

advice needed to continue its tainted relationship with ML and with RB's investors.  For example, in August 2007, three Quarles attorneys attended a meeting with Kant and ML's officers in which the ongoing securities crimes and mounting debt to Radical Bunny were discussed.  *Id.* ¶¶174-77, 279, 352-58.  It was clear at that point that neither RB nor ML had the funds to make the required rescissionary offering, even if either were willing to do so.  *Id.* ¶356. Shortly afterward, the Quarles attorneys received a copy of a new ML-to-RB promissory note showing another $6.8 million had been loaned to ML.  *Id.* ¶364.  At about the same time, Quarles attorneys Bornhoft and Moya learned that RB had raised and was raising money without telling RB's investors that ML could pay the notes by assigning deeds of trust rather than paying in cash.  *Id.* ¶¶299-302.  Moya expressed doubt that payment in kind "jived," to use Moya's word, with what any investor expected.  *Id.* ¶301.[2]  In the meantime, Quarles prepared short-form disclosure documents—the so-called "interim" documents—that it told RB to begin using "right away."  *Id.* ¶¶328-51.

Although Quarles knew that RB was continuing to raise money for ML, Quarles declined to withdraw in the face of the ongoing criminal violations that were defrauding ML and RB investors; declined to notify securities regulators; and prepared temporary disclosure documents to be used "right away" to raise more money for ML.  These temporary documents did not disclose the securities violations that exposed ML and RB to regulatory shutdowns and hundreds of millions of dollars in contingent liabilities.  *Id.* ¶ 346.  Thus, rather than do what was ethically mandatory, Quarles helped ML create a façade of solvency through millions of dollars in criminally raised money.  In this way, Quarles made it easier for ML and RB to continue operating as a team to fund ML's operations with the laundered proceeds of criminal violations that Quarles knew were

---

[2] The e-mail with this statement, *see* Exhibit A, was destroyed under Quarles' 60-day automatic deletion policy.   See further discussion *infra* at 6:5-15.   A copy of the Bornhoft-Moya e-mail exchange was obtained through Berta Walder, one of Hirsch's partners.

not disclosed to either ML or RB investors.  *See* 11/21/11 Order (Dkt. #289), at 5 (finding that the FAC adequately pleaded the facts making the fraud "easier" that are needed for substantial assistance).

Beyond all this, discovery now shows that during 2007 Quarles implemented an e-mail policy under which e-mails were ***automatically deleted and permanently purged*** without a backup system through which retrieval was possible.  *See* e-mail from Quarles defense attorney Roman Darmer to SEC attorney David Brown describing the deletion policy (copy attached as Exhibit B).  As a result, e-mails that were not printed as a file copy or independently archived by an attorney have been irreplaceably destroyed.  *See id.*  Thus, only a handful of e-mails written by Hoffmann in 2007 still exist, and Quarles defense attorneys told the SEC that Bornhoft cannot produce e-mail earlier than October 5, 2007.  *See id.*  This deletion policy constitutes planned spoliation that is (a) unethical under Arizona's ethics rules and (b) violates Quarles' representations in its own engagement letter with Radical Bunny.[3]

**B.    Quarles is attempting to rewrite the law of aiding and abetting.**

Quarles contends that to be liable to the ML investors for aiding and abetting, the secondary defendant—the one aiding and abetting—must not only have made the fraud easier, but also have been directly involved in the unlawful sales to investors.  D. Memo, at 5:19-22, 6:19-22 & 7:2-3.  This purported "involvement-in-the-sale" requirement supposedly arises from *Standard Chartered*'s interpretation of A.R.S. § 44-2003.  *Id.* at 5:13-18.  But *Standard Chartered* was not an aiding-and-abetting case.  *Standard Chartered* was a bank-to-bank sale in which the court interpreted the elements of ***primary*** liability under § 44-2003(A).  Not a word about aiding and abetting appears in

---

[3] *See* AZ Ethics Op. 08-02 (explaining the normal 5-year retention policy; noting that a client's file includes "both paper and electronic documents;" and concluding that it is unethical to purge documents that the lawyer believes are nonessential or immaterial without client consent); Exhibit C ¶ 2 (Quarles' engagement letter with RB representing that RB's file will be preserved throughout the engagement and reserving the right to destroy documents only after the engagement is terminated).

*Standard Chartered*.

Rather, as this Court held, secondary liability for aiding and abetting exists if a defendant makes a fraud easier by assisting an ongoing scheme.  *See* 11/21/11 Order (Dkt. #289), at 5.  That is exactly what Quarles did when it worked with Greenberg to develop ways to retain the tainted funds, including preparing a POM ghosted by Kant, while preparing temporary sales documents with misleading disclosures to be used "right away" to solicit new investors, whose money provided the liquidity that the insolvent ML needed to hide its Ponzi scheme.  FAC ¶¶328-51, 377-84.  By doing these things, Quarles helped conceal the continuing securities violations from both ML and RB investors; helped ML stay afloat; and helped ML continue selling more fraud-ridden securities to ML's investors.  In all these ways, Quarles aided ML's fraud and made it easier for ML to continue selling its securities without disclosing the RB's securities violations that financed ML.

Moreover, Hoffmann questioned the possibility of a Ponzi scheme from the start (FAC ¶263) and knew that both ML and RB were continuing to violate the securities laws by using RB as an unregistered dealer to sell nonexempt securities to fund ML's illegal operations.  *See id.* ¶¶168-99, 264-269 311-84.  And discovery has shown that, as early as March 27, 2007, Bornhoft told Quarles attorney Katea Ravega that "criminal securities violations" had occurred.  See Ex. D (Ravega Dep. at 97); Ex. E (Ravega notes of conversation with Bornhoft about RB noting "criminal securities violations").  By continuing to guide RB's ongoing crimes rather than withdraw as ethically required, Quarles made ML's fraud easier and substantially contributed to the criminal venture forged between RB and ML.

This conduct readily amounts to actionable aiding and abetting under Arizona law.  No Arizona case has required personal involvement in an issuer or seller's sales for aiding and abetting liability.  In fact, Arizona cases like *Geiler* and *Barnes* (discussed below) show that no such involvement in the sale is required.  Nor for that matter has any state or federal decision imposed the fourth element proposed by Quarles.

C.     **Quarles' test for aiding and abetting would erode, if not conflate, the difference between primary and secondary liability.**

According to Quarles, aiding-and-abetting liability exists only if the defendant's aid involves the defendant in making, inducing, or participating in the sale.  In other words, Quarles argues that the secondary violator—the aider-and-abettor—must also be a primary violator under § 44-2003.

In this case, as in most, the primary violators are the sellers—RB and ML, who teamed to issue the securities.  The crux of aiding and abetting—what distinguishes it from primary liability—is scienter.  *See Wells Fargo,* 201 Ariz. at 485 ¶ 33, 38 P.3d at 23.  It is Quarles' ***knowing*** assistance in ML's and RB's ongoing securities registration and fraud violations under § 44-1841 (registration of securities), § 44-1842 (registration of dealers), § 13-2317(B) (money laundering) and § 44-1991(fraud) that renders it liable as an aider and abettor.

If Quarles' view of aiding and abetting was correct, persons who aid and abet would not only have to be primary violators, but they would also have to be persons who act with scienter—a requirement that this court and others have held does not exist for primary liability under either subsection (A)(2) or (A)(3) of 44-1991(A).  *See* 6/09/11 Order (Dkt. #200), at 5; *Allstate Life Ins. Co. v. Robert W. Baird Co., Inc.*, 756 F. Supp. 2d 1113, 1159 (D. Ariz. 2010).

D.     **The portion of *Standard Chartered* on which Quarles relies is obsolete.**

In 1996, the same year that *Standard Chartered* was decided, the legislature reformed the ASA with numerous amendments.[4]  Through these statutory reforms, the legislature rendered obsolete the part of *Standard Chartered* asserting that § 44-2003(A) narrows the persons who can be sued for violations of § 44-1991(A).  When *Standard Chartered* was tried and briefed, the ASA did not explicitly recognize a private action

---

[4] *See* Richard M. Weinroth et al., *Reformation of the Arizona Securities Act:  A Brief Summary,* Ariz. Att'y, Sept. 1996, at 25.

under § 44-1991.  The *Standard Chartered* panel made the point that the legislature could easily have done that if it wanted.  *See* 190 Ariz. at 22, 945 P.2d at 333.  Because the legislature had not done so, *Standard Chartered* adopted an interpretation that narrowed the persons who could be sued for § 44-1991(A) violations to those persons listed in § 44-2003(A).  *See id.*  But then the legislature did act: the version of the statutes that *Standard Chartered* interpreted changed when the 1996 amendments went into effect.  In six provisions, the new statutes explicitly recognize that § 44-1991 itself creates a private right of action.  *See* A.R.S. §§ 44-1991(B), 44-2003(P)(1), 44-2082(A), (B), (C) & (E) (all referring to the existence of a private action under § 44-1991).  Through the 1996 legislative reforms, the narrowing interpretation that *Standard Chartered* adopted was legislatively rendered obsolete.

In *Grand II*, the Supreme Court likewise abandoned a narrowing interpretation.  The *Standard Chartered* court expressed concern that another construction of the ASA "might *sweep* within the statute" collateral actors who only acted to foreseeably contribute to or influence a sale.  *Standard Chartered*, 190 Ariz. at 21, 945 P.2d at 332 (emphasis added).  The Supreme Court in *Grand II* did not share this concern.  Citing the statement of legislative intent (also quoted *infra* note 7), which *Standard Chartered* seems to have been unaware of, the Supreme Court recognized that § 44-1991 provides a cause of action for its "violations" and described the statute and its remedies as "broad," "sweeping," "remedial measure[s]" that are to be "liberally construed." *Grand II,* 225 Ariz. at 174 ¶¶ 12, 16-17, 236 P.3d at 401.  The Supreme Court adopted the very word— *sweep*—that *Standard Chartered* used to narrow the statute.  Because the statute and its remedies are "sweeping" remedial measures, any concern that it would "sweep" too broadly was simply unfounded.

In sum, *Standard Chartered*'s dictum about § 44-2003(A) was legislatively reformed by the 1996 amendments and abandoned by the broader, all-inclusive interpretation of § 44-1991(A) liability rendered in *Grand II*.  After the 1996 amendments and *Grand II*, the argument that remedies for violations of § 44-1991 are in

any way narrowed by § 44-2003(A) is invalid.  Remedies exist for all violations of § 44-1991(A).

**3.    Even before *Standard Chartered*, Arizona's courts accepted secondary theories of liability that did not depend on § 44-2003(A).**

*Grand II* recognized that § 44-2003(A) speaks in "broad terms" that extend § 44-2001(A)'s rescissionary remedy to nonsellers.  *Grand II*, 225 Ariz. at 174 ¶ 17, 236 P.3d at 401.  And through § 44-2005,[5] common-law doctrines like respondeat superior, aiding and abetting, and conspiracy supplement the control liability (§ 44-1999) and extended-primary liability (§ 44-2003(A)) provisions in Arizona's securities laws.  *Cf.* LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4468 (3d rev. ed. 2004) (describing the savings clauses in the 1933 and 1934 Acts—on which A.R.S. § 44-2005 was modeled—as "aimed at ***extending*** liability" by preserving common-law secondary liability (emphasis in original)).

This is shown by a series of Arizona securities fraud cases recognizing liability on the basis of indirect or secondary theories of liability without mentioning or requiring any § 44-2003(A) sale nexus.

**A.    Respondeat superior**

An employer who has no role in making, inducing, or participating in a sale may still be secondarily liable for securities fraud under respondeat superior.  The point is illustrated by *Geiler v. Tanner*, 24 Ariz. App. 266, 537 P.2d 994 (App. 1975).  In *Geiler*, a defrauded seller sued his bank and the Tanner family for securities fraud.  *Id.* at 267-68, 537 P.2d at 995-96.  The bank had no role in the sale.  *Id.* at 271-72, 537 P.2d at 999-1000.  But according to the complaint, a bank manager actively aided the Tanners' fraud.  *Id.*  Although respondeat superior is nowhere mentioned in the ASA, the Court of Appeals had no trouble concluding that "the bank may well be liable on basic agency

---

[5]    A.R.S. § 44-2005 states, "Nothing in this article shall limit any statutory or common law right of any person in any court for any act involved in the sale of securities."

principals." *Id*. at 272, 537 P.2d at 1000.

### B.    Aiding and abetting

Like respondeat superior, aiding and abetting is a centuries old common-law doctrine.  The Supreme Court in *Davis* specifically allowed the plaintiffs to plead an alternative count for aiding and abetting (Count II) in addition to the claim for primary securities fraud (Count I).  123 Ariz. at 331-32, 599 P.2d at 784-85.  The aider and abettors were held potentially liable as principals just as an employer would be liable as a principal under agency law.  *See id.*

*Davis* is but one of many examples that show Quarles misses the mark in asserting that overlapping or alternative claims may not be pleaded in securities litigation.  That is precisely what the legislature intended when it preserved nonsecurities doctrines like respondeat superior and consumer fraud to complement the ASA.  *See, e.g., State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 592, 667 P.2d 1304, 1307 (1983) ("the legislature intended the consumer fraud act to provide an additional avenue of relief to those aggrieved by securities act violations.").

Quarles' citation to *Thompson v. Fin. Registers, Inc.*, CV–11–382–PHX–GMS, 2011 WL 5037028, at *3 (D. Ariz. Oct. 24, 2011), a non-securities case involving the allegation of genuinely duplicative claims, is beside the point.  All *Thompson* holds is that, to the extent a second count repeated the same factual basis for liability as the first count, the second count was unneeded.  *Id.*  To the extent, on the other hand, that the second count pleaded an alternative theory—breach of contract—the *Thompson* court implicitly recognized that was proper.  The problem with the alternative contact theory in *Thompson* was not duplication but that the statute of limitations barred the contract claim.

### C.    Actively aiding securities fraud

Four years before *Davis*, the Court of Appeals held that a bank and "respected lawyer" that provided "active aid" to a seller's securities fraud could be liable under § 44-1991.  *Geiler*, 24 Ariz. App. at 267-68 & 270-71, 537 P.2d at 995-96 & 998-99

1   (describing the active aid and respectability that a bank and lawyer provided as a

2   reasonable jury view of the facts that made the securities scheme possible).  This is a

3   pre-*Davis* example of Arizona's recognition of aiding and abetting and shows that the

4   aid that is required for liability is aiding the underlying scheme, not aiding the sale.[6]

5       **D.    Indirectly facilitating fraud**

6       The Supreme Court's decision in *Barnes v. Vozak,* 113 Ariz. 269, 550 P.2d 1076

7   (1976) is yet another decision that shows that § 44-1991 creates civil liability even if the

8   defendant is not involved in the sale.  In *Barnes*, three defendants who ran a company

9   whose stock was sold to the plaintiff were held liable even though they never spoke to or

10  met the plaintiff.  *Id*. at 273-74, 550 P.2d at 1074-75.  The stock was sold by a salesman

11  who was held directly liable to the plaintiff.  *Id*.  But without mentioning § 44-2003, and

12  despite the lack of contact between the plaintiff and the three nonseller defendants, the

13  Supreme Court held that the three men were liable under § 44-1991 because they

14  "indirectly sold stock to" the plaintiff.  *Id*. at 274, 550 P.2d at 1075.

15      To recap, then, § 44-2003(A) does not narrow secondary liability for § 44-

16  1991(A) violations.  The part of *Standard Chartered* adopting a narrowing interpretation

17  was a doubtful reading from the start, as that restrictive interpretation of § 44-1991

18  reduced public protection despite the legislature's direction to avoid narrow or restricted

19  interpretations.[7]  *Compare Grand II*, 225 Ariz. at 174 ¶ 16, 236 P.3d at 401 (quoting the

20

21  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [6]  The linguistic history of *aid and abet* in legal language shows that to *aid* fraud is

22  equivalent to *aiding and abetting*.  *Aid and abet* are old French synonyms that illustrate
    the law's history of doubling and tripling words when one would do.  *See* DAVID

23  MELLINKOFF, THE LANGUAGE OF THE LAW 122 (1963); *see also* Bryan A. Garner,
    *Doublets, Triplets, and Synonym-Strings, in* GARNER ON LANGUAGE AND WRITING 313,

24  316 (2009) (listing *aid and abet* as an example of the alliteration tradition in legal
    language).  Historically, therefore, a distinction between aiding fraud and aiding and

25  abetting fraud does not exist.  *Abet* is just an alliterative synonym for *aid* that shows the
    historic practice of doubling synonyms.

26  [7]  Section 20 of the 1951 Securities Act provides:

27

28          Sec. 20. INTENT AND CONSTRUCTION. The intent and purpose of this
            Act is for the protection of the public, the preservation of fair and equitable
            business practices, the suppression of fraudulent or deceptive practices in

                                          12

1   legislature's statement of intent and stating that the act should be liberally construed),

2   *and Eastern Vanguard Forex, Ltd. v. Arizona Corporation Commission*, 206 Ariz. 399,

3   411 ¶ 41, 79 P.3d 86, 98 (Ct. App. 2003) (similar).  Beyond this, *Standard Chartered*'s

4   assertion that § 44-1991 does not itself create a direct private action for § 44-1991(A)

5   was rendered obsolete by the 1996 legislative amendments explicitly acknowledging

6   that § 44-1991 creates the private action *Standard Chartered* said did not exist.

7        Finally, *Standard Chartered* has nothing to do with aiding and abetting.  *Geiler*'s

8   "active aid" standard and the later *Davis*, *Wells Fargo,* and *Grand II* formulations of

9   aiding and abetting stand instead as the law in Arizona.

10  **4.      RB Investors' secondary liability claims are properly pleaded.**

11       Quarles' contention that the RB Investor Plaintiffs' secondary liability claim must

12  be dismissed as "entirely duplicative" of their primary liability claim is equally

13  meritless.   As shown above, Arizona case law supports distinct secondary-liability

14  claims for aiding and abetting primary violations of the ASA.  Three times the Court has

15  recognized as much.  03/31/11 Order (Dkt. #160), at 14 (rejecting argument that aiding

16  and abetting securities fraud is not a cognizable claim under Arizona law); 06/09/11

17  Order (Dkt. #200), at 14 (same); 11/21/11 Order (Dkt. # 289) at 4-5 (same).  Moreover,

18  the requisite assistance of the alleged aider and abettor need not relate to any particular

19  securities sale transaction (as it must for primary liability), but rather "to the underlying

20  scheme" of the primary violator.  *Davis*, 123 Ariz. at 331, 599 P.2d at 784.  The RB

21  Lead Plaintiffs here have sufficiently alleged all three elements of aiding and abetting

22  liability under *Davis*: (1) the primary violations of unregistered securities sales and

23

24  _____

25        the sale or purchase of securities, and the prosecution of persons engaged in
      fraudulent or deceptive practices in the sale or purchase of securities. This
26        Act shall not be given a narrow or restricted interpretation or construction,
      but shall be liberally construed as a remedial measure in order not to defeat
27        the purpose thereof.

28  1951 Ariz. Sess. Laws ch. 18, § 26 (1st Reg. Sess.).

13

securities fraud by RB and ML, (2) Quarles' knowledge of those violations, and (3) Quarles' contribution making easier "the underlying scheme." *Id.*

As to the RB Investors, Quarles nevertheless first argues that common law aiding and abetting liability has somehow been preempted by the ASA. D. Memo, at 12:3-22 (arguing that the ASA itself provides for "a form of" aiding and abetting liability). But this argument is directly contradicted by the legislative history of ASA. In fact, the Arizona Legislature expressly disavowed any such intent when it amended the ASA after *Geiler* and *Davis* in 1996: "Nothing **in this act** . . . determines whether or in what circumstances aiding and abetting liability exists under Title 44, chapter 12, Arizona Revised Statutes…." 1996 Ariz. Sess. Laws, ch. 197, § 11(B) (emphasis added). Nor has any court accepted the implied preemption argument that Quarles advances; to the contrary, as shown above, courts within Arizona have acknowledged the continued viability of secondary ASA liability under Arizona law, independent of any statutory provision. *Davis,* 123 Ariz. at 331, 599 P.2d at 784; *Wojtunik,* 394 F.Supp.2d at 1170 (recognizing distinct count for aiding and abetting liability under the ASA).

To make its argument, Quarles incorrectly divides extended ***primary*** liability under § 44-2003 (i.e., for those defendants who "made, participated in or induced" the sale) into two categories: (a) ***primary*** liability limited to those who "made" a sale and (b) ***secondary*** liability limited to those who "participated in or induced" a sale. D. Memo, at 12:3-22. This novel analysis is again directly repudiated by (1) the legislative history of the ASA quoted above (disavowing any legislative intent to affect common law aiding and abetting liability), and (2) the Arizona Supreme Court's analysis in *Grand II*, wherein it expressly recognized "participation" liability under § 44-2003 to be a form of ***primary*** liability, not secondary liability. *See* 225 Ariz. at 177 ¶ 31, 236 P.3d at 404.[8]

---

[8] Even if aiding and abetting liability were intended to be encompassed within the ASA, there is no reason the scope of such secondary liability would be anything less than the scope of such liability under existing Arizona common law standards, given the liberal construction to be given the ASA in light of its remedial purpose and the "sweeping language of inclusion" found in Section 2003. *Grand II*, 225 Ariz. at 174-75 ¶¶16 & 18, 236 P.3d at 401-02.

Quarles' fallback argument is that even if a claim for aiding and abetting statutory securities fraud exists outside the ASA (as controlling Arizona law currently holds), then the RB Plaintiffs' secondary claim must still be dismissed as duplicative of their primary liability claim. D. Memo, at 12:25-14:6.  Quarles again cites no authority in support of a complete conflation of primary and secondary liability.  *Compare Davis*, 123 Ariz. at 330-32, 599 P.2d at 783-85 (affirming refusal of trial court to dismiss separate counts for ASA primary liability and for ASA secondary aiding and abetting liability).  Quarles' contention is instead premised on the same untenable notion that the elements of primary liability under § 44-2003 somehow define and narrow secondary liability for ASA violations.  But if anything, the legislature left *Davis* intact.[9]  And for its part, *Davis* (and *Geiler* too) makes clear that aiding and abetting liability is not limited to those who assist in a given fraudulent sales transaction, but rather extends to those who, knowing of the primary violation, contribute "to the underlying scheme" of the primary violator. *Davis*, 123 Ariz. at 331-32, 599 P.2d at 784-85; *accord,* 11/21/11 Order (Dkt. #289), at 5:7-8 ("Plaintiffs must show that Quarles 'knew' about or was 'generally aware of the fraudulent scheme.'"); *accord*, 06/09/11 Order (Dkt. #200), at 14-15 (a "general awareness of the fraudulent scheme" is enough to satisfy the Arizona standard) (citing *Wells Fargo*, 201 Ariz. at 488 ¶ 45, 38 P.3d at 26).  The RB Plaintiffs have amply alleged Quarles' ***actual*** knowledge of the ***entire*** underlying scheme to keep the Ponzi scheme that was ML afloat through (a) the retention and laundering of RB's illegally raised funds (FAC ¶¶352-358), (b) continued illegal fundraising by RB (FAC ¶¶364-84) and (c) continued illegal fundraising from ML investors without disclosure of ML's dependence on the illegally raised RB funds (FAC ¶¶ 187-191).

---

[9]  The initial draft of Senate Bill 1383, which led to the final legislation, would have eliminated liability for aiding and abetting in civil damage actions. S.B. 1383, § 10, 42d Leg., 2d Reg. Sess.  (Ariz. 1996).  In the final bill, this proposal was itself eliminated. As passed, the statutory note to 1996 amendments provides that "[n]othing in this act . . . determines whether or in what circumstances aiding and abetting liability exists . . . ." 1996 Ariz. Sess. Laws, ch. 197, § 11(B)

1

## 5.      Conclusion

2

Quarles is attempting to rewrite Arizona's law on aiding and abetting under the

3

ASA.   Its motion ignores the standards for reconsideration and does not articulate a

4

proper basis for reconsideration of the Court's decision allowing the secondary liability

5

claims of both the ML investors and the RB investors to proceed.  The motion to dismiss

6

should be denied in its entirety.

7

Dated:  December 22, 2011.                    BONNETT, FAIRBOURN, FRIEDMAN

8                                                                       & BALINT, P.C.

9                                                              /s/ *Andrew S. Friedman*

10                                                             Andrew S. Friedman
                                                                   Bonnett, Fairbourn, Friedman

11                                                              & Balint, P.C.
                                                                   2901 N. Central Avenue, Suite 1000

12                                                             Phoenix, AZ  85012

13                                                             *Attorneys for Plaintiffs Fred C. Hagel and*
                                                                   *Jacqueline M. Hagel Revocable Living Trust*

14                                                             *Dated March 15, 1995; Judith A. Baker*

15                                                             TIFFANY & BOSCO, P.A.

16

17                                                              /s/ *Richard G. Himelrick  with permission*
                                                                   Richard G. Himelrick

18                                                             J. James Christian
                                                                   Third Floor Camelback Esplanade II

19                                                             2525 E. Camelback Road
                                                                   Phoenix, AZ  85016-4237

20                                                             *Attorneys for Plaintiffs Robert Facciola; The*

21                                                             *Robert Maurice Facciola Trust Dated*
                                                                   *December 2, 1994; Honeylou C. Reznik; The*

22                                                             *Morris Reznik and Honeylou C. Reznik Trust;*
                                                                   *Jewel Box Loan Company, Inc.; Jewel Box,*

23                                                             *Inc.; H-M Investments, LLC*

24

25

26

27

28

16

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_/s/ Andrew S. Friedman_
Andrew S. Friedman

#15283-1  492704